08 CV 3821

James A. Skarzynski (JS-1068)
James T. Sandnes (JS-8944)
Jill M. Levy (JL-6040)
BOUNDAS, SKARZYNSKI,
    WALSH & BLACK LLC
One Battery Park Plaza
New York, New York 10004
(212) 820-7700 (Telephone)
(212) 820-7740 (Facsimile)
jsandnes@bswb.com

Attorneys for XL Specialty Insurance Company

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

XL SPECIALTY INSURANCE COMPANY,

    Plaintiff,

   v.

JOHN D. AGOGLIA, PHILLIP R. BENNETT,
LEO R. BREITMAN, EDWIN L. COX,
SUKHMEET DHILLON, THOMAS H.
DITTMER, NATHAN GANTCHER, STEPHEN
GRADY, TONE GRANT, THOMAS HACKL,
DAVID V. HARKINS, SCOTT L. JAECKEL,
DENNIS A. KLEJNA, THOMAS H. LEE,
ERIC G. LIPOFF, SANTO C. MAGGIO,
PETER MCCARTHY, JOSEPH MURPHY,
FRANK MUTTERER, RONALD L. O'KELLEY,
RICHARD N. OUTRIDGE, SCOTT A.
SCHOEN, WILLIAM M. SEXTON, GERALD
SHERER, PHILIP SILVERMAN, AND
ROBERT C. TROSTEN,

    Defendants.

------------------------------------------------------------x



RECEIVED
APR 22 ?8
U.S.D.C. S.D. N.Y.
CASHIERS

UNASSIGNED

No. 08–CV–3821(UA)

ECF CASE

**JURY TRIAL DEMANDED**

## COMPLAINT FOR DECLARATORY JUDGMENT

1.     XL Specialty Insurance Company ("XL"), by and through its undersigned counsel, as and for its Complaint for Declaratory Judgment against defendants John D. Agoglia, Phillip R. Bennett, Leo R. Breitman, Edwin L. Cox, Sukhmeet Dhillon, Thomas H. Dittmer, Nathan Gantcher, Stephen Grady, Tone Grant, Thomas Hackl, David V. Harkins, Scott L. Jaeckel, Dennis A. Klejna, Thomas H. Lee, Eric G. Lipoff, Santo C. Maggio, Peter McCarthy, Joseph Murphy, Frank Mutterer, Ronald L. O'Kelley, Richard N. Outridge, Scott A. Schoen, William M. Sexton, Gerald Sherer, Philip Silverman, and Robert C. Trosten (collectively "Defendants"), allege as follows:

## NATURE OF ACTION

2.     XL issued a directors and officers management liability insurance policy number ELU089673-05 to Refco Inc. ("Refco") for the period of August 11, 2005 to August 11, 2006 (the "XL Policy"). XL issued the XL Policy in reliance on, among other things, the accuracy and integrity of the representations in the application and other materials and information that Refco provided to XL, as well as the important limitation on coverage created by Endorsement 13 (to the XL Policy (titled "Inverted Representation Endorsement" quoted and discussed in detail in ¶47 below), which provides that there is no coverage for any claims arising from facts, circumstances and situations known to any of the Defendants as of the inception of the XL Policy (the "IRE Limitation").

3.     The XL Policy incepted on August 11, 2005, on the same day Refco conducted its initial public offering. However, entirely unbeknownst to XL at that time,

Refco's directors and officers were engaged in a widespread and massive scheme to conceal hundreds of millions of dollars of uncollectible receivables, including $430 million owed to Refco by an off-balance sheet entity controlled by Refco Chairman, President and Chief Executive Officer Phillip R. Bennett ("Bennett"). As a result of the fraud and the misconduct, on October 17, 2005, Refco filed for Chapter 11 bankruptcy protection.

4.      In the wake of the collapse of Refco and the devastating financial losses to investors, numerous lawsuits and governmental and/or regulatory investigations and/or criminal actions were initiated against Refco and certain individuals, including the Defendants (the "Underlying Matters" as more fully defined below). The Underlying Matters allege, in part, that the Defendants engaged in a massive scheme in violation of federal securities laws and victimized the investing public.

5.      In connection with the Underlying Matters, three of Refco's highest executive officers, CEO Bennett, Vice President and Chief Financial Officer Robert C. Trosten ("Trosten") and CEO of Refco Securities and Refco Capital Markets, Santo C. Maggio ("Maggio") have pled guilty to various federal charges, including conspiracy, securities fraud, wire fraud, bank fraud and money laundering. As disclosed in the plea transcripts, all three officers, Bennett, Trosten and Maggio, were aware of, and actively sanctioned and participated in this scheme, beginning as early as 2004. In addition, on April 17, 2008, the former President of Refco Group Ltd. LLC, Tone Grant ("Grant"), was convicted by a jury, in this Court, of conspiracy, securities fraud, wire

fraud, bank fraud and money laundering arising out of the same wrongdoing to which Bennett, Trosten and Maggio confessed.

6.     The Defendants have sought coverage under the XL Policy in connection with the Underlying Matters.  XL has denied coverage for the Underlying Matters based on various terms and conditions in the XL Policy, including, *inter alia*, the IRE Limitation.  The IRE Limitation provides that there is no coverage for any Insured Person under the XL Policy for any claims arising out of any facts, situation or circumstances that were known to *any* Insured Person as of the inception of the insurance.

7.     The guilty pleas by Bennett, Trosten and Maggio, and Grant's conviction, definitively establish that Bennett, Trosten, Maggio and Grant had precisely the type of knowledge that vitiates coverage under the IRE Limitation for all Defendants.

8.     Accordingly, XL brings this action against the Defendants named herein to seek a declaration that the XL Policy affords no coverage for the Defendants in connection with the Underlying Matters.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship between the Plaintiff, on the one hand, and each of the Defendants, on the other hand, and the amount in controversy exceeds $75,000 exclusive of interest and costs.  The particulars of the citizenship of each of the Defendants are alleged in paragraphs 16 to 41 and XL is a Delaware corporation with its principal place of business in Connecticut.

4

10.     In the alternative, jurisdiction exists pursuant to 28 U.S.C. § 1367 because:

(1) the claims are so related to claims in *In re Refco, Inc. Securities Litigation*, No. 05-8626

(GEL)(S.D.N.Y.), over which this Court has original jurisdiction pursuant to 28 U.S.C. §

1331, that the claims are all part of the same case or controversy; or  (2) the claims are so

related to the claims in *Axis Reinsurance Co. v. Bennett, et al.*, No. 07-1712 (RDD)(Bankr.

S.D.N.Y), *Grant, et al. v. Axis Reinsurance Co.*, No. 07-2005 (RDD)(Bankr. S.D.N.Y.) and

*Axis Reinsurance Co., v. Bennett, et al.*, No. 07-07924 (GEL)(S.D.N.Y.) over which this

Court has jurisdiction pursuant to 28 U.S.C. § 1334(a) (inasmuch as this Court has

withdrawn the reference pursuant to 28 U.S.C. § 157(d)) that the claims are all part of

the same case or controversy.

11.     This Court also has *in personam* jurisdiction over the Defendants pursuant

to CPLR §§ 301 and 302.  Each of the Defendants is a former officer and/or director of a

Corporation with its principal place of business in New York, specifically Refco Inc. or

an affiliated company.  As such, each Defendant transacted business in New York or

otherwise engaged in a sufficient course of conduct in the State to make the exercise of

personal jurisdiction proper.

12.     Jurisdiction pursuant to § 302 is also proper because this action relates to

insurance coverage for a series of civil lawsuits and criminal Indictments (or

Informations) alleging that Defendants committed wrongful acts in the State of New

York and/or acts outside of New York that could reasonably be expected to have

consequences in the State.  One of the largest of those civil actions is a class action

pending before this Court (*In re Refco, Inc. Securities Litigation*, No. 05-8626 (GEL)).  The

criminal proceedings against various of the Defendants have likewise been conducted in this judicial district. The attorneys' fees for which the defendants have demanded advancement from XL are, therefore, being incurred primarily in New York. Similarly, any indemnification obligation would arise upon entry of the judgment by the Court in New York. Performance or non-performance of the contract of insurance in issue in this suit would, in turn, necessarily occur in New York with respect to those Underlying Matters.

13.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in New York and, in the alternative, at least one Defendant resides in the Southern District of New York.

14.    A declaratory judgment is authorized in this case by 28 U.S.C. § 2201.

**PARTIES**

15.    XL is an insurance company that is organized and exists pursuant to the laws of the state Delaware. XL has its principal place of business in Hartford, Connecticut.

16.    Defendant John D. Agoglia ("Agoglia") served as a senior vice president at Refco Securities, LLC, a subsidiary of Refco, Inc. at times relevant to this action. Upon information and belief, Agoglia is a citizen of New York.

17.    Bennett served as the Chairman, President and Chief Executive Officer of Refco until October 2005, when he took a leave of absence at the request of the Refco board of directors. Upon information and belief, Bennett is a citizen of New Jersey.

18.     Defendant Leo R. Breitman ("Breitman") served as a Director of Refco at times relevant to this action.  Upon information and belief, Breitman is a citizen of Florida.

19.     Defendant Edwin L. Cox ("Cox") served as a Director of Refco Group Ltd., LLC at times relevant to this action.  Upon information and belief, Cox is a citizen of Texas.

20.     Defendant Sukhmeet Dhillon ("Dhillon") served as Executive Vice President of Refco Group Ltd., LLC ("RGL") and as Executive Vice President of the entity that became Refco LLC, during times relevant to this complaint.  Upon information and belief, Dhillon is a citizen of California.

21.     Defendant Thomas H. Dittmer ("Dittmer") served as Chairman and Chief Executive Officer of Refco at times relevant to this action.  Upon information and belief, Dittmer is a citizen of Florida or Illinois.

22.     Defendant Nathan Gantcher ("Gantcher") served as a Director of Refco at times relevant to this action.  Upon information and belief, Gantcher is a citizen of New York.

23.     Defendant Stephen Grady ("Grady") was Chief Operating Officer of Refco Global Futures LLC, a Refco subsidiary, during times relevant to this action.  Upon information and belief, Grady is a citizen of New Jersey.

24.     Grant served as President of Refco Group Ltd., LLC at times relevant to this action.  Upon information and belief, Grant is a citizen of Illinois.

25.    Defendant Thomas Hackl ("Hackl") served as Executive Vice President of RGL at times relevant to this action.  Upon information and belief, Hackl is a citizen of Geneva, Switzerland.

26.    Defendant David V. Harkins ("Harkins") served as a Director of Refco at times relevant to this action.  Upon information and belief, Harkins is a citizen of Florida.

27.    Defendant Scott L. Jaeckel ("Jaeckel") served as a Director of Refco at times relevant to this action.  Upon information and belief, Jaeckel is a citizen of Massachusetts.

28.    Defendant Dennis A. Klejna ("Klejna") served as Executive Vice President and General Counsel of Refco Group Ltd., LLC at times relevant to this action.  Upon information and belief, Klejna is a citizen of New York.

29.    Defendant Thomas H. Lee ("Lee") served as a Director of Refco at times relevant to this action.  Upon information and belief, Lee is a citizen of New York.

30.    Defendant Eric G. Lipoff ("Lipoff") served as Executive Vice President of a Refco subsidiary at times relevant to this action.  Upon information and belief, Lipoff is a citizen of California.

31.    Maggio served as an Executive Vice President of Refco and as President and Chief Executive Officer of Refco Securities, LLC and Refco Capital Markets, Ltd. at times relevant to this action.  Upon information and belief, Maggio is a citizen of Florida.

32.    Defendant Peter McCarthy ("McCarthy") served as Executive Vice-president of Refco Securities at times relevant to this action. Upon information and belief, McCarthy is a citizen of New York.

33.    Defendant Joseph Murphy ("Murphy") served as President of Refco from October 2005 to November 28, 2005, when he resigned. Murphy also served as Chief Executive Officer of Refco Global Futures and President of Refco, LLC at times relevant to this action. Upon information and belief, Murphy is a citizen of New Jersey.

34.    Defendant Frank Mutterer ("Mutterer") served as Controller of Refco Group Ltd., LLC, during times relevant to this action. Upon information and belief, Mutterer is a citizen of New Jersey.

35.    Defendant Ronald L. O'Kelley ("O'Kelley") served as a Director of Refco at times relevant to this action. Upon information and belief, O'Kelley is a citizen of Florida.

36.    Defendant Richard N. Outridge ("Outridge") served as Chief Financial Officer of Refco Capital Management at times relevant to this action. Upon information and belief, Outridge is a citizen of Pennsylvania.

37.    Defendant Scott A. Schoen ("Schoen") served as a Director of Refco at times relevant to this action. Upon information and belief, Schoen is a citizen of Massachusetts.

38.    Defendant William M. Sexton ("Sexton") served as Executive Vice President and Chief Operating Officer of Refco at times relevant to this action. Upon information and belief, Sexton is a citizen of New York.

39.     Defendant Gerald Sherer ("Sherer") served as Executive Vice President and Chief Financial Officer of Refco at times relevant to this action.  Upon information and belief, Sherer is a citizen of New York.

40.     Defendant Philip Silverman ("Silverman") served as Secretary of Refco at times relevant to this action.  Upon information and belief, Silverman is a citizen of New Jersey.

41.     Trosten served as Executive Vice President and Chief Financial Officer of Refco Group Ltd., LLC at times relevant to this action.  Upon information and belief, Trosten is a citizen of Florida.

## FACTUAL ALLEGATIONS

### The XL Policy

42.     The XL Policy is a directors and officers management liability policy with a policy period of August 11, 2005 to August 11, 2006 and a limit of $20 million.  A true and correct copy of the XL Policy is attached hereto as Exhibit A.  The XL Policy provides coverage to directors and officers for non-indemnifiable claims in excess of any other insurance program maintained by Refco, including an underlying program of insurance providing $50 million of directors' and officers' management liability insurance.[1]

43.     Various other insurers issued that $50 million in underlying directors, officers and corporate liability insurance policies to Refco.  U.S. Specialty Insurance

---

[1] XL seeks a declaration of no coverage for the Underlying Matters under the XL Policy.  To the extent one or more of the Underlying Matters may have been also noticed under any other XL policy of insurance, XL hereby reserves all of its rights and defenses under any such policy.

Company ("U.S. Specialty") issued a primary policy with limits of $10 million excess of applicable retentions (the "Primary Policy"). Lexington Insurance Company ("Lexington") issued a first excess policy with limits of $7.5 million excess of $10 million (the "Lexington Policy"). Axis Reinsurance Company ("Axis") issued a second excess policy with limits of $10 million excess of $17.5 million (the "Axis Policy"). Allied World Assurance Company ("AWAC") issued a third excess policy with limits of $12.5 million excess of $27.5 million (the "AWAC Policy"). Arch Insurance Company ("Arch") issued a fourth excess policy with limits of $10 million excess of $40 million (the "Arch Policy"). Each of the underlying policies has a policy period of August 11, 2005 to August 11, 2006. Collectively the Primary Policy, Lexington Policy, Axis Policy and the AWAC Policy are referred to as the "Underlying Coverage." [2]

44.      Subject to all of its terms and conditions, the XL Policy affords specified coverage to Insured Persons[3] for "Loss resulting from a Claim first made against the Insured Persons[4] during the Policy Period . . . for a Wrongful Act, except to the extent

---

[2] Illinois National Insurance Company ("Illinois National") also issued a separate policy to part of the Refco group of companies. Although that policy had been canceled prior to the inception of the XL Policy, because of an extended discovery period endorsement, the Illinois National policy continued to provide coverage for parts of the Underlying Matters. To the extent the Illinois National policy does prove such coverage, the XL policy is also be excess to the Illinois National policy.

[3] Unless otherwise defined herein, all capitalized terms are as defined in the XL Policy.

[4] Insured Persons is defined in relevant part as "any past, present or future director or officer of the Company . . . ." Exhibit A (XL Policy) Section II (I).

that such Loss is paid by any other Insurance Program[5] or as indemnification from any source." Exhibit A, (XL Policy) Insuring Agreement (I).

45.    In addition to coverage provided under Insuring Agreement I, and subject to all of its terms and conditions, the XL Policy provides coverage to the "Controlling Shareholder," defined as Bennett, "but only with respect to Securities Claims, to the extent and during such time that such Securities Claims are also made and maintained against any other Insured Person or the Company." *Id.* at Endorsement No. 12.

46.    The XL Policy provides coverage to Insured Persons in excess of the Underlying Coverage. The XL Policy states that coverage

> shall be specifically excess over, and shall not contribute with...all indemnification to which an Insured Person may be entitled from any source, including but not limited to the Company or any Outside Entity; and any Insurance Program maintained by the Company or any Outside Entity, whether such other insurance is stated to be primary, contributing, excess, or otherwise.

*Id.* at Endorsement No. 9.

47.    Notably, the XL Policy does not "follow form" to the underlying policies and, thus, the coverage defenses advanced by XL are unique to this action. In particular, Endorsement 13 to the XL Policy (the IRE Limitation, mentioned above) excludes claims arising from matters which any of the Insured Persons knew might afford grounds for a claim. The IRE Limitation provides as follows:

> In consideration of the premium charged, *no coverage will be available* under this Policy for Loss, including Defense Expenses,

---

[5] The Insurance Program is defined as "any existing Management Liability Insurance, Directors' and Officers' Liability Insurance, or similar insurance and any other existing insurance under which coverage may be owed." Exhibit A, Section II (H).

> *from Claims arising from any fact, circumstance or situation of which*, as of the effective date of this Policy, *any Insured had knowledge* and had *reason to suppose might afford grounds for any Claim* that would fall within the scope of the insurance afforded by this Policy.

Exhibit A (emphasis added), XL Policy, Endorsement No. 13. Thus, pursuant to the IRE Limitation, if *any* Insured Person had knowledge of a fact, circumstance or situation that such Insured Person "had reason to suppose might give rise to a Claim," no coverage is available under the XL Policy for any Loss for any Insured Person arising out of those facts, circumstances and/or situations.

48.    Defense Costs have been advanced to certain Defendants under the Primary Policy, the Lexington Policy and the Axis Policy.[6] As of the filing of this complaint, advancement of defense costs has been at least $27.5 million (fully eroding the Primary, Lexington and Axis Policies)[7] and the law firms representing the defendants in the Underlying Matters are currently generating attorneys' fees and costs in the vicinity of $2 million per month. Moreover, two of the Defendants have reached settlements in connection with one of the Underlying Matters, and both of those settlements have received preliminary approval from this Court. Collectively, the two

---

[6] The fact that U.S. Specialty and Lexington advanced fees and costs has no bearing on the coverage issues presented in this case. Axis was ordered by the Refco bankruptcy Court to advance fees and costs despite its denial of coverage. Axis has appealed the order to this Court which appeal is still pending.

[7] On April 11, 2008, AWAC was ordered by the Bankruptcy Court to advance fees and costs and on, information and belief, millions in fees and costs have already been tendered to AWAC for payment.

settlements require a $15.1 million contribution from the insurers.[8]  Thus, it is necessary

to promptly adjudicate the coverage issues presented in this case.

**The Events at Refco**

49.    On August 11, 2005, Refco conducted its initial public offering.

50.    Less than two months later, on October 10, 2005, Refco issued a press

release announcing that the Company had been carrying an uncollectible receivable of

$430 million from an entity controlled by Bennett.  Refco stated that "[b]ased on the

results of the review to date, the Company believes that the receivable was the result of

the assumption by an entity controlled by Mr. Bennett of certain historical obligations

owed by unrelated third parties to the Company, which may have been uncollectible."

Moreover, in the October 10, 2005 press release, Refco stated that although the

receivable "was reflected on the Company's prior period financials, as well as on the

Company's May 31, 2005 balance sheet," the receivable

> was not shown as a related party transaction in any such financials.
> For that reason, and after consultation by the Audit Committee
> with the Company's independent accountants, the Company
> determined, on October 9, 2005, that its financial statements, as of,
> and for the periods ended, February 28, 2002, February 28, 2003,
> February 28, 2004, February 28, 2005, and May 31, 2005, taken as a
> whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco
> Finance, Inc. should no longer be relied upon.

51.    On October 11, 2005, Refco issued a second press release announcing that

Bennett had repaid the $430 million receivable in full.  In addition, the October 11, 2005

press release provided further information on the nature of the receivable:

---

[8] None of the insurers has consented to fund either of the two settlements.

> Based on the results of the internal investigation to date, the
> Company believes that the receivable consisted in major part of
> uncollectible historical obligations owed by unrelated third parties
> to the Company that arose as far back as at least 1998. These
> obligations were transferred periodically to the entity controlled by
> Mr. Bennett, and the Company's books and records then reflected a
> receivable from that entity, rather than a receivable from the
> originating accounts. The fact that the receivable was from a
> company controlled by Mr. Bennett was hidden at the end of
> quarterly and annual reporting periods by reason of transfers to a
> third party customer account that we currently believe is
> unaffiliated with Mr. Bennett or anyone else at the Company.

52.    On October 17, 2005, Refco and certain of its unregulated subsidiaries filed

for Chapter 11 bankruptcy protection.

53.    On January 16, 2007, a federal Grand Jury returned a third superseding

indictment against Bennett, Trosten and Grant (the "S3 Indictment"). The S3

Indictment charged Bennett, Trosten and Grant with securities fraud, conspiracy to

commit securities fraud, wire fraud, bank fraud and money laundering. The S3

Indictment also charged Bennett with making false filings with the SEC and making

false statements to Refco's auditors. A true and correct copy of the S3 Indictment is

attached hereto as Exhibit B.

54.    On February 15, 2008, CEO and President Bennett, who is an Insured

Person under the XL Policy, pled guilty to all charges against him in the S3 Indictment.

Five days later, on February 20, 2008, Trosten, who also is an Insured Person under the

XL Policy, similarly pled guilty to charges of conspiracy, securities, wire and bank fraud

and money laundering.

55.    The S3 Indictment charged that, beginning in the mid 1990's, Bennett, Trosten and their co-conspirators engaged in a scheme to mask the true financial performance of Refco.  Specifically,

> [f]rom at least as early as in or about the mid 1990s, PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, together with others known and unknown, schemed to hide the true financial health of Refco from its banks, counterparties, auditors, and investors.  Starting at least as early as the late 1990s, BENNETT and GRANT embarked on a strategy to mask the true performance of Refco's business in order to sell the company for their own benefit and that of Refco's other owners.  To that end, over the ensuing years, BENNETT, TROSTEN, GRANT and others known and unknown systematically (1) covered up both Refco's own losses and customer losses for which Refco became responsible; (2) moved Refco operating expenses off the company's books; and (3) padded Refco's revenues, all in an effort to mislead Refco's banks, counterparties, auditors and investors, with the goals of keeping Refco in business and then selling it for the maximum benefit to its owners and senior management.

Exhibit B (S3 Indictment) at ¶7.

56.    According to the S3 Indictment, in furtherance of the scheme, Bennett, Trosten and their co-conspirators "made and caused Refco and others on its behalf to make false and fraudulent statements to Refco's banks, counterparties, customers, auditors and investors, and to create false audited financial statements and false public filings" with the SEC.  *Id.* at ¶8.

57.    The S3 Indictment charged that the scheme permitted Refco to engage in, among other things, Refco's August 2005 initial public offering of stock, "in which the public purchased approximately $583 million of Refco common stock based on a false and fraudulent registration statement."  *Id.*

58.    According to the S3 Indictment, the scheme was hatched in 1997, when "Refco directly and indirectly incurred a series of substantial trading losses that threatened the continued viability of Refco's business." *Id.* at ¶9.  In response to those losses, Bennett, Trosten and others "moved losses and expenses out of Refco" and into Refco Group Holdings, Inc. ("RGHI"), an entity that owned Refco and that was owned by, among others, Bennett and Grant, in an effort to mask Refco's financial condition. This strategy increased the debt owed by RGHI to Refco (the "RGHI Receivable"), which eventually totaled more than $1 billion.  *Id.*

59.    The S3 Indictment charged that, beginning at least as early as February 1998, Bennett and others directed a series of transactions designed to hide the "huge and growing" RGHI Receivable from, among others, Refco's auditors, by temporarily paying down all or part of the RGHI Receivable over Refco's fiscal year-end and replacing it with a receivable from one or more other entities not related to Bennett or Refco. *Id.* at ¶21.  Bennett and others caused this cover-up to occur "at every fiscal year-end from at least the fiscal year-end on February 28, 1998 through the fiscal year-end on February 29, 2004." *Id.*  Beginning in August 2004 and continuing until the August 2005 IPO, Bennett and others began causing these cover-up loan transactions to occur at each quarter and year-end period. *Id.* at ¶46.

60.    The S3 Indictment further charged that Bennett, Trosten and others participated in a scheme to defraud participants in the 2004 leveraged buyout of Refco, which was led by private equity fund Thomas H. Lee Partners, by misleading the fund

and purchasers of the $600 million in notes and $800 million in bank debt about the true

financial health of Refco. *Id.* at ¶¶ 36 – 44.

61.     Based on these and other allegations, the S3 Indictment charged Bennett as

follows:

| Count | Charge |
|-------|--------|
| 1 | Conspiracy to commit securities fraud, wire fraud, bank fraud, to make false filings with the SEC, to make material misstatements to auditors, to commit bank fraud and money laundering |
| 2 | Securities fraud in connection with the sale of 9% Senior Subordinated Notes due 2012 |
| 3 | Securities fraud in connection with the purchase and sale of Refco common stock |
| 4 | False filing with the SEC in connection with the filing of Refco's Form 10-K under the Exchange Act of 1934 on July 19, 2005 |
| 5,6 | False filing with the SEC in connection with the filing of certain registration statements under the Securities Act of 1933 on April 6, 2005 and August 8, 2005 |
| 7 – 13 | Wire fraud in connection with certain electronic communications between June 22, 2004 and August 8, 2005, including the transmission of Refco's Form 10-K on July 19, 2005 and its registration statements on April 6, 2005 and August 8, 2005 |
| 14 | Material misstatements to auditors |
| 15 | Bank fraud in connection with the 2004 leveraged buyout transaction |
| 16 – 20 | Money laundering in connection with proceeds of the 2004 leveraged buyout transaction |

62.     On February 15, 2008, Bennett pled guilty to all twenty counts against him

in the S3 Indictment. A true and correct copy of the transcript of the hearing ("Bennett

Tr.") is attached hereto as Exhibit C. During his plea allocution, the following exchange

occurred between the Court and Bennett:

THE COURT:  Mr. Bennett, did you commit the crimes for which you've been charged with in the indictment?

THE DEFENDANT:  I did, your Honor.

THE COURT:  Would you tell me in your own words what you did?

THE DEFENDANT:  Your Honor, during the period that I served as CEO of Refco, I agreed with other Refco executives to enter into a series of transactions at the end of Refco's financial reporting periods to make it appear as if a receivable due to Refco from Refco Upholdings, Inc. [sic], a related party, was instead due from an independent third-party customer.

The IGHI [sic] receivable was composed of, amongst other things, historical customer losses, bad debts, and expenses that IGHI [sic] had incurred on behalf of Refco.

I, along with other Refco executives, have caused Refco to enter into these transactions in order to conceal the size and nature of the IGHI [sic] receivable.  We concealed the receivable from, amongst others, Refco's auditors, Thomas H. Lee Partners, various lenders who, in 2004, participated in Refco's senior secured credit facility, and the issuance of 9 percent senior subordinated notes, and also investors in Refco's common stock.

Among the lenders to whom I knowingly caused the IGHI [sic] receivable to be misrepresented was HSBC Bank, referenced in Count Fifteen of the indictment.  I and other Refco executives also used the interstate wires to accomplish these acts within this district, as referenced in Counts Seven through Thirteen.  Furthermore, I caused funds obtained from the transaction with Thomas H. Lee Partners, referenced in paragraph 34 of the indictment, to be wired to various parties receiving proceeds from the transaction, as referenced in Counts Sixteen through Twenty, knowing that this money had been unlawfully obtained.

The IGHI [sic] receivable and related party transaction used to conceal it were material information that Refco investors and lenders would have wanted to have known prior to investing in or lending money to Refco. While I believed that I would be able to pay the IGHI [sic] receivable down over time, and did, in fact, ultimately pay off the receivable balance in its entirety, I knew that obtaining funds from

Refco's investors and lenders based on misleading financial statements was also wrong.

I also caused Refco to file documents with the SEC, namely S1, S4, and 10-K that did not disclose the full extent of the IGHI [sic] receivable or the transactions used to conceal it; and, thus, were false and misleading with respect to material facts. I knew that failing to disclose these facts in public filings and in connection with Refco's sale and registration of Refco's notes and common stock was wrong, and I deeply regret having done so.

Your Honor, I take full responsibility for my actions . . . .

Exhibit C (Bennett Tr.) at pp. 16 – 19.

63.    At the conclusion of the February 15, 2008 hearing, the Court found that

Bennett pled guilty voluntarily and knowingly:

THE COURT: Mr. Bennett, I'm satisfied that you understand the nature of the charge against you and the consequences of your plea; and that your plea is made voluntarily and knowingly; and that there is a factual basis for it. Accordingly, I will accept your plea of guilty. . .

Id. at p. 20.

64.    The S3 Indictment charged Trosten as follows:

| Count | Charges |
|-------|---------|
| 1 | Conspiracy to commit securities fraud, wire fraud, bank fraud, to make false filings with the SEC, to make material misstatements to auditors, to commit bank fraud and money laundering |
| 2 | Securities fraud in connection with the sale of 9% Senior Subordinated Notes due 2012 |
| 7,8 | Wire fraud in connection with certain electronic communications between June 22, 2004 and August 3, 2004 |
| 15 | Bank fraud in connection with the 2004 leveraged buyout transaction |
| 17 – 18 | Money laundering in connection with proceeds of the 2004 leveraged buyout transaction |

65.     On February 20, 2008, Trosten pled guilty to Counts 1, 2, 7, 15 and 17 against him in the S3 Indictment.  A true and correct copy of the transcript of the hearing ("Trosten Tr.") is attached hereto as Exhibit D.  During the hearing at which Trosten pled guilty, the following exchange occurred between the Court and Trosten:

> THE COURT: Mr. Trosten, did you commit the offenses that you are pleading guilty to?
>
> THE DEFENDANT: I did, your honor.
>
> THE COURT: Would you tell me, please, what you did?
>
> *   *   *
>
> THE DEFENDANT: Your Honor, while I was employed at Refco, I agreed with other Refco executives to hide the true nature of Refco's finances on Refco's financial statements.  I knew that Refco's financial statements did not accurately reflect Refco's financial condition, because the financial statements did not disclose the full amount that Refco Group Holdings, Inc., a related party, owed to Refco.  I understood that the RGHI receivable was underreported because Phillip Bennett, Refco's former chief executive officer, and other Refco executives, including me, were involved in a series of transaction at the end of Refco's financial reporting periods to make it appear as if a receivable was due from third-party customers rather than from a related party.
>
> The RGHI receivable was composed of, amongst other things, historic customer losses, bad debts, and expenses that RGHI incurred on behalf of Refco.
>
> In addition, I participated in a number of transactions that padded or inflated Refco's income.  For example, I participated in transactions that shifted expenses off the books of Refco and onto the books of Refco Group Holdings, Inc.
>
> I, along with other Refco executives, agreed to conceal the true size and nature of the RGHI receivable from, amongst others, Refco's auditors, Thomas H. Lee Partners; HSBC, which, in 2004, participated in Refco's senior secured credit facility, as referenced in . . . paragraph

41 and Count Fifteen of the indictment; and investors who purchased bonds that Refco issued in 2004, as referenced in Count Two of the indictment.

I left the company in August 2004, one year before the IPO of Refco. I and other executives used the interstate wires to accomplish these acts within this district, as referenced in Count Seven of the indictment.

Furthermore, I received funds obtained from the transaction with Thomas H. Lee Partners, referenced in paragraph 34 of the indictment, which I knew were proceeds from unlawful activity, as referenced in Count Seventeen.

The RGHI receivable and the transactions used to conceal it were material information that Refco investors and lenders would have wanted to know before investing in or lending money to Refco.

I knew that obtaining funds from Refco investors and lenders based on misleading financial information was wrong.

*   *   *

Your Honor, I take full responsibility for my actions and my conduct. .

Exhibit D (Trosten Tr.) at pp. 17 – 19.

66.     At the conclusion of the February 20, 2008 hearing, the Court found that

Trosten pled guilty voluntarily and knowingly:

THE COURT:  All right.  Mr. Trosten, I am satisfied that you understand the nature of the charge against you and the consequences of your plea, and that your plea is made voluntarily and knowingly, and that there is a factual basis for your plea. I will therefore accept your plea of guilty.

*Id.* at p. 20.

67.     Meanwhile, on December 19, 2007, Maggio, who is an Insured Person

under the XL Policy, pled guilty to a separate four-count criminal Information (the

"Maggio Information") charging him with conspiracy, securities fraud and wire fraud. A true and correct copy of the Maggio Information is attached hereto as Exhibit E.

68.    The Maggio Information, which mirrored the same claimed misconduct as the S3 Indictment, charged that Maggio was one of Bennett's and Trosten's co-conspirators and that he participated in the conduct underlying the conspiracy. In particular, the Maggio Information charged that Maggio participated in the scheme to hide the RGHI Receivable and to mask the true financial condition of Refco in the several years prior to the August 11, 2005 initial public offering.

69.    Based on these and other allegations, the Maggio Information charged Maggio as follows:

| Count | Charges |
|-------|---------|
| 1 | Conspiracy to commit securities fraud, wire fraud, to make false filings with the SEC, to make material misstatements to auditors, bank fraud and money laundering |
| 2 | Securities fraud in connection with the sale of 9% Senior Subordinated Notes due 2012 |
| 3 | Securities fraud in connection with the purchase and sale of Refco common stock |
| 4 | Wire fraud in connection with the electronic transmission of Refco's Form 10-K on July 19, 2005 |

70.    On December 19, 2007, Maggio pled guilty to every count in the Maggio Information. A true and correct copy of the transcript of the hearing ("Maggio Tr.") is attached hereto as Exhibit F. During the hearing at which Maggio pled guilty, the following exchange occurred between the Court and Maggio:

> THE COURT: Did you commit the offenses for which you have been charged, Mr. Maggio?
>
> THE DEFENDANT: Yes.

23

THE COURT:  Tell me what you did.

\*   \*   \*

THE DEFENDANT:  Your Honor, from the late 1990s to October 2005 I was a senior executive at Revko [sic] Ink [sic]. During that period I participated with others to hide the true financial health of Revko [sic] from banks, counter-parties, auditors and investors.  With my knowledge and active participation Revko's [sic] substantial losses were covered up as revenues padded [sic] and certain operating expenses were moved off its book.  Among the acts I personally engaged in [sic] the signing of loan agreements referencing paragraphs 61-D [loan agreement signed in furtherance of the conspiracy on or about February 20, 2004] and 61-P [loan agreement signed in furtherance of the conspiracy on or about February 23, 2005] of the indictment.

As a result of my conduct and that of my coconspirators false financial statements were issued to obtain debt financing from the public including 9 percent senior subordinated notes referenced in Count Two of the indictment [sic].

To consummate the sale of 57 percent of Revko [sic] to a group headed by Thomas H. Lee in 2004 and to obtain $800 million in bank financing the same year and to effect the Revko [sic] initial public offering in 2005. [sic]  Moreover, with my knowledge false financial statements were filed with the SEC including form 10K referencing Count Four. The mails and interstate wires were used as part of the fraudulent scheme.

I deeply regret my conduct and the harm that it has caused.

THE COURT:  First of all, with respect to all of the activities that you've indicate you participated in it knowingly?

THE DEFENDANT:  Yes.

\*   \*   \*

THE COURT:  And the intent of this scheme was to defraud?

THE DEFENDANT:     Yes.

Exhibit F (Maggio Tr.) at pp. 17 – 19.

71.    At the conclusion of the December 19, 2007 hearing, the Court found that

Maggio pled guilty knowingly and voluntarily:

> THE COURT:  Based on defendant's allocution and the
> recommendations by the government I find that the defendant
> understands the nature, the charges and consequences of his guilty
> plea. I also find that the plea is voluntary and that there is a factual
> basis for the plea. I, therefore, recommend that the plea be accepted
> . .

*Id.* at 20.

72.    Grant chose not to plead guilty to the charges in the S3 indictment and

was tried, before a jury, in this Court.  At trial the United States Attorney showed that

Grant knew of the fraud.  The government introduced into evidence, *inter alia*, a

memorandum with respect to a 2004 meeting between Grant and Bennett on which

Grant hand-wrote "1.111 real debt," referring to the RGHI transaction.  On April 17,

2008 the jury found Grant guilty of conspiracy, securities fraud, wire fraud, bank fraud

and money laundering, as alleged in the S3 Indictment.

73.    As demonstrated by each of the three guilty pleas and the Grant

conviction, on counts that alleged knowledge of, *inter alia*, efforts to hide the RGHI

Receivable from the investing public prior to 2005, Bennett, Trosten, Maggio and Grant,

as of August 11, 2005, had knowledge of or information concerning acts, errors,

omissions, facts, matters or circumstances that might give rise to a Claim under the XL

Policy.

**The Underlying Matters**

74.    Beginning on October 12, 2005, various lawsuits were filed against the Defendants.

75.    The criminal action discussed above, *United States v. Bennett*, No. 05-1720 (S.D.N.Y.) (the "Bennett Criminal Complaint"), was brought on October 12, 2005.

76.    The Bennett Criminal Complaint alleged that Bennett knowingly "hid from investors in [Refco's] August 2005 initial public offering of stock . . . the existence of hundreds of millions of dollars of related party transactions between Refco and a company controlled by Bennett, including causing Refco to file a false and fraudulent S-1 registration statement with the Securities and Exchange Commission." Bennett Criminal Complaint, ¶9. A federal grand jury in New York subsequently returned a criminal Indictment against Bennett that was filed on or about November 10, 2005 in *United States v. Bennett, et al.*, No. 05-1192 (S.D.N.Y.). This indictment repeated and expanded upon the allegations in the Bennett Criminal Complaint. On or about October 24, 2006, the Grand Jury returned a superseding indictment that named both Bennett and Trosten, and a second superseding indictment was handed up against them on or about November 16, 2006. On January 16, 2007, the third superseding indictment was handed up, adding Grant as a defendant – referred to above as the "S3 Indictment." On December 19, 2007, the Information against Maggio was filed. Each of these filings alleged, among other things, that the defendant(s) named therein engaged in a scheme to hide the RGHI receivable from the investing public. Collectively, the

proceedings initiated by these filings will be referred to herein as the "Criminal Proceedings."

77.    The Bennett Criminal Complaint was tendered to XL for coverage under the XL Policy on or about October 13, 2005, and the indictment, the superseding indictment, the second superseding indictment and/or the third superseding indictment were tendered to XL for coverage under the XL Policy thereafter.

78.    The suits *Mazur et al. v. Refco, Inc., et al.*, No. 05-8626 (S.D.N.Y.), *Frontpoint Fin. Serv., Inc. v. Refco, Inc.*, et al., No. 05-8663 (S.D.N.Y.), *Lieber v. Refco, Inc., et al.*, No. 05-8667 (S.D.N.Y.), *Weiss v. Refco, Inc., et al.*, No. 05-8691 (S.D.N.Y.), *Glaubach v. Refco, Inc., et al.*, No. 05-8692 (S.D.N.Y.), *Gross v. Refco, Inc., et al.*, No. 05-8697 (S.D.N.Y.), *Salamone v. Refco, Inc. et al.*, No. 05-8716 (S.D.N.Y.), *RD Partners LLC v. Refco, Inc., et al.*, No. 05-8737 (S.D.N.Y.), *Wakefield v. Refco, Inc., et al.*, No. 05-8742 (S.D.N.Y.), *Gaugler v. Bennett, et al.*, No. 05-8886 (S.D.N.Y.), *Baker v. Bennett, et al.*, No. 05-8923 (S.D.N.Y.), *Nathamon v. Bennett, et al.*, No. 05-3926 (S.D.N.Y.), *Becker v. Refco, Inc., et al.*, No. 05-8929 (S.D.N.Y.), *Mettupatti v. Bennett, et al.*, No. 05-9048 (S.D.N.Y.), *Weiss v. Bennett, et al.*, No. 05-9126 (S.D.N.Y.), *Weit v. Bennett, et al.*, No. 05-9611 (S.D.N.Y.), *Esses v. Bennett, et al.*, No. 05-9654 (S.D.N.Y.), *City of Pontiac General Employees Retirement System v. Bennett et al.*, No. 05-9941 (S.D.N.Y.), *Gensheimer v. Bennett*, No. 05-10318 (S.D.N.Y.) and *Teacher' Retirement System of the State of Illinois et al. v. Lee, et al.*, No. 05-10403 (S.D.N.Y.) are purported class action securities fraud lawsuits that have been consolidated for pre-trial purposes under Case No. 05-8626 (GEL) and captioned *In re Refco, Inc. Securities Litigation* (the "Securities Litigation"). The First Amended Consolidated Class Action

Complaint ("FAC") was filed in the consolidated proceedings on May 5, 2006, and the

Second Amended Consolidated Class Action Complaint ("SAC") was filed on or about

December 3, 2007.

79.     The FAC and SAC allege that Refco's initial public offering registration

statement and prospectus were materially false and misleading.  Specifically, they

allege that the registration statement and prospectus failed to disclose the existence of

the RGHI Receivable.  The SAC further alleges that the Refco financial statements

incorporated in Refco's registration statement and prospectus were inaccurate because

they failed to disclose the related-party transactions between Refco and RGHI that were

allegedly designed to hide the RGHI Receivable.  Included among the defendants

named in the SAC are Bennett, Sherer, Sexton, Maggio, Murphy, Silverman, Klejna,

Trosten, Grant, O'Kelley, Breitman, Gantcher, Lee, Harkins, Jaeckel, and Schoen.

80.     Beginning on or about October 14, 2005, some of the lawsuits comprising

the Securities Litigation were tendered to XL for coverage under the XL Policy.  The

FAC was tendered to XL by letter dated June 16, 2006.

81.     The suits *David Fine v. Bennett, et al.*, No. 05-8701 (S.D.N.Y.), and *Mehta v.*

*Bennett, et al.*, No. 05-8748 (S.D.N.Y.), which were shareholder derivative actions (the

"Derivative Litigation"), have been dismissed.  Bennett, Sherer, Breitman, Gantcher,

Harkins, Jaeckel, Lee, O'Kelley, Schoen, Sexton and Murphy, among others, were

named as defendants in the Derivative Litigation.

82.     The complaints in the Derivative Litigation alleged that Refco's initial

public offering registration statement and prospectus were materially false and

misleading. Specifically, the complaints alleged that the registration statement and prospectus failed to disclose the existence of the RGHI Receivable. The complaints further alleged that the Refco financial statements incorporated in its registration statement and prospectus were inaccurate because they failed to disclose the related-party transactions between Refco and RGHI that were designed to hide the RGHI Receivable.

83.     The *Mehta* complaint was tendered to XL for coverage under the XL Policy on or about October 18, 2005. It does not appear that any party has given notice of the *Fine* action to XL.

84.     The suit *BAWAG P.S.K. Bank v. Refco Inc., et al.*, No. 05-60006 (Bankr. S.D.N.Y.), Adv. No. 05-03161, was filed on November 16, 2005 (the "BAWAG Action"). The BAWAG Action names Bennett (among others) as a defendant.

85.     The complaint in the BAWAG Action alleges that the plaintiff was fraudulently induced to loan approximately $420 million to Bennett on October 10, 2005. The complaint alleges that Bennett failed to disclose that he sought the loan to pay off the RGHI Receivable, a "related party receivable resulting from the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to Refco [that] likely was impaired and not collectible." BAWAG Action Complaint, ¶17. The complaint alleges that Bennett "knew that if BAWAG had been aware of any of the key facts set forth in [Refco's] October 10, 2005 Press Release, BAWAG would not have made the Loan." *Id.*, ¶30.

86.    The BAWAG Action was tendered to XL for coverage under the XL Policy on or about November 30, 2005.

87.    The suit *Thomas H. Lee Equity Fund L.P., et al. v. Bennett, et al.*, No. 05-9608 (S.D.N.Y.), was filed on November 14, 2005 (the "THL Funds Action"). The THL Funds Action names Bennett, Grant and Maggio, among others, as defendants.

88.    The complaint in the THL Funds Action alleges that in June 2004, the plaintiffs invested approximately $507 million in Refco. The complaint alleges that despite the plaintiffs' due diligence efforts, they were unaware that "Bennett intentionally and deliberately engaged in accounting fraud in order to mask a group of largely worthless receivables, bad debts and questionable obligations that, if accurately portrayed on the Company's financial statements, would have materially reduced Refco's value." THL Funds Action Complaint, ¶4. Specifically, the complaint alleges that Bennett "nowhere disclosed to the THL Funds that what appeared to be a good and valid receivable from a third-party customer was actually a receivable from RGHI, an entity controlled by Bennett, representing hundreds of million dollars [*sic*] of customer losses and obligations that would never be repaid to the Company." *Id.* at ¶30. The complaint alleges that the Refco financial statements provided to the plaintiffs during their due diligence review in 2003 and 2004 were materially false and misleading.

89.    The THL Funds Action was tendered to XL for coverage under the XL Policy on or about February 10, 2006.

90.    The complaint in *Unovalores Ltd. v. Bennett*, No. L1564-05 (Sup. Ct. of New Jersey, Somerset County, Law Division) (the "Unovalores Action") was filed in New Jersey state court on or about November 1, 2005.

91.    The plaintiff in the Unovalores Action, which identifies itself as a Refco Capital account holder, names only Mr. Bennett as a defendant. Plaintiff alleges that it entered into a Repurchase Transaction with Refco on August 31, 2005, in reliance upon representations in Refco's registration statement and other filings concerning Refco's financial health. Those representations were false, according to the complaint, because they concealed massive receivables owed by an entity controlled by Mr. Bennett and at least one-half billion dollars of related party transactions with Mr. Bennett.

92.    The Unovalores Action was tendered to XL for coverage under the XL Policy on or about February 10, 2006.

93.    The complaint in *American Financial International Group v. Refco, Inc., et al.*, No. 05-8988 (S.D.N.Y.) (the "American Financial Action"), was filed in the Southern District of New York on or about October 21, 2005, an amended complaint was filed on April 13, 2006, and a second amended complaint was filed on June 30, 2006.

94.    The plaintiff in the American Financial Action identifies itself as a Delaware LLC that traded currencies through an account at Refco F/X Associates, LLC ("Refco F/X"). The suit is a purported class action brought on behalf of all persons who traded currencies through, or had currency trading accounts with, Refco F/X from August 11, 2005 through the date the second amended complaint was filed, and who have been damaged thereby. Included among the defendants named in the second

31

amended complaint are Bennett, Sherer, Sexton, Maggio, Trosten, Mutterer and Silverman. The second amended complaint generally alleges the same conduct that is the subject of the Criminal Proceedings and the Securities Litigation.

95.    The complaint in the American Financial Action was tendered to XL for coverage under the XL Policy on or about October 25, 2005, and the amended complaint was tendered to XL on June 16, 2006.

96.    The complaint in *Global Management Worldwide Limited v. Philip R. Bennett, et al.,* No. 06-0643 (S.D.N.Y.) (the "Global Management Litigation"), was filed in the Southern District of New York on or about January 26, 2006, and a Consolidated Amended Class Action Complaint was filed in September 2006.

97.    The plaintiff in the Global Management Litigation identifies itself as a corporation organized under the laws of Nassau, the Bahamas that was a brokerage customer of Refco Capital Markets, Ltd. ("RCM"). The suit is a purported class action brought on behalf of all brokerage customers of RCM who, at any time from October 17, 2000 to October 17, 2005, entrusted securities to RCM and/or Refco Securities, LLC, directly or indirectly, as custodian and broker for safe-keeping, and continued to hold positions with RCM on October 17, 2005 or thereafter. Plaintiffs generally allege that, during the purported class period, Refco, either directly or through its affiliates, incurred billions of dollars in losses, and tried to hide those losses by surreptitiously selling securities held by RCM in custody for class members. Plaintiffs allege that the financial statements filed by Refco with the SEC during the purported class period were false and misleading because they fraudulently omitted these losses, as well as the

scheme to hide the losses by selling securities stolen from plaintiffs and by building up

and hiding the RGHI Receivable.  Plaintiffs further allege that they relied upon these

false and misleading financial statements and the purported financial integrity of Refco

in entrusting securities to RCM.

98.    The Global Management Litigation was tendered to XL for coverage

under the XL Policy on or about March 14, 2006.

99.    On or about October 9, 2007, two separate lawsuits were brought by seven

investment entities that maintained accounts at RCM: (1) *VR Global Partners L.P., et al. v.*

*Bennett, et al.*, Case No. 07-8686 (S.D.N.Y.) and (2) *Capital Management Select Fund Ltd., at*

*al., v. Bennett, et al.*, Case No. 07-8688 (S.D.N.Y.).  The complaints, which were tendered

to XL in October 2007, also allege that Refco insiders schemed to hide the RGHI

Receivable, thereby inducing plaintiffs to maintain accounts at RCM, and converted

securities owned by plaintiffs to hide losses incurred by Refco.  The defendants in the

VR Global and Capital Management litigations include Bennett, Sexton, Maggio,

Murphy, Silverman, Trosten, Grant, Lee, Harkins, Jaeckel, Schoen and Outridge.  By

order dated November 20, 2007, the Global Management Litigation was consolidated

for pre-trial purposes with the VR Global and Capital Management litigations.  The

consolidated proceedings will be referred to herein as the "RCM Brokerage Customer

Securities Litigation."

100.    The complaint in *Kirschner v. Thomas H. Lee Partners, L. P.*, No. 07-7074

(S.D.N.Y.) (the "Trustee/THL Partners Litigation"), was filed in the Southern District of

New York on or about August 8, 2007.

33

101.    The plaintiff in the Trustee/THL Partners Litigation identifies himself as the trustee of the Refco Litigation Trust (the "Trustee"). The individual defendants named in the complaint are Lee, Harkins, Jaeckel, and Schoen. The Trustee generally alleges that the individual defendants breached fiduciary duties owed to Refco by failing to inform themselves of Refco's true financial state - including efforts to hide the RGHI Receivable – before making business decisions on behalf of Refco.

102.    The complaint in the Trustee/THL Partners Litigation was tendered to XL for coverage under the XL Policy by letter dated August 16, 2007.

103.    The complaint in *Kirschner v. Grant Thornton LLP, et al.*, No. 2007L008818 (Cook County, Ill.) (the "Grant Thornton Litigation"), was filed in Illinois state court on August 21, 2007, and was removed to federal court on or about September 19, 2007 as Case No. 07-cv-05306 (N.D. Ill.).

104.    The Grant Thornton Litigation was brought by the Trustee. The individual defendants named in the complaint include Bennett, Maggio, Trosten, and Grant. The Trustee generally alleges that these defendants engaged in a scheme to hide Refco's true financial condition, which included efforts to hide the RGHI Receivable.

105.    The complaint in the Grant Thornton Litigation was tendered to XL for coverage under the XL Policy by letter dated September 20, 2007.

106.    The complaint in *Kirschner v. Agoglia, et al.*, Adv. Pro. No. 07-3060 (Bankr. S.D.N.Y.) (the "Agoglia Litigation"), was filed on or about October 15, 2007.

107.    The Agoglia Litigation was brought by the Trustee. The individual defendants named in the complaint are Agoglia, Bennett, Cox, Dittmer, Dhillon, Grady,

Grant, Lipoff, Maggio, McCarthy, Murphy, Mutterer, Sexton, and Trosten. The Trustee alleges that Bennett and others "orchestrated a massive financial fraud designed to inflate Refco's financial position artificially until such time as it could be sold," Agoglia Litigation Compl. ¶59, a fraud that included the hiding of the RGHI Receivable. The Trustee seeks to recover transfers made to defendants under avoidance provisions of the Bankruptcy Code and to recover the value of the transfers under a theory of unjust enrichment.

108.    The complaint in the Agoglia Litigation was tendered to XL for coverage under the XL Policy by letters dated October 24 and November 21, 2007.

109.    The complaint in *Kirschner v. Thomas Hackl, et al.*, No. 07-9238 (S.D.N.Y.) (the "Hackl Litigation"), was filed on or about October 15, 2007.

110.    The Hackl Litigation was brought by the Trustee. The only individual defendant named in the complaint is Hackl. The Trustee alleges that Bennett, Hackl and others engaged in a scheme to hide the true financial condition of Refco, including efforts to hide the RGHI Receivable, and seeks recovery from Hackl under counts alleging, *inter alia*, breach of fiduciary duty, civil conspiracy, aiding and abetting fraud, and unjust enrichment.

111.    The complaint in *Kirschner v. Bennett, et al.*, Case No. 602869 (New York County, New York) (the "Trustee/Bennett Litigation"), was filed in the Supreme Court of New York on or about August 27, 2007, and was removed to federal court on or about September 17, 2007 as Case No. 07-08165 (S.D.N.Y.).

112.     The plaintiff in the Trustee/Bennett Litigation identifies himself as the trustee of the Refco Private Actions Trust and assignee of all claims related to Refco belonging to, among others, certain former Refco customers who maintained accounts at, and entrusted funds to, RCM.  The individual defendants named in the complaint are Bennett, Maggio, Trosten and Grant.  The complaint alleges, *inter alia*, that these defendants engaged in a scheme to hide Refco's true financial condition, including engaging in steps to hide the RGHI Receivable.  This conduct allegedly induced RCM customers to entrust assets with RCM, which allegedly were later converted for Refco's use.

113.     The complaint in the Trustee/Bennett Litigation was tendered to XL for coverage under the XL Policy by letter dated October 24, 2007.

114.     The Trustee/THL Partners Litigation, the Grant Thornton Litigation, the Trustee/Bennett Litigation, the Agoglia Litigation and the Hackl Litigation are collectively referred to herein as the "Trustee Litigation."

115.     Upon information and belief, various governmental and/or regulatory investigations of or proceedings involving one or more of the Defendants (the "Regulatory Matters") are ongoing, and one or more of the Defendants has sought or may seek coverage for such matters.

116.     A seizure warrant pursuant to 18 U.S.C §§ 981(a)(1)(C) and 984 in *U.S. v. Funds on Deposit at Bear Stearns, Account Number 893-86267 In The Name of "Dennis A. Klejna," Up To And Including $5,800,000, And All Funds Traceable Thereto* was filed on or about December 19, 2007 (the "Klejna Seizure Warrant").

117.   The Klejna Seizure Warrant was tendered to XL for coverage under the XL Policy by letter dated January 29, 2008.

118.   The complaint in *Krys, et al. v. Sugrue, et al.*, Index No. 600653/08 (New York County, New York) (the "Krys Litigation"), was filed on or about March 5, 2008.

119.   The complaint in the Krys Litigation was tendered to XL for coverage under the XL Policy by letter dated March 7, 2008.

120.   The proceedings discussed above, including the Criminal Proceedings, the Securities Litigation, the Derivative Litigation, the BAWAG Action, the THL Funds Action, the Unovalores Action, the American Financial Action, the Global Management Litigation, the RCM Brokerage Customer Securities Litigation, the Trustee Litigation, the Regulatory Matters, the Klejna Seizure Warrant and the Krys Litigation, and or any other notice of claim or potential claim are collectively referred to herein as the "Underlying Matters," as that term has been used throughout this complaint.  If and to the extent additional civil, criminal or regulatory actions are instituted or come to XL's attention after the filing of this complaint, such additional actions shall also be deemed "Underlying Matters" to the extent they arise out of the same or related transactions or occurrences raised in the Underlying Matters detailed in this complaint.

## CLAIM FOR RELIEF

### (FOR A DECLARATORY JUDGMENT AGAINST ALL DEFENDANTS)

121.   XL incorporates by reference each of the allegations of paragraphs 1 through 120 above.

122.    As of August 11, 2005, the XL Policy's inception date, the Defendants, or at least many of them, unquestionably possessed knowledge of facts, situations and/or circumstances that gave such Defendants reason to suppose such facts, situations and/or circumstance might afford grounds for a Claim under the XL Policy.

123.    Under the XL Policy, if any Insured Person had such knowledge as of the inception of the XL Policy, no coverage for any Loss, including Defense Expenses, is afforded under the XL Policy.

124.    These facts, situations and circumstances include, *inter alia*, the facts alleged in the S-3 Indictment and in the Maggio Information.

125.    Indeed, the guilty plea by Bennett judicially establishes, beyond any reasonable doubt, his knowledge of such facts, situations and circumstances.

126.    Bennett is estopped from denying such knowledge.

127.    Similarly, the guilty plea by Trosten judicially establishes, beyond a reasonable doubt, his knowledge of such facts, situations and circumstances.

128.    Trosten is collaterally estopped from denying such knowledge.

129.    The guilty plea by Maggio also judicially establishes, beyond a reasonable doubt, his knowledge of such facts, situations and circumstances.

130.    Maggio is estopped from denying such knowledge.

131.    The conviction of Grant similarly judicially establishes, beyond a reasonable doubt, Grant's knowledge of such facts, situations and circumstances.

132.    Grant is estopped from denying such knowledge.

133.    The Underlying Matters all consist of charges or causes of action arising from "fact, circumstance or situation" of which the Insured Persons "had knowledge" – as is already judicially established as to Bennett, Trosten, Maggio and Grant – and "had reason to suppose might afford grounds" for a Claim under the XL Policy.  In turn, the Claims with respect to the Underlying Matters are all subject to the restriction in coverage dictated by the IRE Limitation.

134.    Accordingly, no coverage for any Loss, including Defense Expenses, with respect to the Underlying Matters is afforded by the XL Policy.

135.    Moreover other terms and conditions of the XL Policy prevent or limit the availability of coverage for the Underlying Matters for some or all of the Defendants.

136.    This action provides a ripe and justiciable case or controversy.

137.    It is just and equitable that the Court declare the rights and other legal relationships of the parties.

138.    XL is entitled to a declaration, based upon the IRE Limitation and the other limiting and restrictive terms and conditions of the XL Policy, that the XL Policy does not provide coverage for any Loss (including Defense Expenses or advancement of Defense Expenses) arising out of the Underlying Matters.

WHEREFORE, XL requests that the Court enter a Judgment in its favor as follows:

A.    Declaring that the XL Policy does not provide coverage to any Defendant for any Loss incurred in connection with the Underlying Matters including Defense Expenses (or advancement of Defense Expenses);

B.    Awarding XL such additional declaratory and other relief as shall be

found to be just and appropriate under the circumstances; and

C.    Awarding XL its fees and costs incurred in prosecuting this action.

### JURY DEMAND

Plaintiff XL demands trial by jury on all claims for which a jury trial is available.

Dated:    New York, New York
April 22, 2008

Respectfully submitted,

BOUNDAS, SKARZYNSKI WALSH &
BLACK LLC

By: _____
James Sandnes (JS-8944)
One Battery Park Plaza, 32nd Floor
New York, NY 10004
(212) 820-7700

Attorneys for Plaintiff
XL Specialty Insurance Company

**Policy Number:**  ELU089673-05
Renewal of Number

☐ **Greenwich Insurance Company**
☒ **XL Specialty Insurance Company**
Members of the XL America Companies

---

**CLASSIC A-SIDE MANAGEMENT LIABILITY
INSURANCE POLICY DECLARATIONS**

Executive Offices
70 Seaview Avenue
Stamford, CT 06902-6040
Telephone 877-953-2636

---

THIS IS A CLAIMS MADE POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY ONLY APPLIES TO CLAIMS FIRST MADE DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF DEFENSE EXPENSES. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY THE INSURER TO DEFEND ANY INSURED. PLEASE READ AND REVIEW THE POLICY CAREFULLY.

**Item 1. Name and Mailing Address of Insured Entity:**

Refco Inc.
550 W. Jackson Blvd., Suite 1300
Chicago, IL  60661

**Item 2. Policy Period:  From:** August 11, 2005 **To:** August 11, 2006
At 12:01AM Standard Time at your Mailing Address Shown Above

**Item 3. Limit of Liability:**

$20,000,000  Aggregate each Policy Period (including **Defense Expenses**)

**Item 4. Optional Extension Period and Premium:**
Length of Optional Extension Period:   One Year
Optional Extension Premium:   $740,600.00

**Item 5. Notices required to be given to the Insurer must be addressed to:**

Executive Liability Underwriters
One Constitution Plaza, 16th Floor
Hartford, CT  06103
Toll Free Telephone: 877-953-2636

**Item 6. Premium:**
Premium                                        $370,300.00
Taxes, Surcharges or Fees:                     $0.00
Total Policy Premium:                          $370,300.00

**Item 7. Policy Forms and Endorsements Attached at Issuance:**
CL 71 00 03 00   CL 72 02 05 00   CL 83 08 09 02   XL 83 07 01 00   XL 80 24 03 03   XL 80 39 04 05
CL 83 06 07 02   CL 83 14 10 03   CL 80 34 12 02   CL 80 18 09 02   XL 80 34 10 04   XL 83 25 10 00
Manuscript 3027 12 05   XL 80 04 04 00

---

Countersigned: _____ By: _____
                        Date                                    Authorized Representative

---

THESE **DECLARATIONS** AND THE POLICY, WITH THE ENDORSEMENTS, ATTACHMENTS, AND THE **APPLICATION** SHALL CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE INSURER AND THE **INSURED** RELATING TO THIS INSURANCE.

CLASS A-SIDE MANAGEMENT LIABILITY POLICY

In Witness Whereof, the Insurer has caused this Policy to be executed by its authorized officers, but this Policy will not be valid unless countersigned on the Declarations page, if required by law, by a duly authorized representative of the Insurer.

Nicholas M. Brown Jr.
President

Theresa M. Morgan
Secretary

**XL Specialty Insurance Company**

Nicholas M. Brown Jr.
President

Theresa M. Morgan
Secretary

**Greenwich Insurance Company**

# EXECUTIVE LIABILITY UNDERWRITERS
## A Member of the XL Capital Group of Companies

# CLASSIC A-SIDE MANAGEMENT LIABILITY

Executive Liability Underwriters
One Constitution Plaza
16th Floor
Hartford, CT 06103
Phone: 860-246-1863
Fax: 860-246-1899
www.xlelu.com
email: elusubmissions@xlelu.com

# CLASSIC A-SIDE MANAGEMENT LIABILITY
# INSURANCE COVERAGE FORM

**THIS IS A CLAIMS MADE POLICY WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

**In consideration of the payment of the premium, and in reliance on all statements made and information furnished to Executive Liability Underwriters, the Underwriting Manager for the Insurer identified on the Declarations Page (hereinafter, the "Insurer") including the Application and subject to all of the terms, conditions and limitations of all the provisions of this Policy, the Insurer, the Insured Persons and the Company agree as follows:**

## I.  INSURING AGREEMENT

The Insurer will pay on behalf of the **Insured Persons** **Loss** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** or, if applicable, the Optional Extension Period, for a **Wrongful Act**, except to the extent that such **Loss** is paid by any other **Insurance Program** or as indemnification from any source.  If **Loss** is not paid by such other **Insurance Program** or as indemnification from any source, the Insurer will pay covered **Loss** on behalf of the **Insured Persons**, subject to all of the terms, conditions (including but not limited to Condition IV(B)) and limitations of the Policy.

## II.  DEFINITIONS

(A)   **"Application"** means:

   (1)   the **Application** attached to and forming part of this Policy; and

   (2)   any materials submitted therewith, which shall be retained on file by the Insurer and shall be deemed to be physically attached to this Policy.

(B)   **"Change In Control"** means:

   (1)   the merger or acquisition of the **Parent Company**, or of all or substantially all of its assets by another entity such that the **Parent Company** is not the surviving entity;

   (2)   the acquisition by any person, entity, or affiliated group or persons or entities of the right to vote for, select, or appoint more than fifty percent (50%) of the directors of the **Parent Company**; or

   (3)   the appointment of a Receiver, Conservator, Liquidator, Trustee, Rehabilitator, or any comparable authority, with respect to the **Parent Company**.

(C)   **"Claim"** means:

   (1)   a written demand for monetary or non-monetary relief;

   (2)   any civil or criminal judicial proceeding in a court of law or equity, or arbitration; or

   (3)   a formal civil, criminal, or administrative regulatory proceeding or formal investigation against an **Insured Person**.

(D)   **"Company"** means the **Parent Company** and any **Subsidiary** created or acquired on or before the Inception Date set forth in ITEM 2 of the Declarations or during the **Policy Period**, subject to CONDITIONS IV(C).

(E)     "**Defense Expenses**" means reasonable legal fees and expenses incurred in the defense of any **Claim**. **Defense Expenses** will not include the **Company's** overhead expenses or any salaries, wages, fees, or benefits of its directors, officers, or employees.

(F)     "**Employment Practices Claim**" means a **Claim** alleging an **Employment Practices Wrongful Act**.

(G)     "**Employment Practices Wrongful Act**" means any actual or alleged:

    (1)     wrongful termination of employment whether actual or constructive;

    (2)     employment discrimination of any kind;

    (3)     sexual or other harassment in the workplace; or

    (4)     wrongful deprivation of career opportunity, employment related misrepresentations, retaliatory treatment against an employee of the **Company**, failure to promote, demotion, wrongful discipline or evaluation, or refusal to hire.

(H)     "**Insurance Program**" means

    (1)     any existing Management Liability insurance, Directors' and Officers' Liability insurance, or similar insurance, and

    (2)     any other existing insurance under which coverage may be owed.

(I)     "**Insured Person**" means:

    (1)     any past, present, or future director or officer, or member of the Board of Managers, of the **Company** and those persons serving in a functionally equivalent role for the **Parent Company** or any **Subsidiary** operating or incorporated outside the United States;

    (2)     any individual identified in (I)(1) above who, at the specific written request of the **Company**, is serving as a director, officer, trustee, regent, or governor of any **Outside Entity**; or

    (3)     the lawful spouse of any person set forth in the above provisions of this definitions, but only to the extent the spouse is a party to any **Claim** solely in their capacity as a spouse of such persons and only for the purposes of any **Claim** seeking damages recoverable from marital community property, property jointly held by any such person and spouse, or property transferred from any such person to the spouse.

In the event of the death, incapacity or bankruptcy of an individual identified in (I)(1), (2), and (3) above, any **Claim** against the estate, heirs, legal representatives or assigns of such individual for a **Wrongful Act** of such individual will be deemed to be a **Claim** against such individual.

(J)     "**Interrelated Wrongful Acts**" means any **Wrongful Act** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related, or series of related, facts circumstances, situations, transactions, or events.

(K)     "**Loss**" means damages, judgments, settlements or other amounts (including punitive or exemplary damages, where insurable by law) and **Defense Expenses** that the **Insured Persons** are obligated to pay.  **Loss** will not include:

    (1)     the multiplied portion of any damage award;

    (2)     fines, penalties or taxes imposed by law; or

    (3)     matters which are uninsurable under the law pursuant to which this Policy is construed.

Note: With respect to judgments in which punitive damages are awarded, the coverage provided by this Policy shall apply to the broadest extent permitted by law. If, based on the written opinion of counsel for an **Insured Person**, punitive damages are insurable under applicable law, the Insurer will not dispute the written opinion of counsel for the **Insured Person**.

(L)     "**Parent Company**" means the entity named in Item 1 of the Declarations.

(M)     "**Policy Period**" means the period form the Inception Date to the Expiration Date set forth in ITEM 2 of the Declarations or to any earlier cancellation date.

(N)     "**Outside Entity**" means any corporation or organization other than the **Company** of which any **Insured Person** serves as a director, officer, trustee, regent, or governor, but only if such service is at the specific written direction of the **Company**.

(O)     "**Subsidiary**" means any entity during any time in which the **Parent Company** owns, directly or through one of more **Subsidiary(ies)**, more than fifty percent (50%) of the outstanding securities representing the right to vote for the election of such entity's directors.

(P)     "**Wrongful Act**" means:

    (1)     any actual or alleged act, error, or omission, misstatement, misleading statement, neglect, or breach of duty by any **Insured Person** while acting in his or her capacity as an:

        (i)     **Insured Person** of the **Company** or a person serving in a functionally equivalent role for the **Parent Company** or any **Subsidiary**;

        (ii)     **Insured Person** of the **Company** who at the specific written request of the **Company** is serving as a director, officer, trustee, regent or governor or an **Outside Entity**; and

    (2)     any **Employment Practices Wrongful Act**.

## III.   EXCLUSIONS

(A)     Except for **Defense Expenses**, the Insurer shall not pay **Loss** in connection with any **Claim**:

    (1)     by, on behalf of, or at the direction of the **Company** or **Outside Entity**, except and to the extent such **Claim**:

        (i)     is brought by a security holder of the **Company** or **Outside Entity** who, when such **Claim** is made and maintained, is acting independently of, and without the solicitation, assistance, participation or intervention of the **Company** or any **Outside Entity**.

        (ii)     is brought by the Bankruptcy Trustee or Examiner of the **Company** or **Outside Entity**, or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the **Company** or **Outside Entity**;

    (2)     brought about or contributed to in fact by any:

        (i)     intentionally dishonest, fraudulent, or criminal act or omission or any willful violation of any statute, rule, or law; or

        (ii)     profit or remuneration gained by any **Insured Person** to which such **Insured Person** is not legally entitled;

as determined by a final adjudication in the underlying action or in a separate action or proceeding;

(B)    The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured Person**:

    (1)    for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, defamation, slander, libel, disease or death of any person, or damage or destruction of any tangible property including **Loss** of use thereof.  EXCLUSION (B) shall not apply to any **Claim**:

        (i)    brought by a security holder of the **Company** or **Outside Entity** for any actual or alleged violation of the Securities Act of 1933, the Securities Act of 1934, or any state securities statute; or

        (ii)    a derivative action brought by or on behalf of, or in the name or right of, the **Company**, and brought and maintained independently of, and without solicitation, assistance, participation or invention of the **Company, Insured Person,** or **Outside Entity**.

    (2)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance or situation, transaction, event or **Wrongful Act** which, before the Inception Date of this Policy, was the subject of any notice given under any other Management Liability insurance, Directors' and Officers' insurance, or any other similar insurance.

    Note:  EXCLUSION (B)(1) will not apply to any allegation of libel, slander, defamation, mental anguish or emotional distress if and only to the extent that such allegations are made as part of an **Employment Practices Claim** for an **Employment Practices Wrongful Act**.

No conduct of any **Insured Person** will be imputed to any other **Insured Person** to determine the application of any of the above EXCLUSIONS.

## IV.    CONDITIONS

(A)    **Limit of Liability**

    The amount set forth in ITEM 3 of the Declarations shall be the maximum aggregate Limit of Liability of the Insurer under this Policy.  Payment of **Loss**, including **Defense Expenses**, by the Insurer shall reduce the Limit of Liability.

(B)    **Indemnification and Other Insurance**

    (1)    The **Insured Persons** and the **Company** understand and agree that all coverage under this Policy shall be specifically excess over, and shall not contribute with:

        (i)    all indemnification to which an **Insured Person** may be entitled from any source, including but not limited to the **Company** or any **Outside Entity**; and

        (ii)    any **Insurance Program** maintained by the **Company** or any **Outside Entity**, whether such other insurance is stated to be primary, contributing, excess, or otherwise.

    (2)    This Policy shall not be subject to the terms or conditions of any other insurance.  The Insurer does not waive compromise or release any of its rights to recover **Loss** paid under this Policy from the issuers of any other insurance under which coverage may be owed, or from any person or entity from which an **Insured Person** is entitled to indemnification.

(C)    **Mergers and Acquisitions**

    (1)    If during the **Policy Period**, the **Company** acquires any assets, acquires a **Subsidiary**, or acquires any entity by merger, consolidation or otherwise, or assumes any liability of another entity, coverage

shall be provided for any **Loss** involving a **Claim** for a **Wrongful Act** occurring after the consummation of the transaction.

(2)   With respect to the acquisition, assumption, merger, consolidation or other of any entity, asset, **Subsidiary** or liability as described in (C)(1) above, there will be no coverage available under this Policy for any **Claim** made against the acquired, assumed, merged, or consolidated entity, asset, **Subsidiary**, liability, or **Insured Person** for a **Wrongful Act** committed at any time during which such entity, asset, liability, or **Subsidiary** is not insured under this Policy.

(3)   If during the **Policy Period** any entity ceases to be a **Subsidiary**, the coverage provided under this Policy shall continue to apply to the **Insured Persons** who because of their service with such **Subsidiary** were covered under this Policy but only with respect to a **Claim** for a **Wrongful Act** that occurred or allegedly occurred prior to the time such **Subsidiary** ceased to be a **Subsidiary** of the **Company**.

(4)   If, during the **Policy Period**, there is a **Change In Control**, the coverage provided under this Policy shall continue to apply but only with respect to a **Claim** for a **Wrongful Act** committed or allegedly committed prior to the time of the **Change In Control**; and

    (i)   coverage will cease with respect to any **Claim** for a **Wrongful Act** committed subsequent to the **Change In Control**; and

    (ii)   the entire premium for the Policy will be deemed to be fully earned immediately upon the consummation of a **Change In Control**.

(D)   **Notice**

(1)   As a condition precedent to any right to payment under this policy with respect to any **Claim**, the **Insured Persons** or the **Company** shall give written notice to the Insurer of any **Claim** as soon as practicable after it is first made.

(2)   If, during the **Policy Period**, the **Insured Persons** or the **Company** first becomes aware of a specific **Wrongful Act** and if, during the **Policy Period**, the **Insured Persons** or the **Company**:

    (i)   provide the Insurer with written notice of the specific **Wrongful Act**, the consequences which have resulted or may result therefrom (including but not limited to actual or potential damages), the identities of the potential claimants, and the circumstances by which the **Insured Persons** first became aware of such **Wrongful Act**; and

    (ii)   request coverage under this Policy for any subsequently resulting **Claim** for such **Wrongful Act**;

then any **Claim** subsequently made arising out of such **Wrongful Act** will be treated as if it had been first made during the **Policy Period**.

All notices under CONDITIONS (D) (1) and (2) must be sent by certified mail or the equivalent to the address set forth in ITEM 5 of the Declarations;   Attention: Claim Department.

(E)   **Defense and Settlement of Claims**

(1)   It shall be the duty of the **Insured Persons** and not the duty of the Insurer to defend **Claims**.  No **Insured Person** may incur any **Defense Expenses** or admit liability for, make any settlement offer with respect to, or settle any **Claim** without the Insurer's consent, such consent not to be unreasonably withheld.

(2)   Upon written request, the Insurer will pay on a current basis any **Defense Expenses** before the disposition of the **Claim** for which this Policy provides coverage.  As a condition of the advancement of

**Defense Expenses**, the Insurer may require a written undertaking, in a form satisfactory to the Insurer, which will guarantee the repayment of any **Loss** including **Defense Expenses** paid to or on behalf of the **Insured Persons** if it is finally determined that the **Loss** incurred is not covered under this Policy.

(3)     Except for such **Defense Expenses**, the Insurer shall pay **Loss** only upon the final disposition of any **Claim**.

(F)     **Assistance, Cooperation and Subrogation**

(1)     The **Insured Persons** and the **Company** agree to provide the Insurer with all information, assistance and cooperation that the Insurer may reasonably request, and further agree that they will do nothing which in any way increases the Insurer's exposure under this Policy or in any way prejudices the Insurer's potential or actual rights of recovery.

(2)     In the event of any payment under this Policy, the Insurer shall be subrogated to all of the potential or actual rights of recovery of the **Insured Persons**. The **Insured Persons** and the **Company** shall execute all papers required and will do everything necessary to secure such rights including but not limited to the execution of such documents as are necessary to enable the Insurer to effectively bring suit in their name, and will provide all other assistance and cooperation which the Insurer may reasonably require.

(G)     **Interrelated Claims**

All **Claims** arising from the same **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have be made at the earliest time at which the earliest such **Claim** is made or deemed to have been made pursuant to CONDITION (D)(1) and (2) above, if applicable.

(H)     **Exhaustion**

If the Insurer's Limit of Liability as set forth in ITEM 3 of the Declarations is exhausted by the payment of **Loss**, the premium as set forth in ITEM 6 of the Declarations will be fully earned, all obligations of the Insurer under this Policy will be completely fulfilled and exhausted, and the Insurer will have no further obligations of any kind whatsoever under this Policy.

(I)     **Cancellation and Renewal of Coverage**

(1)     Except for the nonpayment of premium, as set forth in (I)(2) below, the **Parent Company** has the exclusive right to cancel this Policy. Cancellation may be effected by mailing to the Insurer written notice when such cancellation shall be effective, provided the date of cancellation is not later than the Expiration Date set forth in ITEM 2 of the Declarations. In such event, the Insurer shall retain the customary short rate portion of the earned premium. Return or tender of the unearned premium is not a condition of cancellation.

(2)     The Insurer may only cancel this Policy for nonpayment of premium. The Insurer will provide not less than twenty (20) days written notice stating the reason for cancellation and when the Policy will be canceled. Notice of cancellation will be sent to the **Parent Company** and the agent of record for the **Insured Person**, if applicable.

(3)     The Insurer is under no obligation to renew this Policy upon its expiration. Once the Insurer chooses to non-renew this Policy, the Insurer will deliver or mail to the **Parent Company** written notice stating such at least sixty (60) days before the Expiration Date set forth in ITEM 2 of the Declarations.

(J)     **Optional Extension Period**

(1)     If either the **Parent Company** or the Insurer does not renew this Policy, the **Parent Company** shall have the right, upon payment of an additional premium set forth in ITEM 4 of the Declarations, to an

extension of the coverage provided by this Policy with respect only to any **Claim** first made during the period of time set forth in ITEM 4 of the Declarations after the Policy Expiration Date, but only with respect to a **Wrongful Act** occurring prior to the Policy Expiration Date.

(2)    As a condition precedent to the right to purchase the Optional Extension Period the total premium for this Policy must have been paid in full. The right of the **Parent Company** to purchase the Optional Extension Period will be immediately terminated if the Insurer does not receive written notice by the **Parent Company** advising it wishes to purchase the Optional Extension Period together with full payment of the premium for the Optional Extension Period within thirty (30) days after the Policy Expiration Date.

(3)    If the **Parent Company** elects to purchase the Optional Extension Period as set forth in (J)(1) and (2) above, the entire premium for the Optional Extension Period will be deemed to be fully earned at the Inception Date for the Optional Extension Period.

(4)    The purchase of the Optional Extension Period will not in any way increase the Limit of Liability set forth in ITEM 3 of the Declarations, and the Limit of Liability with respect to **Claims** made during the Optional Extension Period shall be part of and not in addition to the Limit of Liability for all **Claims** made during the **Policy Period.**

(K)    **Representation Clause**

Each **Insured Person** represents that the statements and particulars contained in the **Application** are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and constitute a part of this Policy, are the basis of this Policy. No knowledge or information possessed by any **Insured Person** will be imputed to any other **Insured Person** for the purposes of determining the availability of coverage with respect to **Claims** made against any other **Insured Person.**

(L)    **Action Against the Insurer, Assignment, and Changes to Policy**

(1)    No action may be taken against the Insurer unless, as a condition precedent thereto:

(i)    there has been full compliance with all of the terms and conditions of this Policy; and

(ii)    the amount of the obligation of the **Insured Person** has been finally determined either by judgment against the **Insured Person** after actual trial, or by written agreement of the **Insured Person**, the claimant and the Insurer.

(2)    Nothing contained herein shall give any person or entity any right to join the Insurer as a party to any **Claim** against the **Insured Person** to determine their liability, nor may the **Insured Person** implead the Insurer in any **Claim.**

(3)    Assignment of interest under this Policy shall not bind the Insurer unless its consent is endorsed hereon.

(4)    Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Insurer will not cause a waiver or change in any part of this Policy or prevent the Insurer from asserting any right under the terms, conditions and limitations of this Policy. The terms, conditions and limitations of this Policy may only be waived or changed by written endorsement signed by the Insurer.

(M)    **Authorization and Notices**

It is understood and agreed that the **Parent Company** will act on behalf of the **Company** and the **Insured Persons** with respect:

    (1)    the payment of the premiums,

    (2)    the receiving of any return premiums that may become due under this Policy,

    (3)    the giving of all notices to the Insurer as provided herein, and

    (2)    the receiving of all notices from the Insurer.

(N)    **Entire Agreement**

The **Insured Persons** agree that the Declarations, Policy, including the endorsements, attachments and the **Application** shall constitute the entire agreement between the Insurer or any of its agents and the **Insured Persons** relation to the insurance.

## POLICYHOLDER DISCLOSURE

### NOTICE OF TERRORISM
### INSURANCE COVERAGE

Coverage for acts of terrorism is already included in your current policy. You should know that, effective November 26, 2002, under your existing coverage, any losses caused by certified acts of terrorism would be partially reimbursed by the United States under a formula established by federal law. Under this formula, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The portion of your annual premium that is attributable to coverage for acts of terrorism is: $ waived.  Any premium waiver is only valid for the current Policy Period.

I ACKNOWLEDGE THAT I HAVE BEEN NOTIFIED THAT UNDER THE TERRORISM RISK INSURANCE ACT OF 2002, ANY LOSSES CAUSED BY CERTIFIED ACTS OF TERRORISM UNDER MY POLICY COVERAGE WILL BE PARTIALLY REIMBURSED BY THE UNITED STATES AND I HAVE BEEN NOTIFIED OF THE AMOUNT OF MY PREMIUM ATTRIBUTABLE TO SUCH COVERAGE.

Name of Insurer:   **XL Specialty Insurance Company**
Policy Number:     **ELU089673-05**

# IN WITNESS ENDORSEMENT

XL SPECIALTY INSURANCE COMPANY

ADMINISTRATIVE OFFICE:   SEAVIEW HOUSE
                         70 SEAVIEW AVENUE
                         STAMFORD, CT 06902-6040

STATUTORY HOME OFFICE:   1201 NORTH MARKET STREET
                         SUITE 501
                         WILMINGTON, DE 19801

It is hereby agreed and understood that the following In Witness Clause supercedes any and all other In Witness clauses in this policy.

All other provisions remain unchanged.

IN WITNESS WHEREOF, the Company has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

_____          _____
Richard S. Banas                          Kenneth P. Meagher
President                                 Secretary

IL MP 9104 0704 XLS

XL Specialty Insurance Company - Illinois Policyholder Notice

**IMPORTANT NOTICE TO ALL ILLINOIS POLICYHOLDERS**

In the event you need to contact someone about this Policy for any reason, please contact us at:

***XL Specialty Insurance Company***
***c/o XL Insurance Underwriters***
***100 Constitution Plaza, 17th Floor***
***Hartford, Connecticut 06103***

If you have been unable to contact or obtain satisfaction from the Insurer, you may contact the Illinois Department of Insurance to obtain information or make a complaint at:

***Illinois Department of Insurance***
***Consumer Division of Public***
***Services Section***
***Springfield, Illinois 62767***

CL 72 02 05 00

Endorsement No.: 1
Named Insured: Refco Inc.
Policy No: ELU089673-05

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# ILLINOIS AMENDATORY ENDORSEMENT

DIRECTORS & OFFICERS PROFESSIONAL LIABILITY COVERAGE FORM

I.       Section IV., CONDITIONS, paragraph (I), CANCELLATION AND RENEWAL OF COVERAGE, is deleted and replaced by: Cancellation -- "The Insured" may cancel this policy by returning the policy to "The Company," or by giving "The Company" written notice and stating at what future date coverage is to stop.

"The Company" may cancel this policy by mailing written notice of cancellation to "The Insured" and any mortgagee or lienholder at the last mailing address known to "The Company."

"The Company" will mail the notice to "The Insured" and any mortgagee or lienholder at least ten (10) days before the effective date of the cancellation when cancellation is for nonpayment of premium. When cancellation is for any other reason, "The Company" will mail the notice of cancellation to "The Insured" and any mortgagee or lienholder at least 30 days prior to the effective date of the cancellation during the first 60 days of coverage or 60 days prior to the effective date of the cancellation if the coverage has been in effect for more than 60 days.

If this policy has been in effect 60 days or more, or if it is a renewal of a policy issued by "us" effective immediately, "we" may cancel this policy only if one or more of the following reasons apply:

      a.      nonpayment of premium;

      b.      the policy was obtained through a material misrepresentation;

      c.      any "insured" has violated any of the "terms" and conditions of the policy;

      d.      the risk originally accepted has measurably increased;

      e.      certification of the Director of the loss of reinsurance by the insurer which provided coverage to "us" for all or a substantial part of the underlying risk insured; or

      f.      a determination by the Director that the continuation of the policy could place "us" in violation of the insurance laws of this state.

"Our" notice will include the reason or reasons for cancellation. "We" will also mail a copy of the notice to "your" broker, if known, or to the agent of record. Proof of mailing is sufficient proof of notice.

"Your" return premium, if any, will be calculated according to "our" rules. It will be refunded to "you" with the cancellation notice or within a reasonable time. Payment or tender of the unearned premium is not a condition of cancellation.

Nonrenewal -- If "we" decide not to renew this policy, "we" will mail "our" notice of nonrenewal to "you" at least 60 days before the end of the policy period or anniversary date.

"Our" notice will include the reasons for nonrenewal. "We" will also mail a copy of the notice to "your" broker, if known, or to the agent of record and any mortgagee or lienholder at the last mailing address known to "us". Proof of mailing is sufficient proof of notice.

CL 72 02 05 00

**Endorsement No.: 1**
**Named Insured: Refco Inc.**
**Policy No: ELU089673-05**

**Effective: August 11, 2005**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

Renewal -- If "we" decide to renew this policy with premium increases of 30% or higher, or impose changes in deductible or coverage that materially alter the policy, "we" will mail to "you" written notice of such increase or change in deductible or coverage at least 60 days prior to the renewal or anniversary date.

All other terms and conditions of the Policy remain the same.

CL 83 08 09 02

**Endorsement No.: 2**
**Named Insured: Refco Inc.**
**Policy No: ELU089673-05**

**Effective: August 11, 2005**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# PRIOR ACTS EXCLUSION

In consideration of the premium charged, no coverage will be available under this Policy for Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any act, error, omission, misstatement, misleading statement, neglect, breach of duty, or Wrongful Act, committed or allegedly committed prior to August 5, 2004.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

James Koval
_____
Print Name

Sr. Vice President
_____
Title

XL 83 07 01 00

**Endorsement No.: 3**
**Named Insured: Refco Inc.**
**Policy No: ELU089673-05**

**Effective: August 11, 2005**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# SPECIFIED CLAIMS EXCLUSION

In consideration of the premium charged, no coverage will be available under this Policy for Loss, including Defense Expenses, in connection with any proceeding set forth below, or in connection with any Claim based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any such proceeding or any fact, circumstance or situation underlying or alleged therein:

Edward McElwreath Case

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

XL 83 07 01 00

Page 1 of 1



XL 80 24 03 03

**Endorsement No.: 4**
**Named Insured: Refco Inc.**
**Policy No: ELU089673-05**

**Effective: August 11, 2005**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# TERRORISM PREMIUM ENDORSEMENT

Please note: The portion of your annual premium set forth in Item 6. of the Declarations that is attributable to coverage for acts of terrorism is: $ waived.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

XL 80 39 04 05

Endorsement No.: 5
Named Insured: Refco Inc.
Policy No: ELU089673-05

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# CHANGE OF ADDRESS OF INSURER ENDORSEMENT

In consideration of the premium charged, as of the effective date of this Endorsement:

**Notices required to be given to the Insurer must be addressed to:**

**Notice to Claim Dept:**

XL Professional

One Hundred Constitution Plaza, 18th Floor
Hartford, CT 06103
Attn: Claim Dept.

**All other Notices:**

XL Professional

One Hundred Constitution Plaza, 17th Floor
Hartford, CT 06103
Attn: Underwriting

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

CL 83 06 07 02

Endorsement No.: 6
Named Insured: Refco Inc.
Policy No: ELU089673-05

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# AMEND INSURED V. INSURED EXCLUSION

In consideration of the premium charged, Section III Exclusions (A)(1) of the Policy is amended to read in its entirety as follows:

"(1)     by, on behalf of, or at the direction of the Company, Outside Entity or any Insured Person, except and to the extent such Claim:

(i)     is brought by a security holder of the Company or Outside Entity who, when such Claim is made and maintained is acting independently of, and without the solicitation, assistance, participation or intervention of the Company or any Outside Entity;

(ii)     is brought by the Bankruptcy Trustee or Examiner of the Company or Outside Entity, or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the Company or Outside Entity;

(iii)     is in the form of a crossclaim, third party claim or other claim for contribution or indemnity by an Insured Person which is part of or results directly from a Claim which is not otherwise excluded by the terms of this Policy; or

(iv)     is an Employment Practices Claim;"

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

CL 83 14 10 03

Endorsement No.: 7
Named Insured: Refco Inc.
Policy No: ELU089673-05

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# PENDING AND/OR PRIOR LITIGATION EXCLUSION

In consideration of the premium charged, no coverage will be available under this Policy for Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or Wrongful Act, underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding or arbitration which was brought prior to August 11, 2005.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

CL 83 14 10 03

Page 1 of 1

CL 80 34 12 02

Endorsement No.: 8
Named Insured: Refco Inc.
Policy No: ELU089673-05

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# AMEND MERGERS AND ACQUISITIONS ENDORSEMENT

In consideration of the premium charged, Section IV Conditions (C)(1) of the Policy is amended to read in its entirety as follows:

"(1)      If during the Policy Period, the Company acquires any assets, acquires a Subsidiary, or acquires any entity by merger, consolidation or otherwise, or assumes any liability of another entity, coverage shall be provided for any Loss involving a Claim for a Wrongful Act occurring after the consummation of the transaction; provided however, if by reason of the transaction (or series of transactions) the entity, assets, Subsidiary or liabilities so acquired or so assumed, exceed thirty five percent (35%) of the total assets or liabilities of the Company, as represented in the Company's most recent audited consolidated financial statements, coverage under this Policy shall be provided for a period of ninety (90) days for any Loss involving a Claim for a Wrongful Act that occurred after the transaction has been consummated. Coverage beyond the ninety (90) day period will be provided only if:

(a)      the Insurer receives written notice containing full details of the transaction(s); and

(b)      the Insurer at its sole discretion, agrees to provide such additional coverage upon such terms, conditions, limitations, and additional premium that it deems appropriate."

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

CL 80 34 12 02

Page 1 of 1

CL 80 18 09 02

Endorsement No.: 9
Named Insured: Refco Inc.
Policy No: ELU089673-05

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# AMEND CONDITIONS (B)(1) ENDORSMENT

In consideration of the premium charged, Section IV Conditions (B)(1) of the Policy is amended to read in its entirety as follows:

"(1)    The Insured Persons and the Company understand and agree that all coverage under this Policy shall be specifically excess over, and shall not contribute with:

    (i)    all indemnification to which an Insured Person may be entitled from any source, including but not limited to the Company or any Outside Entity; and

    (ii)    any Insurance Program maintained by the Company or any Outside Entity, whether such other insurance is stated to be primary, contributing, excess or otherwise.

However, if Loss is not paid by such other insurance or as indemnification, this Policy will respond on behalf of the Insured Persons as if it were primary, subject to all of its terms, conditions and limitations and without prejudice to the Insurer's excess position."

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title



**XL 80 34 10 04**

| | |
|---|---|
| Endorsement No.: 10 | Effective: August 11, 2005 |
| Named Insured: Refco Inc. | 12:01 A.M. Standard Time |
| Policy No: ELU089673-05 | Insurer: XL Specialty Insurance Company |

# RESCISSION ENDORSEMENT

In consideration of the premium charged, the Insurer shall not be entitled under any circumstances to rescind this Policy, other than for non-payment of premium.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

XL 83 25 10 00

**Endorsement No.: 11**
**Named Insured: Refco Inc.**
**Policy No: ELU089673-05**

**Effective: August 11, 2005**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# SPECIFIED ACTS EXCLUSION

In consideration of the premium charged, no coverage will be available under this Policy for Loss, including Defense Expenses, in connection with any fact, circumstance, situation, transaction, event or Wrongful Act set forth below or in connection with any Claim, based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

        Wells Notice/ SEC Investigation

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

Manuscript 3027 12 05

Endorsement No.: 12
Named Insured: Refco Inc.
Policy No: ELU089673-05

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# CONTROLLING SHAREHOLDER ENDORSEMENT

In consideration of the premium charged:

(1)     The term "Insured Person," as defined in Section II. DEFINITIONS (I) of the Policy, is amended to include Philip Bennett in his capacity as a controlling shareholder of the Company, but only with respect to Securities Claims to the extent and during such time that such Securities Claims are also made and maintained against any other Insured Person or the Company.

(2)     With respect to Philip Bennett only, the definition of "Wrongful Act" in Section II. DEFINITIONS (P) of the Policy is amended to include the following:

   (a)     any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by Philip Bennett while acting in his capacity as controlling shareholder of the Company, or

   (b)     any matter claimed against Philip Bennett solely by reason of his status as controlling shareholder of the Company.

(3)     "Securities Claim" means a Claim which is brought by or on behalf of one or more of the securities holders of the Company in their capacities as such, or which arises from the purchase or sale of, or offer to purchase or sell, any securities issued by the Company, whether such purchase, sale or offer involves a transaction with the Company or occurs in the open market.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

Endorsement No.: 13
Named Insured: Refco Inc.
Policy No: ELU089673-05

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

XL 80 04 04 00

# INVERTED REPRESENTATION ENDORSEMENT

In consideration of the premium charged, no coverage will be available under this Policy for Loss, including Defense Expenses, from Claims arising from any fact, circumstance or situation of which, as of the effective date of this Policy, any Insured had knowledge and had reason to suppose might afford grounds for any Claim that would fall within the scope of the insurance afforded by this Policy.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

EXECUTIVE LIABILITY UNDERWRITERS    ☐ Indian Harbor Insurance Company
Member of the XL America Companies

## APPLICATION FOR CLASSIC A-SIDE MANAGEMENT
## LIABILITY INSURANCE POLICY

**NOTICE: THE POLICY FOR WHICH THIS APPLICATION IS MADE APPLIES, SUBJECT TO ITS TERMS, ONLY TO "CLAIMS" FIRST MADE DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED BY "DEFENSE EXPENSES," AND "DEFENSE EXPENSES" WILL BE APPLIED AGAINST THE RETENTION.  THE INSURER WILL HAVE NO DUTY UNDER THE POLICY TO DEFEND ANY "CLAIM."  THE ENTIRE APPLICATION SHOULD BE CAREFULLY READ BEFORE IT IS EXECUTED.**

1.    a) Name of Applicant: *Refco, Inc.*
       (Whenever used in this Application, the term "Applicant" shall mean the Parent Company)

     b) Principal Address: *550 W. Jackson Blvd*

       City: *Chicago*        State: *IL*  Zip Code: *60661*

     c) Name and title of the officer of the **Applicant** designated as the representative to receive all notices from the Insurer on behalf of all person(s) and entity(s) proposed for this Insurance:

2.    Has the **Applicant** or any **Subsidiary** in the past thirty-six (36) months completed or agreed to, or does it contemplate within the next (12) months, any of the following, whether or not such transaction was or will be completed?  If "Yes," please describe the significant provisions of the transaction(s) as an attachment to this Application.

     a) Any registration for a public placement of securities?       ☒ Yes  ☐ No

     b) Reorganization or arrangement with creditors under federal or state law? *See above*  ☐ Yes  ☐ No

3.    Prior Activities:

     a) Has any person(s) or entity(s) proposed for this insurance been a party to any of the following?

         1) Any civil, criminal or administrative proceeding alleging or investigating a violation of any securities or regulation?  ☐ Yes  ☒ No

         2) Any representative actions, class actions or derivative suits?       ☐ Yes  ☐ No

        If "Yes" to 1) or 2) above, a statement to the Application providing full details must be attached.

     b) No claims have been made against any persons or entity(s) proposed for this insurance in their capacity as a director or officer of the Applicant, except as follows (provide detail as to defense costs, settlements, judgments, or other amounts). If answer is "none" so state:
       *McElwreath v. Refco Securities — Marsh will*
       *forward documents*

     c) No persons or entity(s) proposed for this insurance is cognizant of any fact, circumstance or situation which they have reason to suppose might afford grounds for any claim such as would fall within the scope of the proposed insurance, except as follows.  If answer is "none," so state:

Without prejudice to any other rights and remedies of the Insurer, any claim arising from any claims, facts, circumstances or situations disclosed or required to be disclosed in response to 3. b) and 3. c) is excluded from the proposed insurance.

4.    As part of this Application, please submit the following documents with respect to the Applicant:

     a) Latest 10-Q report filed and any 8-K or 13D reports filed with the SEC within the last 12 months.

     b) Each prospectus, offering circular or private placement memorandum within the last 12 months.

     c) Last proxy statement, 10-K and annual report, including audited financial statements with all notes and schedules.

     d) Copies of all provisions of the Applicant's charter and bylaws relating to the indemnification of its directors and officers.

**EXECUTIVE LIABILITY UNDERWRITERS**    ☐    **Indian Harbor Insurance Company**
Member of the XL America Companies

FOR THE PURPOSE OF THIS APPLICATION, THE UNDERSIGNED AUTHORIZED AGENT OF THE PERSONS AND ENTITY(S) PROPOSED FOR THIS INSURANCE DECLARES THAT TO THE BEST OF THEIR KNOWLEDGE AND BELIEF, AFTER REASONABLE INQUIRY, THE STATEMENTS HEREIN ARE TRUE AND COMPLETE. THE INSURER IS AUTHORIZED TO MAKE ANY INQUIRY IN CONNECTION WITH THIS APPLICATION. SIGNING THIS APPLICATION DOES NOT BIND THE INSURER TO COMPLETE THE INSURANCE.

THE UNDERSIGNED DECLARES THAT THE PERSON(S) AND ENTITY(S) PROPOSED FOR THIS INSURANCE UNDERSTAND:

(A)     THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED, AND MAY BE COMPLETELY EXHAUSTED BY THE PAYMENT OF "DEFENSE EXPENSES," AND IN SUCH EVENT, THE INSURER WILL NOT BE RESPONSIBLE FOR ANY ONGOING DEFENSE EXPENSES OR FOR THE AMOUNT OF ANY JUDGEMENT OR SETTLEMENT TO THE EXTENT THAT ANY OF THE FOREGOING EXCEED ANY APPLICABLE LIMIT OF LIABILITY;

(B)     "DEFENSE EXPENSES" WILL BE APPLIED AGAINST THE RETENTION;

(C)     THIS POLICY APPLIES ONLY TO "CLAIMS" FIRST MADE OR DEEMED MADE DURING THE "POLICY PERIOD," OR, IF PURCHASED, ANY EXTENDED REPORTING PERIOD;

(D)     THE INSURER HAS NO DUTY UNDER THIS POLICY TO DEFEND ANY "CLAIM."

IF THE INFORMATION IN THIS APPLICATION MATERIALLY CHANGES BETWEEN THE DATE OF THIS APPLICATION AND THE POLICY EFFECTIVE DATE, THE APPLICANT WILL NOTIFY THE INSURER WHO MAY MODIFY OR WITHDRAW ANY QUOTATION.

THE INFORMATION CONTAINED AND SUBMITTED WITH THIS APPLICATION IS ON FILE WITH THE INSURER AND, ALONG WITH THE APPLICATION, IS CONSIDERED TO BE PHYSICALLY ATTACHED TO THE POLICY AND WILL BECOME PART OF THE POLICY IF ISSUED.

NOTICE TO COLORADO APPLICANTS:  IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY.  PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE, AND CIVIL DAMAGES.  ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICY HOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICY HOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES.

NOTICE TO FLORIDA APPLICANTS:  ANY PERSON WHO, KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY EMPLOYER OR EMPLOYEE, INSURANCE COMPANY, OR SELF-INSURED PROGRAM, FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE OR MISLEADING INFORMATION IS GUILTY OF A THIRD DEGREE FELONY.

NOTICE TO KENTUCKY APPLICANTS:  ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES ANY APPLICATION FOR INSURANCE CONTAINING ANY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME.

NOTICE TO MINNESOTA, OHIO AND ARKANSAS APPLICANTS:  ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD, WHICH IS A CRIME.

NOTICE TO NEW JERSEY APPLICANTS:  ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES.

CL 95 00 03 00

**EXECUTIVE LIABILITY UNDERWRITERS**    ☐  **Indian Harbor Insurance Company**
Member of the XL America Companies

NOTICE TO NEW YORK APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION. NO COVERAGE EXISTS FOR CLAIMS FIRST MADE AFTER THE END OF THE POLICY PERIOD UNLESS, AND TO THE EXTENT, THE EXTENDED REPORTING PERIOD APPLIES. UPON TERMINATION OF COVERAGE FOR ANY REASON, A 60-DAY AUTOMATIC EXTENDED REPORTING PERIOD WILL APPLY. FOR AN ADDITIONAL PREMIUM CALCULATED AS INDICATED IN ITEM 5 OF THE DECLARATION, AN EXTENDED REPORTING PERIOD CAN BE PURCHASED FOR A PERIOD OF AT LEAST ONE YEAR. NO COVERAGE WILL EXIST AFTER THE EXPIRATION OF THE EXTENDED REPORTING PERIOD WHICH MAY RESULT IN A POTENTIAL COVERAGE GAP IF PRIOR ACTS COVERAGE IS NOT SUBSEQUENTLY PROVIDED BY ANOTHER CARRIER. DURING THE FIRST SEVERAL YEARS OF CLAIMS MADE RELATIONSHIPS, CLAIMS MADE RATES ARE COMPARATIVELY LOWER THAN OCCURRENCE RATES, AND THE INSURED CAN EXPECT SUNSTANTIAL ANNUAL PREMIUM INCREASES, INDEPENDENT OF OVERALL RATE INCREASES UNTIL THE CLAIMS MADE RELATIONSHIP REACHES MATURITY.

NOTICE TO OKLAHOMA APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY.

NOTICE TO PENNSYLVANIA APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.

APPLICANT: _PRES. CHAIRMAN AND CEO._    _8/15/05._

BY (Signature of Chairman and/or President)    TITLE    DATE

It is agreed and understood that the Application will only be executed by the Chairman and/or President of the **Applicant** acting in their capacity(s) as the authorized agent of the individual(s) and entity(s) proposed for this insurance.

PRODUCER (Insurance Agent or Broker):    INSURANCE AGENCY OR BROKERAGE:

INSURANCE AGENCY OR BROKERAGE TAXPAYER ID OR SOCIAL SECURITY NO.:    AGENT OR BROKER LICENSE NO.:

ADDRESS OF AGENT OR BROKER (include Street, City, and Zip Code):

E-MAIL ADDRESS OF AGENT OR BROKER:

SUBMITTED BY (Insurance Agency or Brokerage):

INSURANCE AGENCY OR BROKERAGE TAXPAYER ID OR SOCIAL SECURITY NO.:    AGENT OR BROKER LICENSE NO.:

ADDRESS OF AGENT OR BROKER (include Street, City, and Zip Code):

CL 95 00 03 00    Page 3 of 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
                                    :
UNITED STATES OF AMERICA            :
                                    :
        -v-                         :
                                    :
PHILLIP R. BENNETT,                 :
ROBERT C. TROSTEN and               :
TONE N. GRANT,                      :
                                    :
              Defendants.           :
                                    :
------------------------------------x

REDACTED

<u>INDICTMENT</u>

S3 05 Cr. 1192 (NRB)

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
D    ED:  1·16  07
```

<u>COUNT ONE</u>

(Conspiracy To Commit Securities Fraud, Wire Fraud, To Make
False Filings With The SEC, To Make Material Misstatements To
Auditors, Bank Fraud and Money Laundering)

        The Grand Jury charges:

<u>RELEVANT ENTITIES AND PERSONS</u>

        1.  At certain times relevant to this Indictment,

Refco, Inc. was a Delaware corporation with its principal place

of business in New York, New York.  From at least the mid-1990s,

the business of Refco, Inc. and its predecessor entities included

providing execution and clearing services for exchange-traded

derivatives and providing prime brokerage services in the fixed

income and foreign exchange markets.  Refco, Inc. held its

initial public offering of common stock on or about August 10,

2005.  Prior to on or about August 10, 2005, Refco, Inc.'s

predecessor entities were privately held.  Refco, Inc. and its

predecessor entities are referred to herein collectively as

"Refco."

2.     At all times relevant to this Indictment, PHILLIP R. BENNETT, the defendant, was the President and Chief Executive Officer of Refco.  At all times relevant to this Indictment, BENNETT had a substantial ownership interest in Refco, directly and indirectly.

3.     At certain times relevant to this Indictment, ROBERT C. TROSTEN, the defendant, held senior management positions at Refco.  Among other positions, TROSTEN was Chief Financial Officer of Refco, a position he held from in or about May 2001 until in or about August 2004, when he left the company.

4.     At certain times relevant to this Indictment, TONE N. GRANT, the defendant, held a senior management position at Refco.  From at least in or about 1997 through in or about June 1998, GRANT was the President of Refco.  At certain times relevant to this Indictment, GRANT indirectly, held a significant ownership interest in Refco.

5.     At all times relevant to this Indictment, Bank Für Arbeit Und Wirtschaft Und Österreichische Postparkasse Aktiengesellschaft,("BAWAG"), was the fourth largest bank in Austria.  BAWAG was owned at various times by, among other entities, the Austrian Trade Unions Association, formally known as Österreichischer Gewerkschaftsbund (ÖGB).  At various times relevant to this Indictment, BAWAG indirectly held a substantial ownership interest in Refco.

2

6.    At all times relevant to this Indictment, Refco
Group Holdings, Inc. ("RGHI") was a privately-held Delaware
corporation that held a substantial ownership interest in Refco.
At various times relevant to this Indictment, RGHI was owned in
whole or in part by PHILLIP R. BENNETT and TONE N. GRANT.

### THE SCHEME TO DEFRAUD

7.    From at least as early as in or about the mid
1990s, PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT,
the defendants, together with others known and unknown, schemed
to hide the true financial health of Refco from its banks,
counterparties, auditors, and investors.  Starting at least as
early as the mid 1990s, BENNETT and GRANT embarked on a strategy
to mask the true performance of Refco's business in order to sell
the company for their own benefit and that of Refco's other
owners.  To that end, over the ensuing years, BENNETT, TROSTEN,
GRANT and others known and unknown systematically (1) covered up
both Refco's own losses and customer losses for which Refco
became responsible; (2) moved Refco operating expenses off the
company's books; and (3) padded Refco's revenues, all in an
effort to mislead Refco's banks, counterparties, auditors and
investors, with the goals of keeping Refco in business and then
selling it for the maximum benefit to its owners and senior
management.

8.    In furtherance of this scheme, PHILLIP R. BENNETT,

3

ROBERT C. TROSTEN, TONE N. GRANT, and others known and unknown made and caused Refco and others on its behalf to make false and fraudulent statements to Refco's banks, counterparties, customers, auditors, and investors, and to create false audited financial statements and false public filings with the United States Securities and Exchange Commission ("SEC"). The scheme included obtaining, through fraud, the following: lines of credit for Refco; the private sale of notes prior to 2004; the sale of 57% of Refco to a group headed by Thomas H. Lee Partners in 2004; the sale of approximately $600 million of notes to the public in 2004; approximately $800 million of bank financing obtained in 2004; and the August 2005 initial public offering of stock ("IPO") in Refco, Inc., in which the public purchased approximately $583 million of Refco common stock based on a false and fraudulent registration statement.

### Early Origins Of Refco's Financial Problems

9. In or about the mid-1990s, Refco was wholly owned by RGHI, which in turn was owned by PHILLIP R. BENNETT, TONE N. GRANT and one other partner. As of early 1997, RGHI owed Refco at least approximately $106 million. Starting later in 1997, Refco directly and indirectly incurred a series of substantial trading losses that threatened the continued viability of Refco's business. In response to these losses, at various times between in or about May 1997 and in or about October 2005, BENNETT and

his coconspirators, including TONE N. GRANT and ROBERT C.
TROSTEN, moved losses and expenses out of Refco and into RGHI,
and artificially padded Refco's revenues at the expense of RGHI,
in an effort to hide Refco's true liabilities, manipulate its
reported earnings, and thereby seek to defraud a purchaser into
buying the firm at a price that would pay off the accumulated
debt and ensure a profit to Refco's owners.  This strategy
resulted in an enormous increase in the already large debt from
RGHI to Refco that eventually totaled more than $1 billion.  The
debt by RGHI to Refco, carried on Refco's books as a receivable
from RGHI, was over time comprised of, among other things, the
following principal components: (a) liabilities incurred by Refco
when brokerage customers to whom it had extended credit defaulted
on their obligations, which were later transferred to RGHI; (b)
Refco's proprietary trading losses; (c) various operating
expenses incurred by Refco and paid in the first instance by
Refco but later transferred to RGHI as an increase in RGHI's debt
to Refco; and (d) transactions designed to pad Refco's revenues
in which the benefits accrued to Refco and the associated costs
were incurred by RGHI.

     10.  As a commodities, securities, and futures
brokerage and clearing firm, Refco extended credit to customers,
allowing customers to make securities, commodities, and futures
trades in accounts held at Refco.  In the later 1990s, certain

Refco customers to whom Refco had extended credit sustained hundreds of millions of dollars of trading losses in their accounts at Refco. When the customers were unable to make payments on the credit Refco had extended, Refco liquidated certain of the positions and assumed the resulting losses in the customers' accounts. Refco sustained large losses of this type, among other times, in 1997, totaling at least approximately $225 million. These customer losses included the following:

### Asian Debt Crisis Customers

11. In or about May 1997, a group of Refco customers to whom Refco had extended credit for the purpose of investing in Asian markets sustained large losses in connection with the Asian debt crisis. When those customers were unable to cover their losses, Refco paid the losses, using hundreds of millions of dollars of customer funds within the unregulated segments of its business. By the end of May 1997, these losses totaled more than $310 million, and, at the end of December 1997, based on changed market conditions, they totaled approximately $185 million.

### Customer 1

12. In or about October 1997, a Refco customer to whom Refco had extended credit ("Customer 1"), lost more than $90 million in a series of transactions carried out on the Chicago Mercantile Exchange ("CME"). When Customer 1 could not cover his margin requirements, Refco was forced to meet the margin call

from the CME, using the proceeds of an intra day loan from a financial institution of at least approximately $90 million to meet its margin requirements, and then using customer funds taken from the unregulated segments of Refco's business to repay the intra day loan.

13. Recognizing that public acknowledgment of a loss of more than $90 million would threaten Refco's continued existence, PHILLIP R. BENNETT, TONE N. GRANT and others known and unknown falsely represented to the public and other customers that Refco had not sustained a significant loss as a result of Customer 1's losses. In addition, BENNETT, GRANT and ROBERT C. TROSTEN significantly misrepresented the size of the loss to Refco's auditors.

14. PHILLIP R. BENNETT and TONE N. GRANT, having misrepresented to third parties that Refco had not suffered a significant loss as a result of Customer 1's trading activity, caused at least $71 million of debt owed by Customer 1 from the trading losses to be transferred to become a debt from RGHI to Refco.

### Proprietary Trading Losses

15. In the late 1990s, Refco also incurred substantial losses from proprietary trades, or trades carried out on its own behalf. For example, in or about 1998, Refco suffered a loss of at least approximately $40 million on its investment in Russian

bonds after the Russian Government defaulted on its obligations. PHILLIP R. BENNETT, so as to avoid having to acknowledge this loss on Refco's books, caused Refco to inflate the value of the bonds in Refco's books and records to hide the full magnitude of the loss.  Eventually, BENNETT caused those losses to be transferred to RGHI, so that they appeared as a debt from RGHI to Refco.

### Refco Expenses Moved To RGHI

16.  Beginning at least as early as 1999, PHILLIP R. BENNETT and others schemed to reduce Refco's expenses (therefore falsely increasing Refco's apparent profitability) by moving Refco expenses off of Refco's books and onto the books of RGHI. For example:

a. From at least as early as February 1999, and continuing until at least in or about February 2002, BENNETT and others caused a total of approximately $46.3 million of computer systems expenses incurred by Refco to be transferred to RGHI, in the following years in the following amounts:

8

| Fiscal Year End | Amount Transferred to RGHI |
|---|---|
| 2000 | $7,378,927.80 |
| 2001 | $8,797,189.98 |
| 2002 | $9,393,846.76 |
| 2003 | $7,002,153.65 |
| 2004 | $4,876,657.60 |
| 2005 | $5,028,053.21 |
| 2006 | $3,895,030.92 |

b. On or about August 9, 1999, BENNETT and others caused a total of approximately $1.5 million of expenses characterized as payroll expenses to be transferred from Refco to RGHI.

17. The result of these actions by PHILLIP R. BENNETT and his coconspirators was to create a large and growing debt owed by RGHI to Refco. By in or about February 1999, RGHI owed Refco at least approximately $252 million. In addition, as of in or about February 1999, at least approximately $156 million of customer losses for which Refco was responsible were held in accounts within Refco Global Finance, a consolidating Refco subsidiary. Thus, a total of at least approximately $409 million in customer losses, Refco losses, and other expenses, principally from the sources outlined above, had accumulated by February 1999.

9

## Refco's Losses Funded By Use Of Customer Funds

18.    Starting at least in or about 1997, PHILLIP R.
BENNETT and TONE N. GRANT caused Refco to use customer funds to
cover its losses.  As a result, Refco was perpetually short of
cash, and was often unable to cover settlement of its customers'
transactions.  Accordingly, BENNETT, GRANT and others caused
Refco to systematically fail to meet settlement on its customer
transactions, often on a daily basis, in amounts that exceeded,
at times, $100 million a day.  BENNETT, GRANT and others then
caused Refco to repeatedly misrepresent to the financial
institutions to whom Refco owed money to settle Refco's
customers' transactions that its failure to make settlement was
an error, when in fact Refco purposefully selected, on a rotating
basis, institutions with whom it would fail to make settlement,
and attempted to stagger its failures to make settlement with
each institution so as not to arouse suspicion from the
institutions that Refco was in fact unable to fulfill its daily
settlement obligations.

## BAWAG Invests In Refco

19.    By the end of 1998, Refco was in a precarious
financial condition, in light of the significant customer and
proprietary trading losses it had absorbed and the resulting
daily failure to make settlement on customer transactions.  In
order to address that problem, in or about late 1998, PHILLIP R.

BENNETT sought a capital contribution from a long-time Refco customer, BAWAG Bank of Austria. In a transaction that closed in 1999, BAWAG through an affiliate purchased a ten percent ownership interest in Refco for approximately $95 million, and lent Refco approximately $85 million of additional capital in return for an option to purchase an additional ten percent of Refco.

### Hiding The RGHI Receivable

20. Throughout the period covered by this Indictment, Refco's books were audited by independent auditors on an annual basis, with a fiscal year-end on the last day of February. Among the items the auditors examined each year were "related party transactions," and, in particular, transactions between and among Refco and members of Refco's management, including PHILLIP R. BENNETT. Refco and RGHI were related parties.

21. Beginning at least as early as February 1998, PHILLIP R. BENNETT directed others known and unknown to hide the size of the huge and growing RGHI receivable from, among others, Refco's auditors, by carrying out a series of transactions in order temporarily to pay down all or part of the RGHI receivable over Refco's fiscal year-end and replace it with a receivable from one or more other entities not related to BENNETT or Refco. At certain times, BENNETT also caused the Asian Debt Crisis Customer Losses, which were held in an account at Refco Global

11

Finance, a consolidating entity within Refco Group, to temporarily be transferred out of Refco to RGHI and then, together with the rest of the RGHI receivable, transferred to one or more third parties not affiliated with Refco over its fiscal year-end. BENNETT and, later, ROBERT C. TROSTEN, caused the reduction of all or part of the RGHI receivable in this manner at every fiscal year-end from at least the fiscal year-end on February 28, 1998 through the fiscal year-end on February 29, 2004. BENNETT and TROSTEN directed these transactions in order to hide the existence of the related party receivable and the underlying causes of its existence from Refco's auditors, banks, investors, and others.

22. In 1998 and 1999, PHILLIP R. BENNETT, and with respect to 1999, TONE N. GRANT, carried out year-end cover-up transactions in a manner similar to that described below, in the following approximate amounts:

| Date | Approximate Customer Loans |
| --- | --- |
| February 1998 | $175 million |
| February 1999 | $265 million |

23. Beginning in 2000, PHILLIP R. BENNETT's year-end cover-up transactions were of two types: transactions with Refco customers, and transactions with BAWAG. In summary, these year-end transactions were carried out in the following approximate amounts and with the following parties during the 2000 to August

2004 period:

| Date | Approximate Customer Loans | BAWAG Loans | Approximate Total Loan Amount |
|------|----------------------------|-------------|-------------------------------|
| Feb. 2000 | $310 million | $300 million | $610 million |
| Feb. 2001 | $450 million | $300 million | $750 million |
| Feb. 2002 | $625 million | $300 million | $925 million |
| Feb. 2003 | $650 million | $250 million | $900 million |
| Feb. 2004 | $720 million | $250 million | $970 million |
| May 2004 | $700 Million | $0 | $700 million |

24. These transactions typically followed standard patterns. For example, in or about February 2000, PHILLIP R. BENNETT caused the following transactions to occur with several customers and BAWAG, for the purpose of paying down a portion of the RGHI receivable over the February 2000 year-end:

a. Three different customers (collectively, the "Three Customers") lent a total of approximately $310 million to RGHI, which it then used to pay down its obligation to Refco. At the same time, Refco lent to the Three Customers $310 million. As a result, it appeared on Refco's books and records that Refco had $310 million in receivables from the Three Customers, and the debt from RGHI appeared to be reduced by $310 million. In or about March 2000, the transactions were unwound, with Refco lending $310 million back to RGHI (thus increasing the amount owed by RGHI to Refco by $310 million), which RGHI then used to pay back the Three Customers the full amount of the loan. To

13

ensure a profit for the Three Customers, the interest rate that RGHI paid to the Three Customers was higher than the interest rate that the Three Customers paid to Refco. Each of the transactions with the customers were memorialized in loan agreements between Refco, RGHI and the Three Customers, similar to the agreements that follow:

(i). On or about February 25, 2000, Refco Capital Markets, Ltd. a Bermuda corporation controlled by Refco, loaned Customer 2, one of the Three Customers, approximately $150 million. The loan was to be repaid on March 9, 2000.

(ii). On or about the same day, February 25, 2000, Customer 2 loaned approximately $150 million to RGHI. The repayment date was on or about March 9, 2000. The loan agreement for this loan was executed by BENNETT on behalf of RGHI. The interest rate on this loan was 15 basis points higher than the interest rate on the loan from Refco Capital Markets to Customer 2, thereby assuring Customer 2 a profit.

(iii). On or about the same date, BENNETT signed a letter of guaranty to Customer 2 on behalf of Refco Group, Ltd., assuring Customer 2 that, should RGHI default on its approximately $150 million obligation to Customer 2, Refco Group, Ltd. would make Customer 2 whole.

b. At or around the same time as the

14

transactions with the Three Customers, BAWAG loaned RGHI $300 million in cash.  RGHI then used the $300 million to pay off $300 million of its debt to Refco, and Refco then loaned to BAWAG $225 million, using the remaining $75 million to fund its operations. In or about March 2000, the transaction was unwound.  Refco lent $300 million to RGHI, thus recreating a $300 million debt to Refco from RGHI.  RGHI then used the $300 million to pay off the loan from BAWAG.  No loan documents were prepared to document this or any of the subsequent BAWAG transactions.

25.  In addition to the year-end transactions described above, which were designed to hide from Refco's auditors and investors the losses and other components of the RGHI receivable, PHILLIP R. BENNETT, TONE N. GRANT and ROBERT C. TROSTEN, and others, consistently lied and caused others to lie to Refco's auditors in an effort to cover up the size of those losses and other expenses contained in the RGHI receivable.  For example, on or about April 30, 2003 and April 27, 2004, BENNETT and TROSTEN each signed letters to Refco's auditors in which they represented that "[r]elated party transactions and related amounts receivable," including "loans" and "transfers" had all "been properly recorded or disclosed in the consolidated financial statements," when in fact neither BENNETT nor TROSTEN had disclosed the true amount of the related party transactions or indebtedness.

## Refco Sells Notes Based On False Financial Information

26.  At various times prior to August 2004, PHILLIP R. BENNETT and ROBERT C. TROSTEN, in furtherance of the scheme to defraud Refco's potential investors, caused Refco to raise capital through the private placement of certain notes.  These notes were sold to investors based, in part, on the audited financial statements prepared by Refco's auditors, which in turn were rendered false and misleading by the year-end cover-up transactions outlined above and the siphoning of Refco expenses out of Refco and into RGHI.  In particular, BENNETT and TROSTEN caused Refco to raise the following capital through the sale of the following notes to investors, based on false and fraudulent financial statements:

| Date | Note Coupon And Due Date | Approximate Capital Raised |
|------|--------------------------|-----------------------------|
| November 30, 1999 | Series C 8.85% Maturing on November 30, 2007 | $56 million |
| June 29, 2000 | Series D 9.18% Maturing on June 29, 2005 | $37 million |
| October 15, 2002 | Series E 5.9% Maturing on October 15, 2007 | $100 million |
| October 15, 2002 | Series F 6.6% Maturing on October 25, 2009 | $122.5 million |

## Refco Obtains Credit Counterparty Relationships Based On False Financial Information

27.  Because Refco was constantly in need of cash to cover its transactions and meet settlement, Refco sought and

16

obtained credit from banks and other financial institutions, including a revolving line of credit from a number of financial institutions, including JP Morgan Chase, beginning in or about 1998, that eventually grew to more than $300 million.  For each such transaction, including the annual renewal of the revolving line of credit, Refco submitted to the proposed creditor the fraudulent financial statements and made other false statements which materially misstated the health of Refco.

### Refco Helps BAWAG Hide Its Own Balance Sheet Problems

28.  Between 2000 and 2005, while BAWAG assisted PHILLIP R. BENNETT in hiding the RGHI receivable in the manner described above, BENNETT caused Refco to assist BAWAG in hiding its own balance sheet problem.  In or about early 2000, BAWAG entrusted approximately €350 million of BAWAG's funds to an investment advisor, who by the end of 2000 reported to the bank that he had lost substantially all of those funds.  In order to disguise this loss on its balance sheet, BAWAG arranged through BENNETT to hold in an account at Refco certain worthless bonds and other investments that Refco, at BENNETT's direction, maintained at a false value that, over time, reached at least approximately €500 million.  These fake assets were purportedly housed at Refco and maintained at an inflated value for BAWAG's benefit until 2005.

### BAWAG Invests Further In Refco

29.   In or about 2003 and 2004, BAWAG, through a series of off-shore corporate entities, made two contributions to Refco totaling approximately $467,480,000.  In return, BAWAG received the right to approximately 27.2% of the proceeds of the sale of Refco and, together with its existing interest in 20 percent of Refco, had rights to approximately 47 percent of the proceeds of a sale of the company.

### BENNETT's "Exit Strategy" Develops

30.   In or about 2003, PHILLIP R. BENNETT caused Refco to hire the investment bank Credit Suisse First Boston ("CSFB") to assist in selling Refco.  BENNETT asked CSFB to find a major investment bank or commercial bank to purchase Refco, but no such buyer was found to be interested.  After efforts to sell Refco to such a first line buyer failed, BENNETT directed CSFB to look for other purchasers for the company, with the understanding that it would be taken public.

31.   In connection with PHILLIP R. BENNETT's plan to sell Refco, BENNETT and ROBERT C. TROSTEN (a) continued to siphon Refco expenses and losses into RGHI, and (b) padded Refco's reported revenue in order to hit budgeted income targets set by BENNETT and others to disguise the ongoing operational problems at the company.

32.   For example, in or about March 2004, PHILLIP R.

18

BENNETT and others caused approximately $7.9 million in Refco consulting fee expenses to be transferred to RGHI. In addition, during the fiscal year that ended in February 2004, BENNETT and ROBERT C. TROSTEN caused approximately $4.8 million in Refco computer expenses to be shifted to RGHI.

33. In order to further make Refco appear more attractive to a potential purchaser or investor, from at least in or about April 2003, through and including in or about August 2004, PHILLIP R. BENNETT and ROBERT C. TROSTEN shifted at least approximately $34 million in proprietary trading losses that Refco suffered from Refco to RGHI, and thus making it appear that Refco was more profitable than it actually was, and increasing the debt owed by RGHI to Refco.

### The Fraudulent Leveraged Buyout Transaction

34. In or about 2003, PHILLIP R. BENNETT and ROBERT C. TROSTEN, and others began negotiations with Thomas H. Lee Partners, a private equity fund, regarding that entity's possible purchase of a controlling stake in Refco as part of a leveraged buyout transaction. As ultimately carried out on or about August 5, 2004, the leveraged buyout was structured as follows: Thomas H. Lee Partners, through an affiliate, purchased a 57% ownership interest in Refco, in return for approximately $507 million of new capital; simultaneously, Refco sold $600 million in notes and obtained $800 million in financing from a syndicate of banks.

19

35.    As a precursor to this transaction, PHILLIP R. BENNETT purchased TONE N. GRANT's ownership interest in Refco for approximately $4 million, plus a 50% interest in profits made by BENNETT in a future sale of BENNETT's interest in Refco.  As a result of their agreement, GRANT was no longer responsible for RGHI's debt to Refco, which as of February 2004 totaled more than approximately $1 billion, and BENNETT controlled all of RGHI immediately prior to the sale to the Lee entities.

**Lies To Thomas H. Lee Partners**

36.    In connection with the leveraged buyout transaction, on or about July 9, 2004, PHILLIP R. BENNETT executed an officer's questionnaire in which he falsely certified, among other things, that (a) he had no direct or indirect interest in any transaction with Refco or its affiliates within the prior fiscal year of more than $60,000; and (b) had not, in the prior fiscal year, been indebted to Refco or its affiliates.  In fact, during the prior fiscal year, BENNETT owned a substantial interest in RGHI, which had engaged in transactions worth more than $1.5 billion during the year-end cover-up transactions with Refco, and which owed Refco more than $1 billion as of late February 2004.

37.    In connection with the leveraged buyout transaction, on or about July 2, 2004, ROBERT C. TROSTEN executed an officer's questionnaire in which he falsely certified, among

other things, that there was no "material fact concerning the business and operations of [Refco] which is not disclosed in the Offering Circular provided to you or which you believe may be inaccurately stated therein," even though TROSTEN knew that the related party and expense shifting transactions had not been disclosed in the offering documents related to the transaction.

38.   In connection with the leveraged buyout transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN, and others caused Refco's audited financial statements for the year ending February 2004 to be provided to Thomas H. Lee Partners.  Those audited financial statements were false and misleading in the following respects, among others:

a.   The financial statements hid the size of the related party receivable from RGHI, which at the end of February 2004 was, but for the cover-up loan transactions, at least approximately $1 billion, whereas the financial statements misleadingly reported that the "$105 million due from related parties, included in loans receivable at February 28, 2003, was received by February 29, 2004."

b.   The financial statements falsely reported Refco's net income for the year as $187 million, when in fact that number was inflated.

39.   In connection with the leveraged buyout transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN, and others

falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

### Lies To The Note Purchasers

40. In connection with the leveraged buyout transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN, and others provided to the note underwriters and note purchasers the following false and misleading information:

a. Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 37;

b. BENNETT, TROSTEN and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets which, in fact, caused the Asian Debt Crisis Customer Losses; and

c. BENNETT, TROSTEN and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

### Lies To The Bank Syndicate

41. In connection with the leveraged buyout

transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN and others provided to the bank syndicate that was raising the $800 million in loans for Refco as part of the leveraged buyout transaction the following false and misleading information:

a.   Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 37;

b.   BENNETT, TROSTEN and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets which, in fact, caused the Asian Debt Crisis Customer Losses; and

c.   BENNETT, TROSTEN and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

42.   The leveraged buyout transaction closed on or about August 5, 2004, and Refco received a total of approximately $1.9 billion.  Thereafter, PHILLIP R. BENNETT caused the distribution of funds, which had been wired into RGHI bank account at JP Morgan Chase in New York, New York, directly or indirectly, to the following persons and entities, among others:

| Recipient | Approximate Amount |
|---|---|
| BAWAG | $842 million |
| Refco (used to pay down RGHI receivable) | $306 million |
| BENNETT | $25 million |
| TROSTEN | $48 million |
| GRANT | $16 million |
| Other Former Equity Partners | $81.5 million |
| Other Refco Officers, Employees, and Affiliated Parties | $112 million |

43. In connection with the leveraged buyout transaction, PHILLIP R. BENNETT and ROBERT C. TROSTEN falsely represented to Thomas H. Lee Partners that Refco had accumulated approximately $500 million cash in retained profits and that it would be distributing those retained profits through a dividend to its shareholders at the time of the leveraged buyout. In fact, Refco had not retained $500 million in profits, but had funded an account at BAWAG with $110 million in customer funds and a $390 million loan from BAWAG. At the end of the leveraged buyout transaction, BENNETT distributed the $110 million taken from Refco to BAWAG as payment for its participation in this aspect of the fraud, and then wrote off $390 million of the RGHI debt to Refco against the $390 million "dividend" "paid" to RGHI as owner of Refco.

44. In or about August 2004, after completion of the leveraged buyout transaction, ROBERT C. TROSTEN left Refco.

24

PHILLIP R. BENNETT caused RGHI to pay TROSTEN approximately $48 million from the proceeds of the TH Lee transaction, in order to keep TROSTEN from revealing the ongoing fraud scheme.

### BENNETT Plans To Take Refco Public

45. After the leveraged buyout, PHILLIP R. BENNETT, who remained the Chief Executive Officer of Refco following the transaction, and others plotted to sell a portion of Refco to the public through an Initial Public Offering ("IPO") of stock in Refco.

46. Between the August 2004 leveraged buyout and the August 2005 IPO, PHILLIP R. BENNETT continued his manipulation of Refco's finances: At each quarter and year-end period, BENNETT caused cover-up loan transactions designed to hide the existence and size of the RGHI receivable from Refco's auditors and investors; and BENNETT continued to cause Refco expenses to be assumed by RGHI and to artificially pad Refco's revenues by the means previously described. BENNETT caused the following quarter- and year-end transactions:

| Date | Approximate Customer Loans | Bawag Loans | Approximate Total Loan Amount |
|------|----------------------------|-------------|-------------------------------|
| August 2004 | $485 million | 0 | $485 million |
| November 2004 | $545 million | 0 | $545 million |
| February 2005 | $345 million | $250 million | $595 million |
| May 2005 | $450 million | 0 | $450 million |

47.  Between August 2004 and August 2005, Refco padded its revenue by at least approximately $79 million, comprised of at least approximately $38 million in inflated interest income, at least approximately $13 million in fictitious transactions in U.S. Treasury securities, and at least approximately $28 million in fictitious foreign currency transactions.  In particular, BENNETT caused the following transactions, among others, to artificially inflate Refco's revenues:

a.  On or about November 17, 2004, BENNETT caused RGHI, in a total of approximately 50 transactions, to purportedly purchase a total of approximately $1.25 billion in US Treasury notes from Refco, and then reversed the transactions the same day, at a loss to RGHI and a profit to Refco of approximately $7.8 million.

b.  On or about February 11, 2005, BENNETT caused Refco to credit a $12 million "interest adjustment" from RGHI that increased Refco's revenue by $12 million, and RGHI's debt to Refco by the same amount.

c.  On or about February 17, 2005, BENNETT caused RGHI to engage in approximately 32 fictitious foreign currency exchange transactions in British Pounds, Euros, Japanese Yen and Swiss Francs with Refco.  RGHI lost approximately $5 million on the transactions, and Refco recognized $5 million in revenue as a

result of the transactions.  The $5 million loss was then added
to the RGHI receivable.

### Refco's Public Filings And Publicly Traded Securities

48.  In 2005, Refco registered certain of its
securities with the SEC and, with that registration, was required
to make certain additional public filings with the SEC.

49.  On or about April 6, 2005, Refco filed an S-4
registration statement with the SEC in connection with its offer
to exchange $600 million of the senior subordinated notes
originally issued in August 2004 for $600 million of senior
subordinated notes registered under the Securities Act of 1933.
PHILLIP R. BENNETT signed the registration statement on or about
April 6, 2005 in New York, New York.  Registration of these notes
permitted them to be traded publicly.  The S-4 contained several
material misstatements about Refco, including the audited
financial statements which failed to reflect the related party
transactions described above or the debt owed to Refco from RGHI.
The S-4 also cited inflated revenue and income numbers that
resulted from the revenue padding and expense shifting described
above, and falsely claimed that Refco did not engage in
proprietary trading.

50.  On or about July 19, 2005, as required by the
Securities and Exchange Act of 1934 (the "Exchange Act") and
applicable rules, Refco filed with the SEC its annual report for

the year ended February 28, 2005 on Form 10K. PHILLIP R. BENNETT signed the annual report on or about July 19, 2005 in New York, New York. BENNETT also signed two certifications regarding the annual report. In those certifications, BENNETT attested that he had reviewed the annual report and (a) that it did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e] report"; and (b) that "the information contained in the Report fairly present[ed], in all material respects, the financial condition and results of operations of the Company." As noted above, the financial statements were fraudulent in that, among other things, they failed to reflect the related party receivables, the padded revenue, and the shifted expenses.

51. On or about August 8, 2005, Refco filed an S-1 registration statement with the SEC in connection with its initial public offering of common stock. PHILLIP R. BENNETT signed that registration statement on or about August 8, 2005, in New York, New York.

52. The S-4 registration statement, 10K annual report, and S-1 registration statement signed by PHILLIP R. BENNETT each required the disclosure of (a) certain transactions between Refco and its management and (b) certain debts owed directly or

indirectly by any executive officer of Refco to Refco, during Refco's past fiscal year and, for the registration statements, during Refco's prior two fiscal years. These disclosures were required in order to apprize investors of, among other things, potential conflicts of interest by management.

53. The S-4 registration statement, 10K annual report, and S-1 registration statement signed by PHILLIP R. BENNETT each failed to disclose the related party transactions and the related party indebtedness between Refco and RGHI outlined above. In particular, these public filings failed to disclose: (a) the existence of hundreds of millions of dollars of indebtedness by RGHI to Refco during 2004 and 2005; (b) the transactions at quarter- and fiscal year-end during 2004 and 2005 by which RGHI temporarily paid down its debt to Refco, the guaranties by Refco of the third party lenders' loans to RGHI, and the subsequent re-assumption of the debt by RGHI, each of which was a related party transaction required to be disclosed in the public filings.

### Refco's August 2005 IPO

54. On or about August 10, 2005, in reliance on, among other things, Refco's public filings and the accompanying audited financial statements, the public bought approximately $583 million of Refco's common stock. PHILLIP R. BENNETT, through RGHI, sold Refco stock in the IPO valued at more than $100 million, while retaining a substantial ownership interest in

29

Refco. Following the initial public offering, Refco's common stock was listed on the New York Stock Exchange under ticker symbol "RFX."

### End Of Quarter Transactions In August 2005

55.  In or about late August 2005, after the completion of Refco's IPO, PHILLIP R. BENNETT caused Refco to carry out $420 million in cover-up transactions with a Refco customer that temporarily transformed all or part of the RGHI receivable into a receivable from that customer.  After the August 31, 2005 end of Refco's second quarter, the $420 million in cover-up transactions were unwound.

### Public Disclosure Of The Related Party Debt

56.  In or about early October 2005, Refco discovered an approximately $430 million receivable on its books from RGHI. It demanded repayment of the debt by PHILLIP R. BENNETT, who repaid Refco approximately $430 million on or about October 10, 2005, having received an emergency loan in that approximate amount from BAWAG.

57.  On or about October 10, 2005, Refco issued a press release announcing the following:

> [Refco] discovered through an internal review a
> receivable owed to the Company by an entity
> controlled by Phillip R. Bennett, Chief Executive
> Officer and Chairman of the Board of Directors, in
> the amount of approximately $430 million. Mr.
> Bennett today repaid the receivable in cash,
> including all accrued interest. Based on the
> results of the review to date, the Company

30

believes that the receivable was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible. The Company believes that all customer funds on deposit are unaffected by these activities. Independent counsel and forensic auditors have been retained to assist the Audit Committee in an investigation of these matters.

58. Following Refco's announcement of its discovery of this related party receivable, the market price of Refco stock plummeted, resulting in a loss of well more than $1 billion in market capitalization.

59. On or about October 17, 2005, Refco, Inc. and twenty-three of its subsidiaries or affiliates filed a petition in bankruptcy in the United States Bankruptcy Court for the Southern District of New York. Refco's common stock was subsequently delisted by the New York Stock Exchange.

### THE CONSPIRACY

60. From in or about the mid-1990s up to in or about October 2005, in the Southern District of New York and elsewhere, PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, namely: (a) to commit fraud in connection with the purchase and sale of securities issued by Refco, in violation of Sections 78j(b) and 78ff of Title 15, United States Code, and

31

Section 240.10b-5 of Title 17, Code of Federal Regulations; (b) to make and cause to be made false and misleading statements of material fact in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934, and the rules and regulations promulgated thereunder, in violation of Title 15, United States Code, Sections 78o(d) and 78ff; (c) to make and cause to be made false statements in a registration statement filed under the Securities Act of 1933, in violation of Title 15, United States Code, Section 77x; (d) to commit wire fraud, in violation of Section 1343 of Title 18, United States Code; (e) to make and cause to be made false statements and omissions to Refco's auditors, in violation of Title 15, United States Code, Sections 78m and 78ff; Title 17, Code of Federal Regulations, Section 240.13b2-2; (f) to commit bank fraud, in violation of Section 1344 of Title 18, United States Code; and (g) to commit money laundering, in violation of Section 1957(a) of Title 18, United States Code, Section 1957.

## OBJECTS OF THE CONSPIRACY

### Securities Fraud

61.  It was a part and object of the conspiracy that PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT the defendants, and others known and unknown, unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce, the mails, and facilities of national

32

securities exchanges, directly and indirectly, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of notes issued by Refco and the common stock of Refco, Inc., all in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### False Statements In SEC Filings - Exchange Act

62.    It was further a part and object of the conspiracy that PHILLIP R. BENNETT, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, in reports and documents required to be filed with the SEC under the Exchange Act, and the rules and regulations promulgated thereunder, would and did make and cause to be made statements which were false and misleading with respect to material facts, in violation of Title 15, United States Code, Sections 78o(d) and 78ff.

33

## <u>False Statements In SEC Filings - Securities Act</u>

63.  It was further a part and object of the conspiracy that PHILLIP R. BENNETT, the defendant, and others known and unknown, unlawfully, willfully, and knowingly would and did make and cause to be made, in a registration statement filed with the SEC under the Securities Act of 1933, untrue statements of material facts and omit to state material facts required to be stated therein and necessary to make the statements therein not misleading, in violation of Title 15, United States Code, Section 77x.

## <u>Wire Fraud</u>

64.  It was further a part and object of the conspiracy that PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, all in violation of Title 18, United States Code, Section 1343.

## <u>Material Misstatements To Auditors</u>

65.  It was further a part and object of the conspiracy

34

that PHILLIP R. BENNETT, the defendant, being an officer and director of Refco, an issuer obligated to file reports pursuant to section 15(d) of the Securities and Exchange Act of 1934 and subsequently with a class of securities registered pursuant to section 12 of the Securities Exchange Act of 1934, unlawfully, willfully and knowingly, directly and indirectly, (a) made and caused to be made materially false and misleading statements; and (b) omitted to state, and caused others to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading to accountants in connection with (i) audits, reviews and examinations of the financial statements of Refco required to be filed under the Securities and Exchange Act of 1934; and (ii) the preparation and filing of documents and reports required to be filed with the SEC pursuant to rules and regulations promulgated by the SEC.

### Bank Fraud

66.    It was further a part and object of the conspiracy that PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, unlawfully, willfully and knowingly, would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, to wit, HSBC, and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, a financial

35

institution, to wit, HSBC, whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises, all in violation of Title 18, United States Code, Section 1344.

**Money Laundering**

67.  It was further a part and object of the conspiracy that PHILLIP R. BENNETT, ROBERT C. TROSTEN and TONE N. GRANT, the defendants, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully and knowingly would and did engage and attempt to engage in monetary transactions in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, to wit, securities fraud, bank fraud, and wire fraud, in violation of Title 18, United States Code, Section 1957(a).

**MEANS AND METHODS OF THE CONSPIRACY**

68.  Among the means and methods by which PHILLIP R. BENNETT, ROBERT C. TROSTEN, TONE N. GRANT, the defendants, and their co-conspirators would and did carry out the conspiracy were the following:

a.    PHILLIP R. BENNETT and TONE N. GRANT, the defendants, misrepresented to the public the size of customer losses for which Refco was responsible.

b.    PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, and their coconspirators

36

transferred losses incurred by Refco to BENNETT's company, RGHI.

      c.   PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, and their coconspirators concealed the size and related party nature of the debt owed by RGHI to Refco by causing Refco and others to carry out loan transactions over fiscal year-end and fiscal quarter-end dates to move the RGHI receivable to one or more Refco customers.

      d.   PHILLIP R. BENNETT, the defendant, and his coconspirators caused Refco to file false and fraudulent statements with the SEC.

      e.   PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, and their coconspirators, made and caused to be made material false statements and omissions to Refco's auditors.

      f.   PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, and their coconspirators used facilities of interstate commerce, including the use of interstate telephone calls and interstate wire transfers, in furtherance of the objects of the conspiracy.

      g.   PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, and their coconspirators misrepresented to customers, potential customers, lenders, investors and others that Refco did not engage in proprietary trading.

<u>Overt Acts</u>

69.  In furtherance of the conspiracy and to effect the illegal objects thereof, the following acts, among others, were committed in the Southern District of New York and elsewhere:

a.  In or about late 1997, PHILLIP R. BENNETT and TONE N. GRANT, the defendants, misrepresented to the public that Refco had not taken a significant loss in connection with the trading of Customer 1.

b.  On or about May 15, 1998, PHILLIP R. BENNETT and TONE N. GRANT, the defendants, signed a letter to Refco's auditors misrepresenting, among other things, that "the accounting records underlying the financial statements accurately and fairly reflect, in reasonable detail, the transactions of the company" and that Refco had properly "recorded or disclosed" all "related party transactions and related amounts receivable or payable."

c.  On or about April 30, 2003, PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party amounts receivable had been fully disclosed to the auditors.

d.  On or about February 20, 2004, in New York, New York, PHILLIP R. BENNETT, the defendant, signed a guaranty letter on behalf of Refco Group Ltd., LLC. regarding an

38

approximately $720 million loan from a Refco customer to RGHI.

      e.   On or about April 27, 2004, PHILLIP R. BENNETT and ROBERT C. TROSTEN, the defendants, signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party amounts receivable had been fully disclosed to the auditors.

      f.   On or about May 17, 2004, PHILLIP R. BENNETT and TONE N. GRANT, the defendants, met at a hotel in lower Manhattan to discuss the more than $1 billion debt that they, as the owners of RGHI, owed to Refco.

      g.   On or about August 5, 2004, PHILLIP R. BENNETT, the defendant, caused RGHI to transfer to ROBERT C. TROSTEN, the defendant, approximately $48 million.

      h.   On or about August 5, 2004, PHILLIP R. BENNETT, the defendant, caused RGHI to transfer to TONE N. GRANT, the defendant, approximately $4 million.

      i.   On or about August 8, 2004, PHILLIP R. BENNETT, the defendant, caused RGHI to transfer to TONE N. GRANT, the defendant, approximately $12 million.

      j.   On or about February 23, 2005, in New York, New York, PHILLIP R. BENNETT, the defendant, signed a guaranty letter on behalf of Refco Group Ltd., LLC. regarding an approximately $345 million loan from a Refco customer to RGHI.

      k.   On or about April 6, 2005, in New York, New

York, PHILLIP R. BENNETT, the defendant, signed Refco's S-4
registration statement.

l.    On or about May 25, 2005, in New York, New
York, PHILLIP R. BENNETT, the defendant, signed a guaranty letter
on behalf of Refco Group Ltd., LLC. regarding an approximately
$450 million loan from a Refco customer to RGHI.

m.    On or about July 19, 2005, in New York, New
York, PHILLIP R. BENNETT, the defendant, signed Refco's annual
report on Form 10K.

n.    On or about August 8, 2005, in New York, New
York, PHILLIP R. BENNETT, the defendant, signed Refco's S-1
registration statement.

(Title 18, United States Code, Section 371).

## COUNT TWO

(Securities Fraud)

The Grand Jury further charges:

70.    The allegations contained in paragraphs 1 through
59, 68 and 69 of this Indictment are repeated and realleged as if
fully set forth herein.

71.    From in or about the mid-1990s up to in or about
2004, in the Southern District of New York and elsewhere, PHILLIP
R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants,
unlawfully, willfully, and knowingly, directly and indirectly, by
the use of means and instrumentalities of interstate commerce,

40

the mails, and the facilities of national securities exchanges, did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of 9% Senior Subordinated Notes due 2012, issued by Refco Group Ltd., LLC and Refco Finance, Inc.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2).

## COUNT THREE

(Securities Fraud)

The Grand Jury further charges:

72.    The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

73.    From in or about the mid-1990s up to in or about October 2005, in the Southern District of New York and elsewhere, PHILLIP R. BENNETT, the defendant, unlawfully, willfully, and

41

knowingly, directly and indirectly, by the use of means and
instrumentalities of interstate commerce, the mails, and the
facilities of national securities exchanges, did use and employ,
in connection with the purchase and sale of securities,
manipulative and deceptive devices and contrivances, in violation
of Title 17, Code of Federal Regulations, Section 240.10b-5, by:
(a) employing devices, schemes, and artifices to defraud; (b)
making untrue statements of material facts and omitting to state
material facts necessary in order to make the statements made, in
light of the circumstances under which they were made, not
misleading; and (c) engaging in acts, practices, and courses of
business which operated and would operate as a fraud and deceit
upon a person, in connection with the purchase and sale of the
common stock of Refco, Inc.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title
    17, Code of Federal Regulations, Section 240.10b-5; and
        Title 18, United States Code, Section 2).

<u>COUNT FOUR</u>

(False Filing With The SEC – Exchange Act)

The Grand Jury further charges:

74.  The allegations contained in paragraphs 1 through
59, 68 and 69 of this Indictment are repeated and realleged as if
fully set forth herein.

75.  On or about July 19, 2005, in the Southern
District of New York and elsewhere, PHILLIP R. BENNETT, the
defendant, unlawfully, willfully, and knowingly made and caused

42

to be made statements in a report and document required to be filed with the SEC under the Exchange Act, and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, to wit, BENNETT and others caused Refco to submit, and aided and abetted the submission of, in New York, New York, to the SEC in Washington, D.C., Refco's Form 10-K.

(Title 15, United States Code, Sections 78o(d) and 78ff;
Title 17, Code of Federal Regulations, Section 240.15d-2;
and Title 18, United States Code, Section 2.)

## COUNTS FIVE AND SIX

(False Filing With The SEC – Securities Act)

The Grand Jury further charges:

76. The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

77. On or about the dates specified below, in the Southern District of New York and elsewhere, PHILLIP R. BENNETT, the defendant, unlawfully, willfully, and knowingly made and caused to be made, in a registration statement filed with the SEC under the Securities Act of 1933, untrue statements of material facts and omitted to state material facts required to be stated therein and necessary to make the statements therein not misleading, to wit, BENNETT and others caused Refco to submit, and aided and abetted the submission of, in New York, New York,

43

to the SEC in Washington, D.C., the following Forms:

| Count | Approximate Date | Form |
|-------|------------------|------|
| FIVE | April 6, 2005 | S-4 |
| SIX | August 8, 2005 | S-1 |

(Title 15, United States Code, Section 77x;
and Title 18, United States Code, Section 2.)

<u>**COUNTS SEVEN THROUGH THIRTEEN**</u>

(Wire Fraud)

The Grand Jury further charges:

78.   The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

79.   On or about the dates set forth below, in the Southern District of New York, the defendants set forth below unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, the following writings, signs, signals, and sounds for the purpose of executing such scheme and artifice:

44

| Count | Defendant | Approximate Date | Wire Communication |
|-------|-----------|------------------|--------------------|
| SEVEN | PHILLIP R. BENNETT and ROBERT C. TROSTEN | June 22, 2004 | Email from TROSTEN in New York to a Thomas H. Lee Partners representative in Massachusetts |
| EIGHT | PHILLIP R. BENNETT and ROBERT C. TROSTEN | August 3, 2004 | Email from TROSTEN in New York to a Thomas H. Lee Partners representative in Massachusetts |
| NINE | PHILLIP R. BENNETT | April 6, 2005 | Electronic transmission of Refco Form S-4 from New York, New York to Virginia |
| TEN | PHILLIP R. BENNETT | July 19, 2005 | Electronic transmission of Refco Form 10-K from New York, New York to Virginia |
| ELEVEN | PHILLIP R. BENNETT and TONE N. GRANT | August 5, 2004 | $4 million transfer from RGHI's JP Morgan Chase account in New York, NY to GRANT's Harris Trust account in Chicago, Illinois |
| TWELVE | PHILLIP R. BENNETT | August 5, 2005 | $40 million transfer from RGHI's JP Morgan Chase account in New York, NY to a Harris Trust account in Chicago, Illinois |
| THIRTEEN | PHILLIP R. BENNETT | August 8, 2005 | Electronic transmission of Refco Form S-1 from New York, New York to Virginia |

(Title 18, United States Code, Sections 1343 and 2).

## COUNT FOURTEEN

(Material Misstatements To Auditors)

The Grand Jury further charges:

80.   The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

81.   From in or about April 2005 to in or about October

45

2005, in the Southern District of New York, PHILLIP R. BENNETT,

the defendant, being an officer and director of Refco, an issuer

obligated to file reports pursuant to section 15(d) of the

Securities and Exchange Act of 1934 and subsequently with a class

of securities registered pursuant to section 12 of the Securities

Exchange Act of 1934, unlawfully, willfully and knowingly,

directly and indirectly, (a) made and caused to be made

materially false and misleading statements; and (b) omitted to

state, and caused others to omit to state, material facts

necessary in order to make statements made, in light of the

circumstances under which they were made, not misleading to

accountants in connection with (i) audits, reviews and

examinations of the financial statements of Refco required to be

filed under the Securities and Exchange Act of 1934; and (ii) the

preparation and filing of documents and reports required to be

filed with the SEC pursuant to rules and regulations promulgated

by the SEC.

(Title 15, United States Code, Sections 78m and
78ff; Title 17, Code of Federal Regulations, Section
240.13b2-2; and Title 18, United States Code, Section 2).

## COUNT FIFTEEN

(Bank Fraud)

The Grand Jury further charges:

82.  The allegations contained in paragraphs 1 through

59, 68 and 69 of this Indictment are repeated and realleged as if

46

fully set forth herein.

83. On or about August 5, 2004, in the Southern District of New York, PHILLIP R. BENNETT, ROBERT C. TROSTEN, and TONE N. GRANT, the defendants, unlawfully, willfully and knowingly, would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, to wit, HSBC, and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, a financial institution, to wit, HSBC, whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises.

(Title 18, United States Code, Sections 1344 and 2).

## COUNTS SIXTEEN THROUGH TWENTY

(Money Laundering)

The Grand Jury further charges:

84. The allegations contained in paragraphs 1 through 59, 68 and 69 of this Indictment are repeated and realleged as if fully set forth herein.

85. On or about the dates set forth below, in the Southern District of New York, the defendants set forth below, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully and knowingly would and did engage and attempt to engage in monetary transactions in criminally derived property that was of a value greater than

47

$10,000 and that was derived from specified unlawful activity, to wit, securities fraud, bank fraud, and wire fraud, in violation of Title 18, United States Code, Section 1957(a):

| Count | Defendant | Approximate Date | Transaction |
|-------|-----------|------------------|-------------|
| SIXTEEN | PHILLIP R. BENNETT | August 5, 2004 | $25,322,810 transfer from RGHI's JP Morgan Chase account in New York, NY to BENNETT's JP Morgan Chase account in New York, NY |
| SEVENTEEN | PHILLIP R. BENNETT and ROBERT C. TROSTEN | August 5, 2004 | $46,069,300 transfer from RGHI's JP Morgan Chase account in New York, NY to TROSTEN's JP Morgan Chase account in New York, NY |
| EIGHTEEN | PHILLIP R. BENNETT and ROBERT C. TROSTEN | August 5, 2004 | $1,950,000 transfer from RGHI's JP Morgan Chase account in New York, NY to TROSTEN's JP Morgan Chase account in New York, NY |
| NINETEEN | PHILLIP R. BENNETT and TONE N. GRANT | August 5, 2004 | $4 million transfer from RGHI's JP Morgan Chase account in New York, NY to GRANT's Harris Trust account in Chicago Illinois |
| TWENTY | PHILLIP R. BENNETT | August 5, 2005 | $40 million transfer from RGHI's JP Morgan Chase account in New York, NY to a Harris Trust account in Chicago, Illinois |

(Title 18, United States Code, Sections 1957(a) and 2).

48

## FORFEITURE ALLEGATION WITH RESPECT TO
## COUNTS ONE THROUGH FOURTEEN

86.    As a result of committing one or more of the
foregoing securities fraud offenses, in violation of Title 15,
United States Code, Sections 77x, 78j(b), 78o(d), and 78ff; and
Title 17, Code of Federal Regulations, Sections 240.10b-5 and
240.15d-2, as alleged in Counts One, Two, Three, Four, Five, Six
and Fourteen; wire fraud offenses, in violation of Title 18,
United States Code, Section 1343, as alleged in Counts One,
Seven, Eight, Nine, Ten, Eleven, Twelve and Thirteen of this
Indictment, PHILLIP R. BENNETT, the defendant, ROBERT C. TROSTEN,
the defendant (as to the acts alleged in Counts One, Two, Seven,
and Eight), and TONE GRANT, the defendant (as to acts alleged in
Counts One, Two, and Eleven) shall forfeit to the United States
pursuant to Title 18, United States Code, Section 981(a)(1)(C)
and Title 28, United States Code, Section 2461, all property,
real and personal, that constitutes or is derived from proceeds
traceable to the commission of the securities and wire fraud
offenses, including but not limited to the following:

a.    At least $2.4 billion in United States
currency, representing the amount of proceeds obtained as a
result of the charged wire and securities fraud offenses, for
which the defendants are jointly and severally liable, including
but not limited to:

1.    The contents of Account No. ███6752,

49

in the name of Refco Group Holdings, Inc., held at JP Morgan Chase Bank, New York (approximately $63,393.20);

2.    The contents of Account No. ████2791 in the name of Phillip R. Bennett And/or Valerie Bennett, held at JP Morgan Chase Bank, New York (approximately $905,314.91);

3.    The contents of Account No. ████5-00-7, in the name of Phillip Bennett Grantor Retained Annuity Trust ("GRAT"), held at JP Morgan Chase Bank, New York (approximately $13,880,143.28);

4.    All funds from the Liquidation of the Limited Capital Account for Sphinx Managed Futures Index Fund, LP, in the name of Philip Bennett, held at the BISYS Group, Inc. (approximately $974,533.91);

5.    The contents of Account No. ████0832, in the name of Phillip Bennett, held at Citibank, N.A., New York, New York (approximately $13,810,347.00);

6.    The contents of Account No. ████████0258, in the name of Valerie Bennett, held at Wachovia Bank, Charlotte, North Carolina (approximately $440,014.55);

7.    The contents of Account No. ████7710, in the name of Valerie Bennett, held at Merrill Lynch, New York (approximately $1,828,492.00);

8.    The contents of Account. No. ████ ████10-19, in the name of Zahava R. Trosten, held at JP Morgan

50

Chase Bank, New York (approximately $30,024,148.66);

        9.  The contents of Account No. ███████09-19, in the name of Trosten Family Investments LLC, held at JP Morgan Chase Bank, New York (approximately $4,040,000.00); and

        10.  The contents of Account No. ███████70-01, in the name of Zahava R. Trosten, held at JP Morgan Chase Bank, New York (approximately $2,248,318.53);

        11.  Any and all funds in Account No. ██████3235, held at Citibank, New York, or any account to which said contents have been transferred, up to and including $4,000,000.00;

        12.  Any and all right, title and interest in the real property and appurtenances known as ██████████████, Sarasota, Florida 34236; and

        13.  A sum of at least $1,900,000.00 from Account Nos. ██████4805 and ██████0709, in the name of Phillip R. Bennett, held at Commerce Bank, Mount Laurel, New Jersey.

### FORFEITURE ALLEGATION WITH RESPECT TO COUNTS ONE AND FIFTEEN THROUGH TWENTY

        87.  As a result of committing one or more of the foregoing bank fraud offenses, in violation of Title 18 United States Code, Section 1344, as alleged in Counts One and Fifteen of this Indictment, and the money laundering offenses, in violation of Title 18, United States Code, Section 1957(a), as alleged in Counts Sixteen through Twenty of this Indictment,

PHILLIP R. BENNETT, the defendant, ROBERT C. TROSTEN, the defendant (as to the acts alleged in Counts One, Fifteen, Seventeen, and Eighteen), and TONE GRANT, the defendant (as to acts alleged in Counts One, Fifteen, and Nineteen) shall forfeit to the United States pursuant to Title 18, United States Code, Section 982, any property constituting or derived from the proceeds obtained directly or indirectly as a result of the bank fraud offenses and all property, real and personal, involved in the money laundering offenses and all property traceable to such property, including but not limited to the following:

a. At least $800 million in United States currency, representing the amount of proceeds obtained as a result of the charged bank fraud offenses, for which the defendants are jointly and severally liable, including but not limited to the property described in subparagraphs 1-13 in the forfeiture allegation above; and

b. At least $2.4 billion in United States currency, in that such sum in aggregate is property which was involved in the charged money laundering offenses or is traceable to such property, for which the defendants are jointly and severally liable, including but not limited to the property described in subparagraphs 1-13 of the forfeiture allegation above.

## SUBSTITUTE ASSETS PROVISION

88. If any of the above-described forfeitable

52

property, as a result of any act or omission of the defendants:

(i)  cannot be located upon the exercise of due diligence;

(ii)  has been transferred or sold to, or deposited with, a third party;

(iii)  has been placed beyond the jurisdiction of the court;

(iv)  has been substantially diminished in value; or

(v)  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982 and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the forfeitable property described above including but not limited to the following:

1.  Any and all right, title and interest in the real property and appurtenances known as ███████████, Gladstone, New Jersey 07934;

2.  Any and all right, title and interest in the shares of the capital stock of 1001 Tenants Corporation and the proprietary lease for the penthouse apartment located at ████ ███████████, New York, New York 10028; and

3.  Any and all right, title and interest in the

53

real property and appurtenances known as 

 Longboat Key, Florida 34228.

(Title 18, United States Code, Sections 371, 981, 982, 1343, 1344; Title 15, United States Code, Sections 77x, 78j(b), 78o(d), 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5, 240.15d-2; Title 21, United States, Section 853(p); and Title 28, United States Code, Section 2461.)

FOREPERSON

MICHAEL J. GARCIA
United States Attorney

54

Form No. USA-33s-274 (Ed. 9-25-58)

---

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

---

## UNITED STATES OF AMERICA

- v -

### PHILLIP R. BENNETT,
### ROBERT C. TROSTEN,
### TONE N. GRANT

**Defendants.**

---

## INDICTMENT

S3 05 Cr. 1192 (NRB)

(18  USC §371; 15 USC §§ 78j(b) and 78ff; 17 CFR §
240.10b-5,18 USC § 2; 15 USC § 78o(d) and 78ff, 17 CFR,
§240.15d-2; 18 USC §2; 15 USC , §77x, 18 USC §2; 18
USC 1343, 2; 15 U.S.C. §78m and 78ff;  17 CFR §240.13b2-
2); 18 USC 1344,2: 18 USC 1957(a).

MICHAEL J. GARCIA
United States Attorney.

A TRUE BILL

Foreperson.

---

82FVBENP.txt

                                                                    1

82FVBENP                    Plea
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          05 CR 001192 (NRB)

PHILLIP BENNETT,

                    Defendant.

------------------------------x

                                        New York, N.Y.
                                        February 15, 2008
                                        5:40 p.m.


Before:

                    HON. NAOMI REICE BUCHWALD,

                                        District Judge


                            APPEARANCES

MICHAEL J. GARCIA
        United States Attorney for the
        Southern District of New York
NEIL M. BAROFSKY
CHRISTOPHER L. GARCIA
        Assistant United States Attorneys

KRAMER LEVIN NAFTALIS & FRANKEL
        Attorneys for Defendant
GARY P. NAFTALIS
DAVID S. FRANKEL
ADAM C. FORD
DARREN A. LAVERNE

ALSO PRESENT:   WILLIAM JOHNSON, Postal Inspector
                KRIS MOON, Postal Inspector
                ANNE RAILTON, Law Student


                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    2

82FVBENP                    Plea
            (In open court)
            (Case called)
            THE DEPUTY CLERK:  The case is United States against
Phillip Bennett; docket number 05 CR 1192.  Is the government
ready to proceed?
            MR. BAROFSKY:  Yes.  Neil Barofsky for the government.
With me at counsel table, with your Honor's permission, is
Christopher Garcia of our office, our postal inspectors on the
case, William Johnson and Kris Moon, as well as our legal
                            Page 1

```
                              82FVBENP.txt
10     intern, Annie Railton, who's been assisting the trial of this
11     matter.  Good evening, your Honor.
12              MR. GARCIA:  Good evening, your Honor.
13              THE DEPUTY CLERK:  Is the defense ready to proceed?
14              MR. NAFTALIS:  Yes, we are.  Gary Naftalis for
15     Mr. Bennett, along with David Frankel.
16              THE COURT:  Mr. Naftalis?
17              MR. NAFTALIS:  Your Honor, we have an application on
18     behalf of Mr. Bennett to withdraw his plea of not guilty to the
19     charges in the indictment and to offer to plead guilty to the
20     charges in the indictment.
21              THE COURT:  All right.  Mr. Bennett, would you stand
22     please.  Would you raise your right hand.
23              (Defendant sworn)
24              THE COURT:  And would you state your full name for me
25     please.
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                    3
       82FVBENP           Plea
1               THE DEFENDANT:  Phillip Roger Bennett.
2               THE COURT:  And Mr. Bennett, how old are you?
3               THE DEFENDANT:  59, your Honor.
4               THE COURT:  Why don't you sit down.  Mr. Bennett, what
5      was the highest grade in school that you completed?
6               THE DEFENDANT:  University.  Grade, twelfth grade, I
7      think it is, your Honor.
8               THE COURT:  You have the equivalent of a college
9      degree.
10              THE DEFENDANT:  Yes, master of arts.
11              THE COURT:  And are you now or have you currently been
12     under the care of a doctor or psychiatrist?
13              THE DEFENDANT:  No, your Honor.
14              THE COURT:  And have you ever been hospitalized or
15     treated for alcoholism or narcotics addiction?
16              THE DEFENDANT:  No, your Honor.
17              THE COURT:  Are you under the influence of any drug or
18     alcohol today?
19              THE DEFENDANT:  I'm not, no, your Honor.
20              THE COURT:  And how are you feeling physically today?
21              THE DEFENDANT:  Fine, your Honor.  Thank you.
22              THE COURT:  Mr. Bennett, have you had the opportunity
23     to review the charges against you and your plea with
24     Mr. Naftalis and Mr. Frankel and perhaps some other lawyers, as
25     well?
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                    4
       82FVBENP           Plea
1               THE DEFENDANT:  I have, your Honor, yes.
2               THE COURT:  And have you been satisfied with the
3      advice and counsel that Messrs. Naftalis and Frankel have given
4      to you?
5               THE DEFENDANT:  I have, yes.
6               THE COURT:  Are you ready to change your plea at this
7      time?
8               THE DEFENDANT:  I am, your Honor.
9               THE COURT:  And what is your plea at this time, guilty
10     or not guilty?
11              THE DEFENDANT:  It's guilty, your Honor.
12              THE COURT:  Mr. Bennett, in order to determine whether
13     your plea is voluntary and made with a full understanding of
14     the charges against you and the consequences of your plea, I
                                 Page 2
```

82FVBENP.txt
15  will make certain statements to you and I will ask you certain
16  questions. I want you to understand that I need not accept
17  your plea unless I am satisfied that you are, in fact, guilty,
18  and that you fully understand your rights. I'm tempted to ask
19  the government to pick a few favorite charges instead of all of
20  these, but, okay.
21          Mr. Bennett, you've been charged in the 20-count
22  indictment.
23          The first count charges you with a conspiracy to
24  commit securities fraud, wire fraud, bank fraud, and money
25  laundering, and to make false filings to the SEC. This crime
               SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                              5

    82FVBENP                    Plea
1   carries a maximum sentence under the law of five years
2   imprisonment, a maximum fine of the greatest of $250,000 or
3   twice the gross pecuniary gain derived from the offense or
4   twice the gross pecuniary loss to persons other than yourself
5   as a result of the offense, and a $100 special assessment, and
6   a maximum term of supervised release of three years.
7           Do you understand that those are the charges in Count
8   One of the indictment and the maximum statutory penalties
9   applicable to those charges?
10          THE DEFENDANT:  I do, your Honor, yes.
11          THE COURT:  Counts Two and Three of the indictment
12  charge you with securities fraud. Each of these counts carries
13  a maximum sentence of 20 years in prison, a maximum fine of
14  $5,000,000 or twice the gross pecuniary gain derived from the
15  offense or twice the gross pecuniary loss to a person other
16  than yourself as a result of the offense, a $100 special
17  assessment, and a maximum term of supervised release of three
18  years.
19          Do you understand that those are the charges in Counts
20  Two and Three and the maximum penalties under law for those
21  charges of securities fraud?
22          THE DEFENDANT:  I do, your Honor.
23          THE COURT:  Count Four charges you with making a false
24  filing with the Securities and Exchange Commission. And this
25  crime carries a maximum statutory penalty of 20 years in
               SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                              6

    82FVBENP                    Plea
1   prison, a maximum fine of the greatest of $5,000,000 or twice
2   the gross monetary gain derived from the offense or twice the
3   gross monetary loss to a person other than yourself as a result
4   of the offense, a $100 special assessment, and a maximum term
5   of supervised release of three years.
6           Do you understand that those are the charges in Count
7   Four and the maximum penalties applicable to those charges?
8           THE DEFENDANT:  I do, your Honor.
9           THE COURT:  Counts Five and Six of the indictment
10  charge you with making a false filing with the Securities and
11  Exchange Commission -- excuse me, with the Securities and
12  Exchange Commission. Each of these counts carries a maximum
13  sentence under the law of five years imprisonment, a maximum
14  fine of the greatest of $250,000 or twice the gross pecuniary
15  gain derived from the offense or twice the gross pecuniary loss
16  to a person other than yourself as a result of the offense, and
17  a $100 special assessment, and a maximum supervised release
18  term of three years. Do you understand that those are the
19  charges in Counts Five and Six of the indictment and the
                           Page 3

```
                          82FVBENP.txt
20     maximum penalties provided for by law for those crimes?
21          THE DEFENDANT:  Yes, I do, your Honor.
22          THE COURT:  And Counts Seven through Thirteen of the
23     indictment charge you with wire fraud.  Each of these counts
24     carries a maximum possible sentence of 20 years in prison, a
25     maximum fine of the greatest of $250,000 or twice the gross
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```
                                                                    7
```
       82FVBENP           Plea
1      pecuniary gain derived from the offense or twice the gross
2      pecuniary loss to a person other than yourself as a result of
3      the offense, a $100 special assessment, and a maximum term of
4      supervised release of three years.
5           Do you understand that those are the charges in Counts
6      Seven through Thirteen, and the maximum penalties under the
7      statute for those charges?
8           THE DEFENDANT:  Yes, I do, your Honor.
9           THE COURT:  All right.  Count Fourteen charges you
10     with making material misstatements to auditors.  And this crime
11     carries a maximum sentence of 20 years imprisonment, a maximum
12     fine of $5,000,000 or twice the gross pecuniary gain derived
13     from the offense or twice the gross pecuniary loss to a person
14     other than yourself as a result of the offense, a $100 special
15     assessment, and a maximum term of supervised release of three
16     years.
17          Do you understand that that is the crime charged in
18     Count Fourteen of the indictment, and the maximum penalty
19     provided for by statute for Count Fourteen?
20          THE DEFENDANT:  Yes, I do, your Honor.
21          THE COURT:  Count Fifteen of the indictment charges
22     you with bank fraud.  And this crime carries a maximum sentence
23     of 30 years in prison, a maximum fine of the greatest of
24     $1,000,000 or twice the gross pecuniary gain derived from the
25     offense or twice the gross pecuniary loss to a person other
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```
                                                                    8
```
       82FVBENP           Plea
1      than yourself as a result of the offense, a $100 special
2      assessment, and a maximum term of supervised release of five
3      years.
4           Do you understand that that is the charge in Count
5      Fifteen, and that those are the maximum penalties provided for
6      by law?
7           THE DEFENDANT:  Yes, your Honor.  Forgive me, yes,
8      your Honor.
9           THE COURT:  Counts Sixteen through Twenty charge you
10     with money laundering.  Each of these counts carries a maximum
11     possible sentence of ten years imprisonment, a maximum fine of
12     the greatest of $250,000, twice the gross pecuniary gain
13     derived from the offense or twice the gross pecuniary loss to a
14     person other than yourself as a result of the offense, and a
15     $100 mandatory special assessment, and a maximum supervised
16     release term of five years.
17          Do you understand that those are the crimes charged in
18     Counts Sixteen through Twenty, and the maximum possible penalty
19     provided by law?
20          THE DEFENDANT:  Yes, your Honor.
21          THE COURT:  Do you also understand that the Court must
22     impose an order of restitution by law?
23          THE DEFENDANT:  Yes, your Honor.
24          THE COURT:  And do you understand that you are also
                             Page 4
```

```
                              82FVBENP.txt
25    subject to mandatory asset forfeiture?
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                      9
      82FVBENP                    Plea
1           THE DEFENDANT:  Yes, your Honor.
2           THE COURT:  And do you understand that you have the
3     right to plead not guilty and the right to a trial on the
4     charges against you and, in fact, the right to a jury trial?
5           THE DEFENDANT:  Yes, your Honor.
6           THE COURT:  At this time, I'd ask the government to
7     recite the elements of the crimes charged.
8           MR. BAROFSKY:  Yes, your Honor.  For Count One,
9     conspiracy, the government would have to prove the following
10    elements:
11          First, that an agreement or understanding existed to
12    commit the objects charged in the indictment.  Second, the
13    defendant knowingly became a member of that agreement or
14    understanding.  And third, that one of the conspirators
15    knowingly committed at least one overt act in furtherance of
16    the conspiracy during the life of the conspiracy.
17          With respect to Counts Two and Three, securities
18    fraud, the government would have to prove, first, that Bennett,
19    in connection with the purchase or sale of securities, and for
20    Count Two, that would be the notes described in the indictment,
21    and in Count Three, the common stock of Refco described in the
22    indictment, he did one or more of the following:  He either
23    employed a device, scheme, or artifice to defraud or made an
24    untrue statement of a material fact or omitted to state a
25    material fact which made what was said under the circumstances
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                      10
      82FVBENP                    Plea
1     misleading or engage in an act, practice, or course of business
2     that operated or would operate as a fraud or deceit on a
3     purchaser or seller.  Second, that Bennett acted knowingly,
4     willfully, and with intent to defraud.  And, third, that he
5     used or caused to be used any means or instruments of
6     transportation or communication in interstate commerce, but he
7     used the mails in furtherance of the fraudulent conduct.
8           With respect to Count Four, which charges false filing
9     under the Exchange Act, the first element the government would
10    have to prove is that Refco was required by the Securities
11    Exchange Act of 1934 to file the 10-K that's described in Count
12    Four.  And, second, the defendant knowingly and willfully made
13    or caused to be made a materially false or misleading statement
14    in that document or omitted to state any material fact required
15    to be stated therein or necessary to make the statements
16    therein not misleading.
17          With respect to Counts Five and Six, false filings
18    under the Securities Act, the government would have to prove,
19    again, first, that Refco was required under the Securities Act
20    of 1933 to file the S4, which is described in Count Five, and
21    the S1 registration statement described in Count Six.  And,
22    second, that Bennett knowingly and willfully made or caused to
23    be made a materially false or misleading statement in those
24    documents or omitted to state any material fact required to be
25    state therein or necessary to make the statements therein not
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                      11
      82FVBENP                    Plea
                                   Page 5
```

82FVBENP.txt

1  misleading.
2          With respect to Counts Seven through Thirteen of wire
3  fraud, the government would have to prove, first, that a scheme
4  to defraud must have existed; that Bennett must have
5  participated in the scheme with intent to defraud; that
6  misrepresentations or omissions must have related to material
7  facts were made in furtherance of the fraud; that the scheme
8  was executed to obtain money or property; and that in the
9  execution of the scheme, Bennett used or caused to be used the
10 interstate wires listed in the indictment.  And here for Count
11 Seven is the June 22nd of 2004 email from Robert Trosten; in
12 Count Eight, the August 3, '04 email from Robert Trosten; in
13 Count Nine, the April 6, '05 transmission of the S4 from New
14 York to Virginia; in Count Ten, the July 19th, 2005
15 transmission of 10-K from New York to Virginia; in Count
16 Eleven, the August 5th, 2004 transmission of $4,000,000 from
17 New York to Illinois; in Count Twelve, the August 5th, 2004
18 transmission of $40,000,000 from New York to Illinois; and in
19 Count Thirteen, the August 8th, 2005 transmission of the S1
20 registration statement from New York to Virginia.
21          For Count Fourteen, material misstatements to
22 auditors, the government would have to prove, first, that Refco
23 was a public company that was required to submit financial
24 statements to the SEC; second, that Bennett was a
25 director/officer of Refco; third, Bennett knowingly and
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                12
82FVBENP                    Plea
1  willfully made, caused to be made, a materially false or
2  misleading statement or omitted to state a material fact
3  necessary order to make the statements made in light of the
4  circumstances under which such statements were made not
5  misleading to an accountant, and that the statement was made in
6  connection with the audit or examination of the financial
7  statements of Refco required to be made pursuant to the Act.
8          Count Fifteen charges the defendant with bank fraud.
9  And specifically, that on August 5th, 2004, defrauded HSBC.
10 And the government would have to prove, first, there was a
11 scheme to defraud a bank by means of materially false or
12 fraudulent pretenses, representations, or promises; second,
13 that Bennett executed or attempted to execute the scheme with
14 intent to defraud the bank, here, again, HSBC; and third, at
15 the time of the execution of the scheme, HSBC had its deposits
16 insured by the FDIC.  And I'll represent to the Court that at
17 the relevant time periods, HSBC's deposits were insured by the
18 FDIC.
19          And finally, Counts Sixteen through Twenty charge the
20 defendant with money laundering.  And the government would have
21 to prove, first, that Bennett engaged or attempted to engage in
22 monetary transactions involving criminally derived property of
23 a value greater than $10,000; second, that the property
24 involved in the monetary transaction was, in fact, derived and
25 specified unlawful activity; third, that Bennett acted
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                13
82FVBENP                    Plea
1  knowingly.  And for these purposes, wire fraud, bank fraud, and
2  securities fraud are all specified unlawful activities and
3  would have to prove each of the transactions listed in the
4  indictment in Counts Sixteen through Twenty, basically the wire
5  transactions which are described therein.
                        Page 6

82FVBENP.txt

6          THE COURT:  Mr. Bennett, do you understand that if you
7    pled not guilty and went to trial, that the burden would be on
8    the government to prove each and every element of every crime
9    charged beyond a reasonable doubt in order to convict you of
10   that crime?
11         THE DEFENDANT:  I do, your Honor.
12         THE COURT:  Do you understand that at a trial you
13   would have the right to be represented by an attorney at all
14   stages of the proceeding and, if necessary, an attorney would
15   be appointed for you?
16         THE DEFENDANT:  Yes, I do.
17         THE COURT:  And do you understand that at a trial you
18   would have the right to confront and cross-examine witnesses
19   and the right not to be compelled to incriminate yourself?
20         THE DEFENDANT:  I do, your Honor.
21         THE COURT:  And do you understand that at a trial you
22   would be presumed innocent until such time, if ever, the
23   government established your guilt by competent evidence to the
24   satisfaction of the trier of fact beyond a reasonable doubt?
25         THE DEFENDANT:  Yes, your Honor.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                14

82FVBENP              Plea
1          THE COURT:  And do you understand that at a trial you
2    would have the right to testify and would also be entitled to
3    compulsory process; in other words, the right to call other
4    witnesses on your behalf?
5          THE DEFENDANT:  Yes, your Honor.
6          THE COURT:  And do you understand that if your plea is
7    accepted, that there will be no further trial of any kind, so
8    that by pleading guilty, you are waiving your right to a trial?
9          THE DEFENDANT:  I do understand that, your Honor, yes.
10         THE COURT:  And do you understand that if you are
11   sentenced to a period of supervised release, and if you violate
12   the terms of your supervised release, that an additional period
13   of jail time may be imposed without credit for the time that
14   you've previously spent on supervised release?
15         THE DEFENDANT:  Yes, your Honor.
16         THE COURT:  Do you understand that in connection with
17   your plea of guilty, that the Court may ask you certain
18   questions about the offense to which you have pled; and if you
19   answer those questions under oath and on the record and in the
20   presence of your counsel, that your answers are false may later
21   be used against you in a prosecution against you for perjury or
22   false statement?
23         THE DEFENDANT:  Yes, your Honor.
24         THE COURT:  And I recall, Mr. Bennett, you're a
25   citizen of Great Britain.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                15

82FVBENP              Plea
1          THE DEFENDANT:  I am, your Honor, yes.
2          THE COURT:  Do you understand that following any
3    sentence that you receive, that you will likely be deported?
4          THE DEFENDANT:  That is my understanding, your Honor,
5    yes.
6          THE COURT:  And do you understand that in determining
7    your sentence, that the Court is obligated to calculate the
8    applicable sentencing guidelines range, and to consider that
9    range and any possible departures under the guidelines and
10   other sentencing factors under the statute which entitles the
                           Page 7

82FVBENP.txt
11  Court to consider the nature and circumstances of the offense
12  and the history and characteristics of the defendant?
13          THE DEFENDANT: Yes, your Honor.
14          THE COURT: And have you reviewed with your counsel
15  the government's letter to them of yesterday which explains the
16  government's position as to the sentence that you face if the
17  sentencing guidelines are applied to your case?
18          THE DEFENDANT: I have reviewed it, your Honor,
19  correct.
20          THE COURT: Actually, that was said very badly. Let
21  me just try it again so that there's no confusion.
22          Have you reviewed that letter with your lawyers which
23  sets forth the government's calculation of the sentence that
24  you face under the sentencing guidelines?
25          THE DEFENDANT: I have reviewed it.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                          16

82FVBENP                    Plea
1           THE COURT: And do you understand that the government
2   calculates that under the guidelines, that you face a sentence
3   of life imprisonment; and that it has calculated that the
4   maximum possible statutory sentence is 315 years; and that the
5   fine range is from 25,000 to $5,000,000?
6           THE DEFENDANT: I understand that, your Honor,
7   correct.
8           THE COURT: And do you understand that that
9   calculation by the guidelines -- that by the government is just
10  based on the information they currently have?
11          THE DEFENDANT: Yes, your Honor.
12          THE COURT: And do you further understand that the
13  government's letter doesn't bind either the Court or the
14  probation department, and that ultimately the sentence that you
15  receive will be determined by the Court?
16          THE DEFENDANT: Yes, your Honor.
17          THE COURT: Mr. Bennett, have any threats or promises
18  been made to you to make you plead guilty?
19          THE DEFENDANT: No, your Honor.
20          THE COURT: Have any understandings or promises been
21  made to you concerning the sentence that you will receive?
22          THE DEFENDANT: None.
23          THE COURT: Is your plea voluntary?
24          THE DEFENDANT: It is, your Honor.
25          THE COURT: Mr. Bennett, did you commit the crimes
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                          17

82FVBENP                    Plea
1   that you've been charged with in the indictment?
2           THE DEFENDANT: I did, your Honor.
3           THE COURT: Would you tell me in your own words what
4   you did?
5           THE DEFENDANT: Your Honor, during the period that I
6   served as CEO of Refco, I agreed with other Refco executives to
7   enter into a series of transactions at the end of Refco's
8   financial reporting periods to make it appear as if a
9   receivable due to Refco from Refco Upholdings, Inc., a related
10  party, was instead due from an independent third-party
11  customer.
12          The IGHI receivable was composed of, amongst other
13  things, historical customer losses, bad debts, and expenses
14  that IGHI had incurred on behalf of Refco.
15          I, along with other Refco executives, have caused
                        Page 8

82FVBENP.txt

16 Refco to enter into these transactions in order to conceal the
17 size and nature of the IGHI receivable. We concealed the
18 receivable from, amongst others, Refco's auditors, Thomas H.
19 Lee Partners, various lenders who, in 2004, participated in
20 Refco's senior secured credit facility, and the issuance of 9
21 percent senior subordinated notes, and also investors in
22 Refco's common stock.
23         Among the lenders to whom I knowingly caused the IGHI
24 receivable to be misrepresented was HSBC Bank, referenced in
25 Count Fifteen of the indictment. I and other Refco executives
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                18
82FVBENP              Plea
1 also used the interstate wires to accomplish these acts within
2 this district, as referenced in Counts Seven through Thirteen.
3 Furthermore, I caused funds obtained from the transaction with
4 Thomas H. Lee Partners, referenced in paragraph 34 of the
5 indictment, to be wired to various parties receiving proceeds
6 from the transaction, as referenced in Counts Sixteen through
7 Twenty, knowing that this money had been unlawfully obtained.
8         The IGHI receivable and related party transaction used
9 to conceal it were material information that Refco investors
10 and lenders would have wanted to have known prior to investing
11 in or lending money to Refco. While I believed that I would be
12 able to pay the IGHI receivable down over time, and did, in
13 fact, ultimately pay off the receivable balance in its
14 entirety, I knew that failing to disclose the receivable was
15 wrong; I knew that obtaining funds from Refco's investors and
16 lenders based on misleading financial statements was also
17 wrong.
18         I also caused Refco to file documents with the SEC,
19 namely S1, S4, and 10-K that did not disclose the full extent
20 of the IGHI receivable or the transactions used to conceal it;
21 and, thus, were false and misleading with respect to material
22 facts. I knew that failing to disclose these facts in public
23 filings and in connection with Refco's sale and registration of
24 Refco's notes and common stock was wrong, and I deeply regret
25 having done so.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                19
82FVBENP              Plea
1         Your Honor, I take full responsibility for my actions.
2 I wish to publicly apologize to my family and to all of those
3 who have been harmed by my conduct. Thank you, your Honor.
4         THE COURT: Mr. Barofsky, is there anything else you
5 would want me to ask the defendant?
6         MR. BAROFSKY: Your Honor, can we just have a moment
7 to review? There's a lot of elements. Thank you, your Honor.
8         THE COURT: Certainly.
9         (Pause)
10         MR. BAROFSKY: Your Honor, just a couple of areas for
11 clarification. First, if you can please ask the defendant to
12 confirm that he was a director or officer of Refco during this
13 relevant time period. Should I go one-by-one?
14         THE COURT: Mr. Bennett, can you confirm that?
15         THE DEFENDANT: I was, your Honor.
16         MR. BAROFSKY: Second, your Honor, that the
17 misstatements made about Refco's auditor was in connection with
18 the auditor's preparation of a financial statement, and that
19 occurred after April of 2005.
20         THE COURT: Can you confirm that?
                              Page 9

82FVBENP.txt
```
21            THE DEFENDANT: That's correct, your Honor.
22            MR. BAROFSKY: Your Honor, and if you can ask the
23    defendant to confirm he made reference to various wire
24    transfers and wire communications, as well as certain filings
25    in the indictment, if you could please confirm with the
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    20

82FVBENP                           Plea
```
 1    defendant that those acts occurred on or about the dates set
 2    forth in the indictment.
 3            THE DEFENDANT: They did, your Honor.
 4            MR. BAROFSKY: And finally, your Honor, as I noted
 5    earlier, I will represent to the Court that HSBC was --
 6    deposits were insured by the FDIC during the relevant time
 7    period; and also that Refco was an entity that was required to
 8    file the various reports and documents and registration
 9    statements under the Exchange Acts of 1933 and 1934, as well as
10    to file financial statements with respect to the 10-K and the
11    misstatement to auditors account. Thank you, your Honor.
12            THE COURT: Mr. Bennett, do you still wish to plead
13    guilty?
14            THE DEFENDANT: I do, your Honor, yes.
15            THE COURT: Mr. Naftalis, do you know of any reason
16    that Mr. Bennett ought not plead guilty?
17            MR. NAFTALIS: No, your Honor.
18            THE COURT: Mr. Bennett, I'm satisfied that you
19    understand the nature of the charge against you and the
20    consequences of your plea; and that your plea is made
21    voluntarily and knowingly; and that there is a factual basis
22    for it. Accordingly, I will accept your plea of guilty and
23    direct that a presentence report be prepared.
24            THE DEFENDANT: Thank you, your Honor.
25            THE COURT: As for a sentencing date, can I just
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    21

82FVBENP                           Plea
```
 1    basically count out the requisite number of days or does the
 2    government have a view that it should be maybe a little bit
 3    more off into the future in light of the trial that's still
 4    upcoming?
 5            MR. BAROFSKY: Your Honor, we think we can be prepared
 6    in three months.
 7            THE COURT: All right. Why don't we set sentencing
 8    for May 20th at 4 o'clock. And since I would anticipate some
 9    significant presentence submissions, I think we should set a
10    schedule for that. Why don't we say that the government's
11    submission is due -- the defense submission is due on May 6th,
12    and the government's on May 13th.
13            MR. BAROFSKY: That's fine, your Honor.
14            MR. NAFTALIS: Your Honor, if there are things in the
15    government submission that we want to respond to, that's sort
16    of --
17            THE COURT: Doesn't give you quite enough time.
18            MR. NAFTALIS: We don't have -- you're having us
19    first, so we don't really sort of provide -- they could go
20    first, we could go second; we wouldn't object to that.
21            MR. BAROFSKY: We could do simultaneous submissions,
22    as well, your Honor, on the 6th and then we could each respond.
23            THE COURT: Sounds like fun.
24            MR. BAROFSKY: Okay.
25            MR. NAFTALIS: It's a living.
```
                              Page 10

82FVBENP.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

82FVBENP                    Plea
1       THE COURT: Let's not go there.  Okay?  Are we done?
2       MR. BAROFSKY: No, your Honor.  There is the issue of
3   bail.  And at this time, your Honor, the government does
4   request that defendant be remanded.  And if your Honor will let
5   me, I would like to speak briefly on the topic.
6       THE COURT: Okay.
7       MR. BAROFSKY: Obviously the standard has changed
8   under the Bail Act under 3143.  Before when we appeared before
9   your Honor several years ago, the burden was ours to prove the
10  defendant was a risk of flight.  Now, of course, it is the
11  defendant's burden to prove by clear and convincing evidence
12  that he is not likely to flee.  And respectfully, we submit
13  that there have been some extremely significant changed
14  circumstances, that we respectfully submit the defendant cannot
15  meet the burden in this case.
16      First of all, under the current bond, which, as your
17  Honor may recall, is a $50,000,000 bond, secured by $5,000,000
18  in cash and two properties, that security is now essentially
19  worthless; it's essentially an unsecured bond, because all of
20  those properties and that money are subject to asset
21  forfeiture.  The $5,000,000 we have traced as direct proceeds
22  from the IPO, which the defendant has just admitted was money
23  that was fraudulently obtained, and we already have lis pendens
24  on both of the properties, because basically under substitute
25  assets, we'd be able to take those, as well.  Those are all
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

23

82FVBENP                    Plea
1   subject to asset forfeiture and, therefore, don't provide any
2   security for the existing bond.
3       Secondly, the defendant is facing a $2.4 billion asset
4   forfeiture.  We don't think he has $2.4 billion, but we do
5   believe that will essentially -- through proceeds and
6   substitute assets, once this conviction is final -- will
7   basically deprive the defendant of all of his assets.  We have
8   restrained a number of his assets pretrial, but we have not
9   been able to restrain assets that we haven't been able to prove
10  are directly traceable.  And we don't know the exact amount of
11  those items, but we believe that they are in the $20,000,000
12  range, which would certainly facilitate the ability of the
13  defendant to flee.
14      Third, and I guess the most obvious point, is the
15  defendant now faces an advisory guideline range of 315 years of
16  imprisonment.  And that obviously changes the calculus a lot
17  from when we last appeared before your Honor.  We're not
18  suggesting that your Honor is going to --
19      THE COURT: He always faced that, right?
20      MR. BAROFSKY: Yes, your Honor; but before,
21  pretrial -- I'm sorry, pre-guilty plea, there was no certainty
22  that he was necessarily going to be convicted in this case.
23  Now, jail is an inevitability.  And I don't mean to presume
24  what the ultimate sentence will be in this case, because
25  there's obviously no way to predict what the precise sentence
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

82FVBENP                    Plea
1   will be, but the best guess, I think, from anyone's
Page 11

82FVBENP.txt

2  perspective, is that it will be a substantial prison sentence.
3  And for this defendant -- he is now with certainty facing such
4  a sentence that has -- under the guidelines is the equivalent
5  of a life sentence.
6        Defendant is 59 years old.  A sentence of -- a
7  significant sentence in this case may very well prove to be the
8  equivalent of a life sentence.  The defendant is facing certain
9  deportation after he serves that sentence.
10        THE COURT:  Not to a bad place though.
11        MR. BAROFSKY:  Not to a bad place, your Honor.  But it
12  does give the defendant a tremendous incentive to self-deport.
13  In other words, to flee the jurisdiction really with -- unlike
14  most cases, with very little downside.  The worse that happens
15  if he flees and gets caught is he's brought back to the United
16  States and does a jail sentence that probably will be the rest
17  of his life.  If he stays, he's facing pretty much the prospect
18  of the same result, a sentence that may, in fact, result in him
19  being in jail for the rest of his life, given his age.
20        And, your Honor, we respectfully submit that given the
21  shifting of the burden in these really remarkable circumstances
22  of a defendant who's not a U.S. citizen, who's facing the
23  equivalent of a life sentence, and who's now basically would be
24  free on an unsecured bond, that the circumstances dictate the
25  defendant should start serving his sentence, in effect,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

25

82FVBENP                    Plea
1  immediately.  And the defendant should be remanded on the
2  grounds that he cannot meet his burden of demonstrating by
3  clear and convincing evidence that he is not a risk of flight.
4        THE COURT:  Mr. Naftalis.
5        MR. NAFTALIS:  Most respectfully, I find this
6  application most surprising and a baseless one.  And I say it
7  with -- most advisedly.
8        You have a situation here where our client, for almost
9  two and-a-half years, has met every single condition of the
10  bond that was set here.  Your Honor got a report today from the
11  office of pretrial services, which we were given a copy of when
12  we entered the room, in which the office of pretrial services
13  has pointed out that he has complied with the terms of his bail
14  all the way through.
15        And I can sort of punctuate that a little bit because,
16  in fact, if you check with Officer Forelli, who he deals with
17  in pretrial services, you could hear anecdotal information such
18  as Mr. Bennett was the one who has set up the monitoring system
19  in the house in New Jersey because, whatever, I guess they're
20  technophobes, like I, the marshals service, he actually set up
21  the monitoring service which passed their muster in the
22  electronic stuff.  Once, when his bracelet broke down, he
23  immediately reported it to Officer Forelli that it was
24  malfunctioning and he went in.  He's been meticulous in
25  reporting to these people.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

26

82FVBENP                    Plea
1        And secondly, something that the government
2  consciously avoided bringing to your attention, his bond is
3  signed by the three immediate members of his family.  The three
4  of them who are American citizens:  His wife, his daughter, and
5  his son.  They have signed a $50,000,000 bond on his behalf,
6  and these are people with roots in the community.  The daughter

Page 12

82FVBENP.txt

7   is a lawyer, works at a law firm; the son is an investment
8   banker with a leading firm.  The notion that he would run away
9   and do that to his family, I mean, is incomprehensible.  And
10  all we have is rhetoric from the government there.
11          You also have the strict monitoring conditions in
12  which he's under and which he's faithfully complied with for
13  the last two and-a-half years.  Of course, he has no passport;
14  his wife has given up his passport; he has no effective way of
15  leaving the country.
16          And with respect to other situations, in other
17  situations in high-profile cases where people were facing
18  enormous sentences, no such applications were ever granted.
19  For example, the Computer Associates case, where the CEO of
20  Computer Associates, Mr. Kumar, who, under the guidelines which
21  were then in effect, more applicable now, after the Gall case,
22  the guidelines are just, you know, one ingredient in the soup
23  for your Honor to consider under 3533.  He faced life
24  imprisonment under his guidelines.  After pleading guilty, he
25  continued to be free on bond, even though there were admissions
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              27

82FVBENP              Plea
1   of obstruction of justice in that case.
2           After Kumar was sentenced or he got a 12-year
3   sentence, he continued to be allowed to be -- remained free on
4   bond to work out various issues of restitution and the like.
5           In the case in front of Judge Sand, the Adelphia case,
6   which is one of the cases, the Rigases, who got 15 and 20-year
7   sentences, one of them was an eighty -- somewhere in his
8   eighties, they were allowed to remain free on bond pending
9   appeal, even though they had the same sort of issues.  Even
10  Mr. Ebbers, who received the largest sentence in history I've
11  ever heard of, a real outlier sentence, 25 years, he was
12  allowed to remain free on bond pending appeal and the like.
13          And apart from the fact that there is not the
14  slightest bit of evidence for this most unfair application,
15  it's also prejudicial.  As your Honor knows, we have to put in
16  sentencing submissions.  And under 3533, your Honor has a lot
17  of things which you can properly consider in determining in
18  your best judgment what's a fair and just sentence under the
19  case here.  And obviously it's very prejudicial to us in being
20  able to work with our client, who for the last two and-a-half
21  years has been coming to our office every day on a daily basis
22  to work on the case with us.  So I don't see any good-faith
23  basis for any change in bond here whatsoever.
24          THE COURT:  Mr. Barofsky.
25          MR. BAROFSKY:  Your Honor, if there's any specific
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              28

82FVBENP              Plea
1   points you'd like me to respond to.  The ones that jump out to
2   me is, I mean the notion that a defendant can't chronically
3   prepare for sentencing when he's incarcerated, obviously your
4   Honor knows countless defendants who are able to prepare for
5   sentencing when they are incarcerated; and having spent so much
6   time with Mr. Naftalis, I think they are pretty much -- I'm
7   sure they have contemplated this before, this is not the first
8   time.
9           As opposed to those other cases, defendants who are
10  released pending appeal after they've been convicted at trial
11  is a different situation.  There's obviously provisions within
                        Page 13

82FVBENP.txt

```
12   3143 when there are issues on appeal that the judge finds are
13   significant issues that need to be considered and possibly
14   could result in the reversal of a conviction.  That's a
15   different -- those are different facts, and that's a different
16   standard.  Here, we have a guilty plea.  I don't think that
17   Mr. Bennett is going to be challenging his conviction in this
18   case.  He just gave a very detailed guilty plea.
19            With respect to his assurances to his family, I don't
20   mean to minimize the bond between Mr. Bennett and his family,
21   but on the flip side, we're looking at a man who just admitted
22   to telling a series of lies to a large number of victims that
23   resulted in the defrauding of $2.4 billion.  1.7 or 8 billion,
24   which we will show for restitution at the time of sentencing,
25   has not been collected.  People are out all of this money.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

29

82FVBENP                    Plea

```
1            So this man maybe may have some allegiance to his
2    family, but I think you have to look at the flip side as to how
3    strong that may be by a man if he is willing to tell whatever
4    lie is necessary to -- you know, on proportions that are
5    mind-boggling, in the billions of dollars.
6            So we would respectfully submit that -- and we don't
7    contest the fact, by the way, to be clear, that Mr. Bennett has
8    complied with the conditions.  And that is certainly a relevant
9    factor that Mr. Naftalis points out and we don't contest it.
10   We just don't think that that's enough to meet his burden,
11   given his changed circumstances.  And that to allow a defendant
12   like this, who's also not a U.S. citizen, unlike those
13   individuals, out on what is essentially an unsecured bond, it
14   simply isn't the right course of action here.
15            MR. NAFTALIS:  Just one small point, which they
16   reminded me to mention.  Although Mr. Bennett never changed his
17   citizenship, like his wife, or became an American citizen like
18   his children, he's lived in the United States for more than 30
19   years; so it's not like he has any roots anyplace else.  So
20   it's a little unfair for this eleventh-hour application which
21   we heard about today to suggest as if he had someplace to go
22   to.
23            And the government ignored the situation in the Kumar
24   case.  He said that all these other cases where people were on
25   appeal.  In the Kumar case it was a plea of guilty with someone
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

30

82FVBENP                    Plea

```
1    facing, if one took the government's view of the thing, a life
2    sentence.  And he was allowed out, and he showed up.  Even
3    after he got his sentence of 12 years he remained out on bond
4    to work out the restitution things.
5            And we don't necessarily agree at all with the amount
6    of the forfeiture issues here.  I mean there's a forfeiture
7    issue in the case, but the numbers he tosses around are not
8    numbers that we have stipulated to or agreed to by any stretch
9    of the imagination, and he throws them around.
10            That's the only point I wanted to make.
11            THE COURT:  All right.  I'm not going to remand
12   Mr. Bennett, although I do think I can modify his bail
13   conditions to create greater security.  And I'm not going to do
14   so for a number of reasons, the most important of which is that
15   this indictment was filed in 2005.
16            If Mr. Bennett had wanted to flee, he should have fled
```

Page 14

82FVBENP.txt

17  before he paid his lawyers all the money, and kept it, and gone
18  to an appealing location.  In fact, having pled guilty, to
19  leave now, extraditing him will be much easier.  So there's a
20  balance there.
21          In addition, I note that just by statute, to release
22  someone on appeal requires the same finding as the finding now.
23  The judicial officer has to be persuaded by clear and
24  convincing evidence that the person is not likely to flee.
25  That's half of the standard.  The appellate issue is the other
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                31
82FVBENP                  Plea
1   half, so it's the same standard.
2           And I also think that -- and I want to make it
3   clear -- that I don't make any prejudgments about the substance
4   of the case, but this is a case in which there has been a lot
5   of information, publicly, at least, from the bankruptcy
6   proceeding, and so this is a situation in which Mr. Bennett has
7   had the opportunity to see an examiner put the evidence
8   together.  This is not a situation where as the case approaches
9   trial, the government finally turns over information.  I think
10  Mr. Bennett has had a pretty good idea of the nature of the
11  case and the evidence for at least some time, which makes the
12  fact that he stays more significant.
13          The pretrial officer tells me that it would be easier
14  and more effective to monitor Mr. Bennett if he stayed in one
15  home or the other.  And, I guess -- and tells me that basically
16  the minute he leaves home they know about it.  So given that it
17  would take some time to -- since make an escape without a
18  passport, I think that if we modified the bail conditions to
19  limit his location, pretrial tells me that that makes it a more
20  secure situation.  In addition, if the government has any
21  particular practical economic conditions that you can think of,
22  I'm always willing to listen to those.
23          MR. BAROFSKY:  Your Honor, the posting of additional
24  assets by the defendant, they are largely forfeitable assets,
25  but to the extent that there are assets that have not been --
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                32
82FVBENP                  Plea
1   as I said, we estimate that it's in the range of approximately
2   $20,000,000.  If we could at least secure those assets, these
3   are assets that we've not yet secured by having him posted for
4   the bond.
5           In addition, because, frankly, we're going to get
6   those assets anyhow at the conclusion of this case, perhaps the
7   posting the requiring of assets from the children.  He
8   mentioned that the children are successful, one's an investment
9   banker.  And if they have property, that may increase the
10  incentive for Mr. Bennett to stay.
11          THE COURT:  I think it's enough that he's -- the bond
12  mortgages their future if he flees.  We're not taking his kids'
13  money.
14          MR. BAROFSKY:  We aren't.  I wouldn't suggest that we
15  would take it other than if he fled.  We would only be posting
16  whatever interest.  Because really right now the problem, your
17  Honor, and I hear what your Honor is saying, is that he has an
18  unsecured bond, and that just causes us a great deal of
19  concern.  I don't know what the circumstances are in Kumar or
20  Ebbers, but this is a situation if there is a third party
21  posting collateral --
                        Page 15

82FVBENP.txt

```
                              82FVBENP.txt
22              THE COURT:  For all those people, the bottom line is
23   that for any defendant who was older and who was facing
24   sentencing, in, lets call it, the post-Enron era, the situation
25   was the same as for Mr. Bennett.  The possibility that their
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

33

82FVBENP                     Plea

```
 1   sentence would be -- that their residence in the Bureau of
 2   Prisons was the last residence they are going to have.
 3              So I don't think this is really dramatically
 4   different.  And I don't think the fact that he's a British
 5   citizen changes the situation, that he has to -- I think he
 6   gets the credit for having complied with all of his bail
 7   conditions and having had two and-a-half years to reflect.
 8              MR. BAROFSKY:  Your Honor, to be clear, I wasn't
 9   rearguing the bail application.  I was merely trying to respond
10   to your Honor's question whether there were additional economic
11   circumstances.
12              THE COURT:  I'm not asking his children, okay?
13              MR. BAROFSKY:  Well, your Honor, then I would ask that
14   in the alternative, if the defendant could post additional
15   property or money that has not been seized or frozen by the
16   government to secure this bond to at least increase so that
17   there's some notional security of the bond.  And I would ask
18   for a number of $10,000,000 in cash or property.
19              MR. NAFTALIS:  Your Honor, I just think there is no
20   basis whatsoever for the application.  His children, the most
21   important things in the world, are on the hook for $50,000,000
22   if he were to leave.  As they've indicated, they don't have any
23   evidence of anything that he's ever done anything which would
24   indicate he would leave.  As your Honor said, quite correctly,
25   we've known about the evidence in this case; your Honor
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

34

82FVBENP                     Plea

```
 1   remembers the litigation with respect to the bankruptcy trusts,
 2   these report the motion practice there.  There's no secret
 3   about that.  He's showed up all the time; he's complied with
 4   all the conditions.  And there's not a reason in the world and
 5   there's not a basis in the world for any change here
 6   whatsoever.
 7              MR. BAROFSKY:  Your Honor, respectfully, I don't see
 8   any harm in having him post additional property that could only
 9   be used at this time for the purposes to facilitate flight.  He
10   can't transfer these properties without violating the money
11   laundering laws at this point, and I don't see -- I don't even
12   understand how upping the collateral so as to prevent him from
13   fleeing prejudices him in any way.  And we're not asking even
14   for all of the money that we believe is out there, we're asking
15   for $10,000,000 to provide some additional security on what is
16   now an essentially an uncollateralized bond.  It doesn't really
17   move the ball tremendously for us, but it helps.  And at least
18   it would limit his ability to flee, should he make that
19   decision, that it makes more sense to self-deport, since he's
20   going to be going back to England anyhow before he has to face
21   the sentence.  I don't think the government's request is
22   shocking or surprising or terribly dramatic, but we do think it
23   would help, given the situation.
24              MR. NAFTALIS:  They have not shown anything for this
25   eleventh-hour request.  It's totally and absolutely baseless.
                     SOUTHERN DISTRICT REPORTERS, P.C.
                                Page 16
```

82FVBENP.txt
(212) 805-0300

35

82FVBENP                    Plea
1  And I don't think -- I don't know what property may or may not
2  exist, but I don't think that there's any justification.  And
3  they just can't come into court without any basis whatsoever
4  and allege things where all the evidence shows that this
5  application is frivolous.
6          MR. BAROFSKY:  Your Honor, I've listened to this for a
7  fair amount of time now.  And to characterize our application
8  as frivolous and baseless and eleventh-hour I think is unfair.
9          THE COURT:  At least the eleventh hour.
10         MR. BAROFSKY:  I don't know when we were supposed to
11 have made this application.  I don't know if Mr. Naftalis would
12 have had us make it when he notified us about the intent to
13 change his plea yesterday afternoon, I don't think so.  I think
14 the only time we can make a plea based on the changed
15 circumstance of the defendant entering a guilty plea is after
16 he enters the guilty plea.
17         As far as it being baseless, the notion that a
18 defendant who's facing 315 years of prison time --
19         THE COURT:  He wishes.
20         MR. BAROFSKY:  -- is -- that it's baseless to seek his
21 remand when he is an English citizen subject to deportation --
22         THE COURT:  Excuse me.  We're not -- we're sending him
23 to one of the most civilized countries in the world.  It's not
24 punishment to live in England, all right?
25         MR. BAROFSKY:  Exactly, your Honor, which is why we
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

36

82FVBENP                    Plea
1  would ask for additional collateral.
2          THE COURT:  And there is an extradition treaty between
3  the United States and Great Britain, so...
4          MR. BAROFSKY:  Your Honor, I just don't understand the
5  harm --
6          THE COURT:  Because I'm not sure that the purpose of
7  bail is to help you collect, you know, whatever you claim is
8  your eventual restitution.
9          MR. BAROFSKY:  Your Honor, if I wasn't clear on this
10 argument, I apologize.  The reason why we're asking for this is
11 to assure the defendant's appearance.  If that money is posted
12 as a bond, it's not so that we can eventually seize it.  If
13 it's posted as a bond, it's not available for him to use to
14 facilitate flight.  It's also to secure the bond.  This
15 original bond was issued because it was secured by money and
16 property.  Right now it's essentially not secured by money and
17 property.
18         THE COURT:  But that argument applies to any
19 additional money that he would put up.  You would say it was
20 just as forfeitable to you.  So it then becomes unsecured, the
21 same way.
22         MR. BAROFSKY:  But it's unrestrained property, Judge,
23 that's the difference.  This property is actually restrained on
24 top of the fact that it's -- because it's their direct
25 proceeds.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

37

82FVBENP                    Plea
1          What I'm suggesting, these are other properties that
2  have not been restrained, because we're not able to restrain
                        Page 17

82FVBENP.txt

 3  certain properties that are not proceeds.  So this is money
 4  that is available to the defendant for use if he wants to
 5  facilitate flight.
 6       The purpose of a bond, obviously security of a bond,
 7  and why your Honor endorsed the order of a secured bond, was
 8  because more security means less likelihood of flight.  And all
 9  we're suggesting is taking this property that is now available
10  to the defendant and posting it as security for the bond.  And
11  obviously if we are unable to prove, as Mr. Naftalis suggests,
12  that this is property that's subject to asset forfeiture or
13  restitution, he'll get it back when -- at the time of his
14  sentencing or the time that he reports.
15       So we're not taking anything; we're not putting our
16  hands on stuff that we're not entitled to; we're just asking
17  that this bond be really secured, because right now we're
18  basically -- it's the exact same situation we had in October of
19  2005, when he's going out on the same conditions, it's
20  essentially an unsecured bond.  And I don't think that your
21  Honor would have ordered an unsecured bond back then, and we're
22  just asking for some additional security:  Money that is
23  available for the defendant or property, and that we have that
24  to secure the bond in case the defendant flees, and to
25  encourage him not to flee.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                38
    82FVBENP           Plea
 1       MR. NAFTALIS:  Apart from the fact that the government
 2  has proffered not a single fact that anything has changed, I
 3  don't agree with the notion that this bond is unsecured.  One
 4  of the homes which is securing the bond -- there's $5,000,000
 5  cash, there's two residences, is in a trust.  So without going
 6  through all the legalities, I don't think it's so quickly
 7  forfeitable, as they say.
 8       And the notion of ignoring -- and that will be worked
 9  out; we're not here to litigate that issue, but I just -- and
10  the notion that they can continue to ignore the fact that his
11  wife and children have signed a $50,000,000 bond that they will
12  be on the hook for and their lives will be ruined, the notion
13  there's not the slightest reason to suppose that he would do
14  this to his children, he never has, and I have nothing else to
15  say.
16       THE COURT:  I think $50,000,000 is a lot of money.
17  And it does directly affect wife, children, inheritances.  So
18  what about the issue of where he's going to live?
19       MR. NAFTALIS:  If your Honor wants -- feels it would
20  be better, pretrial services --
21       THE COURT:  That's what pretrial tells me.
22       MR. NAFTALIS:  I think he would -- there's a residence
23  in New York and a residence in New Jersey.  I think he would
24  prefer to be in New Jersey where his wife is, and then subject
25  to the fact he could just come to our offices and work with us,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                39
    82FVBENP           Plea
 1  which I think he's allowed to do, I think that would be his
 2  preference in terms of the quality of the life until the
 3  sentence, if that's --
 4       THE COURT:  I get the high sign from pretrial; so
 5  he'll stay in New Jersey.
 6       MR. NAFTALIS:  Okay.
 7       THE COURT:  Other than when he goes to you and also
                            Page 18

82FVBENP.txt

```
 8    when you have to get him to pretrial for -- to probation for
 9    his interview.
10              MR. NAFTALIS:  Yes.
11              THE COURT:  Which we do need to do within the two
12    weeks so that the sentencing schedule can proceed.  And the
13    same is true for the government's description of the crimes.
14              Okay?  I think we're done then.
15              MR. NAFTALIS:  Thank you, your Honor.
16              MR. BAROFSKY:  Thank you, your Honor.
17              MR. GARCIA:  Thank you, your Honor.
18              THE DEFENDANT:  Thank you, your Honor.
19                              *    *    *
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

82KATROP.txt

1

82KATROPps
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  UNITED STATES OF AMERICA,
3
4                  v.                    05 CR 1192 (NRB)
4
5  ROBERT TROSTEN,
5
6                  Defendant.
6
7  ------------------------------x
7
8                                  New York, N.Y.
8                                  February 20, 2008
9                                  5:30 p.m.
9
10
10 Before:
11
11              HON. NAOMI REICE BUCHWALD
12
12                                  District Judge
13
13
14                  APPEARANCES
14
15 MICHAEL J. GARCIA
15      Acting United States Attorney for the
16      Southern District of New York
16 BY:  CHRISTOPHER GARCIA
17      NEIL BAROFSKY
17      Assistant United States Attorneys
18
18 MORVILLO, ABRAMOWITZ, GRAND, IASON,
19 ANELLO & BOHRER, P.C.
19      Attorneys for Defendant
20 BY:  ROBERT G. MORVILLO
20      CHRISTOPHER J. MORVILLO
21      RACHEL M. KORENBLAT
21
22
22 Also Present:  Robert W. Manchak, Criminal Investigator
23               Rua M. Kelly, Assistant United States Attorney
23               Mary Beth Allen, Paralegal
24               United States Attorney's Office
25

                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

2

82KATROPps
1          (In open court)
2          THE CLERK:  The case is United States v. Robert
3  Trosten, Docket No. 05 Crim. 1192.  Is the government ready to
4  proceed?
5          MR. GARCIA:  Yes.  Good afternoon, your Honor.
6  Christopher Garcia on behalf of the government.  With me at
7  counsel table is Assistant United States Attorney Neil
8  Barofsky.  And with the Court's permission, also at counsel
9  table:  Robert Manchak, criminal investigator with our office;
                          Page 1

82KATROP.txt
10  Mary Beth Allen, paralegal with our office; and also Rua Kelly,
11  also an Assistant United States Attorney with our office.
12          THE CLERK:  And is the defense attorney ready to
13  proceed?
14          MR. R. MORVILLO:  We are, your Honor.  Mr. Trosten is
15  here.  For the record, my name is Robert Morvillo.  I represent
16  Mr. Trosten.  And seated to my left is Christopher Morvillo, my
17  co-counsel.
18          THE DEFENDANT:  Good afternoon.
19          THE COURT:  Good afternoon, Mr. Morvillo.
20          MR. R. MORVILLO:  I think it's my application, your
21  Honor.  We would apply to the Court for permission to withdraw
22  our previously entered plea of not guilty as to Counts One,
23  Two, Seven, Fifteen, and Seventeen of the indictment and enter
24  a plea of guilty.
25          THE COURT:  Mr. Trosten, if you will remain standing
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                                                              3

82KATROPps
1   for a moment, would you raise your right hand, please.
2           Do you solemnly swear that the answers to the
3   questions I am about to ask you will be the truth, the whole
4   truth, and nothing but the truth, so help you God?
5           THE DEFENDANT:  I do, your Honor.
6           THE COURT:  Would you state your full name for me,
7   please.
8           THE DEFENDANT:  Robert Charles Trosten, Sr.
9           THE COURT:  And, Mr. Trosten, how old are you?
10          THE DEFENDANT:  38.
11          THE COURT:  Why don't you sit down.
12          THE DEFENDANT:  Thank you.
13          THE COURT:  Mr. Trosten, what was the last grade or
14  level of school that you completed?
15          THE DEFENDANT:  I finished undergraduate college with
16  a B.S. in accounting.
17          THE COURT:  At this time are you under the care of a
18  doctor or psychiatrist?
19          THE DEFENDANT:  Yes, I am.
20          THE COURT:  Which?
21          THE DEFENDANT:  A doctor -- a psychiatrist.
22          THE COURT:  And what condition is he treating you for?
23          THE DEFENDANT:  Dr. Neiman is treating me for sleep
24  and anxiety on occasion.
25          THE COURT:  And are you taking any medicine as a
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                                                              4

82KATROPps
1   result of or in connection with that treatment?
2           THE DEFENDANT:  I take sleep medicine as needed and
3   anxiety medicine as needed.
4           THE COURT:  At the moment, are you under the influence
5   of any drug or alcohol?
6           THE DEFENDANT:  No, I'm not.
7           THE COURT:  Have you in fact ever been hospitalized or
8   treated for either alcoholism or narcotics addiction?
9           THE DEFENDANT:  No, I have not.
10          THE COURT:  And how are you feeling physically today?
11          THE DEFENDANT:  I feel great.
12          THE COURT:  Have you had sufficient time to discuss
13  the charges against you and your proposed plea with your
14  counsel, the Messrs. Morvillo?
                        Page 2

82KATROP.txt
15          THE DEFENDANT:  I have, yes.
16          THE COURT:  And have you been satisfied with the
17     advice and counsel that they have given to you?
18          THE DEFENDANT:  I am.
19          THE COURT:  And at this time, are you ready to change
20     your plea?
21          THE DEFENDANT:  I am indeed.
22          THE COURT:  And what is your plea at the moment?
23     Guilty or not guilty?
24          THE DEFENDANT:  Guilty.
25          THE COURT:  All right.  Mr. Trosten, in order to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                5

82KATROPps
1      determine whether your plea is voluntary and made with a full
2      understanding of the charges against you and the consequences
3      of your plea, I will make certain statements to you and I will
4      ask you certain questions.  I want you to understand that I
5      need not accept your plea unless I am satisfied that you are in
6      fact guilty and that you fully understand your rights.
7           Now, Count One of the indictment charges you with a
8      conspiracy to commit securities fraud, wire fraud, bank fraud,
9      and money laundering, and to make false filings with the SEC
10     and material misstatements to auditors.  This crime carries a
11     maximum statutory penalty of five years in prison, a maximum
12     fine of the greatest of $250,000 or twice the gross pecuniary
13     gain derived from the offense or twice the gross pecuniary loss
14     to a person other than yourself as a result of the offense, a
15     $100 special assessment, and a mandatory term of supervised
16     release of three years.  Do you understand that those are the
17     charges in Count One and the maximum statutory penalties
18     provided for that charge?
19          THE DEFENDANT:  I do.
20          THE COURT:  Count Two charges you with securities
21     fraud.  And this crime carries a maximum possible sentence of
22     20 years in prison, a maximum fine of the greatest of $5
23     million or twice the gross pecuniary loss derived from the
24     offense, or twice the gross pecuniary loss -- I'm sorry.  I
25     think I said twice pecuniary loss.  It's twice the gross
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                6

82KATROPps
1      pecuniary gain derived from the offense or twice the gross
2      pecuniary loss to a person other than yourself as a result of
3      the offense, a $100 special assessment, and a maximum term of
4      supervised release of three years.  Do you understand that
5      those are the charges in Count Two and the maximum possible
6      penalties provided by law?
7           THE DEFENDANT:  I do.
8           THE COURT:  Count Seven charges you with wire fraud,
9      and this crime carries a maximum possible sentence of 20 years
10     in prison, a maximum fine of the greatest of $250,000 or twice
11     the gross pecuniary gain derived from the offense or twice the
12     gross pecuniary loss to a person other than yourself as a
13     result of the offense, a $100 special assessment, and a maximum
14     term of supervised release of three years.  Do you understand
15     that those are the charges in Count Seven and the maximum
16     statutory penalty provided for the crime of wire fraud?
17          THE DEFENDANT:  I do, your Honor.
18          THE COURT:  Count Fifteen charges you with bank fraud.
19     And this crime carries a maximum possible sentence of 30 years
                              Page 3

82KATROP.txt
20  in prison, a maximum fine of the greatest of $250,000 or twice
21  the gross pecuniary gain derived from the offense or twice the
22  gross pecuniary loss to a person other than yourself as a
23  result of the offense, a $100 special assessment, and a
24  mandatory -- or a maximum term of supervised release of five
25  years.  Do you understand that those are the charges in Count
                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              7

82KATROPps
1   Fifteen and the maximum statutory penalty provided therefor?
2            THE DEFENDANT:  I do, your Honor.
3            THE COURT:  Count Seventeen charges you with money
4   laundering, and this crime carries a maximum sentence of ten
5   years in prison, a maximum fine of the greatest of $250,000 or
6   twice the gross pecuniary gain derived from the offense or
7   twice the gross pecuniary loss to a person other than yourself
8   as a result of the offense, a $100 mandatory special
9   assessment, and a maximum supervised release term of three
10  years.  Do you understand that that is the charge in Count
11  Seventeen and the maximum penalty provided for it by statute?
12           THE DEFENDANT:  I do, your Honor.
13           THE COURT:  And do you understand that, in addition to
14  the punishments which I just described, that the Court must
15  order restitution with respect to the charges in the
16  indictment?
17           THE DEFENDANT:  I'm sorry, your Honor?
18           THE COURT:  I said, do you understand that in addition
19  to the punishments that I've just described, that the Court
20  must order restitution --
21           THE DEFENDANT:  I do.
22           THE COURT:  -- with respect to the charges to which
23  you are pleading?
24           THE DEFENDANT:  I do.
25           THE COURT:  Do you understand that as part of your
                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              8

82KATROPps
1   plea agreement, that you have admitted the forfeiture
2   allegations in the indictment and that you agree to forfeit to
3   the United States the sum of $2,400,000,000, as well as all the
4   specific property listed in schedule A to your plea agreement?
5            THE DEFENDANT:  I do, your Honor.
6            THE COURT:  And that as part of this plea agreement,
7   that you have agreed to not file any claims for any of the
8   forfeited property, and also to take such steps as necessary to
9   clear title to the specific property?
10           THE DEFENDANT:  I do, your Honor.
11           THE COURT:  And do you understand that you have the
12  right to plead not guilty and the right to a trial on the
13  charges against you and in fact the right to a jury trial?
14           THE DEFENDANT:  I do.
15           THE COURT:  At this time, Mr. Garcia, I would ask you,
16  please, to recite the elements of the crimes to which
17  Mr. Trosten is pleading.
18           MR. GARCIA:  Yes, your Honor.  With respect to Count
19  One, there are three elements: first, that there existed an
20  agreement or understanding to commit the objects charged;
21  second, that Mr. Trosten knowingly became a member of that
22  agreement or understanding; and, third, that one of the
23  co-conspirators knowingly committed at least one overt act in
24  furtherance of the conspiracy during the life of the
                            Page 4

82KATROP.txt

25      conspiracy.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                        9

82KATROPps
 1              With respect to Count Two, the securities fraud count,
 2      the first element is that Mr. Trosten, in connection with the
 3      purchase or sale of securities, here the notes described in
 4      Count Two, did one or more of the following: employed a device,
 5      scheme, or artifice to defraud; or made an untrue statement of
 6      material fact; or omitted to state a material fact which made
 7      what was said, under the circumstances, misleading; or engaged
 8      in an act, practice, or course of business that operated or
 9      would cause or deceit upon a purchaser or seller.
10      Second, that Mr. Trosten acted knowingly, willfully, and with
11      intent to defraud.  And, third, that Mr. Trosten used or caused
12      to be used any means or instruments of transportation or
13      communication in interstate commerce, or the use of the mails,
14      in furtherance of the fraudulent conduct.
15              With respect to Count Seven, the wire fraud count,
16      there are five elements: first, that a scheme to defraud
17      existed; second, that Mr. Trosten must have participated in the
18      scheme with intent to defraud; third, that misrepresentations
19      or omissions must have related to material facts; fourth, that
20      the scheme was executed to obtain money or property; and
21      finally, that in executing the scheme, Mr. Trosten used or
22      caused to be used interstate wires, or the use of such wires
23      were reasonably foreseeable to him, as listed in the
24      indictment.  And here, your Honor, with respect to Count Seven,
25      it is alleged that on June 22, 2004, Mr. Trosten sent an
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                        10

82KATROPps
 1      e-mail.
 2              With respect to Count Fifteen, the bank fraud charge,
 3      your Honor, there are three elements: first, that there was a
 4      scheme to defraud a bank by means of materially false or
 5      fraudulent pretenses, representations, or promises; second,
 6      that Mr. Trosten executed or attempted to execute the scheme
 7      with intent to defraud the bank; and, third, that at the time
 8      of the execution of the scheme, the bank had its deposits
 9      insured by the Federal Deposit Insurance Corporation.
10              At this time, your Honor, the government would proffer
11      and represent that HSBC, which is identified in the indictment,
12      has its deposits, and had its deposits at the relevant period,
13      insured by the Federal Deposit Insurance Corporation.
14              Finally, your Honor, with respect to Count Seventeen,
15      the money laundering count, there are three elements: first,
16      that Mr. Trosten engaged or attempted to engage in monetary
17      transactions involving criminally derived property of a value
18      greater than $10,000; second, that the property involved in the
19      monetary transaction, or attempted transaction, was in fact
20      derived from specified unlawful activity; finally, that
21      Mr. Trosten acted knowingly.  And with respect to this count,
22      the specified unlawful activities are the wire fraud, bank
23      fraud, and securities fraud otherwise charged.
24              THE COURT:  Mr. Trosten, do you understand that if you
25      pled not guilty and went to trial, that the burden would be on
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                        11

82KATROPps

                            Page 5

82KATROP.txt

```
 1  the government to prove each and every element of the crimes
 2  charged beyond a reasonable doubt in order to convict you?
 3          THE DEFENDANT:  Yes, your Honor.
 4          THE COURT:  Do you understand that at a trial, you
 5  would have the right to be represented by an attorney at all
 6  stages of the proceeding and if necessary an attorney would be
 7  appointed for you?
 8          THE DEFENDANT:  I do, your Honor.
 9          THE COURT:  Do you understand that at a trial you
10  would have the right to confront and cross-examine witnesses
11  against you and the right not to be compelled to incriminate
12  yourself?
13          THE DEFENDANT:  Yes, your Honor.
14          THE COURT:  And do you understand that at a trial you
15  would be presumed innocent until such time, if ever, the
16  government established your guilt by competent evidence to the
17  satisfaction of the trier of fact beyond a reasonable doubt?
18          THE DEFENDANT:  I do, your Honor.
19          THE COURT:  And do you understand that at a trial, you
20  would have the right to testify and would also be entitled to
21  compulsory process, in other words, the right to call other
22  witnesses on your behalf?
23          THE DEFENDANT:  I do, your Honor.
24          THE COURT:  And do you understand that if your plea is
25  accepted, that there will be no further trial of any kind, so
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                12

82KATROPps

```
 1  that by pleading guilty, you are waiving your right to a trial?
 2          THE DEFENDANT:  I do.
 3          THE COURT:  Do you understand that if you are
 4  sentenced to a period of supervised release and if you violate
 5  the terms of your supervised release, that an additional period
 6  of jail time may be imposed without credit for the time that
 7  you had previously spent on supervised release?
 8          THE DEFENDANT:  I do.
 9          THE COURT:  And do you understand that in connection
10  with your plea of guilty, that the Court may ask you certain
11  questions about the offense to which you have pled, and if you
12  answer those questions under oath and on the record and in the
13  presence of your lawyer, that your answers if false may later
14  be used against you in a prosecution for perjury or false
15  statement?
16          THE DEFENDANT:  I do, your Honor.
17          THE COURT:  And do you understand that, in determining
18  your sentence, that the Court is obligated to calculate the
19  applicable sentencing guidelines range and to consider that
20  range and possible departures under the guidelines, as well as
21  other factors concerning the nature and circumstance of the
22  offense and the history and characteristics of the defendant?
23          THE DEFENDANT:  I do, your Honor.
24          THE COURT:  Mr. Trosten, did you sign a plea agreement
25  earlier today?
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                13

82KATROPps

```
 1          THE DEFENDANT:  I did, your Honor.
 2          THE COURT:  And before you signed it, did you discuss
 3  it with your lawyers?
 4          THE DEFENDANT:  I did.
 5          THE COURT:  And before you signed it, did you read it?
```
                              Page 6

82KATROP.txt

6 THE DEFENDANT:  I did, your Honor.
7 THE COURT:  Let's just put the plea agreement to one
8 side for a moment.  Apart from the plea agreement, have any
9 threats or promises been made to you to make you plead guilty?
10 THE DEFENDANT:  No, your Honor.
11 THE COURT:  Again, apart from the plea agreement, have
12 any understandings or promises been made to you concerning the
13 sentence that you will receive?
14 THE DEFENDANT:  No, your Honor.
15 THE COURT:  Is your plea voluntary?
16 THE DEFENDANT:  Yes, it is.
17 THE COURT:  I would like to review a few portions of
18 the plea agreement with you.  Do you understand that pursuant
19 to this plea agreement, that you have undertaken to truthfully
20 and completely disclose all information about yourself and
21 others as required of you by the U.S. Attorney's Office; and
22 that you have agreed to fully cooperate with the U.S.
23 Attorney's Office, the United States Postal Inspection Service,
24 the Securities and Exchange Commission, and any other law
25 enforcement agency designated by the Office; that you have

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

82KATROPps
1 agreed to attend all meetings as your presence is requested,
2 and to provide to the U.S. Attorney's Office any document or
3 other tangible evidence relating to any inquiry from the U.S.
4 Attorney's Office or other law enforcement agencies; that you
5 have agreed to truthfully testify before the grand jury and at
6 any other trial or court proceeding; that you have agreed to
7 fully disclose to the U.S. Attorney's Office any crimes that
8 you have committed and any civil or criminal proceedings in
9 which you have been or are a subject target or a witness; and
10 that you have further agreed to commit no further crimes
11 whatsoever?
12 THE DEFENDANT:  Yes, your Honor.
13 THE COURT:  And do you understand that the U.S.
14 Attorney's Office has no authority to agree not to prosecute
15 you for any possible criminal tax violations?
16 THE DEFENDANT:  I do, your Honor.
17 THE COURT:  And do you understand that if you fully
18 comply with this agreement, that you will not be further
19 prosecuted by the U.S. Attorney's Office for any crime related
20 to your participation in the crimes described in the
21 indictment, Counts One, Two, Seven, Fifteen, and Seventeen,
22 except for a possible criminal tax violation?
23 THE DEFENDANT:  Yes, your Honor.
24 THE COURT:  And are you aware that this agreement
25 doesn't bind any other federal, state, or local prosecuting

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15

82KATROPps
1 office?
2 THE DEFENDANT:  Yes, your Honor.
3 THE COURT:  And do you understand further that the
4 sentence that you will receive is within the sole discretion of
5 the Court?
6 THE DEFENDANT:  Yes, your Honor, I do.
7 THE COURT:  And do you understand that if the United
8 States Attorney's Office determines that you have provided
9 substantial assistance in an investigation or prosecution and
10 fully complied with the understandings specified in this plea

Page 7

82KATROP.txt

```
11   agreement, that the U.S. Attorney's Office will file a motion
12   pursuant to Section 5K1.1 of the guidelines, requesting that
13   you be sentenced in accordance with the factors set forth in
14   that section?
15              THE DEFENDANT:  I do, your Honor.
16              THE COURT:  And do you understand that even if the
17   U.S. Attorney makes such a motion, that the issue of sentencing
18   remains within the discretion of the Court?
19              THE DEFENDANT:  I do.
20              THE COURT:  And do you understand that if the U.S.
21   Attorney's Office determines that you have not provided
22   substantial assistance, that they are released of any
23   obligation to file a 5K1.1 letter?
24              THE DEFENDANT:  I do, your Honor.
25              THE COURT:  And do you understand that, should you
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

                                                              16

82KATROPps
```
 1   commit any further crimes or should it be determined that you
 2   have given false, incomplete, or misleading testimony or
 3   information, that you are thereafter subject to prosecution for
 4   additional federal crimes?
 5              THE DEFENDANT:  I do, your Honor.
 6              THE COURT:  Do you understand that if it is determined
 7   that you have committed further crimes or given false or
 8   misleading testimony or otherwise violated this agreement, that
 9   all statements made by you to the United States Attorney's
10   Office can be used against you in a subsequent prosecution?
11              THE DEFENDANT:  Yes, your Honor.
12              THE COURT:  And are you entering this plea because you
13   are in fact guilty?
14              THE DEFENDANT:  I am, your Honor.
15              THE COURT:  And do you understand that as part of this
16   plea agreement, that you are waiving any right you might have
17   to have the government preserve any physical evidence for
18   future DNA testing or any right you might have for DNA testing
19   at the present time?
20              THE DEFENDANT:  Yes, your Honor.
21              THE COURT:  And do you understand that this agreement
22   takes the place of any prior understanding that you may have
23   reached with the United States Attorney's Office and that there
24   are no conditions beyond those set forth in this written
25   agreement and that there cannot be any additional
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

                                                              17

82KATROPps
```
 1   understandings that are not entered into in writing and signed?
 2              THE DEFENDANT:  Yes, your Honor.
 3              THE COURT:  Mr. Trosten, did you commit the offenses
 4   that you are pleading guilty to?
 5              THE DEFENDANT:  I did, your Honor.
 6              THE COURT:  Would you tell me, please, what you did.
 7              THE DEFENDANT:  Your Honor, first, I just would like
 8   to state for the record that, when I said I felt great, it was
 9   relating to medicines that I had taken, as opposed to feeling
10   ill because of those medicines, not because of my conduct,
11   which I deeply regret, your Honor.
12              THE COURT:  I would just like -- are you under the
13   influence of any medicine today?
14              THE DEFENDANT:  I am not, no.  No.
15              THE COURT:  OK.  And you have not had any trouble
```
                                Page 8

82KATROP.txt
16  following any of the questions I have asked you?
17          THE DEFENDANT:  No, I have not.  No, I have not.
18          Your Honor, while I was employed at Refco, I agreed
19  with other Refco executives to hide the true nature of Refco's
20  finances on Refco's financial statements.  I knew that Refco's
21  financial statements did not accurately reflect Refco's
22  financial condition, because the financial statements did not
23  disclose the full amount that Refco Group Holdings, Inc., a
24  related party, owed to Refco.  I understood that the RGHI
25  receivable was underreported because Philip Bennett, Refco's
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                18

82KATROPps
1   former chief executive officer, and other Refco executives,
2   including me, were involved in a series of transactions at the
3   end of Refco's financial reporting periods to make it appear as
4   if a receivable was due from third-party customers rather than
5   from a related party.
6           The RGHI receivable was composed of, amongst other
7   things, historic customer losses, bad debts, and expenses that
8   RGHI incurred on behalf of Refco.
9           In addition, I participated in a number of
10  transactions that padded or inflated Refco's income.  For
11  example, I participated in transactions that shifted expenses
12  off the books of Refco and onto the books of Refco Group
13  Holdings, Inc.
14          I, along with other Refco executives, agreed to
15  conceal the true size and nature of the RGHI receivable from,
16  amongst others, Refco's auditors, Thomas H. Lee Partners; HSBC,
17  which, in 2004, participated in Refco's senior secured credit
18  facility, as referenced in paragraph 14 -- I'm sorry --
19  paragraph 41 and Count Fifteen of the indictment; and investors
20  who purchased bonds that Refco issued in 2004, as referenced in
21  Count Two of the indictment.
22          I left the company in August of 2004, one year before
23  the IPO of Refco.  I and other Refco executives used the
24  interstate wires to accomplish these acts within this district,
25  as referenced in Count Seven of the indictment.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                19

82KATROPps
1           Furthermore, I received funds obtained from the
2   transaction with Thomas H. Lee Partners, referenced in
3   paragraph 34 of the indictment, which I knew were proceeds from
4   unlawful activity, as referenced in Count Seventeen.
5           The RGHI receivable and the transactions used to
6   conceal it were material information that Refco investors and
7   lenders would have wanted to know before investing in or
8   lending money to Refco.
9           I knew that obtaining funds from Refco investors and
10  lenders based on misleading financial information was wrong.
11          Excuse me.
12          Your Honor, I take full responsibility for my actions
13  and my conduct.
14          I wish to apologize to my family and those that I
15  harmed by my conduct, which I deeply and sincerely regret, your
16  Honor.
17          Thank you.
18          THE COURT:  Mr. Garcia, is there anything else that
19  you wish me to ask Mr. Trosten?
20          MR. GARCIA:  No, your Honor.
                            Page 9

```
                        82KATROP.txt
21          THE COURT:  Mr. Trosten, do you still wish to plead
22   guilty?
23          THE DEFENDANT:  I do, your Honor.
24          THE COURT:  Mr. Morvillo, do you know of any reason
25   that Mr. Trosten ought not to plead guilty?
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                                                              20
     82KATROPps
 1          MR. R. MORVILLO:  I do not, your Honor.
 2          THE COURT:  All right.  Mr. Trosten, I am satisfied
 3   that you understand the nature of the charge against you and
 4   the consequences of your plea, and that your plea is made
 5   voluntarily and knowingly, and that there is a factual basis
 6   for your plea.  I will therefore accept your plea of guilty.
 7          Mr. Garcia, do you want to give me a control date?
 8          MR. GARCIA:  Your Honor, respectfully, the government
 9   would request about a year for a control date.
10          THE COURT:  Let's just see if -- OK.  Well, February
11   20, 2009 is a Friday.  So you can write to me then.
12          All right.  Is there anything else at this time?
13          MR. GARCIA:  Nothing more, your Honor, from the
14   government.
15          THE COURT:  Mr. Morvillo?
16          MR. R. MORVILLO:  Nothing, your Honor.  Thank you for
17   accommodating my schedule by sitting as late as you are.
18          THE COURT:  We're always here at this time.
19          MR. GARCIA:  Thank you, Judge.
20                           oOo
21
22
23
24
25


                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
                                    :
UNITED STATES OF AMERICA            :
                                    :        INFORMATION
        -v-                         :
                                    :        07 Cr.
SANTO C. MAGGIO,                    :
                                    :
              Defendant.            :
                                    :
------------------------------------x

## COUNT ONE

**(Conspiracy To Commit Securities Fraud, Wire Fraud, To Make
False Filings With The SEC, To Make Material Misstatements To
Auditors, Bank Fraud and Money Laundering)**

The United States Attorney charges:

### RELEVANT ENTITIES AND PERSONS

1.  At certain times relevant to this Information,
Refco, Inc. was a Delaware corporation with its principal place
of business in New York, New York.  From at least the mid-1990s,
the business of Refco, Inc. and its predecessor entities included
providing execution and clearing services for exchange-traded
derivatives and providing prime brokerage services in the fixed
income and foreign exchange markets.  Refco, Inc. held its
initial public offering of common stock on or about August 10,
2005.  Prior to on or about August 10, 2005, Refco, Inc.'s
predecessor entities were privately held.  Refco, Inc. and its
predecessor entities are referred to herein collectively as
"Refco."

2.  At all times relevant to this Information, Phillip

R. Bennett, a coconspirator not named as a defendant herein, was the President and Chief Executive Officer of Refco.  At all times relevant to this Information, Bennett had a substantial ownership interest in Refco, directly and indirectly.

3.    At certain times relevant to this Information, Robert C. Trosten, a coconspirator not named as a defendant herein, held senior management positions at Refco.  Among other positions, Trosten was Chief Financial Officer of Refco, a position he held from in or about May 2001 until in or about August 2004, when he left the company.

4.    At certain times relevant to this Information, Tone N. Grant, a coconspirator not named as a defendant herein, held a senior management position at Refco.  From at least in or about 1997 through in or about June 1998, Grant was the President of Refco.  At certain times relevant to this Information, Grant indirectly held a significant ownership interest in Refco.

5.    At certain times relevant to this Information, SANTO C. MAGGIO, the defendant, held senior management positions at Refco.  Among other positions, MAGGIO was an Executive Vice President of Refco, and the President and Chief Executive Officer of Refco Securities LLC, a wholly owned subsidiary of Refco.

6.    At all times relevant to this Information, Bank Für Arbeit Und Wirtschaft Und Österreichische Postparkasse Aktiengesellschaft,("BAWAG"), was the fourth largest bank in

Austria.  BAWAG was owned at various times by, among other
entities, the Austrian Trade Unions Association, formally known
as Österreichischer Gewerkschaftsbund (ÖGB).  At various times
relevant to this Information, BAWAG indirectly held a substantial
ownership interest in Refco.

      7.   At all times relevant to this Information, Refco
Group Holdings, Inc. ("RGHI") was a privately-held Delaware
corporation that held a substantial ownership interest in Refco.
At various times relevant to this Information, RGHI was owned in
whole or in part by Phillip R. Bennett and Tone N. Grant.

<u>**THE SCHEME TO DEFRAUD**</u>

      8.   From at least as early as in or about the late
1990s, SANTO C. MAGGIO, the defendant, at the direction of
Phillip R. Bennett and together with others known and unknown,
schemed to hide the true financial health of Refco from its
banks, counterparties, auditors, and investors.  Starting at
least as early as the late 1990s, Bennett, MAGGIO, and their
coconspirators embarked on a strategy to mask the true
performance of Refco's business in order to sell the company for
Bennett and MAGGIO's own benefit and that of Refco's owners other
than Bennett.  To that end, over the ensuing years, Bennett,
MAGGIO, and others known and unknown systematically (1) covered
up both Refco's own losses and customer losses for which Refco
became responsible; (2) moved Refco operating expenses off the

3

company's books; and (3) padded Refco's revenues, all in an

effort to mislead Refco's banks, counterparties, auditors and

investors, with the goals of keeping Refco in business and then

selling it for the maximum benefit to its owners and senior

management.

9.    In furtherance of this scheme, Phillip R. Bennett,

SANTO C. MAGGIO, and others known and unknown made and caused

Refco and others on its behalf to make false and fraudulent

statements to Refco's banks, counterparties, customers, auditors,

and investors, and to create false audited financial statements

and false public filings with the United States Securities and

Exchange Commission ("SEC").  The scheme included obtaining,

through fraud, the following:  lines of credit for Refco; the

private sale of notes prior to 2004; the sale of 57 per cent of

Refco to a group headed by Thomas H. Lee Partners in 2004; the

sale of approximately $600 million of notes to the public in

2004; approximately $800 million of bank financing obtained in

2004; and the August 2005 initial public offering of stock

("IPO") in Refco, Inc., in which the public purchased

approximately $583 million of Refco common stock based on a false

and fraudulent registration statement.

### Early Origins Of Refco's Financial Problems

10.    In or about the mid-1990s, Refco was wholly owned

by RGHI, which in turn was owned by Phillip R. Bennett, Tone N.

4

Grant and one other partner.  As of early 1997, RGHI owed Refco

at least approximately $106 million.  Starting later in 1997,

Refco directly and indirectly incurred a series of substantial

trading losses that threatened the continued viability of Refco's

business.  In response to these losses, at various times between

in or about May 1997 and in or about October 2005, Bennett, and

later, SANTO C. MAGGIO and their coconspirators, moved losses and

expenses out of Refco and into RGHI, and artificially padded

Refco's revenues at the expense of RGHI, in an effort to hide

Refco's true liabilities, manipulate its reported earnings, and

thereby seek to defraud a purchaser into buying the firm at a

price that would pay off the accumulated debt and ensure a profit

to Refco's owners.  This strategy resulted in an enormous

increase in the already large debt from RGHI to Refco that

eventually totaled more than $1 billion (the "RGHI receivable").

The debt by RGHI to Refco, carried on Refco's books as a

receivable from RGHI, was over time comprised of, among other

things, the following principal components: (a) liabilities

incurred by Refco when brokerage customers to whom it had

extended credit defaulted on their obligations, which were later

transferred to RGHI; (b) Refco's proprietary trading losses; (c)

various operating expenses incurred by Refco and paid in the

first instance by Refco but later transferred to RGHI as an

increase in RGHI's debt to Refco; and (d) transactions designed

5

to pad Refco's revenues in which the benefits accrued to Refco
and the associated costs were incurred by RGHI.

### Historical Losses

11.  As a commodities, securities, and futures
brokerage and clearing firm, Refco extended credit to customers,
allowing customers to make securities, commodities, and futures
trades in accounts held at Refco.  In the later 1990s, certain
Refco customers to whom Refco had extended credit sustained
hundreds of millions of dollars of trading losses in their
accounts at Refco.  When the customers were unable to make
payments on the credit Refco had extended, Refco liquidated
certain of the positions and assumed the resulting losses in the
customers' accounts.  Refco sustained large losses of this type,
among other times, in 1997, totaling at least approximately $225
million.  These customer losses included the following:

### Asian Debt Crisis Customers

12.  In or about May 1997, a group of Refco customers
to whom Refco had extended credit for the purpose of investing in
Asian markets sustained large losses in connection with the Asian
debt crisis.  When those customers were unable to cover their
losses, Refco paid the losses, using hundreds of millions of
dollars of customer funds within the unregulated segments of its
business.  By the end of May 1997, these losses totaled more than
$310 million, and, at the end of December 1997, based on changed

6

market conditions, they totaled approximately $185 million.

### Customer 1

13.    In or about October 1997, a Refco customer to whom Refco had extended credit ("Customer 1"), lost more than $90 million in a series of transactions carried out on the Chicago Mercantile Exchange ("CME").   When Customer 1 could not cover his margin requirements, Refco was forced to meet the margin call from the CME, using the proceeds of a short-term loan from a financial institution of at least approximately $90 million to meet its margin requirements, and then using customer funds taken from the unregulated segments of Refco's business to repay the loan.

14.    Recognizing that public acknowledgment of a loss of more than $90 million would threaten Refco's continued existence, Phillip R. Bennett, Tone N. Grant, SANTO C. MAGGIO, and others known and unknown falsely represented to the public and other customers that Refco had not sustained a significant loss as a result of Customer 1's losses.   In addition, Bennett and others significantly misrepresented the size of the loss to Refco's auditors.

15.    Philip R. Bennett, SANTO C. MAGGIO, and others, having misrepresented to third parties that Refco had not suffered a significant loss as a result of Customer 1's trading activity, caused at least $71 million of debt owed by Customer 1

from the trading losses to be transferred to become a debt from RGHI to Refco.

### Refco Expenses Moved To RGHI

16.  Beginning at least as early as 1999, Phillip R. Bennett and others schemed to reduce Refco's expenses (therefore falsely increasing Refco's apparent profitability) by moving Refco expenses off of Refco's books and onto the books of RGHI.

17.  The result of these actions by Phillip R. Bennett, SANTO C. MAGGIO, and their coconspirators was to contribute to the large and growing debt owed by RGHI to Refco.  By in or about February 1999, RGHI owed Refco at least approximately $252 million.  In addition, as of in or about February 1999, at least approximately $156 million of customer losses for which Refco was responsible were held in accounts within Refco Global Finance, a consolidating Refco subsidiary.  Thus, a total of at least approximately $409 million in customer losses, Refco losses, and other expenses, principally from the sources outlined above, had accumulated by February 1999.

### Refco's Losses Funded By Use Of Customer Funds

18.  Starting at least in or about 1997, Phillip R. Bennett, SANTO C. MAGGIO, and their coconspirators caused Refco to use customer funds to cover its losses.  As a result, Refco was perpetually short of cash, and was often unable to cover settlement of its customers' transactions.  Accordingly, Bennett,

8

MAGGIO, and others caused Refco systematically to fail to meet settlement on its customer transactions, often on a daily basis, in amounts that exceeded, at times, approximately $100 million a day.  Bennett, MAGGIO, and others then caused Refco to repeatedly misrepresent to the financial institutions to whom Refco owed money to settle Refco's customers' transactions that its failure to make settlement was an error, when in fact Refco purposefully selected, on a rotating basis, institutions with whom it would fail to make settlement, and attempted to stagger its failures to make settlement with each institution so as not to arouse suspicion from the institutions that Refco was in fact unable to fulfill its daily settlement obligations.

### BAWAG Invests In Refco

19.  By the end of 1998, Refco was in a precarious financial condition, in light of the significant customer and proprietary trading losses it had absorbed and the resulting daily failure to make settlement on customer transactions.  In order to address that problem, in or about late 1998, Bennett sought a capital contribution from BAWAG.  In a transaction that closed in 1999, BAWAG, through an affiliate, purchased a ten percent ownership interest in Refco for approximately $95 million, and lent Refco approximately $85 million of additional capital in return for an option to purchase an additional ten percent of Refco.

## Hiding The RGHI Receivable

20.   Throughout the period covered by this Information, Refco's books were audited by independent auditors on an annual basis, with a fiscal year-end on the last day of February.   Among the items the auditors examined each year were "related party transactions," and, in particular, transactions between and among Refco and members of Refco's management, including Phillip R. Bennett.   Refco and RGHI were related parties.

21.   Beginning at least as early as February 1998, Phillip R. Bennett and SANTO C. MAGGIO, among others, directed others known and unknown to hide the size of the huge and growing RGHI receivable from, among others, Refco's auditors, by carrying out a series of transactions in order temporarily to pay down all or part of the RGHI receivable over Refco's fiscal year-end and replace it with a receivable from one or more other entities not related to Bennett or Refco.   At certain times, Bennett also caused the Asian Debt Crisis Customer Losses, which were held in an account at Refco Global Finance, a consolidating entity within Refco, to temporarily be transferred out of Refco to RGHI and then, together with the rest of the RGHI receivable, transferred to one or more third parties not affiliated with Refco over its fiscal year-end.   Bennett and, later, MAGGIO and others, caused the reduction of all or part of the RGHI receivable in this manner at every fiscal year-end from at least the fiscal year-end

10

on February 28, 1998 through the fiscal year-end on February 29, 2004. Bennett, MAGGIO and others directed these transactions in order to hide the existence of the related party receivable and the underlying causes of its existence from Refco's auditors, banks, investors, and others.

22. In 1998 and 1999, Phillip R. Bennett, SANTO C. MAGGIO and others, carried out year-end cover-up transactions in a manner similar to that described below, in the following approximate amounts:

| Date | Approximate Customer Loans |
| --- | --- |
| February 1998 | $175 million |
| February 1999 | $265 million |

23. Beginning in 2000, Phillip R. Bennett and SANTO C. MAGGIO's year-end, and starting in 2004, quarter-end cover-up transactions were of two types: transactions with Refco customers, and transactions with BAWAG. In summary, these year-end transactions were carried out in the following approximate amounts and with the following parties during the 2000 to May 2004 period:

| Date | Approximate Customer Loans | BAWAG Loans | Approximate Total Loan Amount |
| --- | --- | --- | --- |
| Feb. 2000 | $310 million | $300 million | $610 million |
| Feb. 2001 | $450 million | $300 million | $750 million |
| Feb. 2002 | $625 million | $300 million | $925 million |
| Feb. 2003 | $650 million | $250 million | $900 million |

11

| Feb. 2004 | $720 million | $250 million | $970 million |
| May 2004 | $700 Million | $0 | $700 million |

24. These transactions typically followed standard patterns. For example, in or about February 2000, SANTO C. MAGGIO, Phillip R. Bennett and others caused the following transactions to occur with several customers and BAWAG, for the purpose of paying down a portion of the RGHI receivable over the February 2000 year-end:

a. Three different customers (collectively, the "Three Customers") lent a total of approximately $310 million to RGHI, which it then used to pay down its obligation to Refco. At the same time, Refco lent to the Three Customers $310 million. As a result, it appeared on Refco's books and records that Refco had $310 million in receivables from the Three Customers, and the debt from RGHI appeared to be reduced by $310 million. In or about March 2000, the transactions were reversed, with Refco lending $310 million back to RGHI (thus increasing the amount owed by RGHI to Refco by $310 million), which RGHI then used to pay back the Three Customers the full amount of the loan. To ensure a profit for the Three Customers, the interest rate that RGHI paid to the Three Customers was higher than the interest rate that the Three Customers paid to Refco. Each of the transactions with the customers were memorialized in loan agreements between Refco, RGHI and the Three Customers, similar

12

to the agreements that follow:

(i).    On or about February 25, 2000, Refco Capital Markets, Ltd. a Bermuda corporation controlled by Refco, loaned Customer 2, one of the Three Customers, approximately $150 million.  The loan was to be repaid on March 9, 2000.

(ii).    On or about the same day, February 25, 2000, Customer 2 loaned approximately $150 million to RGHI. The repayment date was on or about March 9, 2000.  The loan agreement for this loan was executed by Bennett on behalf of RGHI.  The interest rate on this loan was 15 basis points higher than the interest rate on the loan from Refco Capital Markets to Customer 2, thereby assuring Customer 2 a profit.

(iii).    On or about the same date, Bennett signed a letter of guaranty to Customer 2 on behalf of Refco Group, Ltd., assuring Customer 2 that, should RGHI default on its approximately $150 million obligation to Customer 2, Refco Group, Ltd. would make Customer 2 whole.

b.    At or around the same time as the transactions with the Three Customers, BAWAG loaned RGHI $300 million in cash.  RGHI then used the $300 million to pay off $300 million of its debt to Refco, and Refco then loaned to BAWAG $225 million, using the remaining $75 million to fund its operations. In or about March 2000, the transaction was reversed.  Refco lent

13

$300 million to RGHI, thus recreating a $300 million debt to Refco from RGHI. RGHI then used the $300 million to pay off the loan from BAWAG.

25. In addition to the year-end transactions described above, which were designed to hide from Refco's auditors and investors the losses and other components of the RGHI receivable, Phillip R. Bennett, SANTO C. MAGGIO and others, consistently lied and caused others to lie to Refco's auditors in an effort to cover up the size of those losses and other expenses contained in the RGHI receivable.

**Refco Sells Notes Based On False Financial Information**

26. At various times prior to August 2004, Phillip R. Bennett, SANTO C. MAGGIO, and others, in furtherance of the scheme to defraud Refco's potential investors, caused Refco to raise capital through the private placement of certain notes. These notes were sold to investors based, in part, on the audited financial statements prepared by Refco's auditors, which in turn were rendered false and misleading by the year-end cover-up transactions outlined above and the siphoning of Refco expenses out of Refco and into RGHI. In particular, Bennett, MAGGIO and others caused Refco to raise the following capital through the sale of the following notes to investors, based on false and fraudulent financial statements:

14

| Date | Note Coupon And Due Date | Approximate Capital Raised |
|---|---|---|
| November 30, 1999 | Series C 8.85% Maturing on November 30, 2007 | $56 million |
| June 29, 2000 | Series D 9.18% Maturing on June 29, 2005 | $37 million |
| October 15, 2002 | Series E 5.9% Maturing on October 15, 2007 | $100 million |
| October 15, 2002 | Series F 6.6% Maturing on October 25, 2009 | $122.5 million |

### Refco Obtains Credit Counterparty Relationships Based On False Financial Information

27.   Because Refco was constantly in need of cash to cover its transactions and meet settlement, Refco sought and obtained credit from banks and other financial institutions, including a revolving line of credit from a number of financial institutions, including JP Morgan Chase, beginning in or about 1998, that eventually grew to more than $300 million.  For each such transaction, including the annual renewal of the revolving line of credit, Refco submitted to the proposed creditor the fraudulent financial statements and made other false statements which materially misstated the health of Refco.

### Refco Helps BAWAG Hide Its Own Balance Sheet Problems

28.   Between 2000 and 2005, while BAWAG assisted Phillip R. Bennett in hiding the RGHI receivable in the manner described above, Bennett and SANTO C. MAGGIO caused Refco to assist BAWAG in hiding its own balance sheet problems.  In or

15

about early 2000, BAWAG entrusted approximately €350 million of BAWAG's funds to an investment advisor, who by the end of 2000 reported to the bank that he had lost substantially all of those funds.  In order to disguise this loss on its balance sheet, BAWAG arranged through Bennett and MAGGIO to hold in an account at Refco certain worthless bonds and other investments that Refco, at Bennett and MAGGIO's direction, maintained at a false value that, over time, reached at least approximately €500 million.  These fake assets were purportedly housed at Refco and maintained at an inflated value for BAWAG's benefit until 2005.

### Bennett's "Exit Strategy" Develops

29.  In or about 2003, Phillip R. Bennett caused Refco to hire an investment bank (the "Investment Bank"), to assist in selling Refco.  Bennett asked the Investment Bank to find a major investment bank or commercial bank to purchase Refco, but no such buyer was found to be interested.  After efforts to sell Refco to such a first line buyer failed, Bennett directed the Investment Bank to look for other purchasers for the company, with the understanding that it would be taken public.

30.  In connection with Phillip R. Bennett's plan to sell Refco, Bennett, SANTO C. MAGGIO, and others (a) continued to siphon Refco expenses and losses into RGHI, and (b) padded Refco's reported revenue in order to hit budgeted income targets set by Bennett and others to disguise the ongoing operational

16

problems at the company.

### The Fraudulent Leveraged Buyout Transaction

31.    In or about 2003, Phillip R. Bennett, SANTO C. MAGGIO, and others began negotiations with Thomas H. Lee Partners, a private equity fund, regarding that entity's possible purchase of a controlling stake in Refco as part of a leveraged buyout transaction.  As ultimately carried out on or about August 5, 2004, the leveraged buyout was structured as follows:  Thomas H. Lee Partners, through an affiliate, purchased a 57 percent ownership interest in Refco, in return for approximately $507 million of new capital; simultaneously, Refco sold $600 million in notes and obtained $800 million in financing from a syndicate of banks.

*Lies To Thomas H. Lee Partners*

32.    In connection with the leveraged buyout transaction, Phillip R. Bennett, SANTO C. MAGGIO, and others caused Refco's audited financial statements for the year ending February 2004 to be provided to Thomas H. Lee Partners.  Those audited financial statements were false and misleading in the following respects, among others:

a.    The financial statements hid the size of the related party receivable from RGHI, which at the end of February 2004 was, but for the cover-up loan transactions, at least approximately $1 billion, whereas the financial statements

17

misleadingly reported that the "$105 million due from related parties, included in loans receivable at February 28, 2003, was received by February 29, 2004."

b. The financial statements falsely reported Refco's net income for the year as $187 million, when in fact that number was inflated.

33. In connection with the leveraged buyout transaction, Phillip R. Bennett, SANTO C. MAGGIO, and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

*Lies To The Note Purchasers*

34. In connection with the leveraged buyout transaction, Phillip R. Bennett, SANTO C. MAGGIO, and others provided to the note underwriters and note purchasers the following false and misleading information:

a. Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 32;

b. Bennett, MAGGIO and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets which, in

18

fact, caused the Asian Debt Crisis Customer Losses; and

c.    Bennett, MAGGIO, and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

**_Lies To The Bank Syndicate_**

35.    In connection with the leveraged buyout transaction, Phillip R. Bennett, SANTO C. MAGGIO, and others provided to the bank syndicate that was raising the $800 million in loans for Refco as part of the leveraged buyout transaction the following false and misleading information:

a.    Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 32;

b.    Bennett, MAGGIO and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets which, in fact, caused the Asian Debt Crisis Customer Losses; and

c.    Bennett, MAGGIO, and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to

19

RGHI for the purpose of hiding them.

36.    The leveraged buyout transaction closed on or about August 5, 2004, and Refco received a total of approximately $1.9 billion.  Thereafter, Phillip R. Bennett caused the distribution of funds, which had been wired into RGHI bank account at JP Morgan Chase in New York, New York, directly or indirectly, to the following persons and entities, among others:

| Recipient | Approximate Amount |
|---|---|
| BAWAG | $842 million |
| Refco (used to pay down RGHI receivable) | $306 million |
| Bennett | $25 million |
| Trosten | $48 million |
| Grant | $16 million |
| Other Former Equity Partners | $81.5 million |
| MAGGIO | $5.75 million |
| Other Refco Officers, Employees, and Affiliated Parties | $106.25 million |

## Bennett Plans To Take Refco Public

37.    After the leveraged buyout, Phillip R. Bennett, who remained the Chief Executive Officer of Refco following the transaction, SANTO C. MAGGIO, and others plotted to sell a portion of Refco to the public through an Initial Public Offering ("IPO") of stock in Refco.

38.    Between the August 2004 leveraged buyout and the August 2005 IPO, Phillip R. Bennett, SANTO C. MAGGIO, and others

20

continued their manipulation of Refco's finances:  At each
quarter and year-end period, Bennett and MAGGIO caused cover-up
loan transactions designed to hide the existence and size of the
RGHI receivable from Refco's auditors and investors; and Bennett
and MAGGIO continued to cause Refco expenses to be assumed by
RGHI and to artificially pad Refco's revenues by the means
previously described.  Bennett and MAGGIO caused the following
quarter- and year-end transactions:

| Date | Approximate Customer Loans | Bawag Loans | Approximate Total Loan Amount |
|------|----------------------------|-------------|-------------------------------|
| August 2004 | $485 million | 0 | $485 million |
| November 2004 | $545 million | 0 | $545 million |
| February 2005 | $345 million | $250 million | $595 million |
| May 2005 | $450 million | 0 | $450 million |

39.  Between August 2004 and August 2005, Refco padded
its revenue by at least approximately $79 million, comprised of
at least approximately $38 million in inflated interest income,
at least approximately $13 million in fictitious transactions in
U.S. Treasury securities, and at least approximately $28 million
in fictitious foreign currency transactions.  In particular,
Bennett and MAGGIO caused the following transactions, among
others, to artificially inflate Refco's revenues:

            a.    On or about February 11, 2005, Bennett and

MAGGIO caused Refco to credit a $12 million "interest adjustment" from RGHI that increased Refco's revenue by $12 million, and RGHI's debt to Refco by the same amount.

b.   On or about February 17, 2005, Bennett and MAGGIO caused RGHI to engage in approximately 32 fictitious foreign currency exchange transactions in British Pounds, Euros, Japanese Yen and Swiss Francs with Refco.  RGHI lost approximately $5 million on the transactions, and Refco recognized $5 million in revenue as a result of the transactions. The $5 million loss was then added to the RGHI receivable.

### Refco's Public Filings And Publicly Traded Securities

40.   In 2005, Refco registered certain of its securities with the SEC and, with that registration, was required to make certain additional public filings with the SEC.

41.   On or about April 6, 2005, Refco filed an S-4 registration statement with the SEC in connection with its offer to exchange $600 million of the senior subordinated notes originally issued in August 2004 for $600 million of senior subordinated notes registered under the Securities Act of 1933. Phillip R. Bennett signed the registration statement on or about April 6, 2005 in New York, New York.  Registration of these notes permitted them to be traded publicly.  The S-4 contained several material misstatements about Refco, including the audited financial statements which failed to reflect the related party

22

transactions described above or the debt owed to Refco from RGHI. The S-4 also cited inflated revenue and income numbers that resulted from the revenue padding and expense shifting described above, and falsely claimed that Refco did not engage in proprietary trading.

42. On or about July 19, 2005, as required by the Securities and Exchange Act of 1934 (the "Exchange Act") and applicable rules, Refco filed with the SEC its annual report for the year ended February 28, 2005 on Form 10K. Phillip R. Bennett signed the annual report on or about July 19, 2005, in New York, New York. Bennett also signed two certifications regarding the annual report. In those certifications, Bennett attested that he had reviewed the annual report and (a) that it did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e] report"; and (b) that "the information contained in the Report fairly present[ed], in all material respects, the financial condition and results of operations of the Company." As noted above, the financial statements were fraudulent in that, among other things, they failed to reflect the related party receivables, the padded revenue, and the shifted expenses.

43. On or about August 8, 2005, Refco filed an S-1

registration statement with the SEC in connection with its initial public offering of common stock. Phillip R. Bennett signed that registration statement on or about August 8, 2005, in New York, New York.

44. The S-4 registration statement, 10K annual report, and S-1 registration statement signed by Phillip R. Bennett each required the disclosure of (a) certain transactions between Refco and its management and (b) certain debts owed directly or indirectly by any executive officer of Refco to Refco, during Refco's past fiscal year and, for the registration statements, during Refco's prior two fiscal years. These disclosures were required in order to apprize investors of, among other things, potential conflicts of interest by management.

45. The S-4 registration statement, 10K annual report, and S-1 registration statement signed by Phillip R. Bennett each failed to disclose the related party transactions and the related party indebtedness between Refco and RGHI outlined above. In particular, these public filings failed to disclose: (a) the existence of hundreds of millions of dollars of indebtedness by RGHI to Refco during 2004 and 2005; (b) the transactions at quarter- and fiscal year-end during 2004 and 2005 by which RGHI temporarily paid down its debt to Refco, the guaranties by Refco of the third party lenders' loans to RGHI, and the subsequent re-assumption of the debt by RGHI, each of which was a related party

24

transaction required to be disclosed in the public filings.

### Refco's August 2005 IPO

46.   On or about August 10, 2005, in reliance on, among other things, Refco's public filings and the accompanying audited financial statements, the public bought approximately $583 million of Refco's common stock.   Phillip R. Bennett, through RGHI, sold Refco stock in the IPO valued at more than $100 million, while retaining a substantial ownership interest in Refco.   Following the initial public offering, Refco's common stock was listed on the New York Stock Exchange under the ticker symbol "RFX."

### End Of Quarter Transactions In August 2005

47.   In or about late August 2005, after the completion of Refco's IPO, Phillip R. Bennett and SANTO C. MAGGIO caused Refco to carry out $420 million in cover-up transactions with a Refco customer that temporarily transformed all or part of the RGHI receivable into a receivable from that customer.   After the August 31, 2005 end of Refco's second quarter, the $420 million in cover-up transactions were reversed.

### Public Disclosure Of The Related Party Debt

48.   In or about early October 2005, Refco discovered an approximately $430 million receivable on its books from RGHI. It demanded repayment of the debt by Phillip R. Bennett, who repaid Refco approximately $430 million on or about October 10,

2005, having received an emergency loan in that approximate amount from BAWAG.

49. On or about October 10, 2005, Refco issued a press release announcing the following:

> [Refco] discovered through an internal review a receivable owed to the Company by an entity controlled by Phillip R. Bennett, Chief Executive Officer and Chairman of the Board of Directors, in the amount of approximately $430 million. Mr. Bennett today repaid the receivable in cash, including all accrued interest. Based on the results of the review to date, the Company believes that the receivable was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible. The Company believes that all customer funds on deposit are unaffected by these activities. Independent counsel and forensic auditors have been retained to assist the Audit Committee in an investigation of these matters.

50. Following Refco's announcement, the market price of Refco stock plummeted, resulting in a loss of well more than $1 billion in market capitalization.

51. On or about October 17, 2005, Refco, Inc. and twenty-three of its subsidiaries or affiliates filed a petition in bankruptcy in the United States Bankruptcy Court for the Southern District of New York. Refco's common stock was subsequently delisted by the New York Stock Exchange.

### THE CONSPIRACY

52. From in or about the mid-1990s up to in or about October 2005, in the Southern District of New York and elsewhere,

26

SANTO C. MAGGIO, the defendant, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, namely:  (a) to commit fraud in connection with the purchase and sale of securities issued by Refco, in violation of Sections 78j(b) and 78ff of Title 15, United States Code, and Section 240.10b-5 of Title 17, Code of Federal Regulations; (b) to make and cause to be made false and misleading statements of material fact in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 (the "Exchange Act"), and the rules and regulations promulgated thereunder, in violation of Title 15, United States Code, Sections 78o(d) and 78ff; (c) to make and cause to be made false statements in a registration statement filed under the Securities Act, in violation of Title 15, United States Code, Section 77x; (d) to commit wire fraud, in violation of Section 1343 of Title 18, United States Code; (e) to make and cause to be made false statements and omissions to Refco's auditors, in violation of Title 15, United States Code, Sections 78m and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-2; (f) to commit bank fraud, in violation of Section 1344 of Title 18, United States Code; and (g) to commit money laundering, in violation of Section 1957(a) of Title 18, United States Code.

27

## OBJECTS OF THE CONSPIRACY

### Securities Fraud

53.   It was a part and object of the conspiracy that
SANTO C. MAGGIO, the defendant, and others known and unknown,
unlawfully, willfully, and knowingly, by the use of the means and
instrumentalities of interstate commerce, the mails, and
facilities of national securities exchanges, directly and
indirectly, would and did use and employ, in connection with the
purchase and sale of securities, manipulative and deceptive
devices and contrivances, in violation of Title 17, Code of
Federal Regulations, Section 240.10b-5, by: (a) employing
devices, schemes, and artifices to defraud; (b) making untrue
statements of material facts and omitting to state material facts
necessary in order to make the statements made, in the light of
the circumstances under which they were made, not misleading; and
(c) engaging in acts, practices, and courses of business which
operated and would operate as a fraud and deceit upon a person,
in connection with the purchase and sale of notes issued by Refco
and the common stock of Refco, Inc., all in violation of Title
15, United States Code, Sections 78j(b) and 78ff.

### False Statements In SEC Filings - Exchange Act

54.   It was further a part and object of the conspiracy
that SANTO C. MAGGIO, the defendant, and others known and
unknown, unlawfully, willfully, and knowingly, in reports and

28

documents required to be filed with the SEC under the Exchange Act, and the rules and regulations promulgated thereunder, would and did make and cause to be made statements which were false and misleading with respect to material facts, in violation of Title 15, United States Code, Sections 78o(d) and 78ff.

### False Statements In SEC Filings – Securities Act

55.  It was further a part and object of the conspiracy that SANTO C. MAGGIO, the defendant, and others known and unknown, unlawfully, willfully, and knowingly would and did make and cause to be made, in a registration statement filed with the SEC under the Securities Act of 1933, untrue statements of material facts and omissions to state material facts required to be stated therein and necessary to make the statements therein not misleading, in violation of Title 15, United States Code, Section 77x.

### Wire Fraud

56.  It was further a part and object of the conspiracy that SANTO C. MAGGIO, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals,

29

pictures, and sounds for the purpose of executing such scheme and artifice, all in violation of Title 18, United States Code, Section 1343.

### Material Misstatements To Auditors

57. It was further a part and object of the conspiracy that SANTO C. MAGGIO, the defendant, and Phillip R. Bennett, an officer and director of Refco, an issuer obligated to file reports pursuant to section 15(d) of the Exchange Act of 1934 and with a class of securities registered pursuant to section 12 of the Exchange Act, unlawfully, willfully and knowingly, directly and indirectly, (a) made and caused to be made materially false and misleading statements; and (b) omitted to state, and caused others to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading to accountants in connection with (i) audits, reviews and examinations of the financial statements of Refco required to be filed under the Exchange Act; and (ii) the preparation and filing of documents and reports required to be filed with the SEC pursuant to rules and regulations promulgated by the SEC, in violation of Title 15, United States Code, Section 78m, and Title 17, Code of Federal Regulations, Section 240.13b2-2(a).

### Bank Fraud

58. It was further a part and object of the conspiracy

that SANTO C. MAGGIO, the defendant, and others known and unknown, unlawfully, willfully and knowingly, would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, to wit, HSBC, and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, a financial institution whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises, all in violation of Title 18, United States Code, Section 1344.

### Money Laundering

59.  It was further a part and object of the conspiracy that SANTO C. MAGGIO, the defendant, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully and knowingly would and did engage and attempt to engage in monetary transactions in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, to wit, securities fraud, bank fraud, and wire fraud, in violation of Title 18, United States Code, Section 1957(a).

### MEANS AND METHODS OF THE CONSPIRACY

60.  Among the means and methods by which SANTO C. MAGGIO, the defendant, and others known and unknown, and their co-conspirators would and did carry out the conspiracy were the

following:

    a.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators misrepresented to the public the size of customer losses for which Refco was responsible.

    b.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators transferred losses incurred by Refco to Bennett's company, RGHI.

    c.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators concealed the size and related party nature of the debt owed by RGHI to Refco by causing Refco and others to carry out loan transactions over fiscal year-end and fiscal quarter-end dates to move the RGHI receivable to one or more Refco customers.

    d.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators caused Refco to file false and fraudulent statements with the SEC.

    e.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators made and caused to be made material false statements and omissions to Refco's auditors.

    f.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators used facilities of interstate commerce, including the use of interstate telephone calls and interstate wire transfers, in furtherance of the objects of the conspiracy.

g.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators misrepresented to customers, potential customers, lenders, investors and others that Refco did not engage in proprietary trading.

### Overt Acts

61.    In furtherance of the conspiracy and to effect the illegal objects thereof, the following acts, among others, were committed in the Southern District of New York and elsewhere:

a.    In or about late 1997, Phillip R. Bennett and Tone N. Grant misrepresented to the public that Refco had not taken a significant loss in connection with the trading of Customer 1.

b.    On or about May 15, 1998, Phillip R. Bennett and Tone N. Grant signed a letter to Refco's auditors misrepresenting, among other things, that "the accounting records underlying the financial statements accurately and fairly reflect, in reasonable detail, the transactions of the company" and that Refco had properly "recorded or disclosed" all "related party transactions and related amounts receivable or payable."

c.    On or about April 30, 2003, Phillip R. Bennett and Robert C. Trosten signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party amounts receivable had been fully disclosed to the auditors.

33

d. On or about February 20, 2004, in New York, New York, SANTO C. MAGGIO signed a loan agreement on behalf of Refco Capital Markets, Ltd., regarding an approximately $720 million loan from Refco Capital Markets, Ltd., to a customer.

e. On or about April 27, 2004, Phillip R. Bennett and Robert C. Trosten signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party receivables had been fully disclosed to the auditors.

f. On or about May 17, 2004, Phillip R. Bennett and Tone N. Grant met at a hotel in lower Manhattan to discuss the more than $1 billion debt that they, as the owners of RGHI, owed to Refco.

g. On or about August 5, 2004, Phillip R. Bennett caused RGHI to transfer to Robert C. Trosten approximately $48 million.

h. On or about August 5, 2004, Phillip R. Bennett caused RGHI to transfer to Tone N. Grant approximately $4 million.

i. On or about August 5, 2004, Phillip R. Bennett caused RGHI to transfer to SANTO C. MAGGIO, the defendant, approximately $5.75 million.

j. On or about August 8, 2004, Phillip R. Bennett caused RGHI to transfer to TONE N. GRANT approximately

34

$12 million.

      k.   On or about February 23, 2005, in New York, New York, Phillip R. Bennett signed a guaranty letter on behalf of Refco Group Ltd., regarding an approximately $345 million loan from a Refco customer to RGHI.

      l.   On or about April 6, 2005, in New York, New York, Phillip R. Bennett signed Refco's S-4 registration statement.

      m.   On or about May 25, 2005, in New York, New York, Phillip R. Bennett signed a guaranty letter on behalf of Refco Group Ltd., regarding an approximately $450 million loan from a Refco customer to RGHI.

      n.   On or about July 19, 2005, in New York, New York, Phillip R. Bennett signed Refco's annual report on Form 10K.

      o.   On or about August 8, 2005, in New York, New York, Phillip R. Bennett signed Refco's S-1 registration statement.

      p.   On or about August 26, 2005, in New York, New York, SANTO C. MAGGIO signed a loan agreement on behalf of Refco Capital Markets, Ltd., regarding an approximately $420 million loan from Refco Capital Markets, Ltd., to a customer.

      q.   On or about September 6, 2005, Phillip R. Bennett caused RGHI to transfer to SANTO C. MAGGIO, the

defendant, approximately $7,668,600.

(Title 18, United States Code, Section 371).

## COUNT TWO

### (Securities Fraud)

The United States Attorney further charges:

62.  The allegations contained in paragraphs 1 through 51, 60 and 61 of this Information are repeated and realleged as if fully set forth herein.

63.  From in or about the late 1990s up to in or about 2004, in the Southern District of New York and elsewhere, SANTO C. MAGGIO, the defendant, unlawfully, willfully, and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons and entities, in connection with the purchase and

36

sale of 9% Senior Subordinated Notes due 2012, issued by Refco

Group Ltd., LLC and Refco Finance, Inc.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title
17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2.)

## COUNT THREE

### (Securities Fraud)

The United States Attorney further charges:

64. The allegations contained in paragraphs 1 through

51, 60 and 61 of this Information are repeated and realleged as

if fully set forth herein.

65. From in or about the late 1990s up to in or about

October 2005, in the Southern District of New York and elsewhere,

SANTO C. MAGGIO, the defendant, unlawfully, willfully, and

knowingly, directly and indirectly, by the use of means and

instrumentalities of interstate commerce, the mails, and the

facilities of national securities exchanges, did use and employ,

in connection with the purchase and sale of securities,

manipulative and deceptive devices and contrivances, in violation

of Title 17, Code of Federal Regulations, Section 240.10b-5, by:

(a) employing devices, schemes, and artifices to defraud; (b)

making untrue statements of material facts and omitting to state

material facts necessary in order to make the statements made, in

light of the circumstances under which they were made, not

misleading; and (c) engaging in acts, practices, and courses of

37

business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of the common stock of Refco, Inc.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2).

## COUNT FOUR

### (Wire Fraud)

The United States Attorney further charges:

66.   The allegations contained in paragraphs 1 through 51, 60 and 61 of this Information are repeated and realleged as if fully set forth herein.

67.   On or about July 19, 2005, in the Southern District of New York, SANTO C. MAGGIO, the defendant, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, the following writings, signs, signals, and sounds for the purpose of executing such scheme and artifice, the electronic transmission of Refco Form 10-K from New York, New York to Virginia.

(Title 18, United States Code, Sections 1343 and 2).

38

## FORFEITURE ALLEGATION WITH RESPECT TO
## COUNTS ONE THROUGH FOUR

68.  As a result of committing one or more of the foregoing securities fraud offenses, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Sections 240.10b-5, as alleged in Counts One, Two and Three; and wire fraud offenses, in violation of Title 18, United States Code, Section 1343, as alleged in Counts One and Four of this Information, SANTO C. MAGGIO shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the securities and wire fraud offenses, including but not limited to the following: At least $2.4 billion in United States currency, representing the amount of proceeds obtained as a result of the charged wire and securities fraud offenses, for which the defendant is jointly and severally liable.

## SUBSTITUTE ASSETS PROVISION

69.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(i)   cannot be located upon the exercise of due diligence;

(ii)  has been transferred or sold to, or deposited with, a third party;

39

(iii)   has been placed beyond the jurisdiction of the court;

(iv)   has been substantially diminished in value; or

(v)   has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982 and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the forfeitable property described above.

(Title 18, United States Code, Sections 371, 981, 982, 1343; Title 15, United States Code, Sections 78j(b), 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5; Title 21, United States, Section 853(p); and Title 28, United States Code, Section 2461.)


MICHAEL J. GARCIA
United States Attorney

40

7CJAAMAGP1.txt

1

7CJAAMAGP                    Plea
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    UNITED STATES OF AMERICA,
3
4                 v.                          07 SD 312 (RLE)
4
5    SANTO C. MAGGIO,
5
6                    Defendant.
6
7    ------------------------------x
7
8                                          New York, N.Y.
8                                          December 19, 2007
9                                          11:30 a.m.
9
10
10   Before:
11
11                        HON. RONALD L. ELLIS,
12
12                                          Magistrate Judge
13
13
14                           APPEARANCES
14
15   JAMES B. COMEY
15        United States Attorney for the
16        Southern District of New York
16   NEIL BAROFSKY
17   CHRISTOPHER GARCIA
17        Assistant United States Attorney
18
18   PAUL SHECHTMAN
19        Attorney for Defendant Maggio
19
20   SCOTT E. HERSHMAN
20        Attorney for Defendant Maggio
21
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

⬚                                                                        2

7CJAAMAGP                    Plea
1            (Case called)
2            MR. BAROFSKY:  Neil Barofsky and Christopher Garcia
3    for the government.
4            Good morning, your Honor.
5            MR. SCHECTMAN:  Paul Shechtman, for Mr. Maggio, with
6    Scott Hershman, for Mr. Maggio.
7            THE COURT:  Okay.  I understand that he is going to be
8    pleading to an information.
9            MR. SCHECTMAN:  Correct, your Honor.
10           THE COURT:  Has he waived indictment yet?
11           MR. SCHECTMAN:  You have the paperwork.  We're ready
12   to waive.
                           Page 1

7CJAAMAGP1.txt
13            THE COURT:  We will do those separately.  Treat the
14    waiver as it should be and then I'll consider the taking of the
15    plea.
16            MR. SCHECTMAN:  Sounds right.
17            COURTROOM DEPUTY:  You are Santo Maggio?
18            THE DEFENDANT:  Yes.
19            COURTROOM DEPUTY:  Have you signed this waiver of
20    indictment.
21            THE DEFENDANT:  Yes.
22            COURTROOM DEPUTY:  Before you signed it did you
23    discussion it with your attorney?
24            THE DEFENDANT:  Yes.
25            COURTROOM DEPUTY:  Did he explain it to you?
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    3

7CJAAMAGP              Plea
 1            THE DEFENDANT:  Yes.
 2            THE COURT:  Do you understand what you are doing?
 3            THE DEFENDANT:  Yes.
 4            COURTROOM DEPUTY:  Do you understand that you are
 5    under no obligation to waive indictment?
 6            THE DEFENDANT:  Yes.
 7            COURTROOM DEPUTY:  Do you understand that if you do
 8    not waive indictment, if the government wants to prosecute you
 9    they will have to present this case to a grand jury which may
10    or may not indict you?
11            THE DEFENDANT:  Yes.
12            THE COURT:  Do you realize by that by signing this
13    waiver of indictment you have given up your right to have this
14    case presented to a grand jury?
15            THE DEFENDANT:  Yes, I do.
16            COURTROOM DEPUTY:  Have you seen a copy of the
17    information?
18            THE DEFENDANT:  Yes, I did.
19            THE COURT:  Would you like for me to read it to you?
20            THE DEFENDANT:  No.
21            COURTROOM DEPUTY:  How do you plead?
22            THE DEFENDANT:  Guilty.
23            COURTROOM DEPUTY:  The case has already been assigned
24    to Judge Stein.
25            MR. SCHECTMAN:  Correct.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    4

7CJAAMAGP              Plea
 1            MR. BAROVSKY:  Your Honor, we consent to the defendant
 2    being released on his own recognizance.
 3            MR. SCHECTMAN:  We don't object to that.
 4            THE COURT:  Technically to the information you are
 5    supposed to plead "not guilty".
 6            MR. SCHECTMAN:  I think that is right and it is my
 7    apologies.
 8            THE DEFENDANT:  I plead not guilty now and then later
 9    of guilty.
10            MR. SCHECTMAN:  Not guilty at this time, your Honor,
11    but we will be entering a guilty plea.
12            THE COURT:  Objection.  All right.  Now, the actual
13    plea has been referred by Judge Stein; is that it?
14            MR. BAROVSKY:  Yes, your Honor.
15            THE COURT:  And how many counts in the information?
16            MR. BAROVSKY:  Your Honor, there are four counts.
17            THE COURT:  What is he pleading to?
                              Page 2

7CJAAMAGP1.txt
```
18          MR. BAROFSKY:  All four counts, Judge.
19          THE COURT:  Okay.  Mr. Maggio, this matter has been
20     referred to me before Judge Stein for the purpose of taking
21     your plea.  Did you consent to proceed before a United States
22     magistrate judge on your felony plea allocution?
23          THE DEFENDANT:  Yes.
24          THE COURT:  Before you signed it did you discuss it
25     with your attorneys?
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    5

7CJAAMAGP                    Plea
```
 1          THE DEFENDANT:  Yes, your Honor.
 2          THE COURT:  Did they explain it to you?
 3          THE DEFENDANT:  Yes.
 4          THE COURT:  Do you understand that you have an
 5     absolute right to have this proceeding before a United States
 6     district judge?
 7          THE DEFENDANT:  Yes, I do.
 8          THE COURT:  You are voluntarily proceeding before a
 9     United States magistrate judge?
10          THE DEFENDANT:  Yes.
11          THE COURT:  Mr. Maggio, you are charged in a four
12     count information.  Count One of the information charges you,
13     well, conspiracy to commit securities fraud, wire fraud, bank
14     fraud and money laundering and to make false filings with the
15     SEC and material misstatements to auditors in violation of
16     Title 18 U.S.C. Sections 371.  This crime carries a maximum
17     sentence of five years imprisonment, a maximum fine which is
18     the greatest of either $250,5000 or twice the gross pecuniary
19     gain derived from the offense or twice the gross pecuniary loss
20     to persons other than yourself as a result of the offense.
21     There is a $100 special assessment and a term of supervised
22     release of three years.
23          Counts Two and Three of the information charge you
24     with securities fraud in violation of Title 15 U.S.C. Section
25     78 (J) (B) and 78 (F) (F) and Title 17 Code of Federal
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    6

7CJAAMAGP                    Plea
```
 1     Regulations Section 240, 10 (B) (5) and each of those counts
 2     carries a maximum sentence of 20 years imprisonment, a maximum
 3     fine which is the greatest of either five million dollars or
 4     twice the gross pecuniary gain derived from the offense and
 5     twice the gross pecuniary loss of persons other than yourself
 6     as a result of the offense.  Each also has a $100 special
 7     assessment and a term of supervised release of three years.
 8          Count four of the information charges you with wire
 9     fraud in violation of Title 18 U.S.C. Section 1343 and carries
10     a maximum sentence of 0 years imprisonment, a maximum fine
11     which is the greatest of either $250,000 or twice the gross
12     pecuniary gain derived from the offense, or twice the gross
13     pecuniary loss to person others than yourself as a result of
14     the offense.  It carries a $100 special assessment and a term
15     of supervised release of three years.
16          A total maximum sentence of incarceration on the
17     information is 65 years imprisonment.  In addition to the
18     foregoing the Court must order restitution with respect to the
19     information and in accordance with U.S.C.
20          In addition, if you are sentenced to any period of
21     supervised release and violate the conditions of your
22     supervised release you may be sentenced to all or part of the
```
                              Page 3

7CJAAMAGP1.txt
```
23    supervised release as authorized by statute without any credit
24    for time already served on supervised release.
25              Do you understand that?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```
                                                                    7
```
      7CJAAMAGP              Plea
 1              THE DEFENDANT: Yes.
 2              THE COURT: So you understand these penalties as I've
 3    read them to you?
 4              THE DEFENDANT: Yes, I do.
 5              THE COURT: Have you seen a copy of the information in
 6    which the government makes these charges against you?
 7              THE DEFENDANT: Yes, I do.
 8              THE COURT: Have you discussed it with your attorneys?
 9              THE DEFENDANT: Yes, your Honor.
10              THE COURT: Are you prepared to enter a plea today?
11              THE DEFENDANT: Yes, I am.
12              THE COURT: Santo Maggio, how do you plead?
13              THE DEFENDANT: Guilty.
14              THE COURT: Mr. Maggio, before I can recommend that
15    your plea be accepted I must determine that you understand the
16    plea and its consequences, that the plea is voluntary and that
17    there's a factual basis for the plea. For that purpose I must
18    ask you a number of questions and your answers must be under
19    oath. Do you understand that the answers you give under oath
20    may subject you to prosecution for perjury if you do not tell
21    the truth?
22              THE DEFENDANT: Yes, I do.
23              THE COURT: Raise your right hand.
24              (Defendant Santo C. Maggio sworn)
25              THE COURT: Thank you. Please state your full name
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```
                                                                    8
```
      7CJAAMAGP              Plea
 1    for record.
 2              THE DEFENDANT: Santo C. Maggio.
 3              THE COURT: How far did you go in school?
 4              THE DEFENDANT: I finished high school.
 5              THE COURT: Are you currently being treated by a
 6    doctor or psychiatrist for any reason?
 7              THE DEFENDANT: No.
 8              THE COURT: Are you currently on any medications which
 9    might effect you in being alert for this proceeding?
10              THE DEFENDANT: No.
11              THE COURT: Are you any difficulty seeing, hearing or
12    understanding anything that I am saying?
13              THE DEFENDANT: No.
14              THE COURT: Have you had enough time to discuss with
15    your attorneys how you wish to plead?
16              THE DEFENDANT: Yes.
17              THE COURT: Are you satisfied with your attorneys?
18              THE DEFENDANT: Yes.
19              THE COURT: Do you understand what the government says
20    that you did?
21              THE DEFENDANT: Yes.
22              THE COURT: Do you understand that have you a right to
23    plead not guilty?
24              THE DEFENDANT: Yes.
25              THE COURT: Do you understand that you have a right to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
                              Page 4
```

7CJAAMAGP1.txt

9

7CJAAMAGP                    Plea
1   trial by jury on these charges?
2               THE DEFENDANT:  Yes.
3               THE COURT:  Do you understand that if you are to plead
4   not guilty and go to trial you would be presumed innocent until
5   the government proved your guilt beyond a reasonable doubt?
6               THE DEFENDANT:  Yes, I do.
7               THE COURT:  Do you understand that if you were to go
8   to trial you would have a number of important constitutional
9   rights including the right to be represented by counsel and to
10  have counsel appointed for you if you cannot afford an
11  attorney?
12              THE DEFENDANT:  Yes.
13              THE COURT:  Do you understand that at trial you cannot
14  be forced to testify against yourself?
15              THE DEFENDANT:  Yes.
16              THE COURT:  Do you understand at a trial you would
17  have the right to confront and cross-examine witnesses called
18  by the government?
19              THE DEFENDANT:  Yes.
20              THE COURT:  Do you understand that at a trial you
21  would have the right to testify yourself and to call witnesses
22  on your behalf and to compel their attendance by subpoena if
23  necessary?
24              THE DEFENDANT:  Yes.
25              THE COURT:  Do you understand that if your guilty plea
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

10

7CJAAMAGP                    Plea
1   is accepted there will be no trial of any kind and the only
2   remaining steps in your case will be a presentence report and
3   sentencing by Judge Stein?
4               THE DEFENDANT:  Yes.
5               THE COURT:  Have you discussed with your attorney the
6   role that the sentencing guidelines play in sentencing?
7               THE DEFENDANT:  Yes.
8               THE COURT:  Do you understand that the district judge
9   will retain discretion regardless of what calculations there
10  are under the guidelines?
11              THE DEFENDANT:  Yes.
12              THE COURT:  Do you understand that the calculation
13  under the guidelines will take into account a number of factors
14  including the actual conduct in which you engaged, any victims
15  of the offense, the role that you played in the offense,
16  whether or not you have accepted responsibility for your acts,
17  whether you have any criminal history or whether you have
18  engaged in any obstruction of justice; do you understand that?
19              THE DEFENDANT:  Yes.
20              THE COURT:  Between now and the date of sentencing the
21  probation department will conduct an investigation and will
22  prepare a presentence report.  Your attorney, the government
23  and Judge Stein will receive copies.  Both your attorney and
24  the government will have the opportunity to object if they
25  believe anything in the report is inaccurate; do you understand
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

11

7CJAAMAGP                    Plea
1   that?
2               THE DEFENDANT:  Yes.
3               THE COURT:  Do you understand that until the
                            Page 5

7CJAAMAGP1.txt
```
 4    presentence report is prepared neither your attorney nor the
 5    government, nor Judge Stein will be able to determine precisely
 6    what range of penalties will be calculated under the
 7    guidelines.
 8              THE DEFENDANT:  Yes.
 9              THE COURT:  Do you understand than regardless of
10    calculation and the guidelines your sentence cannot exceed the
11    maximums that I advised you of earlier?
12              THE DEFENDANT:  Yes.
13              THE COURT:  Do you understand that under certain
14    circumstances both you and the government may have the right to
15    appeal the sentence imposed.
16              THE DEFENDANT:  Yes.
17              THE COURT:  Do you understand that if the sentence is
18    more severe than you expected you will be bound by your guilty
19    plea and will not be permitted to withdraw it?
20              THE DEFENDANT:  Yes.
21              THE COURT:  You understand that parole has been
22    abolished and that if you are sentenced to any term of
23    imprisonment you will be required to serve the entire term?
24              THE DEFENDANT:  Yes.
25              THE COURT:  Mr. Maggio, are you a citizen of the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```
                                                                    12
```
      7CJAAMAGP                 Plea
 1    United States?
 2              THE DEFENDANT:  Yes, I am.
 3              THE COURT:  Mr. Maggio, I have been handed up a plea
 4    agreement from your case.  Have you had an opportunity to
 5    review and go over this agreement with your attorneys?
 6              THE DEFENDANT:  Yes.
 7              THE COURT:  Do you understand that one of the
 8    provisions in the plea agreement is that you admit the
 9    forfeiture allegation in the information and that you agree to
10    forfeit to the United States a sum of money equal to two
11    billion, four hundred million dollars?
12              THE DEFENDANT:  Yes.
13              THE COURT:  That is what it says, right?
14              MR. BAROFSKY:  Yes, your Honor, that number is
15    correct.
16              Your Honor, the plea cooperation agreement also
17    provides, however, that in satisfaction of that amount there
18    are certain schedules attached to the plea agreement which the
19    government will accept in satisfaction of that judgment.
20              MR. SCHECTMAN:  We don't have quite that much, your
21    Honor.
22              THE COURT:  Okay.  I thought had I too many zeros
23    myself at first.
24              MR. SCHECTMAN:  No, you read it right.
25              THE COURT:  That represents the amount of the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```
                                                                    13
```
      7CJAAMAGP                 Plea
 1    proceedings obtained as a result of the offense; do you
 2    understand that?
 3              THE DEFENDANT:  Yes.
 4              THE COURT:  You also understand that any forfeiture
 5    would not be treated as satisfaction of any fine, restitution,
 6    cause of imprisonment or any other penalty the Court may
 7    impose?
 8              THE DEFENDANT:  Yes.
                           Page 6
```

7CJAAMAGP1.txt
```
 9              THE COURT:  And as indicated in the agreement, there
10   is a scheduled pay of assets.  You have seen the schedule and
11   you have gone over it with your attorneys?
12              THE DEFENDANT:  Yes.
13              THE COURT:  To make sure that it's accurate?
14              THE DEFENDANT:  Yes.
15              MR. SCHECTMAN:  Judge, I might point out for the
16   record there is a Schedule B as well, which are assets that are
17   in Mrs.~Maggio's name that are being forfeited as part of the
18   plea and there is a separate agreement that need not concern
19   your Honor in this matter involving Mrs.~Maggio.
20              THE COURT:  Is that correct, Mr. Maggio, there is also
21   a Schedule B?
22              THE DEFENDANT:  Yes.
23              THE COURT:  That's Mrs.~Maggio's assets?
24              THE DEFENDANT:  Yes.
25              THE COURT:  That is also covered by the agreement that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```
                                                                      14

7CJAAMAGP                    Plea
```
 1   you made with the government?
 2              THE DEFENDANT:  Yes.
 3              THE COURT:  You are also understand the agreement
 4   provides that you cooperate fully with the United States
 5   attorney's office?
 6              THE DEFENDANT:  Yes.
 7              THE COURT:  And that in exchange for that cooperation,
 8   assuming that the office determines that you have made full and
 9   accurate disclosures to them, the government has agreed that it
10   will submit a motion pursuant to Section 5K1.1 of the
11   sentencing guidelines in your favor?
12              THE DEFENDANT:  Yes.
13              THE COURT:  Do you understand that if for any reason
14   the government determines that it will not file such a motion
15   you will not be allowed to withdraw your plea?
16              THE DEFENDANT:  Yes.
17              THE COURT:  You understand that even if the government
18   files such a motion sentencing will still be at the sole
19   discretion of the Court?
20              THE DEFENDANT:  Yes, I did.
21              THE COURT:  Is there anything else in the agreement
22   that I might want to highlight?
23              MR. BAROFSKY:  No, your Honor.
24              THE COURT:  All right.  Other than the representations
25   in this agreement, have any promises been made to you by anyone
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```
                                                                      15

7CJAAMAGP                    Plea
```
 1   to influence you to plead guilty?
 2              THE DEFENDANT:  No.
 3              THE COURT:  This constitutes the sole agreement that
 4   you have?
 5              THE DEFENDANT:  Yes.
 6              THE COURT:  Has anyone promised you a specific
 7   sentence if you plead guilty?
 8              THE DEFENDANT:  No.
 9              THE COURT:  Has anyone made any threats to you to
10   influence you to plead guilty?
11              THE DEFENDANT:  No.
12              THE COURT:  Are you making this plea voluntarily of
13   your own freewill and choice?
```
                          Page 7

7CJAAMAGP1.txt
14          THE DEFENDANT:  Yes, I am.
15          THE COURT:  The elements of the offense is?
16          MR. BAROFSKY:  Your Honor, for Counts One defendant's
17    is charged with conspiracy.  The government would be required
18    to prove each of the elements beyond a reasonable doubt.
19    First, that there is an assistance of a an agreement or
20    understanding to commit one of the objects charged in the
21    information.
22          Second, the defendant knowingly became a member of
23    that agreement or understanding.
24          And third, that one of the conspirators or
25    coconspirators or Mr. Maggio knowingly committed at least one
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                              16

7CJAAMAGP                    Plea
1    overt act in furtherance of the conspiracy during its life.
2          With respect to the securities frauds counts in two
3    and three, first, the defendant in connection with the purchase
4    or sale of securities, here the notes that are described in
5    Count Two and the common stock of Revko that's referenced in
6    Count Three did one or more of the following:  Employed a
7    devise, scheme or artifice to defraud or made an untrue
8    statement of a material fact or admitted to state a material
9    fact which made what was said under the circumstances
10   misleading or engaged in an act, practice or course of business
11   that operated or would operate as a fraud or deceit upon a
12   purchase of a seller for securities.
13         Second the defendant acted knowingly, willfully with
14   the intent to defraud.
15         And third, the defendant used or caused to be used any
16   means or instruments of transportation or communication in
17   interstate commerce or use of the mails in furtherance of that
18   fraudulent conduct.
19         and with respect to the Count Four wire fraud, first,
20   that there was a scheme or artifice to defraud that existence
21   the defendant must have participated in the scheme with the
22   intent to defraud misrepresentations or omissions must have
23   related to a material fact, that the scheme was executed to
24   obtain money or property.
25         And finally, that in execution of the scheme the
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                              17

7CJAAMAGP                    Plea
1    defendant used or caused to be used interstate wires or that
2    such use was reasonably foreseeable to him.
3          THE COURT:  Mr. Maggio, did you hear that recitation?
4          THE DEFENDANT:  Yes.
5          THE COURT:  Did you understand that if the government
6    were to proceed to trial against you it would have the burden
7    of proving each element for each offense, that is, each count
8    beyond a reasonable doubt.
9          THE DEFENDANT:  Yes.
10         THE COURT:  Did you commit the offenses for which you
11   have been charged, Mr. Maggio?
12         THE DEFENDANT:  Yes.
13         THE COURT:  Tell me what you did.
14         MR. SCHECTMAN:  Judge, if it's acceptable to you
15   Mr. Maggio has written out a statement that I think speaks to
16   all four crimes.
17         THE COURT:  Considering the complexities here I'll
18   allow him to read and then if it's not he could fill in the
                      Page 8

7CJAAMAGP1.txt
19    gaps.
20          THE DEFENDANT:  Your Honor, from the late 1990s to
21    October 2005 I was a senior executive at Revko Ink.  During
22    that period I participated with others to hide the true
23    financial health of Revko from banks, counter-parties, auditors
24    and investors.  With my knowledge and active participation
25    Revko's substantial losses were covered up as revenues padded
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
                                                              18
      7CJAAMAGP              Plea
1     and certain operating expenses were moved off its book.  Among
2     the acts I personally engaged in the signing of loan agreements
3     referencing paragraphs 61-D and 61-P of the indictment.
4           As a result of my conduct and that of my
5     coconspirators false financial statements were issued to obtain
6     debt financing from the public including 9 percent senior
7     subordinated notes referenced in Count Two of the indictment.
8           To consummate the sale of 57 percent of Revko to a
9     group headed by Thomas H. Lee in 2004 and to obtain $800
10    million in bank financing the same year and to effect the Revko
11    initial public offering in 2005.  Moreover, with my knowledge
12    false financial statements were filed with the SEC including
13    form 10K referencing Count Four.  The mails and interstate
14    wires were used as part of the fraudulent scheme.
15          I deeply regret my conduct and the harm that it has
16    caused.
17          THE COURT:  First of all, with respect to all of the
18    activities that you've indicate you participated in it
19    knowingly?
20          THE DEFENDANT:  Yes.
21          THE COURT:  Okay.  Where did this take place.
22          THE DEFENDANT:  In New York, New York.  Manhattan, New
23    York.
24          THE COURT:  You said coconspirators, so other people
25    had agreed with you to effectuate this scheme?
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
                                                              19
      7CJAAMAGP              Plea
1           THE DEFENDANT:  Yes.
2           THE COURT:  And the intent of this scheme was to
3     defraud?
4           THE DEFENDANT:  Yes.
5           THE COURT:  Now, I know you mentioned the notes and I
6     think you mentioned the 2005 initial offering that was
7     addressed to Count Three of the information, that is, whether
8     or not you had a scheme to defraud people based on the value of
9     the stock?
10          THE DEFENDANT:  Correct, your Honor.
11          THE COURT:  Mr. Maggio?
12          THE DEFENDANT:  Yes.
13          THE COURT:  That did involve false statements?
14          THE DEFENDANT:  Yes.
15          THE COURT:  False filings that you've indicated?
16          THE DEFENDANT:  Yes.
17          THE COURT:  Now, you said you used the mails which
18    interstate -- I mean, you used the mails, a phone?  How did you
19    use --
20          THE DEFENDANT:  Yes, used regular mail.  We used
21    Express Mail.  We used e-mail all to effect the scheme.
22          THE COURT:  You submitted false statements in the
23    mail?
                              Page 9

7CJAAMAGP1.txt
24          THE DEFENDANT:  False statements, loan agreements as
25     referenced here, yes.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                20

       7CJAAMAGP               Plea
1           THE COURT:  Okay.  Any --
2           MR. BAROFSKY:  Your Honor, I'll just represent to the
3      Court that with respect to Count Four, the wire transmission
4      did in fact originate in the Southern District of New York in
5      Manhattan and was wired outside of the Southern District to
6      Virginia.
7           THE COURT:  Anything else?
8           MR. SCHECTMAN:  Nothing, your Honor.
9           MR. BAROFSKY:  No, your Honor.
10          THE COURT:  I am depending on you here.  Does any
11     either counsel know of any reason why I should not recommend
12     that this plea not be accepted?
13          MR. BAROFSKY:  No, your Honor.
14          MR. SCHECTMAN:  No, your Honor.
15          THE COURT:  Based on defendant's allocution and the
16     recommendations by the government I find that the defendant
17     understands the nature, the charges and consequences of his
18     guilty plea.  I also find that the plea is voluntary and that
19     there is a factual basis for the plea.  I, therefore, recommend
20     that the plea be accepted and direct that a presentence report
21     be reaped.
22          Sentencing will take place before Judge Stein on.
23          MR. BAROFSKY:  May 9, at 2 p.m.
24          THE COURT:  Is there anything else that needs to be
25     addressed today.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                21

       7CJAAMAGP               Plea
1           MR. BAROVSKY:  Not from the government, your Honor.
2           MR. SCHECTMAN:  Not from the offense.
3           THE COURT:  We are adjourned.
4                          o O o
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300