UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
XL SPECIALTY INSURANCE COMPANY,          :
                                         :
                    Plaintiff,           :
                                         :
          v.                             :        No. 08-CV-3821 (GEL)
                                         :
JOHN D. AGOGLIA, PHILLIP R. BENNETT,     :
LEO R. BREITMAN, EDWIN L. COX,           :
SUKHMEET DHILLON, THOMAS H.              :
DITTMER, NATHAN GANTCHER, STEPHEN        :
GRADY, TONE GRANT, THOMAS HACKL,         :
DAVID V. HARKINS, SCOTT L. JAECKEL,      :
DENNIS A. KLEJNA, THOMAS H. LEE,         :
ERIC G. LIPOFF, SANTO C. MAGGIO,         :
PETER MCCARTHY, JOSEPH MURPHY,           :
FRANK MUTTERER, RONALD L. O'KELLEY,      :
RICHARD N. OUTRIDGE, SCOTT A.            :
SCHOEN, WILLIAM M. SEXTON, GERALD        :
SHERER, PHILIP SILVERMAN, AND            :
ROBERT C. TROSTEN,                       :
                                         :
                    Defendants.          :
-------------------------------------------------------------x

## AFFIDAVIT OF JAMES SANDNES

State of New York          )
                           ): ss.
County of New York  )

        James Sandnes, being duly sworn, deposes and says:

        1.       I am a member of the bar of this Court and the firm of Boundas, Skarzynski,

Walsh & Black, LLC, counsel for XL Specialty Insurance Company ("XL") in this action for

declaratory judgment.  I make this affidavit to bring before the Court certain documents relevant

to XL's motion for summary judgment.

2.    XL, along with the insurers in two related matters, has caused to be filed in this

case a group of joint exhibit binders titled "Insurers' Joint Exhibits" ("IJX"), Volume I, II and

III.  Those binders contain true and correct copies of the following documents (except IJX 25)

tabbed as the exhibit number listed next to the document description:

| IJX Exhibit # | Description |
|:---:|:---|
| | **Underlying Matters** |
| 1 | *In re Refco, Inc. Securities Litigation*, No. 05 Civ. 8626 (GEL) (S.D.N.Y.) - Second Amended Consolidated Class Action Complaint (dated December 3, 2007) |
| 2 | *American Financial International Group ,et al. v. Bennett ,et al.*, No. 05 Civ. 8988 (GEL) (S.D.N.Y.) - Third Amended Class Action Complaint (dated January 8, 2008) |
| 3 | *BAWAG v. Refco, et al.*, Case No.05-03161 (Bankr. S.D.N.Y.) - Complaint (dated November 16, 2005) |
| 4 | *Capital Management Select Fund Ltd. v. Bennett et al.*, No. 07 Civ. 8688 (GEL) (S.D.N.Y.) - Complaint (dated October 9, 2007) |
| 5 | *Fine v. Bennett*, et al., No. 05 Civ. 8701 (GEL) (S.D.N.Y.) - Complaint (dated October 13, 2005) |
| 6 | *In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation*, No. 06 Civ. 643 (GEL) (S.D.N.Y.) - Second Amended Consolidated Class Action Complaint (dated December 21, 2007) |
| 7 | *Kirschner v. Agoglia, et al.*, No. 05-60006, Adv. Pro. No. 07-3060 (RDD) (Bankr. S.D.N.Y.) - Complaint (dated October 15, 2007) |
| 8 | *Kirschner v. Bennett, et al.*, No. 07 Civ. 8165 (GEL) (S.D.N.Y.) - Complaint (dated August 27, 2007) |
| 9 | *Kirschner v. Grant Thornton LLP et al.*, No. 07 Civ. 11604 (GEL) (S.D.N.Y.) - Complaint (dated August 21, 2007) |
| 10 | *Kirschner v. Hackl, et al.*, No. 07 Civ. 9238 (GEL) (S.D.N.Y.) - Complaint (dated October 15, 2007) |
| 11 | *Kirschner v. Thomas H. Lee Partners, LP. et al.*, No. 07 Civ. 7074 (GEL) (S.D.N.Y.) - Complaint (dated November 20, 2007) |
| 12 | *Krys, et al. v. Sugrue, et al.*, No. 08 Civ. 3065 (GEL) (S.D.N.Y.) & No. 08 Civ. 3086 (GEL) (S.D.N.Y.) - Complaint (dated March 5, 2008) |
| 13 | *Mehta v. Bennett*, No. 05 Civ. 8748 (GEL) (S.D.N.Y.) - Complaint (dated October 14, 2005) |

| 14 | *Thomas H. Lee Equity Fund V, L.P. v. Bennett, et al.*, No. 05 Civ. 9608 (GEL) (S.D.N.Y.) - Complaint (dated November 14, 2005) |
| 15 | *Unovalores Ltd. v. Bennett*, No. L1564-05 (Sup. Ct. N.J.) - Complaint (dated November 1, 2005) |
| 16 | *V.R. Global Partners, L.P. v. Bennett et al.*, No. 07 Civ. 8686 (GEL) (S.D.N.Y.) - Complaint (dated October 9, 2007) |
| | |
| | **Criminal Prosecution Documents** |
| 17 | Criminal Information in *United States of America v. Maggio* No. 07 Cr. 1196 (SHS) (S.D.N.Y.) |
| 18 | S3 Indictment in *United States of America v. Bennett, Trosten and Grant*, No. 05 Cr. 1192 (NRB) (S.D.N.Y.) |
| 19 | S4 Indictment in *United States of America v. Grant*, 05 Cr. 1192 (NRB) (S.D.N.Y.) |
| 20 | Plea Allocution Transcript in *United States of America v. Maggio*, No. 05 Cr. 1196 (NRB) (S.D.N.Y.) - Dated December 19, 2007 (caption reads No. 07 SD 312 (RLE)) |
| 21 | Plea Allocution Transcript in *United States of America v. Bennett*, No. 05 Cr. 1192 (NRB) (S.D.N.Y.) - Dated February 15, 2008 |
| 22 | Plea Allocution Transcript in *United States of America v. Trosten*, No. 05 Cr. 1192 (NRB) (S.D.N.Y.) - Dated February 20, 2008 |
| 23 | Transcript of Sentencing of Phillip Bennett in *United States of America v. Bennett*, No. 05 Cr. 1192 (NRB) (S.D.N.Y.) - Dated July 3, 2008 |
| 24 | Transcript of Proceeding dated April 17, 2008 in *United States of America v. Grant*, No. 05 Cr. 1192 (NRB) (S.D.N.Y.), pages 3095 - 3097 |
| 25 | Judgment of Conviction in *United States of America v. Bennett*, No. 05 Cr. 1192 (NRB) (S.D.N.Y.) - [to be filed separately later] |
| | |
| | **D&O Insurance Tower** |
| 26 | U.S. Specialty Insurance Company - Policy No. 24-MGU-05-A10821 (Primary Policy) |
| 27 | Lexington Insurance Company - Policy No. 1620924 (First Excess Policy) |
| 28 | Axis Reinsurance Company - Policy No. RNN 506300 (Second Excess Policy) |
| 29 | Allied World Assurance Company (U.S.), Inc. - Policy No. AW0418197 (Third Excess Policy) |

| 30 | Arch Insurance Company - Policy No. DOX0009322-00 (Fourth Excess Policy) |
| 31 | XL Specialty Insurance Company - Policy No. ELU089673-05 (Fifth Excess Policy) |

With respect to IJX 25, we have attempted to obtain a copy of the final judgment of conviction of Phillip R. Bennett ("Bennett"), but it has not been entered on the ECF system. I personally contacted Judge Buchwald's chambers and spoke with one of her clerks who advised me that I could represent, in this affidavit, that the final judgment of conviction was in preparation and would likely be filed within a week. Promptly upon it being filed, we will make a supplemental filing in this matter containing a copy of IJX 25.

3.     The accompanying declaration of Henry Toolan ( "Toolan") provides the Court with material related to the directors and officers management liability insurance policy, number ELU089673-05 issued to Refco Inc. ("Refco") for the period of August 11, 2005 to August 11, 2006 (the "XL Policy"). As explained therein, the XL Policy is an excess policy which is the top of a $70 million "tower" of directors and officers insurance issued for the same policy period. True and correct copies of all of the insurance policies in the tower are included in the Insurers' Joint Exhibits volumes as IJX 26 to 31.

4.     In addition, Illinois National Insurance Company ("Illinois National") issued a policy to part of the Refco group of companies. Upon information and belief, a true and correct copy of the Illinois National Policy, Policy Number 931-75-64 is annexed hereto as Exhibit 32.

5.     On August 11, 2005, Refco conducted its Initial Public Offering ("IPO"). A true and correct copy of the Form S-1 filed with the SEC as part of that IPO is annexed hereto as Exhibit 33.

6.     On October 10, 2005, less than two months after the IPO and the inception of the insurance policies, Refco issued a press release announcing that the company had been carrying

an uncollectible receivable of $430 million from an entity controlled by Bennett.  Refco stated

that "[b]ased on the results of the review to date, the Company believes that the receivable was

the result of the assumption by an entity controlled by Bennett of certain historical obligations

owed by unrelated third parties to the Company, which may have been uncollectible."  A true

and correct copy of the press release is annexed hereto as Exhibit 34.

7.      On October 17, 2005, Refco and certain of its unregulated subsidiaries filed for

Chapter 11 bankruptcy protection.   See docket in *In Re Refco*, 05-60006 (Bankr. S.D.N.Y.)

8.      In the wake of the collapse of Refco, numerous lawsuits and governmental and/or

regulatory investigations and/or criminal actions were initiated against Refco and certain

individuals, including the Defendants (the "Underlying Matters").  True and correct copies of the

most recent complaints in the Underlying Matters are included in the Insurers' Joint Exhibits

volumes as IJX 1 to 16.

9.      In connection with the Underlying Matters, three of Refco's highest executive

officers, CEO Bennett, Vice President and Chief Financial Officer Robert C. Trosten ("Trosten")

and CEO of Refco Securities and Refco Capital Markets, Santo C. Maggio ("Maggio") have pled

guilty to various federal charges.  True and correct copies of the relevant Indictment and

Information are included in the Insurers' Joint Exhibits volumes as IJX 17 and 18 and the plea

allocutions are IJX 20 to 22.

10.     In addition, on April 17, 2008, the former President of Refco Group Ltd. LLC,

Tone Grant ("Grant"), was convicted by a jury, in this Court, of conspiracy, securities fraud, wire

fraud, bank fraud and money laundering arising out of the same wrongdoing to which Bennett,

Trosten and Maggio confessed.  A true and correct copy of the relevant Indictment is included in

the Insurers' Joint Exhibits volumes as IJX 19 and the announcement of the Jury verdict of conviction is included as IJX 24.

11.     On July 3, 2008, Bennett was sentenced to 16 years on his guilty plea (including 5 years of supervised release).  A true and correct copy of the sentencing transcript is included in the Insurers' Joint Exhibits volumes as IJX 23 and, as noted above, the judgment of conviction will be filed as IJX 25.

12.     Each of the Underlying Matters arise from a "fact, circumstance or situation" to which Bennett (and Maggio and Trosten) have pled guilty to knowingly and wrongfully committing.  A demonstrative exhibit, in the form of a chart detailing the fact that the Underlying Matters arise from those facts, circumstances or situations, is annexed hereto as Exhibit 35.

James Sandnes

Sworn to before me this 11th
day of July, 2008

_____
Notary Public

ARI R. MAGEDOFF
Notary Public, State of New York
No. 02MA6150477
Qualified in New York County
Commission Expires July 31, 20_10_

6



 American International Companies®

POLICY NUMBER:
*931-75-64*
REPLACEMENT OF
POLICY NUMBER:
*270-77-99*

## DIRECTORS, OFFICERS AND PRIVATE COMPANY LIABILITY INSURANCE POLICY
### Including Employment Practices and Securities Liability

*PrivateEdge* sm

☐ AIU Insurance Company
☐ American Home Assurance Company
☐ American International Pacific Insurance Company
☐ American International South Insurance Company
☐ Birmingham Fire Insurance Company of Penns.

☐ Granite State Insurance Company
☒ Illinois National Insurance Company
☐ National Union Fire Insurance Company of Pitts., Pa®
☐ National Union Fire Insurance Company of Louisiana
☐ New Hampshire Insurance Company

(each of the above being a capital stock company)

NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS GENERALLY LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE THEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.

NOTICE: THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.

NOTICE: THE INSURER DOES NOT ASSUME ANY DUTY TO DEFEND. HOWEVER THE INSUREDS MAY UNDER CERTAIN CONDITIONS TENDER THE DEFENSE OF A CLAIM. IN ALL EVENTS, THE INSURER MUST ADVANCE DEFENSE COSTS PAYMENTS PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM.

## DECLARATIONS

ITEM 1.    NAMED ENTITY:    *REFCO GROUP LTD, LLC*

MAILING ADDRESS:    *550 W JACKSON BLVD SUITE 1300*
*CHICAGO, IL 60661-5716*

STATE OF INCORPORATION OR STATE OF FORMATION OF THE NAMED ENTITY:
*Delaware*

ITEM 2.    SUBSIDIARY COVERAGE: any past, present or future Subsidiary of the Named Entity

ITEM 3.    POLICY PERIOD:    From: *January 24, 2004*    To: *January 24, 2005*
(12:01 A.M. standard time at the address stated in Item 1.)

ITEM 4.    LIMIT OF LIABILITY:    *$5,000,000*
aggregate for all Loss combined (including Defense Costs)

*7224040*

68461 (8/97)    *COPY*

ITEM 5.    RETENTION:

Judgments, Settlements and
Defense Costs (non-Indemnifiable Loss)          None

Employment Practices Claims
Judgments, Settlements and Defense Costs
(Company and Indemnifiable Loss)

*N/A*

for Loss arising from Claims
alleging the same Wrongful Act
or Related Wrongful Acts
(waivable under Clause 6 in
certain circumstances)

Security Claims (other than private placements)
Judgments, Settlements and Defense Costs
(Company and Indemnifiable Loss)

*$500,000*

for Loss arising from Claims
alleging the same Wrongful Act
or Related Wrongful Acts
(waivable under Clause 6 in
certain circumstances)

All Other Claims (including private placements)
Judgments, Settlements and Defense Costs
(Company and Indemnifiable Loss)

*$500,000*

for Loss arising from Claims
alleging the same Wrongful Act
or Related Wrongful Acts
(waivable under Clause 6 in
certain circumstances)

ITEM 6.    CONTINUITY DATES:

A.    Coverages A and B(ii):          *January 24, 2003*

B.    Coverage B(i):          *January 24, 2003*

C.    Outside Entity Coverage: Per Outside Entity,
          see endorsement #  *N/A*

ITEM 7.    PREMIUM:  *$101,505*


*Premium for Certified Acts of Terrorism Coverage under Terrorism
Risk Insurance Act 2002: $1,005 included in policy premium.
Any coverage provided for losses caused by an act of terrorism as
defined by TRIA (TRIA Losses) may be partially reimbursed by the
United States under a formula established by TRIA as follows:  90% of
TRIA Losses in excess of the insurer deductible mandated by TRIA, the
deductible to be based on a percentage of the insurer's direct earned
premiums for the year preceding the act of terrorism.
      A copy of the TRIA disclosure sent with the original quote is
attached hereto.*

7224040

68461 (8/97)   *COPY*

ADDITIONAL PREMIUM FOR PUNITIVE, EXEMPLARY AND
MULTIPLIED DAMAGES:                    (Included in above)
(No punitive damages coverage provided: *X* )


ITEM 8.    NAME AND ADDRESS OF INSURER (hereinafter "Insurer"):
           (This policy is issued only by the insurance company indicated below.)

           *Illinois National Insurance Company*

           *500 West Madison Street*

           *Chicago, IL 60661*

*7224040*

68461 (8/97)    *COPY*

POLICYHOLDER DISCLOSURE STATEMENT
UNDER
TERRORISM RISK INSURANCE ACT OF 2002

You are hereby notified that under the federal Terrorism Risk Insurance Act of 2002 (the "Act") effective November 26, 2002, you now have a right to purchase insurance coverage for losses arising out of an Act of Terrorism, which is defined in the Act as an act certified by the Secretary of the Treasury (i) to be an act of terrorism, (ii) to be a violent act or an act that is dangerous to (A) human life; (B) property or (C) infrastructure, (iii) to have resulted in damage within the United States, or outside of the United States in case of an air carrier or vessel or the premises of a U.S. mission and (iv) to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. You should read the Act for a complete description of its coverage. The Secretary's decision to certify or not to certify an event as an Act of Terrorism and thus covered by this law is final and not subject to review. There is a $100 billion dollar annual cap on all losses resulting from Acts of Terrorism above which no coverage will be provided under this policy and under the Act unless Congress makes some other determination.

For your information, coverage provided by this policy for losses caused by an Act of Terrorism may be partially reimbursed by the United States under a formula established by the Act. Under this formula the United States pays 90% of terrorism losses covered by this law exceeding a statutorily established deductible that must be met by the insurer, and which deductible is based on a percentage of the insurer's direct earned premiums for the year preceding the Act of Terrorism.

Unless you sign this form and return it to us rejecting Terrorism Coverage under the Federal Act, you will be covered for Terrorism as defined in the Act and your premium for that coverage is *$1,005*_____.

_____    I hereby reject coverage in accordance with the Act.

_____
Signature of Insured

_____
Print Name/Title

_____
Date

COPY OF DISCLOSURE SENT WITH ORIGINAL QUOTE

Insured Name: *REFCO GROUP LTD, LLC*

Policy Number: *931-75-64*
Policy Period Effective Date From: *January 24, 2004*    To: *January 24, 2005*

81285 (1/03)

IN WITNESS WHEREOF, the insurer has caused this policy to be signed on the Declarations page by its President, a Secretary and a duly authorized representative of the insurer.

_Elizabeth M. Tuck_
_____
SECRETARY

_K__
_____
PRESIDENT

_____
AUTHORIZED REPRESENTATIVE

_____
COUNTERSIGNATURE DATE

_____
COUNTERSIGNED AT

MARSH USA, INC.
500 WEST MONROE
CHICAGO, IL 60661

7224040

70598 (5/98)    COPY

 **AMERICAN INTERNATIONAL COMPANIES®**

### DIRECTORS, OFFICERS AND PRIVATE COMPANY LIABILITY INSURANCE
### POLICY
### Including Employment Practices and Securities Liability

*PrivateEdge*<sup>SM</sup>

In consideration of the payment of the premium, and in reliance upon the statements made to the Insurer by application forming a part hereof and its attachments and the material incorporated therein, the insurance company designated in item 8 of the Declarations, herein called the Insurer, agrees as follows:

## 1. INSURING AGREEMENTS

### COVERAGE A: INDIVIDUAL INSURED INSURANCE

This policy shall pay the Loss of each and every Director, Officer or Employee of the Company arising from a Claim first made against such Insureds during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act in their respective capacities as Directors, Officers or Employees of the Company except when and to the extent that the Company has indemnified such Insureds. The Insurer shall, in accordance with and subject to Clause 8, advance Defense Costs of such Claim prior to its final disposition.

### COVERAGE B: PRIVATE COMPANY INSURANCE

This policy shall pay the Loss of the Company arising from a:

   (i)    Claim first made against the Company, or

   (ii)    Claim first made against an Individual Insured,

during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act, but, in the case of (ii) above, only when and to the extent that the Company has indemnified the Individual Insured for such Loss pursuant to law, common or statutory, or contract, or the Charter or By-laws of the Company duly effective under such law which determines and defines such rights of indemnity. The Insurer shall, in accordance with and subject to Clause 8, advance Defense Costs of such Claim prior to its final disposition.

### DEFENSE PROVISIONS

The Insurer does not assume any duty to defend, provided, however, the Named Entity may at its sole option tender to the Insurer the defense of a Claim for which coverage is provided by this policy to the Insurer in accordance with Clause 8 of the policy. Regardless of whether the defense is so tendered, the Insurer shall advance Defense Costs (excess of the applicable retention amount) of such Claim prior to its final disposition. Selection of counsel to defend a "Designated Claim" shall be made in accordance with Clause 9 of the policy.

## 2. DEFINITIONS

   (a)    "Affiliate" means: (i) any person or entity that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is in common control with, another person or entity; or (ii) any person or entity that directly, or indirectly through one or more intermediaries, is a successor in interest to another person or entity.

68462 (8/97)   COPY                    1

(b)   "Claim" means:

    (1)   a written demand for monetary or non-monetary relief (including any request to toll or waive any statute of limitations); or

    (2)   a civil, criminal, administrative, regulatory or arbitration proceeding for monetary or non-monetary relief which is commenced by:

        (i)   service of a complaint or similar pleading; or

        (ii)   return of an indictment (in the case of a criminal proceeding); or

        (iii)   receipt or filing of a notice of charges.

    (3)   an administrative or regulatory investigation when conducted by the Equal Employment Opportunity Commission ("EEOC") (or similar state, local or foreign agency) which is commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to the Insured. However, in no event shall the term "Claim" include any labor or grievance proceeding which is subject to a collective bargaining agreement.

The term "Claim" shall include an Employment Practices Claim and a Securities Claim.

(c)   "Company" means the Named Entity and any Subsidiary thereof.

(d)   "Continuity Date" means the date set forth in:

    (1)   Item 6A of the Declarations with respect to Coverages A and B(ii); or

    (2)   Item 6B of the Declarations with respect to Coverage B(i);

    (3)   Item 6C of the Declarations with respect to a Claim made against an Individual Insured(s) arising out of such Insured's service as a director, officer, trustee or governor of an Outside Entity.

(e)   "Defense Costs" means reasonable and necessary fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and appeal of a Claim against the Insureds, but excluding salaries of officers or Employees of the Company.

(f)   "Employee(s)" means any past, present or future employee, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any part-time, seasonal and temporary employee in his or her capacity as such. An individual who is leased to the Company shall also be an Employee, but only if the Company provides indemnification to such leased individual in the same manner as is provided to the Company's employees. Any other individual who is contracted to perform work for the Company, or who is an independent contractor for the Company shall also be an Employee, but only if the Company provides indemnification to such individual in the same manner as that provided to the Company's employees, and such individual is scheduled by written endorsement attached hereto and the Company pays any additional premium required by the Insurer relating to such individual.

(g)   "Employment Practices Claim" means a Claim alleging an Employment Practices Violation.

(h)   "Employment Practices Violation(s)" means any actual or alleged:

    (1)   wrongful dismissal, discharge or termination (either actual or constructive) of employment, including breach of an implied contract;

(2)    harassment (including sexual harassment whether "quid pro quo", hostile work environment or otherwise);

(3)    discrimination, (including but not limited to discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy, or disability);

(4)    Retaliation (including lockouts);

(5)    employment-related misrepresentation(s) to an Employee or applicant for employment with the Company;

(6)    employment-related libel, slander, humiliation, defamation, invasion of privacy;

(7)    wrongful failure to employ or promote;

(8)    wrongful deprivation of career opportunity, wrongful demotion or negligent employee evaluation, including the giving of negative or defamatory statements in connection with an employee reference;

(9)    wrongful discipline;

(10)    failure to grant tenure;

(11)    failure to provide or enforce adequate or consistent corporate policies and procedure relating to any Employment Practices Violation;

(12)    violation of an individual's civil rights relating to any of the above,

but only if the Employment Practices Violation relates to an Employee(s), or applicant for employment with the Company or an Outside Entity, whether direct, indirect, intentional or unintentional.

With respect to any customer or client of the Company, whether individually or as a class or group, Employment Practices Violation shall mean only any actual or alleged discrimination, sexual harassment or violation of an individual's civil rights relating to such discrimination or sexual harassment, whether direct, indirect, intentional or unintentional.

(I)    "Individual Insured(s)" means:

(1)    any past, present or future duly elected or appointed directors, officers, management committee members or members of the Board of Managers of the Company, but only in their capacities as such. Coverage will automatically apply to all new directors, officers, management committee members or members of the Board of Managers of the Company after the inception date of this policy;

(2)    any past, present or future duly elected or appointed directors, officers, management committee members or members of the Board of Managers of the Company serving in the capacity as director, officer, trustee or governor of an Outside Entity, but only if such service is at the specific written request or direction of the Company;

(3)    in the event the Company operates outside the United States, then the terms director, officer, management committee member or member of the Board of Managers shall also mean those titles, positions or capacities in such foreign Company which are equivalent to such positions in an organization incorporated or formed within the United States; and

(4)    any Employee(s) of the Company.

(j)    "Insured(s)" means:

    (1)    an individual insured; and

    (2)    the Company.

(k)    "Loss" means damages (including back pay and front pay), judgments, settlements, pre- and post-judgment interest, and Defense Costs; however, Loss shall not include: (1) civil or criminal fines or penalties imposed by law; (2) taxes; (3) any amount for which the insureds are not financially liable or which are without legal recourse to the insureds; (4) employment-related benefits, stock options, perquisites, deferred compensation or any other type of compensation other than salary, wages or bonus compensation; (5) any liability or costs incurred by any insured to modify any building or property in order to make said building or property more accessible or accommodating to any disabled person, or any liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seminar relating to an Employment Practices Claim; or (6) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

If an additional premium is stated in Item 7 of the Declarations page, then Loss shall specifically include, (subject to the policy's other terms, conditions and exclusions, including but not limited to exclusions relating to personal profit or advantage, deliberate fraud, criminal acts or willful violation of any statute, rule or regulation) punitive, exemplary and multiple damages (including the multiple or liquidated damages awards under the Age Discrimination in Employment Act and the Equal Pay Act). It is further understood and agreed that the enforceability of the foregoing coverage shall be governed by such applicable law which most favors coverage for punitive, exemplary and multiple damages. If an additional premium is not stated in Item 7 of the Declarations then Loss shall not include punitive, exemplary damages or the multiplied portion of multiple damages.

(l)    "Named Entity" means the organization stated in Item 1 of the Declarations whether a corporation, association, limited liability company or other type of business organization.

(m)    "No Liability" means: (1) a final judgment of no liability obtained prior to trial, in favor of all insureds, by reason of a motion to dismiss or a motion for summary judgment, after the exhaustion of all appeals; or (2) a final judgment of no liability obtained after trial, in favor of all insureds, after the exhaustion of all appeals. In no event shall the term "No Liability" apply to a Claim made against an insured for which a settlement has occurred.

(n)    "Outside Entity" means:

    (1)    a not-for-profit organization under section 501(c)(3) of the Internal Revenue Code of 1986 (as amended); or

    (2)    any other corporation, partnership, joint venture or other organization listed by endorsement to this policy.

(o)    "Policy Period" means the period of time from the inception date shown in Item 3 of the Declarations to the earlier of the expiration date shown in Item 3 of the Declarations or the effective date of cancellation of this policy.

(p)    "Related Wrongful Acts" shall mean Wrongful Acts which are the same, related or continuous, or Wrongful Acts which arise from a common nucleus of facts. Claims can allege Related Wrongful Acts regardless of whether such Claims involve the same or different claimants, insureds or legal causes of action.

(q)    "Retaliation" means a Wrongful Act of an insured relating to or alleged to be in response to any of the following activities: (1) the disclosure or threat of disclosure by an Employee to a superior or to any governmental agency of any act by an insured which act is alleged to be a violation of any federal, state, local or foreign

law, common or statutory, or any rule or regulation promulgated thereunder; (2) the actual or attempted exercise by an Employee of any right that such Employee has under law, including rights under worker's compensation laws, the Family and Medical Leave Act, the Americans with Disabilities Act or any other law relating to employee rights; (3) the filing of any claim under the Federal False Claims Act or any other federal, state, local or foreign "whistle-blower" law; or (4) Employee strikes.

(r)   "Securities Claim" means a Claim (including a civil lawsuit or criminal proceeding brought by the Securities & Exchange Commission) made against an Insured anywhere in the world alleging a violation of any law, regulation or rule, whether statutory or common law, which is:

    (1)   brought by any person or entity alleging, arising out of, based upon or attributable to, in part or in whole, the purchase or sale, or offer or solicitation of an offer to purchase or sell, any securities of the Company, or

    (2)   brought by a securities holder of the Company, whether directly, by class action, or derivatively on the behalf of the Company, or otherwise, alleging any Wrongful Act of an Insured.

(s)   "Subsidiary" means:

    (1)   any for-profit organization which, on or before the inception of the Policy Period, is more than 50% owned by the Named Entity, either directly, or indirectly through one or more of its Subsidiaries;

    (2)   automatically any for-profit organization whose securities are not publicly traded and whose assets total less than 25% of the total consolidated assets of the Company as of the inception date of this policy which becomes a Subsidiary during the Policy Period. The Named Entity shall provide the Insurer with full particulars of the new Subsidiary before the end of the Policy Period; or

    (3)   an organization which becomes a Subsidiary during the Policy Period (other than a for-profit organization described in paragraph (2) above), but only upon the condition that within 90 days of its becoming a Subsidiary, the Named Entity shall have provided the Insurer with full particulars of the new Subsidiary and agreed to any additional premium or amendment of the provisions of this policy required by the Insurer relating to such new Subsidiary. Further, coverage as shall be afforded to the new Subsidiary is conditioned upon the Named Entity paying when due any additional premium required by the Insurer relating to such new Subsidiary.

An organization becomes a Subsidiary when the Named Entity owns more than a 50% ownership interest in such Subsidiary, either directly, or indirectly through one or more of its Subsidiaries. An organization ceases to be a Subsidiary when the Named Entity ceases to own more than a 50% ownership in such Subsidiary, either directly, or indirectly through one or more of its Subsidiaries.

In all events, coverage as is afforded under this policy with respect to a Claim made against individual Insureds or a Claim made against any Subsidiary, shall only apply to Claims for Wrongful Acts committed or allegedly committed after the effective time that such Subsidiary became a Subsidiary and prior to the time that such Subsidiary ceased to be a Subsidiary.

(t)  "Wrongful Act" means:

(1)  with respect to Individual   Insureds, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by such Insureds in their respective capacities as such, or any matter claimed against such Insured solely by reason of their status as directors,  officers or Employees  of the Company;

(2)  with respect to the Company, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Company;

(3)  with respect to service on an Outside Entity, any matter claimed against an Individual Insured as defined in definition (i)(2) arising out of his or her serving as a director, officer, trustee or governor of an Outside Entity in such capacity, but only if such service is at the specific written request or direction of the Company.

With respect to an Employment Practices Claim, the term "Wrongful Act" shall include any Employment Practices Violation.

## 3.  EXTENSIONS

Subject otherwise to the terms hereof, this policy shall cover Loss arising from any Claims made against the estates, heirs, or legal representatives  of deceased  Individual Insureds, and the   legal representatives   of Individual   Insureds in the event of incompetency, insolvency or bankruptcy, who were Individual Insureds at the time the Wrongful Act upon which such Claims are based were committed.

Subject otherwise to the terms hereof, this policy shall cover Loss arising from all Claims made against the lawful spouse (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world) of an Individual Insured for all Claims arising solely out of his or her status as the spouse of an Individual Insured, including   a Claim that seeks damages recoverable from marital community property, property jointly held by the Individual Insured and the spouse, or property transferred from the Individual Insured to the spouse; provided, however, that this extension shall not afford coverage for any Claim for any actual or alleged Wrongful Act of the spouse, but shall apply only to Claims arising out of any actual or alleged Wrongful Acts of an Individual Insured, subject to the policy's terms, conditions and exclusions.

## 4.  EXCLUSIONS

The Insurer shall not be liable to make any payment for Loss in connection with a Claim made against an Insured:

(a)  arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which an Insured was not legally entitled;

(b)  arising out of, based upon or attributable to: (1) profits in fact made from the purchase or sale by an Insured of securities of the Company within the meaning of Section 16(b) of the Securities Exchange  Act of 1934 and amendments  thereto or similar provisions of any state statutory law; or (2) payments to an Insured of any remuneration  without the previous  approval of the stockholders  of the Company, which payment  without such previous approval shall be held to have been illegal;

(c)  arising out of, based upon or attributable to the committing in fact of any criminal, fraudulent or dishonest act, or any willful violation of any statute, rule or law;

[The Wrongful Act of an Insured shall not be imputed to any other Insured for the purpose of determining the applicability of the foregoing exclusions 4(a) through 4(c).]

(d)  alleging, arising out of, based upon or attributable to the facts alleged, or to the same or Related Wrongful Act alleged or contained in any claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(e)  alleging, arising out of, based upon or attributable to as of the Continuity Date, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation of which an Insured had notice, or alleging any Wrongful Act which is the same or Related Wrongful Act to that alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

(f)  alleging, arising out of, based upon or attributable to any actual or alleged act or omission of an Insured serving in any capacity, other than a director, officer, management committee member, member of the Board of Managers or Employee of the Company, or as a director, officer, trustee or governor of an Outside Entity;

(g)  for any Wrongful Act arising out of an Individual Insured serving in a capacity as a director, officer, trustee or governor of an Outside Entity if such Claim is brought by the Outside Entity or a director, officer, trustee or governor thereof;

(h)  alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or any other Insured under any express contract or agreement; provided, however, that with respect to Employment Practice Claims, this exclusion shall not apply to the extent any liability does not arise under such express employment contract or agreement;

(i)  which is brought by any Insured or by the Company; or which is brought by any security holder of the Company, whether directly or derivatively, unless such security holder's Claim is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any Insured; provided, however, this exclusion shall not apply to:

   (1)  any Claim brought by an Individual Insured where such Claim is in the form of a cross-claim or third-party claim for contribution or indemnity which is part of and results directly from a Claim which is not otherwise excluded by the terms of this policy; or

   (2)  an Employment Practices Claim brought by an Employee of the Company other than an Employee who is or was a director, member of the Board of Managers or management committee member of the Named Entity;

(j)  alleging, arising out of, based upon or attributable to any public offering of securities by the Company, an Outside Entity or an Affiliate or alleging a purchase or sale of such securities subsequent to such public offering;

   provided, however, that this exclusion will not apply to:

   (1)  any purchase or sale of securities exempted pursuant to section 3(b) of the Securities Act of 1933. Coverage for such purchase or sale transaction shall not be conditioned upon payment of any additional premium; however, the Named Entity shall give the Insurer written notice of any public offering exempted pursuant to section 3(b), together with full particulars and as soon as practicable, but not later than 30 days after the effective date of the public offering;

   (2)  to any public offering of securities (other than a public offering described in paragraph (1) above), as well as any purchase or sale of such securities subsequent to such public offering, in the event that within 30 days prior to the effective time of such public offering: (i) the Named Entity shall give the

insurer written notice of such public offering together with full particulars and underwriting information required thereto and (ii) the Named Entity accepts such terms, conditions and additional premium required by the Insurer for such coverage. Such coverage is also subject to the Named Entity paying when due any such additional premium. In the event the Company gives written notice with full particulars and underwriting information pursuant to (i) above, then the Insurer must offer a quote for coverage under this paragraph;

(k)  alleging, arising out of, based upon or attributable to the purchase by the Company of securities of a "publicly traded entity" in a transaction which resulted, or would result, in such entity becoming an Affiliate or Subsidiary of the Company; provided, however, this exclusion shall not apply in the event that within 30 days prior to it becoming an Affiliate or Subsidiary, the Named Entity gives written notice of the transaction to the Insurer together with full particulars and underwriting information required and agrees to any additional premium or amendment of the provisions of this policy required by the Insurer relating to the transaction. Further, coverage as shall be afforded to the transaction is conditioned upon the Named Entity paying when due any additional premium required by the Insurer relating to the transaction. An entity is a "publicly traded entity" if any securities of such entity have previously been subject to a public offering;

(l)  alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof; provided, however, that this exclusion shall not apply to Securities Claims;

(m)  for emotional distress, or for injury from libel or slander, or defamation or disparagement, or for injury from a violation of a person's right of privacy; provided, however, this exclusion shall not apply to any Securities Claim or Employment Practices Claim;

(n)  for any actual, alleged or threatened discharge, dispersal, release or escape of pollutants; or for any direction or request to test, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants; provided, however, this exclusion shall not apply to any Claim brought by a securities holder of the Company in its capacity as such or to any Employment Practices Claim;

(o)  for violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar provisions of any federal, state, local or foreign statutory law or common law; provided, however, that this exclusion shall not apply to Loss arising from a Claim for Retaliation;

(p)  alleging, arising out of, based upon or attributable to any obligation pursuant to any worker's compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar law; provided, however, this exclusion shall not apply to Loss arising from a Claim for Retaliation;

(q)  with respect to Coverage B(i) only:

    (1)  for any actual or alleged plagiarism, misappropriation, infringement or violation of copyright, patent, trademark, trade secret or any other intellectual property rights;

    (2)  for any actual or alleged violation of any law, whether statutory, regulatory or common law, respecting any of the following activities: anti-trust, business competition, unfair trade practices or tortious interference in another's business or contractual relationships;

(3)    for the rendering or failure to render any service to a customer or client of the Insured; provided, however, that this exclusion shall not apply to any:

    (i)    Claim solely alleging Employment Practices Violations;

    (ii)   Securities Claim; or

    (iii)  Claim for the rendering or failure to render any professional service to the extent such professional services errors and omissions coverage has been added to this policy by written endorsement attached hereto;

(4)    seeking fines or penalties or non-monetary relief against the Company; provided, however, that this exclusion shall not apply to any Securities Claim or Employment Practices Claim.

5.   LIMIT OF LIABILITY and REINSTATED LIMIT OF LIABILITY (FOR ALL LOSS – INCLUDING DEFENSE COSTS)

**Defense Costs are not payable by the Insurer in addition to the limit of liability. Defense Costs are part of Loss and as such are subject to the applicable Limit of Liability for Loss.**

A.   **General Terms**

The Limit of Liability stated in Item 4 of the Declarations is the limit of the Insurer's liability for all Loss, under Coverage A and Coverage B combined, arising out of all Claims first made against the Insureds during the Policy Period and the Discovery Period (if applicable); however, the Limit of Liability for the Discovery Period shall be part of, and not in addition to, the Limit of Liability for the Policy Period, or the Reinstated Limit as described below (if elected). Further, a Claim which is made subsequent to the Policy Period or Discovery Period (if applicable) which pursuant to Clause 7(b) or 7(c) is considered made during the Policy Period or Discovery Period shall also be subject to the one applicable aggregate Limit of Liability stated in Item 4 of the Declarations, or subject to the one aggregate Reinstated Limit if such Reinstated Limit is applicable to such Claim.

B.   **Reinstated Limit of Liability**

In the event of a Claim under this policy, the Named Entity shall have the right to purchase a Reinstated Limit equal to the Limit of Liability stated in Item 4 of the Declarations. The Reinstated Limit shall be subject to the following conditions:

1.    The right to elect the Reinstated Limit commences on the date a Claim is reported to the Insurer and expires on the last day of the Policy Period; provided, that in all events, only one reinstatement is permitted under this policy. The effective date of the reinstatement shall be the date on which the Insurer acknowledges receipt of the written notice of the Insured's election to exercise the reinstatement.

2.    If the Policy Period of this policy is more than one year, then the additional premium to elect the Reinstated Limit at any time after one year from the inception date of this policy shall be fixed at 150% of the premium set forth in Item 7 of the Declarations. Regardless of the length of the Policy Period of this policy, the additional premium to elect the Reinstated Limit within one year from the inception date of this policy shall be an amount determined by the Insurer at the time of the election of the Reinstated Limit unless otherwise indicated by written endorsement to this policy.

3.    The Reinstated Limit shall only apply to Claims made against an Insured after the effective date of the reinstatement and prior to the end of the Policy

Period or the Discovery Period, if applicable, ("Reinstatement Claims"); provided, however, that the Reinstatement Limit shall not apply to Claims which allege a Related Wrongful Act to Claim(s) reported to the Insurer prior to the effective date of the reinstatement.

4.  The Reinstated Limit shall be the maximum liability of the Insurer for all Reinstatement Claims. The Limit of Liability described in Clause 5A as applicable to Claims made against the Insureds prior to the effective date of the reinstatement shall not apply to any Reinstatement Claim.

5.  Upon exercise of the Reinstated Limit, the entire premium set forth in Item 7 of the Declarations shall be deemed fully earned; the Insureds shall not be entitled to any return premium as a result of the exercise of the Reinstated Limit nor shall any of the premium paid for the policy be credited toward the additional premium required to exercise the Reinstated Limit.

6.  In no event shall the right to a reinstatement apply if prior to the effective date of the reinstatement, this policy has been cancelled, is otherwise not in effect, or the Discovery Period has been elected.

7.  Other than as stated above, coverage for Reinstatement Claims shall be subject to the same terms, conditions and exclusions of the policy applicable to other Claims under this policy. The Insurer cannot otherwise modify any terms, conditions or exclusions of this policy as a condition of providing the reinstatement.

## 6. RETENTION CLAUSE

The Insurer shall only be liable for the amount of Loss arising from a Claim which is in excess of the Retention amount stated in Item 5 of the Declarations, such Retention amount to be borne by the Company or the Insureds and shall remain uninsured, with regard to all Loss under: (1) Coverage A or B(ii) for which the Company has indemnified or is permitted or required to indemnify the Individual Insured(s) ("Indemnifiable Loss"), or (2) Coverage B(i). A single Retention amount shall apply to Loss arising from all Claims alleging the same Wrongful Act or Related Wrongful Act.

Subject to the above paragraph, the Retention amounts stated in Item 5 of the Declarations shall apply. In the event a Claim triggers more than one amount stated in Item 5 of the Declarations, only the highest such amount shall apply, which amount shall apply to all Loss under such Claim.

The Retention amount shall be reduced in the event that an Insured consents to the first "Settlement Opportunity", as defined in Clause 8, by the percentage described in Clause 8, subject to the conditions described in Clause 8.

No Retention shall apply to a Claim which is in the form of a civil action for monetary relief and the Insurer shall thereupon reimburse the Defense Costs paid by the Insured, in the event of:

(1)  a determination of No Liability of all Insureds; or

(2)  a dismissal or a stipulation to dismiss the civil litigation Claim without prejudice and without the payment of any consideration by any Insured;

provided, however, that in the case of (2) above, such reimbursement shall occur ninety (90) days after the date of dismissal or stipulation as long as the Claim is not re-brought (or any other Claim which is subject to the same single retention by virtue of Clause 6 is not brought) within that time, and further subject to an undertaking by the Company in a form acceptable to the Insurer that such reimbursement shall be paid back by the Company to the Insurer in the event the Claim (or any other Claim which is subject to the same single retention by virtue of Clause 6) is brought after such 90 day period and before the expiration of the statute of limitations for such Claim.

### 7. NOTICE/CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to the Insurer named in Item 8 of the Declarations at the address indicated in Item 8 of the Declarations.

If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice. A Claim shall be considered to have been first made against an Insured when written notice of such Claim is received by any Insured, by the Company on the behalf of any Insured or by the Insurer, whichever comes first.

(a)  The Company or the Insureds shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer of any Claim made against an Insured as soon as practicable and either:

   (1)  anytime during the Policy Period or during the Discovery Period (if applicable); or

   (2)  within 30 days after the end of the Policy Period or the Discovery Period (if applicable), as long as such Claim is reported no later than 30 days after the date such Claim was first made against an Insured.

(b)  If written notice of a Claim has been given to the Insurer pursuant to Clause 7(a) above, then any Claim which is subsequently made against the Insureds and reported to the Insurer alleging a Related Wrongful Act to the Claim for which such notice has been given shall be considered made at the time such notice was given.

(c)  If during the Policy Period or during the Discovery Period (if applicable) the Company or the Insureds shall become aware of any circumstances which may reasonably be expected to give rise to a Claim being made against the Insureds and shall give written notice to the Insurer of the circumstances and the reasons for anticipating such a Claim, with full particulars as to dates, persons and entities involved, then any Claim which is subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Related Wrongful Act to such circumstances, shall be considered made at the time such notice of such circumstances was given.

### 8. DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)

The Insurer does not assume any duty to defend. The Insureds shall defend and contest any Claim made against them.

Notwithstanding the foregoing, the Insureds shall have the right to tender the defense of the Claim to the Insurer, which right shall be exercised in writing by the Named Entity on behalf of all Insureds to the Insurer pursuant to the notice provisions of Clause 7 of this policy. This right shall terminate if not exercised within 30 days of the date the Claim is first made against an Insured, pursuant to Clause 7 of the policy. Further, from the date the Claim is first made against the Insureds to the date when the Insurer accepts the tender of the defense of such Claim, the Insureds shall take no action, or fail to take any required action, that prejudices the rights of the Insureds or the Insurer with respect to such Claim. Provided that the Insureds have complied with the foregoing, the Insurer shall be obligated to assume the defense of the Claim, even if such Claim is groundless, false or fraudulent. The assumption of the defense of the Claim shall be effective upon written confirmation sent thereof by the Insurer to the Named Entity. Once the defense has been so tendered, the Insured shall have the right to effectively associate with the Insurer in the defense and the negotiation of any settlement of any Claim, subject to the provisions of this Clause 8. However, the Insurer shall not be obligated to defend such Claim after the

Limit of Liability has been exhausted, or after an Insured's rejection of a Settlement Opportunity as defined in this Clause 8.

When the Insurer has not assumed the defense of a Claim pursuant to this Clause 8, the Insurer shall advance nevertheless, at the written request of the Insured, Defense Costs prior to the final disposition of a Claim. Such advanced payments by the Insurer shall be repaid to the Insurer by the Insureds or the Company, severally according to their respective interests, in the event and to the extent that the Insureds or the Company shall not be entitled under the terms and conditions of this policy to payment of such Loss.

**The Insureds shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the prior written consent of the Insurer. Only those settlements, stipulated judgments and Defense Costs which have been consented to by the Insurer shall be recoverable as Loss under the terms of this policy. The Insurer's consent shall not be unreasonably withheld, provided that the Insurer, when it has not assumed the defense of a Claim pursuant to this Clause 8, shall be entitled to effectively associate in the defense and the negotiation of any settlement of any Claim, and provided further that in all events the Insurer may withhold consent to any settlement, stipulated judgment or Defense Costs, or any portion thereof, to the extent such Loss is not covered under the terms of this policy.**

The Insurer shall have the right to effectively associate with the Company in the defense of any Claim that appears reasonably likely to involve the Insurer, including but not limited to negotiating a settlement. The Company and the Insureds shall give the Insurer full cooperation and such information as it may reasonably require.

If the Insurer recommends a settlement within the policy's applicable Limit of Liability which is acceptable to the claimant (a "Settlement Opportunity"), and the Insureds consent to such settlement, then the Insured's applicable retention amount shall be retroactively reduced by ten percent (10%) for such Loss. It shall be a condition to such reduction that the Insureds must consent to such settlement within thirty (30) days of the date the Insureds are first made aware of the Settlement Opportunity, or in the case of a Settlement Opportunity which arises from a settlement offer by the claimant, then within the time permitted by the claimant to accept such settlement offer, but in all events no later than thirty (30) days after the settlement offer was made.

However, if a Settlement Opportunity arises and the Insureds do not consent to the settlement within the time prescribed above, the retention amount shall remain the applicable amount set forth in Item 5 of the Declarations even if consent is given to a subsequent Settlement Opportunity.

Furthermore, in the event the Insureds do not consent to the first Settlement Opportunity within the time prescribed, then, subject to the applicable limit of liability, the Insurer's liability for all Loss on account of such Claim shall not exceed: (1) the amount for which the Insurer could have settled such Claim plus Defense Costs incurred as of the date such settlement was proposed in writing by the Insurer, ("Settlement Opportunity Amount") plus (2) 50% of covered Loss in excess of such Settlement Opportunity Amount, it being a condition of this insurance that the remaining 50% of such Loss excess of the Settlement Opportunity Amount shall be carried by the Company and the Insureds at their own risk and be uninsured. Notwithstanding the foregoing, this paragraph shall not apply until the Settlement Opportunity Amount exceeds the Retention amount stated in Item 5 of the Declarations.

9. PRE–AUTHORIZED DEFENSE ATTORNEYS FOR DESIGNATED CLAIMS

This clause applies only to an Employment Practices Claim or a Securities Claim (each of the foregoing hereinafter referred to as a "Designated Claim").

Affixed as Appendix A hereto and made a part of this policy is a list or lists of Panel Counsel law firms ("Panel Counsel Firms") from which a selection of legal counsel shall be made to conduct the defense of any Designated Claim against an Insured pursuant to the terms set forth below.

In the event the Insurer has assumed the defense pursuant to Clause 8 of this policy, then the Insurer shall select a Panel Counsel Firm to defend the Insureds. In the event the Insureds are already defending a Designated Claim, then the Insureds shall select a Panel Counsel Firm to defend the Insureds.

The selection of the Panel Counsel Firm, whether done by the Insurer or the Insureds, shall be from the list of Panel Counsel Firms designated for the type of Claim and be from the jurisdiction in which the Designated Claim is brought. In the event a Designated Claim is brought in a jurisdiction not included on the appropriate list, the selection shall be made from a listed jurisdiction which is the nearest geographic jurisdiction to either where the Designated Claim is maintained or where the corporate headquarters or state of formation of the Named Entity is located. In such instance, however, the Insurer shall, at the written request of the Named Entity, assign a non-Panel Counsel Firm of the Insurer's choice in the jurisdiction in which the Designated Claim is brought to function as "local counsel" on the Designated Claim to assist the Panel Counsel Firm which will function as "lead counsel" in conducting the defense of the Designated Claim.

With the express prior written consent of the Insurer, an Insured may select (in the case of the Insured defending the Claim), or cause the Insurer to select (in the case of the Insurer defending the Claim), a Panel Counsel Firm different from that selected by other Insured defendants if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The list of Panel Counsel Firms may be amended from time to time by the Insurer. However, no change shall be made to the specific list attached to this policy during the Policy Period without the consent of the Named Entity.

**10. DISCOVERY CLAUSE**

Except as indicated below, if the Named Entity shall cancel or the Named Entity or the Insurer shall refuse to renew this policy, the Named Entity shall have the right to a period of either one, two or three years following the effective date of such cancellation or nonrenewal upon payment of the respective "Additional Premium Amount" described below (herein referred to as the "Discovery Period") in which to give to the Insurer written notice of Claims first made against the Insureds during said Discovery Period for any Wrongful Act occurring prior to the end of the Policy Period and otherwise covered by this policy. The rights contained in this paragraph shall terminate, however, unless written notice of such election together with the additional premium due is received by the Insurer within 30 days of the effective date of cancellation or nonrenewal. The Additional Premium for the Discovery Period shall be fully earned at the inception of the Discovery Period. The Discovery Period is not cancelable. This clause and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

The Additional Premium Amount for: (1) one year shall be 75% of the "full annual premium"; (2) two years shall be 150% of the "full annual premium"; (3) three years shall be a reasonable premium amount to be mutually agreed upon by the Insured and the Insurer. As used herein, "full annual premium" means the premium level in effect immediately prior to the end of the Policy Period.

In the event of a Transaction, as defined in Clause 12, the Named Entity shall have the right, within 30 days before the end of the Policy Period, to request an offer from the Insurer of a Discovery Period (with respect to Wrongful Acts occurring prior to the effective time of the Transaction) for a period of no less than three years or for such

longer or shorter period as the Named Entity may request. The Insurer shall offer such Discovery Period pursuant to such terms, conditions and premium as the Insurer may reasonably decide. In the event of a Transaction, the right to a Discovery Period shall not otherwise exist except as indicated in this paragraph.

## 11. CANCELLATION CLAUSE

This policy may be canceled by the Named Entity at any time only by mailing written prior notice to the Insurer or by surrender of this policy to the Insurer or its authorized agent.

This policy may be canceled by or on the behalf of the Insurer only in the event of nonpayment of premium by the Named Entity. In the event of non-payment of premium by the Named Entity, the Insurer may cancel this policy by delivering to the Named Entity or by mailing to the Named Entity, by registered, certified, or other first class mail, at the Named Entity's address as shown in Item 1 of the Declarations, written notice stating when, not less than 30 days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The Policy Period terminates at the date and hour specified in such notice, or at the date and time of surrender. The Insurer shall have the right to the premium·amount for the portion of the Policy Period during which the policy was in effect.

If this policy shall be canceled by the Named Entity, the Insurer shall retain the customary short rate proportion of the premium herein.

If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

## 12. CHANGE IN CONTROL OF NAMED ENTITY

If during the Policy Period:

a.  the Named Entity shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

b.  any person or entity or group of persons or entities acting in concert shall acquire an amount of the outstanding securities representing more than 50% of the voting power for the election of directors of the Named Entity, or acquires the voting rights of such an amount of such securities;

(either of the above events herein referred to as the "Transaction"),

then this policy shall continue in full force and effect as to Wrongful Acts occurring prior to the effective time of the Transaction, but there shall be no coverage afforded by any provision of this policy for any actual or alleged Wrongful Act occurring after the effective time of the Transaction. This policy may not be canceled after the effective time of the Transaction and the entire premium for this policy shall be deemed earned as of such time. The Named Entity shall also have the right to an offer by the Insurer of a Discovery Period described in Clause 10 of the policy.

The Named Entity shall give the Insurer written notice of the Transaction as soon as practicable, but not later than 30 days after the effective date of the Transaction.

## 13. SUBROGATION

In the event of any payment under this policy, the Insurer shall be subrogated to the extent of such payment to all the Company's and the Insureds' rights of recovery thereof, and the Company and the Insureds shall execute all papers required and shall do every-thing that may be necessary to secure such rights, including the execution of such documents necessary to enable the Insurer to effectively bring suit in the name of the

Company or the Insureds.  In no event, however, shall the Insurer exercise its rights of subrogation against an Insured under this policy unless such Insured has been convicted of a criminal act, or been determined to have committed a dishonest, fraudulent act or willful violation of any statute, rule or law, or obtained any profit or advantage to which such Insured was not legally entitled.

## 14.  OTHER INSURANCE  AND INDEMNIFICATION

Such Insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance.  This policy specifically shall be excess of any other policy pursuant to which any other Insurer has a duty to defend a Claim for which this policy may be obligated to pay Loss.

In the event of a Claim against an Insured arising out of his or her service as a director, officer, trustee or governor of an Outside Entity or an Employment Practices Claim against a leased Employee as described in definition (f) of Clause 2, coverage as is afforded by this policy shall be specifically excess of indemnification provided by such Outside Entity or such leasing company and any insurance provided to such Outside Entity or such leasing company.

Further, in the event other insurance is provided to the Outside Entity or leasing company referenced in the above paragraph, or is provided under any pension trust or employee benefit plan fiduciary liability insurance policy, and such other insurance is provided by the Insurer or any member company of American International Group, Inc. (AIG) (or would be provided but for the application of the retention amount, exhaustion of the limit of liability or failure to submit a notice of a Claim) then the Insurer's maximum aggregate Limit of Liability for all Losses combined in connection with a Claim covered, in part or in whole, by this policy and such other insurance policy issued by AIG shall not exceed the greater of the Limit of Liability of this policy or the limit of liability of such other AIG insurance policy.

## 15.  NOTICE AND AUTHORITY

It is agreed that the Named Entity shall act on behalf of the Subsidiaries and all Insureds with respect to the giving of notice of a Claim, the giving and receiving of notice of cancellation, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy, the exercising or declining of the right to tender the defense of a Claim to the Insurer and the exercising or declining of any right to a Discovery Period or Reinstated Limit.

## 16.  ASSIGNMENT

This policy and any and all rights hereunder are not assignable without the written consent of the Insurer.

## 17.  DISPUTE RESOLUTION  PROCESS

The Insured shall have the option, in its sole discretion, to submit all disputes or differences which may arise under or in connection with this policy, whether arising before or after termination  of this policy, including any determination of the amount of Loss, to the alternative dispute resolution process ("ADR") set forth in this clause.

The Insureds may elect the type of ADR discussed below. The Insurer agrees to submit to the ADR process chosen by the Insured.  Once elected, the ADR cannot be terminated prior to a determination without the consent of the Insured and the Insurer.

There shall be two choices of ADR: (1) non-binding mediation administered by the American Arbitration Association, in which the Insurer and Insureds shall try in good faith to settle the dispute by mediation under or in accordance with its then-prevailing Commercial Mediation Rules; or (2) arbitration submitted to the American Arbitration Association under or in accordance with its then-prevailing Commercial Arbitration Rules, in which the arbitration panel shall be composed of three disinterested individuals. In either mediation or arbitration, the mediator(s) or arbitrators shall have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute. The mediator(s) or arbitrators shall also give due consideration to the general principles of the law of the state where the Named Entity is incorporated or formed in the construction or interpretation of the provisions of this policy; provided, however, that the terms, conditions, provisions and exclusions of this policy are to be construed in an even-handed fashion in the manner most consistent with the relevant terms, conditions, provisions or exclusions of the policy. In the event of arbitration, the decision of the arbitrators shall be final and binding and provided to both parties, and the arbitrators' award shall not include attorneys fees or other costs. In the event of mediation, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until the mediation shall have been terminated and at least 120 days shall have elapsed from the date of the termination of the mediation. In all events, each party shall share equally the expenses of the ADR.

Either choice of ADR may be commenced in New York, New York; Atlanta, Georgia; Chicago, Illinois; Denver, Colorado; or in the state indicated in Item 1 of the Declarations page as the mailing address for the Named Entity. The Named Entity shall act on behalf of all Insureds in deciding to proceed with ADR under this clause.

## 18. ACTION AGAINST INSURER

Except as provided in Clause 17 of the policy, no action shall lie against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the Insureds' obligation to pay shall have been finally determined either by judgment against the Insureds after actual trial or by written agreement of the Insureds, the claimant and the Insurer.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the Insurer as a party to any action against the Insureds or the Company to determine the Insureds' liability, nor shall the Insurer be impleaded by the Insureds or the Company or their legal representatives. Bankruptcy or insolvency of the Company or the Insureds or of their estates shall not relieve the Insurer of any of its obligations hereunder.

## 19. REPRESENTATIONS AND SEVERABILITY

In granting coverage under this Policy, it is agreed that the Insurer has relied upon the statements and representations contained in the application for this policy (including materials submitted thereto and, if this is a renewal application, all such previous policy applications for which this policy is a renewal) as being accurate and complete. All such statements and representations shall be deemed to be material to the risk assumed by the Insurer, are the basis of this policy and are to be considered as incorporated into this policy.

With respect to such statements and representations, no knowledge or information possessed by any individual Insured, except for those person or persons who executed the application, shall be imputed to any other individual Insured. If any person who executed the application knew that such statement or representation was inaccurate or incomplete,

then this policy will be void as to all insureds other than individual insureds who are "non-employee Directors" of the Company and who did not personally know the statement or representation to be inaccurate or incomplete. (The term "non-employee Director" shall have the meaning described in Securities & Exchange Commission rules or regulations promulgated pursuant to Section 16 of the Securities Exchange Act of 1934).

## 20. WORLDWIDE TERRITORY

This policy shall apply to Claims made against an insured anywhere in the world.

## 21. HEADINGS

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

APPENDIX A
SECURITIES CLAIMS PANEL COUNSEL LIST

**ALASKA**

DAVIS WRIGHT TREMAINE
701 W. Eighth Avenue, Suite 800,
Anchorage, AK 99501-3468
Tel: (907) 257-5300
Contact: David W. Oesting

FOSTER PEPPER & SHEFELMAN
1007 W. Third Ave., Ste. 100,
Anchorage, AK 99501
Tel: (907) 222-7100
Contact: Tim J. Filer / Roger D. Mellem

**CALIFORNIA**

BINGHAM MCCUTCHEN, LLP
1900 University Avenue,
East Palo Alto, CA 94303-1212
Tel: (650) 849-4914
Contact: Stephen D. Hibbard / Mary T. Huser

BINGHAM MCCUTCHEN LLP
3 Embarcadero Center, San
Francisco, CA 94111 Tel: (415)
393-2626 Contact: David H.
Balabanian / Stephen D.
Hibbard

BINGHAM MCCUTCHEN LLP
355 South Grand Avenue, Suite 4400,
Los Angeles, CA 90071-1560
Tel: (213) 680-6416
Contact: John C. Morrissey

BINGHAM MCCUTCHEN LLP
3 Embarcadero Center,
San Francisco, CA 94111
Tel: (415) 393-2170
Contact: David M. Balabanian

CLIFFORD CHANCE US LLP
One Market Steuart Tower, Suite 400,
San Francisco, CA 94105
Tel: (415) 778-4700
Contact: Tower C. Snow / Michael D. Torpey

CLIFFORD CHANCE US LLP
601 South Figueroa Street,
Los Angeles, CA 90017
Tel: (213) 312-9400
Contact: Daniel J. Tyukody

COOLEY GODWARD, LLP
One Maritime Plaza, 20th Floor,
San Francisco, CA 94111
Tel: (415) 693-2073
Contact: Paul A. Renne

COOLEY GODWARD, LLP
One Maritime Plaza, 20th Floor,
San Francisco, CA 94111
Tel: (415) 693-2092
Contact: Benjamin K. Riley

COOLEY GODWARD, LLP
4401 Eastgate Mall,
San Diego, CA 92121-1909
Tel: (858) 550-6050
Contact: William E. Grauer

COOLEY GODWARD, LLP
Five Palo Alto Square,
3000 El Camino Real,
Palo Alto, CA 94306
Tel: (650) 843-5182
Contact: Stephen C. Neal

COOLEY GODWARD, LLP
Five Palo Alto Square,
3000 El Camino Real,
Palo Alto, CA 94306
Tel: (650) 843-5037
Contact: William S. Freeman

DAVIS WRIGHT TREMAINE
One Embarcadero Center, Suite 600,
San Francisco, CA 94111-3834
Tel: (415) 276-6500
Contact: Martin Fineman

GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Avenue,
Los Angeles, CA 90071-3197
Tel: (213) 229-7543
Contact: Phillip L. Bosl

GIBSON, DUNN & CRUTCHER LLP
1530 Page Mill Road,
Palo Alto, CA 94304
Tel: (650) 849-5300
Contact: John C. Dickey

GIBSON, DUNN & CRUTCHER LLP
Jamboree Center, 4 Park Plaza,
Irvine, CA 92614-8557
Tel: (949) 451-3800
Contact: Wayne W. Smith / Meryl L. Young

APPENDIX A
SECURITIES CLAIMS PANEL COUNSEL LIST

GRAY CARY
4365 Executive Drive,
San Diego, CA 92121-2133
Tel: (858) 677-1400
Contact: Shirli Fabbri Weiss /
Robert W. Brownlie

GRAY CARY
2000 University Avenue
East Palo Alto, CA 94303
Tel: (650) 833-2000
Contact: Shirli Fabbri Weiss /
David Priebe

IRELL & MANELLA LLP
1800 Ave. of the Stars, Suite 900,
Los Angeles, CA 90067
Tel: (310) 277-1010
Contact: David Schwarz / David Gindler /
David Siegel / Jim Adler / Richard H. Borow

MORGAN, LEWIS & BOCKIUS LLP
One Market Spear Street Tower
San Francisco, CA 94105
Tel: (415) 442-1000
Contact: Alfred J. Lechner Jr.

300 South Grand Avenue
22nd Floor
Los Angeles, CA 90071-3132
Tel: (213) 612-2500
Contact: Alfred J. Lechner Jr.

MORRISON & FOERSTER LLP
425 Market Street,
San Francisco, CA 94105
Tel: (415) 268-7000
Contact: Melvin R. Goldman / Paul T. Friedman

MORRISON & FOERSTER LLP
555 West 5th Street, Suite 3500,
Los Angeles, CA 90013
Tel: (213) 892-5200
Contact: B. Scott Silverman / Robert S. Stern

MUNGER, TOLLES & OLSON
355 South Grand Avenue, 35th Floor,
Los Angeles, CA 90071-1560
Tel: (213) 683-9264
Contact: Dennis L. Kinnaird

MUNGER, TOLLES & OLSON
355 South Grand Avenue, 35th Floor,
Los Angeles, CA 90071-1560
Tel: (213) 683-9152
Contact: John W. Spiegel

MUNGER, TOLLES & OLSON
355 South Grand Avenue, 35th Floor,
Los Angeles, CA 90071-1560
Tel: (213) 683-9153
Contact: George M. Garvey

O'MELVENY & MYERS LLP
400 South Hope St., 15th Floor,
Los Angeles, CA 90071
Tel: (213) 430-6000
Contact: Robert Vanderet / Seth Aronson

O'MELVENY & MYERS LLP
610 Newport Center, 17th Floor,
Newport Beach, CA 92660
Tel: (949) 760-9600
Contact: Michael G. Yoder / Phillip Kaplan

O'MELVENY & MYERS LLP
275 Battery Street,
San Francisco, CA 94111
Tel: (415) 984-8700
Contact: Daniel Bookin / Michael F. Tubach

ORRICK HERRINGTON & SUTCLIFFE LLP
Old Federal Reserve Bank Building,
400 Sansome Street,
San Francisco, CA 94111
Tel: (415) 392-1122
Contact: William F. Alderman

ORRICK HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road,
Menlo Park, CA 94025
Tel: (650) 614-7400
Contact: W. Reece Bader

PAUL, HASTINGS, JANOFSKY & WALKER LLP
555 S. Flower Street, Twenty-Third Floor,
Los Angeles, CA 90071-2371
Tel: (213) 683-6000
Contact: William F. Sullivan

PILLSBURY WINTHROP LLP
Pacific Bell Building, 101 W. Broadway,
Suite 1800,
San Diego, CA 92101-8219
Tel: (619) 234-5000
Contact: Richard M. Segal

PILLSBURY WINTHROP LLP
2550 Hanover Street,
Palo Alto, CA 94304-1115
Tel: (650) 233-4500
Contact: Walter J. Robinson

Revised (12/03) COPY                    2 of 10

## APPENDIX A
### SECURITIES CLAIMS PANEL COUNSEL LIST

PILLSBURY WINTHROP LLP
725 South Figueroa Street, Suite 2800,
Los Angeles, CA 90017-5443
Tel: (213) 488-7100
Contact: Robert L. Wallan

PILLSBURY WINTHROP LLP
50 Fremont Street,
San Francisco, CA 94105-2228
Tel: (415) 983-1000
Contact: Bruce A. Ericson

SIMPSON THACHER & BARTLETT
3373 Hillview Avenue,
Palo Alto, CA 94304
Tel: (650) 251-5000
Contact: George M. Newcombe /
James G. Kreissman

SIMPSON THACHER & BARTLETT
10 Universal City Plaza, Suite 1850,
Los Angeles, CA 91608
Tel: (818) 755-7000
Contact: Chet Kronenberg /
Seth A. Ribner

SULLIVAN & CROMWELL
1888 Century Park East,
Los Angeles, CA 90067-1725
Tel: (310) 712-6600
Contact: Robert A. Sacks

WILSON, SONSINI, GOODRICH & ROSATI
650 Page Mill Road,
Palo Alto, CA 94304-1050
Tel: (650) 493-9300
Contact: Bruce G. Vanyo / Boris Feldman /
Steven M. Schatz

### COLORADO

COOLEY GODWARD, LLP
380 Interlocken Crescent, Suite 900,
Broomfield, CO 80021-8023
Tel: (720) 566-4000
Contact: James E. Nesland

GIBSON, DUNN & CRUTCHER LLP
1801 California Street, Suite 4100,
Denver, CO 80202
Tel: (303) 298-5700
Contact: George Curtis

### DISTRICT OF COLUMBIA

ARNOLD & PORTER
555 Twelfth Street, NW,
Washington, DC 20004-1202
Tel: (202) 942-5672
Contact: Scott B. Schreiber

CAHILL GORDON & REINDEL
1990 K Street, N.W., Suite 950,
Washington, DC 20006
Tel: (202) 862-8900
Contact: Donald J. Mulvihill

GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.,
Washington, DC 20036-5306
Tel: (202) 955-8500
Contact: F. Joseph Warin / John C. Millian

GREENBERG TRAURIG
800 Connecticut Avenue, N.W., Suite 500,
Washington, DC 20036
Tel: (202) 331-3100
Contact: Joe R. Reeder

PATTON BOGGS LLP
2550 M Street, N.W.,
Washington, DC 20037
Tel: (202) 457-6000
Contact: Eric A. Kuwana /
Ronald S. Liebman

PIPER RUDNICK LLP
1200 Nineteenth Street, NW,
Washington, DC 20036
Tel: (202) 861-3900
Contact: David Clarke, Jr. / Robert J. Mathias /
James D. Mathias

SULLIVAN & CROMWELL
1701 Pennsylvania Avenue, N.W.,
Washington, DC 20006-5805
Tel: (202) 956-7500
Contact: Daryl A. Libow / Margaret K. Pfeiffer

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW,
Washington, DC 20005
Tel: (202) 434-5000
Contact: John K. Villa

WILLKIE FARR & GALLAGHER
1875 K Street, N.W.,
Washington, DC 20006-1238
Tel: (202) 303-1105
Contact: Kevin B. Clark

APPENDIX A
SECURITIES CLAIMS PANEL COUNSEL LIST

WILMER, CUTLER & PICKERING
2445 M Street, N.W.,
Washington, DC 20037
Tel: (202) 663-6000
Contact: Charles A. Davidow / David P. Donovan

DELAWARE

BLANK ROME LLP
1201 Market Street, 21st Floor,
Wilmington, DE 19801
Tel: (302) 425-6400
Contact: Thomas P. Preston /
Neal C. Belgam

WOLF, BLOCK, SCHORR AND SOLISCOHEN LLP
Wilmington Trust Center,
1100 N. Market Street, Suite 1001,
Wilmington, DE 19801
Tel: (302) 777-5860
Contact: Barry Klayman

FLORIDA

AKERMAN SENTERFITT & EIDSON, P.A.
Citrus Center, 17th Floor,
255 South Orange Avenue,
Orlando, FL 32801
Tel: (407) 843-7860
Contact: J. Thomas Cardwell

AKERMAN SENTERFITT & EIDSON, P.A.
SunTrust International Center, 28th Floor,
Miami, FL 33131
Tel: (305) 374-5600
Contact: Stanley H. Wakshlag

CARLTON FIELDS
4000 International Place,
100 S.E. Second Street,
Miami, FL 33131-9101
Tel: (303) 530-0050
Contact: Steven J. Brodie

CARLTON FIELDS
One Harbour Place,
Tampa, FL 33602-5790
Tel: (813) 223-7000
Contact: Gary L. Sasso

GREENBERG TRAURIG
1221 Brickell Avenue,
Miami, FL 33131
Tel: (305) 579-0500
Contact: Hilarie Bass

GREENBERG TRAURIG
777 South Flagler Drive,
West Palm Beach, FL 33401
Tel: (561) 650-7900
Contact: Bradford D. Kaufman

HOLLAND & KNIGHT LLP
315 South Calhoun Street, Suite 600,
P.O. Drawer 810 (Zip 32302),
Tallahassee, FL 32301
Tel: (850) 224-7000
Contact: Robert R. Feagin / Elizabeth
Bevington

HOLLAND & KNIGHT LLP
625 North Flagler Drive, Suite 700,
West Palm Beach, FL 33401
Tel: (561) 833-2000
Contact: Tracy A. Nichols /
Scott Newman

HOLLAND & KNIGHT LLP
200 South Orange Avenue, Suite 2600,
P.O. Box 1525 (Zip 32802),
Orlando, FL 32801
Tel: (407) 244-1115
Contact: William Wilson

HOLLAND & KNIGHT LLP
701 Brickell Avenue – Suite 3000,
P.O. Box 015441 (Zip 33101),
Miami, FL 33131
Tel: (305) 374-8500
Contact: Gregory A. Baldwin / Tracy A. Nichols /
Mitchell Eliot Herr / Louisa Brais

HOLLAND & KNIGHT LLP
400 North Ashley Drive, Suite 2300,
Tampa, FL 33602
Tel: (813) 227-8500
Contact: Tracy A. Nichols / Michael L.
Chapman

HOLLAND & KNIGHT LLP
50 North Laura Street, Suite 3900,
P.O. Box 52687 (Zip 32201),
Jacksonville, FL 32202
Tel: (904) 353-2000
Contact: Tracy A. Nichols / George E. Schulz Jr

MCGUIREWOODS LLP
Bank of America Tower,
50 North Laura Street,
Jacksonville, FL 32202
Tel: (904) 798-3200
Contact: David M. Wells

APPENDIX A
SECURITIES CLAIMS PANEL COUNSEL LIST

STEEL HECTOR & DAVIS LLP
200 South Biscayne Boulevard,
Miami, FL 33131-2398
Tel: (305) 577-2957
Contact: Lewis F. Murphy, P.A. / Wendy Leavitt

STROOCK & STROOCK & LAVAN LLP
200 South Biscayne Boulevard,
Miami, FL 33131-2385
Tel: (305) 358-9900
Contact: Richard B. Simring

WHITE & CASE LLP
Wachovia Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131-2352
Tel: (305) 371-2700
Contact: Charles C. Kline

GEORGIA

ALSTON & BIRD
One Atlantic Center,
1201 W. Peachtree Street,
Atlanta, GA 30309-3424
Tel: (404) 881-7167
Contact: Peter Q. Bassett

ALSTON & BIRD
One Atlantic Center,
1201 W. Peachtree St.,
Atlanta, GA 30309
Tel: (404) 881-7000
Contact: John Goselin / Mary Gill / Todd R.
David

KING & SPALDING
191 Peachtree Street,
Atlanta, GA 30303-1763
Tel: (404) 572-4600
Contact: M. Robert Thornton / Michael R. Smith

MCKENNA LONG & ALDRIDGE LLP
303 Peachtree Street, NE, Suite 5300,
Atlanta, GA 30308
Tel: (404) 527-4000
Contact: J. David Dantzler, Jr. / David L. Balser

PAUL, HASTINGS, JANOFSKY & WALKER LLP
600 Peachtree Street, N.W., Suite 2400,
Atlanta, GA 30308-2222
Tel: (404) 815-2500
Contact: J. Allen Maines

SMITH, GAMBRELL & RUSSELL, LLP
Suite 3100, Promenade II,
1230 Peachtree Rd., N.E.,
Atlanta, GA 30309-3592
Tel: (404) 815-3730
Contact: John G. Despriet

ILLINOIS

KATTEN MUCHIN ZAVIS ROSENMAN
525 W. Monroe Street, Suite 1600,
Chicago, IL 60661-3693
Tel: (312) 902-5452
Contact: David H. Kistenbroker

KATTEN MUCHIN ZAVIS ROSENMAN
525 W. Monroe Street, Suite 1600,
Chicago, IL 60661-3693
Tel: (312) 902-5200
Contact: Pamela G. Smith / Leah J.
Domitrovic / Steven L. Bashwiner / Mary
Ellen Hennessy / Bonita L. Stone

KIRKLAND & ELLIS
200 East Randolph Drive,
Chicago, IL 60601
Tel: (312) 861-2000
Contact: Robert J. Kopecky

PIPER RUDNICK, LLP
203 North LaSalle Street, Suite 1800,
Chicago, IL 60601-1293
Tel: (312) 368-4000
Contact: Samuel B. Isaacson / Michael S.
Poulos

SIDLEY AUSTIN BROWN & WOOD LLP
Bank One Plaza,
10 South Dearborn Street,
Chicago, IL 60603
Tel: (312) 853-7850
Contact: Hillie R. Sheppard

SIDLEY AUSTIN BROWN & WOOD LLP
Bank One Plaza,
10 South Dearborn Street,
Chicago, IL 60603
Tel: (312) 853-7279
Contact: Eugene A. Schoon

SIDLEY AUSTIN BROWN & WOOD LLP
Bank One Plaza,
10 South Dearborn Street,
Chicago, IL 60603
Tel: (312) 853-7734
Contact: Walter C. Carlson

APPENDIX A
SECURITIES CLAIMS PANEL COUNSEL LIST

SONNENSCHEIN NATH & ROSENTHAL
8000 Sears Tower,
Chicago, IL 60606
Tel: (312) 876-8224
Contact: Christopher Q. King

SONNENSCHEIN NATH & ROSENTHAL
8000 Sears Tower,
Chicago, IL 60606
Tel: (312) 876-7483
Contact: David L. Schiavone

## LOUISIANA

LOCKE LIDDELL & SAPP LLP
601 Poydras Street, Suite 2400,
New Orleans, LA 70130-6036
Tel: (504) 558-5100
Contact: Brad Foster / John McElhaney /
W.C. (Peter) Flynn

## MASSACHUSETTS

EDWARDS & ANGELL LLP
101 Federal Street,
Boston, MA 02110-1800
Tel: (617) 951-3373
Contact: John D. Hughes

HALE & DORR LLP
60 State Street,
Boston, MA 02109
Tel: (617) 526-6000
Contact: Jeffrey B. Rudman / William H. Paine /
Andrea J. Robinson

MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
AND POPEO, P.C.
One Financial Center,
Boston, MA 02111
Tel: (617) 542-6000
Contact: Patrick J. Sharkey / Peter M. Saparoff

ROPES & GRAY
One International Place,
Boston, MA 02110-2624
Tel: (617) 951-7566
Contact: John D. Donovan

TESTA, HURWITZ & THIBEAULT, LLP
125 High Street,
Boston, MA 02110
Tel: (617) 248-7363
Contact: Jordan D. Hershman

TESTA, HURWITZ & THIBEAULT, LLP
125 High Street,
Boston, MA 02110
Tel: (617) 248-7253
Contact: Brian E. Pastuszenski

## MINNESOTA

DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500,
Minneapolis, MN 55402
Tel: (612) 340-2600
Contact: Brian E. Palmer / Edward J.
Pluimer / J. Jackson / Peter W. Carter /
Roger J. Magnuson

FAEGRE & BENSON LLP
90 South Seventh Street,
Minneapolis, MN 55402-3901
Tel: (612) 336-3000
Contact: Robert L. Schnell / Thomas L. Kimer

WINTHROP & WEINSTINE, PA
3000 Dain Rauscher Plaza,
60 South Sixth Street,
Minneapolis, MN 55402
Tel: (612) 347-0700
Contact: David P. Pearson / Thomas H. Boyd

## NEW YORK

ARNOLD & PORTER
399 Park Avenue,
New York, NY 10022-4690
Tel: (212) 715-1000
Contact: Kent A. Yalowitz / Scott B. Schreiber

BLANK ROME LLP
The Chrysler Building,
405 Lexington Avenue,
New York, NY 10174
Tel: (212) 885-5000
Contact: Robert J. Mittman

CADWALADER, WICKERSHAM & TAFT
100 Maiden Lane,
New York, NY 10038
Tel: (212) 504-6000
Contact: Dennis J. Block / Gregory A. Markel /
Howard R. Hawkins / Jonathan M. Hoff

CAHILL GORDON & REINDEL
Eighty Pine Street,
New York, NY 10005
Tel: (212) 701-3000
Contact: Charles A. Gilman / Immanuel Kohn /
Thomas J. Kavaler

Revised (12/03) *COPY*                6 of 10

# APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

CLIFFORD CHANCE US LLP
200 Park Avenue,
New York, NY 10166
Tel: (212) 878-8000
Contact: James B. Weidner / James N. Benedict / John K. Carroll / Mark Holland

CRAVATH, SWAINE & MOORE
Worldwide Plaza,
825 Eighth Avenue,
New York, NY 10019-7475
Tel: (212) 474-1000
Contact: Evan R. Chesler / Francis P. Barron / Julie A. North / Keith R. Hummel / Paul C. Saunders / Peter T. Barbur / Richard W. Clary / Robert H. Baron / Ronald S. Rolfe / Rory O. Millson / Thomas G. Rafferty

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON
One New York Plaza,
New York, NY 10004
Tel: (212) 859-8000
Contact: William G. McGuinness / Alexander R. Sussman / Debra M. Torres / Douglas H. Flaum / Barry G. Sher / John A. Borek

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue,
New York, NY 10166-0193
Tel: (212) 351-4000
Contact: Wesley G. Howell / Robert F. Serio / Peter Beshar

GREENBERG TRAURIG
885 Third Avenue, 21st Floor,
New York, NY 10022
Tel: (212) 801-3134
Contact: Robert A. Horowitz

KATTEN MUCHIN ZAVIS ROSENMAN
575 Madison Avenue,
New York, NY 10022
Tel: (212) 940-8800
Contact: David Kistenbroker, Robert W. Gottlieb and Joel W. Sternman.

KAYE, SCHOLER, FIERMAN, HAYS & HANDLER
425 Park Avenue,
New York, NY 10022
Tel: (212) 836-8663
Contact: Fredric W. Yerman

KIRKLAND & ELLIS
Citicorp Center, 153 East 53rd Street,
New York, NY 10022-4675
Tel: (212) 446-4800
Contact: Yosef J. Riemer

KRAMER LEVIN NAFTALIS & FRANKEL LLP
919 Third Avenue,
New York, NY 10022
Tel: (212) 715-9100
Contact: Gary P. Naftalis / Alan Friedman

MAYER, BROWN ROWE & MAW
1675 Broadway,
New York, NY 10019
Tel: (212) 506-2500
Contact: Dennis P. Orr / Richard A. Spehr / Steven Wolowitz

MILBANK, TWEED, HADLEY & MCCLOY
1 Chase Manhattan Plaza,
New York, NY 10005
Tel: (212) 530-5832
Contact: Michael L. Hirschfeld

MILBANK, TWEED, HADLEY & MCCLOY
1 Chase Manhattan Plaza,
New York, NY 10005
Tel: (212) 530-5149
Contact: Scott A. Edelman / Michael L. Hirschfeld

MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178-0060
Tel: (212) 309-6000
Contact: Alfred J. Lechner, Jr.

MORRISON & FOERSTER LLP
1290 Avenue of the Americas,
New York, NY 10104
Tel: (212) 468-8000
Contact: Anthony M. Radice / Jack C. Auspitz

PAUL, HASTINGS, JANOFSKY & WALKER LLP
399 Park Avenue, Thirty-First Floor,
New York, NY 10022-4697
Tel: (212) 318-6000
Contact: J. Allen Maines

PAUL, WEISS, RIFKIND, WHARTON & GARRISON
1285 Avenue of the Americas,
New York, NY 10019-6064
Tel: (212) 373-3000 Contact: Daniel J. Beller / Martin Flumenbaum / Claudia Hammerman / Brad S. Karp / Mark F. Pomerantz / Daniel J. Kramer / Richard A. Rosen

APPENDIX A
SECURITIES CLAIMS PANEL COUNSEL LIST

PIPER RUDNICK LLP
1251 Avenue of the Americas,
New York, NY 10020
Tel: (212) 835-6000
Contact: Joseph G. Finnerty III / Keara M.
Gordon / David E. Nachman / John J. Clarke

SCHULTE ROTH & ZABEL LLP
900 Third Avenue,
New York, NY 10022
Tel: (212) 756-2000
Contact: Betty Santangelo / Howard O.
Godnick / Irwin J. Sugarman / Michael S.
Feldberg / Robert M. Abrahams

SIMPSON THACHER & BARTLETT
425 Lexington Avenue,
New York, NY 10017
Tel: (212) 455-2000
Contact: Bruce D. Anglolillo / Michael J.
Chepiga / Paul C. Curnin / Roy L. Reardon

STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane,
New York, NY 10038
Tel: (212) 806-5400
Contact: Laurence Greenwald / Melvin A.
Brosterman / Robert Lewin

SULLIVAN & CROMWELL
125 Broad Street,
New York, NY 10004-2498
Tel: (212) 558-4000
Contact: D. Stuart Meiklejohn / Gandolfo V.
DiBlasi / John L. Hardiman / John L. Warden /
Philip L. Graham, Jr. / Richard H. Klapper

WACHTELL, LIPTON, ROSEN & KATZ
51 W. 52nd Street, 29th Floor,
New York, NY 10019
Tel: (212) 403-1208
Contact:  Paul Vizcarrondo / Ted Mirvis

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue,
New York, NY 10153
Tel: (212) 310-8000
Contact: Greg A. Danilow / Irwin H. Warren /
Joseph Allerhand

WILLKIE FARR & GALLAGHER
787 Seventh Avenue,
New York, NY 10019-6099
Tel: (212) 728-8000
Contact: Michael R. Young / Richard L. Posen

WILMER, CUTLER & PICKERING
520 Madison Ave.,
New York, NY 10022
Tel: (212) 230-8800
Contact: Peter Vigeland / Robert B. McCaw

## OHIO

JONES, DAY, REAVIS & POGUE
North Point, 901 Lakeside Avenue,
Cleveland, OH 44114
Tel: (216) 586-3939
Contact: John M. Newman / John W. Edwards

## OREGON

DAVIS WRIGHT TREMAINE
2300 First Interstate Tower,
1300 S.W. Fifth Avenue,
Portland, OR 97201
Tel: (503) 241-2300
Contact: John F. McGrory

FOSTER PEPPER & SHEFELMAN
101 S.W. Main Street, 15th Floor,
Portland, OR 97204-3223
Tel: (503) 221-0607
Contact: Tim J. Filer / Roger D. Mellem

LANE POWELL SPEARS LUBERSKY LLP
601 S.W. Second Avenue, Suite 2100,
Portland, OR 97204
Tel: (503) 778-2100
Contact: D. Meredith Wilson / Milo
Petranovich / Robert E. Maloney

## PENNSYLVANIA

BLANK ROME LLP
One Logan Square,
Philadelphia, PA 19103-6998
Tel: (215) 569-5500
Contact: Alan J. Hoffman / Ian Comisky

BUCHANAN INGERSOLL, PC
One Oxford Centre, 20th Floor,
301 Grant Street,
Pittsburgh, PA 15219-8800
Tel: (412) 562-1880
Contact: John R. Leathers

## APPENDIX A
## SECURITIES CLAIMS PANEL COUNSEL LIST

MORGAN, LEWIS & BOCKIUS
1701 Market Street,
Philadelphia, PA 19103-2921
Tel: (215) 963-5000
Contact: Francis S. Chlapowski / Marc J.
Sonnenfeld / Elizabeth Hoop Fay /
Christopher (Kip) P. Hall / Alfred J.
Lechner / Karen Pieslak Pohlmann /
Kevin T. Rover / Stuart Sarnoff / Keith Olin

PEPPER HAMILTON LLP
3000 Two Logan Square, Eighteenth
and Arch Streets,
Philadelphia, PA 19103-2799
Tel: (215) 981-4000
Contact: Barbara W. Mather / Jon A.
Baughman / Laurence Z. Shiekman / M.
Duncan Grant / Robert L. Hickok / Thomas E.
Zemaitis

WOLF, BLOCK, SCHORR and SOLIS-
COHEN LLP
1650 Arch Street, 22nd Floor,
Philadelphia, PA 19103-2097
Tel: (215) 977-2058
Contact: Ian A.L. Strogatz / Jay A. Dubow /
Jerome J. Shestack / M. Norman Goldberger /
Mark L. Alderman

## TEXAS

AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.
Pennzoil Place - South Tower,
711 Louisiana Street, Suite 1900,
Houston, TX 77002
Tel: (512) 499-6250
Contact: Paul R. Bessette / Gregg C. Laswell

AKIN, GUMP, STRAUSS, HAUER & FELD,
L.L.P.
1700 Pacific Avenue, Suite 4100,
Dallas, TX 75201-4675
Tel: (512) 499-6250
Contact: Paul R. Bessette / Edward S.
Koppman / Orrin L. Harrison III

FULBRIGHT & JAWORSKI L.L.P
1301 McKinney, Suite 5100,
Houston, TX 77010-3095
Tel: (713) 651-5151
Contact: Frank G. Jones / Robert S. Harrell /
Gerard G. Pecht

FULBRIGHT & JAWORSKI L.L.P.
2200 Ross Avenue, Suite 2800,
Dallas, TX 75201
Tel: (214) 855-8000
Contact: Karl G. Dial

JENKENS & GILCHRIST, P.C.
1100 Louisiana, Suite 1800,
Houston, TX 77002
Tel: (713) 951-3300
Contact: John Gilliam

JENKENS & GILCHRIST, P.C.
1445 Ross Avenue Suite 3200,
Dallas, TX 75202
Tel: (214) 855-4306
Contact: John Gilliam

LOCKE LIDDELL & SAPP LLP
100 Congress Avenue, Suite 300,
Austin, TX 78701-4042
Tel: (512) 305-4700
Contact: Brad Foster / John McElhaney /
C.W. (Peter) Flynn

LOCKE LIDDELL & SAPP LLP
2200 Ross Avenue, Suite 2200,
Dallas, TX 75201-6776
Tel: (214) 740-8000
Contact: Brad Foster / John McElhaney /
C.W. (Peter) Flynn

LOCKE LIDDELL & SAPP LLP
600 Travis, 3400 Chase Tower,
Houston, TX 77002
Tel: (713) 226-1200
Contact: Brad Foster / John McElhaney /
C.W. (Peter) Flynn

THOMPSON & KNIGHT, PC
Burnett Plaza, Suite 1600,
801 Cherry Street, Unit #1,
Fort Worth, TX 76102-6881
Tel: (817) 347-1700
Contact: Timothy R. McCormick

THOMPSON & KNIGHT, PC
1200 Smith Street, Suite 3600,
Houston, TX 77002
Tel: (713) 654-8111
Contact: Timothy R. McCormick

APPENDIX A
SECURITIES CLAIMS PANEL COUNSEL LIST

THOMPSON & KNIGHT, PC
1700 Pacific Avenue, Suite 3300,
Dallas, TX 75201
Tel: (214) 969-1103
Contact: Timothy R. McCormick

THOMPSON & KNIGHT, PC
98 San Jacinto Boulevard, Suite 1200,
Austin, TX 78701
Tel: (512) 469-6100
Contact: Timothy R. McCormick

WEIL, GOTSHAL & MANGES LLP
100 Crescent Court,
Dallas, TX 75201
Tel: (214) 746-7700
Contact: Ralph I. Miller

WEIL, GOTSHAL & MANGES LLP
700 Louisiana – Suite 1600,
Houston, TX 77002
Tel: (713) 546-5000
Contact: Ralph I. Miller

**VIRGINIA**

COOLEY GODWARD, LLP
One Freedom Square, Reston Town Center,
11951 Freedom Drive,
Reston, VA 20190-5601
Tel: (703) 456-8082
Contact: Robert R. Vieth

GREENBERG TRAURIG
1750 Tysons Boulevard 12th Fl.,
McLean, VA 22102
Tel: (703) 749-1300
Contact: Joe R. Reeder / John Scalia

MCGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800,
McLean, VA 22102
Tel: (703) 712-5000
Contact: Charles McIntyre

MCGUIREWOODS LLP
One James Center, 901 East Cary Street,
Richmond, VA 23219
Tel: (804) 775-1000
Contact: Anne Marie Whittemore

WILMER, CUTLER & PICKERING
1600 Tysons Boulevard, 10th Floor,
Tysons Corner, VA 22102
Tel: (703) 251-9700
Contact: David P. Donovan

WILSON, SONSINI, GOODRICH & ROSATI
7927 Jones Branch Drive, Suite 400,
McLean, VA 22102
Tel: (650) 320-4904
Contact: Bruce Vanyo

**WASHINGTON**

DAVIS WRIGHT TREMAINE
2600 Century Square, 1501 Fourth Avenue,
Seattle, WA 98101-1688
Tel: (206) 622-3150
Contact: Stephen M. Rummage

DAVIS WRIGHT TREMAINE
2600 Century Square, 1501 Fourth Avenue,
Seattle, WA 98101-1688
Tel: (206) 622-3150
Contact: Ladd B. Leavens

FOSTER PEPPER & SHEFELMAN
1111 Third Avenue, Suite 3400,
Seattle, WA 98101-3299
Tel: (206) 447-8998
Contact: Tim J. Filer / Roger D. Mellem

GRAY CARY
701 Fifth Avenue, Suite 7000,
Seattle, WA 98104-7044
Tel: (206) 839-4800
Contact: Stellman Keehnel

LANE POWELL SPEARS LUBERSKY LLP
1420 Fifth Avenue, Suite 4100,
Seattle, WA 98101-2338
Tel: (206) 223-7000
Contact: Christopher B. Wells / James B.
Stoetzer / James L. Robart / Larry S. Gangnes /
Rudy A. Englund

PERKINS COIE LLP
1201 Third Avenue, Ste. 4800,
Seattle, WA 98101-3099
Tel: (206) 583-8888
Contact: Barry M. Kaplan / Harry H. Schnelder /
Ronald L. Berenstain

APPENDIX A
EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

## ALABAMA

BAKER, DONELSON, BEARMAN, CALDWELL &
BERKOWITZ PC
1600 SouthTrust Tower
Birmingham, AL 35203
Tel: (205) 328-0480
Contacts: Steven H. Trent, Esq. / Fern H.
Singer, Esq.
*Class Action Approved

LLOYD GRAY & WHITEHEAD, P.C.
2501 20th Place South
Suite 300
Birmingham, AL 35223
Tel: (205) 967-8822
Contact: Steven E. Whitehead, Esq.
*Class Action Approved

LUTHER, OLDENBURG & RAINEY, P.C.
Riverview Plaza
63 S. Royal Street, Suite 1000
P.O. Box 1003
Mobile, AL 36633
Tel: (251) 433-8088
Contact: Rudene C. Oldenburg, Esq.
*Class Action Approved

MAYNARD, COOPER & GALE, PC
1901 Sixth Avenue North
Suite 2400
Birmingham, AL 35203
Tel: (205) 254-1000
Contact: Warren B. Lightfoot, Esq.
*Class Action Approved

OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203
Tel: (205) 328-1900
Contact: Peyton Lacy, Jr., Esq.
*Class Action Approved

## ALASKA

LANE POWELL SPEARS LUBERSKY LLP
420 L. Street
Suite 300
Anchorage, AK 99501-1937
Tel: (907) 277-9511
Contact: James B. Stoetzer, Esq.
*Class Action Approved

## ARIZONA

BESS KUNZ
3838 N. Central Avenue
Suite 1500
Phoenix, AZ 85012-1902
Tel: (602) 331-4600
Contact: Steven Plitt, Esq.

KUTAK ROCK
Suite 300
8601 North Scottsdale Road
Scottsdale, AZ 85253-2742
Tel: (480) 429-5000
Tel: (949) 417-0999
Contact: Gregory F. Hurley, Esq.

## ARKANSAS

HUCKABAY, MUNSON, ROWLETT & TILLEY
400 West Capital Avenue
Suite 1900
Little Rock, AR 72201
Tel: (501) 374-6535
Contact: Bruce Munson, Esq.
*Class Action Approved

KUTAK ROCK
425 West Capitol Avenue
Suite 1100
Little Rock, AR 72201-3409
Tel: (501) 975-3000
Tel: (949) 417-0999
Contact: Gregory F. Hurley, Esq.

The Three Sisters Building
214 West Dickson Street
Fayetteville, AR 72701-5221
Tel: (479) 973-4200
Tel: (949) 417-0999
Contact: Gregory F. Hurley, Esq.

## CALIFORNIA

EPSTEIN BECKER & GREEN PC
One California Street
26th Floor
San Francisco, CA 94111-5427
Tel: (415) 398-3500
Contact: Howard Pianko, Esq.
*Class Action Approved

## APPENDIX A
### EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

1875 Century Park East
Suite 500
Los Angeles, CA  90067
Tel: (310) 556-8861
Contact: Howard Pianko, Esq.
*Class Action Approved

GORDON & REES
101 West Broadway
Suite 1600
San Diego, CA  92101
Tel: (619) 696-6700
Contact: Roger M. Mansukhani, Esq.
*Class Action Approved

Embarcadero Center West
275 Battery Street, Suite 2000
San Francisco, CA  94111
Tel: (415) 986-5900
Contact: Roger M. Mansukhani, Esq.
*Class Action Approved

300 So. Grand Avenue
20th Floor
Los Angeles, CA  90071
Tel: (213) 576-5000
Contact: Roger M. Mansukhani, Esq.
*Class Action Approved

GROTTA, GLASSMAN & HOFFMAN, P.A.
1801 Century Park East, Suite 2400
Los Angeles, CA  90067
Tel: (310) 556-8786
Contact: Leslie A. Lajewski, Esq.

GROTTA, GLASSMAN & HOFFMAN, P.A.
388 Market Street, Suite 500
San Francisco, CA  94111
Tel: (415) 296-3885
Contact: Leslie A. Lajewski, Esq.

JACKSON LEWIS LLP
725 South Figueroa St. Suite 2500
Los Angeles, CA  90017
Tel: (310) 203-0200
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved – All Locations

1215 K Street, Suite 1800
Sacramento, CA 95814
Tel: (916) 341-0404
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.

KUTAK ROCK
Suite 1100
18201 Von Karmen Avenue
Irvine, CA  92612-1077
Tel: (949) 417-0999
Contact: Gregory F. Hurley, Esq.

LEWIS BRISBOIS BISGAARD & SMITH LLP
221 N. Figueroa Street, Suite 1200
Los Angeles, CA  90012
Tel: (213) 250-1800
Contacts: Robert F. Lewis, Esq. /
Gary S. Rattet, Esq.

One Sansome Street, Suite 1400
San Francisco, CA  94104-4448
Tel: (415) 362-2580
Contact: Duane C. Musfelt, Esq.

550 West C Street, Suite 800
San Diego, CA  92101-3540
Tel: (619) 233-1006
Contact: R. Gaylord Smith, Esq.

650 Town Center Drive, Suite 1400
Costa Mesa, CA  92626
Tel: (714) 545-9200
Contact: Mercedes Cruz, Esq.

650 East Hospitality Lane
Suite 600
San Bernadino, CA  92408-3508
Tel: (909) 387-1130
Contact: Joseph Arias, Esq.

2500 Venture Oaks Way, Suite 200
Sacramento, CA  95833-3500
Tel: (916) 564-5400
Contact: David L. Cohn, Esq.

MORGAN, LEWIS & BOCKIUS LLP
300 South Grand Avenue
22nd Floor
Los Angeles, CA  90071
Tel: (213) 612-2500
Tel: (213) 612-2555
Contact: Susan G. Fillichio, Esq.
*Class Action Approved

One Market Spear Street Tower
San Francisco, CA  94105
Tel: (415) 442-0900
Tel: (650) 843-7530
Contact: Melinda S. Riechert, Esq.
*Class Action Approved

APPENDIX A
EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

2 Palo Alto Square
3000 El Camino Real, Suite 900
Palo Alto, CA  94306
Tel: (650) 331-8000
Tel: (650) 843-7530
Contact: Melinda S. Riechert, Esq.
*Class Action Approved

OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
888 West Sixth Street
Suite 1200
Los Angeles, CA  90017-2738
Tel: (213) 239-9800
Contact: Paul M. Gleason, Esq.
*Class Action Approved

WILSON ELSER MOSKOWITZ EDELMAN &
DICKER LLP
1055 West Seventh Street
Los Angeles, CA  90017
Tel: (213) 624-3044
Contact: James A. Stankowski, Esq.
*Class Action Approved

650 California Street, Suite 1400
San Francisco, CA  94108
Tel: (415) 433-0990
Contact: Louis H. Castoria, Esq.
*Class Action Approved

COLORADO

HALL & EVANS, L.L.C.
1200 17th Street
Suite 1700
Denver, CO  80202
Tel: (303) 628-3300
Contact: Daniel Satriana, Esq.

KUTAK ROCK
1801 California Street
Suite 3100
Denver, CO  80202-2626
Tel: (303) 297-2400
Tel: (949) 417-0999
Contact: Gregory F. Hurley, Esq.

SHERMAN & HOWARD
633 Seventeenth Street
Suite 3000
Denver, CO  80202
Tel: (303) 297-2900
Contact: Andrew Volin, Esq.

CONNECTICUT

EDWARDS & ANGELL LLP
90 State House Square
Hartford, CT  06103
Tel: (860) 525-5065
Contact: John D. Hughes, Esq.
*Class Action Approved

EPSTEIN BECKER & GREEN PC
One Landmark Square
Suite 1800
Stamford, CT  06901-2601
Tel: (203) 348-3737
Tel: (212) 351-4500
Contact: Howard Pianko, Esq.
*Class Action Approved

JACKSON LEWIS LLP
55 Farmington Avenue
Suite 1200
Hartford, CT  06105
Tel: (860) 522-0404
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved – All Locations

JACKSON LEWIS LLP
177 Broad Street
Post Office Box 251
Stamford, CT  06901-2601
Tel: (203) 961-0404
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved

SIEGAL, O' CONNOR, ZANGARI, O' DONNELL &
BECK, P.C.
150 Trumbull Street
Hartford, CT  06103
Tel: (860) 727-8900
Contact: Richard D. O' Connor, Esq.
*Class Action Approved

DELAWARE

BLANK ROME LLP
Chase Manhattan Centre
1201 Market Street, Suite 800
Wilmington, DE  19801
Tel: (302) 425-6400
Tel: (215) 569-5646
Contact: Ian M. Comisky, Esq.
*Class Action Approved

APPENDIX A
EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

GREENBERG TRAURIG LLP
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE  19801
Tel: (302) 661-7000
Contact: Scott D. Cousins, Esq.
*Class Action Approved

REED SMITH
1201 Market Street
Suite 1500
Wilmington, DE  19801
Tel: (302) 778-7500
Tel: (215) 851-8214
Contact: Sara A. Begley, Esq.
*Class Action Approved

WOLF BLOCK SCHORR & SOLIS-COHEN
One Rodney Square
10th & King Street
Wilmington, DE  19801
Tel: (302) 777-0313
Contact: Barry M. Klayman, Esq.
*Class Action Approved

YOUNG, CONAWAY, STARGATT, TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801
Tel: (302) 571-6600
Contact: Barry M. Willoughby, Esq.
*Class Action Approved

DISTRICT OF COLUMBIA

EPSTEIN BECKER & GREEN, P.C.
1227 25th Street
Suite 700
Washington, DC  20037
Tel: (202) 861-0900
Contact: Howard Pianko, Esq.
*Class Action Approved

FORD & HARRISON
1300 19th Street NW
Suite 700
Washington, DC  20036
Tel: (202) 719-2000
Contact: David A. Rosenberg, Esq.

GREENBERG TRAURIG LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC  20036
Tel: (202) 331-3100
Contacts: C. Allen Foster, Esq. / Eric C. Rowe, Esq.
*Class Action Approved

JORDON COYNE & SAVITS, LLP
1100 Connecticut Avenue, NW
Suite 600
Washington, DC  20036
Tel: (202) 496-2810
Contact: Deborah Murrell Whelihan, Esq.
*Class Action Approved

KUTAK ROCK
1101 Connecticut Avenue
Suite 1000
Washington, DC  20036-4374
Tel: (202) 828-2400
Contact: Gregory F. Hurley, Esq.

OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
Fifth Floor
2400 N. Street, N.W.
Washington, DC  20037
Tel: (202) 887-0855
Contact: Bernard Jewler, Esq.
*Class Action Approved

PATTON BOGGS LLP
2550 M. Street, N.W.
Washington, DC  20037
Tel: (202) 457-6000
Contact: Douglas B. Mishkin, Esq.
*Class Action Approved

SEYFARTH SHAW
815 Connecticut Avenue, NW
Suite 500
Washington, DC  20006-4004
Tel: (202) 463-2400
Tel: (312) 269-8965
Contact: Gerald L. Maatman, Jr., Esq.
*Class Action Approved

WILLIAMS MULLEN
1666 K Street N.W., Suite 1200
Washington, D.C.  20006
Tel: (202) 833-9200
Tel: (804) 783-6427
Contact: Lynn F. Jacob, Esq.

WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
1341 G Street NW
Washington, DC  20005
Tel: (202) 626-7660
Contact: Paul D. Krause, Esq.
*Class Action Approved

APPENDIX A
EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

**FLORIDA**

AKERMAN SENTERFITT & EIDSON, P.A.
Suntrust International Center
One Southeast 3rd Ave., 28th Fl.
Miami, FL 33131-1714
Tel: (305) 374-5600
Contact: Susan Eisenberg, Esq.
*Class Action Approved

Las Olas Centre II
350 East Las Olas Blvd., Ste. 1600
Ft. Lauderdale, FL 33301-2229
Tel: (954) 463-2700
Contact: Jon K. Stage, Esq.
*Class Action Approved

Esperante Building
222 Lakeview Ave., Ste. 400
West Palm Beach, FL 33401-6183
Tel: (561) 653-5000
Contact: Jon K. Stage, Esq.
*Class Action Approved

Citrus Center, 17th Floor
255 South Orange Avenue
Orlando, FL 32801
Tel: (407) 843-7860
Contacts: Jon K. Stage, Esq. / Kevin W.
Shaughnessy, Esq.
*Class Action Approved

Wachovia Center
100 South Ashley Drive, Suite 1500
Tampa, FL 33602-5311
Tel: (813) 223-7333
Contact: Jon K. Stage, Esq.
*Class Action Approved

50 North Laura Street
Suite 2500
Jacksonville, FL 32202-3646
Tel: (904) 798-3700
Contacts: Jon K. Stage, Esq. / Patricia J.
Hill, Esq. / Richard N. Margulies, Esq.
*Class Action Approved

BOYD & GREENE LLC
Museum Tower, Ste. 2800
150 W. Flagler Street
Miami, FL 33130
Tel: (786) 425-1045
Contact: W. Todd Boyd, Esq.

CARLTON FIELDS
4000 International Place
100 S.E. 2nd Street
Suite 4000
Miami, FL 33131
Tel: (305) 530-0050
Tel: (305) 539-7225
Contact: Nancy H. Henry, Esq.

FISHER & PHILLIPS LLP
1250 Lincoln Plaza
300 South Orange Avenue
Orlando, FL 32801
Tel: (407) 541-0888
Contact: Theresa M. Gallion, Esq.

GREENBERG TRAURIG LLP
515 East Las Olas Boulevard
Ft. Lauderdale, FL 33301
Tel: (954) 765-0500
Contact: Frank Scruggs, Esq.
*Class Action Approved-All Locations

1221 Brickell Avenue
Miami, FL 33131
Tel: (305) 579-0500
Contact: Ron Rosengarten, Esq.

GUNSTER YOAKLEY & STEWART, PA
777 South Flagler Drive
Suite 500, East Tower
West Palm Beach, FL 33401
Tel: (561) 655-1980
Contact: G. Joseph Curley, Esq.
*Class Action Approved

One Biscayne Tower
Suite 3400
Miami, FL 33131
Tel: (305) 376-6000
Contact: G. Joseph Curley, Esq.
*Class Action Approved

HAYNSWORTH BALDWIN JOHNSON &
GREAVES LLC
600 North Westshore Boulevard
Suite 200
Tampa, FL 33609
Tel: (813) 289-1247
Contact: Grant D. Petersen, Esq.

1301 Riverplace Boulevard
Suite 800 P.O. Box 40593
Jacksonville, FL 32203
Tel: (904) 396-3000
Contact: G. Thomas Harper, Esq.
*Class Action Approved

# APPENDIX A
## EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

HOLLAND & KNIGHT LLP
701 Brickell Avenue – Suite 3000
P.O. Box 015441 (Zip 33101)
Miami, FL  33131
Tel: (305) 374-8500
Contact: Kelly-Ann Cartwright, Esq.
*Class Action Approved

50 North Laura Street, Suite 3900
P.O. Box 52687 (Zip 32201)
Jacksonville, FL  32202
Tel: (904) 353-2000
Contact: Mark Alexander, Esq.
*Class Action Approved

200 South Orange Ave
Suite 2600 P.O. Box 1525 (Zip 32802)
Orlando, FL  32801
Tel: (407) 244-1115
Contact: Steven Ball, Esq.
*Class Action Approved

400 North Ashley Drive
Suite 2300
Tampa, FL  33602
Tel: (813) 227-8500
Contact: William DeMeza, Esq.
*Class Action Approved

315 South Calhoun Street, Suite 600
P.O. Drawer 810 (Zip 32302)
Tallahassee, FL  32301
Tel: (850) 224-7000
Contact: Elizabeth Bevington, Esq.
*Class Action Approved

222 Lakeview Avenue
Suite 1000
West Palm Beach, FL  33401
Tel: (561) 833-2000
Contact: Edward Diaz, Esq.
*Class Action Approved

200 Central Avenue
Suite 1600
St. Petersburg, FL  33701
Tel: (727) 896-7171
Contact: William DeMeza, Esq.
*Class Action Approved

One East Broward Boulevard
Suite 1300
Fort Lauderdale, FL  33301
Tel: (954) 525-1000
Contact: Thomas Loffredo, Esq.
*Class Action Approved

JACKSON LEWIS LLP
One Biscayne Tower
2 South Biscayne Blvd., Suite 2500
Miami, FL  33131
Tel: (305) 577-7600
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved – All Locations

390 N. Orange Avenue
Suite 1285
Orlando, FL  32801-1641
Tel: (407) 246-8440
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved

KUBICKI DRAPER
25 West Flagler Street
Penthouse City National Bank Building
Miami, FL  33130
Tel: (305) 374-1212
Contact: Gene Kubicki, Esq.
*Class Action Approved

STEEL HECTOR & DAVIS LLP
200 South Biscayne Boulevard
Miami, FL  33131-2398
Tel: (305) 577-2957
Tel: (561) 650-7214
Contact: Patricia E. Lowry, Esq.
*Class Action Approved

1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL  33401-6198
Tel: (561) 650-7200
Contact: Patricia E. Lowry, Esq.
*Class Action Approved

215 South Monroe
Suite 601
Tallahassee, FL  32301-1804
Tel: (850) 222-2300
Tel: (561) 650-7214
Contact: Patricia E. Lowry, Esq.
*Class Action Approved

VERNIS & BOWLING, P.A.
884 U.S. Highway One
North Palm Beach, FL  33408
Tel: (561) 845-8781
Contact: G. Jeffrey Vernis, Esq.

APPENDIX A
EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

635 West Garden Street
P.O. Box 12108
Pensacola, FL 32590
Tel: (561) 845-8781
Contact: G. Jeffrey Vernis, Esq.

Surety Bank Building, 3rd Floor
990 North Woodland Blvd.
Deland, FL 32720
Tel: (561) 845-8781
Contact: G. Jeffrey Vernis, Esq.

1680 N.E. 135th Street
North Miami, FL 33181
Tel: (561) 845-8781
Contact: G. Jeffrey Vernis, Esq.

1346 South Ft. Harrison Avenue
Clearwater, FL 33759
Tel: (561) 845-8781
Contact: G. Jeffrey Vernis, Esq.

82883 Overseas Highway
P.O. Box Drawer 529
Islamorada, FL 33036-0529
Tel: (561) 845-8781
Contact: G. Jeffrey Vernis, Esq.

2369 West First Street
Fort Myers, FL 33901
Tel: (561) 845-8781
Contact: G. Jeffrey Vernis, Esq.

**GEORGIA**

ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
Tel: (404) 881-7000
Contact: Robert P. Riordan, Esq.
*Class Action Approved

EPSTEIN BECKER & GREEN, P.C.
Resurgens Plaza
945 East Paces Ferry Road, Ste. 270
Atlanta, GA 30326
Tel: (404) 923-9000
Contact: Howard Pianko, Esq.
*Class Action Approved

HAYNSWORTH BALDWIN JOHNSON &
GREAVES LLC
2500 Windy Ridge Parkway
Suite 1250
Atlanta, GA 30339
Tel: (770) 541-4940
Contact: John K. Anderson, Esq.
*Class Action Approved

HOLLAND & KNIGHT LLP
1201 West Peachtree Street, N.E.
One Atlantic Center, Suite 2000
Atlanta, GA 30309
Tel: (404) 817-8500
Contact: Jack McLean, Esq.
*Class Action Approved

JACKSON LEWIS LLP
1900 Marquis One Tower
245 Peachtree Center Avenue, NE
Atlanta, GA 30303-1226
Tel: (404) 525-8200
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved

KUTAK ROCK
Suite 2100
Peachtree Center South
225 Peachtree Street, NE
Atlanta, GA 30303-1731
Tel: (404) 222-4600
Tel: (949) 417-0999
Contact: Gregory F. Hurley, Esq.

MCKENNA LONG & ALDRIDGE LLP
303 Peachtree Street, NE
Suite 5300
Atlanta, GA 30308
Tel: (404) 527-4000
Contact: Phillip A. Bradley, Esq.

OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
600 Peachtree Street
Suite 2100
Atlanta, GA 30308
Tel: (404) 881-1300
Contact: William P. Steinhaus, Esq.
*Class Action Approved

SEYFARTH SHAW
One Peachtree Pointe
1545 Peachtree Street, NE
Atlanta, GA 30309-2401
Tel: (404) 892-6412
Contact: John F. Meyers, Esq.
*Class Action Approved

APPENDIX A
EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

STITES & HARBISON PLLC
3350 Riverwood Parkway
Suite 1700
Atlanta, GA 30339
Tel: (770) 850-7000
Tel: (502) 681-0469
Contact: Shannon Antle Hamilton, Esq.

WOMBLE, CARLYLE, SANDRIDGE & RICE
One Atlantic Center
1201 West Peachtree, Suite 3500
Atlanta, GA 30309
Tel: (404) 872-7000
Contact: Craig R. Senn, Esq.

HAWAII

GOODSILL ANDERSON QUINN & STIFEL LLP
1099 Alakea Street
Suite 1800
Honolulu, HI 96813
Tel: (808) 547-5600
Contact: John R. Lacy, Esq.
*Class Action Approved

LOVE & NARIKIYO LLC
1164 Bishop Street
Suite 1105
Honolulu, HI 96813
Tel: (808) 546-7575
Contact: Chad P. Love, Esq.
*Class Action Approved

IDAHO

HALL, FARLEY, OBERRECHT & BLANTON, PA
702 West Idaho, Suite 700
Key Financial Center
Boise, ID 83702
Tel: (208) 395-8500
Contact: Richard E. Hall, Esq.
*Class Action Approved

QUANE SMITH LLP
US Bank Plaza, Suite 1600
101 South Capital Blvd
Boise, ID 83702
Tel: (208) 345-0960
Contact: Jeremiah A. Quane, Esq.
*Class Action Approved

ILLINOIS

CLAUSEN MILLER PC
10 South La Salle Street
Suite 1600
Chicago, IL 60603-1098
Tel: (312) 855-1010
Contacts: James S. Barber, Esq. /
James Nolan, Esq.

EPSTEIN BECKER & GREEN, P.C.
150 North Michigan Avenue
Suite 420
Chicago, IL 60601-7553
Tel: (312) 499-1400
Contact: Howard Planko, Esq.
*Class Action Approved

FREEBORN & PETERS
311 South Wacker Drive
Suite 3000
Chicago, IL 60606-6677
Tel: (312) 360-6000
Contact: Steven M. Hartmann, Esq.

JACKSON LEWIS LLP
320 West Ohio Street
Suite 500
Chicago, IL 60610
Tel: (312) 787-4949
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved

KATTEN MUCHIN ZAVIS ROSENMAN
525 W. Monroe Street
Suite 1600
Chicago, IL 60661-3693
Tel: (312) 902-5200
Contact: David H. Kistenbroker, Esq.
*Class Action Approved

LANER, MUCHIN, DOMBROW, BECKER, LEVIN &
TOMINBERG, LTD.
515 North State Street
Suite 2800
Chicago, IL 60610
Tel: (312) 467-9800
Contact: William L. Becker, Esq.

MATKOV, SALZMAN, MADOFF & GUNN
55 E. Monroe Street
Suite 2900
Chicago, IL 60603
Tel: (312) 332-0777
Contact: Craig T. Boggs, Esq.

APPENDIX A
EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
2 First National Plaza
20 South Clark Street, 25th Floor
Chicago, IL 60603
Tel: (312) 558-1220
Contact: Arthur B. Smith, Jr., Esq.
*Class Action Approved

SEYFARTH SHAW
55 East Monroe Street
Chicago, IL 60603
Tel: (312) 346-8000
Contact: Gerald L. Maatman, Jr., Esq.
*Class Action Approved

VEDDER PRICE KAUFMAN & KAMMHOLZ
222 North LaSalle Street
Chicago, IL 60601
Tel: (312) 609-7500
Contact: Barry Hartstein, Esq.
*Class Action Approved

INDIANA

FROST BROWN TODD LLC
120 West Spring Street
Suite 400
New Albany, IN 47150-3655
Tel: (812) 948-2800
Tel: (502) 568-0288
Contact: C. Laurence Woods III, Esq.
*Class Action Approved

KIGHTLINGER & GRAY
Market Square Center, Suite 660
151 North Delaware
Indianapolis, IN 46204
Tel: (317) 638-4521
Contact: Donald L. Dawson, Esq.
*Class Action Approved

OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
One Indiana Square
Suite 2300
Indianapolis, IN 26204
Tel: (317) 916-1300
Contact: Charles Baldwin, Esq.
*Class Action Approved

IOWA

NYEMASTER, GOODE, MCLAUGHLIN, VOIGTS,
WEST, HANSELL & O'BRIEN
700 Walnut Street
Des Moines, IA 50309
Tel: (515) 283-3100
Contact: Hayward Draper, Esq.
*Class Action Approved

KANSAS

HUSCH & EPPENBERGER, LLC
301 North Main Street
Epic Center, Ste. 1400
Wichita, KS 67202
Tel: (316) 264-3339
Contact: Alan L. Rupe, Esq.

KENTUCKY

FROST BROWN TODD LLC
2700 Lexington Financial Center
250 West Main Street
Lexington, KY 40507-1749
Tel: (859) 231-0000
Tel: (502) 568-0288
Contact: C. Laurence Woods III, Esq.
*Class Action Approved

400 West Market Street
32nd Floor
Louisville, KY 40202-3363
Tel: (502) 589-5400
Contact:
*Class Action Approved

HARLIN PARKER
519 East Tenth Street
PO Box 390
Bowling Green, KY 42102-0390
Tel: (270) 842-5611
Contact: William J. Parker, Esq.

STITES & HARBISON PLLC
250 West Main Street
Suite 2300
Lexington, KY 40502
Tel: (859) 226-2300
Tel: (502) 681-0469
Contact: Shannon Antle Hamilton, Esq.

400 West Market Street
Suite 1800
Louisville, KY 40202
Tel: (502) 587-3400
Tel: (502) 681-0469
Contact: Shannon Antle Hamilton, Esq.

APPENDIX A
EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

## LOUISIANA

LOCKE LIDDELL & SAPP LLP
Pan American Life Center
601 Poydras Street, Suite 2400
New Orleans, LA 70130-6036
Tel: (504) 558-5106
Contact: Amelia W. Koch, Esq.

THE JUNEAU FIRM
The Harding Center
1018 Harding St., Suite 202
Lafayette, LA 70503-2412
Tel: (337) 269-0052
Contact: Michael J. Juneau, Esq.

## MAINE

MOON MOSS MCGILL & BACHELDER PA
10 Free Street
PO Box 7250
Portland, ME 04112-7250
Tel: (207) 775-6001
Contact: Richard O. Moon, Esq.

VERRILL & DANA LLP
One Portland Square
P.O. Box 586
Portland, ME 04112
Tel: (207) 774-4000
Contact: Robert C. Brooks, Esq.
*Class Action Approved

## MARYLAND

JORDAN COYNE & SAVITS, LLP
33 Wood Lane
Rockville, MD 20850
Tel: (301) 424-4161
Contact: Deborah Murrell Whelihan, Esq.

WHITEFORD TAYLOR & PRESTON LLP
Seven St. Paul Street
Baltimore, MD 21202
Tel: (410) 347-8700
Contact: William Ryan, Jr., Esq.

WILSON, ELSER, MOSKOWITZ, EDELMAN &
DICKER LLP
400 East Pratt Street, 7th Floor
Baltimore, MD 21201
Tel: (410) 962-8756
Contact: Paul Krause, Esq.
*Class Action Approved

## MASSACHUSETTS

DECHERT LLP
200 Clarendon Street
27th Floor
Boston, MA 02116-5021
Tel: (617) 728-7100
Contact: Bernard J. Bonn III, Esq. /
Matthew A. Porter, Esq.
*Class Action Approved

DONOVAN HATEM LLP
Two Seaport Lane
Boston, MA 02210
Tel: (617) 406-4500
Contact: Kenneth B. Walton, Esq.

EDWARDS & ANGELL LLP
101 Federal Street
Boston, MA 02110-1800
Tel: (617) 951-3373
Contact: John D. Hughes, Esq.
*Class Action Approved

EPSTEIN BECKER & GREEN, P.C.
111 Huntington Avenue
26th Floor
Boston, MA 02199
Tel: (617) 342-4000
Contact: Howard Pianko, Esq.
*Class Action Approved

JACKSON LEWIS LLP
One Beacon Street
33rd Floor
Boston, MA 02108
Tel: (617) 367-0025
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved

MINTZ LEVIN COHN FERRIS GLOVSKY
AND POPEO, PC
One Financial Center
Boston, MA 02110
Tel: (617) 542-6000
Contact: Robert Gault, Esq.
*Class Action Approved

MURPHY, HESSE, TOOMEY & LEHANE
Crown Colony Plaza
300 Crown Colony Drive, Suite 410
Quincy, MA 02269
Tel: (617) 479-5000
Contact: James A. Toomey, Esq.

APPENDIX A
EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

NIXON PEABODY LLP
101 Federal Street
Boston, MA 02110
Tel: (516) 832-7564
Contact: Joseph J. Ortego, Esq.
*Class Action Approved

PEABODY & ARNOLD
50 Rowes Wharf
Boston, MA 02110
Tel: (617) 951-2063
Contact: James Toomey, Esq.

**MICHIGAN**

BRADY, HATHAWAY, BRADY & BRETZ, P.C.
535 Griswold Street
1330 Buhl Building
Detroit, MI 48226-3602
Tel: (313) 965-3700
Contact: Daniel J. Bretz, Esq.

DYKEMA GOSSETT, LLP
39577 Woodward Avenue, Suite 300
Bloomfield, MI 48304-2820
Tel: (248) 203-0700
Tel: (248) 203-0705
Contact: Robert L. Duty, Esq.
*Class Action Approved

124 W. Allegan
800 Michigan National Tower
Lansing, MI 48933
Tel: (517) 374-9100
Tel: (517) 374-9146
Contact: Bruce G. Davis, Esq.
*Class Action Approved

315 E. Eisenhower Pkwy
Suite 100
Ann Arbor, MI 48108
Tel: (734) 214-7660
Tel: (248) 203-0705
Contact: Robert L. Duty, Esq.
*Class Action Approved

300 Ottawa Avenue, N.W.
Suite 700
Grand Rapids, MI 49503
Tel: (616) 776-7500
Tel: (616) 776-7543
Contact: Stephen S. Muhich, Esq.
*Class Action Approved

400 Renaissance Center
Detroit, MI 48243
Tel: (313) 568-6800
Tel: (248) 203-0705
Contact: Robert L. Duty, Esq.
*Class Action Approved

MADDIN, HOUSER, WARTELL, ROTH &
HELLER, P.C.
28400 Northwestern Highway
Third Floor Essex Centre
Southfield, MI 48034
Tel: (248) 354-4030
Contact: Harvey Heller, Esq.

MILLER CANFIELD PADDOCK AND
STONE PLC
1200 Campau Square Plaza
99 Monroe Avenue, NW
Grand Rapids, MI 49503
Tel: (616) 454-8656
Contact: Charles S. Mishkind, Esq.
*Class Action Approved--All Locations

150 West Jefferson, Suite 2500
Detroit, MI 48226
Tel: (313) 963-6420
Contact: Carl H. Von Ende, Esq. (Co-Chair of
Group) / Charles S. Mishkind, Esq. / Michael A.
Alaimo, Esq.
*Class Action Approved

PLUNKETT & COONEY
38505 N. Woodward Avenue
Suite 3000
Bloomfield Hills, MI 48304
Tel: (248) 901-4005
Contact: Teresa Smith Lloyd, Esq.

**MINNESOTA**

DORSEY & WHITNEY LLP
Pillsbury Center South
220 South Sixth Street
Minneapolis, MN 55402
Tel: (612) 340-2600
Contacts: Robert R. Reinhart, Esq. /
Peter S. Hendrickson, Esq.
*Class Action Approved

JACKSON LEWIS LLP
150 South Fifth Street, Suite 2800
Minneapolis, MN 55402
Tel: (612) 341-8131
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved

APPENDIX A
EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

MEAGHER & GEER LLP
4200 Multifoods Tower
Minneapolis, MN 55402
Tel: (612) 338-0661
Contact: James F. Roegge, Esq.

WINTHROP & WEINSTINE, PA
Suite 3500
225 South 6th Street
Minneapolis, MN 55402-4629
Tel: (612) 604-6400
Tel: (612) 604-6692
Contact: David P. Pearson, Esq. / Laura
A. Pfeiffer, Esq.
*Class Action Approved

3200 Minnesota World Trade Center
30 East Seventh Street
St. Paul, MN 55101
Tel: (651) 290-8400
Tel: (612) 604-6692
Contact: David P. Pearson, Esq. / Laura
A. Pfeiffer, Esq.
*Class Action Approved

MISSOURI

ARMSTRONG TEASDALE LLP
2345 Grand Blvd
Suite 2000
Kansas City, MO 64108
Tel: (816) 221-3420
Contact: Lynn W. Hursh, Esq.
*Class Action Approved

HUSCH & EPPENBERGER, LLC
1200 Main Street
Suite 1700
Kansas City, MO 64105-2100
Tel: (816) 421-4800
Contact: Paul D. Seyferth, Esq.

KUTAK ROCK
Suite 200, Valencia Place
444 West 47th Street
Kansas City, MO 64112-1914
Tel: (816) 960-0090
Tel: (949) 417-0999
Contact: Gregory F. Hurley, Esq.

LEWIS RICE & FINGERSH, L.C.
500 N. Broadway, Suite 2000
St. Louis, MO 63102-2147
Tel: (314) 444-7600
Contacts: Robert J. Golterman, Esq. /
Neal F. Perryman, Esq.
*Class Action Approved

MISSISSIPPI

BAKER, DONELSON, BEARMAN, CALDWELL &
BERKOWITZ, PC
4268 I-55 North
Meadowbrook Office Park
Jackson, MS 39211
Tel: (601) 351-2400
Contact:
*Class Action Approved

BUTLER SNOW O'MARA STEVENS &
CANNADA PLLC
AmSouth Plaza, 17th Floor
210 East Capitol Street
Jackson, MS 39201
Tel: (601) 985-4500
Contact: Jeffrey Walker, Esq.
*Class Action Approved

WATKINS & EAGER PLLC
400 East Capitol Street
Jackson, MS 39201
Tel: (601) 948-6470
Contact: Kenneth E. Milan, Esq.

MONTANA

MATOVICH & KELLER PC
225 First Citizens Bank Building
2812 First Avenue N., Suite 225
Billings, MT 59101
Tel: (406) 252-5500
Contact: Cary E. Matovich, Esq.

NEBRASKA

KUTAK ROCK
1630 Farnam Street
Omaha, NE 68102
Tel: (402) 346-6000
Contact: Gregory F. Hurley, Esq.

Meridian Park Office Building
6940 "O" Street, Suite 314
Lincoln, NE 68510-2499
Tel: (402) 464-8200
Tel: (949) 417-0999
Contact: Gregory F. Hurley, Esq.

APPENDIX A
EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

NEW HAMPSHIRE

GETMAN STACEY TAMPOSI
SCHULTESS & STEERE, PA
163 South River Road
Bedford, NH 03110
Tel: (603) 634-4300
Contact: Dona Feeney, Esq.

NEW JERSEY

DECHERT LLP
Princeton Pike Corporate Center
P.O. Box 5218
Princeton, NJ 08543-5218
Tel: (609) 520-3202
Contact: Matthew V. DelDuca, Esq.
*Class Action Approved

EDWARDS & ANGELL LLP
51 John F. Kennedy Parkway
Short Hills, NJ 07078-2701
Tel: (973) 376-7700
Contact: John D. Hughes, Esq.
*Class Action Approved

EPSTEIN BECKER & GREEN PC
Two Gateway Center, 12th Floor
Newark, NJ 07102
Tel: (973) 639-8262
Tel: (973) 642-1900
Contact: Howard Pianko, Esq.
*Class Action Approved

GOLDEN, ROTHSCHILD, SPAGNOLA,
LUNDELL, LEVITT & BOYLAN, P.C.
1011 Route 22 West, Suite 300
P.O. Box 6881
Bridgewater, NJ 08807-0881
Tel: (908) 722-6300
Contact: Kenneth R. Rothschild, Esq.

GROTTA, GLASSMAN & HOFFMAN, P.A.
75 Livingston Avenue
Roseland, NJ 07068
Tel: (973) 992-4800
Contact: Leslie A. Lajewski, Esq.

HARWOOD LLOYD
130 Main Street
Hackensack, NJ 07601
Tel: (201) 487-1080
Contact: Elizabeth Lorell, Esq.

JACKSON LEWIS LLP
60 Washington Street
Morristown, NJ 07960-6844
Local Tel: (973) 538-6890
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved

LINDABURY MCCORMICK & ESTABROOK
53 Cardinal Drive
PO Box 2369
Westfield, NJ 07091-2369
Tel: (908) 233-6800
Contact: John H. Schmidt, Jr., Esq.

MORGAN, LEWIS & BOCKIUS LLP
502 Carnegie Center
Princeton, NJ 08540
Tel: (609) 919-6600
Tel: (215) 963-4928
Contact: Rene M. Johnson, Esq.
*Class Action Approved

PECKAR & ABRAMSON
70 Grand Avenue
River Edge, NJ 07661
Tel: (201) 343-3434
Contact: Jeffrey M. Daitz, Esq.

POWELL TRACHTMAN LOGAN CARRLE
BOWMAN & LOMBARDO
1763 E. Route 70
Suite 213
Cherry Hill, NJ 08003
Tel: (856) 663-0021
Contact: Richard L. Bush, Esq.
*Class Action Approved

REED SMITH
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, NJ 08540
Tel: (609) 987-0050
Tel: (215) 851-8214
Contact: Sara A. Begley, Esq.
*Class Action Approved

The Legal Center
One Riverfront Plaza
Newark, NJ 07102
Tel: (973) 621-3200
Tel: (215) 851-8214
Contact: Sara A. Begley, Esq.
*Class Action Approved

Revised (12/03) COPY                    Page 13 of 24

## APPENDIX A
### EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

SAIBER, SCHLESINGER, SATZ & GOLDSTEIN
One Gateway Center, 13th Floor
Newark, NJ 07102-5311
Tel: (973) 622-3333
Contact: Jeffrey Lorell, Esq.

THOMPKINS MCGUIRE WACHENFELD &
BARRY
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102-4070
Tel: (973) 622-3000
Contact: William B. McGuire, Esq.

WEINER LESNIAK
629 Parsippany Road
Parsippany, NJ 07054-0438
Tel: (973) 403-1100
Contact: Howard E. Brechner, Esq.
*Class Action Approved

WOLFF & SAMSON
One Boland Drive
West Orange, NJ 07052
Tel: (973) 325-1500
Contact: Arthur Goldstein, Esq.
*Class Action Approved

### NEVADA

BARKER BROWN BUSBY CHRISMAN &
THOMAS
300 South Fourth Street
Suite 800
Las Vegas, NV 89101
Tel: (702) 386-1086
Contact: James P. Chrisman, Esq.

GORDON & REES
3753 Howard Hughes Parkway
Suite 2000
Las Vegas, NV 89109
Tel: (702) 784-7646
Contact: Roger M. Mansukhani, Esq.
*Class Action Approved

### NEW MEXICO

BUTT THORNTON & BAEHR PC
4101 Indian School Road NE
Suite 300 South
Albuquerque, NM 87110
Tel: (505) 884-0777
Contact: Carlos G. Martinez, Esq.

### NEW YORK

BROWN RAYSMAN MILLSTEIN FELDER &
STEINER LLP
900 Third Avenue
New York, NY 10022-4728
Tel: (212) 895-2000
Contact: Edward Copeland, Esq.
*Class Action Approved

CLIFTON BUDD & DEMARIA, LLP
420 Lexington Avenue
Suite 420
New York, NY 10170-0089
Tel: (212) 687-7410
Contact: Alfred T. DeMaria, Esq.

D'AMATO & LYNCH
70 Pine Street
New York, NY 10270
Tel: (212) 269-0927
Contact: Luke Lynch Jr., Esq.

EDWARDS & ANGELL LLP
750 Lexington Avenue
New York, NY 10022
Tel: (212) 308-4411
Contact: John D. Hughes, Esq.
*Class Action Approved

EPSTEIN BECKER & GREEN PC
250 Park Avenue, 12th Floor
New York, NY 10177-0077
Tel: (212) 351-4500
Contact: Howard Pianko, Esq.
*Class Action Approved

FIXLER & ASSOCIATES
530 Saw Mill River Road
Elmsford, NY 10523
Tel: (914) 345-3701
Contact: Elliot H. Fixler, Esq.

FULBRIGHT & JAWORSKI LLP
666 Fifth Avenue
New York, NY 10103-3198
Tel: (212) 318-3000
Fax: (212) 318-3400
Contact: Douglas P. Catalano, Esq.
*Class Action Approved

GROTTA, GLASSMAN & HOFFMAN, P.A.
650 Fifth Avenue, 22nd Floor
New York, NY 10019
Tel: (212) 315-3510
Contact: Leslie A. Lajewski, Esq.

APPENDIX A
EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

HODGSON RUSS LLP
One M&T Plaza
Suite 2000
Buffalo, NY  14203-2391
Tel: (716) 856-4000
Contact: Patrick M. Tomovic, Esq.

JACKSON LEWIS LLP
59 Maiden Lane
New York, NY  10038
Tel: (212) 545-4000
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved–All Locations

1000 Woodbury Road
Suite 402
Woodbury, NY  11797
Tel: (516) 364-0404
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved

One North Broadway, 15th Floor
White Plains, NY  10601-2305
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved

JONES HIRSCH CONNORS & BULL, P.C.
1 Dag Hammarskjold Plaza
7th Floor
New York, NY  10017
Tel: (212) 507-1000
Contact: Richard Steer, Esq.

KANE KESSLER, P.C.
1350 Avenue of the Americas
New York, NY  10019-4896
Tel: (212) 541-6222
Contact: Jeffrey H. Daichman, Esq.

KAUFMAN BORGEEST & RYAN LLP
99 Park Avenue, 19th Floor
New York, NY  10016
Tel: (212) 980-9600
Contact: Julianna Ryan, Esq.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
919 Third Avenue
New York, NY  10022
Tel: (212) 715-9100
Contact: Kevin B. Leblang, Esq.
*Class Action Approved

L'ABBATE, BALKAN, COLAVITA & CONTINI, L.L.P.
One Battery Park Plaza
New York, NY  10004
Tel: (212) 825-6900
Contact: Mercedes Cowin, Esq.

1050 Franklin Avenue
Garden City, NY  11530
Tel: (516) 294-8844
Contact: Marianne Conklin, Esq.

MORGAN, LEWIS & BOCKIUS, LLP
101 Park Avenue
New York, NY  10178-0060
Tel: (212) 309-6000
Tel: (215) 963-4928
Contact: Steven R. Wall, Esq.
*Class Action Approved

NIXON PEABODY LLP
990 Stewart Avenue
Garden City, NY  11530
Tel: (516) 832-7564
Contact: Joseph J. Ortego, Esq.
*Class Action Approved – All Locations

Omni Plaza
30 South Pearl St.
Albany, NY  12207
Tel: (518) 427-2650
Tel: (516) 832-7564
Contact: Joseph J. Ortego, Esq.

437 Madison Avenue
New York, NY  10022
Tel: (212) 940-3000
Tel: (516) 832-7564
Contact: Joseph J. Ortego, Esq.

Clinton Square
PO Box 31051
Rochester, NY  14603
Tel: (716) 263-1000
Tel: (516) 832-7564
Contact: Joseph J. Ortego, Esq.

OHRENSTEIN & BROWN LLP
One Penn Plaza
46th Floor
New York, NY  10019
Tel: (212) 338-2400
Contact: Michael D. Brown, Esq.

APPENDIX A
EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

PECKAR & ABRAMSON
546 Fifth Avenue
17th Floor
New York, NY  10036
Tel: (212) 382-0909
Contact: Jeffrey M. Daitz, Esq.

PILLSBURY WINTHROP LLP
One Battery Park Plaza
New York, NY  10004
Tel: (212) 858-1000
Contacts: Kristin L. Peters, Esq. / Kenneth W.
Taber, Esq.
*Class Action Approved

POLLACK & KAMINSKY
114 West 47th Street
19th Floor
New York, NY  10036
Tel: (212) 575-4700
Contact: Daniel A. Pollack, Esq.
*Class Action Approved

PROSKAUER ROSE LLP
1585 Broadway
New York, NY  10036-8299
Tel: (212) 969-3000
Contact: Alan Fagin, Esq.
*Class Action Only

RAINS & POGREBIN, P.C.
210 Old Country Road
Mineola, NY  11501
Tel: (516) 742-1470
Contact: John T. Bauer, Esq.

SHAUB, AHMUTY, CITRIN & SPRATT LLP
655 Third Avenue
New York, NY  10101
Tel: (212) 599-8200
Tel: (212) 599-7767
Contact: David Simon, Esq.

WILSON, ELSER, MOSKOWITZ, EDELMAN &
DICKER LLP
150 East 42nd Street
New York, NY  10017-5639
Tel: (212) 490-3000
Contact: Rick E. Roer, Esq.
*Class Action Approved

WINGET & SPADAFORA & SCHWARTZBERG,
LLP
45 Broadway
19th Floor
New York, NY  10006
Tel: (212) 221-6900
Contact: Louis Spadafora, Esq.
*Class Action Approved

## NORTH CAROLINA

HAYNSWORTH BALDWIN JOHNSON &
GREAVES LLC
Federal Plaza Building
400 W. Trade Street,
Charlotte, NC  28202-1627
Tel: (704) 342-2588
Contact: James B. Spears Jr., Esq.
*Class Action Approved

2709 Henry Street
P.O. Box 13310
Greensboro, NC  27405
Tel: (336) 375-9737
Contact: James M. Powell, Esq.
*Class Action Approved

1400 Crescent Green, Suite 320
P.O. Box 10035
Raleigh, NC  27605
Tel: (919) 233-4600
Contact: Bruce A. Petesch, Esq.
*Class Action Approved

OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
2301 Sugar Bush Road
Suite 501 (27612)
PO Box 31608
Raleigh, NC  27622
Tel: (919) 787-9700
Contact: Matthew C. Keen, Esq.
*Class Action Approved

PARKER POE ADAMS & BERNSTEIN
Three Wachovia Center
401 S. Tryon Street, Suite 3000
Charlotte, NC  28202
Tel: (704) 372-9000
Contact: Jonathan M. Crotty, Esq.

WOMBLE, CARLYLE, SANDRIDGE & RICE
150 Fayetteville Street Mall, Suite 2100
P.O. Box 831
Raleigh, NC  27602
Tel: (919) 484-2300
Contact: Charles A. Edwards, Esq.

Revised (12/03) COPY                    Page 16 of 24

APPENDIX A
EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

2530 Meridian Parkway, Suite 400
P.O. Box 13059
Durham, NC  27713
Tel: (919) 484-2300
Contact: Charles A. Edwards, Esq.

One West Fourth Street
Winston-Salem, NC  27101
Tel: (336) 721-3600
Contact: Alan R. Gitter, Esq.

One Wachovia Center
301 S. College Street, Suite 3300
Charlotte, NC  28202-6025
Tel: (704) 331-4900
Contact: Richard L. Rainey, Esq.

**NORTH DAKOTA**

FLECK, MATHER & STRUTZ
400 East Broadway, Suite 600
Norwest Bank Building, P.O. Box 2798
Bismarck, ND  58501
Tel: (701) 223-6585
Contact: Robert J. Udland, Esq.

**OHIO**

DINSMORE & SHOHL LLP
175 South 3rd Street
10th Floor
Columbus, OH  43215
Tel: (614) 628-6880
Contact: Rick A. Lavinsky, Esq.

FROST BROWN TODD  LLC
2200 PNC Center
201 East Fifth Street
Cincinnati, OH  45202-4182
Tel: (513) 651-6800
Tel: (513) 651-6705
Contact: Deborah S. Adams, Esq.
*Class Action Approved

One Columbus, Suite 1000
10 West Broad Street
Columbus, OH  43215-3467
Tel: (614) 464-1211
Tel: (513) 651-6705
Contact: Deborah S. Adams, Esq.
*Class Action Approved

GALLAGHER SHARP FULTON & NORMAN
Seventh Floor Bulkley Building
1501 Euclid Avenue
Cleveland, OH  44115
Tel: (216) 241-5310
Contact: Alton Stephens, Esq.
*Class Action Approved

JANIK & DORMAN
9200 South Hills Boulevard Suite 300
Cleveland, OH  44141-3521
Tel: (440) 838-7600
Contact: Steven G. Janik, Esq.
*Class Action Approved

ROETZEL & ANDRESS
310 Chiquita Center
250 E. Fifth Street
Cincinnati, OH  45202
Tel: (513) 361-0200
Tel: (216) 615-4039
Contact: Robert E. Blackham, Esq.
*Class Action Approved

National City Center, 12th Floor
155 East Broad Street
Columbus, OH  43215
Tel: (614) 463-9770
Contact: Robert E. Blackham, Esq.
*Class Action Approved

222 South Main Street
Akron, OH  44308
Tel: (330) 376-2700
Contact: Robert E. Blackham, Esq.
*Class Action Approved

One SeaGate
9th Floor
Toledo, OH  43604
Tel: (419) 242-7985
Contact: Robert E. Blackham, Esq.
*Class Action Approved

1375 E. Ninth Street
1 Cleveland Center, 10th Floor
Cleveland, OH  44114
Tel: (216) 623-0150
Contact: Robert E. Blackham, Esq.
*Class Action Approved

Revised (12/03) *COPY*

APPENDIX A
EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

VORYS, SATER, SEYMOUR & PEASE LLP
2100 One Cleveland Center
1375 E. 9th Street
Cleveland, OH 44114
Tel: (216) 479-6100
Tel: (513) 723-4054
Contact: Scott Carroll, Esq.
*Class Action Approved

52 E. Gay Street
Columbus, OH 43216-1008
Tel: (614) 464-6400
Tel: (513) 723-4054
Contact: Scott Carroll, Esq.
*Class Action Approved

221 E. Fourth Street
Atrium Two, Suite 2100
Cincinnati, OH 45201-0236
Tel: (513) 723-4000
Tel: (513) 723-4054
Contact: Scott Carroll, Esq.
*Class Action Approved

OKLAHOMA

RHODES, HIERONYMUS, JONES, TUCKER
& GABLE PLLC
P.O. Box 21100
Tulsa, OK 74121-1100
Tel: (918) 582-1173
Contact: Chris L. Rhodes III, Esq.

OREGON

GORDON & REES
1001 S.W. Fifth Avenue
Suite 1100
Portland, OR 97204
Tel: (503) 220-1679
Contact: Roger M. Mansukhani, Esq.
*Class Action Approved

LANE POWELL SPEARS LUBERSKY LLP
601 SW Second Avenue
Suite 2100
Portland, OR 97204
Tel: (206) 223-7019
Contact: James B. Stoetzer, Esq.
*Class Action Approved

LINDSAY HART NEIL & WEIGLER LLP
1300 West Fifth Avenue
Suite 3400
Portland, OR 97201-5696
Tel: (503) 226-7677
Contacts: Lisa F. Rackner, Esq. /
Jerard S. Weigler, Esq.

PENNSYLVANIA

BLANK ROME LLP
One Logan Square
Philadelphia, PA 19103-6998
Tel: (215) 569-5500
Contact: Ian M. Comisky, Esq.
*Class Action Approved

BUCHANAN INGERSOLL, PC
One Oxford Centre, 20th Floor
301 Grant Street
Pittsburgh, PA 15219-8800
Tel: (412) 562-8800
Tel: (412) 562-3960
Contact: Gregory A. Miller, Esq.

One South Market Square
213 Market Street, 3rd Floor
Harrisburg, PA 17101
Tel: (717) 237-4800
Tel: (412) 562-3960
Contact: Gregory A. Miller, Esq.

Eleven Penn Center, 14th Floor
1835 Market Street
Philadelphia, PA 19103-1443
Tel: (215) 665-8700
Tel: (412) 562-3960
Contact: Gregory A. Miller, Esq.

DECHERT LLP
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103-2793
Tel: (215) 994-4000
Contact: Seymour Kurland, Esq. /
Matthew V. DelDuca, Esq.
*Class Action Approved

HAMBURG & GOLDEN, P.C.
1601 Market Street, Suite 565
Philadelphia, PA 19103-1443
Tel: (215) 255-8590
Contact: Neil Hamburg, Esq.

APPENDIX A
EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

JACKSON LEWIS LLP
One PPG Place
29th Floor
Pittsburgh, PA  15222-5414
Tel: (412) 232-0404
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved

MARSHALL, DENNEHY, WARNER, COLEMAN &
GOGGIN
1845 Walnut Street
Philadelphia, PA  19103-4714
Tel: (215) 575-2600
Contact: Phil Toran, Esq. /
Jay Rothman, Esq.

MEYER, UNKOVIC & SCOTT LLP
1300 Oliver Building
Pittsburgh, PA  15222
Tel: (412) 456-2800
Contact: Laura A. Candris, Esq.

MORGAN, LEWIS & BOCKIUS LLP
1702 Market Street
Philadelphia, PA  19103-2921
Tel: (215) 963-5000
Contact: Steven R. Wall, Esq.
*Class Action Approved.

One Oxford Centre
32nd Floor
Pittsburgh, PA  15219-6401
Tel: (412) 560-3300
Tel: (412) 560-3390
Contact: Carole S. Katz, Esq.
*Class Action Approved

One Commerce Square
417 Walnut Street
Harrisburg, PA  17101-1904
Tel: (717) 237-4000
Tel: (215) 963-4928
Contact: Steven R. Wall, Esq. /
Carole S. Katz, Esq.
*Class Action Approved

PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA  19103-2799
Tel: (215) 981-4000
Contact: Anthony B. Haller, Esq.
*Class Action Approved

POWELL TRACHTMAN LOGAN CARRLE
BOWMAN & LOMBARDO
114 North Second Street
Harrisburg, PA  17101
Tel: (717) 238-9300
Contact: Richard L. Bush, Esq.
*Class Action Approved

475 Allendale Road
Suite 200
King of Prussia, PA  19406
Tel: (610) 354-9700
Contact:  Richard L. Bush, Esq.
*Class Action Approved

REED SMITH
2500 One Liberty Place
1650 Market Street
Philadelphia, PA  19103
Tel: (215) 851-8100
Tel: (215) 851-8214
Contact: Sara A. Begley, Esq.
*Class Action Approved

213 Market Street
Harrisburg, PA  17101
Tel: (717) 234-5988
Tel: (215) 851-8214
Contact: Sara A. Begley, Esq.
*Class Action Approved

435 Sixth Avenue
Pittsburgh, PA  15219
Tel: (412) 288-3131
Tel: (215) 851-8214
Contact: Sara A. Begley, Esq.
*Class Action Approved

WILSON ELSER MOSKOWITZ EDELMAN
DICKER, LLP
830 East Independence Square West
Suite 1130 East
Philadelphia, PA  19106
Tel: (215) 627-6900
Contact: Lou Isaacsohn, Esq.
*Class Action Approved

WOLF BLOCK SCHORR & SOLIS – COHEN LLP
1650 Arch Street, 22nd Floor
Philadelphia, PA  19103-2097
Tel: (215) 977-2588
Contact: Alan Kessler, Esq.
*Class Action Approved

APPENDIX A
EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

RHODE ISLAND

EDWARDS & ANGELL LLP
2800 Financial Plaza
Providence, RI 02903
Tel: (401) 274-9200
Contact: John D. Hughes, Esq.
*Class Action Approved

NIXON PEABODY LLP
One Citizens Plaza
Providence, RI 02903
Tel: (516) 832-7564
Contact: Joseph J. Ortego, Esq.
*Class Action Approved

SOUTH CAROLINA

HAYNSWORTH BALDWIN JOHNSON &
GREAVES LLC
918 S. Pleasantburg Drive
Greenville, SC 29607-2424
Tel: (864) 271-7410
Contact: James M. Powell, Esq.
*Class Action Approved

1201 Main Street
Suite 1230
Columbia, SC 29201
Tel: (803) 799-5858
Contact: Charles T. Speth II, Esq.
*Class Action Approved

JACKSON LEWIS LLP
2100 Landmark Building
301 North Main Street
Greenville, SC 29601
Tel: (864) 232-7000
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved

OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
134 Meeting Street
Suite 500
Charleston, SC 29401
Tel: (843) 853-1300
Contact: Phillip A. Kilgore, Esq.
*Class Action Approved

1501 Main Street
Suite 600
Columbia, SC 29201
Tel: (803) 252-1300
Contact: Eric C. Schweitzer, Esq.
*Class Action Approved

The Ogletree Building
300 North Main Street
Greenville, SC 29601
Tel: (864) 271-1300
Contact: Phillip A. Kilgore, Esq.
*Class Action Approved

WOMBLE, CARLYLE, SANDRIDGE & RICE
700 Poinsetta Plaza
104 S. Main Street, P.O. Box 10208
Greenville, SC 29603
Tel: (864) 255-5400
Contact: Brent Clinkscale, Esq.

YOUNG CLEMENT RIVERS & TISDALE LLP
P.O. Box 993
28 Broad Street
Charleston, SC 29402
Tel: (864) 557-4000
Contact: Shawn D. Wallace, Esq.

SOUTH DAKOTA

COSTELLO PORTER HILL HEISTERKAMP
BUSHNELL & CARPENTER LLP
200 Security Building
P.O. Box 290
Rapid City, SD 57709
Tel: (605) 343-2410
Contact: Robert L. Lewis, Esq.

DAVENPORT EVANS HURWITZ & SMITH LLP
203 West 14th Street
Sioux Falls, SD 57101-1030
Tel: (605) 336-2880
Contact: Susan Brunick Simons, Esq.

TENNESSEE

BAKER, DONELSON, BEARMAN, CALDWELL &
BERKOWITZ, PC
Commerce Center
211 Commerce St., Suite 1000
Nashville, TN 37201
Tel: (615) 726-5600
Tel: (901) 577-2294
Contact: Gregory G. Fletcher, Esq.
*Class Action Approved

APPENDIX A
EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

1800 Republic Centre
633 Chestnut Street
Chattanooga, TN 37450
Tel: (423) 756-2010
Tel: (901) 577-2294
Contact: Gregory G. Fletcher, Esq.
*Class Action Approved

SunTrust Bank Building
207 Mockingbird Lane
Johnson City, TN 37604
Tel: (423) 928-0181
Tel: (901) 577-2294
Contact: Gregory G. Fletcher, Esq.
*Class Action Approved

2200 Riverview Tower
900 South Gay Street
Knoxville, TN 37901
Tel: (865) 549-7000
Tel: (901) 577-2294
Contact: Gregory G. Fletcher, Esq.
*Class Action Approved

CORNELIUS & COLLINS, L.L.P.
511 Union Street, Suite 2700
P.O. Box 190695
Nashville, TN 37219-0695
Tel: (615) 244-1440
Contact: Rebecca Wells-Demaree, Esq.

FROST BROWN TODD LLC
424 Church Street
Suite 1600
Nashville, TN 37219-2308
Tel: (615) 251-5550
Tel: (615) 251-5553
Contact: M. Clark Spoden, Esq.

HUSCH & EPPENBERGER, LLC
736 Cherry Street
Chattanooga, TN 37402
Tel: (423) 266-5500
Contact: Harry B. Ray, Esq.

KIESEWETTER WISE KAPLAN SCHWIMMER &
PRATHER, PLC
3725 Champion Hills Drive
Suite 3000
Memphis, TN 38125
Tel: (901) 795-6695
Contact: Jonathan E. Kaplan, Esq.

LEITNER, WILLIAMS, DOOLEY & NAPOLITAN
PLLC
414 Union Street, Suite 1900
Bank of America Building
Nashville, TN 37402
Tel: (615) 255-7722
Contact: Paul R. Leitner, Esq.
*Class Action Approved

801 Broad Street, Third Floor
Pioneer Building
Chattanooga, TN 37402
Tel: (423) 265-0214
Contact: Paul R. Leitner, Esq.
*Class Action Approved

OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
SunTrust Center, Suite 800
424 Church Street
Nashville, TN 37219
Tel: (615) 254-1900
Contact: Keith D. Frazier, Esq.
*Class Action Approved

STITES & HARBISON PLLC
424 Church Street
Suite 1800
Nashville, TN 37219
Tel: (615) 244-5200
Tel: (502) 681-0469
Contact: Shannon Antle Hamilton, Esq.

WEINTRAUB, STOCK BENNETT
GRISHAM & UNDERWOOD
1715 Aaron Brenner Drive
Suite 512
Memphis, TN 38120
Tel: (901) 526-0431
Contact: James H. Stock, Esq.

TEXAS

CLARK WEST KELLER BUTLER & ELLIS LLP
4800 Renaissance Tower
1201 Elm Street
Dallas, TX 75270-2146
Tel: (214) 741-1001
Contact: Mark Shank, Esq.

EPSTEIN BECKER GREEN WICKLIFF & HALL
Wells Fargo Plaza
1000 Louisiana, Suite 5400
Houston, TX 77002-5013
Tel: (713) 750-3100
Contact: Howard Pianko, Esq.
*Class Action Approved

## APPENDIX A
### EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

Park Central VII
12750 Merit Drive
Dallas, TX 75251-1219
Tel: (972) 628-2450
Contact: Howard Pianko, Esq.
*Class Action Approved

FULBRIGHT & JAWORSKI LLP
1301 McKinney
Suite 5100
Houston, TX 77101-3095
Tel: (713) 651-5442
Contact: Robert S. Harrell, Esq.
*Class Action Approved

2200 Ross Avenue
Suite 2800
Dallas, TX 75201
Tel: (214) 885-8188
Fax: (214) 855-8200
Contact: Richard M. Kobdish, Esq.
*Class Action Approved

300 Convent Street
Suite 2200
San Antonio, TX 78205-3792
Tel: (210) 224-5575
Fax: (210) 270-7205
Contact: Robert S. Harrell, Esq.
*Class Action Approved

600 Congress Avenue
Suite 2400
Austin, TX 78701
Tel: (512) 474-5201
Fax: (512) 320-4598
Contact: Brian Greig, Esq.
*Class Action Approved

JACKSON LEWIS LLP
3811 Turtle Creek Boulevard
Suite 500
Dallas, TX 75219-4497
Tel: (214) 520-2400
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved

LOCKE LIDDELL & SAPP LLP
2200 Ross Avenue
Suite 2200
Dallas, TX 75201-6776
Tel: (214) 740-8000
Contact: John McElhaney, Esq.

MILLS SHIRLEY ECKEL & BASSETT, LLP
400 Washington Building
2228 Mechanic, P.O. Box 1943
Galveston, TX 77553
Tel: (409) 763-2341
Contact: Carla Cotropia, Esq.

OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
700 Preston Commons
8117 Preston Road
Dallas, TX 75225
Tel: (214) 987-3800
Contact: Bryant S. McFall, Esq.
*Class Action Approved

One Allen Center
500 Dallas Street, Suite 3000
Houston, TX 77002-4709
Tel: (713) 655-0855
Contact: Jeffrey C. Londa, Esq.
*Class Action Approved

One Congress Plaza
111 Congress Ave., 4th Floor
Austin, TX 78701
Tel: (512) 391-4985
Contact: Bruce A. Griggs, Esq.
*Class Action Approved

2600 Weston Centre
112 East Pecan Street
San Antonio, TX 78205
Tel: (210) 354-1300
Contact: Lawrence Smith, Esq.
*Class Action Approved

PATTON BOGGS, LLP
2001 Ross Avenue
Suite 3000
Dallas, TX 75201
Tel: (214) 758-1500
Contact: D. Patrick Long, Esq.
*Class Action Approved

SEYFARTH SHAW
700 Louisiana Street, #3900
Houston, TX 77002-2731
Tel: (713) 225-2300
Contact: Gloria Portela, Esq.
*Class Action Approved

APPENDIX A
EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

THOMPSON, COE, COUSINS & IRONS, L.L.P.
700 N. Pearl St., 25th Floor
Plaza of the Americas
Dallas, TX 75201
Tel: (214) 871-8200
Contact: John L. Ross, Esq.
*Class Action Approved

**UTAH**

CHRISTENSON & JENSEN PC
50 South Main Street
Suite 1500
Salt Lake City, UT 84101
Tel: (801) 355-3431
Contact: Phillip S. Ferguson, Esq.

**VERMONT**

CLEARY SHAHI ASSOCIATES
110 Merchants Row
P.O. Box 6740
Rutland, VT 05702
Tel: (802) 775-8800
Contact: David L. Cleary, Esq.

**VIRGIN ISLANDS**

OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
The Tunick Building
1336 Beltjen Road
St. Thomas, VI 00802
Tel: (340) 714-1235
Contact: Charles E. Engeman, Esq.
*Class Action Approved

**VIRGINIA**

CHRISTIAN & BARTON, LLP
909 East Main Street
Suite 1200
Richmond, VA 23219-3095
Tel: (804) 697-4100
Contact: Warren David Harless, Esq.

GENTRY LOCKE RAKES & MOORE
P.O. Box 40013
Roanoke, VA 24022-0013
Tel: (540) 983-9300
Contact: W. David Paxton, Esq.
*Class Action Approved–All Locations

GREENBERG TRAURIG LLP
1750 Tysons Boulevard, 12th Floor
Tysons Corner, VA 22102
Tel: (703) 749-1300
Contact: C. Allen Foster, Esq. / Joe
Reeder, Esq. / Harry M. Glazer, Esq.

JACKSON LEWIS LLP
8614 Westwood Center Drive
Suite 950
Vienna, VA 22182
Tel: (703) 821-2189
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved.

JORDAN COYNE & SAVITS L.L.P.
10509 Judicial Drive
Suite 200
Fairfax, VA 22030
Tel: (703) 246-0900
Contact: John Easton, Esq.
*Class Action Approved

MCGUIRE WOODS BATTLE & BOOTHE LLP
901 East Cary Street
Richmond, VA 23219
Tel: (804) 775-4378
Contact: Stephen D. Busch, Esq.

1750 Tysons Boulevard
Suite 1800
McLean, VA 22102
Tel: (703) 712-5000
Contact: Stephen D. Busch, Esq.

101 West Main Street
Norfolk, VA 23510-1655
Tel: (757) 640-3700
Contact: Stephen D. Busch, Esq.

Court Square Building
310 Fourth Street N.E.
Suite 300
Charlottesville, VA 22902-1288
Tel: (434) 977-2500
Contact: Stephen D. Busch, Esq.

WILLIAMS MULLEN
Two James Center
1021 East Cary Street (23219)
Richmond, VA 23218-1320
Tel: (804) 643-1991
Tel: (804) 783-6427
Contact: Lynn F. Jacob, Esq.

APPENDIX A
EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

8270 Greensboro Drive, Suite 700
McLean, VA  22102
Tel: (703) 760-5200
Tel: (804) 783-6427
Contact: Lynn F. Jacob, Esq.

SunTrust Center
500 East Main Street, Suite 1301
Norfolk, VA  23510
Tel: (757) 284-4000
Tel: (804) 783-6427
Contact: Lynn F. Jacob, Esq.

WILSON, ELSER, MOSKOWITZ, EDELMAN &
DICKER LLP
3923 Old Lee Highway
Suite 62-B    .
Fairfax, VA  22030
Tel: (202) 626-7660
Contact: Paul Krause, Esq.
*Class Action Approved

WOMBLE, CARLYLE, SANDRIDGE & RICE
6862 Elm Street
Eighth Floor
McLean, VA  22101
Tel: (703) 790-3310
Contact: Thomas J. Sawyer, Esq.

WASHINGTON

CARNEY BADLEY SPELLMAN, PS
700 5th Avenue, #5800
Seattle, WA  98104-5017
Tel: (206) 622-8020
Contact: David W. Silke, Esq.

JACKSON LEWIS LLP
1420 Fifth Avenue, Suite 2000
Seattle, WA  98101
Tel: (206) 405-0404
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved

LANE POWELL SPEARS LUBERSKY LLP
1420 Fifth Avenue
Suite 4100
Seattle, WA  98101-2338
Tel: (206) 223-7019
Contact: James B. Stoetzer, Esq.
*Class Action Approved

WEST VIRGINIA

SPILMAN, THOMAS, BATTLE PLLC
Spilman Center
300 Kanawha Blvd., P.O. Box 7232
Charleston, WV  25321-0273
Tel: (304) 340-3800
Contact: Charles L. Woody, Esq.
*Class Action Approved

STEPTOE & JOHNSON LLP
Bank One National Center East
Post Office Box 2190
Clarksburg, WV  26302-2190
Tel: (304) 624-8000
Contact: C. David Morrison, Esq.
*Class Action Approved

WISCONSIN

MELLI WALKER PEASE & RUHLY SC
Ten East Doty, Suite 900
P.O. Box 1664
Madison, WI  53701-1664
Tel: (608) 257-4812
Contact: Jack D. Walker, Esq.

WYOMING

HIRST & APPLEGATE
1720 Carey Avenue
Seattle, WA 98101
Suite 200
Cheyenne, WY  82001
Tel: (307) 632-0541
Contact: Thomas A. Nicholas, Esq.

ENDORSEMENT# *1*

This endorsement, effective *12:01 a.m.   January 24, 2004*        forms a part of
policy number   *931-75-64*
Issued to *REFCO GROUP LTD, LLC*

by    *Illinois National Insurance Company*

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**DIRECTORS, OFFICERS AND PRIVATE COMPANY**

**ILLINOIS AMENDATORY ENDORSEMENT**

The Policy is hereby amended as follows:

Clause 2. DEFINITIONS, Item (e) "Defense Costs" is deleted in its entirety and replaced
with the following:

(e)   "Defense Costs" means reasonable and necessary fees, costs and expenses
consented to by the Insurer (including premiums for any appeal bond,
attachment bond or similar bond, but without any obligation to apply for or
furnish any such bond) resulting solely from the investigation, adjustment,
defense and appeal of a Claim against the Insureds, but excluding salaries of
officers or Employees of the Company or the Insurer.

Clause 2. DEFINITIONS, Item (k) "Loss" is deleted in its entirety and replaced with the
following:

(k)   "Loss" means damages (including back pay and front pay), judgments,
settlements, post-judgment interest, and Defense Costs; however, Loss shall
not include: (1) civil or criminal fines or penalties imposed by law; (2) taxes;
(3) any amount for which the Insureds are not financially liable or which are
without legal recourse to the Insureds; (4) employment-related benefits, stock
options, perquisites, deferred compensation or any other type of compensation
other than salary, wages or bonus compensation; (5) any liability or costs
incurred by any Insured to modify any building or property in order to make
said building or property more accessible or accommodating to any disabled
person, or any liability or costs incurred in connection with any educational,
sensitivity or other corporate program, policy or seminar relating to an
Employment Practices Claim; or (6) matters which may be deemed uninsurable
under the law pursuant to which this policy shall be construed.

If an additional premium is stated in Item 7 of the Declarations page, then
Loss shall specifically include, (subject to the policy's other terms, conditions
and exclusions, including but not limited to exclusions relating to personal
profit or advantage, deliberate fraud, criminal acts or willful violation of any
statute, rule or regulation) punitive, exemplary and multiple damages (including
the multiple or liquidated damages awards under the Age Discrimination in
Employment Act and the Equal Pay Act). It is further understood and agreed
that the enforceability of the foregoing coverage shall be governed by such
applicable law which most favors coverage for punitive, exemplary and
multiple damages. If an additional premium is not stated in Item 7 of the
Declarations then Loss shall not include punitive, exemplary damages or the
multiplied portion of multiple damages.

*END 001*

ENDORSEMENT# *1*     (continued)

Clause 10. DISCOVERY CLAUSE, is deleted in its entirety and replaced with the following:

10.   DISCOVERY CLAUSE

Except as indicated below, if the Named Entity or the Insurer shall cancel or the Named Entity or the Insurer shall refuse to renew this policy, the Named Entity shall have the right to a period of either one, two or three years following the effective date of such cancellation, or nonrenewal upon payment of the respective "Additional Premium Amount" described below (herein referred to as the "Discovery Period") in which to give to the Insurer written notice of Claims first made against the Insureds during said Discovery Period for any Wrongful Act occurring prior to the end of the Policy Period and otherwise covered by this policy. The rights contained in this paragraph shall terminate, however, unless written notice of such election together with the additional premium due is received by the Insurer within 30 (thirty) days of the effective date of cancellation or nonrenewal. The Additional Premium for the Discovery Period shall be fully earned at the inception of the Discovery Period. The Discovery Period is not cancelable.

The Additional Premium Amount for: one (1) year shall be 75% of the "full annual premium"; two (2) years shall be 150% of the "full annual premium"; three (3) years shall be a reasonable premium amount to be mutually agreed upon by the Insured and the Insurer. As used herein, "full annual premium" means the premium level in effect immediately prior to the end of the Policy Period.

In the event of a Transaction, as defined in Clause 12, the Named Entity shall have the right, within thirty (30) days after the end of the Policy Period, to request an offer from the Insurer of a Discovery Period (with respect to Wrongful Acts occurring prior to the effective time of the Transaction) for a period of no less than three years or for such longer or shorter period as the Named Entity may request. The Insurer shall offer such Discovery Period pursuant to such terms, conditions and premium as the Insurer may reasonably decide. In the event of a Transaction, the right to a Discovery Period shall not otherwise exist except as indicated in this paragraph.

In the event of cancellation or nonrenewal by the Insurer for the nonpayment of premium, any monies received by the Insurer as payment for Discovery Period shall be first applied to such premium owing for the policy. The Discovery Period will not take effect until the premium owing for the policy is paid in full and unless the premium owing Discovery Period is paid promptly when due.

Clause 14. OTHER INSURANCE AND INDEMNIFICATION, is deleted in its entirety and replaced with the following:

14.   OTHER INSURANCE AND INDEMNIFICATION

If there is any valid and collectible insurance which applies to any Loss covered by this policy, the Insurer shall not be liable for a greater proportion of such Loss than the applicable Limit of Liability under this policy for such loss bears to the total applicable Limit of Liability of all valid and collectible insurance against them unless such other insurance is written only as specific excess insurance over the Limit of Liability provided by this policy.

In the event of a Claim against an Insured arising out of his or her service as a director, officer, trustee or governor of an Outside Entity or an Employment Practices Claim against a leased Employee as described in definition (f) of Clause 2,

*END 001*

ENDORSEMENT# 1    (continued)

coverage as is afforded by this policy shall be specifically excess of indemnification provided by such Outside Entity or such leasing company and any insurance provided to such Outside Entity or such leasing company.

Further, in the event other insurance is provided to the Outside Entity or leasing company referenced in the above paragraph, or is provided under any pension trust or employee benefit plan fiduciary liability insurance policy, and such other insurance is provided by the insurer or any member company of American International Group, Inc. (AIG) (or would be provided but for the application of the retention amount, exhaustion of the limit of liability or failure to submit a notice of a Claim) then the insurer's maximum aggregate Limit of Liability for all Losses combined in connection with a Claim covered, in part or in whole, by this policy and such other insurance policy issued by AIG shall not exceed the greater of the Limit of Liability of this policy or the limit of liability of such other AIG insurance policy.

Clause 17. DISPUTE RESOLUTION PROCESS, is deleted in its entirety and replaced with the following:

**17.  DISPUTE RESOLUTION PROCESS**

The Insured shall have the option, in its sole discretion, to submit all disputes or differences which may arise under or in connection with this policy, whether arising before or after termination of this policy, including any determination of the amount of Loss, to the alternative dispute resolution process ("ADR") set forth in this clause.

The Insurer agrees to submit to the ADR process chosen by the Insured. Once elected, the ADR cannot be terminated prior to a determination without the consent of the Insured and the Insurer.

There shall be non-binding mediation administered by the American Arbitration Association, in which the Insurer and Insureds shall try in good faith to settle the dispute by mediation under or in accordance with its then-prevailing Commercial Mediation Rules. The mediator(s) shall have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute. The mediator(s) shall also give due consideration to the general principles of the law of the state where the Named Entity is incorporated or formed in the construction or interpretation of the provisions of this policy; provided, however, that the terms, conditions, provisions and exclusions of this policy are to be construed in an even-handed fashion in the manner most consistent with the relevant terms, conditions, provisions or exclusions of the policy. In the event of mediation, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until the mediation shall have been terminated and at least 120 days shall have elapsed from the date of the termination of the mediation. In all events, each party shall share equally the expenses of the ADR.

ADR may be commenced in New York, New York; Atlanta, Georgia; Chicago, Illinois; Denver, Colorado; or in the state indicated in Item 1 of the Declarations page as the mailing address for the Named Entity. The Named Entity shall act on behalf of all Insureds in deciding to proceed with ADR under this clause.

**ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS SHALL REMAIN THE SAME.**

*END 001*    AUTHORIZED REPRESENTATIVE

ENDORSEMENT# 2

This endorsement, effective 12:01 a.m.   January 24, 2004     forms a part of
policy number   931-75-64
issued to REFCO GROUP LTD, LLC

by   Illinois National Insurance Company

## ILLINOIS
## AMENDATORY ENDORSEMENT

Wherever used in this endorsement: 1) "we", "us", "our", and "Insurer" mean the insurance company which issued this policy; and 2) "you", "your", "Named Insured", and "Insured" mean the Named Corporation, Named Organization, Named Sponsor, Named Insured, or Insured stated in the declarations page; and 3) "Other Insured(s)" means all other persons or entities afforded coverage under the policy.

### CANCELLATION AND NONRENEWAL

A.   The cancellation condition of this policy is replaced by the following:

CANCELLATION

1.   The Named Insured may cancel this policy by mailing to the Insurer advance written notice of cancellation.

2.   If this policy has been in effect for sixty (60) days or less, the Insurer may cancel this policy by mailing to the Named Insured written notice of cancellation at least:

a.   Ten (10) days before the effective date of cancellation if the Insurer cancels for nonpayment of premium; or

b.   Thirty (30) days before the effective date of cancellation if the Insurer cancels for any other reason.

3.   If this policy has been in effect for more than sixty (60) days the Insurer may cancel this policy only for one or more of the following reasons:

a.   Nonpayment of premium;

b.   The policy was obtained through a material misrepresentation;

c.   The Named Insured or Other Insured(s) have violated any of the terms and conditions of the policy;

d.   The risk originally accepted has measurably increased;

e.   Certification to the Director of Insurance of the loss of reinsurance by the Insurer which provided coverage to the Insurer for all or a substantial part of the underlying risk insured; or

f.   A determination by the Director that the continuation of the policy could place the Insurer in violation of the insurance laws of this State.

If the Insurer cancels this policy based on one or more of the above reasons except for nonpayment of premium, the Insurer will mail written notice to the Named Insured at least sixty (60) days before the effective date of cancellation. When cancellation is for nonpayment of premium, the Insurer will mail notice at least ten (10) days before the effective date of cancellation.

*END 002*

<u>ENDORSEMENT# 2</u>    (continued)

4.   The Insurer will mail the notice to the Named Insured and the agent or broker at the last addresses known to the Insurer.

5.   Notice of cancellation will state the effective date of cancellation and a specific explanation of the reason or reasons for cancellation. The policy period will end on that date.

6.   If this policy is cancelled, the Insurer will send the Named Insured any premium refund due. If the Insurer cancels, the refund will be pro rata. If the Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if the Insurer has not made or offered a refund.

7.   Proof of mailing will be sufficient proof of notice.

B.   The following is added:

NONRENEWAL

1.   If the Insurer decides not to renew this policy, the Insurer will mail written notice stating the reason for nonrenewal to the Named Insured's last mailing address known to the Insurer at least sixty (60) days before the expiration date of the policy. A copy of the notice will also be sent to:

a.   The broker, if known to the Insurer, or the agent of record; and

b.   The last known mortgagee or lienholder named in the policy at the last mailing address known to the Insurer.

This paragraph does not apply if the Insurer has manifested a willingness to renew directly to the Named Insured.

All other terms, conditions and exclusions remain unchanged.

_____

AUTHORIZED REPRESENTATIVE

*END 002*

52142 (1/93)   *COPY*                         ~ 2 ~

ENDORSEMENT# 3

This endorsement, effective *12:01 a.m.    January 24, 2004*     forms a part of
policy number  *931-75-64*
issued to   *REFCO GROUP LTD, LLC*

by     *Illinois National Insurance Company*

**Nuclear Energy Liability Exclusion**

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any Claim(s) made against any Insured(s):

A.     alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly the hazardous properties of nuclear material, including but not limited to:

   (1)     nuclear material located at any nuclear facility owned by, or operated by or on behalf of, the Company, or discharged or dispersed therefrom; or

   (2)     nuclear material contained in spent fuel or waste which was or is at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of the Company; or

   (3)     the furnishing by an Insured or the Company of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility; or

   (4)     claims for damages to the company or its shareholders which alleges, arises from, is based upon, is attributed to or in any way involves, directly or indirectly, the hazardous properties of nuclear material.

B.

   (1)     which is insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability underwriters, or Nuclear Insurance Association of Canada, or would be insured under any such policy but for its termination or exhaustion of its Limit of Liability; or,

   (2)     with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the Insured is, or had this policy not been issued would be entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into the United States of America, or any agency thereof, with any person or organization.

*COPY*          *END 3*

ENDORSEMENT# 3    (Cc  nued)

This endorsement, effective  12:01 a.m.    January 24, 2004    forms a part of
policy number  931-75-64
issued to   REFCO GROUP LTD, LLC

by    Illinois National Insurance Company

As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or byproduct
material;

"source material", "special nuclear material", and "byproduct material" have the
meanings given them in the Atomic Energy Act of 1954 or in law amendatory
thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has
been used or exposed to radiation in a nuclear reactor;

"waste" means any  waste material (1) containing byproduct material and (2)
resulting from the operation by any person or organization of any nuclear facility
included within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means:

(a)    any nuclear reactor,

(b)    any equipment or device designed or used for (1) separating the isotopes of
uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling,
processing or packaging waste,

(c)    any equipment or device used for the processing, fabricating or alloying of
special nuclear material if at any time the total amount of such material in
the custody of the Insured at the premises where such equipment or device
is located consists of or contains more than 25 grams of plutonium or
uranium 233 or any combination thereof, or more than 250 grams of
uranium 235,

(d)    any structure, basin, excavation, premises or place prepared or used for the
storage or disposal of waste, and includes the site on which any of the
foregoing is located, all operations conducted on such site and all premises
used for such operations;

*COPY*              *END 3*

<u>ENDORSEMENT#</u> *3*     (C(   nued)

This endorsement, effective *12:01 a.m.     January 24, 2004*     forms a part of
policy number   *931-75-64*
issued to   *REFCO GROUP LTD, LLC*

by     *Illinois National Insurance Company*

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a
self-supporting chain reaction or to contain a critical mass of fissionable material.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
                                          AUTHORIZED REPRESENTATIVE

*COPY*          *END 3*

ENDORSEMENT# 4

This endorsement, effective *12:01 a.m.*    *January 24, 2004*        forms a part of
policy number  *931-75-64*
Issued to    *REFCO GROUP LTD, LLC*

by      *Illinois National Insurance Company*

### Professional E&O Exclusion

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any Claim(s) made against any Insured(s) alleging, arising out of, based upon or attributable to any Insured(s)' performance of or failure to perform professional services for others for a fee, or any act(s), error(s) or omission(s) relating thereto.

Notwithstanding the foregoing, it is further understood and agreed that this endorsement shall not apply to any Claim(s) brought by a shareholder of the Company in the form of a shareholder class, direct or derivative action alleging failure to supervise those who performed or failed to perform such professional services, provided that such shareholder action is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, the Company or any Insured(s).

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*COPY*          *END 4*

ENDORSEMENT# 5

This endorsement, effective 12:01 a.m.    January 24, 2004    forms a part of
policy number 931-75-64
issued to REFCO GROUP LTD, LLC

by    Illinois National Insurance Company

**Employment Practices Coverage Deleted**

In consideration of the premium charged, it is hereby understood and agreed that, notwithstanding any other provision of this policy (including any endorsement attached hereto, whether such endorsement precedes or follows this endorsement in time or sequence), this policy shall not provide coverage for Loss arising out of an Employment Practices Claim. It is further agreed that all sections of the policy which relate to coverage for Employment Practices Claims are deleted in their entirety.

It is further understood and agreed that the policy is hereby amended as follows:

I.

Item 5. of the Declarations is deleted in its entirety and replaced with the following:

ITEM 5.    RETENTION:

| | |
|---|---|
| Judgments, Settlements and Defense Costs (non-Indemnifiable Loss) | None |
| Securities Claims (other than private placements) Judgments, Settlements and Defense Costs (Company and Indemnifiable Loss) | $500,000 for Loss arising from Claims alleging the same Wrongful Act or Related Wrongful Acts (waivable under Clause 6 in certain circumstances) |
| All Other Claims (Including private placements) Judgments, Settlements and Defense Costs (Company and Indemnifiable Loss) | $500,000 for Loss arising from Claims alleging the same Wrongful Act or Related Wrongful Acts (waivable under Clause 6 in certain circumstances) |

COPY        END 5

ENDORSEMENT# 5    (Co   nued)

This endorsement, effective  12:01 a.m.    January 24, 2004       forms a part of
policy number  931-75-64
issued to  REFCO GROUP LTD, LLC

by    Illinois National Insurance Company


II.

Clause 2. DEFINITIONS is amended as follows:

1.   Definition (b) "Claim" is amended by deleting subparagraph (3) in its entirety and
     deleting the final paragraph thereof and replacing it with the following:

     The term "Claim" shall include a Securities Claim.

2.   Definition (t) "Wrongful Act" is amended by deleting the last sentence thereof,
     which reads as follows:

     "With respect to an Employment Practices Claim, the term "Wrongful Act" shall
     include any Employment Practices Violation."

III.

Clause 4. EXCLUSIONS is amended as follows:

1.   Exclusions (h), (i), (m), (n) and (q) are amended by deleting all references to
     exceptions for Employment Practices Claims.

2.   Exclusions (o) and (p) are amended by deleting all references to exceptions for
     Claims for Retaliation.

3.   The following exclusion shall apply and is added at the end of Clause 4:

     (r) with respect to all Coverages: alleging an Employment Practices Violation(s).

IV.

Clause 9. PRE-AUTHORIZED DEFENSE ATTORNEYS FOR DESIGNATED CLAIMS is
amended by deleting the first sentence of the Clause and replacing it with the following:

     "This clause applies only to a Securities Claim (hereinafter referred to as a
     "Designated Claim")."


COPY         END 5

ENDORSEMENT# *5*     (Cc   nued)

This endorsement, effective *12:01 a.m.    January 24, 2004*        forms a part of
policy number  *931-75-64*
issued to   *REFCO GROUP LTD, LLC*

by    *Illinois National Insurance Company*


## V.


It is further understood and agreed that any reference(s) to an Employment Practices Claim
or an Employment Practices Violation within the policy  shall not operate to grant coverage
for Loss alleging an Employment Practices Violation.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

*COPY*          *END 5*

ENDORSEMENT# 6

This endorsement, effective *12:01 a.m.    January 24, 2004*          forms a part of
policy number *931-75-64*
issued to    *REFCO GROUP LTD, LLC*

by    *Illinois National Insurance Company*

**Amend Discovery – Bilateral – Premium TBD (No more than 200% for Year One)**

In consideration of the premium charged, it is hereby understood and agreed that the policy
(and any endorsement amending Clause 10. DISCOVERY CLAUSE) is hereby amended to
the extent necessary for the policy to provide the following:

1.    Clause 10. DISCOVERY CLAUSE, is deleted in its entirety and replaced with the
      following:

   10.    DISCOVERY CLAUSE

          Except as indicated below, if the Named Entity shall cancel or the Named
          Entity or the Insurer shall refuse to renew this policy, the Named Entity shall
          have the right to a period of either one, two or three years following the
          effective date of such cancellation or nonrenewal upon payment of the
          respective "Additional Premium Amount" described below (herein referred to
          as the "Discovery Period") in which to give to the Insurer written notice of
          Claims first made against the Insureds during said Discovery Period for any
          Wrongful Act occurring prior to the end of the Policy Period and otherwise
          covered by this policy.  The rights contained in this paragraph shall
          terminate, however, unless written notice of such election together with the
          additional premium due is received by the Insurer within 30 days of the
          effective date of cancellation or nonrenewal. The Additional Premium for the
          Discovery Period shall be fully earned at the inception of the Discovery
          Period. The Discovery Period is not cancelable. This clause and the rights
          contained herein shall not apply to any cancellation resulting from
          non-payment of premium.

          The Additional Premium Amount for: (1) one year shall be 200% of the "Full
          Annual Premium"; (2) two or three years shall be an amount to be
          determined in the absolute and sole discretion of the Insurer.  As used
          herein, "Full Annual Premium" means the premium level in effect
          immediately prior to the end of the Policy Period.

          In the event of a Transaction, as defined in Clause 12, the Named Entity
          shall have the right, within 30 days before the end of the Policy Period, to
          request an offer from the Insurer of a Discovery Period (with respect to
          Wrongful Acts occurring prior to the effective time of the Transaction) for a
          period of no less than three years or for such longer or shorter period as the
          Named Entity may request.  The Insurer shall offer such Discovery Period
          pursuant to such terms, conditions and premium as the Insurer may
          reasonably decide.  In the event of a Transaction, the right to a Discovery
          Period shall not otherwise exist except as indicated in this paragraph.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*COPY*          *END 6*

ENDORSEMENT# 7

This endorsement, effective *12:01 a.m.    January 24, 2004*        forms a part of
policy number   *931-75-64*
issued to *REFCO GROUP LTD, LLC*

by    *Illinois National Insurance Company*

### "NO LIABILITY" PROVISION DELETED

In consideration of the premium charged, it is hereby understood and agreed that the
policy is hereby amended as follows:

(1)    The Definition of "No Liability" is hereby deleted in its entirety; and

(2)    The last paragraph of Clause 6. RETENTION CLAUSE is hereby deleted in its
entirety.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*END 007*

*COPY*

ENDORSEMENT# 8

This endorsement, effective *12:01 a.m.   January 24, 2004*      forms a part of
policy number  *931-75-64*
Issued to  *REFCO GROUP LTD, LLC*

by    *Illinois National Insurance Company*

**Failure To Maintain Insurance Exclusion**

In consideration of the premium charged, it is hereby understood and agreed that the
Insurer shall not be liable for any Loss in connection with any Claim(s) made against an
Insured alleging, arising out of, based upon, attributable to, or in anyway directly or
indirectly relating to any failure or omission on the part of the Insureds or the Company to
effect and/or maintain adequate insurance.


ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.



_____
AUTHORIZED REPRESENTATIVE

*COPY*          *END 8*

ENDORSEMENT# 9

This endorsement, effective *12:01 a.m. January 24, 2004* forms a part of
policy number *931-75-64*
Issued to *REFCO GROUP LTD, LLC*

by *Illinois National Insurance Company*

### Delete Clause 5 - Reinstatement Provision

In consideration of the premium charged, it is hereby understood and agreed that Clause 5.
LIMIT OF LIABILITY and REINSTATED LIMIT OF LIABILITY (FOR ALL LOSS - INCLUDING
DEFENSE COSTS) is deleted in its entirety and replaced with the following:

5.   LIMIT OF LIABILITY (FOR ALL LOSS - INCLUDING DEFENSE COSTS)

Defense Costs are not payable by the Insurer in addition to the Limit of Liability.
Defense Costs are part of Loss and as such are subject to the applicable Limit of
Liability for Loss.

The Limit of Liability stated in Item 4 of the Declarations is the limit of the Insurer's
liability for all Loss, under Coverage A and Coverage B combined, arising out of all
Claims first made against the Insureds during the Policy Period and the Discovery
Period (if applicable); however, the Limit of Liability for the Discovery Period shall be
part of, and not in addition to, the Limit of Liability for the Policy Period. Further, a
Claim which is made subsequent to the Policy Period or Discovery Period (if
applicable) which pursuant to Clause 7(b) or 7(c) is considered made during the
Policy Period or Discovery Period shall also be subject to the one applicable
aggregate Limit of Liability stated in Item 4 of the Declarations.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*COPY*            *END 9*

ENDORSEMENT# 10

This endorsement, effective *12:01 a.m.    January 24, 2004*        forms a part of
policy number  *931-75-64*
Issued to   *REFCO GROUP LTD, LLC*

by   *Illinois National Insurance Company*

**Auto Subsidiary Threshold Amended to 10%**

In consideration of the premium charged, it is hereby understood and agreed that
subparagraph (2) of the Definition of Subsidiary is hereby amended by decreasing the
automatic threshold from 25% to 10%.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

.

_____
AUTHORIZED REPRESENTATIVE

*COPY*        *END 10*

ENDORSEMENT# 11

This endorsement, effective 12:01 a.m.     January 24, 2004          forms a part of
policy number    931-75-64
Issued to REFCO GROUP LTD, LLC

by     Illinois National Insurance Company

## EXCLUSION (o) AMENDED
## (FAIR LABOR STANDARDS ACT)

In consideration of the premium charged, it is hereby understood and agreed that
notwithstanding any other provision of this policy (including any endorsement attached
hereto whether such endorsement precedes or follows this endorsement in time or
sequence), Clause 4. EXCLUSIONS, is hereby amended by deleting Exclusion (o) in its
entirety and replacing it with the following:

(o)     for violation(s) of any of the responsibilities, obligations or duties imposed by
the Employee Retirement Income Security Act of 1974, the Fair Labor
Standards Act (except the Equal Pay Act), the National Labor Relations Act, the
Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus
Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or
regulations of the foregoing promulgated thereunder, and amendments thereto
or any similar federal, state, local or foreign statutory law or common law;
provided, however, this exclusion shall not apply to a Claim for Retaliation;
provided, further, however, there is no coverage provided under this policy for
any Claim related to, arising out of, based upon, or attributable to the refusal,
failure or inability of any Insured(s) to pay wages or overtime pay for services
rendered (hereinafter, "earned Wages") (as opposed to tort-based back pay or
front pay damages) or for improper payroll deductions taken by any Insured(s)
from any Employee(s) or purported employee(s), including, but not limited to,
(i) any unfair business practice claim alleged because of the failure to pay
Earned Wages, or (ii) any Claim seeking earned Wages because any
Employee(s) or purported employee(s) was improperly classified or mislabeled
as "exempt;"

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

*END 011*

(10/02)     *COPY*                    1 of 1

ENDORSEMENT# 12

This endorsement, effective *12:01 a.m.  January 24, 2004*    forms a part of
policy number  *931-75-64*
issued to   *REFCO GROUP LTD, LLC*

by    *Illinois National Insurance Company*

### Major Shareholder Exclusion – 10%

In consideration of the premium charged it is hereby understood and agreed that the
Insurer shall not be liable for any Loss in connection with any Claim(s) made against any
Insured(s) which are brought by any individual(s) or entity(ies) that own or control (whether
beneficially, directly or indirectly) 10% or more of the outstanding voting stock (hereinafter
"Major Shareholder"); or by any security holder of the Company whether directly or
derivatively, unless such security holder's Claim(s) is instigated and continued totally
independent of, and totally without the solicitation of, or assistance of any Major
Shareholder.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


AUTHORIZED REPRESENTATIVE

*COPY*        *END 12*

ENDORSEMENT# *13*

This endorsement, effective *12:01 a.m.   January 24, 2004*   forms a part of
policy number *931-75-64*
Issued to   *REFCO GROUP LTD, LLC*

by   *Illinois National Insurance Company*

### Retention Applicable to All Loss

In consideration of the premium charged, it is hereby understood and agreed that, notwithstanding any other provision of this policy (including any endorsement attached hereto whether such endorsement precedes or follows this endorsement in time or sequence), this policy is hereby amended as follows:

1.   Item 5. of the Declarations, entitled RETENTION is deleted in its entirety and replaced with the following:

ITEM 5.   ·   RETENTION:

| | |
|---|---|
| Judgments, Settlements and Defense Costs (Non-Indemnifiable Loss except for Employment Practices Claims) | None |
| Employment Practices Claims Judgments, Settlements and Defense Costs (Company, Non-Indemnifiable Loss and Indemnifiable Loss) | N/A for Loss arising from Claims alleging the same Wrongful Act or Related Wrongful Acts (waivable under Clause 6 in certain circumstances) |
| Securities Claims (other than private placements) Judgments, Settlements and Defense Costs (Company and Indemnifiable Loss) | $500,000 for Loss arising from Claims alleging the same Wrongful Act or Related Wrongful Acts (waivable under Clause 6 in certain circumstances) |

*COPY*          *END 13*

ENDORSEMENT# 13    (Cc   nued)

This endorsement, effective *12:01 a.m.    January 24, 2004*    forms a part of
policy number  *931-75-64*
issued to   *REFCO GROUP LTD, LLC*

by    *Illinois National Insurance Company*

|  |  |
|---|---|
| All Other Claims (including private placements)<br>Judgments, Settlements and Defense Costs<br>(Company and Indemnifiable Loss) | $500,000<br>for Loss arising from Claims alleging the same Wrongful Act or Related Wrongful Acts (waivable under Clause 6 in certain circumstances) |

2.    Clause 6. RETENTION CLAUSE is amended by deleting the first paragraph and replacing it with the following:

6.    RETENTION CLAUSE

The Insurer shall only be liable for the amount of Loss arising from a Claim which is in excess of the Retention amount stated in Item 5 of the Declarations, such Retention amount to be borne by the Company or the Insureds and shall remain uninsured, with regard to all Loss under:

(1)    (a)    Coverage A or B(ii) for all Claims other than Employment Practices Claims for which the Company has indemnified or is permitted or required to indemnify the Individual Insured(s) ("Indemnifiable Loss"); or

(b)    Coverage A or B(ii) for Employment Practices Claims regardless if the Loss is Indemnifiable or Non-Indemnifiable; or

(2)    Coverage B(i).

A single Retention amount shall apply to Loss arising from all Claims alleging the same Wrongful Act or Related Wrongful Act.

For purposes of this endorsement, "Non-Indemnifiable Loss" means Loss for which the Company has neither indemnified nor is permitted or required to indemnify the Individual Insured(s)

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*COPY*        *END 13*

ENDORSEMENT# 14

This endorsement, effective *12:01 a.m.   August 5, 2004*     forms a part of
policy number   *931-75-64*
Issued to   *REFCO GROUP LTD, LLC*

by     *Illinois National Insurance Company*

**Run-off Endorsement**

**(SELLER/BUYER MERGER)**

In consideration of the additional premium of $228,386, it is hereby understood and
agreed that as of the time and date designated as of the effective time of the merger or
acquisition (hereinafter the "Effective Time") in the merger agreement or plan of merger or
similarly titled contract executed by and between Seller, Buyer or the Buyer's acquisition
company, dated as of  August 5, 2004 including any amendments or revisions thereto,
(hereinafter the "Merger Agreement") the following provisions shall apply and be added to
the policy:

I.

Clause 1. INSURING AGREEMENTS, is deleted in its entirety and replaced with the
following:

1. **INSURING AGREEMENTS**

   **COVERAGE A: INDIVIDUAL INSURED INSURANCE**

   This policy shall pay the Loss of each and every Director, Officer, or Employee of the
   Company arising from a Claim first made against such Insureds during the Policy
   Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to
   the terms of this policy for any actual or alleged Wrongful Act occurring on or prior to
   the Effective Time in their respective capacities as Directors, Officers or Employees of
   the Company, except when and to the extent that the Company, or Buyer or the
   Buyer's acquisition company or successor company thereof has indemnified such
   Insureds. The Insurer shall, in accordance with and subject to Clause 8, advance
   Defense Costs of such Claim prior to its final disposition.

   **COVERAGE B: PRIVATE COMPANY INSURANCE**

   This policy shall pay the Loss of the Company, or in the event the Company no longer
   exists as a legal entity, the Buyer or the Buyer's acquisition company or the successor
   company thereof, arising from a:

   (i)   Claim first made against the Company, or

   (ii)  Claim first made against an Individual Insured.

*COPY*          *END 14*

ENDORSEMENT# *14*    (Con  ued)

This endorsement, effective *12:01 a.m.    August 5, 2004*       forms a part of
policy number  *931-75-64*
issued to  *REFCO GROUP LTD, LLC*

by    *Illinois National Insurance Company*

during the Policy Period or the Discovery Period (if applicable) and reported to the
Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act
occurring on or prior to the Effective Time, but, in the case of (ii) above, only when
and to the extent that the Company, or the Buyer or the Buyer's acquisition company
has indemnified the Individual Insured for such Loss pursuant to law, common or
statutory, or contract, Merger Agreement or the charter or by-laws of the Company or
the Buyer or the Buyer's acquisition company, or any Subsidiary or Affiliate thereof
duly effective under such law which determines and defines such rights of indemnity.
The Insurer shall, in accordance with and subject to Clause 8, advance Defense Costs
of such Claim prior to its final disposition.

**DEFENSE PROVISIONS**

The Insurer does not assume any duty to defend, provided, however, the Named Entity
or in the event that the Named Entity no longer exists as a legal entity Buyer or the
Buyer's acquisition company or any successor company thereof may at its sole option
tender to the Insurer the defense of a Claim for which coverage is provided by this
policy in accordance with Clause 8 of the policy. Regardless of whether the defense
is so tendered, the Insurer shall advance Defense Costs (excess of the applicable
retention amount) of such Claim prior to its final disposition. Selection of counsel to
defend a "Designated Claim" shall be made in accordance with Clause 9 of the policy.

II.

Clause 5. LIMIT OF LIABILITY and REINSTATED LIMIT OF LIABILITY (FOR ALL LOSS -
INCLUDING DEFENSE COSTS) is amended by deleting paragraph B, entitled Reinstated
Limit of Liability, in its entirety.

III.

The first paragraph of Clause 6. RETENTION CLAUSE, is deleted in its entirety and
replaced with the following:

**6. RETENTION CLAUSE**

The Insurer shall only be liable for the amount of Loss arising from a Claim which is in
excess of the Retention amount stated in Item 5. of the Declarations, such Retention
amount to be borne by the Company, Buyer or the Buyer's acquisition company or any
successor company thereof and/or the Insured(s) and shall remain uninsured, with
regard to all Loss under: (1) Coverage A or B(ii) for which the Company, Buyer or the

*COPY*         *END 14*

ENDORSEMENT# *14*    (Con   ued)

This endorsement, effective *12:01 a.m.    August 5, 2004*         forms a part of
policy number    *931-75-64*
issued to    *REFCO GROUP LTD, LLC*

by    *Illinois National Insurance Company*

Buyer's acquisition company or any successor company thereof has indemnified or is
permitted or required to indemnify the Individual Insured(s) ("Indemnifiable Loss"); or
(2) Coverage B(i). A single Retention amount shall apply to Loss arising from all
Claims alleging the same Wrongful Act or related Wrongful Acts.

IV.

Both Clause 8, in its entirety, and paragraph (i) of Clause 4 are amended by deleting the
terms "Company" and "Named Entity" wherever they appear and substituting in lieu
thereof the term, "Company, Buyer or the Buyer's acquisition company or any successor
company thereof, or any Subsidiary or Affiliate thereof";

V.

Clause 10. DISCOVERY CLAUSE, is deleted in its entirety and replaced with the following:

10.    RUN-OFF COVERAGE CLAUSE

The Named Entity shall have the right to a period of six (6) years following
the Effective Time (herein referred to as the Discovery Period or Run-off
Coverage) in which to give written notice to the Insurer of Claims first made
against the Insureds during said six (6) year period for any Wrongful Act
occurring on or prior to the Effective Time and otherwise covered by this
policy.

VI.

Clause 11. CANCELLATION CLAUSE, is deleted in its entirety and replaced with the
following:

This policy may not be canceled by the Named Entity or by the Insurer
except as indicated below.

This policy may be canceled by or on the behalf of the Insurer only in the
event of nonpayment of premium by the Named Entity. In the event of
nonpayment of premium by the Named Entity, the Insurer may cancel this
policy by delivering to the Named Entity or by mailing to the Named Entity,
by registered, certified, or other first class mail, at the Named Entity's
address as shown in Item 1. of the Declarations page, written notice stating

*COPY*        *END 14*

<u>ENDORSEMENT# 14</u>    (Con. ued)

This endorsement, effective *12:01 a.m.    August 5, 2004*        forms a part of
policy number  *931-75-64*
issued to    *REFCO GROUP LTD, LLC*

by    *Illinois National Insurance Company*

> when, not less than thirty (30) days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The Policy Period terminates at the date and hour specified in such notice, or at the date and time of surrender.
>
> If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.
>
> It is further understood and agreed that the premium charged for this endorsement shall be fully earned as of the Effective Time.

VII.

Clause 12. CHANGE IN CONTROL OF NAMED ENTITY, is deleted in its entirety.

VIII.

It is further understood and agreed that notwithstanding any other provision of this policy, this policy shall not provide coverage for any Claim(s) alleging Wrongful Acts occurring after the Effective Time.

IX.

For purposes of this endorsement, the following definitions shall apply:

    Buyer shall mean:  Thomas H. Lee

    Seller shall mean:  Refco Group Ltd, LLC

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

*COPY*        *END 14*

424B1 1 a2162155z424b1.htm 424B1
QuickLinks -- Click here to rapidly navigate through this document

**Filed Pursuant to Rule 424(b)1**
**Registration No. 333-123969**
**Registration No. 333-127421**

26,500,000 Shares



# Refco Inc.
## Common Stock

————

Prior to this offering, there has been no public market for our common stock. The initial public offering price of our common stock is $22.00 per share. We are selling 12,500,000 shares of common stock and the selling stockholders are selling 14,000,000 shares of common stock. We will not receive any of the proceeds from the shares of common stock sold by the selling stockholders. Our common stock has been approved for listing on the New York Stock Exchange under the symbol "RFX."

The underwriters have an option to purchase a maximum of 3,975,000 additional shares from us to cover over-allotments of shares.

**Investing in our common stock involves risks. See "Risk Factors" on page 13.**

|  | Price to Public | Underwriting Discounts and Commissions | Proceeds to Refco | Proceeds to Selling Stockholders |
|---|---|---|---|---|
| Per Share | $22.00 | $1.32 | $20.68 | $20.68 |
| Total | $583,000,000 | $34,980,000 | $258,500,000 | $289,520,000 |

Delivery of the shares of common stock will be made on or about August 16, 2005.

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

*Joint Book-Running Managers*

# Credit Suisse First Boston

# Goldman, Sachs & Co.

# Banc of America Securities LLC

*Co-Managers*

**Deutsche Bank Securities**

        **JPMorgan**

                **Merrill Lynch & Co.**

                        **Sandler O'Neill & Partners, L.P.**

                                **HSBC**

The date of this prospectus is August 10, 2005.

## TABLE OF CONTENTS

|                                                                                    | Page  |
| ---------------------------------------------------------------------------------- | ----- |
| PROSPECTUS SUMMARY                                                                  | 1     |
| RISK FACTORS                                                                        | 13    |
| FORWARD-LOOKING STATEMENTS                                                          | 34    |
| USE OF PROCEEDS                                                                     | 35    |
| DIVIDEND POLICY                                                                     | 35    |
| CAPITALIZATION                                                                      | 37    |
| DILUTION                                                                            | 38    |
| UNAUDITED PRO FORMA CONSOLIDATED FINANCIAL STATEMENTS                               | 40    |
| SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA                                     | 49    |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 53    |
| INDUSTRY                                                                            | 79    |
| BUSINESS                                                                            | 86    |
| MANAGEMENT                                                                          | 101   |
| PRINCIPAL AND SELLING STOCKHOLDERS                                                  | 113   |
| CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS                                      | 117   |
| DESCRIPTION OF CAPITAL STOCK                                                        | 124   |
| DESCRIPTION OF INDEBTEDNESS                                                         | 127   |
| SHARES ELIGIBLE FOR FUTURE SALE                                                     | 131   |
| MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES                                       | 133   |
| UNDERWRITING                                                                        | 136   |
| LEGAL MATTERS                                                                       | 141   |
| EXPERTS                                                                             | 141   |
| AVAILABLE INFORMATION                                                               | 141   |
| GLOSSARY                                                                            | 142   |
| INDEX TO CONSOLIDATED FINANCIAL STATEMENTS                                          | F-1   |

You should rely only on the information contained in this document or to which we have referred you. We have not authorized anyone to provide you with information that is different. This document may only be used where it is legal to sell these securities. The information in this document may only be accurate on the date of this document.

"REFCO" and the Refco logo are our trademarks. Other service marks, trademarks and trade names referred to in this prospectus are the property of their respective owners. As indicated in this prospectus, we have included market data and industry forecasts that were obtained from industry publications.

### Dealer Prospectus Delivery Obligation

Until September 4, 2005 (25 days after the date of this prospectus), all dealers that effect transactions in these securities, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to the dealer's obligation to deliver a prospectus when acting as an underwriter with respect to unsold allotments or subscriptions.

## PROSPECTUS SUMMARY

*This summary highlights key information contained elsewhere in this prospectus. It may not contain all of the information that is important to you. You should read the entire prospectus, including "Risk Factors," our consolidated financial statements and the related notes thereto and the other documents to which this prospectus refers, before making an investment decision. In this prospectus, the terms "Refco," "we," "our" and "us" refer to Refco Inc. and its subsidiaries. The terms "fiscal year" and "FY" refer to the 52 or 53 weeks ended on the final day in February, while the terms "calendar year" and "year" refer to the year ended December 31 of the year referenced.*

### Our Company

We are a leading independent provider of execution and clearing services for exchange-traded derivatives and a major provider of prime brokerage services in the fixed income and foreign exchange markets. We offer our customers rapid, low-cost trade execution and clearing services on a broad spectrum of derivatives exchanges and over-the-counter markets. We serve over 200,000 customer accounts from our 23 locations in 14 countries with a focus on delivering superior customer service. Our customers include corporations, government agencies, hedge funds, managed futures funds, pension funds, financial institutions, retail clients and professional traders.

In 2004, we were the largest provider of customer transaction volume to the Chicago Mercantile Exchange, the largest derivatives exchange in the United States. In fiscal year 2005, we processed 654 million derivatives contracts, a volume of derivatives contracts greater than the volume traded on the Chicago Board of Trade, the Chicago Board Options Exchange or the New York Mercantile Exchange during the same period. We are more diversified than any individual exchange, as we offer access to multiple products on virtually all major derivatives exchanges worldwide as well as over-the-counter markets.

In fiscal year 2005, we cleared over $13.7 trillion in U.S. Treasury repurchase transactions and processed over $1.2 trillion in customer volume in the foreign exchange market. In 2004, we ranked fourth among Fixed Income Clearing Corporation member firms in terms of cleared U.S. Treasury repurchase transaction volume and eighth for U.S. Treasury cash transaction volume.

Our revenues are primarily comprised of:

- transaction fees earned from executing and clearing customer orders; and

- interest income earned on cash balances in our customers' accounts and from providing financing through repurchase transactions.

For the year ended February 28, 2005, we generated $1,331.9 million of net revenues and $176.3 million of net income and for the three months ended May 31, 2005, we generated $411.6 million of net revenues and $42.6 million of net income.

We have positioned ourselves to benefit from strong growth in the exchange-traded derivatives, fixed income and foreign exchange markets. We have also acquired businesses that have enabled us to enter new markets and geographic regions. As a result, our business has grown significantly over the last several years, as exemplified by the following:

- volume of cleared transactions in exchange-traded derivatives contracts has increased from 80.8 million in fiscal year 2001 to 653.7 million in fiscal year 2005, a compound annual growth rate of 68.7%;

- volume of cleared U.S. Treasury repurchase transactions has increased from 0.4 million in fiscal year 2000 to 3.5 million in fiscal year 2005, a compound annual growth rate of 54.3%;

1

- volume of global foreign exchange transactions processed has increased from $482.4 billion in fiscal year 2002 to $1,216.5 billion in fiscal year 2005, a compound annual growth rate of 36.1%;

- net revenues have grown from $461.0 million in fiscal year 2000 to $1,331.9 million in fiscal year 2005, a compound annual growth rate of 23.6%; and

- operating profit has increased from $61.0 million in fiscal year 2000 to $150.6 million in fiscal year 2005, a compound annual growth rate of 19.8%.

## Our Competitive Strengths

We believe our following competitive strengths will enable us to continue to successfully grow our business and increase our profitability:

- **Established Market Position.** As of May 31, 2005, we were the largest independent Futures Commission Merchant in the United States based on domestic customer segregated fund balances of approximately $4.1 billion. We are a clearing member on virtually all major domestic and international derivatives exchanges. We believe our leading market position allows us to provide our customers a broad product offering, superior customer service and leading technology at low cost.

- **Diversified Across Customers, Products and Markets.** We serve more than 200,000 accounts for customers that include corporations, government agencies, hedge funds, managed futures funds, pension funds, financial institutions, retail clients and professional traders. We believe this diversification reduces our overall earnings volatility and dependence on any one customer segment, product or market.

- **Direct Customer Relationships.** We serve as an essential intermediary between our customers and the financial markets and, unlike an exchange, we maintain direct relationships with our customers. These customer relationships allow us to benefit from customer trading of a variety of products across multiple exchanges and markets.

- **Scalable Operating Platform.** Our business benefits from a scalable operating platform. Our existing infrastructure is capable of processing significant additional volumes with limited incremental increases in our Employee Compensation and Benefits expenses and General, Administrative and Other expenses.

- **Ability to Generate Free Cash Flow and Reduce Financial Leverage.** We generate significant free cash flow, which is available for reinvestment in our business, debt service and reduction, acquisitions and other uses. In January 2005, we voluntarily prepaid $150.0 million of our bank debt.

- **Proven and Committed Management Team.** The members of our senior management team have an average of 24 years of industry experience. Under their leadership, net revenues have grown at a compound annual growth rate of 23.6% from fiscal year 2000 through fiscal year 2005.

## Our Business Strategy

We plan on continuing to capitalize on the economies of scale arising from our large execution and clearing volumes and to increase our transaction volumes, revenues and profitability by executing the following strategies:

- **Capitalize on Growing Markets and New Product Opportunities.** We will continue to identify opportunities for growth within our markets and for new product offerings while leveraging the customer relationships, liquidity and transaction processing platform of our existing businesses.

2

- ***Profit from Maturing Markets.***   We seek to continue to take advantage of our scale and operating efficiency to profit from providing execution and clearing services at a low cost to customers in transparent, highly liquid, commoditized markets.

- ***Offer Unconflicted Access to Markets.***   We strive to differentiate our business offerings from our competitors' offerings by focusing solely on customer business and leveraging our transaction processing capabilities. We believe our focus on acting as an agent is important to customers concerned about quality of execution and potential conflicts of interest.

- ***Grow Our Customer Base.***   The significant growth of the markets in which we participate creates opportunities for us to attract new customers. Our dedicated sales force of over 1,000 individuals focuses on developing new corporate and institutional accounts and deepening existing relationships. We have also developed online platforms to attract the growing base of customers who trade over the Internet. As we continue to grow, we will maintain our focus on providing high levels of customer service.

- ***Capitalize on Shift to Electronic Trading.***   Many markets and exchanges are increasingly using electronic trading and moving away from the traditional open outcry method. We believe increased electronic trading has created an opportunity for us to increase market share in our various markets as our operating platform is well suited to accommodate this technological shift.

- ***Manage Risk Prudently.***   We plan to continue to monitor and improve our exposure to customer and counterparty risk throughout our operations using our comprehensive risk management system.

- ***Pursue Selective Strategic Acquisitions.***   We intend to pursue selective acquisitions that will expand our service capabilities or customer base or provide greater access to trading in a wider range of products.

### Our Businesses

We are organized into two operating business segments for financial reporting purposes: Derivatives Brokerage & Clearing and Prime Brokerage/Capital Markets.

### *Derivatives Brokerage & Clearing*

We provide our customers with access to trading in a wide range of derivatives products, including interest rate, equity index, energy, agriculture, foreign currency and metals contracts, across virtually all of the major derivatives exchanges. Customers use our Derivatives Brokerage & Clearing platform to place buy and sell orders for exchange-traded derivatives contracts, which we direct to the appropriate exchange for matching. We also facilitate confirmation and settlement of our customers' derivatives transactions and ensure that our customers have the appropriate collateral in their accounts to support their derivatives positions. We conduct these activities in our capacity as a regulated Futures Commission Merchant.

Annual global trading volume in exchange-traded derivatives grew to approximately 8.8 billion contracts in 2004, representing a compound annual growth rate of approximately 20% over the past 15 years and approximately 25% from 2001 to 2004, according to the Bank for International Settlements. Volume growth in the exchange-traded derivatives market has been influenced by the following trends:

- a shift towards electronic trading;

- the increasing awareness and importance of risk management;

- the introduction of new derivatives products and exchanges;

- a shift in trading from over-the-counter markets to on-exchange trading; and

- increased competition among exchanges and clearing platforms.

3

From fiscal year 2000 through fiscal year 2005, our Derivatives Brokerage & Clearing net revenues and operating profit have grown at compound annual growth rates of 24.3% and 33.3%, respectively.

### Prime Brokerage/Capital Markets

We offer prime brokerage services, including execution, clearing, securities financing, securities lending, custody and trade processing. We provide these prime brokerage services primarily in the U.S. Treasury securities, non-dollar fixed income and foreign exchange markets. To the extent the products for which we provide brokerage services do not trade on regulated exchanges, we broker these transactions as a principal. Our customers include hedge funds and other financial institutions.

*Fixed Income.* Our fixed income operating platform provides our customers access to the interdealer broker market for U.S. Treasury securities. The interdealer broker market is an over-the-counter, wholesale securities market that allows brokers to trade with one another. In 2004, we ranked fourth among Fixed Income Clearing Corporation member firms in terms of cleared U.S. Treasury repurchase transaction volume and eighth for U.S. Treasury cash transaction volume. From 1999 to 2004, average daily trading volume in the interdealer broker market for U.S. Treasury securities and the average daily amount outstanding of repurchase agreements grew at compound annual growth rates of 17.4% and 16.1%, respectively. As we do not engage in strategy-based or directional proprietary trading, we do not face the same conflicts of interest with our customers as our competitors that engage in both agency and proprietary trading. We therefore provide our customers with unconflicted market access, in addition to price transparency, anonymity, high service levels and low-cost execution and clearing. Factors contributing to transaction volume growth in the interdealer broker market include:

- growth in the total amount of debt outstanding;

- increasing use of interest rate derivatives;

- greater sensitivity to credit risk; and

- the introduction of electronic trading platforms.

*Foreign Exchange.* We enable our customers to trade in the majority of the world's principal currencies in the form of spot, forwards and options in over-the-counter foreign exchange markets via several trading platforms. The global foreign exchange market is generally regarded as the largest financial market in the world as measured by transaction value. Estimated average daily volume as of April 2004, for example, was $1.9 trillion, having grown at a 7.3% compound annual growth rate since 1989. While transaction volume in this market is dominated by money center banks, an increasing number of investors utilize the services of non-bank market participants, including independent brokers such as us. Factors contributing to transaction volume growth in the foreign exchange markets include:

- increased cross-border trade and investment;

- increasing use of foreign exchange as a hedging tool;

- alternative investment asset flows; and

- the emergence of electronic brokerage.

From fiscal year 2000 through fiscal year 2005, our Prime Brokerage/Capital Markets net revenues and operating profit have grown at compound annual growth rates of 26.0% and 38.2%, respectively.

4

**Recent Transactions**

*The THL Transactions*

On August 5, 2004, THL Refco Acquisition Partners, an affiliate of Thomas H. Lee Partners, L.P., and its affiliates and co-investors acquired approximately 57% of the equity interests in our indirect subsidiary, Refco Group Ltd., LLC ("Refco Group"), which they hold through our direct subsidiary New Refco Group Ltd., LLC ("New Refco"), for approximately $507.0 million in cash. In connection with the transaction, Phillip Bennett, our President and Chief Executive Officer, exchanged his existing equity investment of approximately $382.5 million in Refco Group for an approximate 42.8% equity interest in New Refco, and other members of our management made an investment in New Refco aggregating approximately $4.5 million in cash. Concurrently with the closing of the acquisition, Refco Group entered into senior credit facilities providing for a fully drawn $800.0 million term loan and an undrawn $75.0 million revolving loan facility, and, together with Refco Finance Inc., issued $600.0 million in aggregate principal amount of senior subordinated notes. Also concurrently with the consummation of the transactions described above, Refco Group distributed $550.0 million in cash as well as all of the equity interests of Forstmann-Leff International Associates, LLC, which at that time owned substantially all the assets of Refco Group's Asset Management business to Refco Group Holdings, Inc., an entity that was owned by Tone Grant and Phillip Bennett and that is now wholly owned by Phillip Bennett. We refer to the foregoing transactions collectively as the "THL Transactions."

*The Reincorporation*

Prior to this offering, we conducted our business through Refco Group and its direct and indirect subsidiaries. Immediately prior to the effectiveness of the registration statement of which this prospectus is a part, Refco Inc., a recently formed Delaware corporation that is a direct, wholly-owned subsidiary of New Refco and following the transactions described below became a holding company for our business, entered into the following transactions:

- Refco Inc. issued an aggregate of 63,122,588 shares of its common stock to Thomas H. Lee Equity Fund V, L.P. and its affiliates and co-investors in exchange for the direct or indirect equity interests in New Refco held by such parties;

- Refco Group Holdings, Inc., which is wholly-owned by Phillip Bennett, our President and Chief Executive Officer, contributed all of its Class A member interests in New Refco to Refco Inc. in exchange for 28,529,522 shares of its common stock;

- The Phillip R. Bennett Three Year Annuity Trust, in respect of which Phillip Bennett, our President and Chief Executive Officer, is both Trustee and Beneficiary, contributed all of its Class A member interests in New Refco to Refco Inc. in exchange for 19,089,272 shares of its common stock;

- Our officers who held Class A member interests in New Refco contributed all of their Class A member interests in New Refco to Refco Inc. in exchange for an aggregate of 242,758 shares of its common stock; and

- Our officers, directors and employees who held Class B member interests in New Refco contributed all of their Class B member interests in New Refco to Refco Inc. in exchange for an aggregate of 4,015,860 shares of its common stock, which shares are subject to vesting.

We refer to the transactions listed above as the "Reincorporation."

As a result of these transactions, Refco Inc. owns all of the outstanding member interests of New Refco. Refco Inc. is a Delaware "C" corporation, and as such is subject to federal and state income taxes. Our previous holding company, New Refco, is a limited liability company not subject to federal

5

or state income taxes, and as such, the historical financial data included in this prospectus do not reflect what our financial position and results of operations would have been had we been a taxable corporation. We expect to record a net deferred tax asset and a corresponding credit to our provision for income taxes of approximately $120.2 million immediately before the effectiveness of the registration statement of which this prospectus is a part. This deferred tax asset primarily results from the excess of the tax basis over the book basis of certain of our intangible assets. We expect to realize future reductions in our current tax expense as these intangibles are amortized and deducted from taxable income on our tax returns. Prior to the closing of this offering, New Refco intends to make a cash distribution of approximately $27.9 million to the members of New Refco to enable them to meet their estimated income tax obligations for the period from January 1, 2005 to the date of the Reincorporation. The amount of this distribution will be based on New Refco's estimated net taxable income from January 1, 2005 to the date of the Reincorporation. Purchasers of shares in the offering will not receive this distribution. Prior to the closing of this offering, Refco Group Holdings, Inc. will make a cash contribution of approximately $21.7 million to New Refco, which amount is equal to the amount of tax distributions that Refco Group Holdings, Inc. received from New Refco in excess of its pro rata share of all tax distributions made to members of New Refco prior to the offering.

This prospectus does not include financial statements of Refco Inc. because it has only been formed recently for the purpose of effecting the offering and until the consummation of the transactions described above, held no material assets and did not engage in any operations.

For more information on the THL Transactions and the Reincorporation, see "Certain Relationships and Related Transactions."

6

Our ownership and corporate structure immediately following the Reincorporation and this offering are set forth in the following chart:



---

(1)     Ownership by Phillip R. Bennett, which constitutes 33.8% of our outstanding common stock following the offering, represents direct ownership and indirect ownership through each of Refco Group Holdings, Inc. and The Phillip R. Bennett Three Year Annuity Trust.

(2)     Undrawn as of May 31, 2005.

(3)     We intend to use a portion of the net proceeds of this offering to redeem $210.0 million aggregate principal amount of the outstanding senior subordinated notes due 2012. In connection with the redemption, we expect to recognize a loss for the write-off of deferred financing costs of $7.4 million and a loss of $18.9 million for the prepayment penalty.

*Acquisition of Cargill Investor Services*

On June 22, 2005, Refco Group announced that it has entered into a definitive agreement to acquire the global brokerage operations of Cargill Investor Services, or CIS, for $208.0 million in cash and future contingent cash payments of between $67.0 million and $192.0 million, based on the performance of the acquired operations. Based solely on preliminary unaudited information provided to us by the seller, the total sales of the acquired business for the year ended May 31, 2005 are estimated to be between $225.0 million and $235.0 million. This financial information is subject to revision based upon the completion of the audit by the independent accountants of the acquired business. The receipt of audited financial statements for the acquired business that are consistent with the preliminary financial statements provided to us by the seller is a condition to our obligation to consummate such acquisition. The audited total sales of the acquired business may be materially different from estimated total sales, and you should not place undue reliance on this estimated information. The transaction, which is subject to the receipt of regulatory approvals and other closing conditions, including the condition described above, is expected to close in the next two months. We cannot assure you that the transaction will close on that schedule or at all.

7

**Our Executive Offices**

We are a Delaware corporation. Our principal executive offices are located at One World Financial Center, 200 Liberty Street, Tower A, New York, New York 10281, and our telephone number is (212) 693-7000. We also have a website located at *www.refco.com*. The information that appears on our website is not a part of, and is not incorporated into, this prospectus.

8

**The Offering**

| | |
|---|---|
| Common stock offered by us | 12,500,000 shares. |
| Common stock offered by the selling stockholders | 14,000,000 shares. |
| Total offering | 26,500,000 shares. |
| Common stock to be outstanding after this offering | 127,500,000 shares. |
| Use of proceeds | We intend to use the net proceeds of this offering to redeem $210.0 million aggregate principal amount of our outstanding senior subordinated notes due 2012 (together with the related premium and accrued and unpaid interest thereon to the redemption date) and for general corporate purposes, including working capital and potential acquisitions. Any proceeds from the exercise of the underwriters' option to purchase additional shares from us will be used to pay a dividend to our stockholders of record prior to this offering. Investors in this offering will not receive any portion of the dividend. See "Use of Proceeds" and "Dividend Policy." We will not receive any of the proceeds from the sale of shares of common stock by the selling stockholders. |
| Dividend policy | Except for the dividend payment described above, we do not anticipate paying any dividends on our common stock in the foreseeable future. |
| New York Stock Exchange symbol | RFX. |
| Risk factors | See "Risk Factors" beginning on page 13 of this prospectus for a discussion of factors you should carefully consider before deciding to invest in our common stock. |

Unless otherwise indicated, all of the information in this prospectus:

- gives effect to the transactions described under "Prospectus Summary—Recent Transactions;"

- excludes 3,634,140 shares of our common stock reserved for future grants under our compensation plans; and

- assumes no exercise of the underwriters' option to purchase up to an additional 3,975,000 shares from us.

9

**Summary Historical and Pro Forma Consolidated Financial Data**

Set forth below is summary historical and pro forma consolidated financial data, at the dates and for the periods indicated, for New Refco and its predecessor, Refco Group, which holds all of our operating subsidiaries and became an indirect subsidiary of Refco Inc. following the Reincorporation. This prospectus does not include financial statements of Refco Inc. because it has only been formed recently for the purpose of effecting this offering and until the consummation of the Reincorporation, held no material assets and will not engage in any operations.

We derived the summary historical consolidated financial data for the years ended February 28, 2003 and February 29, 2004 and for the period from March 1, 2004 through August 5, 2004 and the period from August 6, 2004 through February 28, 2005 from our audited consolidated financial statements. We derived the summary historical consolidated financial data for the three months ended May 31, 2004 and 2005 from our unaudited interim consolidated financial statements. The unaudited consolidated financial statements as of May 31, 2005 and for the three months ended May 31, 2004 and 2005 include all adjustments (consisting of normal, recurring adjustments) that are, in the opinion of management, necessary for a fair presentation of our financial position and result of operations for the period presented. The results for the three months ended May 31, 2005 are not necessarily indicative of our results of operations for a full fiscal year.

The unaudited summary pro forma financial data presented for all periods indicated below were derived from the unaudited pro forma financial statements included elsewhere in this prospectus. The pro forma statement of income data gives effect, in all periods presented, to the completion of (i) the THL Transactions, (ii) the Reincorporation and the conduct of our operations under Refco Inc., a new holding company that is a Delaware "C" corporation, and (iii) this offering and application of the net proceeds therefrom as if they had all occurred on March 1, 2004. The pro forma balance sheet data gives effect to the completion of (i) the Reincorporation and (ii) this offering and the application of the net proceeds therefrom as if they had occurred on May 31, 2005. Prior to the Reincorporation, all federal and state taxes on the income of New Refco have been payable by the members. As a "C" corporation, we are responsible for the payment of all federal and state corporate income taxes and, accordingly, the unaudited pro forma consolidated statement of income data give effect to the pro forma provision for income tax expense for all periods set forth below. The pro forma data gives effect to our issuance of 12,500,000 shares of common stock in this offering at the initial public offering price of $22.00 per share and the application of the net proceeds for this offering, after deducting the underwriting discounts, commissions and estimated expenses payable by us in connection with this offering, as described under "Use of Proceeds."

The pro forma financial data is included for informational purposes only and does not purport to represent what our results of operations would have actually been during the periods presented, nor does the pro forma data give effect to any events other than those discussed above and in the related notes. As a result, the pro forma operating results are not necessarily indicative of the operating results for any future period. See "Certain Relationships and Related Transactions" for a description of the Reincorporation.

You should read the data set forth below in conjunction with our consolidated financial statements and the related notes thereto, "Management's Discussion and Analysis of Financial Condition and Results of Operations," "Unaudited Pro Forma Consolidated Financial Statements," "Capitalization," "Selected Historical and Pro Forma Consolidated Financial Data," "Certain Relationships and Related Transactions" and other financial information included elsewhere in this prospectus.

10

| | Predecessor | | Successor | | | Predecessor | Successor | |
|---|---|---|---|---|---|---|---|---|
| | Fiscal Year Ended February 28, | | Period from March 1, 2004 through August 5, 2004 | Period from August 6, 2004 through February 28, 2005 | Pro Forma Year Ended February 28, 2005 | Three Months Ended May 31, 2004 | Three Months Ended May 31, 2005 | Pro Forma Three Months Ended May 31, 2005 |
| | 2003 | 2004(1) | | | | | | |
| | | | | | (unaudited) | (unaudited) | (unaudited) | (unaudited) |

**(in millions, except per share data)**

**Statement of Income Data:**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Revenues: | | | | | | | | |
| Commissions and brokerage | $ 572 | $ 645 | $ 362 | $ 487 | $ 849 | $ 216 | $ 244 | $ 244 |
| Interest | 2,387 | 1,052 | 769 | 1,817 | 2,586 | 378 | 939 | 939 |
| Principal transactions, net | 83 | 166 | 119 | 161 | 280 | 61 | 115 | 115 |
| Asset management and advisory fees | — | 7 | 4 | 9 | 12 | 2 | 6 | 6 |
| Other | 4 | 4 | 2 | 6 | 8 | 1 | 8 | 8 |
| Total revenues | 3,046 | 1,874 | 1,256 | 2,479 | 3,736 | 657 | 1,312 | 1,312 |
| Expenses: | | | | | | | | |
| Commissions and order execution costs | 385 | 412 | 244 | 359 | 603 | 143 | 208 | 208 |
| Interest | 2,182 | 898 | 707 | 1,765 | 2,477 | 344 | 924 | 919 |
| Employee compensation and benefits | 181 | 205 | 109 | 158 | 267 | 65 | 74 | 74 |
| General, administrative and other | 143 | 170 | 97 | 146 | 247 | 48 | 62 | 61 |
| Total expenses | 2,891 | 1,685 | 1,157 | 2,428 | 3,594 | 599 | 1,268 | 1,262 |
| Income from equity investees | | | | | 25 | | | 14 |
| Provision for income taxes(2) | 1 | 12 | 8 | 6 | 72 | 6 | 5 | 21 |
| Members' interest in earnings (losses) of subsidiary | — | 1 | 6 | (17) | (11) | 1 | 10 | 10 |
| Dividends on preferred securities | 16 | — | — | — | — | — | — | — |
| Income from equity investees | 2 | 11 | 8 | 17 | — | 7 | 14 | — |
| Discontinued operations, net of taxes | — | — | 4 | — | — | 2 | — | — |
| Net income(2) | $ 140 | $ 187 | $ 98 | $ 78 | $ 106 | $ 59 | $ 43 | $ 32 |

**Net income per share data:**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Net income per share: | | | | | | | | |
| Basic | | | | $ 0.86 | | | | $ 0.26 |
| Diluted | | | | $ 0.84 | | | | $ 0.25 |

**Weighted average shares outstanding:**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Basic | | | | 122.4 | | | | 122.4 |
| Diluted | | | | 125.3 | | | | 125.3 |

11

| | As of February 28, | | As of May 31, 2005 | |
|---|---|---|---|---|
| | 2004(3) | 2005 | Actual | Pro Forma |
| | | | (unaudited) | (unaudited) |
| | (dollars in millions) | | | |
| **Balance Sheet Data:** | | | | |
| Total assets | $ 33,332 | $ 48,765 | $ 74,317 | $ 74,436 |
| Long-term debt and preferred securities issued by subsidiaries: | | | | |
| Long-term borrowings | | 316 | 1,238 | 1,236 | 1,026 |
| Subordinated debt | | 16 | — | — | — |
| Preferred securities issued by subsidiaries | | — | — | — | — |
| Total long-term debt and preferred securities issued by subsidiaries | | 332 | 1,238 | 1,236 | 1,026 |

| | | Fiscal Year Ended February 28, | | Period from March 1, 2004 through August 5, 2004 | Period from August 6, 2004 through February 28, 2005 | Three Months Ended May 31, | |
|---|---|---|---|---|---|---|---|
| | | 2003 | 2004(1) | | | 2004 | 2005 |
| | | | | | | (unaudited) | (unaudited) |

Members' equity: 616   150   185
Stockholders' equity: 515

(dollars in millions)

**Other Financial Data:**

| | | 2003 | 2004(1) | 2004 | 2005 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|
| Depreciation and amortization | $ | 23 | $ 26 | $ 12 | $ 18 | $ 6 | $ 10 |
| Long-term debt interest | | 27 | 31 | 12 | 56 | 7 | 23 |
| Capital expenditures | | 12 | 11 | 5 | 9 | 3 | 3 |

| | | Fiscal Year Ended February 28, | | | Three Months Ended May 31, | |
|---|---|---|---|---|---|---|
| | | 2003 | 2004(1) | 2005 | 2004 | 2005 |
| | | (unaudited) | (unaudited) | (unaudited) | (unaudited) | (unaudited) |

**Other Data:**

| | | 2003 | 2004(1) | 2005 | 2004 | 2005 |
|---|---|---|---|---|---|---|
| Derivatives contract volume (contracts in millions) | | 401 | 472 | 654 | 159 | 207 |
| Foreign exchange volume (in billions) | $ | 474 | $ 682 | $ 1,217 | $ 180.8 | $ 409.8 |
| Average customer deposits (in billions) | $ | 3.6 | $ 4.0 | $ 4.2 | $ 4.1 | $ 4.5 |
| Average domestic net repo book (in billions) | $ | 21 | $ 27 | $ 32 | $ 37 | $ 46 |

(1)    Year ended February 29.

(2)    Historical net income and provision for income taxes do not give effect to our reorganization as a "C" corporation and do not reflect additional federal, state and local income taxes that we would have been required to pay had we been a taxable corporation during the periods presented. The pro forma combined effective federal, foreign, state and local tax rate for all periods presented is 41%. As a "C" corporation, we will record a cumulative net deferred tax asset and corresponding credit to our income tax provision of approximately $120.2 million. This deferred tax asset primarily results from the excess of the tax basis over the book basis of certain of our intangible assets. We expect to realize future reductions in our current tax expense as these intangibles are amortized and deducted from taxable income on our tax returns.

(3)    As of February 29.

12

# RISK FACTORS

*An investment in our common stock involves a high degree of risk. Presented below are all the risks that management deems material to an investment in our common stock. You should carefully consider the risks described below, together with the other information contained in this prospectus, before making an investment decision. As a result of any of these risks our business, results of operations or financial condition may be adversely affected, and you may lose all or part of your investment in our common stock.*

## Risks Relating to Our Company

**Changes in domestic and international market factors that reduce trading volumes or interest rates could significantly harm our business.**

We generate revenues primarily from transaction fees we earn from executing and clearing customer orders and from interest income we earn on cash balances in our customers' accounts and from providing secured financing through repurchase transactions. These revenue sources are substantially dependent on customer trading volumes and interest rates. We are, in particular, affected by our customers' trading volumes and their demand for particular derivatives products, such as foreign exchange, interest rate, equity and fixed income futures and options. The volume of transactions our customers conduct with us and interest rates are directly affected by domestic and international market factors that are beyond our control, including:

- economic, political and market conditions;

- broad trends in industry and finance;

- changes in levels of trading activity in the broader marketplace;

- price levels and price volatility in the derivatives, fixed income, equity, foreign exchange and commodity markets;

- legislative and regulatory changes;

- the actions of our competitors;

- changes in government monetary policies;

- foreign exchange rates; and

- inflation.

Any one or more of these factors, or others, may contribute to reduced trading volumes or changes in interest rates. Any material decrease in trading volume in the securities markets in general, or the derivatives, fixed income and foreign exchange markets in particular, or any decline in prevailing interest rates would have a material adverse effect on our business, financial condition and operating results. By way of example, during the second quarter of fiscal year 2005, the seasonal decrease in exchange-traded derivative volumes in Europe (Eurex) and Chicago (the Chicago Mercantile Exchange), exacerbated by historically low levels of volatility in underlying equity and fixed income markets, resulted in a decrease of 5.0% in our transaction volume and a decrease of 7.3% in Derivatives Brokerage & Clearing revenues for the quarter ended August 31, 2004 as compared with the quarter ended May 31, 2004.

**We face intense competition from other companies, and if we are not able to successfully compete with them, our business may be harmed.**

The derivatives, securities and financial services industries are highly competitive, and we expect that competition will intensify in the future. We have numerous current and prospective competitors, both domestically and internationally. Our primary competitors include both large, diversified financial

13

institutions, such as major commercial and investment banks and independent Futures Commission Merchants, foreign broker-dealers and other specialty broker-dealers. Many of our competitors and potential competitors have larger customer bases, more established name recognition and greater financial, marketing, technological and personnel resources than we do. These resources may enable them to, among other things:

- develop services similar to ours or new services that are preferred by our customers;

- provide access to trading in products or a range of products that we do not offer;

- provide better execution and clearing and lower transaction costs;

- offer better, faster and more reliable technology;

- take greater advantage of new or existing acquisitions, alliances and other opportunities;

- more effectively market, promote and sell their services; and

- better leverage their relationships with their customers.

In addition, new or existing competitors could gain access to trading markets in which we currently enjoy a competitive advantage. For example, if additional competitors gained access to the interdealer broker market, it could adversely affect our advantage in providing trading access to the U.S. Treasury securities market. Other market participants, such as the exchanges, may expand their services and begin competing with us more directly. Even if new or existing competitors do not significantly erode our market share, they may offer their services at lower prices, and we may be required to reduce our fees significantly to remain competitive, which could have a material adverse effect on our profitability. If we fail to compete effectively, our business, financial condition and operating results could be materially harmed.

***Our business could be adversely affected if we are unable to retain our existing customers or attract new customers.***

The success of our business depends, in part, on our ability to maintain and increase our customer base. Customers in our market are sensitive to, among other things, the costs of using our services, the quality of the services we offer, the speed and reliability of order execution and the breadth of our service offerings and the products and markets to which we offer access. We may not be able to continue to offer the pricing, service, speed and reliability of order execution or the service, product and market breadth that customers desire. In addition, our existing customers are not obligated to use our services and can switch providers of execution and clearing services or decrease their trading activity conducted through us at any time. As a result, we may fail to retain existing customers or be unable to attract new customers. Our failure to maintain or attract customers could have a material adverse effect on our business, financial condition and operating results.

***We rely on relationships with our introducing brokers for obtaining some of our customers. The failure to maintain these relationships could adversely affect our business.***

We have relationships with introducing brokers who assist us in establishing new customer relationships and provide marketing and customer service functions for some of our customers. These introducing brokers receive compensation for introducing customers to us. Many of our relationships with introducing brokers are non-exclusive or may be cancelled on relatively short notice. In addition, our introducing brokers have no obligation to provide new customer relationships or minimum levels of transaction volume. Our failure to maintain these relationships with these introducing brokers or the failure of these introducing brokers to establish and maintain customer relationships would result in a loss of revenues, which could adversely affect our business.

14

***Our business operations could be significantly disrupted if we lost the services of our President and Chief Executive Officer.***

Our future success depends to a significant degree upon the continued contributions of our management team, particularly our President and Chief Executive Officer, Phillip Bennett. Mr. Bennett may voluntarily terminate his employment with us at any time. The loss of the services of Mr. Bennett could adversely affect our ability to manage our business effectively or execute our business strategy. None of our agreements governing our debt instruments or other contracts includes a provision requiring the continued service of any key employee, and we do not maintain key man life insurance policies on any of our executive officers, including Mr. Bennett. See "Management—Directors and Executive Officers."

***We may not be able to attract and retain the highly skilled employees we need to support our business.***

Our future success also depends upon the efforts of our qualified and highly trained sales personnel and upon our ability to recruit and retain highly skilled and often specialized personnel, particularly in light of the rapid pace of technological advances. The level of competition in our industry for individuals with this level of experience or these skills is intense. If we are not able to attract and retain highly skilled employees, it could have a material adverse effect on our business, financial condition and operating results.

***We may not effectively manage our growth, which could materially harm our business.***

The growth of our business has placed and may continue to place a significant strain on our management, personnel, systems and resources. We must continue to improve our operational and financial systems and managerial controls and procedures, and we will need to continue to expand, train and manage our technology workforce. We must also maintain close coordination among our technology, compliance, risk management, accounting, finance, marketing and sales organizations. We may not manage our growth effectively. If we fail to do so, our business could be materially harmed.

If we continue to grow, we may be required to increase our investment in facilities, personnel and financial and management systems and controls. Continued growth may also require expansion of our procedures for monitoring and assuring our compliance with applicable regulations and that we recruit, integrate, train and manage a growing employee base. The expansion of our existing businesses, our expansion into new businesses and the resulting growth of our employee base increase our need for internal audit and monitoring processes that are more extensive and broader in scope than those we have historically required. We may not be successful in implementing all of the processes that are necessary. Further, unless our growth results in an increase in our revenues that is proportionate to the increase in our costs associated with this growth, our operating margins and profitability will be adversely affected.

***Our operations expose us to significant customer and counterparty credit risks.***

Customers and counterparties that owe us money, securities or other assets may default on their obligations to us due to bankruptcy, lack of liquidity, operational failure or other reasons. As a clearing broker, we act on behalf of our customers for all trades consummated both on exchanges and in over-the-counter markets. Accordingly, we are responsible for our customers' obligations with respect to these transactions, which exposes us to significant credit risk. A substantial part of our working capital is at risk if customers default on their obligations to us and their account balances and security deposits are insufficient to meet all of their obligations. As of May 31, 2005, February 28, 2005 and February 29, 2004, our reserve against receivables from customers was $62.1 million, $61.2 million and $65.2 million, respectively. Although we regularly review credit exposures to specific customers and counterparties to address present credit concerns, default risk may arise from events or circumstances that are difficult to

15

detect or foresee. In addition, concerns about, or a default by, one institution could lead to significant liquidity problems, losses or defaults by other institutions, which in turn could adversely affect us. We may be materially and adversely affected in the event of a significant default by our customers and counterparties.

**We are subject to an SEC investigation, which could adversely affect our business.**

On May 16, 2005 we announced that our subsidiary, Refco Securities, LLC ("Refco Securities"), had received a "Wells Notice" from the SEC arising out of an investigation into short sales of the stock of Sedona Corporation. The Wells Notice stated that the SEC staff intends to recommend that a civil enforcement action be brought against Refco Securities, alleging violations of Section 17(a) of the Securities Act of 1933, as amended, Sections 10(b) and 17(a) of the Exchange Act of 1934, as amended, and Rules l0b-5, l7a-3 and 17a-4 thereunder, Section 220.8 of Regulation T, Conduct Rule 3370 of the National Association of Securities Dealers, Inc., aiding and abetting violations of Section 15(a) of the Exchange Act of 1934, as amended, and failure to comply with a prior SEC cease and desist order and the Section 21(a) order from the SEC. We are in active discussions with the SEC to resolve the matters raised in the investigation and believe that we are near a resolution on all material issues. This settlement likely will involve an injunction against future violations of certain provisions, including anti-fraud provisions, of the federal securities laws, an order to comply with the prior cease and desist order and the Section 21 (a) order, an administrative censure, payment of a substantial civil penalty and retention of an independent consultant to review and make recommendations with respect to various business practices and procedures. We have recorded a reserve of $5.0 million for this potential settlement.

Santo C. Maggio, the President and Chief Executive Officer of Refco Securities, also has been in negotiations with the SEC staff, and likewise is near a resolution of certain supervisory matters raised in the investigation. Mr. Maggio, as part of such resolution, is prepared to accept the entry of an administrative order suspending him for a year from any supervisory duties. While complying with the restrictions of such supervisory suspension, Mr. Maggio would continue to work for us and Refco Securities in his current capacities.

Although we are working to finalize the terms of these settlements in a formal offer of settlement, we believe that the settlements as described above are highly likely and that the SEC staff would recommend such settlements to the SEC Commissioners, whose approval is required. However, we may not reach such settlements with the SEC staff on these terms, or at all or, even if we do, the SEC Commissioners may not approve such settlements. The terms of any final settlements approved by the SEC Commissioners, or any resolution of these matters if we or Mr. Maggio are unable to reach a settlement with the SEC, may be materially less favorable than the settlements described above and could have a material adverse effect on our business.

In October 2003, we received a subpoena from the U.S. Attorney's Office for the Southern District of New York, which called for the production of documents we had produced to the SEC. In addition to producing documents in response to the foregoing subpoenas, we have made our employees available to testify before the SEC and to be interviewed by the U.S. Attorneys' office. Refco Securities, LLC has been advised orally that neither it nor Mr. Maggio is currently the subject of the U.S. Attorneys' investigation.

**Our compliance and risk management methods might not be effective, which could increase the risk that we are subject to regulatory action or litigation or otherwise negatively impact our business.**

Our ability to comply with applicable laws, rules and regulations is largely dependent on our establishment and maintenance of compliance, audit and reporting systems, as well as our ability to attract and retain qualified compliance and other risk management personnel. If we fail to effectively

16

establish and maintain such compliance and reporting systems or fail to attract and retain personnel who are capable of designing and operating such systems, it will increase the likelihood that we will become subject to legal and regulatory infractions, including civil litigation and investigations by regulatory agencies.

For us to avoid a number of risks inherent in our business, it is necessary for us to have polices and procedures that identify, monitor and manage our risk exposure. Management of operational, legal and regulatory risk requires, among other things, policies and procedures to record properly and verify a large number of transactions and events. Such policies may not be fully effective. Some of our risk management policies and procedures depend upon evaluation of information regarding markets, customers or other matters that are publicly available or otherwise accessible by us. That information may not in all cases be accurate, complete, up-to-date or properly evaluated. Further, our risk management policies and procedures rely on a combination of technical and human controls and supervision, which are subject to error and failure. Some of our risk management policies and procedures are based on internally developed controls and observed historical market behavior and also involve reliance on industry standard practices. These policies and procedures may not adequately prevent future losses, particularly as they relate to extreme market movements, which may be significantly greater than comparable historical movements. While we have no reason to believe that our policies and procedures will not continue to be effective, they may not always be effective in the future, and we may not always be successful in monitoring or evaluating the risks to which we are or may be exposed. If our risk management efforts are ineffective, we could suffer losses that could have a material adverse effect on our financial condition or operating results.

***Failure to timely complete the acquisition of Cargill Investor Services' global brokerage operations could require us to revise our business plan.***

Although we expect to complete our acquisition of Cargill Investor Services' global brokerage operations in the next two months, the acquisition is subject to receipt of regulatory approvals and other closing conditions, including the receipt of audited financial statements for the acquired business that are consistent with the preliminary financial statements for the acquired business provided to us by the seller. Our failure to complete the acquisition on the expected schedule, or at all, could require us to revise our business plan and could otherwise have a material adverse effect on our business and on the trading price of our common stock.

***Our acquisition, joint venture and investment strategies and any other new business initiatives we undertake involve risks, and if we are unable to manage these risks effectively, our business will be materially harmed.***

In the past, we have expanded our business through acquisitions, and to achieve our strategic objectives in the future, we may seek to acquire other companies, businesses or technologies. Acquisitions entail numerous risks, including the following:

- difficulties in the integration of acquired operations, personnel or technologies;

- diversion of management's attention from other business concerns;

- assumption of unknown material liabilities or regulatory non-compliance issues;

- failure to achieve financial or operating objectives with respect to an acquired company, business or technology;

- amortization of acquired intangible assets, which would reduce future reported earnings; and

- potential loss of customers or key employees of acquired companies.

Failure to manage our acquisitions to avoid these risks could have a material adverse effect on our business, financial condition and operating results. We have completed 16 acquisitions since 1999. If we

17

continue to undertake acquisitions with a similar or greater frequency, these risks could be magnified and our personnel and other resources could become subject to additional strain.

We also may seek to expand or enhance our operations by forming joint ventures, making other investments or undertaking other business initiatives and entering new lines of businesses. Entering into joint ventures also entails risks, including difficulties in developing and expanding the business of newly formed joint ventures, exercising influence over the activities of joint ventures in which we do not have a controlling interest and potential conflicts with our joint venture partners. Other investments and business initiatives may also involve risks, including but not limited to loss of investment. Any acquisition, joint venture, investment or other business initiative that we have or may enter into may not be successful. Unsuccessful joint ventures, investments and other business initiatives could harm our business, financial condition and operating results.

***Our international operations involve special challenges that we may not be able to meet, which could adversely affect our financial results.***

We currently conduct international operations and plan to expand those operations. There are a number of risks inherent in doing business in international markets, particularly in the derivatives, fixed income and foreign exchange markets, which are heavily regulated in many jurisdictions outside the United States. These risks include:

- less developed technological infrastructures and generally higher costs, which could result in lower customer acceptance of our services or customers having difficulty accessing our products and services;

- the inability to manage and coordinate the various regulatory requirements of multiple jurisdictions that are constantly evolving and subject to unexpected change;

- difficulties in staffing and managing foreign operations;

- fluctuations in currency exchange rates; and

- potentially adverse tax consequences.

Our operations in some less developed countries are also subject to the political, legal and economic risks associated with politically unstable and less developed regions of the world, including the risk of war and other international conflicts and actions by governmental authorities, insurgent groups, terrorists and others. Specifically, we conduct business in countries whose currencies may be unstable. Future instability in such currencies or the imposition of governmental or regulatory restrictions on such currencies could impede our foreign exchange business and our ability to collect on collateral held in such currencies.

Although our revenues are denominated predominantly in U.S. dollars, we generally invest in assets that match the currency in which we expect the related liabilities to be paid. Members' equity held in local business units is kept primarily in local currencies to the extent that members' equity is required to satisfy regulatory and self-imposed capital requirements. This may adversely affect our reported combined members' equity when translated into U.S. dollars at the applicable exchange rate. The volatility of currency exchange rates may materially adversely affect our operating results.

In addition, we are required to comply with the laws and regulations of foreign governmental and regulatory authorities of each country in which we conduct business. These may include laws, rules and regulations, including registration requirements relating to many aspects of the derivatives, fixed income and foreign exchange markets. Our compliance with these laws and regulations may be difficult and time consuming and may require significant expenditures and personnel requirements, and our failure to be in compliance would subject us to legal and regulatory liabilities. We have customers in numerous countries around the world in which we are not registered. As a result, we may become subject to the

18

regulatory requirements of those countries. We may also experience difficulty in managing our international operations because of, among other things, competitive conditions overseas, management of foreign exchange risk, established domestic markets, language and cultural differences and economic or political instability. Any of these factors could have a material adverse effect on the success of our international operations or limit our ability to grow our international operations and, consequently, on our business, financial condition and operating results.

***Our operating results are subject to significant fluctuations due to seasonality. As a result, you should not rely on our operating results in any particular period as an indication of our future performance.***

Our business experiences seasonal fluctuations. Financial markets often experience reduced trading activity during summer months and in the last fiscal quarter as a result of holidays. Traditional commodity derivatives, such as energy, will reflect changing supply/demand factors related to heating/cooling seasons. As a result of these factors, we may experience relatively higher trading volume and thus revenue during our first and third fiscal quarters and lower trading volume in our second fiscal quarter.

***If we experience systems failures or capacity constraints, our ability to conduct our operations would be materially harmed.***

We are heavily dependent on the capacity and reliability of the computer and communications systems supporting our operations, whether owned and operated internally or by third parties. We receive and process a large portion of our trade orders through electronic means, such as through public and private communications networks. These computer and communications systems and networks are subject to performance degradation or failure from any number of reasons, including loss of power, acts of war or terrorism, human error, natural disasters, fire, sabotage, hardware or software malfunctions or defects, computer viruses, intentional acts of vandalism, customer error or misuse, lack of proper maintenance or monitoring and similar events. During the terrorist attacks on the World Trade Center on September 11, 2001, we lost access to a significant portion of our communications and computer networks. Although the disruption of our operations as a result of this event was not material, future occurrences of any of the events listed above, or of any other events, could result in the material degradation or failure of our computer and communications systems and networks.

If such a degradation or failure were to occur, it could cause any number of results, including:

- unanticipated disruptions in service to our customers;

- slower response times;

- delays in our customers' trade execution;

- failed settlement of trades; and

- incomplete or inaccurate accounting, recording or processing of trades.

Further, any of our redundant systems or disaster recovery plans may not have been implemented properly, and these systems and plans or our personnel may not be adequate to correct or mitigate any of the above events. In addition, any redundant systems, disaster recovery plans or personnel of our third-party service providers may not be adequate to correct or mitigate any of the above events or be implemented properly. The occurrence of degradation or failure of the communications and computer systems on which we rely may lead to financial losses, litigation or arbitration claims filed by or on behalf of our customers and regulatory investigations and sanctions, including by the Securities and Exchange Commission and the Commodity Futures Trading Commission, which require that our trade execution and communications systems be able to handle anticipated present and future peak trading volumes. Any such degradation or failure could also have a negative effect on our reputation, which in

19

turn could cause us to lose existing customers to our competitors or make it more difficult for us to attract new customers in the future. Further, any financial loss that we suffer as a result of such degradations or failures could be magnified by price movements of contracts involved in transactions impacted by the degradation or failure, and we may be unable to take corrective action to mitigate any losses we suffer.

***If we fail to maintain our computer and communications systems and networks properly or to upgrade and expand such systems and networks in response to technological change, our business will be materially harmed.***

We need to properly maintain the computer and communications systems and networks that we currently own and operate. We internally support and maintain many of our existing systems and networks, including those that are critical to our derivatives clearing operations. Our failure to adequately maintain these systems and networks could have a material effect on the performance and reliability of such systems and networks, which in turn could materially harm our business.

Further, the markets in which we compete are characterized by rapidly changing technology, evolving customer demand and uses of our services and the emergence of new industry standards and practices that could render our existing technology and systems obsolete. Our future success will depend in part on our ability to anticipate and adapt to technological advancements, evolving customer demands and changing standards in a timely, cost-efficient and competitive manner and to upgrade and expand our systems accordingly. Any upgrades or expansions may require significant expenditures of funds and may also increase the probability that we will suffer system degradations and failures. We may not have sufficient funds to adequately update and expand our networks, and any upgrade or expansion attempts may not be successful and accepted by the marketplace and our customers. Our failure to adequately update and expand our systems and networks or to adapt our systems and technology to evolving customer demands or emerging industry standards would have a material adverse effect on our business.

***We depend on third-party suppliers for a number of services, which are important to our business.***

We depend on a number of suppliers, such as banking, clearing and settlement organizations, telephone companies, online service providers, data processors and software and hardware vendors for elements of our trading, clearing and other systems, as well as communications and networking equipment, computer hardware and software and related support and maintenance. These providers may not be able to continue to provide these services in an efficient, cost-effective manner or be able to adequately expand their services to meet our needs. In addition, our agreements with these providers come up for renewal or may be terminated from time to time. In such an event, we may be required to renegotiate the terms of an agreement on terms that are not as favorable as under the existing agreement, or we may be required to find a replacement supplier. An interruption in or the cessation of service by any service provider and our inability to make alternative arrangements on favorable terms, in a timely manner or at all, could have a material adverse effect on our business, financial condition and operating results.

***Our networks and those of our third-party service providers may be vulnerable to security risks, including our inadvertent dissemination of non-public information, which could result in the wrongful use of our or our customers' information, interruptions or malfunctions in our operations or damage to our reputation.***

The secure transmission of confidential information over public networks is a critical element of our operations. Our networks, including our online trading platforms, and those of our third-party service providers, the exchanges and counterparties with whom we trade and our customers may be vulnerable to unauthorized access, computer viruses and other security problems, including our inadvertent dissemination of non-public information. Persons who circumvent security measures or gain

20

access to customer information could wrongfully use our or our customers' information or cause interruptions or malfunctions in our operations, any of which could have a material adverse effect on our business, financial condition and operating results. Additionally, our reputation could be damaged. If an actual, threatened or perceived breach of our or our security providers' security were to occur, or if we were to inadvertently release confidential customer information, the market perception of the effectiveness of our security measures could be harmed and could cause customers to reduce or stop their use of our services, including our online trading platforms. We or our service providers may be required to expend significant resources to protect against the threat of any such security breaches or to alleviate problems, including reputational harm and litigation, caused by any breaches. Any security measures implemented by us or our service providers may prove to be inadequate and could result in incidental system failures and delays that could lower trading volumes and have an adverse effect on our business, financial condition and operating results.

***We may be unable to protect our intellectual property rights or technology effectively, which would allow competitors to duplicate or replicate our technology and could adversely affect our ability to compete.***

Intellectual property is important to our success and ability to compete, and if we fail to protect our intellectual property rights adequately, our competitors might gain access to our technology. We rely primarily on a combination of copyright, trademark and trade secret laws in the United States and other jurisdictions, as well as license agreements, third-party nondisclosure and other agreements and other contractual provisions and technical measures to protect our intellectual property rights. We attempt to negotiate beneficial intellectual property ownership provisions in our contracts and also require employees, consultants, advisors and collaborators to enter into confidentiality agreements in an effort to protect the confidentiality of our proprietary information. However, laws and our actual contractual terms may not be sufficient to protect our technology from use or theft by third parties. For instance, a third party might reverse engineer or otherwise obtain and use our technology without our permission and without our knowledge, thereby infringing our rights and allowing competitors to duplicate or replicate our products. Furthermore, these protections may not be adequate to prevent our competitors from independently developing technologies that are substantially equivalent or superior to our technology.

We may have legal or contractual rights that we could assert against illegal use of our intellectual property rights, but lawsuits claiming infringement or misappropriation are complex and expensive, and the outcome would not be certain. In addition, the laws of some countries in which we now or may in the future operate may not protect intellectual property rights to the same extent as the laws of the United States.

Defending against intellectual property infringement and related claims could be expensive and disruptive to our business. If we are found to infringe the proprietary rights of others, we could be required to redesign our services, pay royalties or enter into license agreements with third parties.

***Claims that we misuse the intellectual property of others could subject us to litigation and significant liability and disrupt our business.***

There is frequent litigation based on allegations of infringement or other violations of intellectual property rights related to the development or use of technology, including suits in our industry. As the number of participants in our market increases and the number of patents and other intellectual property registrations increase, the possibility of an intellectual property claim against us grows. We have been sued on intellectual property grounds in the past and are currently the subject of a patent infringement lawsuit by Trading Technologies International, Inc. A third party may assert in the future that our technology or the manner in which we operate our business violates its intellectual property rights. From time to time, in the ordinary course of business, we may become subject to legal proceedings and claims relating to the intellectual property rights of others, and we expect that third

21

parties may assert intellectual property claims against us, particularly as we expand the complexity and scope of our business, the number of electronic trading platforms increases and the functionality of these platforms further overlap. For example, third parties may assert infringement claims against us in the future with respect to our electronic trading platforms or any of our other current or future services. Any claims, whether with or without merit, could:

- be expensive and time consuming to defend;

- prevent us from operating our business, or portions of our business;

- cause us to cease developing, licensing or using all or any part of our electronic trading platform that incorporate the challenged intellectual property;

- require us to redesign our products or services, which may not be feasible;

- result in significant monetary liability;

- divert management's attention and resources; and

- require us to pay royalties or enter into licensing agreements in order to obtain the right to use necessary technologies, which may not be possible on commercially reasonable terms.

Any of these events could have a material adverse effect on our business, financial condition and operating results.

***We operate in a heavily regulated environment that imposes significant costs and compliance requirements on us. The failure to comply with the regulations to which we are subject could subject us to sanctions.***

We are extensively regulated by the Commodity Futures Trading Commission; the SEC; the National Association of Securities Dealers, our designated self-regulatory organization with respect to our registration as a broker-dealer; the Chicago Mercantile Exchange, our designated self-regulatory organization with respect to our registration as a Futures Commission Merchant; the National Futures Association; other exchanges of which we are a member; state regulatory agencies; and other domestic and foreign clearing organizations. If we fail to comply with applicable laws, rules or regulations, we may be subject to criminal conviction, increased reporting requirements, censure, fines, cease-and-desist orders, suspension of our business, removal of personnel, civil litigation or other sanctions, including revocation of our operating licenses.

The organizations and agencies that regulate us have broad powers to investigate and enforce compliance and punish non-compliance with their rules and regulations. Neither we nor our managers, officers and employees may be able to fully comply with these rules and regulations, and we may be subject to claims or actions by these organizations and agencies, which could adversely affect our business.

***Changes in legislation or regulations may affect our ability to conduct our business or reduce our profitability.***

The legislative and regulatory environment in which we operate has undergone significant change in the past and may undergo significant change again in the future. The federal government, the Commodity Futures Trading Commission, the SEC, the National Association of Securities Dealers, the Chicago Mercantile Exchange, the National Futures Association or other U.S. or foreign governmental authorities continuously review legislative and regulatory initiatives and may adopt new or revised laws and regulations. These legislative and regulatory initiatives may affect the way in which we conduct our business and may make our business less profitable. Changes in the interpretation or enforcement of existing laws and regulations by those entities may also adversely affect our business.

In addition, we use the Internet as the distribution channel to provide services to our customers. A number of regulatory agencies have recently adopted regulations regarding customer privacy and the

22

use of customer information by service providers. Additional laws and regulations relating to the Internet may be adopted in the future, including regulations regarding the pricing, taxation, content and quality of products and services delivered over the Internet. Complying with these laws and regulations is expensive and time consuming and could limit our ability to use the Internet as a distribution channel, which could adversely affect our business.

***Our auditors reported to us that, at February 28, 2005, there were two significant deficiencies in our internal controls over financial reporting.***

In connection with their audit of our most recently audited financial statements, our independent auditors reported to us that we had two significant deficiencies in our internal controls over financial reporting. Under standards established by the Public Company Accounting Oversight Board, a "significant deficiency" is defined as a deficiency that results in more than a remote likelihood that a misstatement of the financial statements that is more than inconsequential will not be prevented or detected. One significant deficiency was determined to exist based on the need to increase our existing finance department resources to be able to prepare financial statements that are fully compliant with all SEC reporting guidelines on a timely basis. The second significant deficiency was determined to exist based on our lack of formalized procedures for closing our books. Currently we utilize the services of an outside service provider to assist in our financial reporting process. As we prepare for the completion of the offering, we are in the process of enhancing our financial reporting capability by hiring additional internal audit and finance personnel and developing formalized closing procedures, including through the implementation of software upgrades throughout our operations. Although these measures are designed to address the issues raised by our independent auditors, these and any future measures may not enable us to remedy these significant deficiencies or avoid other significant deficiencies in the future. In addition, these and any other significant deficiencies will need to be addressed as part of the evaluation of our internal controls over financial reporting pursuant to Section 404 of the Sarbanes-Oxley Act of 2002 and may impair our ability to comply with Section 404. See "—We will be exposed to risks relating to the evaluation of our internal controls over financial reporting as required by Section 404 of the Sarbanes-Oxley Act of 2002."

***We will become subject to additional financial and other reporting and corporate governance requirements that may be difficult for us to satisfy. Evolving regulation of corporate governance and public disclosure may result in additional expenses and continuing uncertainty.***

We have historically operated our business as a private company. Following the effectiveness of our registration statement filed with the SEC regarding our senior subordinated notes, we became obligated to file with the SEC annual and quarterly information and other reports that are specified in Sections 13 and 15(d) of the Exchange Act, and we are required to ensure that we have the ability to prepare financial statements that are fully compliant with all SEC reporting requirements on a timely basis. Upon completion of this offering, we will also become subject to other new financial and other reporting and corporate governance requirements, including the requirements of the New York Stock Exchange and certain provisions of the Sarbanes-Oxley Act of 2002 and the regulations promulgated thereunder, which will impose significant compliance obligations upon us. In particular, we are, or will be, required to:

- create or expand the roles and duties of our board of directors, our board committees and management;

- institute a more comprehensive compliance function;

- supplement our internal accounting function, including hiring a chief accounting officer, additional controllers and other staff with expertise in accounting and financial reporting for a

23

public company, as well as enhance and formalize closing procedures at the end of our accounting periods;

• prepare and distribute periodic public reports in compliance with our obligations under the federal securities laws;

• involve and retain to a greater degree outside counsel and accountants in the activities listed above;

• establish an internal audit function;

• enhance our investor relations function; and

• establish new internal policies, such as those relating to disclosure controls and procedures and insider trading.

These obligations require a significant commitment of additional resources. We may not be successful in implementing these requirements and implementing them could adversely affect our business or operating results. In addition, if we fail to implement the requirements with respect to our internal accounting and audit functions, our ability to report our operating results on a timely and accurate basis could be impaired.

Changing laws, regulations and standards relating to corporate governance and public disclosure, including the Sarbanes-Oxley Act of 2002, new SEC regulations and NYSE rules are creating uncertainty for public companies. We are presently evaluating and monitoring developments with respect to new rules and cannot predict or estimate the amount of the additional costs we may incur or the timing of those costs. These new or changed laws, regulations and standards are subject to varying interpretations, in many cases due to their lack of specificity, and as a result, their application in practice may evolve over time as new guidance is provided by regulatory and governing bodies. This could result in continuing uncertainty regarding compliance matters and higher costs necessitated by ongoing revisions to disclosure and governance practices. If our efforts to comply with new or changed laws, regulations and standards differ from the activities intended by regulatory or governing bodies due to ambiguities related to practice, regulatory authorities may initiate legal proceedings against us, which could adversely affect our business.

***We are a "controlled company" within the meaning of the NYSE rules and, as a result, will qualify for, and intend to rely on, exemptions from certain corporate governance requirements.***

Upon completion of this offering, Thomas H. Lee Partners, L.P. and its affiliates and Phillip Bennett, our President and Chief Executive Officer, will control a majority of our outstanding common stock. As a result, we are a "controlled company" within the meaning of the NYSE corporate governance standards. Under the NYSE rules, a company of which more than 50% of the voting power is held by an individual, a group, or another company is a "controlled company" and may elect not to comply with certain NYSE corporate governance requirements, as applicable, including (1) the requirement that a majority of our board of directors consist of independent directors, (2) the requirement that we have a nominating/corporate governance committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities and (3) the requirement that we have a compensation committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities. Following this offering, we intend to avail ourselves of these exemptions. As a result, we will not have a majority of independent directors nor will our nominating and corporate governance committee or compensation committee consist entirely of independent directors. Accordingly, you will not have the same protections afforded to stockholders of companies that are subject to all of the NYSE corporate governance requirements.

24

*We will be exposed to risks relating to the evaluation of our internal controls over financial reporting as required by Section 404 of the Sarbanes-Oxley Act of 2002.*

We are in the process of evaluating, testing and implementing internal controls over financial reporting to enable management to report on, and our independent registered accounting firm to attest to, such internal controls as required by Section 404 of the Sarbanes-Oxley Act of 2002. While we anticipate being compliant with the requirements of Section 404 by our February 28, 2007 deadline, we cannot be certain as to the timing of the completion of our evaluation, testing and remediation actions or the impact of the same on our operations. As a public company, we will be required to report, among other things, control deficiencies that constitute a "material weakness" or changes in internal controls that will, or are reasonably likely to, materially affect internal controls over financial reporting. A "material weakness" is a significant deficiency, or combination of significant deficiencies that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. If we are not able to implement the requirements of Section 404 in a timely manner or with adequate compliance, we may be subject to investigation and sanctions by regulatory authorities, such as the SEC and the NYSE. As a result, there could be a negative reaction in the financial markets due to a loss of confidence in the reliability of our financial statements. In addition, we may be required to incur costs in improving our internal controls and hiring additional personnel. Any such actions could negatively affect our results of operations.

*We are subject to significant litigation risk, which could adversely affect our business.*

Many aspects of our business involve substantial liability risks, and we could be exposed to substantial liability under federal and state laws and court decisions, as well as regulatory action by the SEC, the Commodity Futures Trading Commission and other regulatory organizations. These risks include, among others, potential civil litigation triggered by regulatory investigations, potential liability from disputes over terms of a trade, the claim that a system failure or delay caused monetary losses to a customer, that we entered into an unauthorized transaction or that we provided materially false or misleading statements in connection with a transaction. The volume of claims and the amount of damages claimed in litigation and regulatory proceedings against financial intermediaries have been increasing. Dissatisfied customers frequently make claims against their service providers regarding quality of trade execution, improperly settled trades, mismanagement or even fraud. These risks also include potential liability from disputes over the exercise of our rights with respect to customer accounts and collateral. Although our customer agreements generally provide that we may exercise such rights with respect to customer accounts and collateral as we deem reasonably necessary for our protection, our exercise of these rights has at times led to claims by customers that we have exercised these rights improperly. For example, we are currently the subject of a lawsuit brought by a customer who has alleged that we improperly liquidated its position in connection with a margin call. See "Business—Legal Proceedings—Tradewinds." Even if we prevail in this or other cases or claims, we could incur significant legal expenses defending the cases or claims, even those without merit. An adverse resolution of any future cases or claims against us could have a material adverse effect on our reputation, financial condition or operating results.

*We could be harmed by employee or introducing broker misconduct or errors that are difficult to detect and deter.*

There have been a number of highly publicized cases involving fraud or other misconduct by employees of financial services firms in recent years. Misconduct by our employees or introducing brokers could include hiding unauthorized activities from us, improper or unauthorized activities on behalf of customers, improper use of confidential information or use of improper marketing materials. For example, during the mid-1990s, one of our brokers engaged in conduct that was violative of regulations of the Commodity Futures Trading Commission and the Chicago Board of Trade. This conduct resulted in awards and settlements of private arbitrations in 2001 of approximately $42 million

25

and the payment by us of an aggregate $7.0 million in fines to the Commodity Futures Trading Commission and the Chicago Board of Trade in 1999. Employee or introducing broker misconduct could subject us to financial losses or regulatory sanctions and seriously harm our reputation. It is not always possible to deter employee or introducing broker misconduct, and the precautions we take to prevent and detect this activity may not be effective in all cases. Our employees or introducing brokers also may commit errors that could subject us to financial claims for negligence or otherwise, as well as regulatory actions. We have been subject to claims by our customers relating to errors committed by our employees. Employee, broker or introducing broker misconduct or errors could subject us to financial losses or regulatory sanctions and seriously harm our reputation and could adversely affect our business, financial condition and operating results.

***Our business may be adversely affected if our reputation is harmed.***

Our ability to attract and retain customers and employees may be adversely affected to the extent our reputation is damaged. If we fail, or appear to fail, to deal with various issues that may give rise to reputational risk, our reputation may be harmed, which could harm our business prospects. These issues include, but are not limited to, appropriately dealing with potential conflicts of interest, legal and regulatory requirements, ethical issues, money-laundering, privacy, record-keeping, sales and trading practices, and the proper identification of the legal, reputational, credit, liquidity and market risks inherent in our business. Failure to appropriately address these issues could also give rise to additional legal risk to us, which could, in turn, increase the size and number of claims and damages asserted against us or subject us to regulatory enforcement actions, fines and penalties.

***Procedures and requirements of the PATRIOT Act may expose us to significant costs or penalties.***

As participants in the financial services industry, our subsidiaries are subject to laws and regulations, including the PATRIOT Act of 2001, which require that they know certain information about their customers and monitor transactions for suspicious financial activities. The cost of complying with the PATRIOT Act and related laws and regulations is significant. As an online broker with customers worldwide, we may face particular difficulties in identifying our international customers, gathering the required information about them and monitoring their activities. We face risks that our policies, procedures, technology and personnel directed toward complying with the PATRIOT Act are insufficient and that we could be subject to significant criminal and civil penalties due to noncompliance. Such penalties could have a material adverse effect on our business, financial condition and operating results.

***If we do not maintain the capital levels required by regulations, we may be fined or barred from conducting business.***

The SEC, National Association of Securities Dealers, Commodity Futures Trading Commission and various other regulatory agencies have stringent rules with respect to the maintenance of specific levels of net capital by securities broker-dealers and Futures Commission Merchants. Our failure to maintain the required net capital could result in suspension or revocation of our registration by the SEC or the Commodity Futures Trading Commission and our suspension or expulsion by the National Association of Securities Dealers or other U.S. and international regulatory bodies and could ultimately lead to our liquidation or the liquidation of one of our subsidiaries. If net capital rules are changed or expanded, or if we incur an unusually large charge against net capital, our operations that require an intensive use of capital could be limited. Such operations may include dealing activities, marketing and the financing of customer account balances. See "Business—Regulation" for more information on the minimum net capital requirements for our domestic broker-dealer and Futures Commission Merchant subsidiaries.

26

*We require a significant amount of liquidity.*

Ready access to cash is essential to our business. Our liquidity could be impaired by an inability to access lines of credit, an inability to access funds from our subsidiaries or an inability to liquidate customer positions or otherwise sell assets. This situation may arise due to circumstances that we may be unable to control, such as a general market disruption or an operational problem that affects third parties or us. Further, our ability to liquidate customer positions or otherwise sell assets may be impaired if other market participants are seeking to sell similar assets at the same time. Our credit ratings are important to our liquidity. A reduction in our credit ratings could adversely affect our liquidity and competitive position, increase our borrowing costs, limit our access to the capital markets or trigger our obligations under certain bilateral provisions in some of our trading and collateralized financing contracts. Under such contracts, counterparties could terminate contracts with us or require us to post additional collateral. Termination of our trading and collateralized financing contracts could cause us to sustain losses and impair our liquidity by requiring us to find other sources of financing or to make significant cash payments or securities movements. The occurrence of any of the foregoing events could have a material adverse effect on our financial condition or results of operations.

*We have recorded a significant amount of intangible assets, which may never generate the returns we expect.*

Our acquisitions and the THL Transactions have resulted in significant amounts of goodwill and identifiable intangible assets. Goodwill relates to the excess of cost over the fair value of the net assets of the businesses acquired by us. As of May 31, 2005, we had approximately $744.1 million of goodwill and approximately $595.9 million of identifiable intangible assets.

Goodwill and identifiable intangible assets are recorded at fair value on the date of acquisition, and under Financial Accounting Standards Board Statement No. 142, *Goodwill and Other Intangible Assets,* goodwill and indefinite lived intangibles are reviewed at least annually for impairment. Finite lived intangibles are reviewed for impairment whenever events or changes in circumstances indicate carrying amounts may not be recoverable. Impairment may result from, among other things, deterioration in the performance of the acquired business, adverse market conditions, adverse changes in applicable laws or regulations, including changes that restrict the activities of the acquired business, and a variety of other circumstances. The amount of any impairment must be written off. We may never realize the full value of our intangible assets. Any future determination requiring the write-off of a significant portion of intangible assets would have an adverse effect on our financial condition and results of operations.

### Risks Related to Our Substantial Indebtedness

*Our substantial indebtedness could adversely affect our financial health, harm our ability to react to changes to our business and prevent us from fulfilling our obligations under our indebtedness.*

As a result of the THL Transactions, we have a significant amount of indebtedness. As of May 31, 2005, after giving effect to the completion of this offering and application of the net proceeds therefrom, we would have had total debt of approximately $1,034.0 million outstanding. Based on that level of indebtedness and interest rates applicable at May 31, 2005, our annual interest expense would have been $67.9 million. As a financial institution, our cash flows are complex and interrelated and highly dependent upon our operating performance, levels of customer activity and secured financing activities. Our cash flows used in operating activities were $96.4 million and $265.2 million for the three months ended May 31, 2005 and May 31, 2004, respectively. Our cash flows from operations were $528.9 million and $391.2 million for the period from March 1, 2004 through August 5, 2004 and the period from August 6, 2004 through February 28, 2005, respectively, as compared to $727.9 million for the year ended February 29, 2004, as earnings and operating assets and liabilities exceeded cash and cash equivalents utilized in investing and financing activities. Although we believe that our current cash flows are sufficient to cover our annual interest expense for the foreseeable future, any increase in the

27

amount of our debt or any decline in the amount of cash available to make interest payments could require us to divert funds identified for other purposes for debt service and impair our liquidity position.

Our substantial level of indebtedness increases the possibility that we may be unable to generate cash sufficient to pay, when due, the principal of, interest on or other amounts due in respect of our indebtedness. Our substantial debt could also have other significant consequences. For example, it could:

- increase our vulnerability to general economic downturns and adverse competitive and industry conditions;

- require us to dedicate a substantial portion, if not all, of our cash flow from operations to payments on our indebtedness, thereby reducing the availability of our cash flow to pay dividends or fund working capital, capital expenditures and other general corporate expenditures;

- limit our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate;

- place us at a competitive disadvantage compared to competitors that have less debt;

- limit our ability to raise additional financing on satisfactory terms or at all; and

- adversely impact our ability to comply with the financial and other restrictive covenants in the agreements governing our debt instruments, which could result in an event of default under such agreements.

***Increases in interest rates could increase interest payable under our variable rate indebtedness.***

We are subject to interest rate risk in connection with our variable rate indebtedness. Interest rate changes could increase the amount of our interest payments and thus negatively impact our future earnings and cash flows. We currently estimate that our annual interest expense on our floating rate indebtedness would increase by $6.4 million for each increase in interest rates of 1%. If we do not have sufficient earnings, we may be required to refinance all or part of our existing debt, sell assets, borrow more money or sell more securities, none of which we can guarantee we will be able to do.

***Despite current indebtedness levels, we and our subsidiaries may still be able to incur substantially more debt. This could further exacerbate the risks associated with our substantial leverage.***

We and our subsidiaries may be able to incur substantial additional indebtedness in the future. Although the agreements governing our debt instruments contain restrictions on the incurrence of additional indebtedness, these restrictions are subject to a number of qualifications and exceptions, and the indebtedness incurred in compliance with these restrictions could be substantial. For example, we have up to $75.0 million of borrowings available under our revolving credit facility and have the ability to increase the aggregate amount of our term loan under our senior credit facilities by up to $200.0 million without the consent of any person other than the institutions agreeing to provide all or any portion of such increase. If we incur additional debt above the levels currently in effect, the risks associated with our substantial leverage would increase.

***To service our indebtedness, we will require a significant amount of cash. Our ability to generate cash depends on many factors beyond our control.***

Our ability to make payments on and to refinance our indebtedness and to fund our operations will depend on our ability to generate cash in the future, which, to a certain extent, is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control. Specific events that might adversely affect our cash flow include: a default by a customer in the payment of a large margin call; losses incurred by the clearing houses of which we are a member,

28

which could result in a capital call against us; a loss by us of any of the registrations or licenses required for us to conduct business; or a permanent decline in the level of customer business activity.

Our business may not generate sufficient cash flow from operations, and we may be unable to make future borrowings under our senior credit facilities or otherwise in amounts sufficient to enable us to service our indebtedness or to fund our other liquidity needs. If we cannot service our debt, we will have to take actions such as reducing or delaying capital investments, selling assets, restructuring or refinancing our debt or seeking additional equity capital. We may not be able to effect any of these alternatives on commercially reasonable terms, or at all. In addition, the agreements governing our debt instruments may restrict us from adopting any of these alternatives. The implementation of these alternatives may adversely impact our business, financial condition and operating results.

*We are a holding company with no business operations of our own and depend on our subsidiaries for cash.*

We are a holding company with no significant business operations of our own. Our business operations are conducted through our subsidiaries. Dividends from, and cash generated by, our subsidiaries will be our principal sources of cash to repay indebtedness, fund operations and pay dividends. Accordingly, our ability to repay our indebtedness, fund operations and pay dividends to our stockholders is dependent on the earnings and the distributions of funds from our subsidiaries. The agreements governing our debt instruments significantly restrict our subsidiaries from paying dividends and otherwise transferring cash or other assets to us. In addition, some of our subsidiaries are subject to minimum regulatory capital requirements, which may limit their ability to pay dividends or distributions or make loans to us. Furthermore, our subsidiaries are permitted under the agreements governing our debt instruments to incur additional indebtedness that may severely restrict or prohibit the making of distributions, the payment of dividends or the making of loans by our subsidiaries to us.

*Restrictive covenants in the agreements governing our debt instruments may restrict our ability to pursue our business strategies.*

The agreements governing our debt instruments contain a number of restrictive covenants that impose significant operating and financial restrictions on us and may limit our ability to pursue our business strategies or engage in acts that may be in our best interests. Our senior credit facilities include covenants restricting, among other things, our ability to:

- incur or guarantee additional debt;

- incur liens;

- make loans and investments;

- make capital expenditures;

- declare or pay dividends or redeem or repurchase capital stock;

- engage in mergers, acquisitions and other business combinations;

- prepay, redeem or purchase subordinated debt;

- amend or otherwise alter terms of subordinated debt;

- sell assets and engage in sale leaseback transactions;

- transact with affiliates; and

- alter the business that we conduct.

The indenture relating to our senior subordinated notes also contains numerous covenants including, among other things, restrictions on our ability to:

- incur or guarantee additional indebtedness;

- sell assets;

29

- declare or pay dividends or make other equity distributions;

- purchase or redeem capital stock;

- make investments;

- consolidate or merge with or into other companies;

- engage in transactions with affiliates; and

- alter the business that we conduct.

Our senior credit facilities also include financial covenants, including requirements that we maintain:

- a minimum interest coverage ratio; and

- a maximum leverage ratio.

These financial covenants will become more restrictive over time.

A breach of any covenant or the inability to comply with any required financial ratio contained in either of the agreements governing our debt instruments could result in a default under that agreement. If any such default occurs, the lenders under our senior credit facilities or the holders of our senior subordinated notes, as the case may be, may elect to declare all outstanding borrowings, together with accrued and unpaid interest and other amounts payable thereunder, to be immediately due and payable. In addition, a default under the indenture governing our senior subordinated notes would cause a default under our senior credit facilities, and the acceleration of debt under our senior credit facilities or the failure to pay that debt when due would cause a default under the indenture governing our senior subordinated notes. The lenders under our senior credit facilities also have the right upon an event of default thereunder to terminate any commitments they have to provide further borrowings. Further, following an event of default under our senior credit facilities, the lenders under these facilities will have the right to proceed against the collateral granted to them to secure that debt, which includes the available cash of our subsidiaries that guarantee our senior credit facilities, and they will also have the right to prevent us from making debt service payments on our senior subordinated notes. If the debt under our senior credit facilities or our senior subordinated notes were to be accelerated, our assets may not be sufficient to repay in full that debt or any other debt that may become due as a result of that acceleration, which could have a material adverse effect on the value of our common stock.

### Risks Relating to Our Common Stock and this Offering

***Our quarterly revenues and operating results can fluctuate substantially and be difficult to forecast, and we may not be able to maintain historic growth rates.***

Our quarterly revenues and operating results are difficult to forecast. We may experience substantial fluctuations in revenues and operating results from quarter to quarter. The reasons for these fluctuations may include, but are not limited to:

- domestic and international market factors that impact trading volumes or market liquidity;

- competition;

- seasonal fluctuations in our business;

- costs of compliance with regulatory requirements;

- our relationships with our significant customers;

- our relationships with introducing brokers;

- changes in personnel and management;

- credit risk;

30

---

- costs associated with protecting our intellectual property and proprietary rights;

- the timing of acquisitions;

- changes in prevailing interest rates;

- systems failures, capacity constraints or network problems;

- general changes to the U.S. and global economies; and

- political conditions or events.

Period-to-period comparisons of our operating results are not necessarily meaningful and should not be relied upon as indications of future performance.

Our business, revenue and net income have grown significantly over the last several years. From fiscal year 2000 through fiscal year 2005 our net revenue increased from $461.0 million to $1,331.9 million and our net income grew from $45.0 million to $176.3 million. We may not be able to maintain these historic growth rates in future periods. In addition, our revenues may not increase or be sustained in future periods, and we may not be profitable in any future period. Any shortfalls in revenues or net income, or decline in growth rates of revenues and net income, in any given period from levels expected by securities or industry analysts could have an immediate and significant adverse effect on the trading price of our common stock.

**There may not be an active, liquid trading market for our common stock.**

Prior to this offering, there has been no public market for our common stock. We cannot predict the extent to which a trading market will develop or how liquid that market may become. If an active trading market does not develop, you may have difficulty selling any of our common stock that you purchase. The initial public offering price of our common stock was determined by negotiation between us and representatives of the underwriters based upon a number of factors and may not be indicative of prices that will prevail following the completion of this offering. The market price of our common stock may decline below the initial public offering price, and you may not be able to resell your shares of our common stock at or above the initial offering price.

**We expect that our stock price will fluctuate significantly, and you may not be able to resell your shares at or above the initial public offering price.**

The trading price of our common stock is likely to be volatile and subject to wide price fluctuations in response to various factors, including:

- market conditions in the broader stock market in general, or in the financial services industry in particular;

- actual or anticipated fluctuations in our quarterly financial and operating results;

- developments or disputes concerning our intellectual property or proprietary rights;

- introduction of new services by us or our competitors;

- issuance of new or changed securities analysts' reports or recommendations;

- additions or departures of key personnel;

- regulatory developments;

- litigation and governmental investigations; and

- economic and political conditions or events.

These and other factors may cause the market price and demand for our common stock to fluctuate substantially, which may limit or prevent investors from readily selling their shares of common stock and may otherwise negatively affect the liquidity of our common stock. In addition, in the past, when the market price of a stock has been volatile, holders of that stock have instituted securities class action litigation against the company that issued the stock. If any of our stockholders brought a lawsuit

31

against us, we could incur substantial costs defending the lawsuit. Such a lawsuit could also divert the time and attention of our management from our business.

***If the ownership of our common stock continues to be highly concentrated, it may prevent you and other stockholders from influencing significant corporate decisions and may result in conflicts of interest that could cause our stock price to decline.***

We are controlled by affiliates of Thomas H. Lee Partners, L.P. and Phillip Bennett, our President and Chief Executive Officer. Thomas H. Lee Partners, L.P. and its affiliates and Phillip Bennett will beneficially own or control approximately 42.7% and 33.8%, respectively, of our common stock following the completion of this offering. Accordingly, Thomas H. Lee Partners, L.P. and its affiliates and Phillip Bennett, acting as a group, will be able to control matters that require stockholder approval, including the election of directors, any merger, consolidation or sale of all or substantially all of our assets or other significant corporate transactions. Our controlling stockholders may have interests that differ from your interests and may vote in a way with which you may disagree and which may be adverse to your interests. Corporate action may be taken even if other stockholders, including those who purchase shares in this offering, oppose them. These stockholders may also delay or prevent a change of control of us, even if that a change of control would benefit our other stockholders, which could deprive our stockholders of the opportunity to receive a premium for their common stock. The significant concentration of stock ownership may adversely affect the trading price of our common stock due to investors' perception that conflicts of interest may exist or arise.

***If securities or industry analysts do not publish research or reports about our business, if they change their recommendations regarding our stock adversely or if our operating results do not meet their expectations, our stock price and trading volume could decline.***

The trading market for our common stock will be influenced by the research and reports that industry or securities analysts publish about us or our business. If one or more of these analysts cease coverage of our company or fail to publish reports on us regularly, we could lose visibility in the financial markets, which in turn could cause our stock price or trading volume to decline. Moreover, if one or more of the analysts who cover us downgrade our stock or if our operating results do not meet their expectations, our stock price could decline.

***Future sales of common stock may cause our stock price to fall.***

After giving effect to this offering and the Reincorporation, we will have 127,500,000 shares of common stock outstanding, assuming no exercise of the underwriters' over-allotment option. Of these shares of common stock, the 26,500,000 shares of common stock being sold in this offering, plus any shares issued upon exercise of the underwriters' over-allotment option, will be freely tradeable without restriction under the Securities Act, except for any such shares that may be held or acquired by an "affiliate" of ours, as that term is defined in Rule 144 promulgated under the Securities Act, which shares will be subject to the volume limitations and other restrictions of Rule 144. The remaining shares of common stock held by our existing stockholders upon completion of this offering, other than those subject to the underwriters' over-allotment option to the extent it is exercised, will be "restricted securities," as that phrase is defined in Rule 144, and may not be resold, in the absence of registration under the Securities Act, except pursuant to an exemption from such registration. In addition, following the offering, stockholders that collectively own 101,000,000 shares of our common stock will have registration rights with respect to their shares. After the lock-up agreements delivered to the underwriters by our executive officers, directors and substantially all of our stockholders expire or are terminated, all of our additional shares may be sold in the public market, subject to legal restrictions on transfer. See "Underwriting" and "Shares Eligible for Future Sale." At various times beginning approximately 180 days after the date of this prospectus, approximately 101,000,000 million shares will be available for sale pursuant to various exemptions from registration. Additionally, the underwriters

32

may release all or a portion of these shares subject to lock-up agreements at any time prior to this 180th day. Furthermore, we may sell additional shares of common stock in subsequent public offerings. The market price of our common stock could decline as a result of any such sales in the market after this offering, or the perception that these sales could occur. These sales might also make it more difficult for us to sell equity securities at a time and price that we deem appropriate.

***Provisions of our charter documents could delay or prevent an acquisition of our company, even if the acquisition would be beneficial to our stockholders, and could make it more difficult for you to change management.***

Our certificate of incorporation and by-laws contain provisions that could depress the trading price of our common stock by acting to discourage, delay or prevent a change of control of our company or changes in management that our stockholders might deem advantageous. Specific provisions in our certificate of incorporation include:

- our ability to issue preferred stock with terms that the board of directors may determine, without stockholder approval;

- advance notice requirements for stockholder proposals and nominations; and

- limitations on convening stockholder meetings.

As a result of the provisions in our certificate of incorporation, the price investors may be willing to pay in the future for shares of our common stock may be limited. In addition, although we have elected not to be subject to the provisions of Section 203 of the Delaware General Corporation Law, which is intended to prohibit or delay mergers or other takeover or change in control events, we could elect to be subject to Section 203 in the future.

***We do not anticipate paying any cash dividends in the foreseeable future.***

We currently intend to retain our future earnings, if any, for the foreseeable future, to repay indebtedness and to fund the development and growth of our business. We do not intend to pay any dividends to holders of our common stock (other than the dividend to be paid to our stockholders of record prior to this offering with the proceeds from the issuance of shares following any exercise of the underwriters' over-allotment option). In addition, the terms of our existing debt agreements restrict our ability to pay dividends to our stockholders. As a result, capital appreciation in the price of our common stock, if any, will be your only source of gain on an investment in our common stock.

***New investors in our common stock will experience immediate and substantial book value dilution after this offering.***

The initial public offering price of our common stock is substantially higher than the pro forma net tangible book value per share of the outstanding common stock immediately after the offering. Based on the initial public offering price of $22.00 per share and our net tangible book value as of May 31, 2005, if you purchase our common stock in this offering you will pay more for your shares than the amounts paid by existing stockholders for their shares and you will suffer immediate dilution in net tangible book value per share of approximately $28.29 in pro forma net tangible book value, assuming that the underwriters do not exercise their over-allotment option (or $28.10 per share if the underwriters exercise their over-allotment option in full and we use the proceeds to pay a dividend to our existing stockholders). As a result of this dilution, investors purchasing stock in this offering may receive significantly less than the full purchase price that they paid for the shares purchased in this offering in the event of a liquidation. See "Dilution."

33

## FORWARD-LOOKING STATEMENTS

This prospectus contains forward-looking statements that are subject to risks and uncertainties. All statements other than statements of historical fact included in this prospectus are forward-looking statements. Forward-looking statements give our current expectations and projections relating to our financial condition, results of operations, plans, objectives, future performance and business. You can identify forward-looking statements by the fact that they do not relate strictly to historical or current facts. These statements may include words such as "anticipate," "estimate," "expect," "project," "plan," "intend," "believe" and other words and terms of similar meaning in connection with any discussion of the timing or nature of future operating or financial performance or other events.

These forward-looking statements are based on assumptions that we have made in light of our industry experience and on our perceptions of historical trends, current conditions, expected future developments and other factors we believe are appropriate under the circumstances. As you read and consider this prospectus, you should understand that these statements are not guarantees of performance or results. They involve risks, uncertainties (some of which are beyond our control) and assumptions. Although we believe that these forward-looking statements are based on reasonable assumptions, you should be aware that many factors could affect our actual financial results and cause them to differ materially from those anticipated in the forward-looking statements. These factors include, among others:

- changes in domestic and international market conditions;

- competition;

- our ability to attract and retain customers;

- our relationships with introducing brokers;

- retention of our management team;

- our ability to manage our growth or integrate future acquisitions;

- our exposure to significant credit risks with respect to our customers;

- international operations and expansion;

- system failures;

- the performance of third-party suppliers;

- changes in regulations or exchange membership requirements;

- the effectiveness of compliance and risk management methods;

- potential litigation or investigations;

- employee or introducing broker misconduct or errors;

- reputational harm;

- changes in capital requirements; and

- the other factors described under "Risk Factors."

There may be other factors that may cause our actual results to differ materially from the forward-looking statements.

Because of these factors, we caution that you should not place undue reliance on any of our forward-looking statements. Further, any forward-looking statement speaks only as of the date on which it is made. New risks and uncertainties arise from

time to time, and it is impossible for us to predict those events or how they may affect us. Except as required by law, we have no duty to, and do not intend to, update or revise the forward-looking statements in this prospectus after the date of this prospectus.

34

## USE OF PROCEEDS

The net proceeds from this offering with respect to the shares to be sold by us will be $254.0 million, after deducting underwriting discounts and commissions and estimated expenses payable by us in connection with this offering. We will not receive any of the proceeds from the sale of shares by the selling stockholders.

We intend to use a portion of the net proceeds of this offering to redeem $210.0 million aggregate principal amount of the $600.0 million aggregate principal amount outstanding of our senior subordinated notes due 2012 (together with the related prepayment penalty of $18.9 million and accrued and unpaid interest thereon to the redemption date) and for general corporate purposes, including working capital and potential acquisitions. Our senior subordinated notes mature on August 1, 2012 and bear interest at a rate of 9% per annum.

Any proceeds from the exercise of the underwriters' option to purchase up to 3,975,000 additional shares from us will be used to pay a dividend to our stockholders of record prior to the offering. Investors in this offering will not receive any portion of the dividend.

Pending the specific application of the net proceeds as described above, we intend to invest the net proceeds from this offering in short-term, investment-grade, interest-bearing securities.

## DIVIDEND POLICY

New Refco and its predecessor paid aggregate distributions to their equity holders of $100.0 million, $120.0 million and $11.0 million in the fiscal years ended February 28, 2003, February 29, 2004 and February 28, 2005, respectively. For the three months ended May 31, 2005, New Refco paid no distributions to its equity holders. As a limited liability company, we made these distributions to equity holders periodically during the above periods. Prior to the closing of the offering, New Refco intends to make a cash distribution of approximately $27.9 million to the members of New Refco to enable them to meet their estimated income tax obligations for the period from January 1, 2005 to the date of the Reincorporation. The amount of this distribution will be based on New Refco's estimated net taxable income from January 1, 2005 to the date of the Reincorporation. Investors in the offering will not receive this distribution.

Any proceeds from the exercise of the underwriters' option to purchase up to 3,975,000 additional shares from us will be used to pay a dividend to our stockholders of record prior to the offering. Investors in this offering will not receive any portion of the dividend. Our board of directors, which would declare any such dividend, includes representatives of our existing stockholders who will receive the dividend.

Upon the Reincorporation and the completion of this offering, except for the dividend described above, we intend to retain all available funds and any future earnings to reduce debt and fund the development and growth of our business and do not anticipate paying any cash dividends on our capital stock in the foreseeable future.

Our ability to pay dividends on our common stock may also be restricted by the terms of the outstanding indebtedness of our subsidiaries (see "Description of Indebtedness"), by the terms of any future indebtedness that we or our subsidiaries may incur and by legal and regulatory requirements. We are a holding company with no significant business operations of our own. Our business operations are conducted through our subsidiaries. Dividends from, and cash generated by, our subsidiaries will be our principal sources of cash to repay indebtedness, fund operations and pay dividends. Accordingly, our ability to pay dividends to our stockholders is dependent on the earnings and the distributions of funds from our subsidiaries. In addition, certain of our regulated subsidiaries must maintain minimum capital requirements. Compliance with these capital requirements restrict our ability to withdraw capital from our subsidiaries, which in turn may limit our ability to pay dividends.

Any future determination to pay dividends will be at the discretion of our board of directors and will take into account:

- general economic and business conditions;

- our financial condition and results of operations;

- our capital requirements and the capital requirements of our subsidiaries;

- our ability to receive dividends and distributions from our operating subsidiaries; and

- such other factors as our board of directors may deem relevant.

36

## CAPITALIZATION

The following table sets forth our cash and cash equivalents and our capitalization as of May 31, 2005:

- on an audited actual historical basis;

- on an unaudited pro forma basis after giving effect to the Reincorporation and the issuance and sale of shares of common stock in this offering at the initial offering price of $22.00 per share, after deducting the underwriting discounts and commissions and estimated expenses payable in connection with this offering and the application of the net proceeds to us from this offering by us.

This table should be read in conjunction with "Use of Proceeds," "Unaudited Pro Forma Consolidated Financial Statements," "Selected Historical and Pro Forma Consolidated Financial Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and the related notes thereto included elsewhere in this prospectus.

| | As of May 31, 2005 | |
| --- | --- | --- |
| | Actual | Pro Forma |
| | (in thousands) | |
| Cash and cash equivalents | $      405,029 | $      411,405 |
| Current portion of long-term debt(1) | $      144,913 | $      144,913 |
| Long-term debt: | | |
| Senior credit facilities: | | |
| Term loans(1) | 636,000 | 636,000 |
| Revolving credit facility(2) | — | — |
| 9% senior subordinated notes due 2012 | 600,000 | 390,000 |
| Total long-term debt | $   1,236,000 | $   1,026,000 |
| Membership interest issued by subsidiary and minority interest | 23,606 | 23,606 |
| Members'/Stockholders' equity: | | |
| Members' equity | 185,427 | — |
| Preferred Stock, $0.001 par value, 5,000,000 shares authorized; no shares issued or outstanding | | — |
| Common Stock, $0.001 par value, 500,000,000 shares authorized; no shares outstanding, actual; 127,500,000 shares issued and outstanding, pro forma | | 128 |
| Additional paid-in capital | | 514,452 |
| Retained earnings | | — |
| Total members'/stockholders' equity | 185,427 | 514,579 |
| Total capitalization | $   1,589,946 | $   1,709,098 |

(1)    Our senior credit facilities provide for $644.0 million in term loans. We repaid $2.0 million of our term loans during the quarter ended May 31, 2005. In addition, $8.0 million of our borrowings under our senior credit facilities are reflected in the current portion of our long-term debt.

(2)    Our senior facilities provide for a $75.0 million revolving credit facility, none of which has been drawn.

## DILUTION

If you invest in our common stock in this offering, your ownership interest will be diluted to the extent of the difference between the initial public offering price per share and the pro forma net tangible book value per share of common stock upon the completion of this offering and the Reincorporation. Dilution results from the fact that the per share offering price of common stock in this offering is substantially in excess of the book value per share attributable to the shares of our common stock to be held by our existing stockholders following the Reincorporation. Pro forma net tangible book value per share represents our total tangible assets less total liabilities divided by the pro forma total number of shares of common stock outstanding (excluding shares of common stock to be issued in connection with this offering), giving effect to the Reincorporation. On a pro forma basis, giving effect to the Reincorporation, our net tangible book value as of May 31, 2005 was approximately $(1,010.8) million, or approximately $(8.79) per share.

After giving effect to the sale of the shares of common stock at the initial public offering price of $22.00 per share and after deducting underwriting discounts and commissions and estimated expenses payable by us in connection with this offering, our pro forma as adjusted net tangible book value as of May 31, 2005 would have been approximately $(801.9) million, or $(6.29) per share of common stock. This represents an immediate increase in net tangible book value of $2.50 per share to our existing stockholders and an immediate dilution in net tangible book value per share of $28.29 to new investors purchasing shares of common stock in this offering at the initial offering price. The following table illustrates this dilution on a per share basis:

| | | |
|---|---:|---:|
| Initial public offering price per share | | $ 22.00 |
| Pro forma net tangible book value per share as of May 31, 2005 | $ (8.79) | |
| Increase in pro forma net tangible book value per share attributable to the sale of shares in this offering | 2.50 | |
| Pro forma as adjusted net tangible book value per share after this offering | | (6.29) |
| Pro forma dilution in net tangible book value per share to new investors | | $ 28.29 |

The following table summarizes on a pro forma basis as of May 31, 2005, giving effect to the Reincorporation and this offering, the number of shares of our common stock purchased from us, the effective cash contribution paid to us, and the average price per share paid to us by our existing stockholders and to be paid by new investors purchasing shares of our common stock from us in this offering. The table is based on the initial public offering price of $22.00 per share before deduction of underwriting discounts and commissions and estimated expenses payable by us in connection with this offering:

| | Shares Purchased | | Total Consideration | | Average Price Per Share |
|---|---|---|---|---|---|
| | Number | Percent | Amount | Percent | |
| | (in millions) | | (in millions) | | |
| Existing stockholders (1) | 115.0 | 90.2% | $ 874.3 | 76.1% | $ 8.66 |
| New investors(2) | 12.5 | 9.8 | 275.0 | 23.9 | 22.00 |
| Total | 127.5 | 100% | $ 1,149.3 | 100% | |

(1)   Total consideration and average price per share paid by existing stockholders give effect to the $27.9 million tax distribution paid to the members of New Refco prior to the Reincorporation and the cash contribution paid by Refco Group Holdings, Inc. to New Refco of $21.7 million related to excess tax distributions but do not give effect to the $550.0 million distribution paid to Refco Group Holdings, Inc. in connection with the THL Transactions.

(2)        The 26,500,000 shares to be sold in the offering include 14,000,000 shares to be sold by existing stockholders.

The above discussion and tables:

- exclude 3,634,140 shares of our common stock reserved for future grants under our compensation plans; and

- assume no exercise of the underwriters' option to purchase up to 3,975,000 additional shares from us, including the payment of a dividend to our existing stockholders with the proceeds from such exercise as described under "Use of Proceeds."

If the underwriters exercise their over-allotment option in full:

- the percentage of our common stock held by our existing stockholders will decrease to approximately 87.5% of the total outstanding amount of our common stock after the Reincorporation and this offering;

- the percentage of our common stock held by new investors will increase to approximately 12.5% of the total outstanding amount of our common stock after the Reincorporation and this offering; and

- there will be an immediate dilution in net tangible book value per share of $28.10 to new investors, taking into account the payment of a dividend to our stockholders of record prior to the offering from the proceeds of the exercise of such option.

39

## UNAUDITED PRO FORMA CONSOLIDATED FINANCIAL STATEMENTS

The following unaudited pro forma consolidated financial statements of Refco Inc. and its subsidiaries for the year ended February 28, 2005 and the three months ended May 31, 2005 have been derived by application of pro forma adjustments to the historical consolidated audited and unaudited financial statements included elsewhere in this prospectus and the unaudited management accounts of Forstmann-Leff International Associates, LLC. The unaudited pro forma adjustments are based upon available information and assumptions that management believes are reasonable under the circumstances. The unaudited pro forma financial statements do not purport to represent what our results of operations or financial condition would have been had the THL Transactions, the Reincorporation and the Offering actually occurred on the dates indicated, nor do they purport to project the results of our operations or financial condition for any future period or as of any future date.

The unaudited pro forma statements of income for the year ended February 28, 2005 and the three months ended May 31, 2005 give effect to the following transactions as if they had occurred on March 1, 2004:

*The THL Transactions—*

- an equity investment made by THL Refco Acquisition Partners and its affiliates and co-investors in New Refco, totaling approximately $507.0 million in cash through their acquisition of a portion of Refco Group's membership interests for cash and their subsequent exchange of those interests for membership interests of New Refco;

- the exchange of the existing equity investment of Phillip Bennett, our President and Chief Executive Officer, through Refco Group Holdings, Inc., of approximately $382.5 million in Refco Group for an approximate 42.8% equity interest in New Refco;

- an investment by other members of management of approximately $4.5 million in cash in New Refco;

- the entering into by Refco Group (as successor of Refco Finance Holdings, LLC) and New Refco of senior credit facilities providing for approximately $800.0 million in term loans, which were fully drawn immediately prior to the closing of the THL Transactions, and a revolving credit facility for working capital and general corporate purposes of $75.0 million, none of which was drawn at closing;

- the issuance by Refco Finance Holdings LLC and Refco Finance Inc. of $600.0 million in aggregate principal amount of senior subordinated notes;

- the merger of Refco Finance Holdings LLC with and into Refco Group, with Refco Group continuing as the surviving entity;

- the payments of $24.9 million relating to pre-payment premiums on Refco Group's existing debt and $19.8 million relating to obligations triggered by Refco Group's change of control;

- the repayment of $383.5 million of unsecured senior notes issued by Refco Group under four separate note purchase agreements; and

- the repayment of a $16.0 million intercompany subordinated loan between Refco Group Holdings, Inc. and Refco Group.

As part of the THL Transactions, Refco Group distributed $550.0 million in cash and other capital distributions as well as all of the equity interests of Forstmann-Leff International Associates, LLC, which at that time owned substantially all the assets of our Asset Management business (the "Asset Management Distribution"), to Refco Group Holdings, Inc., an entity that was owned by Tone Grant and Phillip Bennett and that is now wholly owned by Phillip Bennett. Following the distribution of Forstmann-Leff International Associates, LLC, Refco Group is organized into two operating business segments, Derivatives Brokerage & Clearing and Prime Brokerage/Capital Markets, and has one non-operating business segment, Corporate & Other. Forstmann-Leff International Associates, LLC is

accounted for as discontinued operations in our pro forma consolidated financial statements and our audited consolidated financial statements included elsewhere in this prospectus. The component from Refco Group's Asset Management business that was retained after the Asset Management Distribution, Refco Alternative Investments, has become part of its Derivatives Brokerage & Clearing business.

Refco Alternative Investments has an existing arms-length distribution agreement with Tilney Holdings, a subsidiary of Forstmann-Leff International Associates, LLC, whereby Refco Alternative Investments receives an advisory fee from Tilney Holdings for certain of Tilney Holdings' hedge fund products, which are sold through its distribution platform. The advisory fee is based on the volume of the product sold through its distribution platform and for as long as they are managed by Tilney Holdings. The fees received by us from Tilney Holdings are not material.

The acquisition by THL Refco Acquisition Partners and its affiliates and co-investors of a portion of Refco Group Holdings, Inc.'s interest in Refco Group and Refco Group Holdings, Inc.'s contribution of its interest in Refco Group to New Refco are each accounted for as a purchase in conformity with Statement of Financial Accounting Standards ("SFAS") No. 141, *Business Combinations*, in accordance with Emerging Issues Task Force ("EITF") No. 88-16, *Basis in Leveraged Buyout Transactions*, with intangible assets recorded in accordance with SFAS No. 142, *Goodwill and Other Intangible Assets*. This guidance requires the continuing residual interest retained by the continuing management investors as a result of the THL Transactions to be reflected at its predecessor basis and a partial step-up of the assets and liabilities to fair value for the portion acquired by THL Refco Acquisition Partners, its affiliates and co-investors.

*The Reincorporation and this offering—*

- Each of THL Refco Blocker Corp., THL Refco Blocker Corp. II and THL Refco Blocker Corp. III (which are general partners, together with THL Refco GP LLC, in THL Refco Acquisition Partners, THL Refco Acquisition Partners II and THL Refco Acquisition Partners III, respectively) merged with and into Refco Inc., with Refco Inc. as the surviving entity, and pursuant to such mergers, Refco Inc. issued an aggregate of 56,431,863 shares of its common stock in exchange for all of the common and preferred stock of such entities;

- THL Refco GP LLC assigned its partnership interests in each of THL Refco Acquisition Partners, THL Refco Acquisition Partners II and THL Refco Acquisition Partners III to Refco Inc., leaving Refco Inc. as the sole holder of all of the partnership interests in such partnerships, at which time such partnerships were dissolved and all of the assets of such partnerships (consisting of Class A member interests in New Refco) were distributed to Refco Inc.;

- Each of PG Direct Invest No. 10, Inc. and GM Refco II Corp. merged with and into Refco Inc., with Refco Inc. as the surviving entity, and pursuant to such mergers, Refco Inc. issued an aggregate of 2,315,593 shares of its common stock in exchange for all of the common and preferred stock of such entities;

- Each of the other affiliates and co-investors of Thomas H. Lee Partners, L.P. holding Class A member interests in New Refco contributed all of its Class A member interests in New Refco to Refco Inc. in exchange for an aggregate of 4,375,132 shares of its common stock;

- Refco Group Holdings, Inc., which is wholly-owned by Phillip Bennett, our President and Chief Executive Officer, contributed all of its Class A member interests in New Refco to Refco Inc. in exchange for 28,529,522 shares of its common stock;

- The Phillip R. Bennett Three Year Annuity Trust, in respect of which Phillip Bennett, our President and Chief Executive Officer, is both Trustee and Beneficiary, contributed all of its Class A member interests in New Refco to Refco Inc. in exchange for 19,089,272 shares of common stock;

41

- Our officers who hold Class A member interests in New Refco contributed all of their Class A member interests in New Refco to Refco Inc. in exchange for an aggregate of 242,758 shares of its commons stock;

- Our officers, directors and employees who hold Class B member interests in New Refco contributed all of their Class B member interests in New Refco to Refco Inc. in exchange for an aggregate of 4,015,860 shares of its common stock, which shares are subject to vesting; and

- New Refco assigned the nominal number of shares of common stock of Refco Inc. held by it back to Refco Inc. for no consideration.

- Our becoming taxable as a corporation.

- Our issuance of 12,500,000 shares in this offering at the initial public offering price of $22.00 per share and the application of the net proceeds from this offering, after deducting the underwriting discounts, commissions and estimated expenses payable by us, as described under "Use of Proceeds."

A chart illustrating our ownership and corporate structure immediately following the Re-incorporation is set forth on page 7.

The unaudited pro forma financial statements do not give effect to the exercise of the underwriters' over-allotment option and the payment of a dividend to our stockholders of record prior to the offering with the proceeds of shares issued by us pursuant to the exercise of such option.

The unaudited pro forma balance sheet as of May 31, 2005 gives effect to the Reincorporation and this offering as if such transactions occurred as of May 31, 2005.

The assumptions underlying the pro forma adjustments are described in the accompanying notes, which should be read in conjunction with these unaudited pro forma consolidated financial statements.

The unaudited pro forma consolidated financial statements should be read in conjunction with the information contained in "Selected Historical and Pro Forma Consolidated Financial Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Certain Relationships and Related Transactions" and the consolidated financial statements and the related notes thereto appearing elsewhere in this prospectus.

The unaudited pro forma consolidated statements of income do not give effect to one-time effects of events that are directly attributable to the Reincorporation and this offering. As a "C" corporation, we are subject to federal and state income taxes. Our previous holding company, New Refco, is a limited liability company and is not subject to federal or state taxes. These one-time events include the following transactions and related tax effects that are expected to occur during the fiscal year ended February 28, 2006 and are not included in the pro forma consolidated statements of income:

- recognition of a credit to our income tax provision of approximately $120.2 million corresponding to a net deferred tax asset recognized upon becoming a "C" corporation immediately before the effectiveness of the registration statement of which this prospectus is a part;

- recognition of a loss for the write-off of deferred financing costs for the year ended February 28, 2005 and the three months ended May 31, 2005 of $7.5 million and $7.4 million, respectively, which relates to the redemption of $210.0 million of our senior subordinated notes using a portion of the net proceeds from this offering;

- recognition of a loss for the prepayment penalty of $18.9 million paid in connection with the redemption of $210.0 million of our senior subordinated notes; and

- recognition of the final management fee payment of $13.0 million by New Refco to THL Managers V, LLC in connection with the termination of the management agreement by THL Managers V, LLC upon consummation of this offering in accordance with the terms of the management agreement.

Any recurring effect of the events described in this paragraph has been reflected in the Unaudited Pro Forma Condensed Consolidated Statements of Income.

42

**Refco Inc. and Subsidiaries**

**Unaudited Pro Forma Consolidated Balance Sheet**
**as of May 31, 2005**
**(in thousands)**

| | Historical | Adjustments for | | Pro Forma |
| | | The Reincorporation | The Offering | |
|---|---|---|---|---|
| Cash and cash equivalents | $ 405,029 | $ — | $ 6,376(b)(c)(d)(e)(f) | $ 411,405 |
| Cash and securities segregated under federal and other regulations: | | | | |
|     Cash and cash equivalents | 1,053,218 | — | — | 1,053,218 |
|     Securities purchased under agreements to resell | 67,013 | — | — | 67,013 |
| Securities purchased under agreements to resell | 46,551,374 | — | — | 46,551,374 |
| Deposits with clearing organizations and others | 2,519,147 | — | — | 2,519,147 |
| Receivables from securities borrowed | 2,631,989 | — | — | 2,631,989 |
| Receivables from broker-dealers and clearing organizations | 10,770,348 | — | — | 10,770,348 |
| Receivables from customers, net of reserves | 1,807,446 | — | — | 1,807,446 |
| Securities owned, at market or fair value | 6,774,039 | — | — | 6,774,039 |
| Memberships in exchanges | 36,159 | — | — | 36,159 |
| Deferred tax assets | — | 120,183(a) | — | 120,183 |
| Goodwill | 744,110 | — | — | 744,110 |
| Identifiable intangible assets | 595,931 | — | — | 595,931 |
| Other assets | 361,388 | — | (7,407)(g) | 353,981 |
|     Total assets | $ 74,317,191 | $ 120,183 | $ (1,031) | $ 74,436,343 |
| | | | | |
| **Liabilities:** | | | | |
|     Short-term borrowings, including current portion of long-term borrowings | $ 144,913 | $ — | $ — | $ 144,913 |
|     Securities sold under agreements to repurchase | 43,333,241 | — | — | 43,333,241 |
|     Payable from securities loaned | 2,458,147 | — | — | 2,458,147 |
|     Payable to broker-dealers and clearing organizations | 8,444,520 | — | — | 8,444,520 |
|     Payable to customers | 7,622,809 | — | — | 7,622,809 |
|     Securities sold, not yet purchased, at market or fair value | 10,590,379 | — | — | 10,590,379 |
|     Accounts payable, accrued expenses, and other liabilities | 278,149 | — | — | 278,149 |
| Long-term borrowings | 1,236,000 | — | (210,000)(c) | 1,026,000 |
|     Total liabilities | 74,108,158 | — | (210,000) | 73,898,158 |
| Commitments and contingent liabilities | | | | |
| Membership interests issued by subsidiary and minority interest | 23,606 | — | — | 23,606 |
| Members' equity/stockholders' equity | 185,427 | 120,183(a) | 208,969(b)(d)(e)(f)(g) | 514,579 |

| | | | | |
|---|---|---|---|---|
| Total liabilities and members'/stockholders' equity | $   74,317,191 | $   120,183 | $   (1,031) | $   74,436,343 |

The accompanying notes are an integral part of the unaudited
pro forma consolidated financial statements

43

**Notes to Unaudited Pro Forma Consolidated Balance Sheet**

**The following pro forma adjustments relate to the unaudited pro forma consolidated balance sheet as of May 31, 2005:**

(a)     Represents the recognition of a one-time, non-cash credit to our income tax provision to recognize previously unrecognized net deferred tax assets of approximately $120.2 million upon becoming a "C" corporation immediately before the effectiveness of the registration statement of which this prospectus is a part. This deferred tax asset primarily results from the excess of the tax basis over the book basis of certain of our intangible assets. We expect to realize future reductions in our current tax expense as these intangibles are amortized and deducted from taxable income on our tax returns.

(b)     Represents net proceeds of $254.5 million received by us from the issuance of 12,500,000 shares of common stock in this offering after deducting underwriting discounts and commissions and estimated expenses of approximately $4.5 million paid by us in connection with this offering.

(c)     Represents the redemption of $210.0 million aggregate principal amount of our senior subordinated notes with a portion of the net proceeds from this offering.

(d)     Represents an adjustment for a prepayment penalty of $18.9 million paid in connection with the redemption of $210.0 million aggregate principal amount of our senior subordinated notes.

(e)     Represents the payment of the final management fee of $13.0 million to THL Managers V, LLC in connection with the termination of the management agreement upon the consummation of this offering in accordance with the terms of the management agreement.

(f)     Represents a cash distribution by New Refco of approximately $27.9 million to its members to enable them to meet their estimated tax obligations, partly offset by a cash contribution of $21.7 million by Refco Group Holdings, Inc. to New Refco equal to the amount of tax distributions that Refco Group Holdings, Inc. received from New Refco in excess of its pro rata share of all tax distributions made by New Refco to its members.

(g)     Represents an adjustment to other assets related to the write-off of $7.4 million of unamortized deferred financing costs in connection with the redemption of $210.0 million aggregate principal amount of our senior subordinated notes.

44

**Refco Inc. and Subsidiaries**
**Unaudited Pro Forma Condensed Consolidated Statements of Income**
**Year ended February 28, 2005**
**(in thousands, except per share data)**

| | Historical | | Adjustments for — The THL Transactions | | | | |
|---|---|---|---|---|---|---|---|
| | Period from March 1, 2004 through August 5, 2004 | Period from August 6, 2004 through February 28, 2005 | Asset Management Distribution(a) | Acquisition and Related Financing | The Reincorporation | The Offering | Pro Forma |
| **Revenues:** | | | | | | | |
| Commissions and brokerage | $ 362,020 | $ 486,705 | $ — | $ — | $ — | $ — | $ 848,725 |
| Interest | 768,713 | 1,817,103 | — | — | — | — | 2,585,816 |
| Principal transactions, net | 119,235 | 160,830 | — | — | — | — | 280,065 |
| Asset management and advisory fees | 3,676 | 8,801 | — | — | — | — | 12,477 |
| Other | 2,469 | 5,973 | — | — | — | — | 8,442 |
| Total revenues | 1,256,113 | 2,479,412 | — | — | — | — | 3,735,525 |
| **Expenses:** | | | | | | | |
| Commissions and order execution costs | 244,009 | 358,528 | — | — | — | —(i) | 602,537 |
| Interest | 706,640 | 1,765,218 | — | 25,542(c) | — | (19,932)(j) | 2,477,468 |
| Employee compensation and benefits | 108,528 | 158,465 | — | — | — | — | 266,993 |
| General, administrative and other | 97,576 | 145,970 | — | 6,541(e) | — | (2,848)(k) | 247,239 |
| Total expenses | 1,156,753 | 2,428,181 | — | 32,083 | — | (22,780) | 3,594,237 |
| Income from equity investees | — | — | — | — | 24,923 (g) | | 24,923 |
| Income (loss) before provision for income taxes, income from equity investees, members' interest in earnings (losses) of subsidiary and discontinued operations | 99,360 | 51,231 | — | (32,083) | 24,923 | 22,780 | 166,211 |
| Provision for income taxes | 7,994 | 6,250 | — | (1,283)(f) | 58,547 (h) | — | 71,508 |
| Income (loss) before income from equity investees, members' interest in earnings (losses) of subsidiary and discontinued operations | 91,366 | 44,981 | — | (30,800) | (33,624) | 22,780 | 94,703 |
| Income (loss) from equity investees | 8,345 | 16,578 | — | — | (24,923)(g) | — | — |
| Members' interest in earnings (losses) of subsidiary | 5,771 | (16,749) | — | — | — | — | (10,978) |
| Income (loss) from continuing operations | 93,940 | 78,308 | — | (30,800) | (58,547) | 22,780 | 105,681 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Discontinued operations: | | | | | | | |
| Income (loss) from discontinued operations | 7,383 | — | (7,383) | — | — | — | — |
| Applicable income tax expense | 3,344 | — | (3,344) | — | — | — | — |
| Net income (loss) | $ 97,979 | $ 78,308 | $ (4,039) | $ (30,800) | $ (58,547) | $ 22,780 | $ 105,681 |

| | |
|---|---|
| Net income per common share | |
| Basic | $ 0.86(l) |
| Diluted | $ 0.84(l) |
| Weighted average shares outstanding (in thousands) | |
| Basic | 122,393(l) |
| Diluted | 125,250(l) |

The accompanying notes are an integral part of the
unaudited pro forma consolidated financial statements

45

**Refco Inc. and Subsidiaries**
**Unaudited Pro Forma Condensed Consolidated Statement of Income**
**Three Months ended May 31, 2005**
**(in thousands, except per share data)**

| | Historical | Adjustments for | | |
| | Three Months Ended May 31, 2005 | The Reincorporation | The Offering | Pro Forma |
|---|---|---|---|---|
| Revenues: | | | | |
| Commissions and brokerage | $ 244,213 | $ — | $ — | $ 244,213 |
| Interest | 939,471 | — | — | 939,471 |
| Principal transactions, net | 114,764 | — | — | 114,764 |
| Asset management and advisory fees | 5,559 | — | — | 5,559 |
| Other | 8,029 | — | — | 8,029 |
| Total revenues | 1,312,036 | — | — | 1,312,036 |
| Expenses: | | | | |
| Commissions and order execution costs | 207,920 | — | — | 207,920 |
| Interest | 923,830 | — | (4,983)(i)(j) | 918,847 |
| Employee compensation and benefits | 74,245 | — | — | 74,245 |
| General, administrative and other | 62,263 | — | (807)(k) | 61,456 |
| Total expenses | 1,268,258 | — | (5,790) | 1,262,468 |
| Income from equity investees | — | 14,182(g) | — | 14,182 |
| Income before provision for income taxes, income from equity investees, members' interest in earnings of subsidiary, minority interest and discontinued operations | 43,778 | 14,182 | 5,790 | 63,750 |
| Provision for income taxes | 4,990 | 16,457(h) | — | 21,447 |
| Income (loss) before income from equity investees, members' interest in earnings of subsidiary, minority interest and discontinued operations | 38,788 | (2,275) | 5,790 | 42,303 |
| Income (loss) from equity investees | 14,182 | (14,182)(g) | — | — |
| Members' interest in earnings of subsidiary and minority interest | 10,383 | — | — | 10,383 |
| Net income (loss) | $ 42,587 | $ (16,457) | $ 5,790 | $ 31,920 |
| Net income per common share | | | | |
| Basic | | | | $ 0.26(l) |
| Diluted | | | | $ 0.25(l) |
| Weighted average shares outstanding (in thousands) | | | | |
| Basic | | | | 122,393(l) |
| Diluted | | | | 125,250(l) |

The accompanying notes are an integral part of the
unaudited pro forma consolidated financial statements

46

**Notes to Unaudited Pro Forma Consolidated Statements of Income**

**The following pro forma adjustments relate to the unaudited pro forma consolidated statements of income for the year ended February 28, 2005 and the three months ended May 31, 2005:**

(a)     Represents the results of operations of the Asset Management business for the year ended February 28, 2005, as derived from the unaudited management information of the Asset Management business. Forstmann-Leff International Associates, LLC, which owns substantially all the assets of the Asset Management business of the Group, was distributed to Refco Group Holdings, Inc., as part of the THL Transactions consummated on August 5, 2004. This distribution does not include the retained assets from our Asset Management business, Refco Alternative Investments, which have been retained and the results of operations of which have become part of our Derivatives Brokerage & Clearing business.

(b)     Represents interest expense for new debt incurred in connection with the THL Transactions at the following interest rates, net of interest expense associated with existing debt being repaid:

| | |
|---|---|
| New senior credit facility | 5.09% |
| New senior subordinated notes | 9.0% |

The additional interest expense is calculated as the new interest on the $646.0 million new senior credit facility at 5.09% per year plus the new interest on the $600.0 million new senior subordinated notes at 9.0% per year, net of the existing interest expense for the year ended February 28, 2005 of $64.3 million.

Borrowings under the new senior credit facility bear interest at a floating rate, which can be either the Eurodollar rate plus an applicable margin or an alternative base rate plus an applicable margin. The applicable margins in respect of the term loan facility are subject to adjustment based on debt ratings of the new senior credit facility. As of June 25, 2005, and based on the then-current debt ratings, the senior credit facility accrued interest at the Eurodollar rate plus 2.00% per annum. The actual rates will vary from those used to compute the above adjustment of interest expense due to floating rates applicable to our new senior credit facility as described above. The effect on pretax income of a $1/8\%$ variance in these rates would be approximately $0.8 million for an annual period.

(c)     Represents additional interest expense for the year ended February 28, 2005 of $1.8 million, related to the amortization of deferred financing costs from debt incurred in relation to the THL Transactions.

(d)     Represents additional amortization expense as a result of the partial step-up to fair market value of customer relationships and technology for the year ended February 28, 2005 of $6.5 million. The pro forma value of the customer relationships are amortized on an accelerated basis over a weighted average economic useful life of 13 years based on patterns of usage. Technology is amortized over an estimated useful life of three years. The additional amortization expense is net of the existing amortization expense for the year ended February 28, 2005 of $14.1 million.

(e)     Represents the net increase in the management fee paid to THL Managers V, LLC for advisory and consulting services for the year ended February 28, 2005 of $1.2 million.

(f)     Represents an increase in income tax benefits for the year ended February 28, 2005 of $1.3 million. This tax benefit is provided at a 4% tax rate for the New York City Unincorporated Business tax due to the aggregate pro forma decrease in income before provision for income taxes. Prior to the consummation of the Reincorporation, New Refco was treated as a partnership for federal income tax purposes, and accordingly, we have not provided for federal income taxes related to New Refco's operating results.

(g)     Represents the reclassification of income from equity investees that are primarily limited liability companies and taxable for us as a "C" corporation. Our income tax liability on this income is included in provision for income taxes.

47

(h)    Represents the adjustment for an estimated increase in income tax provision calculated at an effective rate of 41.0% as a "C" corporation, net of existing tax paid on foreign subsidiaries and New York City Unincorporated Business Tax. The increased income tax totals $58.5 million and $16.4 million, respectively, for the year ended February 28, 2005 and the three months ended May 31, 2005 and reflects additional federal and state income taxes that we would have been required to pay had we been a taxable corporation since March 1, 2004.

(i)    Represents a reduction in interest expense for the year ended February 28, 2005 and the three months ended May 31, 2005 of $18.9 million and $4.7 million, respectively, related to the redemption of $210.0 million of our outstanding senior subordinated notes with a portion of the net proceeds from this offering.

(j)    Represents a reduction to the amortization of deferred financing costs for the year ended February 28, 2005 and the three months ended May 31, 2005 of $1.0 million and $0.3 million, respectively, as a result of the redemption of a portion of our senior subordinated notes in connection with this offering.

(k)    Represents the elimination of the management fee paid to THL Managers V, LLC for advisory and consulting services for the year ended February 28, 2005 and the three months ended May 31, 2005 of $2.8 million and $0.8 million, respectively. Upon the consummation of this offering, THL Managers V, LLC will terminate this agreement pursuant to its terms.

(l)    Pro forma net income per common share is computed by dividing earnings available to common stockholders by the weighted average number of common shares outstanding during the period. Pro forma diluted earnings per common share is computed by dividing earnings available to common stockholders by the sum of weighted average common shares outstanding plus dilutive common shares for the period. Pro forma basic and diluted common shares also include the number of shares from this offering whose proceeds will be used for the repayment of debt.

The following table sets forth the computation of pro forma basic and diluted net income per share:

|  | Year Ended February 28, 2005 | Three Months Ended May 31, 2005 |
|---|---|---|
|  | (in thousands) | |
| Basic and diluted pro forma net income per common share: | | |
| Numerator: | | |
| Net income | $     105,681 | $     31,920 |
| Denominator: | | |
| Weighted average common shares outstanding | 115,000 | 115,000 |
| Less:    Weighted average unvested common shares subject to repurchase or cancellation | (3,012) | (3,012) |
| Add:    Shares from this offering whose proceeds will be used for the repayment of debt(1) | 10,405 | 10,405 |
| Denominator for basic calculation | 122,393 | 122,393 |
| Effect for dilutive securities(2) | 2,857 | 2,857 |
| Denominator for diluted calculation | 125,250 | 125,250 |

(1)    Calculated as $228.9 million of proceeds to be used in the redemption of debt, including the payment of a prepayment penalty on the date of redemption, divided by the offering proceeds of $22.00 per share.

(2)    Calculated based on the effects of the vesting of shares of restricted stock, which are dilutive in nature.

48

## SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA

Set forth below is selected historical consolidated financial data, at the dates and for the periods indicated, for New Refco and its predecessor, Refco Group, which holds all of our operating subsidiaries and became an indirect subsidiary of Refco Inc. following the Reincorporation, as of and for the fiscal years ended February 28, 2001, 2002 and 2003, February 29, 2004 and February 28, 2005 and the three months ended May 31, 2005 and 2004.

This prospectus does not include financial statements of Refco Inc. because it has only been formed recently for the purpose of effecting this offering and until the consummation of the Reincorporation, held no material assets and did not engage in any operations.

The selected historical consolidated financial data as of and for the fiscal years ended February 28, 2002 and 2003, February 29, 2004 and February 28, 2005 have been derived from Refco Group's audited consolidated financial statements for fiscal years 2002, 2003, 2004 and 2005, and the selected historical consolidated financial data for the fiscal year ended February 28, 2001 has been derived from Refco Group's unaudited consolidated financial statements for fiscal year 2001.

The selected historical consolidated financial data as of May 31, 2005 and for the three months ended May 31, 2004 and 2005 have been derived from New Refco and its predecessor Refco Group's unaudited interim consolidated financial statements for those periods. The unaudited consolidated financial statements as of May 31, 2005 and for the three months ended May 31, 2004 and 2005 include all adjustments (consisting of normal, recurring adjustments) that are, in the opinion of management, necessary for a fair presentation of our financial position and result of operations for the period presented. The results for the three months ended May 31, 2005 are not necessarily indicative of our results of operations for a full fiscal year.

The selected historical financial data for the year ended February 28, 2005 represents the sum of the results of operations for Refco Group for the period from March 1, 2004 through August 5, 2004 and the results of operations of New Refco for the period from August 6, 2004 through February 28, 2005 and are not indicative of the results that would have actually been obtained if the THL Transactions occurred on March 1, 2004. The selected historical financial data for the periods indicated below include the results of our Asset Management business, substantially all of which was distributed as part of the THL Transactions.

You should read the data set forth below in conjunction with "Capitalization," "Management's Discussion and Analysis of Financial Condition and Results of Operations," "Unaudited Pro Forma Consolidated Financial Statements," "Certain Relationships and Related Transactions" and our consolidated financial statements and the related notes thereto included elsewhere in this prospectus.

49

| | Fiscal Year Ended February 28, | | | | Period from March 1, 2004 through August 5, | Period from August 6, 2004 through February 28, | Three Months Ended May 31, | |
|---|---|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004(1) | 2004 | 2005 | 2004 | 2005 |
| | (unaudited) | | | | | | (unaudited) | (unaudited) |
| | | | | (dollars in millions) | | | | |
| **Statement of Income Data:** | | | | | | | | |
| Revenues: | | | | | | | | |
| Commissions and brokerage | $      397 | $      478 | $      572 | $      645 | $      362 | $      487 | $      216 | $      244 |
| Interest | 1,528 | 1,711 | 2,387 | 1,052 | 769 | 1,817 | 378 | 939 |
| Principal transactions, net | 103 | 99 | 83 | 166 | 119 | 161 | 61 | 115 |
| Asset management and advisory fees | 10 | 6 | — | 7 | 4 | 9 | 2 | 6 |
| Other | 2 | 4 | 4 | 4 | 2 | 6 | 1 | 8 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Total revenues | 2,040 | 2,298 | 3,046 | 1,874 | 1,256 | 2,479 | 657 | 1,312 |
| Expenses: | | | | | | | | |
| Commissions and order execution costs | 250 | 324 | 385 | 412 | 244 | 359 | 143 | 208 |
| Interest | 1,406 | 1,557 | 2,182 | 898 | 707 | 1,765 | 344 | 924 |
| Employee compensation and benefits | 169 | 167 | 181 | 205 | 109 | 158 | 65 | 74 |
| General, administrative and other | 140 | 149 | 143 | 170 | 97 | 146 | 48 | 62 |
| Total expenses | 1,965 | 2,197 | 2,891 | 1,685 | 1,157 | 2,428 | 599 | 1,268 |
| Income before provision for income taxes, dividends on preferred securities issued by subsidiaries, income from equity investees, members' interest in earnings (losses) of subsidiary, minority interest and discontinued operations | 75 | 101 | 155 | 189 | 100 | 51 | 58 | 44 |
| Provision for income taxes(2) | 6 | 5 | 1 | 12 | 8 | 6 | 6 | 5 |
| Income before dividends on preferred securities issued by subsidiaries, income from equity investees, members' interest in earnings (losses) of subsidiary, minority interest and discontinued operations | 69 | 96 | 154 | 177 | 92 | 45 | 52 | 39 |
| Dividends on preferred securities issued by subsidiaries | 14 | 16 | 16 | — | — | — | — | — |
| Income from equity investees | — | 1 | 2 | 11 | 8 | 17 | 7 | 14 |

50

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Members' interest in earnings (losses) of subsidiary and minority interest | 1 | — | — | 1 | 6 | (17) | 1 | 10 |
| Income from continuing operations | 54 | 81 | 140 | 187 | 94 | 78 | 58 | 43 |
| Discontinued operations: | | | | | | | | |
| Income from discontinued operations | 20 | 14 | 1 | — | 7 | — | 3 | — |

| Applicable income tax expense | | 2 | | 2 | | 1 | | — | | 3 | | — | | 2 | | — |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net income(2) | $ | 72 | $ | 93 | $ | 140 | $ | 187 | $ | 98 | $ | 78 | $ | 59 | $ | 43 |

|  | As of February 28, | | | | | As of May 31, 2005 |
|---|---|---|---|---|---|---|
|  | **2001** | **2002** | **2003** | **2004(3)** | **2005** | **Actual** |
|  | **(unaudited)** | | | | | **(unaudited)** |
|  | **(dollars in millions)** | | | | | |
| **Balance Sheet Data:** | | | | | | |
| Total assets | $  18,277 | $  22,611 | $  19,215 | $  33,332 | 48,765 | $  74,317 |
| Long-term debt and preferred securities issued by subsidiaries: | | | | | | |
| Long-term borrowings | 295 | 262 | 384 | 316 | 1,238 | 1,236 |
| Subordinated debt | 41 | 16 | 16 | 16 | — | — |
| Preferred securities issued by subsidiaries | 160 | 160 | 160 | — | — | — |
| Total long-term debt and preferred securities issued by subsidiaries | 496 | 438 | 560 | 332 | 1,238 | 1,236 |
| Members' equity | 500 | 515 | 566 | 616 | 150 | 185 |

51

| | Fiscal Year Ended February 28, | | | | Period from March 1, 2004 through August 5, 2004 | Period from August 6, 2004 through February 28, 2005 | Three Months Ended May 31, | |
|---|---|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004(1) | | | 2004 | 2005 |
| | (unaudited) | | | | | | (unaudited) | (unaudited) |
| | (dollars in millions) | | | | | | | |
| **Other Financial Data:** | | | | | | | | |
| Depreciation and amortization | $ 22 | $ 34 | $ 23 | $ 26 | $ 12 | $ 18 | $ 6 | $ 10 |
| Long-term debt interest | 23 | 25 | 27 | 31 | 12 | 56 | 7 | 23 |
| Dividends on preferred securities | 14 | 16 | 16 | — | — | — | — | — |
| Capital expenditures | 28 | 15 | 12 | 11 | 5 | 9 | 3 | 3 |

| | Fiscal Year Ended February 28, | | | Period from March 1, 2004 through August 5, 2004 | Period from August 6, 2004 through February 28, 2005 | Three Months Ended May 31, | |
|---|---|---|---|---|---|---|---|
| | 2002 | 2003 | 2004(1) | | | 2004 | 2005 |
| | | | | | | (unaudited) | (unaudited) |
| | (dollars in millions) | | | | | | |
| **Segment Data:** | | | | | | | |
| Revenues: | | | | | | | |
| Derivatives Brokerage & Clearing | $ 692 | $ 746 | $ 840 | $ 446 | $ 629 | $ 264 | $ 337 |
| Prime Brokerage/Capital Markets | 2,217 | 2,609 | 1,268 | 913 | 2,036 | 441 | 1,124 |
| Corporate & Other | (611) | (309) | (234) | (103) | (186) | (47) | (148) |
| Total revenues | $ 2,298 | $ 3,046 | $ 1,874 | $ 1,256 | $ 2,479 | $ 657 | $ 1,312 |
| Income (loss) before provision for income taxes, dividends on preferred securities issued by subsidiaries, income from equity investees, members' interest in earnings (losses) of subsidiary, minority interest and discontinued operations | | | | | | | |
| Derivatives Brokerage & Clearing | $ 58 | $ 77 | $ 122 | $ 60 | $ 75 | $ 41 | $ 36 |
| Prime Brokerage/Capital Markets | 96 | 101 | 125 | 67 | 71 | 32 | 50 |
| Corporate & Other | (53) | (23) | (57) | (27) | (94) | (14) | (42) |
| Total | $ 101 | $ 155 | $ 189 | $ 100 | $ 51 | $ 58 | $ 44 |

(1)     Year ended February 29.

(2)     Net income and provision for income taxes do not give effect to our reorganization as a "C" corporation and do not reflect additional federal, state and local income taxes that we would have been required to pay had we been a taxable corporation during the periods presented. The combined pro forma effective federal, foreign, state and local tax rate for all periods presented is 41%. As a "C" corporation, we will record a cumulative net deferred tax asset and corresponding credit to our income tax provision of approximately $120.2 million. This deferred tax asset primarily results from the excess of the tax basis over the book basis of certain of our intangible assets. We expect to realize future reductions in our current tax expense as these intangibles are amortized and deducted from taxable income on our tax returns.

(3)    As of February 29.

52

## MANAGEMENT'S DISCUSSION AND ANALYSIS
## OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*This prospectus contains forward-looking statements that involve risks and uncertainties. Our actual results could differ materially from those anticipated in forward-looking statements for many reasons, including the factors described in "Risk Factors" and elsewhere in this prospectus. You should read the following discussion in conjunction with the information included under the captions "Unaudited Pro Forma Consolidated Financial Statements" and "Selected Historical and Pro Forma Consolidated Financial Data" and our consolidated financial statements and the related notes thereto included elsewhere in this prospectus. Further, the following discussion includes information related to our Asset Management business, substantially all the assets of which were distributed to Refco Group Holdings, Inc. on August 5, 2004. Reference to the year ended February 28, 2005 includes the period from March 1, 2004 through August 5, 2004 combined with the period from August 6, 2004 through February 28, 2005.*

### General

We provide execution and clearing services for exchange-traded derivatives and provide prime brokerage services in the fixed income and foreign exchange markets. We serve over 200,000 customer accounts from our 23 locations in 14 countries. Our international operations generated $586.1 million, or 44.0%, of our net revenues for the year ended February 28, 2005 and $173.7 million, or 42.2%, of our net revenues for the three months ended May 31, 2005. Our customers include corporations, government agencies, hedge funds, managed futures funds, pension funds, financial institutions, retail clients and professional traders.

We were historically organized into three operating business segments for financial reporting purposes: (i) Derivatives Brokerage & Clearing; (ii) Prime Brokerage/Capital Markets; and (iii) Asset Management. We also have historically had a Corporate & Other non-operating business segment. Following the distribution of substantially all the assets of our Asset Management business in connection with the THL Transactions described below, we are now organized into two operating business segments for financial reporting purposes, Derivatives Brokerage & Clearing and Prime Brokerage/Capital Markets, and we have one non-operating business segment, Corporate & Other. We report the retained assets from our Asset Management business, Refco Alternative Investments, as part of our Derivatives Brokerage & Clearing business.

### The THL Transactions and the Reincorporation

On August 5, 2004, THL Refco Acquisition Partners, an affiliate of Thomas H. Lee Partners, L.P., and its affiliates and co-investors acquired approximately 57% of the equity interests in our indirect subsidiary, Refco Group Ltd., LLC ("Refco Group"), which they hold through our direct subsidiary New Refco Group Ltd., LLC ("New Refco"), for approximately $507.0 million in cash. In connection with the transaction, Phillip Bennett, our President and Chief Executive Officer, exchanged his existing equity investment of approximately $382.5 million in Refco Group for an approximate 43% interest in New Refco, and other members of our management made an investment in New Refco aggregating approximately $4.5 million in cash. Concurrently with the closing of the acquisition, Refco Group entered into senior credit facilities providing for a fully drawn $800.0 million term loan and an undrawn $75.0 million revolving loan facility, and, together with Refco Finance Inc., issued $600.0 million in aggregate principal amount of senior subordinated notes. Also concurrently with the consummation of the transactions described above, Refco Group distributed $550.0 million in cash as well as all of the equity interests of Forstmann-Leff International Associates, LLC, which at that time owned substantially all the assets of Refco Group's Asset Management business, to Refco Group Holdings, Inc., an entity that was owned by Tone Grant and Phillip Bennett and that is now wholly owned by Phillip Bennett. We refer to the foregoing transactions collectively as the "THL Transactions."

53

Prior to this offering, we conducted our business through Refco Group and its direct and indirect subsidiaries. Immediately prior to the effectiveness of the registration statement of which this prospectus is a part, Refco Inc., a newly formed Delaware corporation that is a direct, wholly-owned subsidiary of New Refco and following the Reincorporation became a holding company for our business, entered into the following transactions:

- Refco Inc. issued an aggregate of 63,122,588 shares of its common stock to Thomas H. Lee Equity Fund V, L.P. and its affiliates and co-investors in exchange for the direct or indirect equity interests in New Refco held by such parties;

- Refco Group Holdings, Inc., which is wholly-owned by Phillip Bennett, our President and Chief Executive Officer, contributed all of its Class A member interests in New Refco to Refco Inc. in exchange for 28,529,522 shares of its common stock;

- The Phillip R. Bennett Three Year Annuity Trust, in respect of which Phillip Bennett, our President and Chief Executive Officer, is both Trustee and Beneficiary, contributed all of its Class A member interests in New Refco to Refco Inc. in exchange for 19,089,272 shares of its common stock;

- Our officers who held Class A member interests in New Refco contributed all of their Class A member interests in New Refco to Refco Inc. in exchange for an aggregate of 242,758 shares of its common stock; and

- Our officers, directors and employees who held Class B member interests in New Refco contributed all of their Class B member interests in New Refco to Refco Inc. in exchange for an aggregate of 4,015,860 shares of its common stock, which shares shall be subject to vesting.

We refer to the transactions listed above as the "Reincorporation."

As a result of these transactions, Refco Inc. owns all of the outstanding member interests of New Refco. Refco Inc. is a Delaware "C" corporation, and as such is subject to federal and state income taxes. New Refco was a limited liability company not subject to state or federal income taxes, and as such, the historical financial data included in this prospectus do not reflect what our financial position and results of operations would have been had we been a taxable corporation. We expect to record a net deferred tax asset and a corresponding credit to our provision for income taxes of approximately $120.2 million upon becoming a "C" corporation immediately before the effectiveness of the registration statement of which this prospectus is a part. This deferred tax asset primarily results from the excess of the tax basis over the book basis of certain of our intangible assets. We expect to realize future reductions in our current tax expense as these intangibles are amortized and deducted from taxable income on our tax returns. Prior to the closing of this offering, New Refco intends to make a cash distribution of approximately $27.9 million to the members of New Refco to enable them to meet their estimated income tax obligations for the period from January 1, 2005 to the date of the Reincorporation. The amount of this distribution will be based on New Refco's estimated net taxable income from January 1, 2005 to the date of the Reincorporation. Purchasers of shares in the offering will not receive any of this distribution. Prior to the closing of this offering, Refco Group Holdings, Inc. will make a cash contribution of approximately $21.7 million to New Refco, which amount is equal to the amount of tax distributions that Refco Group Holdings, Inc. received from New Refco in excess of its pro rata share of all tax distributions made to members of New Refco prior to the offering.

This prospectus does not include financial statements of Refco Inc. because it has only been formed recently for the purpose of effecting the offering and until the consummation of the transactions described above, held no material assets and did not engage in any operations. Upon completion of the transactions described above, Refco Inc. became the parent of New Refco and its wholly-owned and majority-owned subsidiaries and has no other assets or operations.

For more information on the THL Transactions and the Reincorporation, see "Certain Relationships and Related Transactions."

54

**Factors Affecting Our Results**

Our results of operations have been, and we expect will continue to be, affected principally by transaction volumes, interest rates, the level of global market activity, market volatility and expense management. Our results of operations have also been affected by acquisitions.

Our revenues are primarily comprised of: (i) transaction fees earned from executing and clearing customer orders, which we record as commissions and brokerage or principal transactions, net depending on the nature of the transaction, and (ii) interest income earned on cash balances in our customers' accounts and from providing secured financing through repurchase transactions. From fiscal year 2000 through fiscal year 2005, our Derivatives Brokerage & Clearing net revenues increased at a compound annual growth rate of 24.3%, due primarily to annual increases in contract volumes executed or cleared and in part attributable to acquisitions and annual increases in customer deposits. During the same period, our Prime Brokerage/Capital Markets net revenues increased at a compound annual growth rate of 26.0%, due primarily to increases in both the number of customers and markets we serve as well as new product introductions and acquisitions.

*Transaction Volumes*

Since 2001, Derivatives Brokerage & Clearing transaction volumes, measured in numbers of contracts, have increased, reflecting the broad growth trend in contract trading volumes currently being experienced in the derivatives industry. The continued convergence of derivatives and cash markets and the expanded use of derivatives for hedging and investment purposes have been the primary drivers of this industry trend. This industry trend has been global in nature, with a rapid introduction of new products in a variety of international markets. Prime Brokerage/Capital Markets transaction volumes, specifically foreign exchange dollar volumes and our customer securities financing and clearing volumes, increased reflecting expanded U.S. government borrowing activity and the continued long-term growth of foreign exchange markets. Recently, this increase in volume has been accelerated by market volatility caused by political uncertainty in the Middle East and its impact on energy supplies and the uncertain outlook concerning economic growth, interest rates and, in particular, the changing value of the U.S. dollar. We have been able to take advantage of the increase in derivatives transaction volume because of our diverse customer base, product offering and market coverage and have benefited from the increase in prime brokerage volumes as a result of new product initiatives, including online foreign exchange and emerging market debt brokerage.

*Interest Rates*

Due to the fact that a portion of our revenues is derived from interest earned from the investment of funds deposited with us primarily by customers of our Derivatives Brokerage & Clearing business and the level of secured customer financing transactions in our Prime Brokerage/Capital Markets business, the level of prevailing interest rates affects our revenues. We generally benefit from rising interest rates. Rising interest rates increase the amount of net interest income earned from these customer deposits and the potential financing spread available on secured customer financing transactions. However, our interest expense also increases as a result of rising interest rates because borrowings under our new senior credit facilities accrue interest at variable rates. Declining interest rates decrease the amount of net interest income earned on customer deposits and the spread available on secured customer financing transactions. This is only partially offset by a decrease in interest rates on borrowings under our senior credit facilities.

*Global Market Activity*

Each of our primary business segments is global in nature, and the general expansion of the global economy and continued globalization of financial markets have had a positive impact on our results of operations. The introduction of derivatives products internationally has accelerated in recent years, with emerging markets in Asia and Latin America supplementing traditional centers in North America and Europe. This growth has been prompted by economic expansion in these regions, deregulation and

55

globalization. Similar trends have emerged in our Prime Brokerage/Capital Markets business as the capital markets in emerging economies have become more sophisticated. We believe this has presented us with growth opportunities in non-dollar fixed income, emerging market debt and foreign exchange brokerage.

### Expense Management

We have been able to leverage our operating capabilities to benefit from increased scale in our transaction volumes. By adding incremental volume to a pre-existing platform, our marginal cost of growth in transaction processing has been minimal. We believe we will benefit from the scalable nature of our transaction processing capabilities as more markets automate and move to electronic platforms. A high proportion of our marginal expense is variable in nature, which provides us an opportunity to improve our cost to income ratio. We believe this characteristic will have a continuing positive impact on our results of operations.

### Acquisitions

We have completed 16 acquisitions since 1999. It has been our practice to integrate and rationalize acquired companies as rapidly as possible, transferring operations to our existing platform. During the fiscal year ended February 28, 2002, we acquired the professional floor trader business of First Options, MST Canada Co. and Main Street Trading, all derivatives brokerage businesses. We acquired two other derivatives brokerage businesses during the fiscal year ended February 28, 2003: a division of Spear, Leeds & Kellog and CFG Financial Group Inc. During the fiscal year ended February 29, 2004, we acquired three asset management businesses, Edinburgh Fund Managers Ltd., Societe Generale Investment Managers and Cardales UK Ltd., and five derivatives brokerage businesses, MacFutures Ltd., Carlton Brokerage Ltd., Friedberg Mercantile Group, RB&H and Trafalgar Commodities Ltd. In September 2004, we acquired the customer accounts and related assets of Pioneer Futures, a division of Pioneer Futures, Inc. In April 2005, we acquired the customer accounts and related business operations of The League Corp. In May 2005, we made a cash offer to the shareholders of EasyScreen plc. The cash offer closed on May 31, 2005, and as of that date we held 95.3% of EasyScreen's outstanding ordinary share capital. In addition, we entered into a purchase and sale agreement to acquire the global brokerage operations of Cargill Investor Services in June 2005.

## Results of Operations

### Revenues

*Total Revenues.* The components of our total revenues are commissions and brokerage, interest, principal transactions, net, asset management and advisory fees and other income.

Commissions and brokerage revenue.   Commissions and brokerage revenues represent transaction fees earned on executed or cleared contracts in our Derivatives Brokerage & Clearing business and transaction fees on trades in our Prime Brokerage/Capital Markets business. The transaction fees we charge are based on the type of customer, the type of transaction, the method of trading and the volume of trading activity that a particular customer conducts with us. The aggregate amount of commissions and brokerage revenues is a function of the number of transactions we process and the amount of gross commissions charged to customers in respect of those transactions.

Interest revenue.   Interest revenue represents both interest earned from the investment of customer funds deposited with us as margin for their trading activities in our Derivatives Brokerage & Clearing business and interest earned from providing secured customer financing through repurchase agreements as part of our Prime Brokerage/Capital Markets business. The latter involves taking a customer's security and refinancing it with a qualified financial counterparty. We earn interest revenue on these transactions by charging our customer a pre-determined spread above our cost of refinancing. Overall, interest revenue is driven by the level of customer deposits placed with our brokerage operations, the level of secured financing

56

transactions we provide to our customers and the level of prevailing interest rates. Typically, the net interest that we earn is lower in a low interest rate environment and higher in a higher interest rate environment.

Principal transactions, net.   Principal transactions, net revenue is generated mainly by our Prime Brokerage/Capital Markets business and is derived from broking transactions in non-exchange traded derivatives and foreign exchange products. To execute a customer's order in non-exchange traded derivatives and foreign exchange products we enter into a transaction with our customer and a simultaneous and offsetting transaction in the market. We generally price the customer transaction such that we earn a small positive spread on the offsetting transaction, which we record on our income statement as principal transactions, net. This revenue represents our compensation for executing our customers' orders, and therefore is analogous to the commissions we earn when executing our clearing contracts for exchange traded derivative contracts.

Although the absence of a central clearing counterparty requires us to broker such transactions as principal, the risks associated with such transactions are not materially greater than those associated with the brokerage of exchange-traded derivatives. Our customers bear the risk of the economic results of such transactions, and we confine ourselves to earning the positive spread on the transaction. Nonetheless, because of our principal role, we are required to record certain other aspects of the transactions, including a record of realized and unrealized gains and losses relating to such customer transactions. These transaction gains are for the benefit of our customers and any losses are for the account of our customers who secure the payment to us of any such losses by depositing margin funds as collateral. Analyses of the realized and unrealized gains and losses as recognized and recorded under principal transactions, net for each of the years ended February 28, 2005, February 29, 2004 and February 28, 2003 and the three months ended May 31, 2005 and 2004 are included in our consolidated financial statements and the related notes thereto included elsewhere in this prospectus. See Note B to our audited consolidated financial statements and Note D to our unaudited consolidated financial statements.

Asset management and advisory fees revenues.   Asset management and advisory fees revenues primarily represent fees we charge for managing funds. The amount of these revenues has traditionally fluctuated with the level of funds under management and the investment performance of these funds.

*Net Revenues.*   Although we report total revenues on a gross basis in our consolidated financial statements for purposes of segment reporting and analyzing our revenues, we believe that net revenues provide a more meaningful indication of our operating results. Net revenues represent total revenues less interest expense. Interest expense includes interest paid to Derivatives Brokerage & Clearing customers on the funds they maintain with us and interest paid to finance counterparties in our Prime Brokerage/Capital Markets business for the financing of customer securities. For purposes of calculating net revenues, interest expense excludes interest paid on long-term debt. We net interest expense against revenues because a substantial portion of our interest expense pertains to customer transactions from which we derive interest income but in which we have a related charge for interest expense.

## Expenses

*Commissions and Order Execution Costs.*   Commissions and order execution costs include variable expenses related directly to transactions conducted in our brokerage operations. These costs include exchange and clearing house fees, fees paid to third parties for execution of customer orders and sales commissions paid in those cases where customers are introduced and their orders are handled by non-salaried sales personnel.

*Employee Compensation and Benefits Expenses.*   Employee compensation and benefits expenses include the cost of our global salaried employees. These expenses include base compensation, bonus compensation (whether discretionary or performance related) and the cost of medical insurance and other related employee benefits.

57

*General, Administrative and Other Expenses.*    General, administrative and other expenses include all other operating expenses, including primarily lease expenses, communications and quotation systems expenses, travel and entertainment expenses, depreciation and amortization, professional fees and other miscellaneous expenses.

## Income from Equity Investees

We own minority interests in various businesses. We record income earned by these businesses based on our proportionate ownership. This income is recorded on our income statement as income from equity investees. These companies are engaged in both derivatives brokerage and prime brokerage operations in key product segments (such as retail foreign exchange brokerage) and important geographical markets (such as the Taiwan derivatives markets). Because we consider these activities integral to our global operations and material to our results of operations, we historically included earnings from these activities in operating profit for comparative purposes.

## Operating Profit

Operating profit represents income before provision for income taxes, dividends on preferred securities issued by subsidiaries, income from equity investees, members' interest in earnings (losses) of subsidiary, minority interest and discontinued operations.

## Income Taxes

Prior to the Reincorporation, New Refco operated as a limited liability company and was treated as a partnership for federal income tax purposes. Under applicable regulations, members of a limited liability company treated as a partnership are responsible for their individual income tax liabilities related to the limited liability company's results of operations. Because we generated taxable income, we included in distributions to our members amounts sufficient to facilitate the payment of tax liabilities arising from the limited liability company's income. Accordingly, we have not provided for federal income taxes related to our results of operations. We made aggregate distributions, which included distributions with respect to members' tax liabilities arising from the limited liability company's income, of $100.0 million, $120.0 million, $11.0 million in the years ended February 28, 2003, February 29, 2004 and February 28, 2005, respectively. We made no distributions to our equity holders during the three months ended May 31, 2005. These distributions exclude any distributions made in connection with the THL Transactions. The provision for income taxes included in our consolidated financial statements relates to income taxes of foreign subsidiaries. After the Reincorporation, we will be taxed as a corporation. After the Reincorporation, we anticipate that our effective tax rate will be 41%, and we will have to increase our provision for income taxes accordingly.

## Periodic Results

The following tables summarize our results of operations for the periods indicated and include our consolidated net revenues and net revenues and income before taxes and certain other items by segment. The consolidated financial data for the fiscal years ended February 28, 2003, February 29, 2004 and February 28, 2005 have been derived from our audited consolidated financial statements. The unaudited consolidated financial statements for the three months ended May 31, 2004 and 2005 include all adjustments (consisting of normal, recurring adjustments) that are, in the opinion of management, necessary for a fair presentation of our financial position and results of operations for the periods presented.

For purposes of the tables and discussions below, the results of operations for the year ended February 28, 2005 represent the sum of results of operations of Refco Group from March 1, 2004 through August 5, 2004 and the results of operations of New Refco for the period from August 6, 2004 through February 28, 2005 and are not indicative of the results that would actually have been obtained if the THL Transactions had occurred on March 1, 2004.

The information contained in the following tables should be read in conjunction with "Unaudited Pro Forma Consolidated Financial Statements," "Selected Historical and Pro Forma Consolidated Financial Data" and our consolidated financial statements and the related notes thereto included elsewhere in this prospectus.

58

| | Fiscal Year Ended | | | Three Months Ended |

| | February 28, | | | May 31, | |
|---|---|---|---|---|---|
| | 2003 | 2004(1) | 2005(2) | 2004 | 2005 |
| | | | | (unaudited) | (unaudited) |
| | | | (in millions) | | |
| Commissions and brokerage | $ 571.5 | $ 645.4 | $ 848.7 | $ 215.8 | $ 244.2 |
| Interest | 2,387.3 | 1,051.7 | 2,585.8 | 377.6 | 939.5 |
| Principal transactions, net | 82.6 | 165.9 | 280.1 | 61.2 | 114.8 |
| Asset Management and advisory fees | 0.1 | 7.3 | 12.5 | 1.9 | 5.6 |
| Other | 4.6 | 4.0 | 8.4 | 1.0 | 8.0 |
| Total revenues | $ 3,046.1 | $ 1,874.3 | $ 3,735.5 | $ 657.4 | $ 1,312.0 |
| Interest expense | (2,182.3) | (897.7) | (2,471.8) | (344.3) | (923.8) |
| Interest expense from long-term borrowings | 27.2 | 31.1 | 68.2 | 7.0 | 23.4 |
| Net revenues | $ 891.0 | $ 1,007.7 | $ 1,331.9 | $ 320.2 | $ 411.6 |

| | Fiscal Year Ended February 28, | | | Three Months Ended May 31, | |
|---|---|---|---|---|---|
| | 2003 | 2004(1) | 2005(2) | 2004 | 2005 |
| | | | | (unaudited) | (unaudited) |
| | | | (in millions) | | |
| Net revenues: | | | | | |
| Derivatives Brokerage & Clearing | $ 674.0 | $ 778.3 | $ 971.4 | $ 243.7 | $ 286.1 |
| Prime Brokerage/Capital Markets | 243.7 | 287.9 | 404.1 | 83.8 | 150.5 |
| Corporate & Other(3) | 23.1 | (2.1) | (15.2) | (1.5) | (14.1) |
| Eliminations(3) | (49.8) | (56.4) | (28.4) | (5.8) | (10.8) |
| Total net revenues | $ 891.0 | $ 1,007.7 | $ 1,331.9 | $ 320.2 | $ 411.6 |
| Expenses: | | | | | |
| Commissions and order execution costs | $ 385.4 | $ 411.9 | $ 602.5 | $ 142.7 | $ 207.9 |
| Employee compensation and benefits | 181.0 | 204.9 | 267.0 | 64.6 | 74.2 |
| General, administrative and other | 142.6 | 170.3 | 243.5 | 47.5 | 62.3 |
| Total | $ 709.0 | $ 787.1 | $ 1,113.1 | $ 254.8 | $ 344.4 |
| Income (loss) before provision for income taxes, dividends on preferred securities issued by subsidiaries, income from equity investees, members' interest in earnings (losses) of subsidiary, minority interest and discontinued operations: | | | | | |
| Derivatives Brokerage & Clearing | $ 76.9 | $ 121.5 | $ 134.5 | $ 40.9 | $ 35.5 |
| Prime Brokerage/Capital Markets | 100.6 | 124.6 | 137.5 | 31.6 | 50.1 |
| Corporate & Other | (22.7) | (56.6) | (121.3) | (14.1) | (41.8) |
| Total | $ 154.8 | $ 189.5 | $ 150.6 | $ 58.4 | $ 43.8 |

(1)     Year ended February 29.

(2)    Includes the period from March 1, 2004 through August 5, 2004 combined with the period from August 6, 2004 through February 28, 2005.

(3)    These line items are included to reconcile these summarized financial tables to our consolidated financial statements. Corporate & Other net revenues and expenses primarily include interest income and interest expense incurred at the parent company level as well as non-material fees and other expenses. Eliminations arise upon the consolidation of group operating performance and relate to intercompany balances and transactions.

59

***Results for the Three Months Ended May 31, 2005 Compared to the Three Months Ended May 31, 2004***

*Net Revenues.* Net revenues on a consolidated basis for the three months ended May 31, 2005 increased $91.4 million, or 28.5%, to $411.6 million from $320.2 million for the three months ended May 31, 2004. The increase in net revenues for the three months ended May 31, 2005 was primarily due to the growth in transaction volumes across all major market segments that we serve. Commissions and brokerage revenue for the three months ended May 31, 2005 increased $28.4 million, or 13.2%, to $244.2 million from $215.8 million for the three months ended May 31, 2004. The increase was primarily due to an increase of 30.2% in derivative transaction volumes from 159 million contracts cleared for the three months ended May 31, 2004 to 207 million contracts cleared for the three months ended May 31, 2005. Net interest revenue, excluding interest from long-term borrowings, for the three months ended May 31, 2005 decreased $1.2 million, or 3.0%, to $39.1 million from $40.3 million for the three months ended May 31, 2004. The decline in net interest revenues was the result of lower interest margins primarily related to the timing and duration at which investments mature. This decline also reflects the reduced investment income available to us following the distribution by Refco Group of $550.0 million in liquid working capital in connection with the THL Transactions. Principal transactions, net revenue for the three months ended May 31, 2005 increased $53.6 million, or 87.6%, to $114.8 million from $61.2 million for the three months ended May 31, 2004. This increase was primarily due to a 126.7% increase in foreign exchange dollar volumes to $409.8 billion for the three months ended May 31, 2005.

*Commissions and Order Execution Costs.* Commissions and order execution costs on a consolidated basis for the three months ended May 31, 2005 increased $65.2 million, or 45.7%, to $207.9 million from $142.7 million for the three months ended May 31, 2004. The increase in commissions and order execution costs for the three months ended May 31, 2005 was primarily due to the increase in transaction volume in all of our business segments and the addition of new business operations.

*Employee Compensation and Benefits Expenses.* Employee compensation and benefits expenses on a consolidated basis for the three months ended May 31, 2005 increased $9.6 million, or 14.9%, to $74.2 million from $64.6 million for the three months ended May 31, 2004. The increase in employee compensation and benefits expenses was due in part to the addition of several new operating groups acquired during the year ended February 28, 2005. These groups include Trafalgar Commodities and the Wexford Fixed Income Group in New York as well as the further expansion of the MacFutures Group, particularly the commencement of its U.S. operations where the start-up expenses have exceeded anticipated revenues. In addition, bonus accruals increased as a function of increased profitability in certain business segments in the geographical markets that we serve, including Asia and Europe, where local currency appreciation compared to the three months ended May 31, 2004 also had the effect of increasing equivalent U.S. dollar compensation levels.

*General, Administrative and Other Expenses.* General, administrative and other expenses on a consolidated basis for the three months ended May 31, 2005 increased $14.8 million, or 31.2%, to $62.3 million from $47.5 million for the three months ended May 31, 2004. Our results for the three months ended May 31, 2005 reflect the financial impact of the THL Transactions. There was an increase in depreciation and amortization expense associated with the amortization of customer relationships determined as a result of the THL Transactions. The increase in amortization of the customer relationships determined as a result of the THL Transactions for the three months ended May 31, 2005 was $3.8 million compared to the three months ended May 31, 2004. Total depreciation and amortization expense was $9.7 million and $6.4 million for the three months ended May 31, 2005 and May 31, 2004, respectively.

*Operating Profit.* Operating profit for the three months ended May 31, 2005 decreased $14.6 million, or 25.0%, to $43.8 million from $58.4 million for the three months ended May 31, 2004.

Operating profit for the three months ended May 31, 2005 includes significant incremental expenses associated with the THL Transactions. In addition to the increased cost of depreciation and amortization of customer relationships, interest expense on long-term borrowings increased compared to the three months ended May 31, 2004. For the three months ended May 31, 2005, these expenses totaled $5.1 million and $23.4 million, respectively, compared with pre-THL Transactions expenses of $1.2 million and $7.0 million, respectively, for the three months ended May 31, 2004. The THL Transactions resulted in a total increase in expenses of $20.2 million for the three months ended May 31, 2005, which decreased our operating profit by 34.6% as compared to the three months ended May 31, 2004. Further, interest revenue decreased due to the $550.0 million cash distribution made in connection with the THL Transactions.

In addition, we record operating profit exclusive of the income we derive from investments in non-consolidated equity investees. Income from investments in non-consolidated equity investees is recorded in income from equity investees and included in income from continuing operations. These companies are engaged in both derivatives brokerage and prime brokerage operations in key product segments (such as retail foreign exchange brokerage) and important geographical markets (such as the Taiwan derivatives markets). Because we consider these activities integral to our global operations and material to our results of operations, we historically included earnings from these activities in operating profit. Operating profit excluding the earnings from equity investees for the three months ended May 31, 2005 decreased $14.6 million, or 25.0%, to $43.8 million from $58.4 million for the three months ended May 31, 2004. The decrease in operating profit reflected a shift in product mix within our operations to products offered by equity investees, particularly retail foreign exchange brokerage. Income from our share of our equity investees' operations totaled $14.2 million for the three months ended May 31, 2005 compared with $6.6 million for the three months ended May 31, 2004. The increase in income from equity investees of $7.6 million increased operating profit by 13.0% for the three months ended May 31, 2005.

## Segment Information

### *Derivatives Brokerage & Clearing*

*Net Revenues.* Derivatives Brokerage & Clearing net revenues for the three months ended May 31, 2005 increased $42.4 million, or 17.4%, to $286.1 million from $243.7 million for the three months ended May 31, 2004. The increase in Derivatives Brokerage & Clearing net revenues for the three months ended May 31, 2005 was primarily due to increased transaction volume in virtually all markets and in all geographic sectors that we serve, particularly electronic markets utilized by our professional trading customers, which are reflected in commissions and brokerage revenues and principal transactions, net. Global demand for commodity materials, in particular oil and petroleum products, resulted in increased activity in physical commodity markets, while interest rate uncertainties increased the level of interest rate derivative volumes. In Europe, local foreign exchange operations (reported in Derivatives Brokerage & Clearing) also increased. Derivatives Brokerage & Clearing contract volume for the three months ended May 31, 2005 increased by 48 million contracts, or 30.2%, to 207 million contracts cleared from 159 million contracts cleared for the three months ended May 31, 2004. Commissions and brokerage income increased by 13.4% as a result of increased transaction volume and changing customer mix. This increase includes European foreign exchange revenues. Substantially all of the assets of our Asset Management business were distributed to Refco Group Holdings, Inc. as part of the THL Transactions. We report the retained assets from the Asset Management business, Refco Alternative Investments, as part of our Derivatives Brokerage & Clearing business. Refco Alternative Investments' net revenues for the three months ended May 31, 2005 increased approximately $2.6 million, or 154.1%, to $4.2 million from $1.7 million for the three months ended May 31, 2004.

61

*Operating Profit.*    Derivatives Brokerage & Clearing operating profit for the three months ended May 31, 2005 decreased $5.4 million, or 13.2%, to $35.5 million from $40.9 million for the three months ended May 31, 2004. The decrease in Derivatives Brokerage & Clearing operating profit for the three months ended May 31, 2005 was primarily due to increased general and administrative and employee compensation expense in London; a modest reduction in commission and brokerage revenues reflecting a temporary slowing of Asia-Pacific market growth in Singapore; increased general and administrative expenses at Refco Trading Services, which also had a small decline in average commission income; and restructuring and related costs incurred in transitioning to full electronic platforms in foreign markets. The increase in income from equity investees increased operating profit by $0.6 million, or 1.5%, for the three months ended May 31, 2005. Operating profit includes expenses associated with the THL Transactions, most notably the increase in the amortization of customer relationships determined as a result of the THL Transactions. The increased amortization of $0.7 million for the Derivatives Brokerage & Clearing customer relationships determined as a result of the THL Transactions for the three months ended May 31, 2005 decreased operating profit by 1.7% for the three months ended May 31, 2005.

## Prime Brokerage/Capital Markets

*Net Revenues.*    Prime Brokerage/Capital Markets net revenues for the three months ended May 31, 2005 increased $66.7 million, or 79.6%, to $150.5 million from $83.8 million for the three months ended May 31, 2004. The increase in Prime Brokerage/Capital Markets net revenues for the three months ended May 31, 2005 was primarily due to the increase of 25.5% in the average net customer securities financing portfolio to $46.2 billion from $36.8 billion for the three months ended May 31, 2004 and a 126.7% increase in foreign exchange dollar volumes, which totaled $409.8 billion for the three months ended May 31, 2005, up from $180.8 billion for the three months ended May 31, 2004. These increases were offset in part by decreased volume in the U.S. Treasury market.

*Operating Profit.*    Prime Brokerage/Capital Markets operating profit for the three months ended May 31, 2005 increased $18.5 million, or 58.5%, to $50.1 million from $31.6 million for the three months ended May 31, 2004. Prime Brokerage/Capital Markets operating profit excludes income from equity investees, which totaled $13.1 million for the three months ended May 31, 2005. The increase in income from equity investees increased operating profit by $7.0 million, or 22.2%, for the three months ended May 31, 2005. Operating profit includes expenses associated with the THL Transactions, most notably the increase in the amortization of customer relationships determined as a result of the THL Transactions. The increased amortization of $3.1 million for the Prime Brokerage/Capital Markets customer relationships determined as a result of the THL Transactions for the three months ended May 31, 2005 decreased operating profit by 9.8% for the three months ended May 31, 2005. The underlying increase in Prime Brokerage/Capital Markets operating profit for the three months ended May 31, 2005 was primarily due to the continued growth in Prime Brokerage/Capital Markets net revenues, particularly the 126.7% increase in foreign exchange dollar volumes described above.

## Results for the Year Ended February 28, 2005 Compared to the Year Ended February 29, 2004

*Net Revenues.*    Net revenues on a consolidated basis for the year ended February 28, 2005 increased $324.2 million, or 32.2%, to $1,331.9 million from $1,007.7 million for the year ended February 29, 2004. The increase in net revenues for the year ended February 28, 2005 was primarily due to the growth in transaction volumes that reflects broad secular trends across all major market segments that we serve. Commissions and brokerage revenue for the year ended February 28, 2005 increased $203.3 million, or 31.5%, to $848.7 million from $645.4 million for the year ended February 29, 2004. The increase was primarily due to an increase of 38.6% in derivative transaction volumes from 472 million contracts cleared for the year ended February 29, 2004 to 654 million contracts cleared for the year ended February 28, 2005. Net interest revenue, excluding interest from

62

long-term borrowings, for the year ended February 28, 2005 decreased $2.9 million, or 1.6%, to $182.2 million from $185.1 million for the year ended February 29, 2004. The decline in net interest revenues was driven by lower interest rates realized on customer deposits as well as the impact of the timing and duration at which investments mature. Principal transactions, net revenue for the year ended February 28, 2005 increased $114.2 million, or 68.8%, to $280.1 million from $165.9 million for the year ended February 29, 2004. This increase was primarily due to a 78.3% increase in foreign exchange dollar volumes to $1,216.5 billion for the year ended February 28, 2005.

*Commissions and Order Execution Costs.*   Commissions and order execution costs on a consolidated basis for the year ended February 28, 2005 increased $190.6 million, or 46.3%, to $602.5 million from $411.9 million for the year ended February 29, 2004. The increase in commissions and order execution costs for the year ended February 28, 2005 was primarily due to the increase in transaction volume in all of our business segments and the addition of new business operations.

*Employee Compensation and Benefits Expenses.*   Employee compensation and benefits expenses on a consolidated basis for the year ended February 28, 2005 increased $62.1 million, or 30.3%, to $267.0 million from $204.9 million for the year ended February 29, 2004. The increase in employee compensation and benefits expenses was due in part to the addition of several new operating groups acquired during the year ended February 28, 2005. These groups include Trafalgar Commodities and the Wexford Fixed Income Group in New York as well as the further expansion of the MacFutures Group, particularly the commencement of its U.S. operations where the start-up expenses have exceeded anticipated revenues. In addition, bonus accruals increased as a function of increased profitability in certain business segments in the geographical markets that we serve, including Asia and Europe, where local currency appreciation also had the effect of increasing equivalent U.S. dollar compensation levels.

*General, Administrative and Other Expenses.*   General, administrative and other expenses on a consolidated basis for the year ended February 28, 2005 increased $73.2 million, or 43.0%, to $243.5 million from $170.3 million for the year ended February 29, 2004. We estimate that general, administrative and other expenses for the year ended February 28, 2005 increased by approximately $14.8 million, or 8.7%, due in part to expenses associated with acquisitions during the year ended February 28, 2005, including an estimated $9.8 million of expenses associated with the physical integration of acquired businesses and the recognition of a legal reserve of $5.0 million. Our results for the year ended February 28, 2005 reflect the financial impact of the THL Transactions. The THL Transactions resulted in an increase in depreciation and amortization expense associated with the amortization of customer relationships determined as a result of the THL Transactions. The increase in amortization of the customer relationships determined as a result of the THL Transactions for the year ended February 28, 2005 was $8.8 million compared to the year ended February 29, 2004. Total depreciation and amortization expense was $30.0 million and $26.2 million for the years ended February 28, 2005 and February 29, 2004, respectively.

*Operating Profit.*   Operating profit for the year ended February 28, 2005 decreased $38.9 million, or 20.5%, to $150.6 million from $189.5 million for the year ended February 29, 2004. Operating profit for the year ended February 28, 2005 includes significant incremental expenses associated with the THL Transactions. In addition to the increased cost of depreciation and amortization of customer relationships, interest expense on long-term borrowings increased compared to the year ended February 29, 2004. For the year ended February 28, 2005, these incremental expenses related to the THL Transactions totaled $13.5 million and $68.2 million, respectively, compared with pre-THL Transactions expenses of $4.7 million and $31.1 million, respectively, for the year ended February 29, 2004. The THL Transactions therefore resulted in a total increase in expenses of $45.9 million for the year ended February 28, 2005, which decreased our operating profit by 24.2% as compared to the year

63

ended February 29, 2004. Further, interest revenue decreased due to the $550.0 million cash distribution made in connection with the THL Transactions.

In addition, we record operating profit exclusive of the income we derive from investments in non-consolidated equity investees. Income from investments in non-consolidated equity investees is recorded in income from equity investees and included in income from continuing operations. These companies are engaged in both derivatives brokerage and prime brokerage operations in key product segments (such as retail foreign exchange brokerage) and important geographical markets (such as the Taiwan derivatives markets). Because we consider these activities integral to our global operations and material to our results of operations, we historically included earnings from these activities in operating profit. Operating profit excluding the earnings from equity investees for the year ended February 28, 2005 decreased $38.9 million, or 20.5%, to $150.6 million from $189.5 million for the year ended February 29, 2004. The decrease in operating profit reflected a shift in product mix within our operations to products offered by equity investees, particularly retail foreign exchange brokerage. Income from our share of our equity investees' operations totaled $24.9 million for the year ended February 28, 2005 compared with $11.5 million for the year ended February 29, 2004. Members' interest in earnings (losses) of subsidiary is also included as a decrease in total revenues and is recovered in our income from continuing operations. The increase in income from equity investees and the decrease in members' interest in earnings (losses) of subsidiary of $25.6 million increased operating profit by 13.5% for the year ended February 28, 2005. Our operating profit is also impacted by the recognition of a legal reserve of $5.0 million and the estimated $9.8 million of expenses associated with the physical integration of acquired businesses, which decreased operating profit by approximately $14.8 million, or 7.8%, for the year ended February 28, 2005.

### Segment Information

#### *Derivatives Brokerage & Clearing*

*Net Revenues.* Derivatives Brokerage & Clearing net revenues for the year ended February 28, 2005 increased $193.1 million, or 24.8%, to $971.4 million from $778.3 million for the year ended February 29, 2004. The increase in Derivatives Brokerage & Clearing net revenues for the year ended February 28, 2005 was primarily due to increased transaction volume in all markets and in all geographic sectors that we serve, particularly electronic markets utilized by our professional trading customers and non-ferrous metals brokerage activities in Europe, which are reflected in commissions and brokerage revenues and principal transactions, net. Global demand for commodity materials resulted in increased activity in physical commodity markets, while interest rate uncertainties increased the level of interest rate derivative volumes. In Europe and Singapore, local foreign exchange operations (reported in Derivatives Brokerage & Clearing) also increased. Derivatives Brokerage & Clearing contract volume for the year ended February 28, 2005 increased by 182 million contracts, or 38.6%, to 654 million contracts cleared from 472 million contracts cleared for the year ended February 29, 2004. Commissions and brokerage income increased by 22.1% as a result of increased transaction volume and changing customer mix. This increase includes European and Singapore foreign exchange revenues and European non-ferrous metals brokerage revenues. Substantially all of the assets of our Asset Management business were distributed to Refco Group Holdings, Inc. as part of the THL Transactions. We report the retained assets from the Asset Management business, Refco Alternative Investments, as part of our Derivatives Brokerage & Clearing business. Refco Alternative Investments' net revenues for the year ended February 28, 2005 increased $4.8 million, or 70.1%, to approximately $11.6 million from $6.8 million for the year ended February 29, 2004.

*Operating Profit.* Derivatives Brokerage & Clearing operating profit for the year ended February 28, 2005 increased $13.0 million, or 10.7%, to $134.5 million from $121.5 million for the year ended February 29, 2004. The increase in Derivatives Brokerage & Clearing operating profit for the year ended February 28, 2005 was primarily due to commissions and brokerage income that increased

by 22.1% as a result of increased transaction volume. The increase in income from equity investees increased operating profit by $0.3 million, or 0.2%, for the year ended February 28, 2005. Operating profit includes expenses associated with the THL Transactions, most notably the increase in the amortization of customer relationships determined as a result of the THL Transactions. The increased amortization for the Derivatives Brokerage & Clearing customer relationships determined as a result of the THL Transactions for the year ended February 28, 2005 was $0.9 million. The increase in the amortization of customer relationships and the $6.8 million of expenses associated with the physical integration of acquired businesses decreased operating profit by $7.7 million, or 6.3%, for the year ended February 28, 2005.

### Prime Brokerage/Capital Markets

*Net Revenues.* Prime Brokerage/Capital Markets net revenues for the year ended February 28, 2005 increased $116.2 million, or 40.4%, to $404.1 million from $287.9 million for the year ended February 29, 2004. The increase in Prime Brokerage/Capital Markets net revenues for the year ended February 28, 2005 was primarily due to the increase of 19.9% in the average net customer securities financing portfolio to $32.0 billion from $26.7 billion for the year ended February 29, 2004 and a 78.3% increase in foreign exchange dollar volumes, which totaled $1,216.5 billion for the year ended February 28, 2005, up from $682.4 billion for the year ended February 29, 2004.

*Operating Profit.* Prime Brokerage/Capital Markets operating profit for the year ended February 28, 2005 increased $12.9 million, or 10.4%, to $137.5 million from $124.6 million for the year ended February 29, 2004. Operating profit also includes the members' interest in earnings (losses) of subsidiary of $11.0 million. Additionally, Prime Brokerage/Capital Markets operating profit excludes income from equity investees, which totaled $22.1 million for the year ended February 28, 2005. The increase in income from equity investees and the members' interest in earnings (losses) of subsidiary increases operating profit by $25.3 million, or 20.3%, for the year ended February 28, 2005. Operating profit includes expenses associated with the THL Transactions, most notably the increase in the amortization of customer relationships determined as a result of the THL Transactions. The increased amortization for the Prime Brokerage/Capital Markets customer relationships recognized on the THL Transactions for the year ended February 28, 2005 was $7.9 million. The increase in amortization of customer relationships and $2.5 million of expenses associated with the physical integration of acquired businesses decreased operating profit by $10.4 million, or 8.3%, for the year ended February 28, 2005. The underlying increase in Prime Brokerage/Capital Markets operating profit for the year ended February 28, 2005 was primarily due to the continued growth in Prime Brokerage/Capital Markets net revenues, particularly the 78.3% increase in foreign exchange dollar volumes to a total for the year ended February 28, 2005 of $1,216.5 billion and the inclusion of the Wexford Fixed Income Group, which was acquired in January 2004 and contributed $4.5 million to operating profit in the year ended February 28, 2005.

### Results for the Year Ended February 29, 2004 Compared to the Year Ended February 28, 2003

*Net Revenues.* Net revenues on a consolidated basis for the year ended February 29, 2004 increased $116.7 million, or 13.1%, to $1,007.7 million from $891.0 million for the year ended February 28, 2003. The increase in net revenues for the year ended February 29, 2004 was primarily due to the significant increase in brokerage transaction volume, which was partially offset by a decline in net interest revenues. In general, our volumes have increased as the volumes in our industry and sector have increased. Commissions and brokerage revenues for the year ended February 29, 2004 increased $73.9 million, or 12.9%, to $645.4 million from $571.5 million for the year ended February 28, 2003. Derivative contracts cleared increased by 71 million contracts to 472 million contracts for the year ended February 29, 2004. This increase was primarily the result of the acquisition of MacFutures in February 2003, which was included in the full results of operations for the year ended

65

February 29, 2004. While customer deposits increased 7.9% from $3.8 billion for the year ended February 28, 2003 to $4.1 billion for the year ended February 29, 2004 and customer secured financing transactions increased 26.5% with average net customer securities financing portfolio of $26.7 billion for the year ended February 29, 2004, net interest revenues for the year ended February 29, 2004 decreased 20.3% to $185.1 million from $232.2 million for the year ended February 28, 2003 primarily as a result of the very low interest rate environment and the impact of the timing and duration at which investments mature. Principal transactions, net revenue for the year ended February 29, 2004 increased $83.3 million, or 100.8%, to $165.9 million from $82.6 million for the year ended February 28, 2003. The increase was due primarily to a 43.8% increase in customer foreign exchange transaction volumes worldwide to $682.4 billion for the year ended February 29, 2004. Asset management and advisory fees revenues for the year ended February 29, 2004 increased $7.2 million to $7.3 million from $0.1 million for the year ended February 28, 2003 as a result of improved investment performance resulting from stronger equity markets. Overall, transaction pricing across products and markets remained generally consistent with the prior year.

*Commissions and Order Execution Costs.*  Commissions and order execution costs on a consolidated basis for the year ended February 29, 2004 increased $26.5 million, or 6.9%, to $411.9 million from $385.4 million for the year ended February 28, 2003. The increase in commissions and order execution costs for the year ended February 29, 2004 was primarily due to a 17.7% increase in Derivatives Brokerage & Clearing transactions volume. However, the rate of increase of expenses was lower than the increase in transaction volumes across both business segments, in part because of a shift in overall product mix towards Prime Brokerage/Capital Market operations. Most of the latter volume is conducted by corporate sales groups and not commission-based sales personnel.

*Employee Compensation and Benefits Expenses.*  Employee compensation and benefits expenses on a consolidated basis for the year ended February 29, 2004 increased $23.9 million, or 13.2%, to $204.9 million from $181.0 million for the year ended February 28, 2003. The increase in employee compensation and benefits expenses for the year ended February 29, 2004 was primarily due to the addition to our payroll of the majority of employees of acquired companies, specifically MacFutures, Trafalgar Commodities and Carlton Brokerage.

*General, Administrative and Other Expenses.*  General, administrative and other expenses on a consolidated basis for the year ended February 29, 2004 increased $27.7 million, or 19.4%, to $170.3 million from $142.6 million for the year ended February 28, 2003. The increase in general, administrative and other expenses for the year ended February 29, 2004 was primarily due to the incremental expenses associated with acquired operations. Total depreciation and amortization expense was $26.2 million and $23.5 million for the years ended February 29, 2004 and February 28, 2003, respectively.

*Operating Profit.*  Operating profit on a consolidated basis for the year ended February 29, 2004 increased $34.7 million, or 22.4%, to $189.5 million from $154.8 million for the year ended February 28, 2003. The increase in operating profit for the year ended February 29, 2004 was primarily due to the increase in net revenues derived from the increased transaction volume noted above, together with the improvement in operating margins created by the reduction in sales commission costs and our ability to control the overall level of general and administrative expenses.

**Segment Information**

*Derivatives Brokerage & Clearing*

*Net Revenues.*     Derivatives Brokerage & Clearing net revenues for the year ended February 29, 2004 increased $104.3 million, or 15.5%, to $778.3 million from $674.0 million for the year ended February 28, 2003. The increase in Derivatives Brokerage & Clearing net revenues for the year ended February 29, 2004 was primarily due to increased transaction volume in all major geographic and product sectors that we serve. Dollar price increases in physical commodity markets driven by the growth of Asian economies, particularly China, resulted in an increase in trading of agricultural and metals derivatives contracts. The changing outlook for interest rates combined with the addition of the MacFutures platform in March 2003, increased financial futures contract volume, particularly interest rate products. Derivatives Brokerage & Clearing contract volume for the year ended February 29, 2004 increased by 71 million, or 17.7%, to 472 million contracts cleared from 401 million contracts cleared for the year ended February 28, 2003. Commissions and brokerage income increased by 13.7%, primarily as a result of increased transaction volume, and this was additionally increased by an increase of 14.3% in net interest revenue resulting from increased customer deposits and changes in the timing and duration of investments. Approximately $6.8 million, or 0.7%, of net revenues was attributable to our Asset Management business.

*Operating Profit.*     Derivatives Brokerage & Clearing operating profit for the year ended February 29, 2004 increased $44.6 million, or 58.0%, to $121.5 million from $76.9 million for the year ended February 28, 2003. The increase in Derivatives Brokerage & Clearing operating profit for the year ended February 29, 2004 was primarily due to a 17.7% increase in derivative contracts cleared and a reduction in sales commission costs (calculated as a percent of commissions and brokerage revenue) reflecting a reduced reliance on commission sales groups. Additionally, net interest income rose primarily as a result of the 7.9% increase in customer deposits to a record $4.1 billion. This offset lower investment yields resulting from the generally lower interest rate environment.

*Prime Brokerage/Capital Markets*

*Net Revenues.*     Prime Brokerage/Capital Markets net revenues for the year ended February 29, 2004 increased $44.2 million, or 18.1%, to $287.9 million from $243.7 million for the year ended February 28, 2003. The increase in Prime Brokerage/Capital Markets net revenues for the year ended February 29, 2004 was primarily due to the increase in transaction volume and revenues of our foreign exchange brokerage activities. The increase in transaction volume reflected the continued expansion of our fixed income clearing operations. The increase in foreign exchange revenues reflected the diversification of our product offerings and the launch of online wholesale and retail products in June 2003. Prime Brokerage/Capital Markets net revenues also increased as a result of an increase in the average net customer securities financing portfolio to $26.7 billion from $21.1 billion for the year ended February 28, 2003. The decrease in net interest revenue of 26.6% to $104.5 million for the year ended February 29, 2004 was mainly due to the lower interest rate environment and changes in the timing and duration of investments.

*Operating Profit.*     Prime Brokerage/Capital Markets operating profit for the year ended February 29, 2004 increased $24.0 million, or 23.9%, to $124.6 million from $100.6 million for the year ended February 28, 2003. The increase in Prime Brokerage/Capital Markets operating profits was primarily due to the 43.8% increase in foreign exchange dollar volumes to $682.4 billion for the year ended February 29, 2004.

**Seasonality**

Our business has experienced seasonal fluctuations. Financial markets often experience reduced trading activity during summer months and in the last fiscal quarter as a result of holidays. Traditional commodity derivatives, such as energy contracts, will reflect changing supply/demand factors related to

67

heating/cooling seasons. As a result of these factors, we may experience relatively high trading volume and revenue during our first and third fiscal quarters and lower trading volume in our second fiscal quarter. However, this trend is not evident in every year and in recent years has been moderated by globalization and an expanded range of products that tend to counteract traditional seasonality trends. For these reasons, seasonality was not a major factor in our 2005 fiscal year or the first quarter of fiscal year 2006.

**Liquidity and Capital Resources**

We expect our primary uses of cash over the next twelve months to be for working capital and debt service. Also, consistent with past practice and policy, we may from time to time evaluate acquisition opportunities in our core businesses. If we were to consummate an acquisition, we may utilize cash for that purpose.

*Cash Flows*

As a financial institution, our cash flows are complex and interrelated and highly dependent upon our operating performance, levels of customer activity and secured financing activities. Our cash flows from operations were $528.9 million and $391.2 million for the period from March 1, 2004 through August 5, 2004 and the period from August 6, 2004 through February 28, 2005, respectively, as compared to $727.9 million for the year ended February 29, 2004 as earnings and operating assets and liabilities exceeded cash and cash equivalents utilized in secured financing activities. Included in cash used in financing activities is $150.0 million that was used to make a voluntary prepayment of our term loan during the quarter ended February 28, 2005. During the year ended February 28, 2005, we increased cash by $206.4 million as cash flows from operating activities and discontinued operations of $920.0 million and $21.8 million, respectively, exceeded cash used in investing and financing activities of $92.2 million and $643.2 million, respectively. During the year ended February 29, 2004, we increased cash and cash equivalents by $90.0 million as cash flows from operating activities of $727.9 million exceeded cash used in investing activities, financing activities and discontinued operations of $118.9 million, $384.7 million and $134.3 million, respectively. During the year ended February 28, 2003, we increased cash and cash equivalents by $81.5 million overall as cash provided by operating activities and financing activities of $80.6 million and $54.5 million, respectively, exceeded cash used in investing activities and discontinued operations of $3.5 million and $50.1 million, respectively.

We had cash flow used in operating activities of $96.4 million for the three months ended May 31, 2005. This compared to cash flow used in operating activities of $265.2 million for the three months ended May 31, 2004. For the three months ended May 31, 2005, total cash and cash equivalents decreased by $117.6 million, consisting of $96.4 million of cash used in operating activities and $4.1 million used in financing activities, together with $17.1 million used in investing activities in connection with our acquisitions of The League Corp. and EasyScreen plc. During the three months ended May 31, 2004, total cash and cash equivalents decreased by $118.8 million as cash flows from investing activities and discontinued operations of $0 and $151.3 million, respectively, were offset by cash used in operating activities and financing activities of $265.2 million and $4.9 million, respectively.

Historically, we included a portion of our excess cash balances from our Derivatives Brokerage & Clearing business in segregated cash accounts to maximize the investment yield on these funds. We included approximately $257.1 million in the segregated cash account balance as of February 29, 2004. Consequently, changes in our cash and cash equivalent balance included in the segregated account historically affected our cash flow from operating activities. As of February 28, 2005, the excess cash balances were swept from the segregated cash accounts and are included in cash and cash equivalents and can be used to meet our debt service obligations without any restrictions. See "—Contractual Obligations and Commitments."

68

*Working Capital*

Our primary requirement for working capital relates to funds we are required to maintain at exchanges or clearing organizations to support our customers' trading activities. We require that our customers deposit funds with us in support of their trading activities, which we in turn deposit with exchanges or clearing organizations to satisfy our obligations. These required deposits account for the majority of our working capital requirements and thus our primary use of working capital is funded directly or indirectly by our customers. Our working capital needs are otherwise primarily limited to regulatory capital requirements which we have satisfied in the past from internally generated cash flow and available funds.

Notwithstanding the self-funding nature of our operations, we may sometimes be required to fund timing differences arising from the delayed receipt of customer funds or timing differences associated with the settlement of customer transactions in securities markets. Historically, these timing differences have been funded either with internally generated cash flow or, if needed, with funds drawn under short-term borrowing facilities, including committed lines of credit. We have $75.0 million of available borrowings under a revolving credit facility for working capital purposes. Separately, our finance subsidiary, Refco Capital, LLC, utilizes secured bank facilities to refinance specialized financing arrangements entered into with select customers from time to time. As of May 31, 2005, there were no borrowings outstanding under these facilities.

Our two primary U.S. regulated subsidiaries are Refco, LLC and Refco Securities, LLC. Refco, LLC is subject to the Commodity Futures Trading Commission ("CFTC") minimum financial requirements, which requires it to maintain net capital equal to the sum of 8% of the total risk margin requirements for all positions carried in customer accounts and 4% of the total risk margin requirements for all positions carried in non-customer accounts. As of May 31, 2005, Refco, LLC had net capital of $354.5 million, which was $167.7 million in excess of required net capital. Refco Securities, LLC is subject to the uniform net capital requirements of the SEC, which require the maintenance of minimum net capital. Refco Securities, LLC computes its net capital requirements under the alternative method provided for by the SEC's rules, which require that Refco Securities, LLC maintain net capital equal to the greater of $250,000 or 2% of aggregate customer related debit items as defined in the SEC's rules. The net capital rule also provides that equity capital may not be withdrawn or cash dividends paid if resulting net capital would be less than 5% of aggregate customer-related debit items. As of May 31, 2005, Refco Securities, LLC had net capital of $62.2 million which was 11.1% of aggregate customer-related debit items and $49.6 million in excess of required net capital.

As a matter of policy, we maintain excess regulatory capital to provide liquidity during periods of unusual market volatility, and this has been sufficient in the past to absorb volatile market events. Similarly, for our brokerage activities in the OTC markets, despite these transactions being brokered as principal and not as agent, we have adopted a futures-style margin methodology to protect us against price movements, and this also reduces the amount of capital needed to conduct business because even if we are required to post funds with clearing organizations in order to facilitate customer-initiated transactions, we are able to use customer deposits for this purpose rather than our own funds. As a result, we are able to execute a substantial volume of transactions without the need for large amounts of working capital.

Funding for purposes other than working capital requirements, including the financing of acquisitions, has been provided either through internally generated cash flow or through specific long-term financing arrangements described below. Substantially all the assets of our Asset Management business, which accounted for 1.3% of fiscal year 2005 revenue and an operating income of $7.4 million in fiscal year 2005, were distributed to Refco Group Holdings, Inc. in connection with the THL Transactions. Our Asset Management business generated nominal cash flow for fiscal year 2005.

69

*Long-Term Debt*

It has been our policy to match the varied nature of our liquidity requirements with appropriately structured funding sources. Prior to the THL Transactions, our long-term debt consisted principally of long-term notes, which we had traditionally used to finance acquisitions. We repaid all these notes in connection with the THL Transactions. However, in connection with the THL Transactions we incurred a substantial amount of new long-term debt, including an $800.0 million term loan facility and $600.0 million aggregate principal amount of senior subordinated notes. For more information on the senior credit facilities and the notes, see "Description of Indebtedness." The proceeds from the term loans, along with the proceeds from the issuance of the senior subordinated notes, were used to fund the cash payments made to our existing stockholders, repay existing indebtedness and pay related transaction fees and expenses. See "Certain Relationships and Related Transactions—The Equity Purchase and Contribution Agreement." During the quarter ended February 28, 2005, we voluntarily prepaid $150.0 million of the senior term loan with cash from operations, and borrowings thereunder were reduced to $648.0 million. Our long-term debt currently consists of our senior credit facilities and the notes. As of May 31, 2005, we had $1,244.0 million of long-term debt outstanding, including the current portion of long-term debt. We intend to continue to fund long-term requirements, including acquisitions, with long-term debt.

As of May 31, 2005, our senior credit facilities consisted of a $75.0 million revolving credit facility and a $644.0 million term loan facility. We have an option to increase the aggregate amount of term loans by up to $200.0 million without the consent of any person other than the institutions agreeing to provide all or any portion of such increase.

Borrowings under the senior credit facilities bear interest at a floating rate, which can be either the Eurodollar rate plus an applicable margin or, at the borrower's option, an alternative base rate (defined as the higher of (x) the Bank of America prime rate and (y) the federal funds effective rate, plus one half percent (.50%) per annum) plus an applicable margin. The applicable margins for Eurodollar rate loans and alternative base loans in respect of the revolving credit facility are subject to adjustment based on a Leverage Ratio (as defined), as set forth in the following table:

| | | Applicable Margin | |
| Pricing Level | Leverage Ratio | Eurodollar Rate | Base Rate |
|---|---|---|---|
| 1 | >5.00:1 | 2.75% | 1.75% |
| 2 | >4.50:1 but ≤5.00:1 | 2.50% | 1.50% |
| 3 | >4.00:1 but ≤4.50:1 | 2.00% | 1.00% |
| 4 | ≤4.00:1 | 1.75% | 0.75% |

The applicable margins under the term loan facility are subject to adjustment based on the debt ratings of the senior credit facilities by S&P and Moody's, as set forth in the following table:

| | | Applicable Margin | |
| Pricing Level | Criteria | Eurodollar Rate | Base Rate |
|---|---|---|---|
| 1 | rated at least BB- by S&P and Ba3 by Moody's | 1.75% | 0.75% |
| 2 | rated at least BB- by S&P and B1 by Moody's and Level 1 does not apply | 2.00% | 1.00% |
| 3 | if neither Level 1 nor Level 2 applies | 2.25% | 1.25% |

The weighted average interest rates per annum in effect as of May 31, 2005 for the term loan facility is 5.03%. The interest rate payable under the senior credit facilities will increase by two percentage points per annum during the continuance of any payment or bankruptcy event of default.

70

The senior credit facilities contain restrictive covenants which, among other things, limit indebtedness, investments, dividends, transactions with affiliates, asset sales, acquisitions, capital expenditures, mergers and consolidations, prepayments of other indebtedness, liens and encumbrances and other matters customarily restricted in such agreements. In addition, the senior credit facilities require compliance with a variety of covenants. We were in compliance with those covenants as of May 31, 2005. The most restrictive covenants relate to ratios of Consolidated EBITDA to Consolidated Interest Charges (Interest Coverage Ratio), Adjusted Consolidated Funded Indebtedness (net of Cash on Hand) to Consolidated EBITDA (Leverage Ratio), and maximum capital expenditures, all as defined in the senior credit facilities. The minimum Interest Coverage and maximum Leverage Ratios are computed based on our results as of the end of each fiscal quarter for the four fiscal quarter period ending on the date of such determination. More specifically, the senior credit facilities' covenants require us to maintain:

- a minimum Interest Coverage Ratio of 2.15:1.00 from November 30, 2004 through November 30, 2005; 2.25:1.00 from February 28, 2006 through November 30, 2006; 2.45:1.00 from February 28, 2007 to November 30, 2007; 2.70:1.00 from February 29, 2008 through November 30, 2008; and 3:00:1.00 as of February 28, 2009 and through each fiscal quarter ending thereafter through November 30, 2011.

- a maximum Leverage Ratio of 6.25:1.00 as of February 28, 2005 and May 31, 2005; 6.00:1.00 as of August 31, 2005 and November 30, 2005; 5.50:1.00 as of February 28, 2006 and May 31, 2006; 5.25:1.00 as of August 31, 2006 and November 30, 2006; 5.00:1.00 as of February 28, 2007 and May 31, 2007; 4.75:1.00 as of August 31, 2007 and November 30, 2007; 4.25:1 from February 29, 2008 through November 30, 2008; 3.50:1.00 from February 28, 2009 through November 30, 2009; and 3:00:1.00 as of February 28, 2010 and each fiscal quarter ending thereafter through November 30, 2011.

- a maximum capital expenditure limitation of $40.0 million for fiscal year 2006; $45.0 million for fiscal year 2007; $50.0 million for fiscal year 2008, $70.0 million for fiscal year 2009; and $55.0 million from fiscal year 2010 through fiscal year 2012 with the ability to roll forward to future years unused amounts from the previous fiscal year.

We expect to maintain compliance with these covenants for the foreseeable future. Consolidated EBITDA, as defined in the senior credit facilities, differs from the term "EBITDA" as it is commonly used in our industry. In addition to adjusting net income to exclude interest expense, income taxes and depreciation and amortization, Consolidated EBITDA, as defined in the senior credit facilities, also adjusts net income by excluding items or expenses not typically excluded in the calculation of "EBITDA": letter of credit fees; non-cash expenses resulting from employee benefit and management compensation plans, the grant of stock and stock options to our employees or the treatment of such options under variable plan accounting; extraordinary charges; non-cash amortization of financing costs; cash expenses incurred in connection with the THL Transactions, permitted investments and issuances of equity or debt (in each case, whether or not consummated); any losses realized upon the disposition of property or assets outside the ordinary course of business; to the extent actually reimbursed, expenses incurred to the extent covered by indemnification provisions of any agreement on connection with a permitted acquisition; to the extent covered by insurance, expenses with respect to liability or casualty events or business interruptions; permitted management fees; non-cash purchase accounting adjustments and step-ups with respect to re-valuing assets and liabilities in connection with the THL Transactions or any permitted investments; non-cash losses from joint ventures and non-cash minority interest reductions; fees and expenses in connection with permitted exchanges or refinancings; non-cash, non-recurring charges with respect to employee severance; other non-cash, non-recurring charges that do not result in a cash charge in a future period; cash charges that do not exceed $25.0 million in the aggregate or $15.0 million during any fiscal year; other expenses reducing Consolidated Net Income that do not represent a cash item in such period or any future period; fines, penalties, settlement payments or judgment payments related to the Tradewinds litigation or the SEC

71

and/or U.S. attorneys' investigation into the sale of stock of Sedona Corporation (to the extent the payments do not exceed $10.0 million in the aggregate and are made on or prior to August 5, 2005 or Refco Group is indemnified for such payments); and, for purposes of calculating the ratios described above, the net cash proceeds of certain equity issuances in an amount as is necessary to ensure compliance with the ratios, solely to the extent that such net cash proceeds are (i) received no later than twenty business days after the date of delivery of the applicable compliance certificate and (ii) not otherwise required to be applied to prepay borrowings under the senior credit facilities or to determine the permissibility of a transaction under the senior credit facilities; less non-cash income, extraordinary gains and gains realized upon the disposition of property outside the ordinary course of business; plus/ minus unrealized gains/losses in respect of certain hedging arrangements.

We present Consolidated EBITDA because it is a material component of the covenants contained in our senior credit facilities. Non-compliance with those covenants could result in the acceleration of all amounts outstanding under the senior credit facilities, which could have a material adverse effect on our results of operations, financial position and cash flow. While the determination of "unusual and non-recurring losses" is subject to interpretation and requires judgment of management, we believe the items and calculations set forth below are in accordance with the senior credit facilities. Consolidated EBITDA does not represent net income or cash flow from operations as those terms are defined by GAAP and does not necessarily indicate whether cash flows will be sufficient to fund cash needs.

The following is a calculation of our minimum Interest Coverage and maximum Leverage Ratios under our senior credit facilities as of May 31, 2005. The terms and related calculations are defined in the senior credit facilities, which is included as Exhibit 10.8 to our registration statement of which this prospectus is a part (in thousands, except ratios).

|  | May 31, 2005 |
|---|---|
| Calculation of minimum Interest Coverage Ratio: |  |
| Twelve months ended Consolidated EBITDA(1) | $ 296,747 |
| Consolidated Interest Charges(2) | $ 74,686 |
| Actual Interest Coverage Ratio | 3.97x |
| Minimum permitted Interest Coverage Ratio | 2.15x |
|  |  |
| Calculation of maximum Leverage Ratio: |  |
| Adjusted Consolidated Funded Indebtedness (net of Cash on Hand) | $ 899,539 |
| Twelve months ended Consolidated EBITDA(1) | $ 296,747 |
| Actual Leverage Ratio | 3.03x |
| Maximum permitted Leverage Ratio | 6.25x |

(1)     Consolidated EBITDA for the twelve months ended May 31, 2005 adds back to Consolidated Net Income: Refco Interest Expense with respect to Consolidated Funded Indebtedness; income, franchise and similar taxes and permitted tax distributions; depreciation and amortization expense; and non-cash expenses resulting from employee benefit and management compensation plans, the grant of stock and stock options to our employees or the treatment of such options under variable plan accounting. In addition, for purposes of our senior credit facilities, Consolidated EBITDA for the twelve months ended May 31, 2005 includes $4.0 million of net income from discontinued operations. In future periods, net income from discontinued operations will not be included.

(2)     Consolidated Interest Charges for the twelve months ended May 31, 2005 follows (in thousands):

| Interest expense on Consolidated Funded Indebtedness | $ 78,992 |
|---|---|
| Interest income on Cash on Hand | (4,306) |
| Consolidated Interest Charges | $ 74,686 |

The senior credit facilities contain customary events of default, including without limitation, payment defaults, breaches of representations and warranties, covenant defaults, cross-defaults to other indebtedness in excess of specified amounts, events of bankruptcy and insolvency specified in the senior credit facilities, judgment defaults in excess of specified amounts, failure of any material provision of any guaranty or security document supporting the senior credit facilities to be in full force and effect, and a change of control.

Our subsidiary Refco Capital, LLC has a $20.0 million credit facility, pursuant to which Refco Capital, LLC provides financing to fund the margin requirements of some of our commercial customers who maintain futures trading accounts with us. Advances under this facility are secured by Refco Capital, LLC's security interest in the customer's rights to payments arising from these accounts. There was no outstanding debt under this facility as of May 31, 2005.

Refco Securities, LLC has two lines of credit with Euroclear Bank S.A./N.V. in the aggregate amount of $550.0 million for the purpose of settling intra-day transactions and, if necessary, financing positions overnight. As of May 31, 2005, no amounts were outstanding under these facilities.

Our subsidiaries Refco Singapore Pte. Ltd. and Refco Investment Services Pte Ltd. (Singapore) have facilities to assist with working capital requirements. The aggregate amount available under these facilities is approximately $29.0 million. Refco Group has guaranteed our subsidiaries' obligations under these facilities. There was no outstanding debt under these facilities as of May 31, 2005.

In addition, several of our subsidiaries have facilities with various financial institutions to, among other things, provide credit support to some of our customers, satisfy minimum exchange and clearing house collateral requirements and provide stock financing in exchange-approved warehouses. The total availability under these facilities is approximately $509.2 million. Refco Group has guaranteed all of our subsidiaries' obligations under these facilities, with the exception of one $10.0 million facility. As of May 31, 2005, letters of credit in the aggregate amount of approximately $1.1 million were outstanding under these facilities.

Our subsidiaries enter into similar facilities, and Refco Group guarantees these facilities, in the normal course of business.

We believe that our cash flow is sufficient to meet our term debt service requirements and that our cash and cash equivalents, as well as cash flow from operations, will be sufficient to fund our operations for the foreseeable future.

*Liquidity Risk*

Ready access to cash is essential to our business. Our liquidity could be impaired by an inability to access lines of credit, an inability to access funds from our subsidiaries or an inability to liquidate customer positions or otherwise sell assets. This situation may arise due to circumstances that we may be unable to control, such as a general market disruption or an operational problem that affects third parties or us. Further, our ability to liquidate customer positions or otherwise sell assets may be impaired if other market participants are seeking to sell similar assets at the same time. Our credit ratings are important to our liquidity. A reduction in our credit ratings could adversely affect our liquidity and competitive position, increase our borrowing costs, limit our access to the capital markets or trigger our obligations under bilateral provisions in some of our trading and collateralized financing contracts. Under such contracts, counterparties could terminate contracts with us or require us to post additional collateral. Termination of our trading and collateralized financing contracts could cause us to sustain losses and impair our liquidity by requiring us to find other sources of financing or to make significant cash payments or securities movements.

**Contractual Obligations and Commitments**

We have contractual obligations to make future payments under long-term debt and long-term non-cancelable lease agreements and have contingent commitments under a variety of commercial

73

arrangements. See Notes D and K to our consolidated financial statements for further information regarding our commitments and contingencies. The table below shows as of February 28, 2005 our contractual obligations and commitments, including our payments due by period:

| | | | | Payments due by period | | | | | |
| | Total | | Less than 1 year | | 1–3 years | | 4–5 years | | More than 5 years |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | (in millions) | | | | |
| Long-term debt obligations | $ | 1,246.0 | $ | 8.0 | $ | 16.0 | $ | 16.0 | $ 1,206.0 |
| Operating lease obligations | | 70.7 | | 11.7 | | 23.7 | | 15.6 | 19.7 |
| Total | $ | 1,316.7 | $ | 19.7 | $ | 39.7 | $ | 31.6 | $ 1,225.7 |

In addition to the contractual obligations and commitments set forth above, we may be obligated to make earn-out payments in connection with acquisitions we have completed in the past.

## Off Balance Sheet Arrangements

In the normal course of our customer brokerage activities in Prime Brokerage/Capital Markets products, where no central clearing counterparty (such as an exchange) exists, we enter into various contractual commitments as a principal in order to facilitate the execution of a customer transaction. Such commitments often involve forward settlement and include exchange-traded futures, fixed income and equity swaps, foreign currency forwards and option contracts. We use these commitments to offset the customer order and generate a positive profit spread for us. We also enter into forward repurchase agreements. Such activities involve customers and counterparties in and outside the United States.

The following table shows the gross notional or contractual amounts of contracts held or issued by us that require forward settlement. This table reflects only off-balance sheet contracts. It should be noted that these off-balance sheet contracts are often offset by on-balance sheet items not shown here.

| | As of February 29, 2004 | | As of February 28, 2005 | | As of May 31, 2005 | |
| | Notional | Fair Value | Notional | Fair Value | Notional | Fair Value |
| --- | --- | --- | --- | --- | --- | --- |
| | | | (in millions) | | | |
| Forward currency contracts | $ 41,586.9 | $ (0.7) | $ 79,683.5 | $ (5.4) | $ 110,108.1 | $ 7.0 |
| Swaps contracts | 2,927.4 | 1.3 | 30.1 | (3.2) | 45.3 | (0.7) |
| Options contracts, sold or written | 10,383.3 | (272.1) | 19,125.4 | (352.4) | 13,406.9 | (273.0) |
| Options contracts, purchased | 10,723.6 | 272.5 | 14,478.4 | 370.4 | 10,743.0 | 278.4 |
| Exchange-traded futures | 3,735.8 | (1.6) | 14,246.6 | (1.9) | 15,541.9 | 22.4 |
| Total | $ 69,357.0 | $ (0.6) | $ 127,564.0 | $ 7.5 | $ 149,845.2 | $ 34.1 |

We record our contractual commitments at market or fair value. Changes in market or fair value are recorded currently in income. The level of reported market risk is determined by a number of factors, including size, composition and diversification of positions held, market volatility and changes in interest and foreign exchange rates. However, in our case the level of reported market and financial risk associated with these contractual commitments is mitigated by our role as principal broker and the fact that such transactions are offset ultimately by our obligation to pay the customers profits relating to such transactions and our practice of ensuring that losses, whether realized or unrealized, are secured with customer deposits. As a practical matter, the actual level of market risk on financial instruments entered into on behalf of customers is limited by other financial instruments recorded on and, as in the case of the above table, off balance sheet. This limits overall market risk and the net impact of such transactions on our income statement. To ensure this our management actively monitors those positions to review the effectiveness of the offset or hedging strategy.

**Critical Accounting Policies and Estimates**

Our discussion of our financial condition and results of operations is based upon our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. During the preparation of these consolidated financial statements, we are required to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses and related disclosures of contingent assets and liabilities. On an ongoing basis, we evaluate our estimates and assumptions, including those related to principal transactions, provisions for doubtful accounts on receivables, fair values of derivative financial instruments and goodwill and intangible assets. We base our estimates on historical experience and on various other assumptions that we believe are reasonable under the circumstances. The results of our analysis form the basis for making assumptions about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions, and the impact of such differences may be material to our consolidated financial statements.

We believe that the following critical accounting policies affect our more significant judgments and estimates used in the preparation of our consolidated financial statements:

*Principal Transactions*

As a broker of prime brokerage and capital markets products (e.g., foreign exchange), which do not trade on regulated exchanges, we enter into contractual commitments, as principal, involving forward settlement in order to execute customer transactions in such markets. We record these contracts at market or fair value and generally immediately hedge these contracts with offsetting contracts, which results in a profit spread for us. Because the market or fair value of these transactions is based on observable market data, this profit spread is recognized immediately in our statement of income under "principal transactions, net." We recognized net revenues of $160.8 million, $119.2 million, $165.9 million and $82.6 million from principal transactions for the period from August 6, 2004 through February 28, 2005, the period from March 1, 2004 through August 5, 2004 and the years ended February 29, 2004 and February 28, 2003, respectively. Because the market or fair value of these contracts may vary over time, it is our policy whenever possible to enter into hedging, (i.e., offsetting) arrangements that fully secure the value of the spread achieved when the transaction is first executed. In certain instances, it may be possible to secure only a portion of the spread achieved, exposing us to potential adverse changes in the market or fair value of the instrument. We believe, however, that our exposure to adverse changes in the market or fair value instruments we hold is immaterial because typically we are able to fully hedge the value of the spread achieved and, in many instances in which we are not able to do so, any changes in the market or fair value of the contractual commitments we enter into as principal generally offset each other.

*Receivables from Customers—Provisions for Doubtful Accounts*

Our receivables are generally collateralized with marketable securities. For some customer receivables that are not fully secured, we establish reserves for doubtful accounts when, in the opinion of management, such reserves are appropriate. We have established reserves of $61.2 million and $65.2 million against receivables from customers as of February 28, 2005 and February 29, 2004, respectively. Our allowance for doubtful accounts is based upon management's continuing review and evaluation of the factors such as collateral value, aging and the financial condition of our customers. The allowance is assessed to reflect best estimate of probable losses that have been incurred as of the balance sheet date. Any changes are included in the current period operating results. We pursue collection of these receivables through various means, including legal action and collection agencies, and generally do not charge-off any of these receivables. Although these reserves have been adequate historically, the default of a large customer or prolonged period of weakness in global financial markets could adversely affect the ability of our customers to meet their obligations. We do not establish reserves for unidentified losses, which may be inherent in our customer base.

75

*Fair Values of Derivative Financial Instruments and Securities*

As a broker, we enter into transactions involving derivative financial instruments and securities on behalf of our customers. These transactions are carried at market value or, if market prices are not readily available, fair value. Changes in fair value are recognized immediately in net income. Market values for exchange-traded derivatives are based on quoted market prices. Fair market values for OTC derivative financial instruments are based on pricing models that are in turn based on observable market data intended to approximate the amounts that would be received from or paid to a third party in settlement of the contracts. Valuation models include the use of management estimates and current market information. Management is also required to make assumptions on how the fair value of derivative financial instruments and securities is affected by current market conditions. If management's underlying assumptions for evaluating fair value prove to be inaccurate, there could be material differences in our consolidated operating results.

Substantially all of our holdings of securities owned and securities sold, not yet purchased are based on quoted market values or pricing models which are based on observable market data.

*Goodwill*

Goodwill is the cost of acquired companies or businesses in excess of the fair value of identifiable net assets as of acquisition date. Prior to December 1, 2001, we amortized goodwill over a period of 25 years on a straight-line basis. Effective December 1, 2001, we adopted SFAS No. 142, *Goodwill and Other Intangible Assets*. Consequently, goodwill is no longer amortized but, instead, is tested at least annually for impairment. We are required to record an impairment loss if the estimated fair value of an operating segment is less than its estimated net book value. We derive the fair value of each of our operating segments primarily based on earnings multiples. A prolonged reduction in the earnings of one of our operating segments could result in an impairment charge in our results. We performed our last annual impairment test during the fourth quarter of fiscal year 2005 and identified no impairment. As of May 31, 2005, the carrying value of our goodwill was $744.1 million.

*Identifiable Intangible Assets*

Identifiable intangible assets, which consist primarily of customer relationships, and trade names, are amortized over their weighted average economic useful lives. Customer relationships are amortized on an accelerated basis based upon patterns of usage. These intangible assets are tested for potential impairment whenever events or changes in circumstances suggest that an asset's carrying value may not be fully recoverable. An impairment loss, calculated as the difference between the estimated fair value and the carrying value of the identifiable intangible asset, is recognized if the expected undiscounted cash flows relating to the identifiable intangible asset is less than the corresponding carrying value. Trade names have been classified as indefinite-lived assets and are not amortized but tested annually for impairment. The valuation of our identifiable intangible assets is dependent upon assumptions in areas such as growth rates, customer retention and profitability. Changes to these assumptions or a prolonged period of weakness in global financial markets could adversely impact our businesses and impair the value of our identifiable intangible assets. We performed our last impairment test during the fourth quarter of fiscal year 2005 and identified no impairment. We discontinued the MacFutures trade name on November 10, 2004 and wrote off the book value of the trade name, which was approximately $0.5 million. As of May 31, 2005, the carrying value of our identifiable intangibles was $595.9 million.

*Use of Estimates*

The use of generally accepted accounting principles requires management to make estimates. In addition to the estimates we use in connection with fair value measurements and the accounting for goodwill and identifiable intangible assets, the use of estimates is also important in determining provisions for potential losses that may arise from litigation and regulatory proceedings.

76

**Recent Accounting Pronouncements**

In December 2004, the Financial Accounting Standards Board ("FASB") issued SFAS No. 123 (revised), *Share-Based Payment* ("SFAS 123R"). SFAS 123R requires an entity to measure the cost of employee services received in exchange for an award of equity instruments based on the grant-date fair value of the award with the cost to be recognized over the period during which an employee is required to provide service in exchange for the award. We are required to adopt the provisions of SFAS 123R as of the beginning of the first interim period of the first fiscal year that begins after June 15, 2005, although earlier adoption is permitted. We are in the process of determining the impact, if any, of SFAS 123R on our consolidated financial statements.

In May 2005, the FASB issued SFAS No. 154, *Accounting Changes and Error Corrections—a replacement of APB Opinion No. 20 and FASB Statement No. 3*. SFAS No. 154 replaces Accounting Principles Board Opinion No. 20, *Accounting Changes*, and SFAS No. 3, *Reporting Accounting Changes in Interim Financial Statements*, and changes the requirements for the accounting for and reporting of a change in accounting principle. This statement applies to all voluntary changes in accounting principle and also applies to changes required by an accounting pronouncement in the unusual instance that the pronouncement does not include specific transition provisions. The statement is effective for accounting changes and corrections of errors made in fiscal years beginning after December 15, 2005. We will adopt the provisions of SFAS No. 154 beginning in fiscal year 2007. Management believes that the adoption of the provisions of SFAS No. 154 will not have a material impact on our current consolidated financial statements.

**Quantitative and Qualitative Disclosure about Market Risk**

Our primary market risks relate to counterparty, interest rate and exchange rate risk.

*Customer and Counterparty Risk*

We are exposed to the risk that third parties that owe us money, securities or other assets will not perform their obligations. These parties may default on their obligations to us due to bankruptcy, lack of liquidity, operational failure or other reasons. As a clearing broker, we generally bear the risk of the defaults or misconduct of our customers. In addition, we have experienced, due to competitive factors, pressure to extend credit and to price more aggressively the credit risks we take. Although we regularly review credit exposures to specific customers and counterparties and to specific industries, countries and regions that we believe may present credit concerns, default risk may arise from events or circumstances that are difficult to detect or foresee. In addition, concerns about, or a default by, one institution could lead to significant liquidity problems, losses or defaults by other institutions, which in turn could adversely affect us.

As a matter of policy, we continue to upgrade our risk management procedures and systems to improve our ability to monitor actual and projected risk associated with customer positions. Our Global Risk Management department is responsible for the systematic review of customer exposure in both regulated and nonregulated markets. Our current system provides the ability to project the impact of market volatility on price movement. Using various stress tests, we quantify potential adverse price movements in order to determine whether such movements would adversely affect the customer's ability to pay margin. We perform frequent stress tests to our customers' positions, including intra-day trading analysis, daily equity change analysis, concentration risk analysis, position liquidity analysis and premium seller analysis. Adjustments of margin or collateral requirements are made in anticipation of unusual adverse market developments.

We have a policy that requires customers to deposit margin in respect of their trading accounts irrespective of the credit rating of the customer in question. This policy also applies to daily margin calls. As of May 31, 2005, the dollar value of customer margin calls in excess of $500,000 was $24.4 million relating to 20 customer accounts in our Derivatives Brokerage & Clearing business and margin calls in excess of $100,000 totaled $9.6 million relating to seven customer accounts in our Prime

77

Brokerage/Capital Markets business. The total amount of margin calls over $50,000 that had been outstanding for more than three days as of May 31, 2005 was $5.9 million in our Derivatives Brokerage & Clearing business and Prime Brokerage/Capital Markets business. We also have exposure with respect to certain credit line customers and clearing organizations associated with the exchanges of which we are a member. As of May 31, 2005, our aggregate exposure to margin financing was $23.4 million.

*Interest Rate Risk*

In the ordinary course of our operations, we have limited our exposure to interest rate risk. Our balance sheet, which reflects a substantial amount of short-term and highly liquid assets, consists of equally matched assets and liabilities. We generate interest income from the positive spread earned on customer deposits or secured customer financing transactions, and the basis for the calculation of interest received and paid is entirely matched. This is the case in both rising and falling interest rate environments, although we have the opportunity to create higher levels of interest income in a rising interest rate environment.

In the future, we expect to have greater exposure to changes in interest rates. Borrowings under our new senior credit facilities accrue interest at variable rates. Interest rate changes may therefore impact the amount of our interest payments and our future earnings and cash flows. Conversely, interest rate changes may affect the fair market value of our fixed rate debt, such as the senior subordinated notes. Assuming we had completed the THL Transactions and applied the proceeds as of February 29, 2004, we would have had variable-rate debt of approximately $800.0 million. Assuming we had incurred this debt on March 1, 2003, holding other variables constant, including levels of debt, a one percentage point increase in interest rates would have had an estimated impact on pre-tax earnings and cash flows for the year ended February 29, 2004 of $8.0 million (or $6.5 million after giving effect to our repayment of $150.0 million of borrowings outstanding under our senior credit facility during the quarter ended February 28, 2005). Although interest expense related to our variable-rate debt may increase in a rising interest rate environment, we expect the impact to be mitigated in part by increased interest income generated from the investment of customer balances. We invest these balances on a daily basis in a variety of permissible short-term instruments.

*Exchange Rate Risk*

We conduct global operations. Our revenues are denominated predominately in U.S. dollars with our most significant non-dollar currency flows being denominated in Euros and Pounds Sterling. Our expenses are also denominated predominantly in U.S. dollars and to a lesser extent in a variety of local currencies reflecting the location of physical operations, including in the United Kingdom, Canada, France and Singapore.

Currently, our general practice is to invest in assets that match the currency in which we expect related liabilities to be paid. Members' equity held in local business units is kept primarily in local currencies to the extent that members' equity is required to satisfy regulatory and self-imposed capital requirements. This facilitates our efforts to ensure that capital held in local business units will be able to support the local business irrespective of currency movements. However, this may adversely affect our reported combined members' equity when expressed in U.S. dollars. The table below shows the approximate effect on members' equity of instantaneous adverse movements in currency exchange rates of 10% on our major currency exposures at May 31, 2005 against the U.S. dollar.

| | Adverse exchange rate movement against the U.S. dollar | Approximate decline in members' equity (in millions) |
|---|---|---|
| Euro | 10% | $ 4.6 |
| Pounds sterling | 10% | $ 5.3 |
| Canadian dollar | 10% | $ 0.7 |

78

# INDUSTRY

## Derivatives

### Overview

Derivatives are contracts that are valued based on the performance of an underlying financial or physical asset, index or other investment. The most common types of derivatives are futures and options. A futures contract is a legally binding agreement to buy or sell a commodity or financial instrument at a future date at a specific price. Options are contracts that provide for a right, but not an obligation, to buy or sell a commodity or financial instrument over a specified period at a specific price. Derivatives contracts are broadly comprised of two underlying categories: financial and physical. Examples of financial derivatives include contracts on interest rates, equity indices, individual equities and foreign currencies. Examples of physical derivatives include contracts on energy products, agricultural commodities and non-precious and precious metals. Derivatives markets have grown significantly over the past 15 years in terms of the volume of exchange-traded derivatives activity and the notional amounts outstanding of over-the-counter ("OTC") contracts.

Derivatives contracts are either standardized and traded on exchanges or privately negotiated and traded between specific counterparties in the OTC market. According to the Bank for International Settlements ("BIS"), the global notional amount outstanding for OTC derivatives at June 30, 2004 was $220 trillion, while the global notional principal amount outstanding for financial exchange-traded derivatives was $47 trillion. There are 61 derivatives exchanges tracked by the Futures Industry Association ("FIA") located in 24 countries, including 17 exchanges in the United States. Major derivatives exchanges in the United States include the Chicago Mercantile Exchange ("CME"), the Chicago Board of Trade ("CBOT"), the New York Mercantile Exchange ("NYMEX"), the Chicago Board Options Exchange ("CBOE") and the New York Board of Trade ("NYBOT"). Major derivatives exchanges outside the United States include Eurex, Euronext.liffe, the International Petroleum Exchange ("IPE"), Mercado Oficial de Futuros y Opciones Financieros ("MEFF"), Euronext N.V., Singapore Derivatives Exchange Ltd. ("SGX") and the Tokyo Stock Exchange ("TSE"). Contracts traded on the top five U.S. exchanges represented approximately 26% of global derivatives volume in 2004. The top five U.S. exchanges accounted for 83% of the exchange-traded derivatives volume transacted in the United States in 2004.

The customer base for derivatives contracts includes professional traders, financial institutions, institutional and individual investors, as well as major corporations, manufacturers, producers and governments. These customers purchase derivatives primarily for hedging or investment purposes. Hedging involves the practice of managing risk inherent in one market position by taking an offsetting position in another market. For example, corporations use the futures markets to protect their businesses from adverse changes in the costs of their raw materials. Investing involves a market participant taking a position in an attempt to earn a profit from buying and selling futures and options contracts in anticipation of future price movements. When entering into exchange-traded derivatives contracts, customers are required to make good faith margin deposits to ensure future performance under the derivatives contract.

### Methods of Trade Execution

Trading in derivatives products has traditionally occurred in "pits" on the physical trading floor of an exchange through an auction process known as open outcry. Only members owning or leasing a seat on the exchange may trade in the pit. Buy and sell orders from individuals and institutions are sent to these members on the trading floor, usually through a Futures Commission Merchant ("FCM"). Members of an exchange may exercise their trading privileges as independent market-makers (known as locals) trading for their own account or as floor brokers executing customer orders.

79

The diagram below illustrates the process through which customers place trade orders on an exchange floor through an FCM.



In order to expand access to their markets, most derivatives exchanges have supplemented or replaced their open outcry trading facilities with electronic trading platforms. Electronic systems allow investors to obtain real-time information about bid and ask prices and trading volumes and to enter orders directly into the electronic exchange's centralized order book, subject to the agreement of an FCM to process the investors' trades. The emergence of electronic trading has been enabled by the ongoing development of sophisticated electronic order routing and matching systems, as well as advances in communications networks and protocols. Examples of electronic trading platforms include CME's GLOBEX system, LIFFE CONNECT, which is provided by Euronext.liffe, and the Cantor Exchange, which is provided by Cantor Fitzgerald, L.P.

### Exchange Clearing Houses

Transactions executed on derivatives exchanges are settled through a clearing house that acts as a central counterparty to the clearing member on each side of the transaction. When a futures transaction has been executed in the pit or on an electronic platform, the clearing house confirms the matching and settlement of the trade with FCMs representing both the buyer and seller.

The major clearing houses for futures products include the Clearing Division of the CME, the Options Clearing Corporation, the LCH.Clearnet Group Limited and Singapore Exchange Derivatives Clearing Limited. A clearing house manages its counterparty risk through required margin deposits that are managed to ensure effective delivery of the underlying security or commodity and maintaining guarantee funds and capital call rights.

### Futures Commission Merchants

In the United States, customers access the exchange-traded derivatives market through FCMs. We operate as an FCM in our derivatives and clearing business. FCMs are members of one or more exchanges that solicit or accept orders from customers for the purchase or sale of derivatives and route those orders to the appropriate exchange. FCMs execute customer orders on the exchange and

80

maintain records of each customer's position, margin deposits, money balances and completed transactions. In return for providing these services, FCMs collect commissions on each trade order from customers. In addition, FCMs earn interest income on cash deposits held on behalf of their customers. FCMs are subject to a number of regulatory requirements, including the maintenance of a minimum level of net capital. FCMs are regulated by the CFTC, an independent federal regulatory agency, and must be a member of the National Futures Association ("NFA"), an industry-wide self-regulatory organization. FCMs are typically either divisions of major investment or commercial banks or independent providers such as our company. Regulatory jurisdictions outside of the United States have similar governing bodies, minimum capital requirements and self-regulatory organizations.

*Industry Growth*

According to the BIS, annual global trading volume in exchange-traded derivatives has grown at a compound annual growth rate of 21% over the past 15 years, from 488 million contracts traded in 1989 to approximately 8.8 billion contracts traded in 2004. During the same period, trading volumes in exchange-traded derivatives increased at a compound annual growth rate of 16% in North America. Excluding single stock and commodity contracts, the compound annual growth rate of trading volumes in exchange-traded derivatives has been 23% in Europe and 29% in the Asia and Pacific markets during the same period.

**Futures and Options Trading Volume on Global Derivatives Exchanges**
(Contract amounts in millions)



Source:      BIS.
Note:        Data based on calendar year. The "financial" category of derivatives includes interest rate, currency and equity index contracts.

81

We believe growth in exchange-traded derivatives volumes has been driven by the following factors:

- *Electronic Trading*—The ongoing conversion of the derivatives markets from floor-based exchanges to an electronic format has enabled exchanges to lower clearing fees, reduce execution times and broaden access. Electronic trading has led to the decentralization of exchanges and has allowed customers to view bid and ask prices and trade derivatives products globally nearly 24 hours a day. Due to the previously mentioned benefits, we believe electronic trading is attracting new customers to the exchange-traded derivatives market and increasing the trading activity among existing customers. For example, from April 2004 through April 2005, the average daily volume on CME's GLOBEX electronic trading platform increased by over 110%. Electronic trading represented 35% of average daily volume on the CME in 2002, 42% in 2003 and 57% in 2004.

- *Increasing Importance of Risk Management*—An increasing fluidity of capital and diversification of commercial activity among capital markets has broadened the financial exposure that businesses and individuals face and increased the need to hedge their risks. We believe companies and investors focus on controlling exposures in their businesses and providing less volatile earnings for shareholders. To achieve this goal, managers are emphasizing risk management as a means of reducing volatility in their businesses. As risk management needs have increased so have the number of exchange-traded derivatives contracts available to meet these needs.

- *Product Innovation*—In general, the number of contracts available for trading on exchanges has grown significantly in recent years. As of December 2004, the CME, Eurex and CBOT offered for trading a total of 264 contract types, an increase of 149 since January 2000. For example, the e-mini S&P 500 index has experienced rapid growth since being launched in 1997, partially as a result of its small size in relation to most other contracts and its resulting affordability to smaller investors. The e-mini S&P 500 index's annual trading volume reached 167 million contracts in 2004.

- *Structural Shift from OTC Markets to On-Exchange Trading*—The exchange-traded derivatives market for financial derivatives contracts grew at a faster rate than the OTC derivatives market in 2003 based on the total notional amount of contracts outstanding. Exchanges offer customers the advantages of improved price transparency, centralized clearing and credit intermediation. Due in part to these benefits, an increasing proportion of mature and standardized OTC derivatives products (e.g., equity indexes) have shifted to an exchange platform. Given the large size of the OTC derivatives market in terms of notional amount of contracts outstanding, exchanges are developing new products based on the most commonly traded OTC products.

- *Exchange and Clearing Platform Competition*—Competition among exchanges and clearing platforms has increased as a result of globalization, deregulation and technological advances. Competition has increased product innovation as evidenced by the proliferation of contract types traded on each derivatives exchange and has led to significant fee reductions. An example of exchange competition is the launch by Eurex of a U.S.-based exchange, which competes directly with the CBOT in some product areas. In response to Eurex's entrance, the CBOT has reduced some of its clearing fees. We believe this competition will significantly contribute to transaction volume growth and will benefit other market participants such as FCMs.

- *Deregulation*—Deregulation of the financial services industry in the United States, Europe and Asia has increased customer access to derivatives products and markets, reduced regulatory barriers to product innovation and encouraged consolidation among exchanges.

    *United States:*  Many regulatory barriers to product development, such as lengthy CFTC review of new contracts, were largely repealed by the enactment of the Commodity Futures

82

Modernization Act of 2000 ("CFMA") in the United States. Among other developments, the CFMA authorized the trading of new products, such as futures contracts on individual stocks and narrow-based stock indexes, which were prohibited under prior law. The CFMA also enabled regulated exchanges to self-certify new contracts and rules, without delays occasioned by regulatory review and approval, permitting quicker product launch and modification.

*Europe and Asia:* Deregulation and competition will continue to pressure European exchanges to consolidate across borders to gain operating efficiencies necessary to compete for customers and intermediaries, lowering transaction costs and trading friction, which should continue to attract new market participants. The Singapore Derivatives Exchange, the TSE, Eurex and Euronext N.V. are major exchanges for various types of securities in addition to being derivatives exchanges, highlighting the growing convergence between cash and derivatives markets. Euronext N.V., which resulted from the merger of the Amsterdam Exchanges N.V., Paris Bourse SA and Societe de la Bourse de Valeurs Mobilieres de Bruxelles S.A. (the Brussels Exchange) acquired a controlling interest in LIFFE and integrated their derivatives markets into Euronext.liffe.

## Prime Brokerage

Prime brokerage is an industry term referring to specialized services provided by brokers to institutional customers as a bundled package. The services typically include execution and clearing, securities financing, custody, trade processing, securities lending and other administrative services. These services can be provided on either electronic or voice platforms, or both. Prime brokers serve customers in all major securities markets, such as equity, fixed income and foreign exchange. Prime brokers typically earn revenue through commission or transaction fees and interest income. They are typically divisions of major investment or commercial banks, or independent providers, such as our company.

The fixed income and foreign exchange markets we provide prime brokerage services to are discussed separately below.

### *Fixed Income*

The fixed income securities market is one of the largest financial markets in the world. In the United States, there were approximately $23.6 trillion of fixed income securities outstanding at the end of 2004. The U.S. Treasury securities market, the largest and most liquid fixed-income market, has experienced strong volume growth. Average daily dollar trading volume has increased from $18.3 billion in 1980 to $497.9 billion in 2004, representing a compound annual growth rate of 14.8%.

While there are many types of investors in the U.S. Treasury securities market, financial institutions, corporations and hedge funds comprise a large percentage of the activity. These investors are typically attracted to the U.S. Treasury securities market due to its significant liquidity and low risk profile. Additionally, U.S. Treasury securities are commonly used as part of a larger investment strategy and are primarily financed through the OTC repurchase agreement ("repo") market.

The OTC repo market is one of the largest and most active sectors in the U.S. fixed income market. Repos are widely used as a means to inexpensively finance short-term borrowings against collateral (commonly U.S. Treasury securities) and to invest surplus funds on a short-term basis. The largest users of repos are broker-dealers, banks and hedge funds. The largest providers of cash liquidity to the repo market are money market funds, state and local governments and foreign central banks.

Traditionally, the majority of U.S. Treasury securities are bought and sold by investors using the services of a broker (typically a large commercial bank or investment bank). Such customers receive price quotes from these brokers. The broker in turn either buys the security from the market or sells

83

the security from existing inventory. Additionally, they may access the interdealer broker ("IDB") market to match the transaction with another broker. Access to the IDB market has traditionally been limited to brokers dealing with other brokers. The customer compensates the broker for executing this transaction through the payment either of a commission or through a mark up that is added by the broker to the price at which the broker can access the IDB market to execute the transaction.

The U.S. Treasury market has been moving away from voice broking to electronic trading in recent years. Many of the major broker-dealers now have electronic order entry platforms, which allow customers to ask for bid and offer prices. In some cases the dealer may list current bid and offer prices on the platform. Similarly, the IDB market has also evolved from a predominately voice brokered market to an electronic market. Participants in the IDB market can now see bids and offers shown live on a screen and can execute against these prices electronically.

In order to participate in transactions in the IDB market, a participant must become a netting member of the Fixed Income Clearing Corporation ("FICC"), a clearing house for the U.S. fixed income market. A prospective netting member must complete a lengthy approval process that requires the applicant to (i) be a financial institution, (ii) maintain a minimum level of capital and (iii) be actively involved as a clearer, dealer or broker of government securities. As a result, most FICC netting members are either large investment banks, broker-dealers or commercial banks who use the IDB market to access the best pricing and greatest liquidity for U.S. Treasury securities. These institutions typically buy securities both for their own proprietary trading account or for resale to clients.

We believe growth in the U.S. Treasury securities market and the repurchase agreement market has been driven by the following factors:

- *Growth in the Total Amount of Debt Outstanding*—According to the Bond Market Association, the total size of the U.S. Treasury securities market has increased significantly, with $3.9 trillion outstanding as of December 31, 2004, compared to $616.4 billion at December 31, 1980. Total gross issuance of short- and long-term U.S. Treasury securities for 2004 was $3.5 trillion.

- *Growth in Interest Rate Derivatives*—Interest rate derivatives are contracts that transfer an asset's risk and return from one party to another without transferring ownership of the underlying asset, allowing market participants to obtain interest protection or assume interest rate exposure associated with fixed-income securities and other debt obligations. Interest rate derivatives provide increased flexibility and liquidity for investors and lenders to diversify their interest rate exposures.

- *Greater Sensitivity to Credit Risk*—Repurchase agreements are generally secured by high quality collateral and are a liquid investment, offering relatively low to no credit risk. Given recent past financial crises, including the Asian financial crisis in 1997 and the Russian debt crisis in 1998, an increasing number of investors have sought such low-risk assets.

- *Introduction of Electronic Trading Platforms*—Electronic trading platforms act as central facilities to bring together buyers and sellers. The actions of participants on these platforms are facilitated by an electronic medium that improves some of the manual processes that might otherwise be required. These platforms also have integrated compliance and risk management functions, as well as greater accuracy and decreased probability of erroneous trades than voice brokerage, and as a result, typically provide a lower-cost and more efficient means for price discovery and trade execution.

## Foreign Exchange

The global foreign exchange market is generally regarded as the largest financial market in the world as measured by transaction value. Estimated average daily volume as of April 2004, for example,

84

was $1.9 trillion. By comparison, average daily volume in the next largest financial market, that for U.S. Treasury securities, was approximately $497.9 billion during 2004.

The majority of foreign exchange volume is traded OTC. Most foreign exchange transactions take place by telephone or through proprietary trading networks established by large financial institutions.

The primary participants in the foreign exchange markets fall into four categories: central banks, banks, brokers and institutional clients of brokers. Banks are the largest participants in the market, as approximately two-thirds of all foreign exchange transactions involve banks trading currencies with one another. Brokers act as intermediaries between other participants in the market, searching for the most favorable rates on behalf of customers and providing a level of anonymity for the buyer and seller. Brokers earn commissions on the trades they execute.

There are three primary types of foreign exchange transactions: spot, forward and options. In a spot transaction, a buyer and seller agree on an exchange rate and promptly settle the trade based on that rate. In a forward transaction, a buyer and seller agree to settle the traded currencies at a later date at an agreed upon rate, regardless of market exchange rates at that time. The most common type of forward transaction is a swap, in which two parties exchange currencies at a given rate and agree to reverse the transaction at a later date. Options on foreign exchange work the same way as options on equities: they convey a right, not an obligation, to trade at a future date at a certain rate. As of April 2004, spot transactions represented 33% of the OTC traditional foreign exchange daily volume, swap transactions represented 50% and outright forward transactions represented 11% (while estimated gaps in reporting were 6%).

We believe growth in the foreign exchange market has been driven by the following factors:

- *Increased Cross-Border Trade and Investment*—We believe cross-border trade should continue to increase, as the world is more open to free trade than in past years. For U.S. international trade, for example, the average annual increase in exports and imports over the past 40 years was 10% and 12%, respectively. Similarly, foreign direct investment has experienced a long-term growth trend and is expected to continue. This growth in global trade and foreign direct investment is a driver of demand for foreign exchange products.

- *Increasing Use of Foreign Exchange as a Hedging Tool*—Foreign exchange derivatives products, such as foreign exchange forwards and swaps, facilitate the hedging of foreign exchange risk. From 1992 to 2004, forward and swap volumes have been growing as a percentage of total foreign exchange volume. This trend is consistent with the compound annual growth in the exchange-traded derivatives market since 1989 of 21%.

- *Alternative Investment Asset Flows*—Foreign exchange has emerged as a distinct asset class for investment purposes, driven largely by demand from hedge funds whose investments in foreign exchange have risen significantly since 2001 as equity market valuations declined and historically low interest rates rendered many fixed income products less attractive. In addition, retail customer participation in the foreign exchange market has increased as customers have become more aware of foreign exchange contracts as an investable asset class.

- *Emergence of Electronic Brokerage*—Trading in the OTC market is conducted over the telephone, Internet or trading platform, either directly or through a broker. Electronic brokers play a large role in the market based on their offering of lower costs, higher efficiency and greater transparency compared to direct dealing. The BIS reported that electronic brokers conducted approximately 50% to 70% of foreign exchange transactions in major currency pairs in 2001, compared to approximately 40% and 10% in 1998 and 1995, respectively. Similarly, usage of electronic trading has grown among non-bank foreign exchange investors.

85

# BUSINESS

## Our Company

We are a leading independent provider of execution and clearing services for exchange-traded derivatives and a major provider of prime brokerage services in the fixed income and foreign exchange markets. We offer our customers rapid, low-cost trade execution and clearing services on a broad spectrum of derivatives exchanges and OTC markets. We serve over 200,000 customer accounts from our 23 locations in 14 countries with a focus on delivering superior customer service. Our customers include corporations, government agencies, hedge funds, managed futures funds, pension funds, financial institutions, retail clients and professional traders.

In 2004, we were the largest provider of customer transaction volume to the CME, the largest derivatives exchange in the United States. In fiscal year 2005, we processed 654 million derivatives contracts, a volume of derivatives contracts greater than the volume traded on the CBOT, the CBOE or the NYMEX during the same period. In fiscal years 2003 and 2004, we processed 401 million and 472 million of derivatives contracts, respectively. We are more diversified than any individual exchange, as we offer access to multiple products on virtually all major derivatives exchanges as well as OTC markets.

In fiscal year 2005, we cleared over $13.7 trillion in U.S. Treasury repurchase transactions and processed over $1.2 trillion in customer volume in the foreign exchange market. In 2004, we ranked fourth among FICC member firms in terms of cleared U.S. Treasury repurchase transaction volume and eighth for U.S. Treasury cash transaction volume.

Our revenues are primarily comprised of:

- transaction fees earned from executing and clearing customer orders; and

- interest income earned on cash balances in our customers' accounts and from providing financing through repurchase transactions.

For the year ended February 28, 2005, we generated $1,331.9 million of net revenues and $176.3 million of net income and for the three months ended May 31, 2005, we generated $411.6 million of net revenues and $42.6 million of net income.

## Competitive Strengths

We believe our following competitive strengths will enable us to continue to successfully grow our business and increase our profitability:

### Established Market Position

As of May 31, 2005, we were the largest independent FCM in the United States based on domestic customer segregated fund balances of approximately $4.1 billion. We are a clearing member on virtually all major domestic and international derivatives exchanges, including the CME, CBOT, Eurex, the London Metal Exchange ("LME"), Euronext.liffe, NYMEX and the IPE, and offer our customers access to a broad range of derivatives contracts. In fiscal year 2005, we processed 654 million derivatives contracts, cleared over $13.7 trillion in U.S. Treasury repurchase transactions and processed over $1.2 trillion in customer volume in the foreign exchange market. In 2004, we ranked fourth among FICC member firms in terms of cleared U.S. Treasury repo transaction volume and eighth for U.S. Treasury cash transaction volume. We believe our leading market position allows us to provide our customers a broad product offering, superior customer service and leading technology at low cost.

### Diversified Across Customers, Products and Markets

We serve more than 200,000 accounts for customers that include corporations, government agencies, hedge funds, managed futures funds, pension funds, financial institutions, retail clients and professional traders. No single customer represents more than 1% of our gross commission revenue. In

86

our Derivatives Brokerage & Clearing division, we provide our customers access to a wide variety of exchange-traded derivatives products. We also provide access to a wide range of OTC fixed income and foreign exchange products through our Prime Brokerage/Capital Markets division. In fiscal year 2005, operating profits for our Derivatives Brokerage & Clearing division and our Prime Brokerage/Capital Markets division were comparable. We believe this diversification reduces our overall earnings volatility and dependence on any one customer segment, product or market.

### Direct Customer Relationships

We serve as an essential intermediary between our customers and the financial markets and, unlike an exchange, we maintain direct relationships with our customers. These customer relationships allow us to benefit from customer trading of a variety of products across multiple exchanges and markets. In order to gain access to the markets we serve and to satisfy regulatory requirements, our customers maintain account balances with us, and we generally earn interest income on these balances. As of May 31, 2005, we held approximately $3.7 billion of domestic customer deposits.

### Scalable Operating Platform

Our business benefits from a scalable operating platform. Our existing infrastructure is capable of processing significant additional volumes with limited incremental increases in our Employee Compensation and Benefits expenses and General, Administrative and Other expenses. Our operating platform services both floor traders and electronic trading, and we expect to further benefit from the trend towards electronic trading. Our operating income has increased from $61.0 million in fiscal year 2000 to $150.6 million in fiscal year 2005.

### Ability to Generate Free Cash Flow and Reduce Financial Leverage

We generate significant free cash flow, which is available for reinvestment in our business, debt service and reduction, acquisitions and other uses. Our cash flow is generated by high margins and a business model that allows us to grow without significant capital expenditures. For the period from March 1, 2004 through August 5, 2004 and the period from August 6, 2004 through February 28, 2005, we incurred capital expenditures of $5.0 million and $9.3 million, respectively. For the three months ended May 31, 2005, we incurred capital expenditures of $3.3 million. In January 2005, we voluntarily prepaid $150.0 million of our bank debt.

### Proven and Committed Management Team

The members of our senior management team have an average of 24 years of industry experience. Phillip Bennett, who has been with us for 24 years, became our President and Chief Executive Officer in 1998. Under their leadership, net revenues have grown at a compound annual growth rate of 23.6% from fiscal year 2000 through fiscal year 2005. Following this offering, Mr. Bennett will beneficially own an approximate 33.8% interest in us.

## Our Business Strategy

We plan on continuing to capitalize on the economies of scale arising from our large execution and clearing volumes and to increase our transaction volumes, revenues and profitability by executing the following strategies:

### Capitalize on Growing Markets and New Product Opportunities

We will continue to identify opportunities for growth within our markets and for new product offerings while leveraging the customer relationships, liquidity and transaction processing platform of our existing businesses. Because of our global presence, we believe we can react quickly to emerging opportunities throughout the world. We have positioned our business within growing markets and benefit from increasing transaction volumes. We maintain a strong presence on the world's major

87

exchanges and OTC markets in which we operate, offer access to trading in an extensive suite of products to a diversified and growing customer base and continually seek to reduce our costs. In the past, we have grown our Derivatives Brokerage & Clearing and Prime Brokering/Capital Markets businesses by offering new products and services to our customers as they expand their trading activities into new asset classes and financial markets. We plan to expand our product offering into other markets where our focus on access to markets and efficient execution on behalf of customers is a competitive advantage. We continually work to identify new market and product opportunities where we can leverage our transaction processing platform.

### Profit from Maturing Markets

We seek to continue to take advantage of our scale and operating efficiency to profit from providing execution and clearing services at a low cost to customers active in transparent, highly liquid, commoditized markets. The economics of these markets are characterized by low per unit revenues levied on each of millions of transactions. Many former competitors have chosen to exit these markets and potential competitors have chosen not to enter them because the financial returns are relatively unattractive for a sub-scale operation. As other existing markets mature, becoming more liquid and standardized, and market participants demand more efficient access to the same services at potentially lower costs, we expect to be able to service these markets profitably while our competitors operating with less scale will likely generate lower profit margins and may choose to exit these markets altogether.

### Offer Unconflicted Access to Markets

We strive to differentiate our business offerings from our competitors' offerings by focusing solely on customer business and leveraging our transaction processing capabilities. Unlike many of our competitors in the brokerage industry, we do not trade in a directional or strategy-based manner for our own account. We focus on attracting customers and providing them with access to markets. We strive to provide our customers with low transaction costs, rapid order execution and access to pricing data that allows customers to see the price of the security and the commission or transaction fee paid to us. We target market participants who value this service offering as an important part of their investment strategies. For example, we believe our domestic fixed income prime brokerage business is attractive to fixed income hedge funds that require low cost access to the prices in the IDB market in order to execute their investment strategies. We believe our focus on acting as an agent is important to customers concerned about quality of execution and potential conflicts of interest.

### Grow Our Customer Base

The significant growth of the markets in which we participate creates opportunities for us to attract new customers. We have also developed online platforms to attract the growing base of customers who trade over the Internet. As we continue to grow, we will maintain our focus on providing high levels of customer service to address the diverse needs of our three key customer segments.

*Institutions*—We have a dedicated sales force of over 1,000 individuals calling on institutional customers. Our ability to provide institutional customers unconflicted access to a wide range of markets is an advantage when soliciting new customers. We believe recent trends such as growth in the hedge fund industry and increased cross-border commerce have increased the demand among corporations, institutional investors and hedge funds for a wider variety of products with which to hedge risks and invest for profit. We plan to take advantage of what we believe is a valuable cross-selling opportunity by continuing to educate our institutional customers about our full range of derivatives, fixed income and foreign exchange services.

*Professional Traders and Locals*—We have been building our strong market position as a provider of clearing services to professional traders on the world's major exchanges. Professional traders and

locals are typically high trading volume customers and have contributed significantly to our volume growth. An increasing number of professional traders access the markets electronically. As part of our strategy to penetrate the market for locals, we have begun to offer training programs and high performance trading facilities for those moving from the trading floor to electronic trading and for new professional traders.

*Retail*—Our retail operations include our Lind-Waldock division, a leading online retail derivatives brokerage operation. We believe we are well positioned to capitalize on an increased awareness and understanding of the derivatives and foreign exchange markets among retail customers. We plan to continue encouraging this increased understanding through targeted marketing via direct mail, the Internet, customer education seminars and other media. In order to serve the wide variety of customers in this segment, we offer a complete suite of retail-focused products and services, including online and broker-assisted trading and research.

### Capitalize on Shift to Electronic Trading

Many markets and exchanges are increasingly using electronic trading and moving away from the traditional open outcry method. We believe increased electronic trading has created an opportunity for us to increase market share in our various markets as our operating platform is well suited to accommodate this technological shift. We plan to take advantage of this opportunity by utilizing our existing relationships with floor-based brokers as well as our scale, technology and market knowledge to adapt our service offering to meet evolving customer demands. We believe our training programs and high performance trading facilities, together with our technology platform and electronic trading capabilities, provide rapid trade execution and market visibility as well as an attractive platform for new professional traders and those moving from the trading floor to electronic trading.

We have provided electronic trading systems in the markets we serve and have gained a level of expertise in providing these systems to a global and diverse customer base. As electronic trading has comprised a growing proportion of the volume in our markets, we have seen total market volumes increase substantially. Electronic trading also allows us to execute and clear orders more efficiently, as we can better employ technology for functions such as margin and risk management. We have continued to develop these systems to satisfy our customers' evolving trading requirements. The characteristics of the electronic platforms that interface with exchange matching engines are complex in functionality and in configuration. We have integrated them into our operational infrastructure and can handle rapidly increasing trading volumes. We believe we will be able to realize the efficiency afforded by electronic trading when it is applied to all the exchanges' current floor-transacted volume. These systems and our expert implementation capabilities and operation of a global network of multi-exchange electronic order flow allows us to manage order flow straight through processing on a scale that significantly exceeds traditional physical order execution processes.

### Manage Risk Prudently

We plan to continue to monitor and improve our exposure to customer and counterparty risk throughout our operations using our comprehensive risk management system. We are not exposed to market risk as a result of strategy-based or directional proprietary trading. In order to mitigate customer and counterparty risk, we will continue to utilize a number of proactive risk management tools.

### Pursue Selective Strategic Acquisitions

We intend to pursue selective acquisitions that will expand our service capabilities or customer base or provide greater access to trading in a wider range of products. Our flexible operating platform can facilitate the efficient transfer and integration of the customer positions and operations of acquired companies. Our historical results have benefited from a focused acquisition program that has expanded

89

our service offering and strengthened our market position within our customer segments. Since 1999, we have acquired and integrated 16 businesses.

## History

We began operations in 1969 by providing execution and clearing services in agricultural commodities. Throughout the 1970s, we expanded our product offerings in response to the introduction of new financial futures products. Our involvement in Prime Brokerage/Capital Markets began in 1982 in response to requests from existing futures customers for the ability to adjust their futures positions after the futures market was closed. We formed the Prime Brokerage/Capital Markets division to provide this service by facilitating customer access to the cash markets, including the interbank foreign exchange market, in our capacity as a broker in principal. The brokerage in principal business model established the foundation both for our foreign exchange operations and for our other cash market brokerage activities. From 1983 to 1985, we emerged as a leading consolidator in the futures industry by acquiring Chicago Grain, ContiCommodities and DLJ Futures. By 1985, we had built an international infrastructure and strong market position in global derivatives markets.

In September 1998, Phillip Bennett was named our chief executive officer. Under his leadership, we formed a new senior executive team with significant industry experience to focus on growing our business and strengthening our regulatory and customer focus. Under our new senior management team, we grew internally and through a number of acquisitions. In 2000, we acquired Lind-Waldock, a leading retail derivatives brokerage operation. From 2001 to 2003, we enhanced our strong market position in the professional trader market by, among other things, the acquisition of MacFutures Limited and the professional floor trader business of First Options.

## Services

We are organized into two operating business segments for financial reporting purposes: (i) Derivatives Brokerage & Clearing and (ii) Prime Brokerage/Capital Markets, and we have one non-operating business segment, Corporate & Other.

### Derivatives Brokerage & Clearing

We execute and clear customers' orders for exchange-traded derivatives. Customers use our Derivatives Brokerage & Clearing platform to place buy and sell orders for derivatives contracts, which we direct to the appropriate exchange for matching. We also facilitate confirmation and settlement of our customers' derivatives transactions and ensure that our customers have the appropriate collateral in their accounts to support their derivatives positions. We conduct these activities in our capacity as a regulated FCM. As an FCM, we are responsible to the applicable clearing house for our customers' transactions. We are the largest independent FCM in the United States based on domestic customer segregated fund balances of approximately $4.1 billion as of May 31, 2005. In 2004, we were the largest customer in terms of contract volume of the CME, the largest derivatives exchange in the United States.

We generate Derivatives Brokerage & Clearing revenues from: (i) transaction fees earned from executing and clearing customer orders and (ii) interest income earned on cash balances in our customers' accounts. From fiscal year 2000 through fiscal year 2005, our Derivatives Brokerage & Clearing net revenues and operating profit have grown at a compound annual growth rate of 24.3% and 33.3%, respectively, driven primarily by annual increases in contract volumes executed or cleared and annual increases in customer deposits. Our growth has been generated both organically and through strategic acquisitions, which have broadened our customer base, service offerings, geographic reach and exchange coverage.

90

Our business is diversified across customers, products and exchanges. The following charts illustrate our diversity across exchanges and contract types for fiscal year 2005:



**Contract Volume by Exchange(1)**

**Contract Volume by Type(1)**

(1)     Total volume: 654 million contracts

*Customers.*     As of May 31, 2005, our Derivatives Brokerage & Clearing division serviced over 199,000 customer accounts. Our customers include institutions, professional traders and retail investors.

*Institutions.*     Institutions are typically large mutual funds, hedge funds, financial institutions, pension plans and other non-financial entities. We market to our institutional customers through a sales force of experienced financial services professionals. We offer institutions high service levels, anonymity, unconflicted access to a broad range of products and markets and competitive pricing. We believe that it is important to institutional customers that we do not speculatively trade with our own capital in a strategy-based or directional manner and therefore avoid potential conflicts with our customers. We believe the quality of execution is very important to our institutional customers and that we are able to provide such customers with efficient execution due to our scale, liquidity and geographic breadth. We have experienced growth in our institutional customer base, in part, driven by the proliferation of hedge funds and an increasing corporate focus on risk management.

*Professional Traders.*     Professional traders are either locals, who are individual members of derivatives exchanges trading for their own account on the floors of those exchanges that maintain the open outcry method of price discovery, or professionals trading electronically from dedicated facilities built to service their needs. We have a strong market position among professional traders and locals. Professional traders are high volume customers who require an operating platform with rapid execution at a low cost. Locals fulfill an important role in the market as liquidity providers for the exchanges of which they are members. Through internal growth and acquisitions, we have increased our professional trader customer base as part of our strategy to grow transaction volumes and our plan to diversify our customer base. This strategy allows us to integrate and efficiently process very large volumes and to manage effectively the risks associated with this particular customer group. We also believe that this particular customer base will be of strategic significance in the future as markets become increasingly automated. Locals are well suited to the development of off-the-floor trading locations, which provide them with direct access to electronic markets and enable us to continue to benefit from the order flow and commission generating potential of these clients. Our MacFutures model is indicative of the opportunities presented by this trend. MacFutures, a London- based business we acquired in March 2003, provides specialty clearing services for individual professional traders, specializing in the electronic derivatives and fixed income markets in Europe. The model, which involves the recruiting and training of professional traders who are provided with access to electronic exchanges on our own off-the-floor trading locations, has now been implemented in Chicago and Montreal.

91

*Retail Investors.*    Retail customers are typically experienced individual investors. We have grown our retail customer base historically through internally generated new accounts and through acquisitions. The global retail customer base is growing as new product offerings with a broad investor appeal, such as the e-mini contracts, are listed on exchanges. We offer our retail customers access to a broad range of products and value added services, including research, real time quotes, risk management tools, account information and customer support. Our retail customers also benefit from the operating platform that we have built to service our institutional and professional trader clients. We market to retail customers through an actively managed lead generation and marketing strategy targeted at identifiable customer groups who we believe would be receptive to trading equity derivatives. Specific examples of these initiatives include the following:

- We leverage our prominent Lind-Waldock brand name and its online platform. Lead generation is driven primarily by print media advertising and, increasingly, a broad range of internet marketing initiatives, including key word strategies negotiated with search engines.

- We are developing business-to-business ("B-2-B") relationships to expand the scale of our retail customer base. These are often negotiated with complementary and non-competitive retail brokerage firms such as Charles Schwab & Co., Inc., TD Waterhouse Investor Services, Inc. and Ameritrade Inc. We typically provide access to and execution of exchange-traded derivatives products for the customers of our B-2-B partners.

- We rely on our traditional sales force of account executives and registered introducing brokers who independently (but with corporate product support) market to individual clients throughout North America.

- First time potential clients are targeted using educational marketing strategies often developed in conjunction with seminar providers and investment educational professionals.

*Product Access.*    We provide our customers access to all significant exchange-traded derivatives contracts, including interest rates, equity indexes, energy, agriculture, foreign currency, metals contracts and managed futures.

*Exchanges.*    We provide our customers access to virtually all major global derivatives exchanges, including the CME, CBOT, NYMEX, LME, Eurex, Euronext.liffe, CBOE and IPE. In recognition of the technological advances in the industry, we provide both open outcry and electronic access to the derivatives markets. The electronic trading platforms we provide access to include GLOBEX, LIFFE CONNECT and NYMEX Access.

*Competition.*    The primary competitors of our Derivatives Brokerage & Clearing business include affiliates of major commercial and investment banks and independent FCMs. We compete for customers and transaction volume on the basis of our access to a broad range of products and exchanges, our service levels, relationships, technology and operating platform and pricing. Many of our investment and commercial banking competitors maintain large proprietary trading operations.

*Refco Alternative Investments.*    In June 2002, we created Refco Alternative Investments to develop product offerings using alternative assets, such as managed futures, for distribution to our customers. These offerings result in the creation of asset management funds, which utilize both our sales force and third- party distributors to raise assets. All investment decisions are made by third-party managers, and all brokerage activity of the funds is directed exclusively to our derivatives and cash brokerage affiliates, driving transaction volume to our core transaction processing platform. Additionally, such funds typically earn an asset management fee. An important milestone was reached following the negotiation with Standard and Poor's for the branding of a portfolio of Commodity Trading Advisors and the subsequent creation of a managed futures index, which is tracked by a public fund and a series of private funds. This product, which took advantage of weaker equity markets and the non-correlated performance of derivatives investing to equity market performance, was successfully launched in March 2003. As of May 31, 2005, approximately $647.4 million has been raised for this product,

92

including our investment of approximately $0.5 million. We have earned approximately $4.6 million and $1.5 milllion in management fees during fiscal year 2005 and the three months ended May 31, 2005, respectively.

## Prime Brokerage/Capital Markets

We offer prime brokerage services, including execution, clearing, securities financing, securities lending, custody and trade processing. We provide these prime brokerage services primarily in the U.S. Treasury securities, foreign exchange and non-dollar fixed income markets. Our customers include hedge funds and other financial institutions.

Our fixed income operating platform provides our customers access to the IDB market for U.S. Treasury securities. The IDB market is an OTC, wholesale securities market that allows brokers to trade with one another. Access to the IDB market is usually limited to member firms who can meet its membership requirements, such as the minimum capital requirement. We allow our customers to use our IDB membership and operating platform to gain direct access to transparent IDB market pricing and liquidity.

In the case of foreign exchange, we act as a broker for customers wishing to transact business in the interbank foreign exchange market. We processed over $1.2 trillion in customer transaction volume in fiscal year 2005. We enable our customers to trade in the majority of the world's principal currencies in the form of spot, forwards and options in OTC foreign exchange markets via several trading platforms. These platforms include both voice broking in which our team of brokers place customer orders with market makers, primarily large money center banks, as well as online platforms.

We generate Prime Brokerage/Capital Markets revenues from: (i) transaction fees earned from executing and clearing customer orders and (ii) interest income earned from providing financing through repo transactions. From fiscal year 2000 through fiscal year 2005, our Prime Brokerage/Capital Markets net revenues and operating profit have grown at compound annual growth rates of approximately 26.0% and 38.2%, respectively. This growth has been driven primarily by an increase in the number of customers, growth in the U.S. Treasury securities market and new product introductions. We have also grown through acquisitions.

Unlike our exchange-traded derivatives business, our Prime Brokerage/Capital Markets activities are not conducted on exchanges. In order to effect Prime Brokerage/Capital Markets transactions for our customers, we act as a principal executing the transaction with our customer and simultaneously executing an offsetting trade in the market. We do not trade speculatively in a directional or strategy-based manner for our own account and only initiate an order in the market to match an offsetting customer transaction. Because we act as broker in principal in our capital markets/fixed income business, these transactions are reported as "principal transactions, net" on our consolidated statement of income. We employ mark-to-market and margin risk management procedures identical to those adopted in regulated agent markets. We believe that the risk involved in these transactions is comparable to that incurred in our traditional derivatives brokerage operations.

*Product Access.*   Within our Prime Brokerage/Capital Markets segment, we primarily provide fixed income and foreign exchange products and services.

93

**Fiscal Year 2005 Prime Brokerage/Capital Markets Net Revenue Breakdown**



*Fixed Income.*   Our worldwide trade execution capabilities extend to select sectors of the fixed income market, primarily in U.S. Treasury securities, OTC options on U.S. Treasury securities, corporate debt and related OTC derivatives, sovereign debt and emerging market debt.

Our most important fixed income offerings are U.S. Treasury products available in the IDB market and associated financing primarily through U.S. Treasury securities repurchase agreements. We provide our customers with a single platform, "Refco Trader," to obtain access to dealer prices only available on IDB markets. Our customers use this platform to buy and sell U.S. Treasury securities and obtain financing through the repo market. We believe that the efficiency of the Refco Trader platform and the competitive bid offer spread in the IDB market is valuable to the fixed income fund manager and professional trader.

Our IDB product offering has been enhanced in recent years by the consolidation among traditional participants in fixed income markets. We have been able to exploit the consolidation among liquidity providers without incurring any undue risk by providing professional customers and fixed income traders with an alternative source of liquidity through repurchase transactions. As we do not trade speculatively in a directional or strategy-based manner for our own account, we do not face the conflicts of interests with our customers as our competitors that engage in both agency and proprietary trading.

We are targeting other fixed income markets, such as mortgage backed securities and European sovereign debt, where we can provide our customers a similar service offering and value proposition as our U.S. Treasury offering. We also have a strong presence in Europe as one of the few non-bank repo clearing members of the London Clearing House ("LCH") and have an expanding presence in Latin American, Eastern European and Southeast Asian markets.

*Foreign Exchange.*   We are a major international broker of foreign exchange in the areas of execution and prime brokerage, processing over $1.2 trillion in transaction volume during fiscal year 2005. We provide 24-hour trading facility coverage of all major and most minor currencies, with service including spot, forwards, options, swaps and custom derivative overlays.

Our largest foreign exchange business is the traditional voice brokerage business. Customers call us to execute foreign currency transactions. As a broker in principal, we enter into the transaction with our customer and simultaneously enter into an offsetting transaction with a market maker. For providing this service, we earn either a transaction fee or the spread between the price we charge our customer and the price that we pay the market maker. We compete for customers based on service, relationships, price competitiveness and by providing anonymity in trading.

We have an online currency trading platform for our institutional customers developed in conjunction with Currenex, a leading global provider of currency pricing systems. This platform provides our customers electronic access to the foreign currency prices of several major market makers. The overall market for trading currency electronically is growing quickly due to the speed and cost

94

benefits and the price transparency. This type of direct access is generally not offered by commercial or investment banks.

We have also developed retail online foreign exchange offerings. These products are web-enabled, rely on global Internet-based distribution and, most importantly, encourage self-directed trading, which requires minimal human interaction on our part. This facilitates the handling of significant customer volumes with very low cost to income characteristics. An active web-based marketing strategy is currently in process to take maximum advantage of this market opportunity. We also own 35% of FXCM, which provides a foreign currency trading platform and execution services to retail investors.

*Other.*   We have developed a worldwide clearing infrastructure that offers institutions and fund managers a single source for execution and all related financing activities in both domestic and international equity markets. These capabilities allow us to offer investors capital leverage through global integrated financing, securities lending, structured products and prime brokerage. We provide securities lending services for customers seeking to borrow equities to cover a short selling strategy or to generate additional income by lending securities already owned. Customers may also leverage equity positions with us through the use of customized derivative products and currency-linked transactions. Our financing structures include equity swaps, zero-cost options and repurchase agreements.

*Customers.*   Our Prime Brokerage/Capital Markets customers are primarily institutions, including hedge funds, mutual funds, banks, broker-dealers and other corporate customers. We also serve a growing number of retail foreign exchange investors. All customers are subject to a detailed application process and credit check.

*Competition.*   The primary competitors of our Prime Brokerage/Capital Markets business include affiliates of major commercial and investment banks and independent broker-dealers. Customers value speed of execution, anonymity in trading, low price, customer service and access to a breadth of products.

## Risk Management

### Liquidity Policy

Our execution and clearing of derivatives requires limited working capital because the margin mechanism used by exchanges results in the customers providing the required funding to maintain positions. We maintain excess regulatory capital to provide liquidity during periods of unusual market volatility. Similarly for our brokerage activities in the cash markets, despite these transactions being brokered as principal and not as agent, we have adopted a futures-style margin methodology in which customer positions are valued daily and resulting realized or unrealized losses must be paid immediately in cash. This practice protects us against the risk that adverse price movements may prevent customers from meeting their financial obligations to us. Additionally, we have adopted a margin style procedure to control customer positions in our foreign exchange business. This account structure has facilitated considerable growth in the volume of business conducted, while maintaining a low risk profile.

### Regulatory Capital

Our primary U.S. regulated entities are Refco, LLC, an FCM, and Refco Securities, LLC, a broker-dealer. Each entity has regulatory capital requirements. As of May 31, 2005, the excess regulatory capital of Refco, LLC and Refco Securities, LLC was $167.7 million and $49.6 million, respectively. See "—Regulation."

### Market Risk/Economic Liquidity

Our risk is credit related risk or risk related to our customers' ability to meet their margin obligations. Because we do not trade speculatively in a directional or strategy-based manner for our

95

own account, we have no direct exposure to market risk volatility or the potential price or liquidity risk that might arise.

*Counterparty Risk Management*

Our current system provides the ability to project the impact of market volatility on price movement. We perform frequent stress tests of our customer positions, including intra-day trading analysis, daily equity change analysis, concentration risk analysis and premium seller analysis. Adjustments of margin or collateral requirements are made in anticipation of unusual adverse market developments. These tests have resulted in minimal losses due to counterparty exposures. We continue to upgrade our risk management procedures and systems to improve our ability to monitor actual and projected risk associated with customer operations. Our risk management department is responsible for the systematic review of customer exposure in both regulated and nonregulated markets.

## Technology and Information Systems

Our information technology group supports 14 locations worldwide, including our major management centers in New York, London and Chicago. Our exchange-traded derivatives central processing capacity is located in Memphis, Tennessee with primary backup in Chicago.

Our core exchange-traded derivatives transaction-processing platform has been owned and developed by us since 1979. This system has accommodated our significant growth in recent years, including the integration of significant levels of acquired volume. Our ability to process transactions on a proprietary platform provides us with a strategic advantage by offering significant flexibility and high levels of responsiveness to changing customer and market conditions. Capital markets transaction processing platforms are outsourced. Fixed income prime brokerage and foreign exchange brokerage operations utilize systems developed by third parties.

Customers currently access our global network through both traditional means (i.e., the use of voice brokers) and electronically. For electronic access, we provide third party vendor systems consistent with our focus on transaction processing rather than front-end technology while also offering a proprietary system for our retail customers. An increasing number of these applications are web-enabled. We have developed a web strategy to enhance access to the system and to use our website as a driver for business development in the form of lead creation. Among the capabilities that can be accessed online are risk management monitoring and access to tools, the account opening process as well as static forms, account statements and position and funds information.

The continued integrity and security of our systems is key to our business. All of our systems have off-site backups and redundancies. These capabilities have been thoroughly tested, particularly during the events of September 2001 and the blackout of August 2003. In each case and despite the total loss of access to corporate headquarters in New York, our business was comprehensively and effectively redirected to pre-planned alternative locations and operating platforms and services to customers remained essentially uninterrupted.

## Facilities

Our main corporate offices are located in approximately 71,247 square feet of leased office space at One World Financial Center, 200 Liberty Street, Tower A, New York, New York 10281-1994. We also lease over 473,000 square feet of additional space throughout North America, Europe and Asia. Our primary management centers are located in Chicago and London and at our New York corporate office. Our exchange-traded derivatives central processing system is run out of a leased facility located in Memphis, Tennessee. We believe that our leased facilities are adequate to meet anticipated requirements for our current lines of business for the foreseeable future.

**Employees**

At May 31, 2005, we had approximately 2,390 employees. Approximately 1,668 of our employees are located in the United States. At the present time, no employees are represented by unions, and we believe our relations with our employees are satisfactory.

**Regulation**

Most aspects of our business are subject to stringent regulation by U.S. federal and state regulatory agencies and derivatives and securities exchanges and by non-U.S. government agencies or regulatory bodies and exchanges. New laws or regulations or changes to existing laws and regulations (including changes in interpretation or enforcement) could materially adversely affect our financial condition or results of operations. As a global financial institution, to the extent that different regulatory regimes impose inconsistent or iterative requirements on the conduct of our business, we will face complexity and additional costs in our compliance efforts.

As an FCM, Refco, LLC's activities are regulated by the CFTC and the exchanges of which it is a member. Other of our subsidiaries, including Refco Alternative Investments LLC, Refco Fund Management Inc. and Refcofund Holdings Corporation, are registered with the CFTC as commodity trading advisors and commodity pool operators. Refco, LLC's business is also regulated by the NFA of which Refco, LLC and certain of its affiliates are members. Violations of the rules of the CFTC, the NFA or the exchanges could result in remedial actions including fines, registration terminations or revocations of exchange memberships.

Refco Securities, LLC is registered as a broker-dealer with the SEC and in all 50 states, the District of Columbia and Puerto Rico and is a member of self-regulatory organizations, including the National Association of Securities Dealers ("NASD") and certain exchanges, including the CBOE. Broker-dealers are subject to regulations covering all aspects of the securities business, including sales and trading practices, public offerings, publication of research reports, use of customers' funds and securities, capital structure, record keeping and the conduct of directors, managers, officers and employees. Broker-dealers are also regulated by securities administrators in those states where they do business. Violations of regulations governing a broker-dealer's actions could result in censure, fine, the issuance of cease-and-desist orders, the suspension or expulsion from the securities industry of such broker-dealer or its officers or employees, or other similar consequences.

Margin lending by some of our broker-dealer subsidiaries is regulated by the Federal Reserve Board's restrictions on lending in connection with customer purchases and short sales of securities, and NASD rules also require such subsidiaries to impose maintenance requirements on the value of securities contained in margin accounts. In many cases, our margin policies are more stringent than these rules.

We conduct some of our government securities activities through Refco Securities, LLC, an NASD member registered as a government securities broker-dealer with the SEC and in certain states. The Department of Treasury has promulgated regulations concerning, among other things, capital adequacy, custody and use of government securities and transfers and control of governmental securities subject to repurchase transactions. The rules of the Municipal Securities Rulemaking Board, which are enforced by the NASD, govern the municipal securities activities of Refco Securities, LLC.

As a registered broker-dealer, Refco Securities, LLC is subject to the SEC's and NASD's net capital rules, and, as an FCM, Refco, LLC is subject to the net capital requirements of the CFTC and various exchanges. Many non-U.S. securities exchanges and regulatory authorities also have imposed rules relating to capital requirements applicable to our non-U.S. subsidiaries. These rules, which specify minimum capital requirements, are designed to measure general financial integrity and liquidity and require that at least a minimum amount of assets be kept in relatively liquid form. Refco Securities, LLC computes its net capital requirements under the alternative method provided for in the rule, which requires that Refco Securities, LLC maintain net capital equal to the greater of $250,000 or 2%

97

of aggregate customer related debit items, as defined in SEC Rule 15c3-3. The net capital rule also provides that equity capital may not be withdrawn or cash dividends paid if resulting net capital would be less than 5% of aggregate debits. As of May 31, 2005, Refco Securities, LLC had net capital of $62.2 million, which was 11.1% of aggregate debit balance and $49.6 million in excess of required net capital. Refco, LLC, is required to maintain net capital equal to the sum of 8% of the total risk margin requirements for all positions carried in customer accounts and 4% of the total risk margin requirements for all positions carried in non-customer accounts. The net capital rule also provides that Refco, LLC must maintain adjusted net capital in excess of an early warning level equal to 110% of its net capital requirement. As of May 31, 2005, Refco, LLC had net capital of $354.5 million, which was $167.7 million in excess of required net capital.

Compliance with the capital requirements may limit our operations requiring the intensive use of capital. Such requirements restrict our ability to withdraw capital from our subsidiaries, which in turn may limit our ability to pay dividends or repay debt. Any change in such rules or the imposition of new rules affecting the scope, coverage, calculation or amount of capital requirements, or a significant operating loss or any unusually large charge against capital, could adversely affect our ability to pay dividends or to expand or maintain present business levels.

The USA PATRIOT Act of 2001 (the "PATRIOT Act") contains anti-money laundering and financial transparency laws and mandates the implementation of various new regulations applicable to FCMs, broker-dealers and other financial services companies, including standards for verifying customer identification at account opening and obligations to monitor customer transactions and detect and report suspicious activities to the government. Institutions subject to the PATRIOT Act must implement specialized employee training programs, designate an anti-money laundering compliance officer and submit to independent audits of the effectiveness of the compliance program. Anti-money laundering laws outside the United States contain similar provisions. We have established policies, procedures and systems designed to comply with these regulations.

Our securities and futures businesses are also regulated extensively by non-U.S. governments, exchanges, self-regulatory organizations, central banks and regulatory bodies, especially in those jurisdictions in which one of our subsidiaries maintains an office. For instance, the Financial Services Authority and Euronext.liffe regulate the activities of Refco Overseas Limited in the United Kingdom. Other subsidiaries are also subject to regulation by securities, banking and finance regulatory authorities, exchanges and other self-regulatory organizations in numerous other countries in which they do business.

## Geographic Distribution of Our Business

We conduct the majority of our business and earn the majority of our revenues in the United States. We also have material operations in Bermuda and the United Kingdom. Our foreign operations expose us to numerous risks, including operating in countries with less developed technological infrastructures than the United States, operating in differing and often extensively regulated environments and exposing us to exchange rate fluctuations. See Note R to our audited financial statements and "Risk Factors—Risks Relating to Our Company—Our international operations involve special challenges that we may not be able to meet, which could adversely affect our financial results."

## Legal Proceedings

### *Tradewinds*

On April 1, 1999, Tradewinds Financial Corporation, Tradewinds Debt Strategies Fund, L.P., Tradewinds Offshore Fund, Limited, Tradewinds Clipper Fund Ltd. and Tradewinds Secured Debt Fund (collectively, "Tradewinds") filed an action against Refco Securities, Inc., Refco Capital Markets, Ltd. and Martin Loftus (collectively, "Refco") in the U.S. District Court for the Southern District of New York, alleging, among other things, that Refco breached a customer agreement governing certain

98

margin accounts by requiring Tradewinds to increase the value of collateral securing a margin loan from 60% to 100% in September 1998. Upon the completion of discovery, the parties stipulated that the court lacked jurisdiction over Tradewinds' claims and the case was dismissed. Tradewinds refiled the action in the Supreme Court of the State of New York. On March 27, 2002, Refco filed a motion for summary judgment. On September 15, 2003, the court granted in part Refco's motion, dismissing six of the seven claims asserted against Refco. The court reserved for trial before a jury Tradewinds' claim that Refco's actions breached the implied contractual duty of good faith and fair dealing. On March 16, 2004, the Appellate Division of the First Department of the State of New York affirmed the decision of the trial court in all respects. In June 2004, the sole remaining claim was tried before a jury. On June 17, 2004, the jury returned a verdict in favor of Tradewinds on the liability issue submitted to it by the trial judge. By memorandum decision and order dated March 3, 2005, the trial court granted Refco's post-trial motion to set aside the jury verdict as against the weight of the evidence and ordered a new trial. Tradewinds filed a notice of appeal of the order and Refco filed a notice of cross appeal. Tradewinds perfected its notice of appeal on July 11, 2005 and the appeals will be fully briefed by August 29, 2005. The court scheduled a pre-trial conference for August 12, 2005. The parties are scheduled to attend a mediation session on July 26, 2005.

At this time, it is not possible to predict the final outcome of this proceeding with certainty.

### *SEC Investigation*

In 2001, the Division of Enforcement of the SEC commenced an informal investigation into short sales of the stock of Sedona Corporation. The SEC requested that we produce documents relating to any of our accounts that traded in the stock of Sedona. In June 2001, the SEC issued a formal order of investigation into short sales of Sedona stock, as well as other transactions. In 2002 and 2003, we received subpoenas from the SEC and a request for a written statement. Generally, the subpoenas and the request required the production of documents, tapes and information regarding two of our former brokers who handled the account of Amro International, S.A., one of our former customers that engaged through its account with us in short sales of Sedona stock and whose financial advisor settled SEC charges with respect to such short sales in February 2003; our relationship with Amro and its two principals; other securities traded by Amro; and our record keeping, supervisory and short sale policies and restrictions.

On May 16, 2005 we announced that our subsidiary, Refco Securities, LLC ("Refco Securities"), had received a "Wells Notice" from the SEC arising out of the investigation. The Wells Notice stated that the SEC staff intends to recommend that a civil enforcement action be brought against Refco Securities, alleging violations of Section 17(a) of the Securities Act of 1933, as amended, Sections 10(b) and 17(a) of the Exchange Act of 1934, as amended, and Rules l0b-5, l7a-3 and 17a-4 thereunder, Section 220.8 of Regulation T, Conduct Rule 3370 of the National Association of Securities Dealers, Inc., aiding and abetting violations of Section 15(a) of the Exchange Act of 1934, as amended, and failure to comply with a prior SEC cease and desist order and the Section 21(a) order from the SEC. We are in active discussions with the SEC to resolve the matters raised in the investigation and believe that we are near a resolution on all material issues. This settlement likely will involve an injunction against future violations of certain provisions, including anti-fraud provisions, of the federal securities laws, an order to comply with the prior cease and desist order and the Section 21(a) order, an administrative censure, payment of a substantial civil penalty and retention of an independent consultant to review and make recommendations with respect to various business practices and procedures. We have recorded a reserve of $5.0 million for this potential settlement.

Santo C. Maggio, the President and Chief Executive Officer of Refco Securities, also has been in negotiations with the SEC staff, and likewise is near a resolution of certain supervisory matters raised in the investigation. Mr. Maggio, as part of such resolution, is prepared to accept the entry of an administrative order suspending him for a year from any supervisory duties. While complying with the

restrictions of such supervisory suspension, Mr. Maggio would continue to work for us and Refco Securities in his current capacities.

Although we are working to finalize the terms of these settlements in a formal offer of settlement, we believe that the settlements as described above are highly likely and that the SEC staff would recommend such settlements to the SEC Commissioners, whose approval is required. There is no assurance that we will reach such settlements with the SEC staff on these terms, or at all or, even if we do, that the SEC Commissioners will approve such settlements. The terms of any final settlements approved by the SEC Commissioners, or any resolution of these matters if we or Mr. Maggio are unable to reach a settlement with the SEC, may be materially less favorable than the settlements described above.

In October 2003, we received a subpoena from the U.S. Attorney's Office for the Southern District of New York, which called for the production of documents we had produced to the SEC. In addition to producing documents in response to the foregoing subpoenas, we have made our employees available to testify before the SEC and to be interviewed by the U.S. Attorneys' office. Refco Securities, LLC has been advised orally that neither it nor Mr. Maggio is currently the subject of the U.S. Attorneys' investigation.

*Trading Technologies*

On March 1, 2005, Trading Technologies International, Inc. filed an action against Refco Group, Refco, LLC and Refco EasySolutions, LLC (collectively, the "Refco parties") in the U.S. District Court for the Northern District of Illinois, Eastern Division, alleging that the Refco parties infringed upon certain patents owned by Trading Technologies relating to electronic trading software. In its complaint, Trading Technologies demanded a preliminary and permanent injunction against the Refco parties, as well as unspecified damages and costs. The Refco parties filed certain counterclaims for breach of contract and attempted monopolization and an affirmative defense of patent misuse. On May 20, 2005, Trading Technologies filed a motion to dismiss these counterclaims and affirmative defense. On June 17, 2005, the Refco parties filed a response to the motion to dismiss, which is pending. On July 15, 2005, Trading Technologies terminated certain licensing agreements with the Refco parties.

*Other*

Since 2002, Gerard Sillam has instituted numerous commercial and criminal actions against Refco entities under the French legal system, which permits private individuals to initiate criminal proceedings. We have cooperated with the criminal inquiries, none of which has resulted in any action against any Refco entity or individual. We are vigorously defending these actions and believe that Mr. Sillam's claim is without merit. In 2004, Mr. Sillam filed a commercial claim in New York State Supreme Court but then requested and was granted dismissal of the case after we removed it to federal court. To our knowledge, no action by Mr. Sillam against any Refco entity is pending in the United States.

In addition to the matters discussed above, from time to time, we are party to litigation and administrative proceedings that arise in the ordinary course of our business. We do not have any other pending litigation that, separately or in the aggregate, would in the opinion of management have a material adverse effect on our results of operations or financial condition.

100

**MANAGEMENT**

**Directors and Executive Officers**

We conduct our business through Refco Inc. and its direct and indirect subsidiaries. The following table sets forth the names and ages as of August 1, 2005 of each director and executive officer of Refco Inc.

| Name | Age | Position |
| --- | --- | --- |
| Phillip R. Bennett | 57 | President, Chief Executive Officer and Chairman |
| Joseph J. Murphy | 44 | Executive Vice President; President and Chief Executive Officer of Refco Global Futures, LLC |
| Gerald M. Sherer | 57 | Executive Vice President and Chief Financial Officer |
| William M. Sexton | 40 | Executive Vice President and Chief Operating Officer |
| Santo C. Maggio | 53 | Executive Vice President; President and Chief Executive Officer of Refco Securities, LLC |
| Dennis A. Klejna | 58 | Executive Vice President, General Counsel and Secretary |
| Leo R. Breitman | 64 | Director |
| Nathan Gantcher | 65 | Director |
| David V. Harkins | 64 | Director |
| Scott L. Jaeckel | 34 | Director |
| Thomas H. Lee | 61 | Director |
| Ronald L. O'Kelley | 60 | Director |
| Scott A. Schoen | 46 | Director |

*Phillip R. Bennett* has served as President, Chief Executive Officer and Chairman of Refco Group since September 1998. He also serves as the President of Refco Capital Holdings, LLC and as the President and Chief Executive Officer of New Refco. Mr. Bennett joined Refco Group in 1981 from The Chase Manhattan Bank, where he held various positions involving credit and commercial lending in New York, Toronto, Brussels and London from 1970 to 1981. Among other positions at Chase, Mr. Bennett served as a member of its Commodity Lending Department. He is a graduate of Cambridge University, England.

*Joseph J. Murphy* has served as President of Refco Global Futures, LLC, one of our subsidiaries, since March 1999. He also serves as Executive Vice President of Refco Group responsible for global marketing and as President Refco, LLC, our FCM subsidiary. From 1994 to 1999, Mr. Murphy was Executive Managing Director of HSBC Futures Americas and Cash Securities based in Chicago. Prior to joining HSBC, Mr. Murphy was a Vice President and Producing Manager with Chase Manhattan Futures Corporation in New York. He also held management positions in the Treasury Department of The Chase Manhattan Bank. Mr. Murphy holds a degree from Providence College located in Providence, Rhode Island. His professional affiliations include memberships with the CBOT and CME. Mr. Murphy is a member of the Board of Directors and Chairman of the FIA and a member of the Board of Directors and Vice Chairman of The Clearing Corporation.

*Gerald M. Sherer* has served as Executive Vice President and Chief Financial Officer of Refco Group since January 2005. From 1997 to 2004, Mr. Sherer held various positions at Deutsche Bank, including Deputy Global Head of Controlling and the Chief Financial Officer of the Investment Bank, and most recently, served as Chief Financial Officer of the Americas and the Global Head of Internal Controls. Previously, Mr. Sherer was Chief Financial Officer of all U.S. operations at CIBC Wood

101

Gundy in New York from 1995 to 1997. He also served as Senior Vice President of the Finance Division for Goldman Sachs from 1982 to 1995. Mr. Sherer holds a B.S. in Computer Science from Northern Arizona University and an M.B.A from Fordham University.

*William M. Sexton* has served as Executive Vice President and Chief Operating Officer of Refco Group since August 2004. He joined Refco Group in April 1999 and has served in various capacities, including as Executive Vice President and Chief Operating Officer of Refco, LLC, our FCM subsidiary, since July 2001. He is responsible for information technology, operations, accounting and finance, credit, margins and risk for our futures businesses. From 1991 to 1997, Mr. Sexton served in various capacities at The Chase Manhattan Bank, including the financial controller for the U.S. FCM, institutional sales for marketing derivatives, foreign exchange and treasury products. Mr. Sexton holds a B.S. in Business Administration from Pace University and an M.B.A. from Fordham University, both with concentrations in finance. He is a member of the NFA. He is also a member of the FIA, the NYMEX FCM Advisory Committee, the FIA Operations and Technology Divisions and is a member of the Board of Directors of Eurex U.S.

*Santo C. Maggio* has served as Executive Vice President of Refco Group and President and Chief Executive Officer of Refco Securities, LLC, our NASD broker-dealer subsidiary, since 1991. Mr. Maggio has also served as President of Refco Capital Markets, Ltd., one of our subsidiaries, since 2001. He joined Refco Group in 1985. From 1976 to 1982, Mr. Maggio was employed as Vice President of Inland Consultants Corporation and from 1982 to 1985 as Vice President for McMahan Securities. Mr. Maggio holds an accounting degree from Hunter College, City University of New York.

*Dennis A. Klejna* has served as Executive Vice President and General Counsel of Refco Group since joining Refco Group in January 1999. He has served as our Secretary since August 2005. Prior to joining Refco Group, Mr. Klejna was in private law practice in the Washington, D.C. office of Vinson & Elkins, L.L.P. from 1996 to 1998, where his practice was focused on derivatives trading regulation. He was Director of the Division of Enforcement at the CFTC from 1983 to 1995. Mr. Klejna is a member of the Committee on Futures Regulation of the Bar Association of the City of New York, the New York State Bar Association Committee on Futures and Derivatives Regulation and the Committee on the Regulation of Futures and Derivative Instruments of the American Bar Association. He serves on the Executive Committee of the Law and Compliance Division of the FIA and the Board of Editors of the Futures and Derivatives Law Report. As an Adjunct Professor at the Georgetown University Law Center from 1998 to 2000, he taught futures and derivatives regulation. Mr. Klejna is a graduate of Fordham College and Fordham Law School and served as a Captain in the U.S. Army Judge Advocate General's Corps.

*Leo R. Breitman* was Chairman and Chief Executive Officer of Fleet Bank—Massachusetts from 1991 through March 2004 and also served as Senior Lending Officer of FleetBoston Financial Corporation from 2002 through March 2004. He retired in May 2004. From 1996 to 2002, Mr. Breitman was Managing Director of the Commercial Banking Division of FleetBoston Financial Corporation. Mr. Bretiman is a director of American Biltrite Inc. and Metris Companies, Inc. Mr. Breitman holds a B.B.A in Finance from The George Washington University and an M.B.A in Finance from Boston University.

*Nathan Gantcher* has served as a Managing Member of EXOP Capital LLC since May 2005 and was Co-chairman, President and Chief Executive Officer of Alpha Investment Management L.L.C. from 2002 until August 2004 when the firm was sold. Prior to joining Alpha Investment Management, Mr. Gantcher was a private investor from 1999 to 2001. Mr. Gantcher served as Vice Chairman of CIBC Oppenheimer Corp. from 1997 to 1999. Prior to becoming Vice Chairman of CIBC Oppenheimer Corp., Mr. Gantcher served as Co-Chief Executive Officer of Oppenheimer & Co., Inc. Mr. Gantcher currently serves as a director of Mack-Cali Realty Corporation and is a member of its audit, nominating and corporate governance and executive committees. He serves as a member of the

102

board of trustees of CharterMac and is a member of its nominating and governance, compensation and capital markets committees. He also has served as a member of the board of directors of NDS Group plc since January 2004 and is a member of its audit and compensation committees. Mr. Gantcher currently serves as a member of each of the Council of Foreign Relations and the Overseers Committee of the Columbia University Graduate School of Business. Mr. Gantcher received his A.B. in economics and biology from Tufts University and his M.B.A. from the Columbia University Graduate School of Business.

*David V. Harkins* is Vice Chairman and Managing Director of Private Equity Funds of Thomas H. Lee Partners, L.P. In the past five years, Mr. Harkins has also served as President of Thomas H. Lee Partners, L.P. Mr. Harkins served as the interim Chief Executive Officer of Conseco, Inc., an insurance and financial services company, from April 2000 until June 2000. Mr. Harkins is also a director of Nortek, Inc., Metris Companies, Inc. and National Dentex Corporation. Mr. Harkins is a graduate of the U.S. Military Academy.

*Scott L. Jaeckel* is a Managing Director of Thomas H. Lee Partners, L.P. He served as a Vice President of Thomas H. Lee Partners, L.P. from 2001 until December 2004. Previously, Mr. Jaeckel worked at Thomas H. Lee Company from 1994 to 1996, rejoining in 1998 as an Associate. From 1992 to 1994, Mr. Jaeckel worked at Morgan Stanley & Co. Incorporated in the Corporate Finance Department. He currently serves as a director of Paramax Capital Group and Warner Music Group. He holds a B.A. in Economics and Mathematics from the University of Virginia and an M.B.A. from Harvard Business School.

*Thomas H. Lee* founded the Thomas H. Lee Company, the predecessor of Thomas H. Lee Partners, L.P., in 1974 and since that time has served as its Chairman and CEO. From 1966 through 1974, Mr. Lee was with First National Bank of Boston where he directed the bank's high technology lending group from 1968 to 1974 and became a Vice President in 1973. Prior to 1966, Mr. Lee was a securities analyst in the institutional research department of L.F. Rothschild in New York. Mr. Lee serves or has served as a Director of numerous public and private companies in which THL and its affiliates have invested, including Finlay Enterprises, Inc., The Smith & Wollensky Restaurant Group, Inc., General Nutrition Companies, Metris Companies, Inc., Playtex Products, Inc., Snapple Beverage Corp., Vertis Holdings, Inc., Warner Music Group, and Wyndham International, Inc. In addition, Mr. Lee is a Member of the JP Morgan National Advisory Board. Mr. Lee is currently a Trustee of Lincoln Center for the Performing Arts, The Museum of Modern Art, NYU Medical Center, The Rockefeller University, and Whitney Museum of American Art among other civic and charitable organizations. He also serves on the Executive Committee for Harvard University's Committee on University Resources. Mr. Lee is a 1965 graduate of Harvard College.

*Ronald L. O'Kelley* has been Chairman and Chief Executive Officer of Atlantic Coast Venture Investments Inc., a private investment company, since 2002. Mr. O'Kelley served as Executive Vice President, Chief Financial Officer and Treasurer of State Street Corporation from 1995 to 2002, as Chief Financial Officer at Douglas Aircraft Company from 1991 to 1995 and as Chief Financial Officer at Rolls Royce Inc. from 1983 to 1991. He also served in senior financial positions at Citicorp from 1975 to 1983 and at Texas Instruments Incorporated from 1969 to 1975. Mr. O'Kelley is a director of U.S. Shipping Partners L.P. and Selective Insurance Group, Inc. Mr. O'Kelley holds an A.B. in Mathematics from Duke University and an M.B.A. from Carnegie Mellon University.

*Scott A. Schoen* is a Co-President of Thomas H. Lee Partners, L.P., which he joined in 1986. He served as a Managing Director of Thomas H. Lee Partners, L.P. from 1992 to 2004 and a Vice President from 1988 to 1992. Prior to joining the firm, Mr. Schoen was in the Private Finance Department of Goldman, Sachs & Co. Mr. Schoen is a director of Spectrum Brands, Inc., Wyndham International and Simmons Company. Mr. Schoen is a Vice Chairman of the Board and a member of the Executive Committee of the United Way of Massachusetts Bay. He is also a member of the

103

Advisory Board of the Yale School of Management. Mr. Schoen is a 1980 graduate of Yale College and holds an M.B.A. from Harvard Business School and a J.D. from Harvard Law School.

## Controlled Company Status

Upon completion of this offering, the majority of our shares and voting power will be controlled by Thomas H. Lee Partners, L.P. and Phillip Bennett, our President and Chief Executive Officer (collectively the "Majority Stockholders"). For this reason, we are a "controlled company" under the NYSE corporate governance standards, which permit a company of which more than 50% of the voting power is held by an individual, a group or another company to elect not to comply with certain NYSE corporate governance standards. Upon completion of the offering, we intend to avail ourselves certain of these exemptions, which will eliminate the requirements that we have a majority of independent directors on our board of directors and that our compensation and nominating and corporate governance and executive committees be composed entirely of independent directors. We will have annual performance evaluations of our nominating and corporate governance and compensation committees, as well as written charters addressing each committee's purpose and responsibilities. The other requirements of the NYSE's corporate governance standards will apply to us as of the date of listing with the NYSE.

## Board Composition

Our amended and restated by-laws provide for a board of directors consisting of at least two and up to eleven members. Our board of directors is comprised of eight members. Pursuant to the terms of our amended and restated securityholders agreement, three directors will be nominated by THL, two directors will be nominated by Refco Group Holdings, Inc. and one director will be nominated by THL and Refco Group Holdings, Inc. together. Three members of our board of directors, Messrs. Breitman, Gantcher and O'Kelley, are "independent" within the meaning of the rules of the NYSE.

## Committees

Our board of directors has three standing committees: the audit committee, the nominating and corporate governance committee and the compensation committee.

The primary purpose of the audit committee is to:

- assist the board's oversight of:

  - the integrity of our financial statements;

  - our compliance with legal and regulatory requirements;

  - our independent auditors' qualifications and independence; and

  - the performance of our independent auditors and our internal audit function; and

- prepare the report required to be prepared by the committee pursuant to SEC rules.

Messrs. O'Kelley, Breitman and Gantcher serve on the audit committee. Mr. O'Kelley serves as chairman of the audit committee and also qualifies as an independent "audit committee financial expert" as such term has been defined by the SEC in Item 401(h)(2) of Regulation S-K. In accordance with the rules of the NYSE and relevant federal securities laws and regulations, each member of our audit committee is independent within the meaning of such rules.

The primary purpose of the nominating and corporate governance committee is to:

- identify and to recommend to the board individuals qualified to serve as directors of our company and on committees of the board;

104

- advise the board with respect to the board composition, procedures and committees;

- develop and recommend to the board a set of corporate governance principles and guidelines applicable to us; and

- oversee the evaluation of the board and our management.

Messrs. Breitman, Harkins and Schoen serve on the nominating and corporate governance committee. Mr. Breitman serves as the chairman of the corporate governance and nominating committee. Mr. Breitman is independent within the meaning of the rules of the NYSE and the relevant federal securities laws and regulations.

The primary purpose of our compensation committee is to oversee our compensation and employee benefit plans and practices and to produce a report on executive compensation as required by SEC rules. Messrs. Gantcher, Bennett and Schoen serve on the compensation committee. Mr. Gantcher serves as the chairman of the compensation committee. Mr. Gantcher is independent within the meaning of the rules of the NYSE and the relevant federal securities laws and regulations.

**Director Compensation**

It is anticipated that each of our independent directors will receive director fees of $50,000 per year, together with $1,000 for each board meeting attended. All members of our board of directors will be reimbursed for their usual and customary expenses incurred in connection with attending all board and other committee meetings. In addition, it is anticipated that the chairman of the audit committee will receive an additional $10,000 per year and the chairmen of the other committees will receive an additional $5,000 per year.

In November 2004, New Refco granted 20,000 Class B Units to each of Leo Breitman, Nathan Gantcher and Ronald O'Kelley, who are members of its board of managers, pursuant to their respective restricted unit agreements. The Class B Units granted to Messrs. Breitman, Gantcher and O'Kelley vest ratably on each of February 28, 2005, February 28, 2006, February 28, 2007 and February 29, 2008.

Vesting of all units is subject to acceleration upon a change of control. In the event that any of Messrs. Breitman, Gantcher and O'Kelley is no longer a member of New Refco's board of managers, his unvested Class B Units will be forfeited to New Refco and his vested Class B Units may be repurchased by New Refco at fair market value.

In connection with the Reincorporation, holders of Class B Units contributed their Class B Units to Refco Inc. in exchange for the number of shares of Refco Inc.'s common stock that its Board of Directors determined in good faith has a fair value at least equal to the fair value of the Class B Units being exchanged. The vesting schedule applicable to the Class B Units continues to apply to the shares of common stock received in the exchange.

105

**Executive Compensation**

The following table sets forth information concerning the compensation awarded to, earned by or paid by Refco Group to Refco Group's chief executive officer and each of Refco Group's four most highly compensated executive officers during each of the last three fiscal years. The bonuses set forth below include amounts earned in the year shown but paid in the subsequent year.

## Summary Compensation Table

| Name and Principal Position | Fiscal Year | Salary ($) | Bonus ($) | Other Annual Compensation ($) | Long-Term Compensation — Restricted Stock Awards ($) | Total Compensation ($) |
|---|---|---|---|---|---|---|
| Phillip R. Bennett | 2005(1) | 1,266,667 | 2,007,438 | 461,671(2) | 250,800(3) | 3,986,576 |
| President, Chief | 2004 | 1,500,000 | 2,469,000 | 444,840(2) | — | 4,413,840 |
| Executive | 2003 | 1,500,000 | 2,196,000 | 500,692(2) | — | 4,196,692 |
|    Officer and Chairman | | | | | | |
| | | | | | | |
| Joseph J. Murphy | 2005(1) | 1,000,000 | 1,475,551 | — | 146,300(3) | 2,621,851 |
| Executive Vice | 2004 | 1,000,000 | 1,920,000 | — | — | 2,920,000 |
| President; | 2003 | 1,000,000 | 1,640,000 | — | — | 2,640,000 |
|    President and Chief | | | | | | |
|    Executive Officer of | | | | | | |
|    Refco Global Futures, | | | | | | |
|    LLC | | | | | | |
| | | | | | | |
| Gerald M. Sherer(4) | 2005(1) | 166,667 | — | — | 543,000(3) | 709,667 |
| Executive Vice President | 2004 | — | — | — | — | — |
|    and Chief Financial | 2003 | — | — | — | — | — |
|    Officer | | | | | | |
| | | | | | | |
| William M. Sexton | 2005(1) | 675,000 | 737,775 | — | 146,300(3) | 1,559,075 |
| Executive Vice President | 2004 | 500,000 | 960,000 | — | — | 1,460,000 |
|    and Chief Operating | 2003 | 500,000 | 820,000 | — | — | 1,320,000 |
|    Officer | | | | | | |
| | | | | | | |
| Santo C. Maggio | 2005(1) | 602,083 | 943,664 | — | 146,300(3) | 1,692,047 |
| Executive Vice | 2004 | 500,000 | 1,252,000 | — | — | 1,752,000 |
| President; | 2003 | 500,000 | 1,084,000 | — | — | 1,584,000 |
|    President and Chief | | | | | | |
|    Executive Officer of | | | | | | |
|    Refco Securities, LLC | | | | | | |
| | | | | | | |
| Robert C. Trosten(5) | 2005(1) | 583,335 | 1,629,967 | — | — | 2,213,302 |
| Executive Vice President | 2004 | 1,000,000 | 2,139,000 | — | — | 3,139,000 |
|    and Chief Financial | 2003 | 1,000,000 | 1,838,000 | — | — | 2,838,000 |
|    Officer | | | | | | |

(1)    With respect to the period from August 6, 2004 to February 28, 2005, information is presented for New Refco.

(2)    Consists of premiums for term life insurance and includes an amount equal to the payment to Mr. Bennett to compensate him for the incremental tax impact associated with the payment of the premium.

(3)    Represents the value of Class B Units vested as of February 28, 2005.

(4)    Mr. Sherer commenced his employment with us effective January 3, 2005.

(5)    Effective October 4, 2004, Robert Trosten resigned as Refco Group's Executive Vice President and Chief Financial
       Officer in order to pursue other financial interests.

106

In connection with the THL Transactions, New Refco granted Class B Units to members of our management. See "Certain Relationships and Related Transactions—Restricted Unit Agreements" for a description of the Class B Units.

There were no option grants to the executive officers listed in the table above in fiscal 2005.

**Compensation Committee Interlocks and Insider Participation**

Upon the completion of this offering, none of our executive officers will serve on the compensation committee or board of directors of any other company of which any of the members of our compensation committee or any of our directors is an executive officer.

**Employment Agreements**

**Phillip Bennett Employment Agreement.**     On June 8, 2004, Phillip Bennett entered into an Executive Employment and Non-Competition Agreement with Refco Group that became effective on the date of the closing of the THL Transactions. Under the agreement, Mr. Bennett serves as Refco Group's Chairman, President and Chief Executive Officer and reports directly to Refco Group's Board of Managers for an initial term ending on February 28, 2007. After such date, Mr. Bennett will continue to serve with an automatic renewal thereafter for additional one year terms, unless either party terminates the agreement in accordance with its provisions.

Under the terms of the agreement, Mr. Bennett receives an annual base salary of $1,100,000, and he is eligible to receive an annual bonus as determined in accordance with Refco Group's Management Bonus Pool Plan and is able to participate in equity-based compensation plans, including through the grant of Class B Units pursuant to a Restricted Unit Agreement with New Refco. In certain circumstances, Mr. Bennett's termination entitles him to a severance package that includes two years of his base salary and annual bonus at the time of termination. In addition, Mr. Bennett has agreed that during the term of the agreement and for a two year period thereafter (but in no event, less than five years), he will not, directly or indirectly (i) compete with us, (ii) solicit or hire any of our officers, managers, consultants or executives or (iii) solicit any of our customers or suppliers or potential or prospective customers or suppliers of whom he was aware prior to or during the term of his employment.

**Executive Employment Agreements.**     In connection with the THL Transactions, Joseph Murphy, William Sexton, Santo Maggio and Dennis Klejna entered into Executive Employment and Non-Competition Agreements with Refco Group. In December 2004, Gerald Sherer entered into an Executive Employment and Non-Competition Agreement with Refco Group. Each of these agreements has substantially identical terms, except for the applicable positions and annual base salary amounts for each employee as described below. In addition, Mr. Sherer's agreement provides that if after February 28, 2006 the aggregate value of any Class B Units granted to him and any other equity incentive issued to him is less than $3.5 million, we will pay him the difference in cash. The same provision applies if we terminate Mr. Sherer without cause prior to February 28, 2006. Under all the agreements, each employee is eligible for an annual bonus to be determined in accordance with the Senior Management Bonus Pool Plan adopted by Refco Group and may participate in equity-based compensation plans, including through the

107

grant of Class B Units pursuant to Restricted Unit Agreements entered into with New Refco. The position and initial base salary for each of the employees under the agreements is as listed below:

| Name | Position | Base Salary |
|---|---|---|
| Joseph Murphy | Executive Vice President; President and Chief Executive Officer of Refco Global Futures, LLC | $ 1,000,000 |
| Gerald Sherer | Executive Vice President and Chief Financial Officer | 1,000,000 |
| William Sexton | Executive Vice President and Chief Operating Officer | 800,000 |
| Santo Maggio | Executive Vice President; President and Chief Executive Officer of Refco Securities, LLC | 675,000 |
| Dennis Klejna | Executive Vice President and General Counsel | 650,000 |

Each employee is entitled to a severance package in certain circumstances that includes 18 months of his base salary and annual bonus as of the date of termination. In addition, each employee has agreed that during the term of the agreement and for an 18-month period thereafter, such employee will not, directly or indirectly (i) compete with Refco Group, (ii) solicit or hire any of Refco Group's officers, managers, consultants or executives or (iii) solicit any of Refco Group's customers or suppliers or potential or prospective customers or suppliers of whom he was aware prior to or during the term of his employment.

**Senior Management Bonus Pool Plan**

The Senior Management Bonus Pool Plan enables participating senior managers to receive bonuses based on Refco Group's performance. If Refco Group's actual EBITDA (subject to specified adjustments) for a fiscal year is between 95% and 105% of the budgeted EBITDA for the year, the bonus pool amount to be divided among all participating senior managers generally will be the greater of 100% of the aggregate base compensation of such senior managers or, subject to the cap described below, 2.1% of our actual EBITDA (subject to specified adjustments). The bonus pool amount will be adjusted if actual EBITDA (subject to specified adjustments) is more than 105% or less than 95% of budgeted EBITDA. The aggregate bonus pool amount to be divided among all participating senior managers in any event cannot be greater than 150% of the aggregate base compensation of such senior managers. For purposes of calculating the bonus pool amount, EBITDA is our consolidated earnings before income taxes, depreciation and amortization. EBITDA is then adjusted to take into account the estimated amount of the bonus pool and add back the management fees payable pursuant to the Management Agreement with THL Managers V, LLC. See "Certain Relationships and Related Transactions—Management Agreement."

**Equity Plan**

We have adopted the Refco Inc. 2005 Stock Incentive Plan (the "Plan"). The Plan is intended to provide incentives that will attract, retain and motivate highly competent persons as officers and employees of, and consultants to, us and our subsidiaries, by providing them with opportunities to acquire shares of stock or to receive monetary payments based on the value of those shares pursuant to the Benefits (defined below).

*Shares Available*

The Plan makes available for Benefits an aggregate of 7,650,000 shares of our common stock, subject to adjustments, of which 4,015,860 shares have been issued in connection with the Reincorporation. During the term of the Plan, the maximum number of shares of common stock with respect to which Benefits may be granted (or measured) to any individual participant may not exceed 1,250,000. Any shares of common stock subject to a Benefit which for any reason is forfeited or

108

cancelled, expires or in the case of a Benefit other than a stock option, is settled in cash, will be deemed not to have been delivered under the Plan. If any stock option is exercised by tendering shares of common stock, either actually or by attestation, to us as full or partial payment in connection with the exercise of a stock option under this Plan, only the number of shares of common stock issued net of the shares of common stock tendered will be deemed delivered for purposes of determining the maximum number of shares of common stock available for delivery under the Plan. Further, shares of common stock delivered under the Plan in settlement, assumption or substitution of outstanding awards (or obligations to grant future awards) under the plans or arrangements of another entity will not reduce the maximum number of shares of common stock available for delivery under the Plan, to the extent that such settlement, assumption or substitution is as a result of us or one of our subsidiaries or affiliates acquiring another entity (or an interest in another entity).

### Administration

The Plan provides for administration by a committee or committees of the Board of Directors or a subcommittee of a committee of the Board (the "committee"), which will be comprised, unless otherwise determined by the Board, solely of not less than two members who shall be (i) "Non-Employee Directors" within the meaning of Rule 16b-3(b)(3) (or any successor rule) promulgated under the Securities Exchange Act of 1934, as amended, and (ii) "outside directors" within the meaning of Treasury Regulation § 1.162-27(e)(3) under Section 162(m) of the Internal Revenue Code of 1986, as amended (the "Code"). The committee is authorized, subject to the provisions of the Plan, to make such determinations and interpretations and to take such action in connection with the Plan and any Benefits granted as it deems necessary or advisable. Thus, among the committee's powers are the authority to select the directors, officers and employees of us and our subsidiaries to receive Benefits, and to determine the form, amount and other terms and conditions of Benefits. The committee also has the power to modify or waive restrictions on Benefits, to amend Benefits, to grant extensions and accelerations of Benefits, and to determine the extent to which any Benefit under the Plan is required to comply, or not comply, with Section 409A of the Code.

### Eligibility for Participation

Officers and key employees of, and consultants to, us or any of our subsidiaries are eligible to participate in the Plan. The selection of participants is within the sole discretion of the committee.

### Types of Benefits

The Plan provides for the grant of any or all of the following types of benefits: (1) stock options, including incentive stock options and non-qualified stock options; (2) stock appreciation rights; (3) stock awards; (4) performance awards; and (5) stock units (collectively, "Benefits"). Benefits may be granted singly or in combination as determined by the committee. Stock awards, performance awards and stock units may, as determined by the committee in its discretion, constitute Performance- Based Awards, as described below.

Under the Plan, the committee may grant awards in the form of options to purchase shares of common stock. Options may either be incentive stock options, qualifying for special tax treatment, or non-qualified options. The committee will, with regard to each stock option, determine the number of shares subject to the option, the manner and time of the option's exercise (but in no event later than ten years after the date of grant) and vesting, and the exercise price per share of stock subject to the option; however, the exercise price will not be less than 100% of the "Fair Market Value" of the common stock on the date the stock option is granted with respect to incentive stock options. For purposes of the Plan, "Fair Market Value" means the closing price of common stock on the date of calculation (or on the last preceding trading date if common stock was not traded on such date) if the common stock is readily tradeable on a national securities exchange or other market system, and if the

109

common stock is not readily tradeable, Fair Market Value means the amount determined in good faith by the committee as the fair market value of the common stock.

The Plan authorizes the committee to grant stock appreciation rights ("SARs"). An SAR is a right to receive a payment, in cash, common stock, or a combination thereof, equal to the excess of (x) the Fair Market Value, or other specified valuation, of a specified number of shares of common stock on the date the right is exercised over (y) the Fair Market Value, or other specified valuation (which will not be less than Fair Market Value), of such shares of common stock on the date the right is granted all as determined by the committee. Each SAR will be subject to such terms and conditions as that committee will impose from time to time.

The committee may, in its discretion, grant stock awards or stock units to participants. Such grants may be subject to such terms and conditions as the committee determines appropriate. The committee, in its discretion, may grant performance awards which may take the form of shares of common stock or stock units, or any combination thereof and which may constitute Performance-Based Awards. Such performance awards will be contingent upon the attainment over a period to be determined by the committee of certain performance targets. The length of the performance period, the performance targets to be achieved and the measure of whether and to what degree such targets have been achieved will be determined by the committee.

### Performance-Based Awards

Certain Benefits granted under the Plan may be granted in a manner such that the Benefit qualifies for the performance-based compensation exemption to Section 162(m) of the Code ("Performance-Based Awards"). As determined by the committee in its sole discretion, either the granting or vesting of such Performance-Based Awards will be based on achievement of hurdle rates and/or growth rates in one or more business criteria that apply to the individual participant, one or more geographic or business segments, or one or more of our business units or our company as a whole. The business criteria shall be as follows, individually or in combination: (i) net earnings; (ii) earnings per share; (iii) net sales; (iv) market share; (v) net operating profit; (vi) expense targets; (vii) working capital targets relating to inventory and/or accounts receivable; (viii) operating margin; (ix) return on equity; (x) return on assets; (xi) planning accuracy (as measured by comparing planned results to actual results); (xii) market price per share; (xiii) gross margin; and (xiv) total return to stockholders. In addition, Performance-Based Awards may include comparisons to the performance of other companies or to market indices, such performance to be measured by one or more of the foregoing business criteria. The measurement of performance against goals may exclude the impact of charges for restructurings, discontinued operations, extraordinary items and other unusual or non-recurring items, and the cumulative effects of accounting changes, each as defined by generally accepted accounting principles as identified in the financial statements, notes to the financial statements or management's discussion and analysis.

### Other Terms of Benefits

The Plan provides that Benefits shall not be transferable other than by will or the laws of descent and distribution. The committee shall determine the treatment to be afforded to a participant in the event of termination of employment for any reason including death, disability or retirement. Notwithstanding the foregoing, other than with respect to incentive stock options, the committee may permit the transferability of an award by a participant to members of the participant's immediate family or trusts for the benefit of such persons or partnerships, corporations, limited liability companies or other entities owned solely by such persons, including trusts for such persons, subject to any restriction included in the award of the Benefit.

110

Upon the grant of any Benefit under the Plan, the committee may, by way of an agreement with the participant, establish such other terms, conditions, restrictions and/or limitations covering the grant of the Benefit as are not inconsistent with the Plan. No Benefit shall be granted under the Plan more than ten years after the effective date. The committee reserves the right to amend, suspend or terminate the Plan at any time, subject to the rights of participants with respect to any outstanding Benefits. No amendment of the Plan may be made without approval of our stockholders if the amendment will: (i) increase the aggregate number of shares of common stock which may be issued under the Plan; (ii) increase the maximum number of shares with respect to Benefits that may be granted to any individual under the Plan; (iii) change the types of business criteria on which Performance-Based Awards are to be based under the Plan; or (iv) modify the requirements as to eligibility for participation in the Plan.

The Plan contains provisions for equitable adjustment of Benefits in the event of a merger, consolidation, reorganization, recapitalization, stock dividend, stock spilt, reverse stock split, split up, spinoff, combination of shares, exchange of shares, dividend in kind or other like change in capital structure or distribution or any extraordinary dividend or distribution of cash or other assets (other than normal cash dividends) to our stockholders. The Plan contains provisions for the acceleration of exercisability or vesting of Benefits in the event of a change in control, including the cash settlement of such Benefits.

*Certain Federal Income Tax Consequences*

The statements in the following paragraphs of the principal federal income tax consequences of stock options under the Plan are based on statutory authority and judicial and administrative interpretations, as of the date of this filing, which are subject to change at any time (possibly with retroactive effect). The law is technical and complex, and the discussion below represents only a general summary.

*Incentive Stock Options.*   Incentive stock options ("ISOs") granted under the Plan are intended to meet the definitional requirements of Section 422(b) of the Code for "incentive stock options."

An employee who receives an ISO does not recognize any taxable income upon the grant of such ISO. Similarly, the exercise of an ISO generally does not give rise to federal income tax to the employee, provided that (i) the federal "alternative minimum tax," which depends on the employee's particular tax situation, does not apply and (ii) the employee is employed by us from the date of grant of the option until three months prior to the exercise thereof, except where such employment terminates by reason of disability (where the three month period is extended to one year) or death (where this requirement does not apply). If an employee exercises an ISO, after these requisite periods, the ISO will be treated as an NSO (as defined below) and will be subject to the rules set forth below under the caption "Non-Qualified Stock Options."

Further, if after exercising an ISO, an employee disposes of the common stock so acquired more than two years from the date of grant and more than one year from the date of transfer of the common stock pursuant to the exercise of such ISO (the "applicable holding period"), the employee will generally recognize a long-term capital gain or loss equal to the difference, if any, between the amount received for the shares and the exercise price. If, however, an employee does not hold the shares so acquired for the applicable holding period—thereby making a "disqualifying disposition"—the employee would recognize ordinary income equal to the excess of the fair market value of the shares at the time the ISO was exercised over the exercise price and the balance, if any, would be long-term capital gain (provided the holding period for the shares exceeded one year and the employee held such shares as a capital asset at such time). If the disqualifying disposition is a sale or exchange that would permit a loss to be recognized under the Code (were a loss in fact to be realized), and the sales

111

proceeds are less than the fair market value of the shares on the date of exercise, the employee's ordinary income therefrom would be limited to the gain (if any) realized on the sale.

The Company will not be allowed a federal income tax deduction upon the grant or exercise of an ISO or the disposition, after the applicable holding period, of the common stock acquired upon exercise of an ISO. In the event of a disqualifying disposition, the Company generally will be entitled to a deduction in an amount equal to the ordinary income included by the employee.

*Non-Qualified Stock Options.* Non-qualified stock options ("NSOs") granted under the Plan are options that do not qualify as ISOs. An employee who receives an NSO will not recognize any taxable income upon the grant of such NSO. However, the employee generally will recognize ordinary income upon exercise of an NSO in an amount equal to the excess of the fair market value of the shares of common stock at the time of exercise over the exercise price.

The ordinary income recognized with respect to the receipt of shares upon exercise of an NSO will be subject to both wage withholding and other employment taxes.

A federal income tax deduction generally will be allowed to us in an amount equal to the ordinary income included by the individual with respect to his or her NSO.

*Certain Limitations on Deductibility of Executive Compensation.* We believe that stock options granted under the Plan should qualify for the performance-based compensation exception to Section 162(m).

*Change in Control.* In general, if the total amount of payments to an individual that are contingent upon a change of control (within the meaning of Section 280G of the Code), including payments under the Plan that vest upon a change in control, equals or exceeds three times the individual's "base amount" (generally, such individual's average annual compensation for the five calendar years preceding the change of control), then, subject to certain exceptions, the portion of such payments in excess of the base amount may be treated as "parachute payments" under the Code, in which case a portion of such payments would be non-deductible to us and the individual would be subject to a 20% excise tax on such portion of the payments.

112

## PRINCIPAL AND SELLING STOCKHOLDERS

The following table sets forth certain information regarding the beneficial ownership of our outstanding equity securities before and after the completion of this offering, as adjusted to reflect the Reincorporation, by:

- each person or entity known to beneficially own more than 5% of our outstanding common stock;

- each of our directors and executive officers;

- all of our directors and executive officers as a group; and

- each of our stockholders who are selling shares in this offering.

Beneficial ownership of shares is determined under rules of the SEC and generally includes any shares over which a person exercises sole or shared voting or investment power. As of the date of this prospectus, after giving effect to the Reincorporation, there would have been 115,000,000 shares of common stock outstanding held by 41 holders of record, and after giving effect to this offering, there would have been 127,500,000 shares of common stock outstanding.

We have granted the underwriters a 30-day option to purchase up to 3,975,000 additional shares of common stock from us. Any proceeds from the exercise of the underwriters' over-allotment option will be used to pay a dividend to our stockholders of record prior to this offering. Investors in this offering will not receive any portion of the dividend.

Except as otherwise indicated, the persons named in the table below have sole voting and investment power with respect to all shares of capital stock held by them. Unless otherwise indicated, the address for each executive officer and director listed below is c/o Refco Inc., One World Financial Center, 200 Liberty Street, Tower A, New York, New York 10281.

| Name and Address | Number of Shares Beneficially Owned | | Number of Shares to be Sold in Offering | Percent of Shares Beneficially Owned | |
| --- | --- | --- | --- | --- | --- |
| | Before Offering | After Offering | | Before Offering | After Offering |
| | | | (in thousands) | | |
| **5% and Selling Stockholders:** | | | | | |
| Refco Group Holdings, Inc.(1)(11) | 48,427 | 43,052 | 5,375 | 42.1% | 33.8% |
| Thomas H. Lee Equity Fund V, L.P.(2)(11) | 44,322 | 38,265 | 6,056 | 38.5% | 30.0% |
| Thomas H. Lee Parallel Fund V, L.P.(2)(11) | 11,500 | 9,928 | 1,571 | 10.0% | 7.8% |
| Thomas H. Lee Equity (Cayman) Fund V, L.P.(2)(11) | 611 | 527 | 83 | * | * |
| Thomas H. Lee Investors Limited Partnership(2)(11) | 73 | 63 | 10 | * | * |
| U.S. Bank N.A., as trustee under the 1997 Thomas H. Lee Nominee Trust(2)(11) | 106 | 91 | 14 | * | * |
| Putnam Investments Holdings, LLC(3) | 346 | 299 | 47 | * | * |
| Putnam Investments Employees' Securities Company I, LLC(3) | 298 | 257 | 41 | * | * |
| Putnam Investments Employees' Securities Company II, LLC(3) | 266 | 229 | 36 | * | * |
| JPMorgan Chase Bank, as Trustee for First Plaza Group Trust(4)(11) | 797 | 688 | 109 | * | * |
| Performance Co-Investment Fund I, L.P.(4)(11) | 1,071 | 924 | 146 | * | * |
| Auda Refco Ltd.(5)(11) | 492 | 425 | 67 | * | * |
| Auda Partners L.P.(5)(11) | 130 | 113 | 18 | * | * |

113

| | | | | |
|---|---|---|---|---|
| New York State Retirement Co-Investment Fund L.P. (6) | 1,245 | 1,075 | 170 | 1.1% | * |
| CSFB Fund Co-Investment Program, L.P.(7)(11) | 622 | 537 | 85 | * | * |
| Partners Group Private Equity Performance Holding Limited(8) | 373 | 322 | 51 | * | * |
| Vega Invest (Guernsey) Limited(8) | 187 | 161 | 26 | * | * |
| Pearl Holding Limited(8) | 560 | 484 | 77 | * | * |
| Credit Suisse Anlagestiftung(8) | 124 | 107 | 17 | * | * |
| **Executive Officers and Directors:** | | | | | |
| Phillip R. Bennett(9) | 48,427 | 43,052 | 5,375 | 42.1% | 33.8% |
| Gerald M. Sherer | 464 | 464 | | * | * |
| William M. Sexton | 596 | 596 | | * | * |
| Joseph J. Murphy | 534 | 534 | | * | * |
| Santo C. Maggio | 503 | 503 | | * | * |
| Dennis A. Klejna | 261 | 261 | | * | * |
| Leo R. Breitman | 13 | 13 | | * | * |
| Nathan Gantcher | 13 | 13 | | * | * |
| David V. Harkins(10) | 56,432 | 48,721 | | 49.1% | 38.2% |
| Scott L. Jaeckel(10) | 56,432 | 48,721 | | 49.1% | 38.2% |
| Thomas H. Lee(10) | 56,432 | 48,721 | | 49.1% | 38.2% |
| Ronald L. O'Kelley | 13 | 13 | | * | * |
| Scott A. Schoen(10) | 56,432 | 48,721 | | 49.1% | 38.2% |
| All directors and executive officers as a group (13 persons) | 107,256 | 94,170 | | 93.3% | 73.9% |

\*       Represents less than 1%

(1)      The address for Refco Group Holdings, Inc. is One World Financial Center, 200 Liberty Street, Tower A, New York, New York 10281.

(2)      Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P. and Thomas H. Lee Equity (Cayman) Fund V, L.P. (the "THLee Funds") are Delaware limited partnerships, whose general partner is THL Equity Advisors V, LLC, a Delaware limited liability company. Thomas H. Lee Advisors, LLC, a Delaware limited liability company, is the general partner of Thomas H. Lee Partners, L.P., a Delaware limited partnership, which is the sole member of THL Equity Advisors V, LLC. Thomas H. Lee Investors Limited Partnership (f/k/a THL-CCI Limited Partnership) is a Massachusetts limited partnership, whose general partner is THL Investment Management Corp., a Massachusetts corporation. Thomas H. Lee is the sole stockholder and sole director of THL Investment Management Corp. and disclaims beneficial ownership of any securities held by such entity. The 1997 Thomas H. Lee Nominee Trust is a trust with US Bank, N.A. serving as Trustee. Thomas H. Lee, a Managing Director of Thomas H. Lee Advisors, LLC, has voting and investment control over common shares owned of record by the 1997 Thomas H. Lee Nominee Trust. The address for all such entities and Thomas H. Lee is 100 Federal Street, 35th Floor, Boston, Massachusetts 02110.

114

(3)     Putnam Investments Holdings LLC, Putnam Investments Employees' Securities Company I, LLC and Putnam
        Investments Employees' Securities Company II, LLC are entities that co-invest with the THLee Funds, and each
        disclaims beneficial ownership of any securities other than the securities held directly by such entity. The address for
        the Putnam entities is One Post Office Square, Boston, Massachusetts 02109.

(4)     First Plaza Group Trust ("First Plaza") and Performance Co-Investment Fund I, L.P ("PCF", f/k/a GM Capital
        Partners I, L.P.) may be deemed affiliates of Performance Equity Associates ("PEA"). PEA owns 51% of Performance
        Equity Management, LLC ("PEM"). First Plaza Group Trust is a New York trust containing assets of certain employee
        benefit plans of General Motors ("GM"), its subsidiaries and unrelated employers. General Motors Investment
        Management Corporation ("GMIMCo"), an indirect wholly-owned subsidiary of GM and 49% owner of PEM, is
        investment manager to First Plaza. Pursuant to a Subadvisory Agreement, GMIMCo has delegated management of
        certain assets of First Plaza to PEM, including the assets of First Plaza invested in Refco Inc. The shares held by PCF
        may be deemed to be owned beneficially by PEM. A series of PEM serves as the general partner of PCF. Each of PEM
        and GMIMCo is registered as an investment adviser under the Investment Advisers Act of 1940. PEM's principal
        business is, through its series, serving as general partner of certain private funds. PEM and PEA, as the controlling
        entity of PEM, have the power to direct the voting and disposition with respect to shares of PCF. GMIMCo, in its
        capacity as a fiduciary to the pension plans in First Plaza Group Trust, has the power to direct the trustee as to the
        voting and disposition of First Plaza Group Trust's shares. Because of the First Plaza Group Trust trustee's limited role,
        beneficial ownership of the shares by the trustee is disclaimed. The principal address of PEM and PEA is 2 Pickwick
        Plaza, Suite 310, Greenwich, Connecticut 06830. The principal address of First Plaza and GMIMCo is 767 Fifth
        Avenue, New York, New York 10153.

(5)     Auda Partners LLC is the general partner of Auda Partners L.P. and the managing limited partner of Auda Partners
        Beteiligungen GmbH & Co. KG, the sole stockholder of Auda Refco Ltd. The address for Auda Refco Ltd. and Auda
        Partners L.P. is 745 Fifth Avenue, 29th Floor, New York, New York 10151.

(6)     New York State Retirement Co-Investment Fund, L.P. is a Delaware limited partnership, whose general partner is PCG
        NYS Investments LLC, a Delaware limited liability company. PCG NYS Investments LLC is wholly owned by Pacific
        Corporate Group LLC, a Delaware limited liability company. Pacific Corporate Group LLC is wholly owned by
        Pacific Corporate Group Holdings, LLC, a Delaware limited liability company. Each of PCG NYS Investments LLC,
        Pacific Corporate Group LLC and Pacific Corporate Group Holdings, LLC disclaims beneficial ownership of any
        securities. The address for the New York State Retirement Co-Investment Fund, L.P. is 1200 Prospect, Suite 200, La
        Jolla, California 92037.

(7)     The address for CSFB Fund Co-Investment Program, L.P. is Eleven Madison Avenue, New York, New York 10011.

(8)     Credit Suisse Anlagestiftung, a Swiss investment foundation whose address is Zugerstrasse 57, 6341 Baar-Zug,
        Switzerland. Pearl Holding Limited, Vega Invest (Guernsey) Limited, and Partners Group Private Equity Performance
        Holding Limited are Guernsey companies with the following address: Elizabeth House, St Peter Port, Guernsey,
        GY1 6BD.

(9)     Represents shares held by Phillip Bennett directly and indirectly through each of Refco Group Holdings, Inc. and The
        Phillip R. Bennett Three Year Annuity Trust.

115

(10)    Thomas H. Lee is the Chairman and CEO of Thomas H. Lee Partners, L.P. David V. Harkins, Scott L. Jaeckel and Scott A. Schoen serve as Vice Chairman and Managing Director, Managing Director and Co-President, respectively, of Thomas H. Lee Partners, L.P. Each of Messrs. Lee, Harkins, Jaeckel and Schoen may be deemed to beneficially own the shares of common stock held of record by Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P. and Thomas H. Lee Equity (Cayman) Fund V, L.P. Each of these individuals disclaims beneficial ownership of such shares of common stock except to the extent of their pecuniary interest therein.

(11)    This selling stockholder is the affiliate of a registered broker-dealer. Each such selling stockholder purchased the securities held by such selling stockholder in the ordinary course of business and at the time of purchase, such selling stockholder had no agreements or understandings, directly or indirectly, with any person to distribute such securities.

116

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

**The Reincorporation**

Prior to this offering, we conducted our business through Refco Group and its direct subsidiaries. Immediately prior to the effectiveness of the registration statement of which this prospectus is part, Refco Inc., a newly formed Delaware corporation that following the Reincorporation became a holding company for our business, entered into the following transactions:

- Each of THL Refco Blocker Corp., THL Refco Blocker Corp. II and THL Refco Blocker Corp. III (which are general partners, together with THL Refco GP LLC, in THL Refco Acquisition Partners, THL Refco Acquisition Partners II and THL Refco Acquisition Partners III, respectively) merged with and into Refco Inc., with Refco Inc. as the surviving entity, and pursuant to such mergers, Refco Inc. issued an aggregate of 56,431,863 shares of its common stock in exchange for all of the common and preferred stock of such entities (which common and preferred stock will be distributed to three affiliates of Thomas H. Lee Partners, L.P.);

- THL Refco GP LLC assigned its partnership interests in each of THL Refco Acquisition Partners, THL Refco Acquisition Partners II and THL Refco Acquisition Partners III to Refco Inc., leaving Refco Inc. as the sole holder of all of the partnership interests in such partnerships, at which time such partnerships were dissolved and all of the assets of such partnerships (consisting of Class A member interests in New Refco) were distributed to Refco Inc.;

- Each of PG Direct Invest No. 10, Inc. and GM Refco II Corp. merged with and into Refco Inc., with Refco Inc. as the surviving entity, and pursuant to such mergers, Refco Inc. issued an aggregate of 2,315,593 shares of its common stock in exchange for all of the common and preferred stock of such entities;

- Each of the other affiliates and co-investors of Thomas H. Lee Partners, L.P. holding Class A member interests in New Refco contributed all of its Class A member interests in New Refco to Refco Inc. in exchange for an aggregate of 4,375,132 shares of its common stock;

- Refco Group Holdings, Inc., which is wholly-owned by Phillip Bennett, our President and Chief Executive Officer, contributed all of its Class A member interests in New Refco to Refco Inc. in exchange for 28,529,522 shares of its common stock;

- The Phillip R. Bennett Three Year Annuity Trust, in respect of which Phillip Bennett, our President and Chief Executive Officer, is both Trustee and Beneficiary, contributed all of its respective Class A member interests in New Refco to Refco Inc. in exchange for 19,089,272 shares of its common stock;

- Our officers who hold Class A member interests in New Refco contributed all of their Class A member interests in New Refco to Refco Inc. in exchange for an aggregate of 242,758 shares of its common stock;

- Our officers, directors and employees who held Class B member interests in New Refco contributed all of their Class B member interests in New Refco to Refco Inc. in exchange for an aggregate of 4,015,860 shares of its common stock, which shares are subject to vesting; and

- New Refco assigned the nominal number of shares of common stock of Refco Inc. held by it back to Refco Inc. for no consideration.

Our ownership and corporate structure immediately following the Reincorporation and this offering are set forth in the following chart:

117



_____

(1)     Ownership by Phillip R. Bennett, which constitutes 33.8% of our outstanding common stock following the offering, represents direct ownership and indirect ownership through each of Refco Group Holdings, Inc. and The Phillip R. Bennett Three Year Annuity Trust.

(2)     Undrawn as of May 31, 2005.

(3)     We intend to use a portion of the net proceeds of this offering to redeem $210.0 million aggregate principal amount of the outstanding senior subordinated notes due 2012. In connection with the redemption, we expect to recognize a loss for the write-off of deferred financing costs of $7.4 million and a loss of $18.9 million for the prepayment penalty.

    As a result of these transactions, Refco Inc. owns all of the outstanding member interests of New Refco. Refco Inc. is a Delaware "C" corporation, and as such is subject to federal and state income taxes. Our previous holding company, New Refco, is a limited liability company not subject to federal or state income taxes, and as such, the historical financial data included in this prospectus do not reflect what our financial position and results of operations would have been had we been a taxable corporation. We expect to record a net deferred tax asset and a corresponding credit to our provision for income taxes of approximately $120.2 million immediately before the effectiveness of the registration statement of which this prospectus is a part. This deferred tax asset primarily results from the excess of the tax basis over the book basis of certain of our intangible assets. We expect to realize future reductions in our current tax expense as these intangibles are amortized and deducted from taxable income on our tax returns. Prior to the closing of this offering, New Refco intends to make a cash distribution of approximately $27.9 million to the members of New Refco to enable them to meet their estimated income tax obligations for the period from January 1, 2005 to the date of the Reincorporation. The amount of this distribution will be based on New Refco's estimated net taxable income from January 1, 2005 to the date of the Reincorporation. Purchasers of shares in the offering will not receive this distribution. Prior to the closing of this offering, Refco Group Holdings, Inc. will make a cash contribution of approximately $21.7 million to New Refco, which amount is equal to the amount of tax distributions that Refco Group Holdings, Inc. received from New Refco in excess of its pro rata share of all tax distributions made to members of New Refco prior to the offering.

118

Any proceeds from the exercise of the underwriters' option to purchase an additional 3,975,000 shares from us in the offering will be used to fund the payment of a dividend to our stockholders of record prior to the offering. Investors in the offering will not receive any portion of such dividend.

**The Equity Purchase and Contribution Agreement**

On June 8, 2004, THL Refco Acquisition Partners entered into an equity purchase and merger agreement with Refco Group, Refco Group Holdings, Inc. and other parties named therein, which was amended on July 9, 2004 to, among other things, add New Refco as a party and modify the structure of the transactions contemplated by the agreement. The Purchase Agreement provided for a series of transactions that resulted in New Refco becoming Refco Group's parent and THL Refco Acquisition Partners and its affiliates and co-investors owning an approximate 57% interest in New Refco, based on a valuation of New Refco of approximately $2.3 billion.

Upon consummation of the transactions contemplated by the Purchase Agreement, the following transactions occurred:

- THL Refco Acquisition Partners and its affiliates and co-investors purchased a portion of the voting membership interests in Refco Group then held by Refco Group Holdings, Inc., one of two holders of Refco Group's membership interests at that time, for an amount of cash equal to $507.0 million;

- BAWAG Overseas, Inc., the other holder of Refco Group's membership interests at that time, merged with and into a wholly owned subsidiary of Refco Group Holdings, Inc., and all of the membership interests acquired in the merger were distributed as a dividend to Refco Group Holdings, Inc.;

- Refco Group distributed $550.0 million in cash as well as all of the equity interests in Forstmann-Leff International Associates, LLC, which at that time owned substantially all the assets of Refco Group's Asset Management business, to Refco Group Holdings, Inc., an entity that was then owned by Tone Grant and Phillip Bennett and that is now wholly owned by Phillip Bennett;

- each outstanding membership interest of Refco Group acquired by Refco Group Holdings, Inc., in connection with the merger of BAWAG Overseas, Inc. with and into a wholly owned subsidiary of Refco Group Holdings, Inc., was exchanged for one Class A Unit of New Refco;

- each outstanding voting membership interest of Refco Group held by Refco Group Holdings, Inc., in connection with its rollover equity investment, was exchanged for one Class A Unit of New Refco;

- each outstanding voting membership interest held by Refco Group Holdings, Inc. that was not exchanged for a Class A Unit (as described above) was converted into the right to receive cash equal to the quotient determined by dividing approximately $2.3 billion (subject to certain adjustments), by the total number of Refco Group's membership interests outstanding immediately prior to the effective time of the contribution;

- each membership interest of Refco Group purchased by THL Refco Acquisition Partners and its affiliates and co-investors was exchanged for one Class A Unit of New Refco; and

- Refco Finance Holdings LLC, a co-issuer with Refco Finance Inc. of our senior subordinated notes, merged with and into Refco Group, with Refco Group as the surviving entity.

Upon consummation of the THL Transactions, THL Refco Acquisition Partners and its affiliates and co-investors owned 57% of the equity interests of New Refco, and Phillip R. Bennett, our

119

President and Chief Executive Officer, through his wholly-owned subsidiary, Refco Group Holdings, Inc., owned approximately 43% of the equity interests of New Refco.

In connection with the THL Transactions, Refco Group Holdings, Inc. agreed to reimburse THL Refco Acquisition Partners and its assignees for certain tax benefits received by Refco Group Holdings, Inc. related to the acquisition of membership interests in Refco Group held by BAWAG Overseas, Inc. In March 2005, Refco Group Holdings, Inc. paid THL Refco Acquisition Partners approximately $2.2 million pursuant to the agreement. No further payments will accrue under the agreement upon completion of this offering.

Our ownership and corporate structure immediately following the THL Transactions are set forth in the following chart:



120

**Limited Liability Company Agreement of New Refco**

The amended and restated limited liability company agreement of New Refco authorized New Refco to issue Class A and Class B units. The Class A and Class B units generally have identical rights and preferences, except that the Class B Units are nonvoting and have different rights as to certain distributions. Prior to the consummation of this offering, our officers, directors and employees who held Class B Units contributed all of their Class B Units in New Refco to Refco Inc. in exchange for an aggregate of 4,015,860 shares of its common stock, which shares are subject to vesting.

A board of managers has the exclusive authority to manage and control New Refco's business and affairs. The board of managers' composition is determined in accordance with the provisions of the securityholders agreement described below.

**Securityholders Agreement**

Pursuant to the securityholders agreement entered into in connection with the THL Transactions, units of New Refco that are beneficially owned by Refco Group Holdings, Inc., THL Refco Acquisition Partners or any of its affiliates or any limited partners of them so long as THL Refco Acquisition Partners or any of its affiliates maintains voting control over the units held, (collectively, the "THL Holders"), the executive investors and certain of New Refco's other employees and employees of New Refco's subsidiaries, are subject to voting requirements with respect to the board of managers, restrictions on transfer and certain preemptive, registration and call rights.

The securityholders agreement was amended and restated in connection with this offering and provides for, among other things:

    (1)    the right of Refco Group Holdings, Inc. and THL to nominate six members of our board of directors. Of the eight members of our board, Refco Group Holdings, Inc. has the right to nominate two directors, one of whom will be Phillip Bennett, our President and Chief Executive Officer, provided that he is willing and able to serve; THL or their designees will have the right to nominate three directors (the "THL Directors"); and Refco Group Holdings, Inc. and THL together will have the right to nominate one director who will be independent. The securityholders will agree to vote their shares in favor of each such nominated director;

    (2)    in the event that THL transfers any of its common stock to a third party, THL may, if it so elects, permit the transferee to have the right to nominate a number of THL Directors in proportion to the number of shares so transferred, provided that the transferee executes and agrees to be bound by and subject to the amended and restated securityholders agreement;

    (3)    in the event that we cease to be a "controlled company" within the meaning of the NYSE corporate governance standards, the rights described in numbers (1) and (2) above will cease to apply;

    (4)    the ability, subject to limitations, of each of Refco Group Holdings, Inc., THL, The Phillip R. Bennett Three Year Annuity Trust and limited partners of THL and the affiliates of those limited partners (each, an "Investor") to "tag along" their shares of our common stock to sales by any other Investor; and

    (5)    registration rights, which will generally require us to register shares of our common stock held by the stockholders party to the amended and restated securityholders agreement under the Securities Act.

**Management Agreement**

Pursuant to the management agreement entered into in connection with the THL Transactions, THL Managers V, LLC renders to New Refco and each of its subsidiaries advisory and consulting services. In consideration of those services, either New Refco or Refco Group pays to THL Managers V, LLC semi-annually, an aggregate *per annum* management fee equal to the greater of:

    •    $2.5 million; and

- an amount equal to 1.0% of the consolidated earnings before interest, taxes, depreciation and amortization of New Refco and its subsidiaries for such fiscal year, but before deduction of any such fee.

New Refco also paid THL Managers V, LLC at the closing of the THL Transactions a transaction advisory fee of $30.0 million.

New Refco also agreed to indemnify THL Managers V, LLC and its affiliates from and against all losses, claims, damages and liabilities arising out of or related to the performance by THL Managers V, LLC of the services pursuant to the management agreement. Upon the consummation of this offering, THL Managers V, LLC intends to terminate the agreement pursuant to its terms, which will require New Refco to make a final payment of $13.0 million to THL Managers V, LLC.

## Restricted Unit Agreements

In connection with the THL Transactions, members of senior management were granted Class B Units of New Refco pursuant to restricted unit agreements entered into on the closing date of the THL Transactions. Phillip Bennett, Joseph Murphy, William Sexton, Santo Maggio, Robert Trosten and Dennis Klejna were granted approximately 1,203,365, 701,963, 701,963, 701,963, 701,963 and 350,981 Class B Units, respectively. Upon Mr. Trosten's resignation, his Class B Units were forfeited and returned to New Refco.

On October 31, 2004, New Refco declared a 202,551.721-for-one split of its Class A and Class B Units (the "Unit Split"). New Refco also granted an aggregate of 1,818,655.1 Class B Units to certain employees of Refco Group and its subsidiaries. In November 2004, New Refco granted an aggregate of 60,000 Class B Units to Messrs. Breitman, Gantcher and O'Kelley who are members of its board of managers. On December 6, 2004, New Refco granted 690,000 Class B Units to Gerald Sherer, our Executive Vice President and Chief Financial Officer.

The Class B Units granted to management and employees are subject to vesting requirements under restricted unit agreements as follows:

- 50% of the Class B Units will vest based on time, with 25% of these units vesting on each of February 28, 2005, February 28, 2006, February 28, 2007 and February 29, 2008.

- The remaining 50% of the Class B Units will vest based upon New Refco's achievement of certain EBITDA targets. Any performance-based units that do not vest based on performance will vest in full on the 8th anniversary of issuance, provided that the employee has maintained continuous employment with New Refco or its subsidiaries.

The Class B Units granted to the members of New Refco's board of managers vest ratably on each of February 28, 2005, February 28, 2006, February 28, 2007 and February 29, 2008.

Vesting of all units is subject to acceleration upon a change of control. Upon the termination of a holder, unvested Class B Units are forfeited to New Refco and vested Class B Units may be repurchased by New Refco at fair market value.

In connection with the Reincorporation, holders of Class B Units contributed their Class B Units to Refco Inc. in exchange for the number of shares of its common stock that its Board of Directors determined in good faith to have a fair value at least equal to the fair value of the Class B Units being exchanged. The vesting schedule applicable to the Class B Units continues to apply to the shares of common stock received in the exchange.

## Escrow Agreement

Pursuant to the escrow agreement entered into in connection with the THL Transactions, New Refco and THL Refco Acquisition Partners delivered approximately $36.4 million of the purchase price at the closing to HSBC Bank USA, as escrow agent, to satisfy any earn-out amounts that are to be paid by New Refco after the closing of the THL Transactions. The escrowed funds were separated into six separate escrow accounts, each representing a separate earn-out amount.

122

If an earn-out payment is due by New Refco, the escrow agent will release a portion of the funds from the earn-out account designated on written instructions given by New Refco's chief executive officer. If the escrowed amount in a given earn-out account exceeds the amount of all obligations with respect to a particular earn-out account, then the escrow agent will release the amount of any excess to Refco Group Holdings, Inc. upon joint written instructions signed by the chief executive officer, THL Refco Acquisition Partners and Refco Group Holdings, Inc. If the earn-out amount to be distributed by New Refco exceeds the escrowed amount in the designated earn-out account, then Refco Group Holdings, Inc. will be liable for the deficiency.

In November 2004, pursuant to the procedures set forth in the escrow agreement, approximately $22.8 million of escrowed funds were paid to Refco Group with respect to MacFutures Ltd. The balance of the $25.0 million originally designated for the MacFutures escrow account was remitted to Refco Group Holdings, Inc. No other amounts have been paid under the escrow agreement.

## Management Investment

In connection with the THL Transactions, Phillip Bennett, through his continuing ownership interest in Refco Group Holdings, Inc., rolled over an approximate $382.5 million equity investment into the common equity interests of New Refco. Upon consummation of this offering, Mr. Bennett will beneficially own approximately 33.8% of our common stock. Messrs. Sexton, Murphy, Maggio and Klejna made investments of $1.0 million, $500,000, $250,000 and $200,000, respectively, in the common equity interests of New Refco in connection with the THL Transactions.

## Profit Sharing Agreement

Prior to the consummation of the THL Transactions, Refco Group Holdings, Inc., which is wholly owned by Phillip Bennett, our President and Chief Executive Officer who beneficially owns an approximate 43% interest in New Refco through Refco Group Holdings, Inc. and The Phillip R. Bennett Three Year Annuity Trust, was part of a profit sharing agreement with Joseph J. Murphy, our Executive Vice President and the President and Chief Executive Officer of Refco Global Futures, LLC; William M. Sexton, our Executive Vice President and Chief Operating Officer; Santo C. Maggio, our Executive Vice President and Chief Executive Officer of Refco Securities, LLC; and Dennis A. Klejna, our Executive Vice President and General Counsel. Upon consummation of the THL Transactions, Refco Group Holdings, Inc. acquired the interests in the profit sharing agreement held by Messrs. Murphy, Sexton, Maggio and Klejna for approximately $13.7 million, $9.0 million, $8.4 million and $6.5 million, respectively. Refco Group Holdings, Inc. paid Messrs. Murphy, Sexton, Maggio and Klejna approximately $9.5 million, $7.0 million, $6.0 million and $6.5 million, respectively, on the closing date of the THL Transactions. The outstanding amounts due to Messrs. Murphy, Sexton and Maggio are payable in equal installments from Refco Group Holdings, Inc. on December 31, 2005 and December 31, 2006. These payments will be accelerated upon the consummation of this offering.

## Currenex Fees

Through a joint venture with Putnam Investments, Thomas H. Lee Partners, L.P. has an indirect ownership interest in Currenex, Inc., which is a technology firm that has created an electronic platform for trading currencies. We paid fees of $1.7 million and $0.4 million for the year ended February 28, 2005 and the three months ended May 31, 2005, respectively, to Currenex in connection with the use of its platform.

## Refco Alternative Investments Distribution Agreement

Refco Alternative Investments has an existing arms-length distribution agreement with Tilney Holdings, a subsidiary of Forstmann-Leff International Associates, LLC, whereby Refco Alternative Investments receives an advisory fee from Tilney Holdings for certain of Tilney Holdings' hedge fund products, which are sold through its distribution platform. The advisory fee is based on the volume of the product sold through its distribution platform and for as long as they are managed by Tilney Holdings. The fees received by us from Tilney Holdings are not material.

123

## DESCRIPTION OF CAPITAL STOCK

**General**

Our certificate of incorporation authorizes us to issue 500,000,000 shares of common stock, $0.001 par value, and 5,000,000 shares of preferred stock, $0.001 par value. After giving effect to this offering and the Reincorporation, there will be 127,500,000 shares of common stock and no shares of preferred stock outstanding. The following discussion is a summary of the material provisions of our capital stock, certificate of incorporation and by-laws as will be in effect following the Reincorporation and is subject to, and qualified in its entirety by, our certificate of incorporation and by-laws, which are included as exhibits to the registration statement of which this prospectus is a part, and by the provisions of applicable Delaware law.

**Common Stock**

The holders of common stock are entitled to one vote per share on all matters to be voted upon by the stockholders. Our certificate of incorporation does not provide for cumulative voting in connection with the election of directors, and accordingly, holders of more than 50% of voting shares will be able to elect all of the directors standing for election. Subject to preferences that may be applicable to any series of preferred stock that may be outstanding at the time, the holders of common stock are entitled to receive ratably any dividends that may be declared from time to time by the board of directors out of funds legally available for that purpose. Our ability to declare and pay dividends on our common stock will be restricted by the terms of our senior credit facilities, the indenture governing our senior subordinated notes and various regulatory requirements. In the event of our liquidation, dissolution or winding up, the holders of common stock are entitled to share ratably in all assets remaining after payment of liabilities, subject to prior distribution rights of preferred stock, if any, then outstanding. The common stock has no preemptive or conversion rights or other subscription rights. There are no redemption or sinking fund provisions applicable to the common stock. All outstanding shares of common stock are fully paid and nonassessable, and the shares of common stock to be issued upon the closing of this offering will be fully paid and nonassessable.

**Preferred Stock**

Our board of directors will have the authority, subject to any limitations imposed by law or NYSE rules, without further action by the stockholders, to issue up to 5,000,000 shares of preferred stock in one or more series and to fix the rights, preferences, privileges and restrictions of each series of such preferred stock. These rights, preferences and privileges include dividend rights, conversion rights, voting rights, terms of redemption, liquidation preferences, sinking fund terms and the number of shares constituting any series or the designation of that series, any or all of which may be greater than the rights of common stock. The issuance of preferred stock could adversely affect the voting power of holders of common stock and the likelihood that those holders will receive dividend payments and payments upon liquidation. In addition, the issuance of preferred stock could have the effect of delaying, deferring or preventing a change in control of our company without further action by the stockholders. We have no present plan to issue any shares of preferred stock.

**Options**

We have no outstanding options.

**Anti-Takeover Effects of our Certificate of Incorporation and By-laws**

Our certificate of incorporation and by-laws will contain certain provisions that are intended to enhance the likelihood of continuity and stability in the composition of the board of directors and that may have the effect of delaying, deferring or preventing a future takeover or change in control of our

124

company, even in those cases where such a transaction may be at a premium to the current market price of our common stock.

These provisions include:

*Action by Written Consent; Special Meetings of Stockholders.*    Our certificate of incorporation will provide that stockholder action can be taken only at an annual or special meeting of stockholders and cannot be taken by written consent in lieu of a meeting. Our certificate of incorporation and the by-laws will provide that, except as otherwise required by law, special meetings of the stockholders can only be called by the chairman of the board, or pursuant to a resolution adopted by a majority of the board of directors. Stockholders will not be permitted to call a special meeting or to require the board of directors to call a special meeting.

*Advance Notice Procedures.*    Our by-laws will establish an advance notice procedure for stockholder proposals to be brought before an annual meeting of our stockholders, including proposed nominations of persons for election to the board of directors. Stockholders at an annual meeting will only be able to consider proposals or nominations specified in the notice of meeting or brought before the meeting by or at the direction of the board of directors or by a stockholder who was a stockholder of record on the record date for the meeting, who is entitled to vote at the meeting and who has given our Secretary timely written notice, in proper form, of the stockholder's intention to bring that business before the meeting. Although the by-laws will not give the board of directors the power to approve or disapprove stockholder nominations of candidates or proposals regarding other business to be conducted at a special or annual meeting, the by-laws may have the effect of precluding the conduct of certain business at a meeting if the proper procedures are not followed or may discourage or deter a potential acquirer from conducting a solicitation of proxies to elect its own slate of directors or otherwise attempting to obtain control of the company.

*Authorized but Unissued Shares.*    Our authorized but unissued shares of common stock and preferred stock will be available for future issuance without stockholder approval. These additional shares may be utilized for a variety of corporate purposes, including future public offerings to raise additional capital, corporate acquisitions and employee benefit plans. The existence of authorized but unissued shares of common stock and preferred stock could render more difficult or discourage an attempt to obtain control of a majority of our common stock by means of a proxy contest, tender offer, merger or otherwise.

## Section 203 of Delaware Law

Upon consummation of the Reincorporation and this offering, we will elect not to be subject to the provisions of Section 203 of the Delaware General Corporation Law. Subject to exceptions specified therein, Section 203 of the Delaware General Corporation Law prohibits a publicly-held Delaware corporation from engaging in a "business combination" with an "interested stockholder," including general mergers or consolidations or acquisitions of additional shares of the corporation, for a three-year period following the time that such stockholder became an interested stockholder.

Except as otherwise specified in Section 203, an "interested stockholder" is defined to include:

- any person that is the owner of 15% or more of the outstanding voting stock of the corporation, or is an affiliate or associate of the corporation and was the owner of 15% or more of the outstanding voting stock of the corporation at any time within three years immediately prior to the date of determination; and

- the affiliates and associates of any such person.

The statute is intended to prohibit or delay mergers or other takeover or change in control attempts. Although we have elected to opt out of the statute's provisions, we could elect to be subject to Section 203 in the future.

125

**Limitations on Liability and Indemnification of Officers and Directors**

Our certificate of incorporation limits the liability of directors to the fullest extent permitted by the Delaware General Corporation Law. In addition, our certificate of incorporation provides that we shall indemnify our directors and officers to the fullest extent permitted by such law.

**Registration Rights**

For a description of the registration rights that will be held by certain of our stockholders following the Reincorporation and this offering, see "Shares Eligible for Future Sale—Registration Rights" and "Certain Relationships and Related Transactions—Securityholders Agreement."

**Transfer Agent and Registrar**

The transfer agent and registrar for our common stock is The Bank of New York.

**New York Stock Exchange Listing**

Our common stock has been approved for listing on the NYSE under the symbol "RFX."

126

## DESCRIPTION OF INDEBTEDNESS

**Senior Credit Facilities**

In connection with the THL Transactions, Refco Group entered into senior secured credit facilities with Bank of America, N.A., as administrative agent, swingline lender and l/c issuer, Banc of America Securities LLC, Credit Suisse First Boston, acting through its Cayman Islands Branch, and Deutsche Bank Securities Inc. as co-lead arrangers and joint book running managers, Credit Suisse First Boston, acting through its Cayman Islands Branch, as syndication agent, and Deutsche Bank Securities Inc. as documentation agent, and various lenders. The senior credit facilities initially consisted of a $75.0 million revolving credit facility and an $800.0 million term loan facility. In January 2005, we voluntarily prepaid $150.0 million of borrowings under the term loan facility, and available borrowings thereunder were reduced to $648.0 million. On March 15, 2005, Refco Group refinanced and replaced the term loan facility with a new term loan facility providing for borrowings of up to an aggregate principal amount of $648.0 million. Set forth below is a summary of the terms of the senior credit facilities.

The senior credit facilities provide for aggregate borrowings of up to $723.0 million, including:

- a revolving credit facility of up to $75.0 million in revolving credit loans and letters of credit, none of which has been drawn, and

- a term loan facility of $648.0 million, with an option to increase the aggregate amount of term loans by up to $200.0 million without the consent of any person other than the institutions agreeing to provide all or any portion of such increase and subject to certain closing conditions.

All revolving loans incurred under the senior credit facilities mature on August 5, 2010. The term loan facility matures on August 5, 2011. As of May 31, 2005, $644.0 million remained outstanding on the term loan (excluding accrued interest) and the revolving credit facility was undrawn.

The senior credit facilities are secured by, among other things:

- a first priority security interest in substantially all of the assets of Refco Group, New Refco and Refco Group's non-regulated restricted domestic subsidiaries (other than Refco Finance Inc.), including without limitation, all receivables, contracts, contract rights, equipment, intellectual property, inventory and all other tangible and intangible assets, subject to certain customary exceptions;

- a pledge of (i) all of present and future capital stock of each of Refco Group's, New Refco's and each guarantor's direct domestic subsidiaries, including regulated domestic subsidiaries held directly by Refco Group or any guarantor and (ii) 65% of the voting stock of each of Refco Group's and each guarantor's direct foreign subsidiaries; and

- all proceeds and products of the property and assets described above.

In addition, the senior credit facilities are guaranteed by New Refco and Refco Group's non-regulated restricted domestic subsidiaries.

Borrowings under the senior credit facilities bear interest at a floating rate, which can be either the Eurodollar rate plus an applicable margin or, at the borrower's option, an alternative base rate (defined as the higher of (x) the Bank of America prime rate and (y) the federal funds effective rate, plus one half percent (.50%) per annum) plus an applicable margin. The applicable margins for Eurodollar rate

127

loans and alternative base loans in respect of the revolving credit facility are subject to adjustment based on Leverage Ratio (as defined), as set forth in the following table:

| | | Applicable Margin | |
| Pricing Level | Leverage Ratio | Eurodollar Rate | Base Rate |
|---|---|---|---|
| 1 | >5.00:1 | 2.75% | 1.75% |
| 2 | >4.50:1 but ≤5.00:1 | 2.50% | 1.50% |
| 3 | >4.00:1 but ≤4.50:1 | 2.00% | 1.00% |
| 4 | ≤4.00:1 | 1.75% | 0.75% |

The applicable margins under the term loan facility are subject to adjustment based on the debt ratings of the senior credit facilities by S&P and Moody's, as set forth in the following table:

| | | Applicable Margin | |
| Pricing Level | Criteria | Eurodollar Rate | Base Rate |
|---|---|---|---|
| 1 | rated at least BB- by S&P and Ba3 by Moody's | 1.75% | 0.75% |
| 2 | rated at least BB- by S&P and B1 by Moody's and Level 1 does not apply | 2.00% | 1.00% |
| 3 | if neither Level 1 nor Level 2 applies | 2.25% | 1.25% |

The weighted average interest rates per annum in effect as of May 31, 2005 for the term loan facility is 5.03%. The interest rate payable under the senior credit facilities will increase by two percentage points per annum during the continuance of any payment or bankruptcy event of default.

For Eurodollar rate loans, Refco Group may select interest periods of one, two, three or six months and, to the extent available to all lenders, nine or twelve months. Interest will be payable at the end of the selected interest period, but no less frequently than every three months within the selected interest period.

The senior credit facilities also require payment of a commitment fee on the difference between committed amounts and amounts actually borrowed under the revolving credit facility. Prior to the maturity date, funds borrowed under the revolving credit facility may be borrowed, repaid and reborrowed, without premium or penalty.

The term loan facility is subject to amortization in equal quarterly installments of principal as set forth in the table below.

| Year | Term Loan Facility |
|---|---|
| 1 | $ 8.0 million |
| 2 | $ 8.0 million |
| 3 | $ 8.0 million |
| 4 | $ 8.0 million |
| 5 | $ 8.0 million |
| 6 | $ 8.0 million |
| 7 | $ 600.0 million |

Voluntary prepayments of principal amounts outstanding under the senior credit facilities are permitted at any time. A 1% prepayment penalty will be assessed to any prepayment of principal made on the term loan facility where (a) such prepayment is made with the proceeds of, or in connection with, a new tranche of senior secured term loans incurred on or before

March 15, 2006, (b) such new term loans have an interest rate margin that is less than the applicable rate on the term loan facility, and (c) such new term loans are incurred for the primary purpose of refinancing the term loan facility. Further, if a prepayment of principal is made with respect to a Eurodollar rate loan on a date other

128

than the last day of the applicable interest period, the lenders will require compensation for any funding losses and expenses incurred as a result of the prepayment.

In addition, mandatory prepayments are required to prepay amounts outstanding under the senior credit facilities in an amount equal to:

- 100% of net cash proceeds from certain asset dispositions by New Refco, Refco Group or any of Refco Group's restricted subsidiaries, subject to certain exceptions and reinvestment provisions and limitations on the remittance of funds by our regulated subsidiaries;

- 100% of the net cash proceeds from the issuance or incurrence after the closing date of any additional debt by New Refco, Refco Group or any of Refco Group's restricted subsidiaries (excluding certain permitted debt) and subject to limitations on the remittance of funds by Refco Group's regulated subsidiaries;

- 50% (which percentage will be reduced upon the achievement of specified performance targets) of the net cash proceeds from the issuance or sale after the closing date of additional equity by New Refco, Refco Group or any of Refco Group's restricted subsidiaries in a public offering or in a private placement underwritten, managed, arranged, placed or initially purchased by an investment bank, excluding proceeds of equity issuances or sales to certain investors, proceeds from this offering (including the proceeds used to redeem our senior subordinated notes) and other customary exceptions and subject to limitations on the remittance of funds by Refco Group's regulated subsidiaries; and

- 50% (which percentage will be reduced upon the achievement of specified performance targets) of excess cash flow, as defined in the senior credit facilities, subject to certain limitations on the remittance of funds by Refco Group's regulated subsidiaries.

The senior credit facilities require compliance with a minimum interest coverage ratio and a maximum leverage ratio (subject to an equity cure in specified instances). In addition, the senior credit facilities contain certain restrictive covenants which, among other things, limit indebtedness, investments, dividends, transactions with affiliates, asset sales, acquisitions, capital expenditures, mergers and consolidations, prepayments of other indebtedness, liens and encumbrances and other matters customarily restricted in such agreements.

The senior credit facilities contain customary events of default, including without limitation, payment defaults, breaches of representations and warranties, covenant defaults, cross-defaults to certain other indebtedness in excess of specified amounts, certain events of bankruptcy and insolvency, judgment defaults in excess of specified amounts, failure of any material provision of any guaranty or security document supporting the senior credit facilities to be in full force and effect, and a change of control.

### Senior Subordinated Notes

In connection with the THL Transactions, Refco Group, together with Refco Finance Inc. as co-issuer, issued $600.0 million aggregate principal amount of 9% senior subordinated notes. The senior subordinated notes rank equally in right of payment with all of Refco Group's existing and future senior indebtedness and rank senior in right of payment to all Refco Group's existing and future subordinated indebtedness. These notes are not secured, and as such, have no underlying assets to secure the payment of principal or interest. The senior subordinated notes are guaranteed on a senior unsecured basis by Refco Group's non-regulated domestic subsidiaries. The senior subordinated notes mature on August 1, 2012, with interest at a rate of 9% payable semi-annually in arrears on February 1 and August 1, commencing on February 1, 2005.

The senior subordinated notes may be redeemed at any time, in whole or in part, on or after August 1, 2008 at a redemption price equal to 104.5% of the principal amount of the senior

129

subordinated notes in the first year, declining yearly to par at August 1, 2010, plus accrued and unpaid interest, if any, to the date of redemption. In addition, at any time prior to August 1, 2007, Refco Group may redeem the senior subordinated notes in the aggregate up to 35% of the original principal amount using the net proceeds of certain equity offerings (including this offering) at a redemption price equal to 109.0% of the principal amount of the senior subordinated notes, plus accrued and unpaid interest, if any, to the date of redemption. The indenture does not contain any mandatory prepayment provisions.

Upon the occurrence of a change of control, each holder of the senior subordinated notes will have the right to require Refco Group to repurchase that holder's senior subordinated notes at a price equal to 101% of their principal amount, plus accrued and unpaid interest, if any, to the date of purchase.

The indenture governing the senior subordinated notes contains covenants that, among other things, limit the ability of Refco Group and its subsidiaries, subject to certain qualifications and exceptions, to: incur or guarantee additional indebtedness; sell assets; pay dividends and make other equity distributions; purchase or redeem capital stock; make investments; consolidate or merge with or into other companies; and engage in transactions with affiliates.

The senior subordinated notes contain certain events of default, including failure to pay principal and interest on the notes, failure to comply with covenants, subject to a 60-day grace period in certain instances, and certain bankruptcy, insolvency or reorganization events with respect to Refco Group or its subsidiary guarantors.

We intend to apply a portion of the net proceeds of this offering to redeem $210.0 million aggregate principal amount of our senior subordinated notes and to pay the related premium and accrued and unpaid interest thereon to the redemption date. See "Use of Proceeds."

## Other Credit Facilities

Our subsidiary Refco Capital, LLC has a $20.0 million credit facility, pursuant to which Refco Capital, LLC provides financing to fund the margin requirements of certain commercial customers who maintain futures trading accounts with certain of our subsidiaries. Advances under this facility are secured by Refco Capital, LLC's security interest in the customer's rights to payments arising from these accounts. We had no outstanding indebtedness under this facility as of May 31, 2005.

Refco Securities, LLC has two lines of credit with Euroclear Bank S.A./N.V. in the aggregate amount of $550.0 million for the purpose of settling intra-day transactions and, if necessary, financing positions overnight. As of May 31, 2005, no amounts were outstanding under these facilities.

Our subsidiaries Refco Singapore Pte. Ltd. and Refco Investment Services Pte Ltd. (Singapore) have facilities to assist with working capital requirements. The aggregate amount available under these facilities is approximately $29.0 million, Refco Group has guaranteed our subsidiaries' obligations under these facilities. We had no outstanding indebtedness under these facilities as of May 31, 2005.

In addition, several of our subsidiaries have facilities with various financial institutions to, among other things, provide credit support to some of our customers, satisfy minimum exchange and clearing house collateral requirements and provide stock financing in exchange-approved warehouses. The total availability under these facilities is approximately $509.2 million. Refco Group has guaranteed all of our subsidiaries' obligations under these facilities, with the exception of one $10.0 million facility. As of May 31, 2005, letters of credit in the aggregate amount of approximately $1.1 million were outstanding under these facilities.

Our subsidiaries enter into similar facilities, and Refco Group guarantees these facilities, in the normal course of business.

130

## SHARES ELIGIBLE FOR FUTURE SALE

Prior to this offering, there was no market for our common stock. We can make no predictions as to the effect, if any, that sales of shares of common stock or the availability of shares of common stock for sale will have on the market price prevailing from time to time. Nevertheless, sales of significant amounts of our common stock in the public market, or the perception that such sales may occur, could adversely affect prevailing market prices.

If permitted under our current and future agreements governing our debt, such as our senior credit facilities, we may issue shares of common stock from time to time as consideration for future acquisitions, investments or other purposes. In the event of any such acquisition, investment or other transaction is significant, the number of shares that we may issue may be significant, which may have an adverse effect on the market price of our common stock. In addition, we may also grant registration rights covering those shares of common stock issued in connection with any such acquisitions, investments or other transactions.

### Sale of Restricted Shares

After giving effect to this offering and the Reincorporation, we will have 127,500,000 shares of common stock outstanding, assuming no exercise of the underwriters' over-allotment option. Of these shares of common stock, the 26,500,000 shares of common stock being sold in this offering, plus any shares issued upon exercise of the underwriters' over-allotment option, will be freely tradable without restriction under the Securities Act, except for any such shares that may be held or acquired by an "affiliate" of ours, as that term is defined in Rule 144 promulgated under the Securities Act, which shares will be subject to the volume limitations and other restrictions of Rule 144 described below. The remaining shares of common stock held by our existing stockholders upon completion of this offering, other than those subject to the underwriters' over-allotment option to the extent it is exercised, will be "restricted securities," as that phrase is defined in Rule 144, and may not be resold, in the absence of registration under the Securities Act, except pursuant to an exemption from such registration, including among others, the exemptions provided by Rules 144, 144(k) or 701 under the Securities Act, which rules are summarized below. All of these restricted securities will be subject to the lock-up agreements described below.

At various times beginning approximately 180 days after the date of this prospectus, approximately 101,000,000 restricted shares and shares held by our affiliates that are subject to the lock-up agreements will be eligible for sale pursuant to Rules 144 and 701.

### Rule 144

In general, under Rule 144 as currently in effect, beginning 90 days after the date of this prospectus, a person or persons whose shares are aggregated, who has beneficially owned restricted shares for at least one year, including persons who may be deemed to be our "affiliates," would be entitled to sell within any three-month period a number of shares that does not exceed the greater of:

- 1.0% of the number of shares of common stock then outstanding, which will equal approximately 1,275,000 shares immediately after this offering; or

- the average weekly trading volume of our common stock on the NYSE during the four calendar weeks before a notice of the sale on Form 144 is filed.

Sales under Rule 144 are also subject to certain manner of sale provisions and notice requirements and to the availability of certain public information about us.

131

**Rule 144(k)**

Under Rule 144(k), a person who is not deemed to have been one of our "affiliates" at any time during the 90 days preceding a sale and who has beneficially owned the shares proposed to be sold for at least two years, including the holding period of any prior owner other than an "affiliate," is entitled to sell these shares without complying with the manner of sale, public information, volume limitation or notice provisions of Rule 144.

**Rule 701**

In general, under Rule 701 of the Securities Act as currently in effect, any of our employees, consultants, or advisors who purchase shares of our common stock from us in connection with a compensatory stock or option plan or other written agreement is eligible to resell those shares 90 days after the effective date of this offering in reliance on Rule 144, but without compliance with some of the restrictions, including the holding period, contained in Rule 144.

**Options**

We intend to file a registration statement on Form S-8 under the Securities Act to register approximately 7,650,000 shares of common stock reserved for issuance under our stock incentive plan. This registration statement is expected to be filed on or about the date of this prospectus and will be effective upon filing. Shares issued upon the exercise of stock options after the effective date of the Form S-8 registration statement will be eligible for resale in the public market without restriction, subject to Rule 144 limitations applicable to affiliates and the lock-up agreements described below. See "Management—Equity Plan."

**Lock-Up Agreements**

Notwithstanding the foregoing, our executive officers, directors and existing stockholders have agreed not to offer, sell, contract to sell or otherwise dispose of any shares of our common stock for a period of 180 days after the date of this prospectus pursuant to agreements with Credit Suisse First Boston LLC, Goldman, Sachs & Co. and Banc of America Securities LLC, as representatives of the underwriters. This lock-up period may be extended in certain circumstances. Additionally, the underwriters may release all or a portion of the shares subject to lock-up agreements at any time prior to the end of the 180-day period. See "Underwriting."

**Registration Rights**

Pursuant to the securityholders agreement entered into in connection with the THL Transactions, as amended, the THL Holders holding a majority of common stock held by all THL Holders are entitled to request up to six registrations of our common stock under the Securities Act. In addition, following an initial registration request by the THL Holders, Refco Group Holdings, Inc. is entitled to request up to two registrations of our common stock under the Securities Act. All holders have the right to have their shares of common stock registered in connection with any registration statement (other than on Form S-8) that we propose to file. Any requested registration is subject to customary cut-backs and blackout periods. Each signatory of the securityholders agreement agreed that in connection with any such registration, it will vote, or cause to be voted, all common stock over which that holder has power to vote to effect any stock split deemed necessary to facilitate the effectiveness of a requested registration. Following the offering, stockholders that collectively own 101,000,000 shares of our common stock will have registration rights with respect to their shares.

132

## MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES

**General**

The following is a general discussion of the material U.S. federal income and estate tax consequences of the ownership and disposition of common stock that may be relevant to you if you are a non-U.S. Holder. In general, a "non-U.S. Holder" is any person or entity that is, for U.S. federal income tax purposes, a foreign corporation, a nonresident alien individual or a foreign estate or trust. This discussion is based on current law, which is subject to change, possibly with retroactive effect, or different interpretations. This discussion is limited to non-U.S. Holders who hold shares of common stock as capital assets within the meaning of the U.S. Internal Revenue Code. Moreover, this discussion is for general information only and does not address all the tax consequences that may be relevant to you in light of your personal circumstances, nor does it discuss special tax provisions, which may apply to you if you relinquished U.S. citizenship or residence.

If you are an individual, you may, in many cases, be deemed to be a resident alien, as opposed to a nonresident alien, by virtue of being present in the United States for at least 31 days in the calendar year and for an aggregate of at least 183 days during a three-year period ending in the current calendar year. For these purposes all the days present in the current year, one-third of the days present in the immediately preceding year, and one-sixth of the days present in the second preceding year are counted. Resident aliens are subject to U.S. federal income tax as if they were U.S. citizens.

If a partnership, including any entity treated as a partnership for U.S. federal income tax purposes, is a holder of our common stock, the tax treatment of a partner in the partnership will generally depend upon the status of the partner and the activities of the partnership. A holder that is a partnership, and the partners in such partnership, should consult their own tax advisors regarding the tax consequences of the purchase, ownership and disposition of our common stock.

EACH PROSPECTIVE PURCHASER OF COMMON STOCK IS ADVISED TO CONSULT A TAX ADVISOR WITH RESPECT TO CURRENT AND POSSIBLE FUTURE TAX CONSEQUENCES OF PURCHASING, OWNING AND DISPOSING OF OUR COMMON STOCK AS WELL AS ANY TAX CONSEQUENCES THAT MAY ARISE UNDER THE LAWS OF ANY U.S. STATE, MUNICIPALITY OR OTHER TAXING JURISDICTION.

**Dividends**

We do not anticipate paying any cash dividends on our common stock in the foreseeable future. See "Dividend Policy." If dividends are paid on shares of our common stock, such distributions will constitute dividends for U.S. federal income tax purposes to the extent paid from our current or accumulated earnings or profits, as determined under U.S. federal income tax principles. If a distribution exceeds our current and accumulated earnings and profits, it will constitute a return of capital that is applied and reduces, but not below zero, a non-U.S. Holder's adjusted tax basis in our common stock. Any remainder will constitute gain from the sale or exchange of the common stock.

If dividends are paid, as a non-U.S. Holder, you will be subject to withholding of U.S. federal income tax at a 30% rate or a lower rate as may be specified by an applicable income tax treaty. To claim the benefit of a lower rate under an income tax treaty, you must properly file with the payor an Internal Revenue Service Form W-8BEN, or successor form, claiming an exemption from or reduction in withholding under the applicable tax treaty. In addition, where dividends are paid to a non-U.S. Holder that is a partnership or other pass-through entity, persons holding an interest in the entity may need to provide certification claiming an exemption or reduction in withholding under the applicable treaty.

If dividends are considered effectively connected with the conduct of a trade or business by you within the United States and, where a tax treaty applies, are attributable to a U.S. permanent

133

establishment of yours, those dividends will be subject to U.S. federal income tax on a net basis at applicable graduated individual or corporate rates but will not be subject to withholding tax, provided an Internal Revenue Service Form W-8ECI, or successor form, is filed with the payor. If you are a foreign corporation, any effectively connected dividends may, under certain circumstances, be subject to an additional "branch profits tax" at a rate of 30% or a lower rate as may be specified by an applicable income tax treaty.

You must comply with the certification procedures described above, or, in the case of payments made outside the United States with respect to an offshore account, certain documentary evidence procedures, directly or under certain circumstances through an intermediary, to obtain the benefits of a reduced rate under an income tax treaty with respect to dividends paid with respect to your common stock. In addition, if you are required to provide an Internal Revenue Service Form W-8ECI or successor form, as discussed above, you must also provide your tax identification number.

If you are eligible for a reduced rate of U.S. withholding tax pursuant to an income tax treaty, you may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the Internal Revenue Service.

## Gain on Disposition of Common Stock

As a non-U.S. Holder, you generally will not be subject to U.S. federal income tax on any gain recognized on a sale or other disposition of common stock unless:

- the gain is considered effectively connected with the conduct of a trade or business by you within the United States and, where a tax treaty applies, is attributable to a U.S. permanent establishment of yours (in which case you will be taxed in the same manner as a U.S. person, and if you are a foreign corporation, you may be subject to an additional branch profits tax equal to 30% or a lower rate as may be specified by an applicable income tax treaty);

- you are an individual who holds the common stock as a capital asset and are present in the United States for 183 or more days in the taxable year of the sale or other disposition and certain other conditions are met (in which case you will be subject to a 30% tax on the gain); or

- we are or become a U.S. real property holding corporation ("USRPHC"). We believe that we are not currently, and are not likely not to become, a USRPHC. If we were to become a USRPHC, then gain on the sale or other disposition of common stock by you generally would not be subject to U.S. federal income tax provided:

  - the common stock was "regularly traded on an established securities market"; and

  - you do not actually or constructively own more than 5% of the common stock during the shorter of (i) the five-year period ending on the date of such disposition or (ii) the period of time during which you held such shares.

## Federal Estate Tax

If you are an individual, common stock held at the time of your death will be included in your gross estate for U.S. federal estate tax purposes, and may be subject to U.S. federal estate tax, unless an applicable estate tax treaty provides otherwise.

## Information Reporting and Backup Withholding Tax

We must report annually to the Internal Revenue Service and to each of you the amount of dividends paid to you and the tax withheld with respect to those dividends, regardless of whether withholding was required. Copies of the information returns reporting those dividends and withholding

134

may also be made available to the tax authorities in the country in which you reside under the provisions of an applicable income tax treaty or other applicable agreements.

Backup withholding is generally imposed (currently at a 28% rate) on certain payments to persons that fail to furnish the necessary identifying information to the payor. You generally will be subject to backup withholding tax with respect to dividends paid on your common stock unless you certify your non-U.S. status. Dividends subject to withholding of U.S. federal income tax as described above in "Dividends" would not be subject to backup withholding.

The payment of proceeds of a sale of common stock effected by or through a U.S. office of a broker is subject to both backup withholding and information reporting unless you provide the payor with your name and address and you certify your non-U.S. status or you otherwise establish an exemption. In general, backup withholding and information reporting will not apply to the payment of the proceeds of a sale of common stock by or through a foreign office of a broker. If, however, such broker is, for U.S. federal income tax purposes, a U.S. person, a controlled foreign corporation, a foreign person that derives 50% or more of its gross income for certain periods from the conduct of a trade or business in the United States or a foreign partnership that at any time during its tax year either is engaged in the conduct of a trade or business in the United States or has as partners one or more U.S. persons that, in the aggregate, hold more than 50% of the income or capital interest in the partnership, backup withholding will not apply but such payments will be subject to information reporting, unless such broker has documentary evidence in its records that you are a non-U.S. Holder and certain other conditions are met or you otherwise establish an exemption.

Any amounts withheld under the backup withholding rules generally will be allowed as a refund or a credit against your U.S. federal income tax liability provided the required information is furnished in a timely manner to the Internal Revenue Service.

135

**UNDERWRITING**

Under the terms and subject to the conditions contained in an underwriting agreement dated August 10, 2005, we and the selling stockholders have agreed to sell to the underwriters named below, for whom Credit Suisse First Boston LLC, Goldman, Sachs & Co. and Banc of America Securities LLC are acting as representatives, the following respective numbers of shares of common stock:

| Underwriter | Number of Shares |
|---|---|
| Credit Suisse First Boston LLC | 6,855,550 |
| Goldman, Sachs & Co. | 5,639,200 |
| Banc of America Securities LLC | 5,392,750 |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | 2,451,250 |
| Deutsche Bank Securities Inc. | 1,717,200 |
| J.P. Morgan Securities Inc. | 1,717,200 |
| Sandler O'Neill & Partners, L.P. | 736,700 |
| HSBC Securities (USA) Inc. | 442,550 |
| William Blair & Company, L.L.C. | 442,550 |
| Harris Nesbitt Corp. | 442,550 |
| CMG Institutional Trading LLC | 132,500 |
| Samuel A. Ramirez & Company, Inc. | 132,500 |
| Muriel Siebert & Co. Inc. | 132,500 |
| The Williams Capital Group, L.P. | 132,500 |
| Utendahl Capital Partners, L.P. | 132,500 |
| Total | 26,500,000 |

The underwriting agreement provides that the underwriters are obligated to purchase all the shares of common stock in the offering if any are purchased, other than those shares covered by the over-allotment option described below. The underwriting agreement also provides that, if an underwriter defaults, the purchase commitments of non-defaulting underwriters may be increased or the offering may be terminated.

We have granted to the underwriters a 30-day option to purchase on a pro rata basis up to          additional shares from us at the initial public offering price less the underwriting discounts and commissions. The option may be exercised only to cover any over-allotments of common stock.

The underwriters propose to offer the shares of common stock initially at the public offering price on the cover page of this prospectus and to selling group members at that price less a selling concession of $0.759 per share. The underwriters and selling group members may allow a discount of $0.100 per share on sales to other broker-dealers. After the initial public offering, the representatives may change the public offering price and concession and discount to broker-dealers.

The following table summarizes the compensation and estimated expenses we and the selling stockholders will pay:

| | Per Share | | Total | |
|---|---|---|---|---|
| | Without Over-allotment | With Over-allotment | Without Over-allotment | With Over-allotment |
| Underwriting discounts and commissions paid by us | $ 1.32 | $ 1.32 | $ 16,500,000 | $ 21,747,000 |
| Expenses payable by us | $ 0.36 | $ 0.27 | $ 4,461,000 | $ 4,461,000 |
| Underwriting discounts and commissions paid by the selling stockholders | $ 1.32 | $ 1.32 | $ 18,480,000 | $ 18,480,000 |

We have agreed that we will not offer, sell, contract to sell, pledge or otherwise dispose of, directly or indirectly, or file with the SEC a registration statement under the Securities Act relating to, any shares of our common stock or securities convertible into or exchangeable or exercisable for any shares of our common stock, or publicly disclose the intention to make any offer, sale, pledge, disposition or

136

filing, without the prior written consent of the representatives (except issuances of our common stock pursuant to the conversion or exchange of convertible or exchangeable securities or the exercise of warrants or options, in each case outstanding as of the date of the underwriting agreement, issuances of our common stock pursuant to the exercise of such options or issuances of our common stock pursuant to any dividend reinvestment plan) for a period of 180 days after the date of this prospectus. However, in the event that either (1) during the last 17 days of the "lock-up" period, we release earnings results or material news or a material event relating to us occurs or (2) prior to the expiration of the "lock-up" period, we announce that we will release earnings results during the 16-day period beginning on the last day of the "lock-up" period, then in either case the expiration of the "lock-up" will be extended until the expiration of the 18-day period beginning on the date of the release of the earnings results or the occurrence of the material news or material event, as applicable, unless the representatives waive, in writing, such an extension.

Our officers and directors and our stockholders have agreed that they will not offer, sell, contract to sell, pledge or otherwise dispose of, directly or indirectly, any shares of our common stock or securities convertible into or exchangeable or exercisable for any shares of our common stock, enter into a transaction that would have the same effect, or enter into any swap, hedge or other arrangement that transfers, in whole or in part, any of the economic consequences of ownership of our common stock, whether any of these transactions are to be settled by delivery of our common stock or other securities, in cash or otherwise, or publicly disclose the intention to make any offer, sale, pledge or disposition, or to enter into any transaction, swap, hedge or other arrangement, without, in each case, the prior written consent of the representatives for a period of 180 days after the date of this prospectus. However, in the event that either (1) during the last 17 days of the "lock-up" period, we release earnings results or material news or a material event relating to us occurs or (2) prior to the expiration of the "lock-up" period, we announce that we will release earnings results during the 16-day period beginning on the last day of the "lock-up" period, then in either case the expiration of the "lock-up" will be extended until the expiration of the 18-day period beginning on the date of the release of the earnings results or the occurrence of the material news or event, as applicable, unless the representatives waive, in writing, such an extension. The foregoing restrictions shall not apply to (1) any shares of our common stock acquired in the open market, (2) the sale of any shares of our common stock in this offering pursuant to the underwriting agreement, (3) any transfer of shares of our common stock or securities convertible into or exchangeable or exercisable for any shares of our common stock as a bona fide gift to any person or to a family member, affiliate or trust or (4) distributions of any shares of our common stock or any securities convertible into or exchangeable for any shares of our common stock to limited or general partners or stockholders; provided that, in the case of numbers (3) and (4) above, the transferee agrees to be bound in writing by the terms of the foregoing agreement prior to such transfer.

The underwriters have reserved for sale at the initial public offering price up to 5% of the shares of common stock sold in the offering for employees, directors and other persons associated with us who have expressed an interest in purchasing common stock in the offering. The number of shares available for sale to the general public in the offering will be reduced to the extent these persons purchase the reserved shares. Any reserved shares not so purchased will be offered by the underwriters to the general public on the same terms as the other shares.

We and the selling stockholders have agreed to indemnify the underwriters against liabilities under the Securities Act, or contribute to payments that the underwriters may be required to make in that respect.

Our shares of common stock have been approved for listing on the NYSE. In order to meet one of the requirements for listing our common stock on the NYSE, the underwriters have undertaken to sell lots of 100 or more shares of common stock to a minimum of 2,000 beneficial holders.

137

Certain of the underwriters and their respective affiliates have from time to time performed various financial advisory, commercial banking and investment banking services for us and our affiliates in the ordinary course of business, for which they received customary compensation. Certain of the underwriters and their respective affiliates may also perform various financial advisory, commercial banking and investment banking services for us and our affiliates in the future. In particular, certain of the underwriters or their affiliates act as lenders under our senior secured credit facilities and also act in other capacities in connection with such facilities. Further, certain of the underwriters have engaged, and may continue to engage, in transactions with us in the ordinary course of our business as a provider of execution and clearing services in the derivatives, foreign exchange and fixed income markets for which they or us received customary compensation. An affiliate of Credit Suisse First Boston LLC is a selling stockholder in this offering. Such affiliate currently holds 0.54% of our outstanding Class A member interests. Upon consummation of this offering, such affiliate will hold 0.42% of our outstanding common stock. As a stockholder of record prior to this offering, this entity will receive a pro rata portion of the dividend that will be paid with the proceeds of any exercise of the underwriters' option to purchase additional shares from us in the offering.

Because we derive 50 percent or more of our gross revenues from Refco Securities, LLC, a member of the National Association of Securities Dealers, Inc. (NASD), we are deemed a "parent" under NASD Rule 2720 of the Conduct Rules of the NASD. Accordingly, this offering will be made in accordance with the applicable provisions of Rule 2720 of the Conduct Rules.

Prior to this offering, there has been no public market for our common stock. The initial public offering price will be determined by a negotiation between us and the underwriters and will not necessarily reflect the market price of the common stock following the offering. The principal factors that were considered in determining the public offering price included:

- the information in this prospectus and otherwise available to the underwriters;

- market conditions for initial public offerings;

- the history and the prospects for the industry in which we compete;

- the ability of our management;

- the prospects for our future earnings;

- the present state of our development and our current financial condition;

- the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies; and

- the general condition of the securities markets at the time of this offering.

The initial public offering price may not correspond to the price at which the common stock will trade in the public market subsequent to the offering or that an active trading market for the common stock will develop and continue after the offering.

In connection with the offering, the underwriters may engage in stabilizing transactions, over-allotment transactions, syndicate covering transactions and penalty bids in accordance with Regulation M under the Securities Exchange Act of 1934, as amended;

- Stabilizing transactions permit bids to purchase the underlying security so long as the stabilizing bids do not exceed a specified maximum.

- Over-allotment involves sales by the underwriters of shares in excess of the number of shares the underwriters are obligated to purchase, which creates a syndicate short position. The short position may be either a covered short position or a naked short position. In a covered short position, the number of shares over-allotted by the underwriters is not greater than the number of shares that they may purchase in the over-allotment option. In a naked short position, the number of shares involved is greater than the number of shares in the over-allotment option.

138

The underwriters may close out any covered short position by either exercising their over-allotment option and/or purchasing shares in the open market.

- Syndicate covering transactions involve purchases of the common stock in the open market after the distribution has been completed in order to cover syndicate short positions. In determining the source of shares to close out the short position, the underwriters will consider, among other things, the price of shares available for purchase in the open market as compared to the price at which they may purchase shares through the over-allotment option. If the underwriters sell more shares than could be covered by the over-allotment option, a naked short position, the position can only be closed out by buying shares in the open market. A naked short position is more likely to be created if the underwriters are concerned that there could be downward pressure on the price of the shares in the open market after pricing that could adversely affect investors who purchase in the offering.

- Penalty bids permit the representatives to reclaim a selling concession from a syndicate member when the common stock originally sold by the syndicate member is purchased in a stabilizing or syndicate covering transaction to cover syndicate short positions.

These stabilizing transactions and syndicate covering transactions may have the effect of raising or maintaining the market price of our common stock or preventing or retarding a decline in the market price of the common stock. As a result the price of our common stock may be higher than the price that might otherwise exist in the open market. These transactions may be effected on the NYSE or otherwise and, if commenced, may be discontinued at any time.

Each underwriter has represented, warranted and agreed that: (i) it has not offered or sold and, prior to the expiry of a period of six months from the closing date of this offering, will not offer or sell any shares to persons in the United Kingdom except to persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their businesses or otherwise in circumstances which have not resulted and will not result in an offer to the public in the United Kingdom within the meaning of the Public Offers of Securities Regulations 1995; (ii) it has only communicated or caused to be communicated and will only communicate or cause to be communicated any invitation or inducement to engage in investment activity (within the meaning of section 21 of the Financial Services and Markets Act 2000 ("FSMA")) received by it in connection with the issue or sale of any shares in circumstances in which section 21(1) of the FSMA does not apply to the Issuer; and (iii) it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the shares in, from or otherwise involving the United Kingdom.

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State"), each Underwriter has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date") it has not made and will not make an offer of shares to the public in that Relevant Member State prior to the publication of a prospectus in relation to the shares which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of shares to the public in that Relevant Member State at any time:

(a) to legal entities which are authorised or regulated to operate in the financial markets or, if not so authorised or regulated, whose corporate purpose is solely to invest in securities;

(b) to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts; or

139

    (c)      in any other circumstances which do not require the publication by the company of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of shares to the public" in relation to any shares in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the shares to be offered so as to enable an investor to decide to purchase or subscribe the shares, as the same may be varied in that Relevant Member State by any measure implementing the Prospectus Directive in that Relevant Member State and the expression Prospectus Directive means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

The shares may not be offered or sold by means of any document other than to persons whose ordinary business is to buy or sell shares or debentures, whether as principal or agent, or in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap. 32) of Hong Kong, and no advertisement, invitation or document relating to the shares may be issued, whether in Hong Kong or elsewhere, which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the securities laws of Hong Kong) other than with respect to shares which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571) of Hong Kong and any rules made thereunder.

This prospectus has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this prospectus and any other document or material in connection with the offer or sale, or invitation or subscription or purchase, of the securities may not be circulated or distributed, nor may the securities be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than under circumstances in which such offer, sale or invitation does not constitute an offer or sale, or invitation for subscription or purchase, of the securities to the public in Singapore.

The securities have not been and will not be registered under the Securities and Exchange Law of Japan (the Securities and Exchange Law) and each underwriter has agreed that it will not offer or sell any securities, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan (which term as used herein means any person resident in Japan, including any corporation or other entity organized under the laws of Japan), or to others for re-offering or resale, directly or indirectly, in Japan or to a resident of Japan, except pursuant to an exemption from the registration requirements of, and otherwise in compliance with, the Securities and Exchange Law and any other applicable laws, regulations and ministerial guidelines of Japan.

A prospectus in electronic format may be made available on the websites maintained by one or more of the underwriters, or selling group members, if any, participating in this offering. The representatives may agree to allocate a number of shares to underwriters and selling group members for sale to their online brokerage account holders. Internet distributions will be allocated by the underwriters and selling group members that will make internet distributions on the same basis as other allocations.

140

## LEGAL MATTERS

Weil, Gotshal & Manges LLP, New York, New York has passed upon the validity of the common stock offered hereby on behalf of us. Mayer, Brown, Rowe & Maw LLP has also represented us in connection with this offering. The underwriters have been represented by Cravath, Swaine & Moore LLP, New York, New York. Certain partners of Weil, Gotshal & Manges LLP have indirect ownership interests, totaling less than 0.01%, in us.

## EXPERTS

The New Refco Group Ltd., LLC (the Successor) consolidated balance sheet as of February 28, 2005 and the related consolidated statements of income, changes in members' equity and cash flows for the period from August 6, 2004 through February 28, 2005 and Refco Group Ltd., LLC (the Predecessor) consolidated balance sheet as of February 29, 2004 and the related consolidated statements of income, changes in members' equity and cash flows for the period from March 1, 2004 through August 5, 2004 and for the years ended February 29, 2004 and February 28, 2003 and schedules included in this prospectus and elsewhere in this registration statement have been audited by Grant Thornton LLP, independent registered public accountants, as stated in their reports with respect thereto, and is included herein in reliance upon the authority of said firm as experts in accounting and auditing.

## AVAILABLE INFORMATION

We have filed with the SEC a registration statement on Form S-1 under the Securities Act with respect to the common stock offered hereby. This prospectus does not contain all of the information set forth in the registration statement and the exhibits and schedules thereto. For further information with respect to Refco Inc. and the common stock offered hereby, you should refer to the registration statement and to the exhibits and schedules filed therewith. Statements contained in this prospectus regarding the contents of any contract or any other document that is filed as an exhibit to the registration statement are not necessarily complete, and each such statement is qualified in all respects by reference to the full text of such contract or other document filed as an exhibit to the registration statement. Our subsidiary Refco Group Ltd., LLC files periodic reports under the Securities Exchange Act of 1934, copies of which may be inspected without charge at the public reference room maintained by the SEC located at 450 Fifth Street, N.W., Washington, D.C. 20549. Copies of all or any portion of Refco Group's periodic reports may be obtained from such offices upon payment of prescribed fees. The public may obtain information on the operation of the public reference room by calling the SEC at 1-800-SEC-0330. The SEC maintains a website at *www.sec.gov* that contains reports, proxy and information statements and other information regarding registrants that file electronically with the SEC.

You may obtain a copy of any of our filings, at no cost, by writing or telephoning us at:

Refco Inc.
One World Financial Center
200 Liberty Street, Tower A
New York, New York 10281
Attn: Investor Relations
(212) 693-7000

141

## GLOSSARY

**Broker in Principal**    An individual or firm who acts as an intermediary or temporary dealer between a buyer and a seller and who either takes title to the asset on behalf of its client or has a client position offset by an equal but opposite position with a dealer.

**CBOE**    Chicago Board Options Exchange, which is a securities exchange created in the early 1970s for the public trading of standardized option contracts. Primary place for the trading of stock options, foreign currency options and index options.

**CBOT**    Chicago Board of Trade, which is the second largest derivatives exchange in the United States and a pioneer in the development of financial futures and options.

**CFMA**    Commodity Futures Modernization Act of 2000, which amended the Commodity Exchange Act, removing much regulation by the CFTC to which OTC derivatives had been subject previously.

**CFTC**    Commodity Futures Trading Commission, which is the federal regulatory agency that administers the Commodity Exchange Act. It is the federal oversight agency that monitors the futures and options on futures markets to detect and prevent price distortion and market manipulation and to protect the rights of customers who use the markets for either commercial or investment purposes.

**Clearing House**    An agency or corporation that acts as a central counterparty to the clearing members or FCMs on each side of a transaction. Clearing Houses are responsible for settling trading accounts, collecting and maintaining margin monies, regulating delivery and reporting trading data.

**CME**    Chicago Mercantile Exchange, which is the largest derivatives exchange in the United States and the second largest exchange in the world for the trading of futures and options on futures. CME has four major product areas based on interest rates, stock indexes, foreign exchange and commodities.

**Commodity Exchange Act**    The principal legislation governing the trading of commodities and futures in the United States.

**Commodity Pool Operator**    An individual or organization which operates or solicits funds for a pool in which funds contributed by a number of persons are combined for the purpose of trading futures or options contracts. Generally required to be registered with the CFTC.

**Commodity Trading Advisor**    A person who directly or indirectly advises others as to the advisability of buying or selling futures or commodity options. Most Commodity Trading Advisors may exercise trading authority over a customer's account. A Commodity Trading Advisor is generally required to be registered with the CFTC.

142

| | |
|---|---|
| **E-mini** | E-minis are smaller versions of popular index funds that cover the entire S&P 500 and Nasdaq-100 indexes. E-minis are 20% the size of larger index contracts and allow for great flexibility when assembling a portfolio. E-mini trading is popular because it requires less of an initial capital investment, and it enables traders to diversify a portfolio and hedge against more focused investments. |
| **Eurex** | World's largest derivatives exchange based on volume. This fully electronic exchange has participants around the world, creating decentralized and standardized access to its markets. |
| **Euronext** | Europe's first cross-border group of stock exchanges and their derivatives markets, formed by the merger of the stock exchanges of Amsterdam, Brussels and Paris in 2000. |
| **Exchange** | A marketplace in which shares, options and/or futures on stocks, bonds, commodities and indexes are traded. |
| **FCM** | Futures Commission Merchant, which is a firm engaged in soliciting or accepting and handling orders for the purchase or sale of futures contracts and accepting money or securities to provide margin for any resulting trades or contracts. An FCM must be registered with the CFTC. |
| **Forward** | A contract in which a seller agrees to deliver a specified asset to a buyer at a specified price sometime in the future. In contrast to futures contracts, forward contracts are not standardized, not traded on exchanges and generally contemplate a delivery at settlement. |
| **FXCM** | An FCM specializing in foreign exchange products with operations around the world. |
| **LCH** | London Clearing House, which is a leading independent clearing house in Europe, serving major international exchanges and platforms, equity markets, exchange-traded derivatives markets, energy markets, the interbank interest rate swaps market and the majority of the Euro-denominated and sterling bond and repo markets. |
| **LME** | London Metal Exchange, which is a market for trading base metals. LME prices are used as reference prices in many world markets by metals producers and fabricators of metal products and are the basis for most major commodity indices. |
| **Mark-to-Market** | To debit or credit a trading account on a daily basis based on the prices established at the close of that day's trading session. |
| **Net Capital** | The amount by which current assets exceed liabilities (adjusted for illiquid assets, certain operating capital charges, and potential adverse fluctuations in the value of securities inventory). |

| | |
|---|---|
| **NFA** | National Futures Association, which is the industry wide self-regulatory organization of the futures industry. Congress authorized its creation in 1974, and the CFTC designated it a "registered futures association" in 1982. |
| **NYMEX** | New York Mercantile Exchange, which is the world's largest physical commodity derivatives exchange. |
| **OTC Market** | Over-The-Counter Market, which is a decentralized market where geographically dispersed dealers are linked by telephones and computer screens. The market is for securities not listed on exchanges. |
| **Repo** | Repurchase agreement, which is an agreement in which one party sells a security to another party and agrees to repurchase it on a specified date for a specified price. This represents a collateralized short-term loan, where the collateral may be a Treasury security, money market instrument, federal agency security or mortgage-backed security. A reverse repurchase agreement, otherwise known as a "reverse repo," which is the purchase of a security at a specified price with an agreement to sell the same or substantially the same security to the same counterparty at a fixed or determinable price at a future date. |
| **Repurchase Transaction** | See the definition for "repo." |
| **Segregated Funds** | The amount of money, securities and property due to commodity futures or options customers, which is held in segregated accounts in compliance with Section 4d of the Commodity Exchange Act and CFTC Regulations. Such money, securities or property may not be comingled with the money, securities and property of the FCM, but the FCM may earn interest on it. |
| **TSE** | Tokyo Stock Exchange, which is the largest stock exchange in Japan with some of the most active trading in the world. |

144

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

**New Refco Group Ltd., LLC**

| | |
|---|---|
| Reports of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets as of February 28, 2005 (Successor) and February 29, 2004 (Predecessor) | F-4 |
| Consolidated Statements of Income for the Successor period from August 6, 2004 through February 28, 2005, the Predecessor period from March 1, 2004 through August 5, 2004 and for the years ended February 29, 2004 and February 28, 2003 | F-5 |
| Consolidated Statements of Changes in Members' Equity for the Successor period from August 6, 2004 through February 28, 2005, the Predecessor period from March 1, 2004 through August 5, 2004 and for the years ended February 29, 2004 and February 28, 2003 | F-6 |
| Consolidated Statements of Cash Flows for the Successor period from August 6, 2004 through February 28, 2005, the Predecessor period from March 1, 2004 through August 5, 2004 and for the years ended February 29, 2004 and February 28, 2003 | F-7 |
| Notes to Consolidated Financial Statements | F-8 |
| Consolidated Balance Sheets as of May 31, 2005 (unaudited) and February 28, 2005 | F-48 |
| Consolidated Statements of Income for the three months ended May 31, 2005 and 2004 (unaudited) | F-49 |
| Consolidated Statement of Changes in Members' Equity for the three months ended May 31, 2005 and 2004 (unaudited) | F-50 |
| Consolidated Statements of Cash Flows for the three months ended May 31, 2005 and 2004 (unaudited) | F-51 |
| Notes to Consolidated Financial Statements (unaudited) | F-52 |

F-1

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Members of
**New Refco Group Ltd., LLC**

We have audited the accompanying consolidated balance sheet of New Refco Group Ltd., LLC (the "Successor" or "Company") (a Delaware limited liability company) and subsidiaries as of February 28, 2005 and the related consolidated statements of income, changes in members' equity and cash flows for the period from August 6, 2004 through February 28, 2005. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor are we engaged to perform an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of New Refco Group Ltd., LLC and subsidiaries as of February 28, 2005, and the results of their operations and their cash flows for the period from August 6, 2004 through February 28, 2005 in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note H(1)(i), the notes to the consolidated financial statements have been restated to include summarized financial information related to a significant equity method investment.

Grant Thornton LLP
New York, New York
May 24, 2005 (except for Note H(1)(i) as to which
the date is July 19, 2005)

F-2

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Members of
  **New Refco Group Ltd., LLC**

We have audited the accompanying consolidated balance sheet of Refco Group Ltd., LLC (the "Predecessor") (a Delaware limited liability company) and subsidiaries as of February 29, 2004, and the related consolidated statements of income, changes in members' equity and cash flows for the period from March 1, 2004 through August 5, 2004 and for the years ended February 29, 2004 and February 28, 2003. These financial statements are the responsibility of the Predecessor's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Predecessor is not required to have, nor were we engaged to perform an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Predecessor's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Refco Group Ltd., LLC and subsidiaries as of February 29, 2004, and the results of their operations and their cash flows for the period from March 1, 2004 through August 5, 2004 and for the years ended February 29, 2004 and February 28, 2003 in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note H(1)(i), the notes to the consolidated financial statements have been restated to include summarized financial information related to a significant equity method investment.

Grant Thornton LLP
New York, New York
May 24, 2005 (except for Note H(1)(i) as to which
the date is July 19, 2005)

F-3

**NEW REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**

| | Successor February 28, 2005 | | Predecessor February 29, 2004 | |
|---|---|---|---|---|
| | (in thousands) | | | |
| Cash and cash equivalents | $ | 522,621 | $ | 316,213 |
| Cash and securities segregated under federal and other regulations: | | | | |
|     Cash and cash equivalents | | 1,102,539 | | 1,375,838 |
|     Securities purchased under agreements to resell | | 58,650 | | 55,061 |
| Securities purchased under agreements to resell | | 30,235,871 | | 22,974,308 |
| Deposits with clearing organizations and others | | 2,439,653 | | 1,831,765 |
| Receivables from securities borrowed | | 3,128,304 | | 1,808,566 |
| Receivables from broker-dealers and clearing organizations | | 1,996,331 | | 504,810 |
| Receivables from customers, net of $61,190 and $65,200 in reserves, respectively | | 2,081,968 | | 1,591,385 |
| Receivables from equity members | | — | | 210,223 |
| Securities owned, at market or fair value | | 5,594,797 | | 2,032,535 |
| Memberships in exchanges (market value: February 28, 2005: $60,566, February 29, 2004: $41,337) | | 36,638 | | 15,869 |
| Assets of discontinued operations (Note C) | | — | | 276,012 |
| Goodwill | | 716,566 | | 145,718 |
| Identifiable intangible assets | | 578,702 | | 23,272 |
| Other assets | | 272,709 | | 170,597 |
|     Total assets | $ | 48,765,349 | $ | 33,332,172 |
| | | | | |
| Liabilities | | | | |
|     Short-term borrowings, including current portion of long-term borrowings | $ | 32,628 | $ | 88,890 |
|     Securities sold under agreements to repurchase | | 28,625,903 | | 23,763,252 |
|     Payable from securities loaned | | 3,028,933 | | 1,867,047 |
|     Payable to broker-dealers and clearing organizations | | 741,122 | | 583,643 |
|     Payable to customers | | 6,847,558 | | 5,053,337 |
|     Securities sold, not yet purchased, at market or fair value | | 7,833,022 | | 807,485 |
|     Liabilities of discontinued operations (Note C) | | — | | 44,878 |
|     Accounts payable, accrued expenses and other liabilities | | 252,582 | | 171,651 |
| Long-term borrowings | | 1,238,000 | | 315,500 |
| Subordinated debt | | — | | 16,000 |
|     Total liabilities | | 48,599,748 | | 32,711,683 |
| Commitments and contingent liabilities | | | | |
| Membership interests issued by subsidiary | | 15,351 | | 4,405 |
| Members' equity | | 150,250 | | 616,084 |
|     Total liabilities and members' equity | $ | 48,765,349 | $ | 33,332,172 |

The accompanying notes are an integral part of these financial statements.

F-4

**NEW REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF INCOME**

| | Successor | Predecessor | | |
|---|---|---|---|---|
| | Period from August 6, 2004 through February 28, 2005 | Period from March 1, 2004 through August 5, 2004 | Year Ended | |
| | | | February 29, 2004 | February 28, 2003 |
| | | (in thousands) | | |
| **Revenues** | | | | |
| Commissions and brokerage | $ 486,705 | $ 362,020 | $ 645,440 | $ 571,520 |
| Interest | 1,817,103 | 768,713 | 1,051,695 | 2,387,339 |
| Principal transactions, net | 160,830 | 119,235 | 165,936 | 82,554 |
| Asset management and advisory fees | 8,801 | 3,676 | 7,255 | 123 |
| Other | 5,973 | 2,469 | 3,973 | 4,563 |
| Total revenues | 2,479,412 | 1,256,113 | 1,874,299 | 3,046,099 |
| **Expenses** | | | | |
| Commissions and order execution costs | 358,528 | 244,009 | 411,894 | 385,375 |
| Interest | 1,765,218 | 706,640 | 897,674 | 2,182,346 |
| Employee compensation and benefits | 158,465 | 108,528 | 204,854 | 180,962 |
| General, administrative and other | 145,970 | 97,576 | 170,415 | 142,585 |
| Total expenses | 2,428,181 | 1,156,753 | 1,684,837 | 2,891,268 |
| Income before provision for income taxes, dividends on preferred securities issued by subsidiaries, income from equity investees, members' interest in earnings (losses) of subsidiary and discontinued operations | 51,231 | 99,360 | 189,462 | 154,831 |
| Provision for income taxes | 6,250 | 7,994 | 11,687 | 1,223 |
| Income before dividends on preferred securities issued by subsidiaries, income from equity investees, members' interest in earnings (losses) of subsidiary and discontinued operations | 44,981 | 91,366 | 177,775 | 153,608 |
| Dividends on preferred securities | — | — | — | 15,576 |
| Income from equity investees | 16,578 | 8,345 | 11,544 | 1,673 |
| Members' interest in earnings (losses) of subsidiary | (16,749) | 5,771 | 1,273 | — |
| Income from continuing operations | 78,308 | 93,940 | 188,046 | 139,705 |

Discontinued operations:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Income (loss) from discontinued operations | | — | | 7,383 | (401) | | 1,151 |
| Applicable income tax expense | | — | | 3,344 | 489 | | 737 |
| Net income | $ | 78,308 | $ | 97,979 | $ 187,156 | $ | 140,119 |

The accompanying notes are an integral part of these financial statements.

F-5

## NEW REFCO GROUP LTD., LLC AND SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF CHANGES IN MEMBERS' EQUITY

| | Members' equity | | |
| --- | --- | --- | --- |
| | Common capital | Other comprehensive income | Total |
| | (in thousands) | | |
| Balance, February 28, 2002 (predecessor) | $ 527,897 | $ (12,781) | $ 515,116 |
| Capital withdrawals | (100,000) | — | (100,000) |
| Net income | 140,119 | — | 140,119 |
| Currency translation adjustment | — | 11,126 | 11,126 |
| Balance, February 28, 2003 (predecessor) | 568,016 | (1,655) | 566,361 |
| Capital withdrawals | (120,000) | — | (120,000) |
| Loss on early extinguishment of preferred securities issued by subsidiaries | (39,774) | — | (39,774) |
| Net income | 187,156 | — | 187,156 |
| Currency translation adjustment | — | 22,341 | 22,341 |
| Balance, February 29, 2004 (predecessor) | 595,398 | 20,686 | 616,084 |
| Net income | 97,979 | — | 97,979 |
| Currency translation adjustment | — | (4,900) | (4,900) |
| Balance, August 5, 2004 (predecessor) | 693,377 | 15,786 | 709,163 |
| Distribution of Asset Management business | (230,913) | (6,922) | (237,835) |
| Distribution of cash | (550,000) | — | (550,000) |
| Balance, August 5, 2004 (predecessor, adjusted) | (87,536) | 8,864 | (78,672) |
| Resetting of equity accounts due to the Transactions | 87,536 | (8,864) | 78,672 |
| Balance, August 5, 2004 (successor) | — | — | — |
| Push down of capital contribution to fund portion of purchase price | 511,494 | — | 511,494 |
| Carry over of predecessor basis | (33,661) | — | (33,661) |
| Deemed dividend | (403,612) | — | (403,612) |
| Balance, August 6, 2004 as adjusted to give effect to the Transactions (successor) | 74,221 | — | 74,221 |
| Capital withdrawals | (11,000) | — | (11,000) |
| Net income | 78,308 | — | 78,308 |
| Repurchase of Class A Units | (2,500) | — | (2,500) |
| Issuance of Class B Units to employees | 1,875 | — | 1,875 |
| Currency translation adjustment | — | 9,346 | 9,346 |
| Balance, February 28, 2005 | $ 140,904 | $ 9,346 | $ 150,250 |

The accompanying notes are an integral part of these financial statements.

F-6

**NEW REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Successor | | Predecessor | |
|---|---|---|---|---|
| | | | Year Ended | |
| | Period from August 6, 2004 through February 28, 2005 | Period from March 1, 2004 through August 5, 2004 | February 29, 2004 | February 28, 2003 |
| | | | (in thousands) | |
| Cash flows from operating activities | | | | |
| Net income | $ 78,308 | $ 97,979 | $ 187,156 | $ 140,119 |
| (Loss) income from discontinued operations | — | 4,039 | (890) | 414 |
| Net income from continuing operations | 78,308 | 93,940 | 188,046 | 139,705 |
| Noncash items included in net income | | | | |
| Depreciation and amortization | 18,046 | 11,993 | 26,161 | 23,499 |
| Stock compensation expense | 1,875 | — | — | — |
| Members' interest in earnings (losses) of subsidiary | (16,749) | 5,771 | 1,273 | — |
| (Increase) decrease in operating assets | | | | |
| Cash and securities segregated under federal and other regulations: | | | | |
| Cash and cash equivalents | (282,581) | 555,880 | 574,008 | (1,109,672) |
| Securities purchased under agreements to resell | (5,487) | 1,898 | 14,100 | 86,351 |
| Securities purchased under agreements to resell | 4,432,778 | (11,694,341) | (11,195,025) | 5,098,889 |
| Deposits with clearing organizations and others | (1,081,361) | 473,473 | (79,964) | (698,744) |
| Receivables from securities borrowed | (1,082,330) | (237,408) | (1,424,552) | (296,584) |
| Receivables from broker-dealers and clearing organizations | (781,745) | (709,776) | (201,059) | 49,689 |
| Receivables from customers | 504,736 | (995,096) | (101,005) | 394,443 |
| Receivables from equity members | — | 210,000 | 70,322 | 108,678 |
| Securities owned, at market or fair value | (2,828,729) | (733,533) | (1,542,115) | (195,891) |
| Memberships in exchanges | (422) | (2,010) | 2,820 | (10,377) |
| Other assets | 8,404 | (93,670) | 45,953 | (11,746) |
| Increase (decrease) in operating liabilities | | | | |
| Short-term borrowings, including current portion of long-term borrowings | 24,628 | (20,890) | (156,920) | 50,573 |
| Securities sold under agreements to repurchase | (6,037,147) | 10,899,798 | 11,277,259 | (4,322,774) |
| Payable from securities loaned | 937,810 | 224,076 | 1,573,584 | 257,989 |
| Payable to broker-dealers and clearing organizations | (749,962) | 907,441 | 326,860 | (42,921) |
| Payable to customers | 1,595,688 | 198,533 | 696,282 | 661,646 |
| Securities sold, not yet purchased, at market or fair value | 5,612,862 | 1,412,675 | 595,280 | (71,327) |
| Accounts payable, accrued expenses and other liabilities | 42,560 | 20,108 | 36,597 | (30,816) |
| Net cash provided by operating activities | 391,182 | 528,862 | 727,905 | 80,610 |
| Cash flows from investing activities | | | | |
| Distribution of cash in asset management business | — | (24,457) | — | — |
| Payment of acquisition fees | (46,989) | (3,536) | — | — |
| Acquisition of businesses, net of cash acquired | (17,225) | — | (118,930) | (3,473) |
| Net cash used in investing activities | (64,214) | (27,993) | (118,930) | (3,473) |
| Cash flows from financing activities | | | | |
| Issuance of long-term borrowings | — | — | — | 222,500 |
| Proceeds from new borrowings | 1,400,000 | — | — | — |
| Repayment of long-term borrowings | (539,436) | (37,000) | (68,000) | (68,000) |
| Payment to former shareholders | (19,815) | — | — | — |
| Payment to former shareholder for sale of interest in predecessor | (861,749) | — | — | — |
| Payment of deferred financing costs | (43,648) | — | — | — |
| Payment for redemption of preferred securities issued by subsidiaries | — | — | (199,774) | — |

| | | | | |
|---|---|---|---|---|
| Repurchase of Class A Units | (2,500) | — | — | — |
| Distribution of cash | — | (550,000) | — | — |
| Net contributions (withdrawals) to membership interests issued by subsidiary | 28,815 | (6,891) | 3,132 | — |
| Capital withdrawals | (11,000) | — | (120,000) | (100,000) |
| Net cash (used in) provided by financing activities | (49,333) | (593,891) | (384,642) | 54,500 |
| Net cash provided by (used in) discontinued operations | — | 21,795 | (134,285) | (50,150) |
| Net increase (decrease) in cash and cash equivalents | 277,635 | (71,227) | 90,048 | 81,487 |
| Cash and cash equivalents, beginning of year | 244,986 | 316,213 | 226,165 | 144,678 |
| Cash and cash equivalents, end of year | $     522,621 | $     244,986 | $     316,213 | $     226,165 |
| **SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION:** | | | | |
| Noncash financing activities | | | | |
| Pushdown of partial step-up of assets and liabilities in Transactions | 567,719 | — | — | — |
| Distribution of Asset Management business, net of cash | 213,378 | — | — | — |
| Income taxes paid | $       8,186 | $       2,027 | $       3,331 | $       6,032 |
| Interest paid | $   1,797,800 | $   645,949 | $   713,142 | $   2,250,879 |

The accompanying notes are an integral part of these financial statements.

F-7

## NEW REFCO GROUP LTD., LLC AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE A—ORGANIZATION

New Refco Group Ltd., LLC (the "Company" or "Successor") is a limited liability company under the laws of the State of Delaware. The consolidated financial statements include the accounts of the Company and its subsidiaries (collectively, the "Group"). The Group is a diversified financial services organization and is among the leading firms in the futures and options brokerage business. In addition to its futures and options activities, the Group provides fund management and administrative services and is also a substantial broker of cash market products, including government securities, foreign exchange and foreign exchange options, international equities and emerging markets debt. The Group's worldwide headquarters in New York are complemented by a network of U.S. and international offices.

The Group's principal operating subsidiaries comprise Refco Securities, LLC, a registered broker-dealer, Refco, LLC, a registered Futures Commission Merchant and Refco Capital Markets, Ltd., an offshore securities and foreign exchange broker.

*The Transactions*

On June 8, 2004, THL Refco Acquisition Partners entered into an equity purchase and merger agreement with Refco Group Ltd., LLC (the "Predecessor"), Refco Group Holdings, Inc. ("RGHI") and certain other parties, which was amended on July 9, 2004 (the "Purchase Agreement"). The Purchase Agreement provided for a series of transactions that resulted in New Refco Group Ltd., LLC ("New Refco") becoming Refco Group Ltd., LLC's parent and THL Refco Acquisition Partners and its affiliates and co-investors acquiring a 56.7% interest in the Company, based on a valuation of the Company of $2.3 billion, following the closing of the Transactions on August 5, 2004. THL Refco Acquisition Partners and its affiliates are affiliates of Thomas H. Lee Partners, L.P. Thomas H. Lee Partners, L.P. is a leading private equity firm focused on identifying and acquiring substantial ownership stakes in mid-to large-cap growth companies.

Prior to the closing date of the Transactions on August 5, 2004, the Predecessor was 90% owned by RGHI, a Delaware corporation. The remaining 10% was owned by BAWAG Overseas, Inc., a third-party financial institution.

Concurrently with the consummation of the Transactions, the Predecessor distributed $550.0 million in cash and other capital distributions and all the equity interests of Forstmann-Leff International Associates, LLC, which upon consummation of the Transactions owned substantially all the assets of the Predecessor's Asset Management business (the "Asset Management Distribution"), to RGHI, an entity wholly owned by Phillip Bennett upon consummation of the Transactions. This distribution did not include the retained assets from the Group's Asset Management Business, Refco Alternative Investments, which have been retained and became part of the Group's Derivatives Brokerage & Clearing business.

The financing for the Transactions, including the refinancing of the outstanding debt, was provided by:

(i)    borrowings under a new $875.0 million Senior Secured Credit Facility, consisting of an $800.0 million term loan facility and a $75.0 million revolving credit facility in revolving credit loans and letters of credit for working capital and general corporate purposes. The term loan was fully drawn prior to the consummation of the Transactions, with none of the revolving credit facility drawn as yet;

(ii)   the issuance of $600.0 million senior subordinated notes by co-issuers Refco Finance Holdings LLC and Refco Finance Inc.;

F-8

(iii)    $507.0 million of capital provided in cash by THL Refco Acquisition Partners and its affiliates and co-investors;

(iv)    exchange of the existing equity investment in the Predecessor of $382.5 million by Phillip Bennett, the Company's chief executive officer; and

(v)    management ownership investments of $4.5 million in cash.

As a result, THL Refco Acquisition Partners and its affiliates and co-investors acquired 56.7% of the Company, Phillip Bennett received 42.8% of ownership and management purchased an ownership of 0.5%. Furthermore, THL Refco Acquisition Partners and its affiliates and co-investors and RGHI contributed their interests in Refco Group Ltd., LLC to the Company; and Refco Finance Holdings LLC merged with and into Refco Group Ltd., LLC with Refco Group Ltd., LLC continuing as the surviving entity.

The acquisition by THL Refco Acquisition Partners and its affiliates and co-investors of a portion of RGHI's interest in Refco Group Ltd., LLC and RGHI's contribution of its interest in Refco Group Ltd., LLC to the Company are each accounted for as a purchase in conformity with Statement of Financial Accounting Standards ("SFAS") No. 141, *Business Combinations*, in accordance with Emerging Issues Task Force ("EITF") No. 88-16, *Basis in Leveraged Buyout Transactions*, with intangible assets recorded in accordance with SFAS No. 142, *Goodwill and Other Intangible Assets*. This guidance requires the continuing residual interest retained by the continuing management investors, as a result of the Transactions, be reflected at its predecessor basis. In accordance with EITF Issue No. 90-12, *Allocating Basis to Individual Assets and Liabilities for Transactions within the Scope of Issue No. 88-16*, a step-up of assets and liabilities to fair value was recorded in purchase accounting for the remaining interest in the Refco Group Ltd., LLC acquired by THL Refco Acquisition Partners and its affiliates and co-investors. The amount of the distribution to the selling shareholders in excess of the predecessor basis was reflected as a deemed dividend of $403.6 million in equity in the opening consolidated balance sheet.

The purchase price including transaction costs was approximately $2.3 billion. The sources and uses of funds in connection with the acquisition are summarized below (in thousands):

| | | |
|---|---|---:|
| *Sources:* | | |
| Proceeds from Secured Term Loan | $ | 800,000 |
| Proceeds from Senior Subordinated Notes | | 600,000 |
| Proceeds from equity investors | | 511,494 |
| Available cash | | 172 |
| Fair value of existing equity investment | | 382,507 |
| Total sources | $ | 2,294,173 |
| *Uses:* | | |
| Purchase price of member units | $ | 1,373,242 |
| Repayment of old debt and penalties | | 387,436 |
| Transaction and debt financing fees | | 94,173 |
| Payments to former shareholders | | 19,815 |
| Other | | 37,000 |
| Fair value of existing equity investment | | 382,507 |
| Total uses | $ | 2,294,173 |

F-9

The Company has prepared an allocation of the purchase price to the assets acquired and liabilities assumed based upon their respective fair values as determined by an independent third-party valuation firm as of the date of the acquisition. The allocation of the purchase price to the fair value of the net assets acquired is summarized below (in thousands):

| | Predecessor Basis | Fair Value | Deemed Dividend | Push-down of existing carry-over basis | Successor Basis |
|---|---|---|---|---|---|
| Cash and cash equivalents, securities purchased and deposits | $ 39,191,022 | $ 39,191,022 | $ — | $ — | $ 39,191,022 |
| Receivables, securities owned and other assets | 6,810,999 | 6,810,999 | — | — | 6,810,999 |
| Memberships in exchanges, at fair value | 17,879 | 49,997 | (13,781) | — | 36,216(a) |
| Total assets acquired | 46,019,900 | 46,052,018 | (13,781) | — | 46,038,237 |
| Short-term borrowings, securities sold and payables | 45,717,287 | 45,717,287 | — | — | 45,717,287 |
| Accounts payable, accrued expenses and other liabilities | 199,945 | 222,654 | — | — | 222,654 |
| Total liabilities assumed | 45,917,232 | 45,939,941 | — | — | 45,939,941 |
| Net tangible assets | 102,668 | 112,077 | (13,781) | — | 98,296 |
| Intangible assets | 24,556 | 986,800 | (412,862) | — | 573,938(a) |
| Net assets acquired | 127,224 | 1,098,877 | (426,643) | — | 672,234 |
| Purchase price, including carryover basis by Phillip Bennett | | 2,248,691 | (403,612) | (382,507) | (33,661) | 1,428,911 |
| Excess purchase price | | 1,149,814 | 23,031 | (382,507) | (33,661) | 756,677 |
| Goodwill | | 1,109,702 | 23,031 | (382,507) | (33,661) | 716,565 |
| Deferred financing costs, net | | 40,112 | — | — | — | 40,112 |
| | | $ 1,149,814 | $ 23,031 | $ (382,507) | $ (33,661) | $ 756,677 |

(a)     As mandated by EITF Issue No. 88-16, successor basis reflects a partial stepped-up value calculated as 42.8% of predecessor basis plus 57.2% of fair value.

Payments were also made to or for the account of existing equity holders, including $24.9 million relating to pre-payment penalties on the Predecessor's existing debt, and $19.8 million relating to obligations triggered by the Predecessor's change of control.

The following unaudited pro forma consolidated summary of operations presents information of the Company as if the Transactions had occurred on March 1, 2003 and 2004, respectively.

| | Year Ended February 28, 2005 | Year Ended February 29, 2004 |
|---|---|---|
| | (unaudited) (in thousands) | |
| Total revenue | $ 3,735,525 | $ 1,874,299 |
| Net income | $ 141,952 | $ 112,300 |

F-10

These pro forma results are for illustrative purposes. They do not purport to be indicative of the results of operations that actually would have resulted had the Transactions occurred as of March 1, 2003 or 2004, or the future results of operations of the Company.

## NOTE B—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of preparation

The consolidated financial statements include the accounts of the Company and each of its subsidiaries, all of which are wholly owned, except for Refco Securities, LLC, a subsidiary of the Company, which issues non-voting membership interests in the normal course of business. All material intercompany transactions and balances have been eliminated in consolidation.

20% to 50% owned companies are accounted for using the equity method and included in "Other Assets."

The Group consolidates entities deemed to be variable interest entities ("VIEs") when the Group is determined to be the primary beneficiary under Financial Accounting Standards Board ("FASB") Interpretation No. 46 Revised (December 2003), *Consolidation of Variable Entities* ("Interpretation 46 R").

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

### Foreign currency translation

In the normal course of business, the Group engages in transactions denominated in foreign currencies. For financial reporting purposes, assets, liabilities and contractual commitments in foreign currencies have been translated at the year-end spot rate and revenues and expenses are translated at average rates of exchange for the fiscal year. Gains and (losses) resulting from foreign currency transactions, included in the consolidated statements of income, were $(1.5) million, $0 million, $(0.7) million and $(15.7) million for the period from August 6, 2004 through February 28, 2005, the period from March 1, 2004 through August 5, 2004 and the years ended February 29, 2004 and February 28, 2003, respectively. Gains and (losses) resulting from translating foreign currency financial statements into U.S. dollars are included in cumulative currency translation adjustment, which represents other comprehensive income, a separate component of members' equity.

### Cash and cash equivalents

Cash and cash equivalents are defined as cash and short-term liquid investments with original maturities of 90 days or less when acquired.

F-11

**Cash and securities segregated under federal and other regulations**

Cash and cash equivalents have been segregated in special reserve bank accounts for the benefit of clients under various regulatory requirements. These requirements at year-end are set forth below:

|  | February 28, 2005 | February 29, 2004 |
|---|---|---|
|  | (in thousands) | |
| Rule 15c3-3 of the Securities Exchange Act of 1934 | $ 27,209 | $ 25,271 |
| Section 1.20 of the Commodity Exchange Act | 500,585 | 924,613 |
| Foreign subsidiaries regulated under various foreign regulations | 574,745 | 425,954 |
|  | $ 1,102,539 | $ 1,375,838 |

As of February 28, 2005 and February 29, 2004, securities purchased under agreements to resell of $58.7 million and $55.1 million, respectively are held for the benefit of clients under Rule 15c3-3 of the Securities Exchange Act of 1934.

**Securities purchased under agreements to resell and Securities sold under agreements to repurchase**

Securities purchased under agreements to resell and Securities sold under agreements to repurchase are treated as financing transactions and are carried at the amounts at which the securities will be reacquired or resold as specified in the respective agreements plus accrued interest. These carrying amounts approximate their fair values. It is the Group's policy to take possession of securities purchased under agreements to resell, which consist largely of securities issued by the U.S. Government. The Group retains the right to re-pledge collateral received in secured financing transactions.

As permitted by FASB Interpretation No. 41, *Offsetting of Amounts Related to Certain Repurchase and Reverse Repurchase Agreements*, the Group nets certain securities purchased under agreements to resell and securities sold under agreements to repurchase for financial reporting purposes.

**Securities-lending activities**

Securities borrowed and securities loaned transactions are generally reported as collateralized financings. Securities-borrowed transactions require the Company to deposit cash with the lender. With respect to securities loaned, the Company receives collateral in the form of cash in an amount generally in excess of the market value of securities loaned. The Company monitors the market value of securities borrowed and loaned on a daily basis, with additional collateral obtained or refunded as necessary.

**Receivables from and payable to customers**

These balances primarily pertain to margin and open contractual commitments related to customers' futures, foreign currency forward and securities transactions. Receivables from and payable to customers in connection with futures and foreign currency forward transactions include gains and losses on open futures, options and forward contracts. Receivables from and payable to customers in connection with securities transactions include amounts due on cash and margin transactions.

F-12

Receivables from customers, net of reserves at each year end are as follows:

|  | | February 28, 2005 | | February 29, 2004 |
|---|---|---|---|---|
|  | | (in thousands) | | |
| Futures transactions | $ | 626,422 | $ | 212,299 |
| Foreign currency and other OTC derivative transactions | | 811,026 | | 38,724 |
| Securities transactions | | 627,024 | | 1,340,362 |
| Other | | 17,496 | | — |
|  | $ | 2,081,968 | $ | 1,591,385 |

Payable to customers at each year end are as follows:

|  | | February 28, 2005 | | February 29, 2004 |
|---|---|---|---|---|
|  | | (in thousands) | | |
| Futures transactions | $ | 4,853,138 | $ | 4,052,363 |
| Foreign currency and other OTC derivative transactions | | 359,085 | | 394,936 |
| Securities transactions | | 1,635,335 | | 606,038 |
|  | $ | 6,847,558 | $ | 5,053,337 |

These receivables are generally collateralized with marketable securities. The Group's allowance for doubtful accounts is based upon management's continuing review and evaluation of factors such as collateral value, aging and the financial condition of the customers. The allowance is assessed to reflect best estimate of probable losses that have been incurred as of the balance sheet date. Any changes are included in the current period operating results. The Group pursues collection of these receivables through various means, including legal action and collection agencies. Reserves of $61.2 million and $65.2 million have been provided against receivables from customers as of February 28, 2005 and February 29, 2004, respectively. The Group generally nets receivables and payables related to its customers' futures, foreign currency forwards and securities transactions on a counterparty basis pursuant to master netting agreements. Where possible, it is the Group's policy to settle these transactions on a net basis with its counterparties.

**Financial instruments**

The consolidated balance sheets generally reflect purchases and sales of financial instruments owned or sold on a trade-date basis.

**Securities owned and Securities sold, not yet purchased**

Securities owned and Securities sold, not yet purchased consist primarily of U.S. and foreign equity and fixed-income securities, which are stated at quoted market values, with unrealized gains and losses recognized in income under "Principal transactions, net." Securities not readily marketable are valued at fair value as determined by management. Fair value is the amount at which an instrument could be exchanged in a current transaction between willing parties, other than in a forced or liquidation sale.

F-13

**Derivative financial instruments**

As a broker, the Group enters into transactions involving derivative financial instruments in relation to its customer business. These transactions are generally immediately economically hedged by back-to-back trades with other financial institutions. All derivative financial instruments are carried at market value or, if market prices are not readily available, fair value. Market values for exchange-traded derivatives are based on quoted market prices. Fair market values for over-the-counter derivative financial instruments are based on pricing models that are based on observable market data intended to approximate the amounts that would be received from or paid to a third party in settlement of the contracts.

Derivatives used for economic hedging purposes include swaps, forwards, futures and purchased options. Unrealized gains or losses on these derivative contracts are recognized currently in the statement of income as Principal transactions, net. The Group does not apply hedge accounting as defined in Statement of Financial Accounting Standards ("SFAS") No. 133, *Accounting for Derivative Instruments and Hedging Activities*, as all financial instruments are marked to market with changes in fair values reflected in earnings. Therefore, the disclosures required in paragraphs 44 and 45 of the statement are generally not applicable with respect to these financial instruments.

**Memberships in exchanges**

Exchange memberships comprise both rights to trade on exchanges and deposits made in relation to these memberships. Exchange memberships owned are recorded at cost and tested annually for impairment.

**Furniture, equipment and leasehold improvements**

Furniture, equipment and leasehold improvements are recorded at cost less accumulated depreciation and amortization. Depreciation is computed using the straight-line method over the estimated useful lives of the assets, which range from three to seven years. Leasehold improvements are amortized over the lesser of the economic useful life of the improvement or the term of the lease.

**Impairment of assets**

The Company reviews its long-lived assets and intangible assets for impairment whenever events or changes in circumstances indicate that the carrying amounts may not be recoverable. If such assets are considered to be impaired, the impairment to be recognized is measured as the amount by which the carrying amount of the assets exceeds the fair value of the assets.

**Goodwill**

Goodwill is the cost of acquired companies in excess of the fair value of identifiable net assets at acquisition date. Prior to March 1, 2002, goodwill was amortized over a period of 25 years on a straight-line basis. Effective March 1, 2002, the Group adopted SFAS No. 142, *Goodwill and Other Intangible Assets*; consequently, goodwill is no longer amortized but, instead, is tested at least annually for impairment. An impairment loss is triggered if the estimated fair value of an operating segment is less than its estimated net book value. Such loss is calculated as the difference between the estimated fair value of goodwill and its carrying value. Goodwill was recognized as part of the Transactions on

F-14

August 5, 2004. Goodwill relates to the excess purchase price over the fair value of the net assets acquired by the Company.

**Identifiable intangible assets**

Identifiable intangible assets consist primarily of customer relationships and trade names. Customers relationships are amortized on an accelerated basis based upon patterns of usage over a weighted-average economic useful life of approximately 13 years. These intangible assets are tested for potential impairment whenever events or changes in circumstances suggest that an asset's or asset group's carrying value may not be fully recoverable in accordance with SFAS No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets.* An impairment loss, calculated as the difference between the estimated fair value and the carrying value of an asset or asset group, is recognized if the expected undiscounted cash flows relating to the asset or asset group are less than the corresponding carrying value. Trade names have been classified as indefinite-lived assets and are not amortized but tested annually for impairment.

**Stock-based compensation**

The Group measures compensation expense for its employee stock-based compensation plans using the fair value method prescribed by SFAS No. 123, *Accounting for Stock-Based Compensation.*

**Income taxes**

The Group has elected to be treated as a limited liability company for federal income tax purposes, as defined in the regulations. Under these regulations, members are responsible for their individual income tax liabilities related to the Group's operating results. Accordingly, the Group has not provided for Federal income taxes related to its operating results. The provision for income taxes relates to income taxes of foreign subsidiaries.

**Revenue recognition**

Commissions and brokerage are recorded on a trade-date basis as securities transactions occur. Commissions and brokerage includes per contract charges for trade execution and clearing. Fees are charged at various rates based on the product traded and the method of trade. Commissions earned and related expenses on customers' open futures positions are recognized on a half-turn basis. The Group reports gross commission income on transactions executed by introducing brokers and reports commissions paid to introducing brokers as commission expense.

Interest is recognized on an accrual basis. Interest income or interest expense on repurchase agreements and collateralized financing arrangements are recognized as interest over the life of the transaction. Interest income and expense for matched repurchase agreement transactions are presented net in the consolidated statements of income.

Certain Prime Brokerage/Capital Markets transaction fee revenues are recorded as principal transactions, net in the Consolidated Statements of Income. In these instances the customer may not pay a separately billed commission rate related to a given transaction. Instead, the equivalent of a commission is included in the revenues of the transaction following its execution on behalf of the

F-15

customer. These transactions are specific to those markets in which no third party clearing organization is utilized and involve primarily client foreign exchange transactions.

The Group, as a broker of derivatives products, enters into contractual commitments, as principal, involving forward settlement. The Group generally enters into offsetting contracts to achieve economic hedges, which result in a profit spread for the Group. Both the contractual commitment and the offsetting contract are recorded at fair value. The Group does not apply hedge accounting as defined in SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*, and all offsetting contracts are marked to market and included in the Consolidated Statements of Income. Both realized and unrealized gains and losses are recognized and recorded in the consolidated statements of income under "Principal transactions, net" as follows:

| | Period from August 6, 2004 through February 28, 2005 | | | Period from March 1, 2004 through August 5, 2005 | | | Year Ended February 29, 2004 | | | Year Ended February 28, 2003 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Net | | | Net | | | Net | | | Net | | |
| | Realized Gains (Losses) | Unrealized Gains (Losses) | Total Gains (Losses) | Realized Gains (Losses) | Unrealized Gains (Losses) | Total Gains (Losses) | Realized Gains (Losses) | Unrealized Gains (Losses) | Total Gains (Losses) | Realized Gains (Losses) | Unrealized Gains (Losses) | Total Gains (Losses) |
| | | | | | | (in thousands) | | | | | | |
| Foreign currency forwards | $ 41,099 | $ (12,530) | $ 28,569 | $ 15,243 | $ 9,034 | $ 24,277 | $ 83,660 | $ (198) | $ 83,462 | $ 54,293 | $ (34,785) | $ 19,508 |
| Futures | 65,166 | (37,419) | 27,747 | 17,235 | 26,236 | 43,471 | 54,186 | (6,661) | 47,525 | (49,753) | 177,742 | 127,989 |
| Options | 19,414 | 1,107 | 20,521 | 8,621 | 7,375 | 15,996 | (5,973) | 5,165 | (808) | (121,989) | 123,851 | 1,862 |
| Treasury notes | 52,338 | 26,621 | 78,959 | 43,530 | (7,278) | 36,252 | 35,878 | 3,492 | 39,370 | (76,714) | 1,012 | (75,702) |
| Bonds | 4,942 | 1,721 | 6,663 | 4,564 | (3,181) | 1,383 | (2,725) | (1,141) | (3,866) | 40,561 | (14,839) | 25,722 |
| Other | (4,393) | 2,764 | (1,629) | (1,558) | (586) | (2,144) | (1,304) | 1,557 | 253 | (16,735) | (90) | (16,825) |
| Total | $ 178,566 | $ (17,736) | $ 160,830 | $ 87,635 | $ 31,600 | $ 119,235 | $ 163,722 | $ 2,214 | $ 165,936 | $(170,337) | $ 252,891 | $ 82,554 |

The following table shows the gross notional or contractual amounts of derivatives held by the Group.

| | As of February 28, 2005 | | As of February 29, 2004 | |
|---|---|---|---|---|
| | Notional | Fair Value | Notional | Fair Value |
| | | (in thousands) | | |
| Forward currency contracts | $ 79,683,493 | $ (5,382) | $ 41,586,917 | $ (715) |
| Swap contracts | 30,056 | (3,199) | 2,927,400 | 1,304 |
| Option contracts sold or written | 19,125,420 | (352,428) | 10,383,291 | (272,078) |
| Option contracts purchased | 14,478,439 | 370,410 | 10,723,550 | 272,528 |
| Exchange-traded futures | 14,246,658 | (1,873) | 3,735,774 | (1,585) |
| Total | $ 127,564,066 | $ 7,528 | $ 69,356,932 | $ (546) |

Asset management and advisory fees primarily include fees from investment management and other financial service related products and are recognized as services are provided. They are determined in accordance with contracts based upon a percentage of assets under management or the volume of financial service products sold through our distribution platform.

## Accounting Changes

## Consolidation of Variable Interest Entities

On March 1, 2004, the Group adopted Interpretation 46 R, which contains substantial changes to the original FASB

Interpretation No. 46, *Consolidation of Variable Interest Entities* ("FIN 46"). The changes to these pronouncements include revisions to the calculation of expected losses and expected

F-16

residual returns and reducing the impact of decision maker and guarantor fees in those calculations. Revisions were also made to the definition of a variable interest entity, which changes the method of determining whether certain entities should be included in the Group's Consolidated Financial Statements as VIEs. The Group has determined that no entities are required to be consolidated and that the adoption of Interpretation 46 R has not had a material impact on the Group's financial statements.

**Recently issued accounting pronouncement**

In December 2004, the FASB issued SFAS No. 123 (revised), *Share-Based Payment* ("SFAS 123R"). SFAS 123R requires an entity to measure the cost of employee services received in exchange for an award of equity instruments based on the grant-date fair value of the award with the cost to be recognized over the period during which an employee is required to provide service in exchange for the award. The Company is required to adopt the provisions of SFAS 123R as of the beginning of the first interim period of the first fiscal year that begins after June 15, 2005, although earlier adoption is permitted. The Company is in the process of determining the impact, if any, of SFAS 123R on its consolidated financial statements.

**NOTE C—DISCONTINUED OPERATIONS**

On August 5, 2004, the Predecessor distributed all the equity interests of Forstmann-Leff International Associates, LLC, which owned substantially all the assets of the Predecessor's Asset Management business, to Refco Group Holdings, Inc., an entity wholly owned by Phillip Bennett upon consummation of the Transactions.

Financial information related to Forstmann-Leff International Associates, LLC is reported separately in the Company's income statement as discontinued operations. Prior period information has been adjusted on the same basis to reflect this presentation.

Operating results for Forstmann-Leff International Associates, LLC included in the discontinued operations are presented in the following table.

|  | Period from March 1, 2004 through August 5, 2004 | Year Ended | |
|  |  | February 29, 2004 | February 28, 2003 |
| --- | --- | --- | --- |
|  |  | (in thousands) | |
| Revenue | $ 47,660 | $ 64,692 | $ 57,018 |
| Expenses | 40,277 | 65,093 | 55,867 |
| Income (loss) before income taxes | 7,383 | (401) | 1,151 |
| Income tax expenses | 3,344 | 489 | 737 |
| Net income (loss) | $ 4,039 | $ (890) | $ 414 |

The following table presents the carrying amounts of major classes of assets and liabilities of Forstmann-Leff International Associates, LLC as of February 29, 2004. These assets and liabilities are

F-17

included under the captions "Assets of discontinued operations" and "Liabilities of discontinued operations" on the Group's February 29, 2004 consolidated balance sheet.

|  | February 29, 2004 |
| --- | --- |
|  | (in thousands) |
| Cash and cash equivalents | $    22,030 |
| Receivable from customers | 25,582 |
| Other assets | 228,400 |
| Total assets | $    276,012 |
| Payable to customers | $    42,380 |
| Other liabilities(a) | 2,498 |
| Total liabilities | $    44,878 |

(a)     includes accounts payable and accrued expenses

## NOTE D—SHORT-TERM BORROWINGS, LONG-TERM BORROWINGS AND OTHER BORROWINGS

### Short-term borrowings

The Group obtains short-term borrowings through bank loans. Short-term borrowings also include the portion of long-term borrowings maturing within one year and certain long-term borrowings that may be payable within one year at the option of the holder. The carrying value of these short-term obligations approximates fair value due to their short-term nature.

Bank loans are generally from major money center banks and are primarily payable on demand. Interest is paid at prevailing short-term market rates. The Group enters into loan agreements with banks, which may be collateralized by letters of credit or other forms of collateral. Generally, the amounts pledged represent the underlying collateral for the Group's receivables from customers.

Short-term borrowings at year end are set forth below:

|  | February 28, 2005 | February 29, 2004 |
| --- | --- | --- |
|  | (in thousands) | |
| Bank loans | $    24,628 | $    20,890 |
| Current portion of long-term borrowings | 8,000 | 68,000 |
| Total | $    32,628 | $    88,890 |

The weighted average interest rate on outstanding bank loans, which includes short-term funding and overdrafts, was 3.78% and 1.58% at February 28, 2005 and February 29, 2004, respectively.

Interest rates paid on short-term borrowings, excluding the current portion of long-term borrowings, ranged from 1.89% to 7.4% and 1.58% to 2.25% for the years ended February 28, 2005 and February 29, 2004, respectively.

F-18

**Long-term borrowings**

Long-term borrowings of $1,246.0 million and $383.5 million for the years ended February 28, 2005 and February 29, 2004, respectively, consist of the following loans:

| | February 28, 2005 | | February 29, 2004 |
|---|---|---|---|
| | (in thousands) | | |
| New Senior Credit Facility: | | | |
| Secured Term Loan | $ 646,000 | $ | — |
| Secured Revolving Loan | — | | — |
| 9% Senior Subordinated Notes, due August 1, 2012 | 600,000 | | — |
| Old Senior Notes: | | | |
| Series A Senior Notes 2004 | — | | 17,000 |
| Senior Notes 2005 | — | | 74,000 |
| Series B Senior Notes 2006 | — | | 14,000 |
| Senior Notes 2007 | — | | 56,000 |
| Series A Senior Notes 2007 | — | | 100,000 |
| Series B Senior Notes 2009 | — | | 122,500 |
| | 1,246,000 | | 383,500 |
| Less: Portion included within short-term borrowings | 8,000 | | 68,000 |
| Total long-term borrowings | $ 1,238,000 | $ | 315,500 |

*Predecessor:*

The long-term borrowings represent unsecured syndicated senior notes with major financial institutions. These borrowings were subject to acceleration in the event of a change in control and were repaid in full in connection with the Transactions on August 5, 2004.

*Successor:*

In connection with the Transactions on August 5, 2004, Refco Group Ltd., LLC entered into a new Senior Credit Facility (the "New Senior Credit Facility") and issued 9% Senior Subordinated Notes, a portion the proceeds from which was used to repay the outstanding amounts under the old senior notes and the old subordinated loan from a member.

The New Senior Credit Facility provides for a $75.0 million revolving credit facility in revolving credit loans and letters of credit. The revolving credit facility matures on August 5, 2010. The New Senior Credit Facility also provides for an $800.0 million secured term loan facility. The secured term loan facility matures on August 5, 2011. See "Note S—Subsequent Events" for additional information on the New Senior Credit Facility.

The secured term loan facility was fully drawn immediately after the closing of the Transactions on August 5, 2004. None of the revolving credit facility had been drawn as of this date. This facility will meet the Group's future needs for working capital and general corporate purposes.

The New Senior Credit Facility bears interest, at the Group's option, at either the Eurodollar Rate or the Base Rate (both as defined), plus an applicable margin. The applicable margins under the term

F-19

loan facility and the revolving credit facility are determined based upon the Leverage Ratio (as defined), as set forth in the following table:

| | | Applicable Margin | | | |
| | | Term Loans | | Revolving Loans | |
| Pricing Level | Leverage Ratio | Eurodollar Rate | Base Rate | Eurodollar Rate | Base Rate |
|---|---|---|---|---|---|
| 1 | >5.00:1 | 2.75% | 1.75% | 2.75% | 1.75% |
| 2 | >4.50:1 but ≤5.00:1 | 2.75% | 1.75% | 2.50% | 1.50% |
| 3 | >4.00:1 but ≤4.50:1 | 2.75% | 1.75% | 2.00% | 1.00% |
| 4 | ≤4.00:1 | 2.75% | 1.75% | 1.75% | 0.75% |

The weighted average interest rates per annum in effect as of February 28, 2005 for the secured term loan facility was 4.79%. The interest rate payable under the New Senior Credit Facility will increase by 2.00% per annum during the continuance of any payment or bankruptcy event of default.

The New Senior Credit Facility is also secured by, among other things:

- a first priority security interest in substantially all of the assets of the Company and the Company's non-regulated restricted domestic subsidiaries (other than Refco Finance Inc.), including without limitation, all receivables, contracts, contract rights, equipment, intellectual property, inventory and all other tangible and intangible assets, subject to certain customary exceptions;

- a pledge of (i) all of present and future capital stock of each of Refco Group Ltd., LLC and the Company, the Company's and each guarantor's direct domestic subsidiaries, including regulated domestic subsidiaries held directly by the Company or any guarantor and (ii) 65% of the voting stock of each of the Company and each guarantor's direct foreign subsidiaries; and

- all proceeds and products of the property and assets described above.

In addition, the New Senior Credit Facility is guaranteed by the Company and the Company's non-regulated restricted domestic subsidiaries.

On January 24, 2005, the Group made a voluntary prepayment on the principal amount outstanding of the secured term loan facility in the amount of $150.0 million. The write-off of the unamortized deferred financing costs in connection with the voluntary prepayment was included in interest expense.

On August 5, 2004, Refco Group Ltd., LLC completed a financing, which consisted of the sale of $600.0 million of 9% Senior Subordinated Notes due 2012 (the "New Notes") pursuant to a private offering. The New Notes bear interest at the rate of 9% per annum, which is payable semi-annually in cash in arrears on February 1 and August 1. The New Notes mature on August 1, 2012. The payment of the principal of, premium, if any, and interest on the New Notes and the payment of any Subsidiary Guaranty will be subordinate in right of payment to the prior payment in full of all Senior Indebtedness of the Issuers or the relevant Subsidiary Guarantor, as the case may be. Refco Group Ltd., LLC has issued 9% Senior Subordinated Notes due 2012 (the "Exchange Notes") in exchange for all New Notes, pursuant to an exchange offer whereby holders of the New Notes will

F-20

receive Exchange Notes that have been registered under the Securities Act of 1933, as amended, having terms substantially identical in all material aspects to the New Notes, except that the Exchange Notes will not contain terms with respect to transfer restrictions.

At any time prior to August 1, 2007, Refco Group Ltd., LLC may redeem up to 35% of the aggregate principal amount of the New Notes at a price of 109.000% in connection with a Designated Offering, as defined. With the exception of a Designated Offering, the New Notes are redeemable at the option of Refco Group Ltd., LLC beginning August 1, 2008 at prices decreasing from 104.500% of the principal amount thereof to par on August 1, 2010 and thereafter. Prior to August 1, 2008, Refco Group Ltd., LLC has the option to redeem all, but not less than all, of the New Notes at a redemption price equal to 100% of the principal amount of the New Notes, plus an Applicable Premium, as defined, plus accrued and unpaid interest to the redemption date. Refco Group Ltd., LLC is not required to make mandatory redemption or sinking fund payments with respect to the New Notes.

The indenture for the New Notes requires Refco Group Ltd., LLC and its subsidiaries to comply with certain restrictive covenants, including a restriction on dividends; and limitations on the incurrence of indebtedness, certain payments and distributions and sales of Refco Group Ltd., LLC's assets and stock. Refco Group Ltd., LLC was in compliance with all contractual debt commitments as of February 28, 2005 and February 29, 2004, respectively.

The New Notes are fully and unconditionally guaranteed on an unsecured, senior subordinated basis by all of the Company's active domestic non-regulated subsidiaries. The Condensed Consolidating Financial Information in Note R provides additional guarantor/non-guarantor information.

The table below sets out the maturities of the Group's long-term borrowings (in thousands):

| Fiscal year ended | | |
|---|---|---|
| 2006 | $ | 8,000 |
| 2007 | | 8,000 |
| 2008 | | 8,000 |
| 2009 | | 8,000 |
| 2010 | | 8,000 |
| 2011 and thereafter | | 1,206,000 |
| Total | $ | 1,246,000 |

The Group's interest expense from long-term borrowings for the period from August 6, 2004 through February 28, 2005 and the period from March 1, 2004 through August 5, 2004 was $52.6 million and $11.7 million, respectively. For the years ended February 29, 2004 and February 28, 2003, interest expense from long-term borrowings was $31.1 million and $27.2 million, respectively.

**Other borrowings**

Subordinated debt of $16.0 million, included in the consolidated balance sheets, consists of a subordinated loan from a member. The subordinated debt outstanding at February 29, 2004 bears interest at the prime rate and matures June 1, 2005. For the year ended February 29, 2004, the weighted-average interest rate on the subordinated debt was 4.08%. Subordinated debt is subordinated

F-21

to the claims of present and future general creditors. The subordinated debt was repaid in full in connection with the Transactions on August 5, 2004.

**NOTE E—SECURITIES OWNED AND SECURITIES SOLD, NOT YET PURCHASED**

Securities owned and Securities sold, not yet purchased, consist of trading and investment securities and derivative financial instruments at market or fair value.

| | February 28, 2005 | | February 29, 2004 |
|---|---|---|---|
| | (in thousands) | | |
| Securities owned consists of: | | | |
| U.S. Treasuries | $ | 3,269,667 | $ 1,316,754 |
| Foreign governments | | 1,779,353 | 290,317 |
| Corporate bonds | | 62,529 | — |
| Options | | 383,142 | 251,623 |
| Fund investments | | 22,528 | 87,233 |
| Equities | | 36,087 | 8,697 |
| Other | | 41,491 | 77,911 |
| | $ | 5,594,797 | $ 2,032,535 |
| | | | |
| Securities sold, not yet purchased consist of: | | | |
| U.S. Treasuries | $ | 5,301,510 | $ 555,039 |
| Foreign governments | | 2,101,947 | — |
| Corporate bonds | | 57,727 | — |
| Options | | 364,433 | 251,172 |
| Other | | 7,405 | 1,274 |
| | $ | 7,833,022 | $ 807,485 |

As of February 28, 2005 and February 29, 2004, the Group had not pledged any securities owned as collateral with counterparties.

F-22

**NOTE F—GOODWILL**

The changes in goodwill by reportable segment for the period from August 6, 2004 through February 28, 2005, the period from March 1, 2004 through August 5, 2004 and the year ended February 29, 2004 are as follows:

|  | Derivatives Brokerage & Clearing | Prime Brokerage/Capital Markets | Total |
|---|---|---|---|
|  | (in thousands) | | |
| **Predecessor:** | | | |
| **Balance as of February 28, 2003** | $ 121,971 | $ 4,410 | $ 126,381 |
| Acquisition | 19,337 | — | 19,337 |
| Disposition | — | — | — |
| Impairment losses | — | — | — |
| **Balance as of February 29, 2004** | $ 141,308 | $ 4,410 | $ 145,718 |
| Acquisition | — | — | — |
| Disposition | — | — | — |
| Impairment losses | — | — | — |
| **Balance as of August 5, 2004** | $ 141,308 | $ 4,410 | $ 145,718 |
| **Successor:** | | | |
| Acquisition | 286,626 | 429,940 | 716,566 |
| Disposition | — | — | — |
| Impairment losses | — | — | — |
| **Balance as of February 28, 2005** | $ 286,626 | $ 429,940 | $ 716,566 |

Goodwill of $716.6 million was recognized as part of the Transactions on August 5, 2004 and was assigned to Derivative Brokerage & Clearing and Prime Brokerage/Capital Markets in the amounts of $286.6 million and $430.0 million, respectively.

**NOTE G—IDENTIFIABLE INTANGIBLE ASSETS**

The Company's identifiable intangible assets are comprised of the following:

|  | February 28, 2005 | | | February 29, 2004 | | |
|---|---|---|---|---|---|---|
|  | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
|  | (in thousands) | | | | | |
| Customer relationships | $ 357,928 | $ 11,812 | $ 346,116 | $ 39,861 | $ 17,649 | $ 22,212 |
| Trade names | 231,752 | — | 231,752 | 1,060 | — | 1,060 |
| Technology | 1,027 | 193 | 834 | — | — | — |
|  | $ 590,707 | $ 12,005 | $ 578,702 | $ 40,921 | $ 17,649 | $ 23,272 |

Of the $573.9 million intangible assets recognized on the Transactions, $232.2 million assigned to trade names is not subject to amortization. The remaining $341.7 million intangible assets recognized have a weighted-average economic useful life of approximately 13 years, which is comprised of customer relationships of $340.7 million with a 13-year estimated useful

life and technology of $1.0 million with a three-year estimated useful life. The Predecessor basis of the Macfutures trade

F-23

name of $0.5 million has been written off due to this trade name being discontinued on November 10, 2004.

The amortization of identifiable intangible assets included in general, administrative and other expenses for the period from August 6, 2004 through February 28, 2005, the period from March 1, 2004 through August 5, 2004 and the years ended February 29, 2004 and February 28, 2003 was $12.5 million, $1.0 million, $3.6 million and $4.6 million, respectively.

The estimated amortization expense, based on current identifiable intangible balances, for the next five fiscal years beginning March 1, 2005 is as follows (in thousands):

| Fiscal year | |
|---|---|
| 2006 | $ 21,465 |
| 2007 | 21,661 |
| 2008 | 21,359 |
| 2009 | 20,869 |
| 2010 | 20,172 |

## NOTE H—OTHER ASSETS

Other assets are generally less liquid, non-financial assets. The following table sets forth the Group's other assets by type:

| | February 28, 2005 | February 29, 2004 |
|---|---|---|
| | (in thousands) | |
| Equity-method investments(1) | $ 77,461 | $ 65,504 |
| Investments(2) | 55,574 | 32,241 |
| Deferred financing costs(3) | 41,572 | 3,239 |
| Furniture, equipment and leasehold improvements(4) | 43,871 | 44,351 |
| Miscellaneous receivables and other | 54,231 | 25,262 |
| Total | $ 272,709 | $ 170,597 |

(1)     Equity method investments

Equity method investments as of February 28, 2005 comprise:

| | Principal Activity | Percentage Owned | Country of operation | Carrying Value |
|---|---|---|---|---|
| | | | | (in thousands) |
| Forex Capital Markets, LLC | Spot FX broker | 35% | United States | $ 55,499 |
| Friedberg Mercantile Group | Investment dealer, futures commission merchant and fund manager | 50% | Canada | 12,989 |
| Refco Polaris Taiwan | Futures broker | 20% | Taiwan | 8,973 |
| | | | | $ 77,461 |

Under the equity method of accounting, the Company's initial investment is recorded at cost and is subsequently increased to reflect the Company's share of the investees' income and reduced to reflect the Company's share of the investees' losses or dividends received. The Company's income from equity

F-24

investees was $16.6 million, $8.3 million, $11.5 million and $1.7 million for the period from August 6, 2004 through February 28, 2005, the period from March 1, 2004 through August 5, 2004 and the years ended February 29, 2004 and February 28, 2003, respectively.

(i)    *Forex Capital Markets, LLC*

The following information has been restated to include summarized financial information for the Company's significant equity method investment, Forex Capital Markets, LLC, as follows:

|  | Year Ended | | |
|---|---|---|---|
|  | February 28, 2005 | February 29, 2004 | February 28, 2003 |
|  | (in thousands) | | |
| Statements of income information: |  |  |  |
|   Revenues | $ 141,437 | $ 81,241 | $ 46,584 |
|   Income from continuing operations | 63,265 | 41,328 | 26,290 |
|   Net income | 63,265 | 41,428 | 25,255 |
| Balance sheet information: |  |  |  |
|   Current assets | 269,204 | 140,906 |  |
|   Noncurrent assets | 5,824 | 2,560 |  |
|   Current liabilities | 8,562 | 1,038 |  |
|   Noncurrent liabilities | 201,529 | 101,364 |  |

(2)    Investments

As part of its corporate strategy and in the normal course of its business, the Company makes investments in companies engaged in its core business and in companies engaged in closely related market activities. As of February 28, 2005 and February 29, 2004, the value of such investments was $55.6 million and $32.2 million, respectively.

Investments made in core activities consist primarily of investments made in international derivative and capital market brokerage operations. As of February 28, 2005 and February 29, 2004, international derivative brokerage investments included HanMag Futures Corp., a derivative clearing company in Seoul, Korea, Sify-India, a derivative brokerage operation in India, Cantor Index, a broker of over-the-counter index derivatives in London, England, and ACM, an online foreign exchange brokerage operation in Geneva, Switzerland.

As of February 28, 2005 and February 29, 2004, related market investments also included Xinhua Financial Inc., a market leader in providing financial and commodity research and price information to financial market users in the People's Republic of China.

A further category of investments are investments made in software providers considered strategically important to the Company's product delivery infrastructure in derivatives and prime brokerage. As of February 28, 2005 and February 29, 2004, the Company had investments in Easy Solutions, a leading provider of front-end order entry software for global derivatives markets, and QV Trading, the pricing platform upon which certain of the Company's fixed income prime brokerage operations are built.

(3)    Deferred Financing Costs

F-25

As of February 28, 2005, unamortized deferred financing costs incurred in connection with the issuance of the New Senior Credit Facility and the New Notes (See Note D) were $41.6 million and are amortized over the life of the related long-term borrowing. As of February 29, 2004, unamortized deferred financing costs incurred in connections with the secured syndicated senior notes with major financial institutions was $3.2 million.

The Group's amortization of deferred financing costs for the period from August 6, 2004 through February 28, 2005, the period from March 1, 2004 through August 5, 2004 and the years ended February 29, 2004 and February 28, 2003 was $3.9 million, $1.2 million, $3.2 million and $2.8 million, respectively.

(4)    Furniture, equipment and leasehold improvements

|  | Cost | Accumulated amortization/depreciation | February 28, 2005 Net book value | February 29, 2004 Net book value |
|---|---|---|---|---|
|  | (in thousands) | | | |
| Furniture and equipment | $ 117,182 | $ 85,577 | $ 31,605 | $ 33,797 |
| Leasehold improvements | 29,351 | 17,085 | 12,266 | 10,554 |
|  | $ 146,533 | $ 102,662 | $ 43,871 | $ 44,351 |

Depreciation and amortization expense, included in general, administrative and other expenses, was $5.6 million, $8.7 million, $21.5 million and $18.8 million for the period from August 6, 2004 through February 28, 2005, the period from March 1, 2004 through August 5, 2004 and the years ended February 29, 2004 and February 28, 2003, respectively.

## NOTE I—ACQUISITIONS

On September 1, 2004, the Group entered into a purchase agreement to acquire the customer accounts and related customer assets of Pioneer Futures, a division of Pioneer Futures Inc., for approximately $17.2 million in cash. The full amount paid has been assigned to customer relationships. These customer relationships are amortized on an accelerated basis over a weighted-average economic useful life of 13 years, based on a preliminary valuation analysis. Pioneer Futures Inc., a Futures Commission Merchant, provides clearing services to professional floor traders and brokers in futures and options on futures contracts and acts as a clearing firm for certain introducing brokers.

## NOTE J—NET CAPITAL REQUIREMENT

The Company's subsidiary Refco Securities, LLC is subject to the uniform net capital requirements of the Securities and Exchange Commission ("SEC") under Rule 15c3-1 (the "Rule"), which requires the maintenance of minimum net capital. Refco Securities, LLC computes its net capital requirements under the alternative method provided for in the Rule, which requires that Refco Securities, LLC maintain net capital equal to the greater of $250,000 or 2% of aggregate customer related debit items, as defined in SEC Rule 15c3-3. The net capital rule also provides that equity capital may not be withdrawn or cash dividends paid if resulting net capital would be less than 5% of aggregate debits. As of February 28, 2005, Refco Securities, LLC had net capital of $82.0 million, which was 24.7% of aggregate debit balances and $75.4 million in excess of required net capital.

The Company's subsidiary Refco, LLC is subject to the Commodity Futures Trading Commission's ("CFTC") minimum financial requirements, which require that the subsidiary maintain net capital, as defined. The requirement is equal to the greater of 4% of customer funds required to be segregated/secured pursuant to the Commodity Exchange Act less the market value of certain commodity options, all as defined, or the sum of 8% of the customer risk maintenance margin requirement plus 4% of the non-customer risk maintenance margin requirement. The net capital rule also provides that Refco, LLC must maintain adjusted net capital in excess of an early warning level equal to 110% of its net capital requirement. Additionally, the subsidiary is subject to certain restrictions in reductions in capital, as defined. As of February 28, 2005, Refco, LLC had net capital of $283.9 million, which was $95.0 million in excess of required net capital.

## NOTE K—COMMITMENTS AND CONTINGENCIES

### Lease Commitments

The Group occupies offices in various locations under operating leases expiring through 2014. Future minimum rental payments required under significant leases for premises, excluding any escalation adjustments, are as follows (in thousands):

| Fiscal year | |
|---|---|
| 2006 | $ 11,662 |
| 2007 | 11,631 |
| 2008 | 12,073 |
| 2009 | 8,051 |
| 2010 | 7,578 |
| Thereafter | 19,674 |
| | $ 70,669 |

The Group's rent expense for the period from August 6, 2004 through February 28, 2005, the period from March 1, 2004 through August 6, 2004 and the years ended February 29, 2004 and February 28, 2003 was $7.4 million, $6.1 million, $14.0 million and $12.1 million, respectively.

### Purchase Commitments

On June 10, 2003, the Group acquired 50% of the shares of the Friedberg Mercantile Group ("FMG"), a registered broker/investment dealer. The Group has a commitment to purchase the remaining 50% of FMG's shares at June 10, 2008 for a maximum price of $17.9 million.

### Contingencies

In the ordinary course of business, the Group has been named as a party to both litigation and administrative proceedings, certain of which are described below.

On March 1, 2005, Trading Technologies International, Inc. ("Trading Technologies") filed an action against Refco Group Ltd., LLC, Refco, LLC and Refco EasySolutions, LLC (collectively, the "Refco parties") in the U.S. District Court for the Northern District of Illinois, Eastern Division, alleging that the Refco parties infringed upon certain patents owned by Trading Technologies relating to electronic trading software. In its complaint, Trading Technologies demanded a preliminary and permanent injunction against the Refco parties, as well as unspecified damages and costs. The Refco

F-27

parties filed certain counterclaims for breach of contract and attempted monopolization and an affirmative defense of patent misuse. On May 20, 2005, Trading Technologies filed a motion to dismiss these counterclaims and affirmative defense. Trading Technologies has also announced that it has postponed its planned termination of certain licensing agreements with the Refco parties until at least July 15, 2005.

Certain of the Group's subsidiaries have been named in a legal proceeding in which the plaintiffs, two hedge funds and their investment managers, alleged that the subsidiaries breached a customer agreement governing the plaintiffs' margin account when they required the plaintiffs to increase the value of collateral securing a margin loan from 60% to 100% in September 1998.

On September 15, 2003, the Supreme Court of the State of New York granted the Group's motion for summary judgment on six of the seven claims and dismissed those claims with prejudice. By Order dated March 16, 2004, the appellate court (Appellate Division, First Department) affirmed the trial court's decision. On May 11, 2004, the trial court granted the Group's motion to bifurcate the trial of liability from any trial on damages. The remaining claim of liability was tried before a jury in June 2004.

On June 17, 2004, the jury returned a verdict in favor of the plaintiffs' claim as to the Group's liability. The Group moved the trial court (a) for judgment in favor of the Group as a matter of law, (b) to set aside the verdict and (c)(i) to direct entry of judgment for the Group as a matter of law, or (ii) in the alternative, to order a new trial on plaintiffs' second cause of action. By memorandum decision and order dated March 3, 2005, the trial court granted the Group's post-trial motion to set aside the jury verdict as against the weight of the evidence and ordered a new trial. Tradewinds has filed a notice of appeal of the order and Refco has filed a notice of cross appeal. The court scheduled a pre-trial conference for August 12, 2005. If the parties' appeals have not been perfected by that date, the court will set a date for a new trial.

After consultation with legal counsel, management believes that it is not probable that a material loss will result from the final verdict. The Group raised its margin requirements to 100% and/or terminated plaintiffs' financing on specific bonds and issued resulting margin calls to plaintiffs, who defaulted. The Appellate Division, First Department previously ruled that the Group had the contractual right to terminate margin loans to plaintiffs and thus did not breach any express provision of the customer agreements. The Group believes the sole issue remaining for the jury to determine was whether the Group breached the implied covenant of good faith and fair dealing when it exercised its contractual rights. The Group does not believe it breached the implied covenant when it exercised its contractual rights. Upon retrial, the Group believes the plaintiff will not be able to sustain its burden. Accordingly, the Group has not recorded an accrual for any losses that might arise from the final verdict.

In 2001, the Division of Enforcement of the SEC commenced an informal investigation into short sales of the stock of Sedona Corporation ("Sedona"). The SEC requested that the Group produce documents relating to any of its accounts that traded in the stock of Sedona. In June 2001, the SEC issued a formal order of investigation into short sales of Sedona stock, as well as other transactions. In 2002 and 2003, the Group received subpoenas from the SEC and a request for a written statement. Generally, the subpoenas and the request required the production of documents, tapes and information regarding two of the Group's former brokers who handled the account of Amro International, S.A. ("Amro"), one of the Group's former customers which engaged in short sales of Sedona stock, the

F-28

Group's relationship with Amro and its two principals; other securities traded by Amro; and the Group's record keeping, supervisory and short sale policies and restrictions. In October 2003, the Group received a subpoena from the United States Attorney's Office for the Southern District of New York, which called for the production of documents which had been provided to the SEC.

In addition to producing documents in response to the foregoing subpoenas, the Group has made their employees available to testify before the SEC and to be interviewed by the United States Attorneys' office. The Group has been advised that it is not currently the subject of the United States Attorney's investigation. On May 16, 2005, the Group announced that its subsidiary, Refco Securities, LLC, received a "Wells Notice" from the SEC arising out of the investigation. Under SEC procedures, Refco Securities, LLC has the opportunity to make a submission to the SEC staff outlining why it believes any proposed enforcement action should not be brought. Refco Securities, LLC is currently engaged in discussions with the SEC staff regarding the Wells Notice and the possible resolution of this matter, and continues to cooperate fully with the SEC in respect of its investigation.

At the present time, it is not possible to predict the ultimate outcome of the foregoing investigation with any certainty. Management has recorded a reserve for potential settlement and related costs.

In the opinion of management and where appropriate, in consultation with outside counsel, the resolution of these and other matters will not have a material adverse effect on the consolidated financial condition and results of operations of the Group in future periods.

**NOTE L—CLASS A AND B UNITS**

On August 5, 2004, New Refco Group Ltd., LLC, authorized 101.0 million Class A Units and issued 100.3 million Class A Units and 7.0 million Class B Units and issued 4.4 million Class B Units, valued at $0.83 per unit, to the Group's employees. The Class A and Class B units generally have identical rights and preferences, except the Class B Units are non-voting and have different rights as to certain distributions than the Class A Units.

The Company repurchased 0.3 million of its Class A Units on October 5, 2004 for $2.5 million, which has been reported as a reduction in members' equity. As of February 28, 2005, the Company had 100.0 million Class A Units outstanding.

One half of the Class B Units (the "Non Performance-Based Units") will vest 25% on each of February 28, 2005, February 28, 2006, February 28, 2007 and February 29, 2008. The other half of the Class B Units (the "Performance Units") will vest based upon the Company's achievement of EBITDA targets as defined in the agreements set forth for each of the Company's fiscal years ended February 28, 2005, February 28, 2006, February 28, 2007 and February 29, 2008. Any unvested Performance Units will vest automatically and immediately on the eighth anniversary date from the date of issuance if employees remain employed on a full-time basis.

On October 31, 2004, the Company declared a 202,551.721-for-one split of its Class A and Class B units (the "Unit Split"). The Unit Split entitled each Unit holder to receive 202,550.721 units for every outstanding Class A and Class B unit held on that date. All units included in the accompanying consolidated financial statements for all periods presented have been adjusted to retroactively reflect the Unit Split.

F-29

On October 31, 2004, November 10, 2004 and November 19, 2004, the Company issued 1,818,655.1, 40,000 and 20,000 additional Class B Units, respectively, to the Company's employees and members of its board of managers. The units issued to the members of the Company's board of managers are all Non Performance-Based Units and will vest 25% on each of February 28, 2005, February 28, 2006, February 28, 2007 and February 29, 2008. The fair value of the additional units is $1.32 per unit.

On December 6, 2004, the Company issued 690,000 Class B Units to its Chief Financial Officer pursuant to a restricted unit agreement. One half of the Class B Units are Non-Performance-Based Units and the other half are Performance Units. Any unvested Performance Units will vest automatically and immediately on the eighth anniversary date from the date of issuance if the employee remains employed on a full-time basis. The fair value of the additional units is $3.15 per unit.

Stock-based compensation expense was $1.9 million for the period from August 6, 2004 through February 28, 2005. The fair value of the Class B Units was calculated by a third party valuation firm using the average of the Black-Scholes option pricing model and Exit Scenarios Analysis for the initial and October valuations and the average of the Intrinsic Value and Exit Scenario Analysis for the December valuation, with the following weighted average assumptions:

**Weighted average assumptions for the initial and October valuations**

| Black-Scholes option pricing model | | Exit Scenarios Analysis | |
|---|---|---|---|
| Risk-free interest rate | 2.92% | Exit EBITDA Multiple | 8.0x |
| | | Required rate of return | 30.0% |
| Expected lives | 3.50 years | Capital structure | |
| Expected volatility | 21.67% | Class A Units | 96.0% |
| Expected dividend rate | 0.00% | Class B Units | 4.0% |

For the Class B Units issued on October 31, 2004, November 10, 2004 and November 19, 2004, a secondary exit scenario analysis was also performed by the third party valuation firm using a required rate of return of 16.6%, and this was factored into the fair value of the Class B Units issued on these dates.

**Assumptions for the December valuation**

| Intrinsic Value | | Exit Scenario Analysis | |
|---|---|---|---|
| | | Exit EBITDA Multiple | 8.5x |
| | | Required rate of return | 30.0% |
| Capital Structure | | Capital Structure | |
| Class A Units | 94.3% | Class A Units | 94.3% |
| Class B Units | 5.7% | Class B Units | 5.7% |

F-30

The values derived from these two approaches were calculated on the original grant date in August 2004, in October 2004 and in December 2004. These values derived under the two approaches are as follows:

| | Fair Value per Class B Unit | | |
| | Initial Valuation | October Valuation | December Valuation |
| Methodology | | | |
|---|---|---|---|
| Black-Scholes/Intrinsic | $    0.84 | $    0.79 | $    1.32 |
| Exit Scenario Analysis | $    0.83 | $    1.67 | $    3.93 |

Change in the Class B Units during the period from August 5, 2004 through February 28, 2005 is as follows:

| | Number of Units (in thousands) |
|---|---|
| Outstanding at August 5, 2004 | — |
| Issued | 6,931 |
| Exercised | — |
| Forfeited | (702) |
| Outstanding at February 28, 2005 | 6,229 |

## NOTE M—VARIABLE INTEREST ENTITIES

An entity is subject to Interpretation 46 R and is called a VIE if it has (1) equity that is insufficient to permit the entity to finance its activities without additional subordinated financial support from other parties, or (2) equity investors that cannot make significant decisions about the entity's operations, or that do not absorb the expected losses or receive the expected returns of the entity. All other entities are evaluated for consolidation under SFAS No. 94, *Consolidation of All Majority-Owned Subsidiaries*. A VIE is consolidated by its primary beneficiary, which is the party involved with the VIE that has a majority of the expected losses or a majority of the expected residual returns or both. In addition to the VIEs that are consolidated in accordance with Interpretation 46 R, the Group has significant variable interests in certain other VIEs that are not consolidated because the Company is not the primary beneficiary. As of February 28, 2005, the Group held variable interests in certain VIEs with respect to which the Group is deemed not to be the primary beneficiary. Those VIEs include several managed futures funds with aggregate net asset value of approximately $481.9 million managed by several of the Company's subsidiaries since April 1, 2003. Several of the Company's subsidiaries earn fixed investment management fees and, in certain cases, incentive fees and other fees from these managed funds. As of February 28, 2005, the Group's maximum exposure to loss from the funds managed by these subsidiaries is not material.

## NOTE N—DERIVATIVE ACTIVITIES, OFF BALANCE SHEET AND CONCENTRATION OF CREDIT RISK

In the normal course of its customer-driven operations, the Group enters into various contractual commitments, as principal, involving forward settlement. These include exchange-traded futures, fixed income swaps, equity swaps, foreign currency forwards and option contracts. The Group generally enters into offsetting contracts to achieve economic hedges at prices that result in a profit spread for

F-31

the Group. The Group also enters into forward repurchase agreements. Customers and counterparties of the Group consist of entities in and outside the United States.

The Group records its contractual commitments at market or fair value. Therefore, resulting changes in market or fair value are recorded currently in income. The Group's exposure to market risk is determined by a number of factors, including size, composition and diversification of positions held, market volatility and changes in interest and foreign exchange rates. The overall level of market risk from financial instruments the Group is exposed to is often limited by other financial instruments recorded both on and off balance sheet. Management actively monitors its market risk by reviewing the effectiveness of hedging strategies and setting market risk limits.

The Group also enters into financing agreements, collateralized primarily by U.S. Government securities, in which it extends short-term credit to counterparties. The value and adequacy of the collateral are continually monitored.

The Group's business also includes clearing and executing futures contracts and options on futures contracts for the accounts of customers. As such, the Group guarantees to the respective clearinghouse its customers' performance under these contracts. The Group provides clearing services of futures and options to introducing brokers. The Group may require introducing brokers to deposit funds or pledge their exchange memberships, thereby reducing risks associated with the clearing of futures and options. Additionally, to reduce its risk, the Group requires customers to meet, at a minimum, the margin requirements established by each of the exchanges at which the contract is traded. This margin is a good faith deposit from the customer, which reduces the risk to the Group of failure on behalf of the customer to fulfill any obligation under the contract. To minimize its exposure to risk of loss due to market variation, the Group adjusts these margin requirements, as needed, due to daily fluctuations in the values of the underlying positions. If necessary, certain positions may be liquidated to satisfy resulting changes in margin requirements.

The Group is unable to develop an estimate of the maximum payout under these guarantees. However, its management believes that the margin deposits held at February 28, 2005 were adequate to minimize the risk of material loss, which could be created by the positions held at that time, and it is unlikely the Group will have to make material payments under these arrangements. The Group has applied the initial recognition and measurement provisions of FASB Interpretation No. 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees,* but has not recorded a liability for these guarantees because the estimated fair value of such guarantees was zero based on the Group's qualitative analysis.

## NOTE O—FAIR VALUE OF FINANCIAL INSTRUMENTS

SFAS No. 107, *Disclosures about Fair Value of Financial Instruments,* requires the Group to report the fair value of financial instruments, as defined.

Assets and liabilities that are carried at fair value include all of the Group's securities, including derivative financial instruments used for trading purposes, which are recorded as Securities owned and Securities sold but not yet purchased.

Assets and liabilities, recorded at contractual amounts, that approximate market or fair value include cash, cash and securities segregated under federal and other regulations, deposits with clearing organizations and others, short-term borrowings and payable to broker-dealers, clearing organizations

F-32

and customers. The market values of such items are not materially sensitive to shifts in market interest rates because of the limited term to maturity of these instruments and their variable interest rates.

The Group's long-term borrowings are recorded at historical amounts, which could differ from fair value as a result of changes in market rates.

The following table provides a summary of the fair value of the Group's long-term borrowings. The fair value of the Group's long-term borrowings was estimated using either quoted market prices or discounted cash flow analyses based on the Group's current borrowing rates for similar types of borrowing arrangements.

|  | February 28, 2005 | February 29, 2004 |
|---|---|---|
|  | (in thousands) | |
| Carrying value of long-term borrowings | $ 1,246,000 | $ 383,500 |
| Fair value of long-term borrowings | 1,298,927 | 399,990 |

The Group carries its secured financing activities, including securities purchased under agreements to resell, securities borrowed, securities sold under agreements to repurchase, securities loaned and other secured borrowings, at their original contract amount plus accrued interest. Because the majority of such financing activities are short-term in nature, carrying value approximates fair value.

## NOTE P—SECURITIES PURCHASED UNDER AGREEMENTS TO RESELL AND SECURITIES SOLD UNDER AGREEMENTS TO REPURCHASE

Securities purchased under agreements to resell ("resale agreements") and Securities sold under agreements to repurchase ("repurchase agreements") are treated as financing transactions and are carried at the amounts at which the securities will be reacquired or resold as specified in the respective agreements plus accrued interest. The carrying amounts approximate their fair values. Where appropriate, resale and repurchase agreements with the same counterparty are reported on a net basis in accordance with FASB Interpretation No. 41, *Offsetting of Amounts Related to Certain Repurchase and Reverse Repurchase Agreements*. The Group is required to present the following table when repurchase agreements are 10% or greater of total assets.

| | | | February 28, 2005 | | | |
|---|---|---|---|---|---|---|
| | Demand | Overnight | Less than 30 days | 30-90 days | Greater than 90 days | Total |
| | | | (in thousands) | | | |
| **Security Type** | | | | | | |
| US Governments | $ 1,277,173 | $ 15,353,429 | $ 1,302,419 | $ 1,361,433 | $ 227,948 | $ 19,522,402 |
| US Corporations | 143,853 | 2,764 | 162,234 | — | 197,498 | 506,349 |
| Foreign Governments | 137,664 | — | — | — | — | 137,664 |
| Foreign Corporations | 77,873 | 12,543 | 18,639 | 5,100 | — | 114,155 |
| Emerging Market Government | 1,226,385 | 189,219 | 1,839,959 | 749,688 | 891,153 | 4,896,404 |
| Other | 30,785 | 1,209,903 | 1,544,978 | 223,122 | 440,141 | 3,448,929 |
| | $ 2,893,733 | $ 16,767,858 | $ 4,868,229 | $ 2,339,343 | $ 1,756,740 | $ 28,625,903 |

F-33

The Group's policy is to take possession of securities purchased under resale agreements, which consist largely of securities issued by the U.S. Government. The Group retains the right to re-pledge collateral received in secured financing transactions. As of February 28, 2005, substantially all of the collateral received had been re-pledged in connection with these financing activities. The market value of the collateral the Group received as of February 28, 2005 and February 29, 2004 was $201.2 billion and $124.4 billion, respectively. The Group continually monitors the market value of the underlying collateral received as compared with the related receivable, including accrued interest, and requests additional collateral where deemed appropriate.

The amount of risk under repurchase agreements that exceeds 10% of members' equity as of February 28, 2005 is as follows (in thousands):

| Entity | | Amount | Weighted average maturity (in days) |
|---|---|---|---|
| Credit Suisse First Boston | $ | 19,003 | 1.05 |
| Dresdner Bank AG | | 29,444 | 41.53 |
| JPMorgan Chase | | 31,767 | 34.26 |
| Deutsche Bank AG | | 15,840 | 1.53 |
| ING Baring | | 23,508 | 1.00 |
| Lehman Brothers Inc. | | 55,884 | 1.00 |
| Morgan Stanley & Co. | | 34,047 | 53.27 |
| UBS AG | | 20,059 | 1.00 |
| Canadian Imperial Bank of Commerce | | 58,114 | 6.82 |

## NOTE Q—RELATED PARTY TRANSACTIONS

The Group may loan money to and may borrow money from its affiliates, members, affiliated companies and other related parties. Interest is generally charged at prevailing market rates.

As of February 29, 2004, the Group had a deposit with BAWAG Overseas, Inc., a third party financial institution who was a member, of $210.2 million. This balance was also included in "Receivables from equity members" and was liquidated shortly after year-end.

Through a joint venture with Putnam Investments, Thomas H. Lee Partners, L.P. has an indirect ownership interest in Currenex, Inc., which is a technology firm that has created an electronic platform for trading currencies. For the period from August 6, 2004 through February 28, 2005, the period from March 1, 2004 through August 5, 2004 and the years ended February 29, 2004 and February 28, 2003, the Company paid fees of $1.4 million, $0.3 million, $0.3 million and $0, respectively, to Currenex in connection with the use of its platform.

## NOTE R—SEGMENT REPORTING

Operating segments are defined as components of an enterprise for which separate financial information is regularly available and evaluated by the chief operating decision maker, or decision making group, in deciding how to allocate resources and in assessing performance.

The Group has reported the results of operations related to Forstmann-Leff International Associates, LLC as discontinued operations (see Note C). Forstmann-Leff International Associates, LLC was previously disclosed within the Asset Management segment. The Group's remaining operations include two operating segments: (1) Derivatives Brokerage & Clearing; and (2) Prime Brokerage/Capital Markets. The Derivatives Brokerage & Clearing business operations consist of execution and clearing services for global exchange-traded derivatives in electronic and open outcry markets. Prime Brokerage/Capital Markets is focused on offering a variety of securities products consisting of fixed income, equities, foreign exchange and prime brokerage. The retained assets from the Asset Management segment, Refco Alternative Investments, have become part of our Derivatives Brokerage & Clearing segment. Segment data has been reclassified to reflect the current segment structure.

F-34

For financial reporting purposes, and to reconcile to the amounts reported in the consolidated financial statements, we have established a Corporate & Other non-operating segment. Corporate administration costs are not allocated to the respective segments and are included in Corporate & Other. Eliminations consist of intersegment interest income and interest expense derived in the Group's normal course of business from intercompany funding.

| | Derivatives Brokerage & Clearing | Prime Brokerage/ Capital Markets | Corporate & Other | Eliminations | Total |
|---|---|---|---|---|---|
| | | | (in thousands) | | |
| **Period from August 6, 2004 through February 28, 2005** | | | | | |
| Interest revenue | $ 121,358 | $ 1,868,091 | $ 5,082 | $ (177,428) | $ 1,817,103 |
| Total revenues | 629,051 | 2,036,260 | 8,434 | (194,333) | 2,479,412 |
| Interest expense | 66,826 | 1,801,977 | 73,844 | (177,429) | 1,765,218 |
| Depreciation and amortization | 3,788 | 8,219 | 6,039 | — | 18,046 |
| Income (loss) before provision for income taxes, income from equity investees and members' interest in earnings (losses) of subsidiary | 74,677 | 70,771 | (94,217) | — | 51,231 |
| Total assets | 9,303,522 | 50,629,868 | 716,668 | (11,884,709) | 48,765,349 |
| **Period from March 1, 2004 through August 5, 2004** | | | | | |
| Interest revenue | $ 65,265 | $ 794,982 | $ 7,256 | $ (98,790) | $ 768,713 |
| Total revenues | 445,733 | 913,392 | 7,970 | (110,982) | 1,256,113 |
| Interest expense | 36,587 | 743,621 | 25,948 | (99,516) | 706,640 |
| Depreciation and amortization | 4,801 | 937 | 6,255 | — | 11,993 |
| Income (loss) before provision for income taxes, income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 59,790 | 66,681 | (27,111) | — | 99,360 |
| **As of and for the year ended February 29, 2004** | | | | | |
| Interest revenue | $ 141,897 | $ 1,084,204 | $ 20,154 | $ (194,560) | $ 1,051,695 |
| Total revenues | 840,308 | 1,267,634 | 20,180 | (253,823) | 1,874,299 |
| Interest expense | 62,012 | 979,704 | 53,367 | (197,409) | 897,674 |
| Depreciation and amortization | 10,284 | 1,311 | 14,566 | — | 26,161 |
| Income (loss) before provision for income taxes, income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 121,546 | 124,631 | (56,715) | — | 189,462 |
| Total assets | 7,275,399 | 31,763,273 | 863,307 | (6,569,807) | 33,332,172 |
| **As of and for the year ended February 28, 2003** | | | | | |
| Interest revenue | $ 141,934 | $ 2,507,557 | $ 53,688 | $ (315,840) | $ 2,387,339 |
| Total revenues | 746,026 | 2,608,850 | 58,682 | (367,459) | 3,046,099 |
| Interest expense | 72,065 | 2,365,181 | 62,741 | (317,641) | 2,182,346 |
| Depreciation and amortization | 8,010 | 647 | 14,842 | — | 23,499 |
| Income (loss) before provision for income taxes, dividends on preferred securities issued by subsidiaries, income from equity investees and discontinued operations | 76,883 | 100,562 | (22,614) | — | 154,831 |
| Total assets | 6,054,415 | 20,505,353 | 1,195,988 | (8,540,327) | 19,215,429 |

*Geographic Information*

The Group conducts business in three countries that individually comprise greater than 10% of revenues and long-lived assets within the last three years. The following information provides a reasonable representation of each region's contribution to the consolidated amounts:

| | Period from August 6, 2004 through February 28, 2005 | Period from March 1, 2004 through August 5, 2004 | Year Ended February 29, 2004 | Year Ended February 28, 2003 |
|---|---|---|---|---|
| | (in thousands) | | | |
| **Total revenues:** | | | | |
| United States | $ 2,049,027 | $ 941,010 | $ 1,272,622 | $ 2,455,450 |
| Bermuda | 202,188 | 139,727 | 325,791 | 411,114 |
| United Kingdom | 156,008 | 117,053 | 177,461 | 96,524 |
| Other | 72,189 | 58,323 | 98,425 | 83,011 |
| Total | $ 2,479,412 | $ 1,256,113 | $ 1,874,299 | $ 3,046,099 |

| | As of February 28, 2005 | As of February 29, 2004 |
|---|---|---|
| | (in thousands) | |
| **Long-lived assets:** | | |
| United States | $ 32,417 | $ 35,661 |
| Bermuda | 1,318 | 1,900 |
| United Kingdom | 4,979 | 2,004 |
| Other | 5,157 | 4,786 |
| Total | $ 43,871 | $ 44,351 |

No single customer accounted for greater than 10% of total revenues in the seven months ended February 28, 2005, the five months ended August 5, 2004 and the years ended February 29, 2004 and February 28, 2003.

For segment reporting purposes, long lived assets comprise furniture, equipment and leasehold improvements.

**NOTE S—SUBSEQUENT EVENTS**

On March 15, 2005, the Group amended its New Senior Credit Facility (the "Amended Credit Facility"). Under the Amended Credit Facility, the Secured term loan bears interest at the Group's choice of the Eurodollar Rate or Base Rate plus an applicable margin based on the Debt Ratings (as defined).

Refco Group Ltd., LLC has issued 9% Senior Subordinated Notes due 2012 (the "Exchange Notes") in exchange for all New Notes, and has filed a Form S-4 exchange offer registration statements whereby holders of the New Notes will receive Exchange Notes which have been registered under the Securities Act of 1933, as amended, having terms substantially identical in all material aspects to the New Notes. The Form S-4 exchange offer registration statement was declared effective on April 8, 2005.

In April 2005, the Board of Directors of Refco Inc., a newly-formed Delaware corporation, approved the filing with the SEC of a registration statement on Form S-1 in connection with the proposed initial public offering (the "Offering") of its common stock. Immediately prior to consummation of the Offering, the Company's existing members will contribute all of their Class A and

F-36

Class B units in the Company to Refco Inc. in exchange for shares of common stock of Refco Inc. As a result, Refco Inc. will own all of the outstanding membership interests in the Company. There can be no assurance that the Offering will be consummated.

Refco Inc. is a Delaware "C" corporation, and as such will be subject to federal and state income taxes. Deferred tax assets and liabilities will be recognized for the tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax basis. Deferred tax assets and liabilities will be measured using enacted tax rates applied to taxable income in the years in which those temporary differences are expected to be recovered or settled. A deferred tax asset valuation allowance will be recorded if it is more likely than not that all or a portion of the recorded deferred tax assets will not be realized.

*The following paragraphs are unaudited:*

In April 2005, the Group acquired the customer accounts and related business operations of The League Corp. for approximately $11.2 million with an additional contingent payment based on performance to be made after the one-year period ended January 31, 2006.

Refco Trading Services (UK) Ltd., a wholly owned subsidiary of the Company, made a cash offer to the existing shareholders of EasyScreen plc ("EasyScreen") for £15.525 per share. This offer values the entire share capital of EasyScreen at approximately £14.8 million. The offer closed on May 31, 2005, and as of that date, the Company owned 95.3% of the outstanding ordinary share capital of EasyScreen.

In June 2005, the Group entered into a definitive agreement to acquire the global brokerage operations of Cargill Investor Services for $208.0 million in cash and a future contingent cash payment of between $67.0 million and $192.0 million, based on the performance of the acquired operations.

F-37

**NOTE T—CONDENSED CONSOLIDATING FINANCIAL INFORMATION**

The following information sets forth the Group's condensed consolidating financial statements as of February 28, 2005 and February 29, 2004 and for each of the three years in the period ended February 28, 2005. New Refco refers to New Refco Group Ltd., LLC as parent of Refco Group Ltd., LLC, and Refco Group refers to Refco Group Ltd., LLC as issuer of the senior subordinated notes.

**Condensed consolidating balance sheet**

| | February 28, 2005 | | | | | |
|---|---|---|---|---|---|---|
| | New Refco | Refco Group | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | (in thousands) | | | | | |
| Cash and cash equivalents | $ — | $ — | $ 29,429 | $ 493,192 | $ — | $ 522,621 |
| Cash and securities segregated under federal and other regulations | | | | | | |
| Cash and cash equivalents | — | — | — | 1,102,539 | — | 1,102,539 |
| Securities purchased under agreements to resell | — | — | — | 58,650 | — | 58,650 |
| Securities purchased under agreements to resell | — | — | — | 34,548,479 | (4,312,608) | 30,235,871 |
| Deposits with clearing organizations and others | — | — | 6,348 | 3,409,003 | (975,698) | 2,439,653 |
| Receivables from securities borrowed | — | — | — | 3,128,304 | — | 3,128,304 |
| Receivables from broker-dealers, clearing organizations and customers, net of reserves | — | 125,796 | 3,298,520 | 6,508,245 | (5,854,262) | 4,078,299 |
| Securities owned, at market value or fair value | — | — | 341 | 5,990,649 | (396,193) | 5,594,797 |
| Investment in and advances to subsidiaries | 152,750 | 2,472,182 | 907,702 | — | (3,532,634) | — |
| Goodwill, identifiable intangible assets and other assets | — | 92,852 | 365,745 | 1,394,157 | (248,139) | 1,604,615 |
| Total assets | $ 152,750 | $ 2,690,830 | $ 4,608,085 | $ 56,633,218 | $ (15,319,534) | $ 48,765,349 |
| Liabilities | | | | | | |
| Short-term borrowings, including current portion of long-term borrowings | | $ 8,000 | $ — | $ 24,628 | $ — | $ 32,628 |
| Securities sold under agreements to repurchase | | — | — | 33,001,115 | (4,375,212) | 28,625,903 |
| Payable from securities loaned | — | — | — | 3,028,933 | — | 3,028,933 |
| Payable to broker-dealers and clearing organizations | | — | 6,093 | 1,122,507 | (387,478) | 741,122 |
| Payable to customers | | 1,237,776 | 3,601,764 | 8,603,429 | (6,595,411) | 6,847,558 |
| Securities sold, not yet purchased, at market value or fair value | | — | 351 | 7,832,671 | — | 7,833,022 |
| Accounts payable, accrued expenses and other liabilities | 2,500 | 54,304 | 71,693 | 195,976 | (71,891) | 252,582 |
| Long-term borrowings | | 1,238,000 | — | — | — | 1,238,000 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Subordinated debt | | — | — | 113,264 | (113,264) | — |
| Total liabilities | 2,500 | 2,538,080 | 3,679,901 | 53,922,523 | (11,543,256) | 48,599,748 |
| Membership interests issued by subsidiary | — | — | — | 15,351 | — | 15,351 |
| Members' equity | 150,250 | 152,750 | 928,184 | 2,695,344 | (3,776,278) | 150,250 |
| Total liabilities and members' equity | $ 152,750 | $ 2,690,830 | $ 4,608,085 | $ 56,633,218 | $ (15,319,534) | $ 48,765,349 |

F-38

**Condensed consolidating balance sheet**

| | | | February 29, 2004 | | |
|---|---|---|---|---|---|
| | Refco Group | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (in thousands) | | |
| Cash and cash equivalents | $ — | $ 4,477 | $ 311,736 | $ — | $ 316,21: |
| Cash and securities segregated under federal and other regulations | | | | | |
|   Cash and cash equivalents | — | — | 1,375,838 | — | 1,375,83: |
|   Securities purchased under agreements to resell | — | — | 55,061 | — | 55,06 |
| Securities purchased under agreements to resell | — | — | 25,009,575 | (2,035,267) | 22,974,30: |
| Deposits with clearing organizations and others | — | 654 | 2,807,990 | (976,879) | 1,831,76: |
| Receivables from securities borrowed | — | — | 1,808,566 | — | 1,808,56: |
| Receivables from broker-dealers, clearing organizations and customers, net of reserves | 314,279 | 1,266,036 | 3,332,898 | (2,817,018) | 2,096,19: |
| Receivables from equity members | — | — | 210,223 | — | 210,22: |
| Securities owned, at market value or fair value | — | 2,091 | 2,414,286 | (383,842) | 2,032,53: |
| Investment in and advances to subsidiaries | 1,131,766 | 1,160,431 | — | (2,292,197) | — |
| Assets of discontinued operations | — | — | 276,012 | — | 276,01: |
| Goodwill, identifiable intangible assets and other assets | 58,612 | 430,084 | 119,548 | (252,788) | 355,45: |
|    Total assets | $ 1,504,657 | $ 2,863,773 | $ 37,721,733 | $ (8,757,991) | $ 33,332,17: |
| Liabilities | | | | | |
|   Short-term borrowings, including current portion of long-term borrowings | $ 68,000 | $ — | $ 20,890 | $ — | $ 88,89: |
|   Securities sold under agreements to repurchase | — | — | 26,208,264 | (2,445,012) | 23,763,25: |
|   Payable from securities loaned | — | — | 1,867,047 | — | 1,867,04: |
|   Payable to broker-dealers and clearing organizations | — | 1 | 610,632 | (26,990) | 583,64: |
|   Payable to customers | 465,681 | 1,547,382 | 6,614,220 | (3,573,946) | 5,053,33: |
|   Securities sold, not yet purchased, at market value or fair value | — | 2,091 | 805,394 | — | 807,48: |
|   Liabilities of discontinued operations | — | — | 44,878 | — | 44,87: |
|   Accounts payable, accrued expenses and other liabilities | 23,392 | 68,182 | 143,665 | (63,588) | 171,65: |
| Long-term borrowings | 315,500 | — | — | — | 315,50: |
| Subordinated debt | 16,000 | — | 109,056 | (109,056) | 16,00: |
|    Total liabilities | 888,573 | 1,617,656 | 36,424,046 | (6,218,592) | 32,711,68: |
| Membership interests issued by subsidiary | — | — | 4,405 | — | 4,40: |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Members' equity | | 616,084 | | 1,246,117 | | 1,293,282 | | (2,539,399) | 616,084 |
| Total liabilities and members' equity | $ | 1,504,657 | $ | 2,863,773 | $ | 37,721,733 | $ | (8,757,991) | $ 33,332,17 |

F-39

**Condensed consolidating statement of income**

| | Period from August 6, 2004 through February 28, 2005 | | | | | |
|---|---|---|---|---|---|---|
| | New Refco | Refco Group | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | | (in thousands) | | |
| **Revenues** | | | | | | |
| Commissions and brokerage | $        — | $        — | $     2,154 | $    497,610 | $    (13,059) | $    486,705 |
| Interest | — | 3,115 | 61,711 | 1,929,705 | (177,428) | 1,817,103 |
| Principal transactions, net | — | — | 43,899 | 116,931 | — | 160,830 |
| Asset management and advisory fees | — | — | — | 8,801 | — | 8,801 |
| Other | — | 3,348 | 1,382 | 5,089 | (3,846) | 5,973 |
| Total revenues | — | 6,463 | 109,146 | 2,558,136 | (194,333) | 2,479,412 |
| **Expenses** | | | | | | |
| Commissions and order execution costs | — | — | 33,239 | 338,348 | (13,059) | 358,528 |
| Interest | — | 63,471 | 63,994 | 1,815,181 | (177,428) | 1,765,218 |
| Employee compensation and benefits | — | 9,537 | 12,361 | 136,567 | — | 158,465 |
| General, administrative and other | — | 19,638 | 1,544 | 128,634 | (3,846) | 145,970 |
| Total expenses | — | 92,646 | 111,138 | 2,418,730 | (194,333) | 2,428,181 |
| Equity in net income (loss) of subsidiaries | 78,308 | 164,381 | 79,290 | — | (321,979) | — |
| Income (loss) before provision for income taxes, income from equity investees and members' interest in losses of subsidiary | 78,308 | 78,198 | 77,298 | 139,406 | (321,979) | 51,231 |
| (Benefit from) provision for income taxes | — | (110) | — | 6,360 | — | 6,250 |
| Income (loss) before income from equity investees and members' interest in losses of subsidiary | 78,308 | 78,308 | 77,298 | 133,046 | (321,979) | 44,981 |
| Income from equity investees | — | — | 15,779 | 799 | — | 16,578 |
| Members' interest in earnings (losses) of subsidiary | — | — | — | (16,749) | — | (16,749) |
| Net income (loss) | $ 78,308 | $ 78,308 | $   93,077 | $    150,594 | $    (321,979) | $     78,308 |

F-40

**Condensed consolidating statement of income**

| | Period from March 1, 2004 through August 5, 2004 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Refco Group | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (in thousands) | | |
| **Revenues** | | | | | |
| Commissions and brokerage | $ — | $ 2,618 | $ 369,810 | $ (10,408) | $ 362,020 |
| Interest | 5,789 | 43,382 | 818,332 | (98,790) | 768,713 |
| Principal transactions, net | — | 17,742 | 101,493 | | 119,235 |
| Asset management and advisory fees | — | — | 3,676 | — | 3,676 |
| Other | 639 | 2,316 | 1,298 | (1,784) | 2,469 |
| Total revenues | 6,428 | 66,058 | 1,294,609 | (110,982) | 1,256,113 |
| **Expenses** | | | | | |
| Commissions and order execution costs | — | 8,727 | 244,963 | (9,681) | 244,009 |
| Interest | 20,212 | 47,567 | 738,378 | (99,517) | 706,640 |
| Employee compensation and benefits | 2,136 | 7,950 | 98,442 | — | 108,528 |
| General, administrative and other | 6,964 | 9,017 | 83,379 | (1,784) | 97,576 |
| Total expenses | 29,312 | 73,261 | 1,165,162 | (110,982) | 1,156,753 |
| Equity in net income (loss) of subsidiaries | 120,863 | 60,837 | — | (181,700) | — |
| Income (loss) before provision for income taxes, income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 97,979 | 53,634 | 129,447 | (181,700) | 99,360 |
| Provision for income taxes | — | — | 7,994 | — | 7,994 |
| Income (loss) before income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 97,979 | 53,634 | 121,453 | (181,700) | 91,366 |
| Income from equity investees | — | 7,770 | 575 | — | 8,345 |
| Members' interest in earnings of subsidiary | — | — | 5,771 | — | 5,771 |
| Income (loss) from continuing operations | 97,979 | 61,404 | 116,257 | (181,700) | 93,940 |
| Discontinued operations: | | | | | |
| Income from discontinued operations | — | — | 7,383 | — | 7,383 |
| Applicable income tax expense | — | — | 3,344 | — | 3,344 |
| Net income (loss) | $ 97,979 | $ 61,404 | $ 120,296 | $ (181,700) | $ 97,979 |

F-41

**Condensed consolidating statement of income**

|  | Year Ended February 29, 2004 | | | | |
|  | Refco Group | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| --- | --- | --- | --- | --- | --- |
|  | | | (in thousands) | | |
| **Revenues** | | | | | |
| Commissions and brokerage | $ — | $ 5,666 | $ 692,411 | $ (52,637) | $ 645,440 |
| Interest | 15,037 | 68,075 | 1,163,143 | (194,560) | 1,051,695 |
| Principal transactions, net | — | 26,966 | 138,970 | — | 165,936 |
| Asset management and advisory fees | — | | 7,527 | (272) | 7,255 |
| Other | — | 4,066 | 6,261 | (6,354) | 3,973 |
| Total revenues | 15,037 | 104,773 | 2,008,312 | (253,823) | 1,874,299 |
| **Expenses** | | | | | |
| Commissions and order execution costs | — | 13,039 | 439,833 | (40,978) | 411,894 |
| Interest | 40,404 | 78,831 | 975,848 | (197,409) | 897,674 |
| Employee compensation and benefits | 4,636 | 13,869 | 186,349 | — | 204,854 |
| General, administrative and other | 18,856 | 14,175 | 152,819 | (15,435) | 170,415 |
| Total expenses | 63,896 | 119,914 | 1,754,849 | (253,822) | 1,684,837 |
| Equity in net income (loss) of subsidiaries | 236,015 | 241,200 | — | (477,215) | — |
| Income (loss) before provision for income taxes, income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 187,156 | 226,059 | 253,463 | (477,216) | 189,462 |
| Provision for income taxes | — | — | 11,687 | — | 11,687 |
| Income (loss) before income from equity investees, members' interest in earnings of subsidiary and discontinued operations | 187,156 | 226,059 | 241,776 | (477,216) | 177,775 |
| Income from equity investees | — | 10,609 | 935 | — | 11,544 |
| Members' interest in earnings of subsidiary | — | — | 1,273 | — | 1,273 |
| Income (loss) from continuing operations | 187,156 | 236,668 | 241,438 | (477,216) | 188,046 |
| Discontinued operations: | | | | | |
| Loss from discontinued operations | — | — | (401) | — | (401) |
| Applicable income tax expense | — | — | 489 | — | 489 |
| Net income (loss) | $ 187,156 | $ 236,668 | $ 240,548 | $ (477,216) | $ 187,156 |

F-42

**Condensed consolidating statement of income**

| | Refco Group | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|
| | | | Year Ended February 28, 2003 | | |
| | | | (in thousands) | | |
| **Revenues** | | | | | |
| Commissions and brokerage | $ — | $ 6,278 | $ 598,999 | $ (33,757) | $ 571,520 |
| Interest | 34,908 | 100,795 | 2,567,476 | (315,840) | 2,387,339 |
| Principal transactions, net | — | 6,275 | 76,279 | — | 82,554 |
| Asset management and advisory fees | — | — | 5,833 | (5,710) | 123 |
| Other | 5,007 | 4,087 | 56,423 | (60,954) | 4,563 |
| Total revenues | 39,915 | 117,435 | 3,305,010 | (416,261) | 3,046,099 |
| **Expenses** | | | | | |
| Commissions and order execution costs | — | 4,991 | 413,432 | (33,048) | 385,375 |
| Interest | 46,667 | 95,267 | 2,358,053 | (317,641) | 2,182,346 |
| Employee compensation and benefits | 6,479 | 12,085 | 162,398 | — | 180,962 |
| General, administrative and other | 60,850 | 3,687 | 143,619 | (65,571) | 142,585 |
| Total expenses | 113,996 | 116,030 | 3,077,502 | (416,260) | 2,891,268 |
| Equity in net income (loss) of subsidiaries | 214,200 | 182,183 | — | (396,383) | — |
| Income (loss) before provision for income taxes, dividends on preferred securities issued by subsidiaries, income from equity investees and discontinued operations | 140,119 | 183,588 | 227,508 | (396,384) | 154,831 |
| Provision for income taxes | — | — | 1,223 | — | 1,223 |
| Income (loss) before dividends on preferred securities issued by subsidiaries, income from equity investees and discontinued operations | 140,119 | 183,588 | 226,285 | (396,384) | 153,608 |
| Dividends on preferred securities issued by subsidiary | — | 15,576 | — | — | 15,576 |
| Income from equity investees | — | 1,673 | — | — | 1,673 |
| Income (loss) from continuing operations | 140,119 | 169,685 | 226,285 | (396,384) | 139,705 |
| Discontinued operations: | | | | | |
| Income from discontinued operations | — | — | 1,151 | — | 1,151 |
| Applicable income tax expense | — | — | 737 | — | 737 |
| Net income (loss) | $ 140,119 | $ 169,685 | $ 226,699 | $ (396,384) | $ 140,119 |

F-43

**Condensed consolidating statement of cash flows**

| | New Refco | Refco Group | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|---|
| | | | **(in thousands)** | | | |
| Net cash generated from operating activities | $ 2,500 | $ 122,637 | $ 40,089 | $ 225,956 | $ — | $ 391,182 |
| Cash flows from investing activities | | | | | | |
| Payment of acquisition fees | — | (46,989) | — | — | — | (46,989) |
| Acquisition of businesses, net of cash acquired | — | — | (17,225) | — | — | (17,225) |
| Net cash used in investing activities | — | (46,989) | (17,225) | — | — | (64,214) |
| Cash flows from financing activities | | | | | | |
| Proceeds from new borrowings | — | 1,400,000 | — | — | — | 1,400,000 |
| Repayment of long-term borrowings | — | (539,436) | — | — | — | (539,436) |
| Payment to former shareholders | — | (19,815) | — | — | — | (19,815) |
| Payment to former shareholder for sale of interest in predecessor | — | (861,749) | — | — | — | (861,749) |
| Payment of deferred financing costs | — | (43,648) | — | — | — | (43,648) |
| Purchase of Class A Units | (2,500) | — | — | — | — | (2,500) |
| Withdrawals of interests by members of subsidiary | — | — | — | 28,815 | — | 28,815 |
| Capital withdrawals | — | (11,000) | — | — | — | (11,000) |
| Net cash (used in) generated from financing activities | (2,500) | (75,648) | — | 28,815 | — | (49,333) |
| Net increase in cash and cash equivalents | — | — | 22,864 | 254,771 | — | 277,635 |
| Cash and cash equivalents, beginning of period | — | — | 6,565 | 238,421 | — | 244,986 |
| Cash and cash equivalents, end of period | $ — | $ — | $ 29,429 | $ 493,192 | $ — | $ 522,621 |

F-44

| | Refco Group | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|
| **Period from March 1, 2004 through August 5, 2004** | | | | | |

|  | | (in thousands) | | | |
|---|---|---|---|---|---|
| Net cash generated from (used in) operating activities | $ 590,536 | $ 567 | $ (62,241) | $ — | $ 528,862 |
| Cash flows from investing activities | | | | | |
|   Distribution of cash in Asset Management business | — | — | (24,457) | — | (24,457) |
|   Payment of acquisition fees | (3,536) | — | — | — | (3,536) |
|   Net cash used in investing activities | (3,536) | — | (24,457) | — | (27,993) |
| Cash flows from financing activities | | | | | |
|   Repayment of long-term borrowings | (37,000) | — | — | — | (37,000) |
|   Distribution of cash | (550,000) | — | — | — | (550,000) |
|   Withdrawals of interests by members of subsidiary | — | — | (6,891) | — | (6,891) |
|   Net cash used in financing activities | (587,000) | — | (6,891) | — | (593,891) |
|   Net cash used in discontinued operations | — | — | 21,795 | — | 21,795 |
|   Net increase (decrease) in cash and cash equivalents | — | 567 | (71,794) | — | (71,227) |
| Cash and cash equivalents, beginning of period | — | 5,998 | 310,215 | — | 316,213 |
| Cash and cash equivalents, end of period | $ — | $ 6,565 | $ 238,421 | $ — | $ 244,986 |

**Year Ended February 29, 2004**

|  | Refco Group | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|
|  | | | (in thousands) | | |
| Net cash generated from operating activities | $ 387,774 | $ 23,682 | $ 316,449 | $ — | $ 727,905 |
| Cash flows from investing activities | | | | | |
|   Acquisition of businesses, net of cash acquired | — | (23,219) | (95,711) | — | (118,930) |
|   Net cash used in investing activities | — | (23,219) | (95,711) | — | (118,930) |
| Cash flows from financing activities | | | | | |
|   Repayment of long-term borrowings | (68,000) | — | — | — | (68,000) |
|   Payment for redemption of preferred securities issued by subsidiaries | (199,774) | — | — | — | (199,774) |
|   Net contributions to | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| membership interest issued by subsidiary | — | — | 3,132 | — | 3,132 |
| Capital withdrawals | (120,000) | — | — | — | (120,000) |
| Net cash (used in) generated from financing activities | (387,774) | — | 3,132 | — | (384,642) |
| Net cash used in discontinued operations | — | — | (134,285) | — | (134,285) |
| Net increase in cash and cash equivalents | — | 463 | 89,585 | — | 90,048 |
| Cash and cash equivalents, beginning of year | — | 4,014 | 222,151 | — | 226,165 |
| Cash and cash equivalents, end of year | $ — | $ 4,477 | $ 311,736 | $ — | $ 316,213 |

F-45

| | Year Ended February 28, 2003 | | | | |
|---|---|---|---|---|---|
| | Refco Group | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (in thousands) | | |
| Net cash (used in) generated from operating activities | $ (54,500) | $ 1,658 | $ 133,452 | $ — | $ 80,610 |
| Cash flows from investing activities | | | | | |
| Acquisition of businesses, net of cash acquired | — | — | (3,473) | | (3,473) |
| Net cash used in investing activities | — | — | (3,473) | | (3,473) |
| Cash flows from financing activities | | | | | |
| Issuance of long-term debt | 222,500 | — | — | — | 222,500 |
| Repayment of long-term borrowings | (68,000) | — | — | — | (68,000) |
| Capital withdrawals | (100,000) | — | — | — | (100,000) |
| Net cash provided by financing activities | 54,500 | — | — | — | 54,500 |
| Net cash used in discontinued operations | — | — | (50,150) | — | (50,150) |
| Net increase in cash and cash equivalents | — | 1,658 | 79,829 | — | 81,487 |
| Cash and cash equivalents, beginning of year | — | 2,356 | 142,322 | — | 144,678 |
| Cash and cash equivalents, end of | | | | | |

| year | $ | — | $ | 4,014 | $ | 222,151 | $ | — | $ | 226,165 |

## NOTE U—QUARTERLY SUPPLEMENTAL INFORMATION

The following represents the Group's unaudited quarterly results for the years ended February 28, 2005 and February 29, 2004. These quarterly results were prepared in accordance with U.S. generally accepted accounting principles and reflect all normal and recurring adjustments that are, in the opinion of management, necessary for a fair statement of the results.

|  | Year Ended February 28, 2005 | | | |
|  | First | Second(1) | Third | Fourth |
|  | (unaudited) (in thousands) | | | |
| Total revenues | $ 657,424 | $ 865,849 | $ 1,071,401 | $ 1,140,851 |
| Net income | 59,270 | 45,173 | 36,120 | 35,724 |

|  | Year Ended February 29, 2004 | | | |
|  | First | Second | Third | Fourth |
|  | (unaudited) (in thousands) | | | |
| Total revenues | $ 480,549 | $ 395,204 | $ 447,808 | $ 550,738 |
| Net income | 46,360 | 46,770 | 47,254 | 46,772 |

(1)    Includes the period from June 1, 2004 through August 5, 2004 combined with the period from August 6, 2004 through August 31, 2004.

F-46

[THIS PAGE IS INTENTIONALLY LEFT BLANK]
(Interim Financial Statements begin on the following page)

F-47

**NEW REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**

|  | May 31, 2005 | February 28, 2005 |
|---|---|---|
|  | (unaudited) |  |
|  | (in thousands) | |
| Cash and cash equivalents | $ 405,029 | $ 522,621 |
| Cash and securities segregated under federal and other regulations: | | |
|     Cash and cash equivalents | 1,053,218 | 1,102,539 |
|     Securities purchased under agreements to resell | 67,013 | 58,650 |
| Securities purchased under agreements to resell | 46,551,374 | 30,235,871 |
| Deposits with clearing organizations and others | 2,519,147 | 2,439,653 |
| Receivables from securities borrowed | 2,631,989 | 3,128,304 |
| Receivables from broker-dealers and clearing organizations | 10,770,348 | 1,996,331 |
| Receivables from customers, net of $62,107 and $61,190 in reserves, respectively | 1,807,446 | 2,081,968 |
| Securities owned, at market or fair value | 6,774,039 | 5,594,797 |
| Memberships in exchanges (market value: May 31, 2005: $58,984, February 28, 2005: $60,566) | 36,159 | 36,638 |
| Goodwill | 744,110 | 716,566 |
| Identifiable intangible assets | 595,931 | 578,702 |
| Other assets | 361,388 | 272,709 |
|     Total assets | $ 74,317,191 | $ 48,765,349 |
| **Liabilities** | | |
|     Short-term borrowings, including current portion of long-term borrowings | $ 144,913 | $ 32,628 |
|     Securities sold under agreements to repurchase | 43,333,241 | 28,625,903 |
|     Payable from securities loaned | 2,458,147 | 3,028,933 |
|     Payable to broker-dealers and clearing organizations | 8,444,520 | 741,122 |
|     Payable to customers | 7,622,809 | 6,847,558 |
|     Securities sold, not yet purchased, at market or fair value | 10,590,379 | 7,833,022 |
|     Accounts payable, accrued expenses and other liabilities | 278,149 | 252,582 |
| Long-term borrowings | 1,236,000 | 1,238,000 |
|     Total liabilities | 74,108,158 | 48,599,748 |
| Commitments and contingent liabilities | | |
| Membership interests issued by subsidiary and minority interest | 23,606 | 15,351 |
| Members' equity | 185,427 | 150,250 |
|     Total liabilities and members' equity | $ 74,317,191 | $ 48,765,349 |

The accompanying notes are an integral part of these financial statements.

F-48

**NEW REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF INCOME**

| | Successor | Predecessor |
|---|---|---|
| | Three Months Ended May 31, 2005 | Three Months Ended May 31, 2004 |
| | (unaudited) | |
| | (in thousands) | |
| **Revenues** | | |
| Commissions and brokerage | $ 244,213 | $ 215,795 |
| Interest | 939,471 | 377,560 |
| Principal transactions, net | 114,764 | 61,200 |
| Asset management and advisory fees | 5,559 | 1,891 |
| Other | 8,029 | 978 |
| Total revenues | 1,312,036 | 657,424 |
| **Expenses** | | |
| Commissions and order execution costs | 207,920 | 142,706 |
| Interest | 923,830 | 344,254 |
| Employee compensation and benefits | 74,245 | 64,570 |
| General, administrative and other | 62,263 | 47,521 |
| Total expenses | 1,268,258 | 599,051 |
| Income before provision for income taxes, income from equity investees, members' interest in earnings of subsidiary, minority interest and discontinued operations | 43,778 | 58,373 |
| Provision for income taxes | 4,990 | 6,330 |
| Income before income from equity investees, members' interest in earnings of subsidiary, minority interest and discontinued operations | 38,788 | 52,043 |
| Income from equity investees | 14,182 | 6,597 |
| Members' interest in earnings of subsidiary and minority interest | 10,383 | 926 |
| Income from continuing operations | 42,587 | 57,714 |
| Discontinued operations: | | |
| Income from discontinued operations | — | 3,437 |
| Applicable income tax expense | — | 1,881 |
| Net income | $ 42,587 | $ 59,270 |

The accompanying notes are an integral part of these financial statements.

F-49

**NEW REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENT OF CHANGES IN MEMBERS' EQUITY**

|  | Members' equity | | |
|---|---|---|---|
|  | Common capital | Other Comprehensive Income | Total |
|  | (unaudited) | | |
|  | (in thousands) | | |
| Balance, February 29, 2004 (predecessor) | $    595,398 | $    20,686 | $    616,084 |
| Net income | 59,270 | — | 59,270 |
| Currency translation adjustment | — | (4,254) | (4,254) |
| Balance, May 31, 2004 (predecessor) | $    654,668 | $    16,432 | $    671,100 |
| Balance, February 28, 2005 (successor) | 140,904 | 9,346 | 150,250 |
| Net income | 42,587 | — | 42,587 |
| Issuance of Class B Units to employees | 559 | — | 559 |
| Currency translation adjustment | — | (7,969) | (7,969) |
| Balance, May 31, 2005 (successor) | $    184,050 | $    1,377 | $    185,427 |

The accompanying notes are an integral part of these financial statements.

F-50

**NEW REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Sucessor | Predecessor |
|---|---|---|
| | May 31, 2005 | May 31, 2004 |
| | (unaudited) (in thousands) | |
| **Cash flows from operating activities** | | |
| Net income | $       42,587 | $       59,270 |
| Income from discontinued operations | — | 1,556 |
| Net income from continuing operations | 42,587 | 57,714 |
| Noncash items included in net income | | |
| Depreciation and amortization | 9,662 | 6,361 |
| Stock compensation expense | 559 | — |
| Members' interest in earnings of subsidiary and minority interest | 10,383 | 926 |
| (Increase) decrease in operating assets | | |
| Cash and securities segregated under federal and other regulations: | | |
| Cash and cash equivalents | 49,321 | (60,234) |
| Securities purchased under agreements to resell | (8,363) | 13,230 |
| Restricted cash | — | (500,000) |
| Securities purchased under agreements to resell | (16,315,503) | (15,980,574) |
| Deposits with clearing organizations and others | (79,494) | (87,606) |
| Receivables from securities borrowed | 496,315 | (1,037,181) |
| Receivables from broker-dealers and clearing organizations | (8,774,017) | (3,006,915) |
| Receivables from customers | 274,522 | (443,286) |
| Receivables from equity members | — | (13,777) |
| Securities owned, at market or fair value | (1,179,242) | (865,349) |
| Memberships in exchanges | 479 | (75) |
| Other assets | (126,013) | 12,713 |
| Increase (decrease) in operating liabilities | | |
| Short-term borrowings, including current portion of long-term borrowings | 112,285 | (20,890) |
| Securities sold under agreements to repurchase | 14,707,338 | 17,857,323 |
| Payable from securities loaned | (570,786) | 809,225 |
| Payable to broker-dealers and clearing organizations | 7,703,398 | 1,797,426 |
| Payable to customers | 775,251 | 612,510 |
| Securities sold, not yet purchased, at market or fair value | 2,757,357 | 569,003 |
| Accounts payable, accrued expenses and other liabilities | 17,598 | 14,264 |
| Net cash used in operating activities | (96,363) | (265,192) |
| **Cash flows from investing activities** | | |
| Acquisition of businesses, net of cash acquired | (17,101) | — |
| Net cash used in investing activities | (17,101) | — |
| **Cash flows from financing activities** | | |
| Repayment of long-term borrowings | (2,000) | — |
| Net withdrawals to membership interests issued by subsidiary | (2,128) | (4,876) |
| Net cash used in financing activities | (4,128) | (4,876) |

| | | |
|---|---|---|
| Net cash provided by discontinued operations | — | 151,315 |
| Net decrease in cash and cash equivalents | (117,592) | (118,753) |
| Cash and cash equivalents, beginning of period | 522,621 | 316,213 |
| Cash and cash equivalents, end of period | 405,029 | 197,460 |

The accompanying notes are an integral part of these financial statements.

F-51

**NEW REFCO GROUP LTD., LLC AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE A—ORGANIZATION

New Refco Group Ltd., LLC (the "Company" or "Successor") is a limited liability company under the laws of the State of Delaware. The consolidated financial statements include the accounts of the Company and its subsidiaries (collectively, the "Group"). The Group is a diversified financial services organization and is among the leading firms in its futures and options brokerage operations. In addition to its futures and options activities, the Group provides fund management and administrative services and is also a substantial broker of cash market products, including government securities, foreign exchange and foreign exchange options, international equities and emerging markets debt. The Group's worldwide headquarters in New York are complemented by a network of U.S. and international offices.

The Group's principal operating subsidiaries comprise Refco Securities, LLC, a registered broker-dealer, Refco, LLC, a registered Futures Commission Merchant and Refco Capital Markets, Ltd., an offshore securities and foreign exchange broker.

*The Transactions*

On June 8, 2004, THL Refco Acquisition Partners entered into an equity purchase and merger agreement with Refco Group Ltd., LLC (the "Predecessor" or "Refco Group") Refco Group Holdings, Inc. ("RGHI") and certain other parties, which was amended on July 9, 2004 (the "Purchase Agreement"). The Purchase Agreement provided for a series of transactions that resulted in New Refco Group Ltd., LLC ("New Refco") becoming Refco Group's parent and THL Refco Acquisition Partners and its affiliates and co-investors acquiring a 56.7% interest in the Company, based on a valuation of the Company of $2.3 billion, following the closing of the Transactions on August 5, 2004. THL Refco Acquisition Partners and its affiliates are affiliates of Thomas H. Lee Partners, L.P. Thomas H. Lee Partners, L.P. is a leading private equity firm focused on identifying and acquiring substantial ownership stakes in mid-to large-cap growth companies.

Prior to the closing date of the Transactions on August 5, 2004, the Group was 90% owned by RGHI, a Delaware corporation. The remaining 10% was owned by BAWAG Overseas, Inc., a third party financial institution.

Concurrently with the consummation of the Transactions, the Predecessor distributed $550.0 million in cash and other capital distributions and all the equity interests of Forstmann-Leff International Associates, LLC, which upon consummation of the Transactions owned substantially all the assets of the Predecessor's Asset Management business (the "Asset Management Distribution"), to RGHI, an entity wholly owned by Phillip Bennett upon consummation of the Transactions. This distribution did not include the retained assets from the Group's Asset Management Business, Refco Alternative Investments, which have been retained and became part of the Group's Derivatives Brokerage & Clearing business.

The following unaudited pro forma consolidated summary of operations presents information of the Company as if the Transactions had occurred on March 1, 2004.

|  | Three Months Ended May 31, 2004 |
| --- | --- |
|  | (unaudited)<br>(in thousands) |
| Total revenue | $           657,424 |
| Net income | $            37,762 |

These pro forma results are for illustrative purposes. They do not purport to be indicative of the results of operations that actually would have resulted had the Transactions occurred as of March 1, 2004, or the future results of operations of the Company.

F-52

**NOTE B—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

**Basis of preparation**

The consolidated financial statements include the accounts of the Company and each of its subsidiaries, most of which are wholly owned. Refco Securities, LLC, a subsidiary of the Company, issues non-voting membership interests in the normal course of business. All material intercompany transactions and balances have been eliminated in consolidation.

20% to 50% owned companies are carried on the equity method and included in "Other Assets."

The Group consolidates entities deemed to be variable interest entities ("VIEs") when the Group is determined to be the primary beneficiary under Financial Accounting Standards Board ("FASB") Interpretation No. 46 Revised (December 2003), *Consolidation of Variable Entities* ("Interpretation 46 R").

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

These unaudited consolidated financial statements reflect all adjustments that are, in the opinion of management, necessary for a fair statement of the results for the interim period presented. These adjustments are of a normal, recurring nature. Interim period operating results may not be indicative of the operating results for a full year. These consolidated financial statements should be read in conjunction with the Group's fiscal year-end consolidated financial statements.

**Recently issued accounting pronouncement**

In May 2005, the FASB issued SFAS No. 154, *Accounting Changes and Error Corrections—a replacement of APB Opinion No. 20 and FASB Statement No. 3*. SFAS No. 154 replaces Accounting Principles Board Opinion No. 20, *Accounting Changes*, and SFAS No. 3, *Reporting Accounting Changes in Interim Financial Statements*, and changes the requirements for the accounting for and reporting of a change in accounting principle. This statement applies to all voluntary changes in accounting principle and also applies to changes required by an accounting pronouncement in the unusual instance that the pronouncement does not include specific transition provisions. The statement is effective for accounting changes and corrections of errors made in fiscal years beginning after December 15, 2005. The Company will adopt the provisions of SFAS No. 154 beginning in fiscal year 2007. Management believes that the adoption of the provisions of SFAS No. 154 will not have a material impact on the Company's current consolidated financial statements.

F-53

NEW REFCO GROUP LTD., LLC AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE C—NET CAPITAL REQUIREMENT**

The Company's subsidiary Refco Securities, LLC is subject to the uniform net capital requirements of the Securities and Exchange Commission ("SEC") under Rule 15c3-1 (the "Rule"), which requires the maintenance of minimum net capital. Refco Securities, LLC computes its net capital requirements under the alternative method provided for in the Rule, which requires that Refco Securities, LLC maintain net capital equal to the greater of $250,000 or 2% of aggregate customer related debit items, as defined in SEC Rule 15c3-3. The net capital rule also provides that equity capital may not be withdrawn or cash dividends paid if resulting net capital would be less than 5% of aggregate debits. As of May 31, 2005, Refco Securities, LLC had net capital of $62.2 million, which was 11.1% of aggregate debit balances and $49.6 million in excess of required net capital.

The Company's subsidiary Refco, LLC is subject to the Commodity Futures Trading Commission's ("CFTC") minimum financial requirements, which require that the subsidiary maintain net capital, as defined. The requirement is equal to the greater of 4% of customer funds required to be segregated/secured pursuant to the Commodity Exchange Act less the market value of certain commodity options, all as defined, or the sum of 8% of the customer risk maintenance margin requirement plus 4% of the non-customer risk maintenance margin requirement. The net capital rule also provides that Refco, LLC must maintain adjusted net capital in excess of an early warning level equal to 110% of its net capital requirement. Additionally, the subsidiary is subject to certain restrictions in reductions in capital, as defined. As of May 31, 2005, Refco, LLC had net capital of $354.5 million, which was $167.7 million in excess of required net capital.

**NOTE D—PRINCIPAL TRANSACTIONS, NET**

The Group, as a broker of derivative products, enters into contractual commitments, as a principal, involving forward settlement. The Group generally enters into offsetting contracts to achieve economic hedges, which result in a profit spread for the Group. Both the contractual commitment and the offsetting contract are recorded at fair value. The Group does not apply hedge accounting as defined in SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*, and all offsetting contracts are marked to market and included in the Consolidated Statements of Income. Both realized and unrealized gains and losses are recognized and recorded in the consolidated statements of income under "Principals transactions, net" as follows:

| | Three Months Ended May 31, 2005 | | | Three Months Ended May 31, 2004 | | |
|---|---|---|---|---|---|---|
| | Net | | | Net | | |
| | Realized Gains (Losses) | Unrealized Gains (Losses) | Total Gains (Losses) | Realized Gains (Losses) | Unrealized Gains (Losses) | Total Gains (Losses) |
| | (unaudited) (in thousands) | | | | | |
| Foreign currency forwards | $ 24,615 | $ 17,240 | $ 41,855 | $ 2,643 | $ 3,399 | $ 6,042 |
| Futures | (12,349) | 29,640 | 17,291 | 16,145 | 19,230 | 35,375 |
| Options | 7,312 | (4,044) | 3,268 | 4,107 | 2,591 | 6,698 |
| Treasury notes | 72,585 | (20,130) | 52,455 | 19,023 | (5,903) | 13,120 |
| Bonds | 4,484 | (10,210) | (5,726) | 1,932 | (2,398) | (466) |
| Other | (29) | 5,650 | 5,621 | 745 | (314) | 431 |
| Total | $ 96,618 | $ 18,146 | $ 114,764 | $ 44,595 | $ 16,605 | $ 61,200 |

F-54

The following table shows the gross notional or contractual amounts of derivatives held by the Group.

| | As of May 31, 2005 | | As of February 28, 2005 | |
| | Notional | Fair Value | Notional | Fair Value |
| | (unaudited) | | | |
| | (in thousands) | | | |
|---|---|---|---|---|
| Forward currency contracts | $ 110,108,090 | $ 6,999 | $ 79,683,493 | $ (5,382) |
| Swap contracts | 45,258 | (705) | 30,056 | (3,199) |
| Option contracts sold or written | 13,406,921 | (273,016) | 19,125,420 | (352,428) |
| Option contracts purchased | 10,743,001 | 278,363 | 14,478,439 | 370,410 |
| Exchange-traded futures | 15,541,937 | 22,473 | 14,246,658 | (1,873) |
| Total | $ 149,845,207 | $ 34,114 | $ 127,564,066 | $ 7,528 |

## NOTE E—COMMITMENTS AND CONTINGENCIES

**Commitments**

The Group occupies offices in various locations under operating leases expiring through 2014. Future minimum rental payments required under significant leases for premises, excluding any escalation adjustments, are as follows (in thousands):

| Fiscal period | |
|---|---|
| Nine months ended 2006 | $ 8,793 |
| 2007 | 11,631 |
| 2008 | 12,073 |
| 2009 | 8,051 |
| 2010 | 7,578 |
| Thereafter | 19,674 |
| | $ 67,800 |

The Group's rent expense for the three months ended May 31, 2005 and 2004 was $3.3 million and $2.5 million, respectively.

The Company has commitments to enter into certain forward repurchase and forward reverse repurchase agreements of $51.3 billion and $49.0 billion as of May 31, 2005 and February 28, 2005, respectively.

**Purchase Commitments**

On June 10, 2003, the Group acquired 50% of the shares of the Friedberg Mercantile Group ("FMG"), a registered broker/investment dealer. The Group has a commitment to purchase the remaining 50% of FMG's shares at June 10, 2008 for a maximum price of $17.5 million.

F-55

**Lines of Credit**

The Company's subsidiary Refco Capital, LLC has a $20.0 million credit facility, pursuant to which Refco Capital, LLC provides financing to fund the margin requirements of certain commercial customers who maintain futures trading accounts with certain of the Company's subsidiaries. Advances under this facility are secured by Refco Capital, LLC's security interest in the customer's rights to payments arising from these accounts. As of May 31, 2005, the Company had no outstanding indebtedness under this facility.

Refco Securities, LLC has two lines of credit with Euroclear Bank S.A./N.V. in the aggregate amount of $550.0 million for the purpose of settling intra-day transactions and, if necessary, financing positions overnight. As of May 31, 2005, no amounts were outstanding under these facilities.

The Company's subsidiaries Refco Singapore Pte. Ltd. and Refco Investment Services Pte Ltd. (Singapore) have facilities to assist with working capital requirements. The aggregate amount available under these facilities is approximately $29.0 million, Refco Group has guaranteed its subsidiaries' obligations under these facilities. As of May 31, 2005, the Company had no outstanding indebtedness under these facilities.

In addition, several of the Company's subsidiaries have facilities with various financial institutions to, among other things, provide credit support to some of the Company's customers, satisfy minimum exchange and clearing house collateral requirements and provide stock financing in exchange-approved warehouses. The total availability under these facilities is approximately $509.2 million. Refco Group has guaranteed all of its subsidiaries' obligations under these facilities, with the exception of one $10.0 million facility. As of May 31, 2005, letters of credit in the aggregate amount of approximately $1.1 million were outstanding under these facilities.

The Company's subsidiaries enter into similar facilities, and Refco Group guarantees these facilities, in the normal course of business.

**Contingencies**

In the ordinary course of business, the Group has been named as a party to both litigation and administrative proceedings, certain of which are described below.

On March 1, 2005, Trading Technologies International, Inc. ("Trading Technologies") filed an action against Refco Group, Refco, LLC and Refco EasySolutions, LLC (collectively, the "Refco parties") in the U.S. District Court for the Northern District of Illinois, Eastern Division, alleging that the Refco parties infringed upon certain patents owned by Trading Technologies relating to electronic trading software. In its complaint, Trading Technologies demanded a preliminary and permanent injunction against the Refco parties, as well as unspecified damages and costs. The Refco parties filed certain counterclaims for breach of contract and attempted monopolization and an affirmative defense of patent misuse. On May 20, 2005, Trading Technologies filed a motion to dismiss these counterclaims and affirmative defense. On June 17, 2005, the Refco parties filed a response to the motion to dismiss, which is pending. On July 15, 2005, Trading Technologies terminated certain licensing agreements with the Refco parties.

Certain of the Group's subsidiaries have been named in a legal proceeding in which the plaintiffs, two hedge funds and their investment managers, alleged that the subsidiaries breached a customer

F-56

agreement governing the plaintiffs' margin account when they required the plaintiffs to increase the value of collateral securing a margin loan from 60% to 100% in September 1998.

On September 15, 2003, the Supreme Court of the State of New York granted the Group's motion for summary judgment on six of the seven claims and dismissed those claims with prejudice. By Order dated March 16, 2004, the appellate court (Appellate Division, First Department) affirmed the trial court's decision. On May 11, 2004, the trial court granted the Group's motion to bifurcate the trial of liability from any trial on damages. The remaining claim of liability was tried before a jury in June 2004.

On June 17, 2004, the jury returned a verdict in favor of the plaintiff's claim as to the Group's liability. The Group moved the trial court (a) for judgment in favor of the Group as a matter of law, (b) to set aside the verdict and (c)(i) to direct entry of judgment for the Group as a matter of law, or (ii) in the alternative, to order a new trial on plaintiffs' second cause of action. By memorandum decision and order dated March 3, 2005, the trial court granted the Group's post-trial motion to set aside the jury verdict as against the weight of the evidence and ordered a new trial. The plaintiff filed a notice of appeal of the order and the Group filed a notice of cross appeal. The plaintiff perfected its notice of appeal on July 11, 2005 and the appeals will be fully briefed by August 29, 2005. The court scheduled a pre-trial conference for August 12, 2005. The parties are scheduled to attend a mediation session on July 26, 2005.

After consultation with legal counsel, management believes that it is not probable that a material loss will result from the final verdict. The Group raised its margin requirements to 100% and/or terminated plaintiffs' financing on specific bonds and issued resulting margin calls to plaintiffs, who defaulted. The Appellate Division, First Department previously ruled that the Group had the contractual right to terminate margin loans to plaintiffs and thus did not breach any express provision of the customer agreements. The Group believes the sole issue remaining for the jury to determine was whether the Group breached the implied covenant of good faith and fair dealing when it exercised its contractual rights. The Group does not believe it breached the implied covenant when it exercised its contractual rights. Upon retrial, the Group believes the plaintiff will not be able to sustain its burden. Accordingly, the Group has not recorded an accrual for any losses that might arise from the final verdict.

In 2001, the Division of Enforcement of the SEC commenced an informal investigation into short sales of the stock of Sedona Corporation ("Sedona"). The SEC requested that the Group produce documents relating to any of its accounts that traded in the stock of Sedona. In June 2001, the SEC issued a formal order of investigation into short sales of Sedona stock. In 2002 and 2003, the Group received subpoenas from the SEC and a request for a written statement. Generally, the subpoenas and the request required the production of documents, tapes and information regarding two of the Group's former brokers who handled the account of Amro International, S.A. ("Amro"), one of the Group's former customers which engaged in short sales of Sedona stock, the Group's relationship with Amro and its two principals; other securities traded by Amro; and the Group's record keeping, supervisory and short sale policies and restrictions.

On May 16, 2005, the Group announced that its subsidiary, Refco Securities, LLC ("Refco Securities"), had received a "Wells Notice" from the SEC arising out of the investigation. The Wells Notice stated that the SEC staff intends to recommend that a civil enforcement action be brought against Refco Securities, alleging violations of Section 17(a) of the Securities Act of 1933, as amended, Sections 10(b) and 17(a) of the Exchange Act of 1934, as amended, and Rules 10b-5, 17a-3 and 17a-4

thereunder, Section 220.8 of Regulation T, Conduct Rule 3370 of the National Association of Securities Dealers, Inc., aiding and abetting violations of Section 15(a) of the Exchange Act of 1934, as amended, and failure to comply with a prior SEC cease and desist order and the Section 21(a) order from the SEC. The Group is in active discussions with the SEC to resolve the matters raised in the investigation and believes that it is near a resolution on all material issues. This settlement likely will involve an injunction against future violations of certain provisions, including anti-fraud provisions, of the federal securities laws, an order to comply with the prior cease and desist order and the Section 21(a) order, an administrative censure, payment of a substantial civil penalty and retention of an independent consultant to review and make recommendations with respect to various business practices and procedures. The Group has recorded a reserve of $5.0 million for this potential settlement.

Santo C. Maggio, the President and Chief Executive Officer of Refco Securities, also has been in negotiations with the SEC staff, and likewise is near a resolution of certain supervisory matters raised in the investigation. Mr. Maggio, as part of such resolution, is prepared to accept the entry of an administrative order suspending him for a year from any supervisory duties. While complying with the restrictions of such supervisory suspension, Mr. Maggio would continue to work for the Group and Refco Securities in his current capacities.

Although the Group is working to finalize the terms of these settlements in a formal offer of settlement, the Group believes that the settlements as described above are highly likely and that the SEC staff would recommend such settlements to the SEC Commissioners, whose approval is required. There is no assurance that the Group will reach such settlements on these terms, or at all, or, even if it does, that the SEC Commissioners will approve such settlements. The terms of any final settlements approved by the SEC Commissioners, or any resolution of these matters if the Group or Mr. Maggio is unable to reach a settlement with the SEC, may be materially less favorable than the settlements described above.

In October 2003, we received a subpoena from the U.S. Attorney's Office for the Southern District of New York, which called for the production of documents we had produced to the SEC. In addition to producing documents in response to the foregoing subpoenas, we have made our employees available to testify before the SEC and to be interviewed by the U.S. Attorneys' office. Refco Securities, LLC has been advised orally that neither it nor Mr. Maggio is currently the subject of the U.S. Attorneys' investigation.

Since 2002, Gerard Sillam has instituted numerous commercial and criminal actions against Refco entities under the French legal system, which permits private individuals to initiate criminal proceedings. The Group has cooperated with the criminal inquiries, none of which has resulted in any action against any Refco entity or individual. The Group is vigorously defending these actions and believes that Mr. Sillam's claim is without merit. In 2004, Mr. Sillam filed a commercial claim in New York State Supreme Court but then requested and was granted dismissal of the case after the Group removed it to federal court. To the Group's knowledge, no action by Mr. Sillam against any Refco entity is pending in the United States.

In the opinion of management and where appropriate, in consultation with outside counsel, the resolution of these and other matters will not have a material adverse effect on the consolidated financial condition and results of operations of the Group.

F-58

## NOTE F—SHORT-TERM BORROWINGS AND LONG-TERM BORROWINGS

**Short-term borrowings**

The Group obtains short-term borrowings through bank loans. Short-term borrowings also include the portion of long-term borrowings maturing within one year and certain long-term borrowings that may be payable within one year at the option of the holder. The carrying value of these short-term obligations approximates fair value due to their short-term nature.

Bank loans are generally from major money center banks and are primarily payable on demand. Interest is paid at prevailing short-term market rates. The Group enters into loan agreements with banks, which may be collateralized by letters of credit or other forms of collateral. Generally, the amounts pledged represent the underlying collateral for the Group's receivables from customers.

Short-term borrowings at May 31, 2005 and February 28, 2005 are set forth below:

|  | May 31, 2005 | February 28, 2005 |
|---|---|---|
|  | (unaudited) |  |
|  | (in thousands) | |
| Bank loans | $ 136,913 | $ 24,628 |
| Current portion of long-term borrowings | 8,000 | 8,000 |
| Total | $ 144,913 | $ 32,628 |

The weighted average interest rate on outstanding bank loans, which includes short-term funding and overdrafts, was 4.55% and 3.78% at May 31, 2005 and February 28, 2005, respectively.

Interest rates paid on short-term borrowings, excluding the current portion of long-term borrowings, ranged from 1.55% to 25.15% and 1.89% to 7.4% for the three months ended May 31, 2005 and the year ended February 28, 2005, respectively.

**Long-term borrowings**

Long-term borrowings of $1,244.0 million and $1,246.0 million at May 31, 2005 and February 28, 2005, respectively, consist of the following loans:

|  | May 31, 2005 | February 28, 2005 |
|---|---|---|
|  | (unaudited) |  |
|  | (in thousands) | |
| New Senior Credit Facility: | | |
|    Secured Term Loan | $ 644,000 | $ 646,000 |
|    Secured Revolving Loan | — | — |
| 9% Senior Subordinated Notes, due August 1, 2012 | 600,000 | 600,000 |
|  | 1,244,000 | 1,246,000 |
| Less: Portion included within short-term borrowings | 8,000 | 8,000 |
|  | $ 1,236,000 | $ 1,238,000 |

In connection with the Transactions on August 5, 2004, Refco Group entered into a new Senior Credit Facility (the "New

Senior Credit Facility"), and issued 9% Senior Subordinated Notes due 2012, a portion of which repaid the outstanding amounts under the old senior notes and the old subordinated loan from a member.

The New Senior Credit Facility provides for a $75.0 million revolving credit facility in revolving credit loans and letters of credit. The revolving credit facility matures on August 5, 2010. The New

F-59

Senior Credit Facility also provides for an $800.0 million secured term loan facility, which was fully drawn immediately after the closing of the Transactions. The secured term loan facility matures on August 5, 2011. In January 2005, Refco Group voluntarily prepaid $150.0 million of borrowings under the secured term loan facility, and available borrowings thereunder were reduced to $648.0 million. On March 15, 2005, Refco Group refinanced and replaced the secured term loan facility with a new secured term loan facility providing for borrowings of up to an aggregate principal amount of $648.0 million.

None of the revolving credit facility has been drawn as of May 31, 2005. This facility will meet the Group's future needs for working capital and general corporate purposes.

The New Senior Credit Facility bears interest, at the Group's option, at either the Eurodollar Rate or Base Rate (both as defined), plus an applicable margin. The applicable margin under the revolving credit facility is determined based upon the Leverage Ratio (as defined), as set forth in the following table:

| Pricing Level | Leverage Ratio | Applicable Margin | |
|---|---|---|---|
| | | Eurodollar Rate | Base Rate |
| 1 | >5.00:1 | 2.75% | 1.75% |
| 2 | >4.50:1 but ≤5.00:1 | 2.50% | 1.50% |
| 3 | >4.00:1 but ≤4.50:1 | 2.00% | 1.00% |
| 4 | ≤4.00:1 | 1.75% | 0.75% |

The applicable margins under the term loan facility are subject to adjustment based on the debt ratings of the senior credit facilities by S&P and Moody's, as set forth in the following table:

| Pricing Level | Criteria | Applicable Margin | |
|---|---|---|---|
| | | Eurodollar Rate | Base Rate |
| 1 | rated at least BB- by S&P and Ba3 by Moody's | 1.75% | 0.75% |
| 2 | rated at least BB- by S&P and B1 by Moody's and Level 1 does not apply | 2.00% | 1.00% |
| 3 | if neither Level 1 nor Level 2 applies | 2.25% | 1.25% |

The weighted average interest rates per annum in effect as of May 31, 2005 for the secured term loan facility was 5.03%. The interest rate payable under the New Senior Credit Facility will increase by 2.00% per annum during the continuance of any payment or bankruptcy event of default.

The New Senior Credit Facility is also secured by, among other things:

- a first priority security interest in substantially all of the assets of the Company and the Company's non-regulated restricted domestic subsidiaries (other than Refco Finance Inc.), including without limitation, all receivables, contracts, contract rights, equipment, intellectual property, inventory and all other tangible and intangible assets, subject to certain customary exceptions;

- a pledge of (i) all of present and future capital stock of each of Refco Group Ltd., LLC and the Company, the Company's and each guarantor's direct domestic subsidiaries, including regulated domestic subsidiaries held directly by the Company or any guarantor and (ii) 65% of the voting stock of each of the Company and each guarantor's direct foreign subsidiaries; and

- all proceeds and products of the property and assets described above.

In addition, the New Senior Credit Facility is guaranteed by the Company and the Company's non-regulated restricted domestic subsidiaries.

F-60

On August 5, 2004, the Refco Group Ltd., LLC completed a financing, which consisted of the sale of $600.0 million of 9% Senior Subordinated Notes due 2012 (the "New Notes") pursuant to a private offering. The New Notes bear interest at the rate of 9% per annum, which is payable semi-annually in cash in arrears on February 1 and August 1. The New Notes mature on August 1, 2012. The payment of the principal of, premium, if any, and interest on the New Notes and the payment of any Subsidiary Guaranty will be subordinate in right of payment to the prior payment in full of all Senior Indebtedness of the Issuers or the relevant Subsidiary Guarantor, as the case may be. Refco Group Ltd., LLC has issued 9% Senior Subordinated Notes due 2012 (the "Notes") in exchange for all New Notes, pursuant to an exchange offer whereby holders of the New Notes received Notes that have been registered under the Securities Act of 1933, as amended, having terms substantially identical in all material aspects to the New Notes, except that the Notes do not contain terms with respect to transfer restrictions.

At any time prior to August 1, 2007, Refco Group Ltd., LLC may redeem up to 35% of the aggregate principal amount of the Notes at a price of 109.000% in connection with a Designated Offering, as defined. With the exception of a Designated Offering, the Notes are redeemable at the option of Refco Group Ltd., LLC beginning August 1, 2008 at prices decreasing from 104.500% of the principal amount thereof to par on August 1, 2010 and thereafter. Refco Group Ltd., LLC is not required to make mandatory redemption or sinking fund payments with respect to the Notes. Prior to August 1, 2008, Refco Group Ltd., LLC has the option to redeem all, but not less than all, of the Notes at a redemption price equal to 100% of the principal amount of the Notes.

The indenture for the Notes requires Refco Group Ltd., LLC and its subsidiaries to comply with certain restrictive covenants, including a restriction on dividends; and limitations on the incurrence of indebtedness, certain payments and distributions and sales of Refco Group Ltd., LLC's assets and stock. Refco Group Ltd., LLC was in compliance with all contractual debt commitments as of May 31, 2005 and February 28, 2005, respectively.

The Notes are fully and unconditionally guaranteed on an unsecured, senior subordinated basis by all of the Company's active domestic non-regulated subsidiaries. The Condensed Consolidating Financial Information in Note K provides additional guarantor/non-guarantor information.

The table below sets out the maturities of the Group's long-term borrowings (in thousands):

| Fiscal period ended: | |
|---|---|
| 2006 | $ 6,000 |
| 2007 | 8,000 |
| 2008 | 8,000 |
| 2009 | 8,000 |
| 2010 | 8,000 |
| 2011 and thereafter | 1,206,000 |
| | $ 1,244,000 |

The Group's interest expense for long-term borrowings for each of the three months ended May 31, 2005 and 2004 was $21.7 million and $7.0 million, respectively.

F-61

## NOTE G—VARIABLE INTEREST ENTITIES

An entity is subject to Interpretation 46 R and is called a VIE if it has (1) equity that is insufficient to permit the entity to finance its activities without additional subordinated financial support from other parties, or (2) equity investors that cannot make significant decisions about the entity's operations, or that do not absorb the expected losses or receive the expected returns of the entity. All other entities are evaluated for consolidation under SFAS No. 94, *Consolidation of All Majority-Owned Subsidiaries*. A VIE is consolidated by its primary beneficiary, which is the party involved with the VIE that has a majority of the expected losses or a majority of the expected residual returns or both. In addition to the VIEs that are consolidated in accordance with Interpretation 46 R, the Group has significant variable interests in certain other VIEs that are not consolidated because the Company is not the primary beneficiary. As of May 31, 2005, the Group held variable interests in certain VIEs with respect to which the Group is deemed not to be the primary beneficiary. Those VIEs include several managed futures funds with aggregate net asset value of approximately $511.6 million managed by several of the Company's subsidiaries since April 1, 2003. Several of the Company's subsidiaries earn fixed investment management fees and, in certain cases, incentive fees and other fees from these managed funds. As of May 31, 2005, the Group's maximum exposure to loss from the funds managed by these subsidiaries is not material.

## NOTE H—ACQUISITIONS

In April 2005, the Group acquired the customer accounts and related business operations of The League Corp. for approximately $11.2 million with an additional contingent payment based on performance to be made after the one year period ended January 31, 2006. This acquisition was accounted for as a purchase in conformity with SFAS No. 141, *Business Combinations*. The Company has assigned $6.7 million to customer relationships and $1.1 million to non-compete agreements based on a preliminary valuation analysis by an independent valuation firm. The customer relationships are amortized on an accelerated basis over a weighted-average economic useful life of nine years, and the non-compete agreements are amortized on a straight-line basis over five years.

In May 2005, Refco Trading Services (UK) Ltd., a wholly owned subsidiary of the Company, made a cash offer to the shareholders of EasyScreen plc ("EasyScreen") for £15.525 per share, or £12.8 million, which valued the entire share capital of EasyScreen at approximately £14.8 million. EasyScreen is a software development company that designs and markets innovative software for trading on electronic markets. The cash offer closed on May 31, 2005, and as of that date the Company owned 95.3% of EasyScreen's outstanding ordinary share capital. This acquisition was accounted for as a purchase in conformity with SFAS No. 141. Based on an initial estimate to be followed by a valuation from an independent firm, the Company has assigned $15.0 million to technology, which is being amortized on a straight-line basis over an economic useful life of seven years.

## NOTE I—SEGMENT REPORTING

Operating segments are defined as components of an enterprise for which separate financial information is regularly available and evaluated by the chief operating decision maker, or decision making group, in deciding how to allocate resources and in assessing performance.

The Group has reported the results of operations related to Forstmann-Leff International Associates, LLC as discontinued operations. Forstmann-Leff International Associates, LLC was previously disclosed within the Asset Management segment. The Group's remaining operations include

F-62

two operating segments: (1) Derivatives Brokerage & Clearing; and (2) Prime Brokerage/Capital Markets. The Derivatives Brokerage & Clearing business operations consist of execution and clearing services for global exchange-traded derivatives in electronic and open outcry markets. Prime Brokerage/Capital Markets is focused on offering a variety of securities products consisting of fixed income, equities, foreign exchange and prime brokerage. Segment data has been reclassified to reflect the current segment structure.

For financial reporting purposes, and to reconcile to the amounts reported in the consolidated financial statements, the Group has established a Corporate & Other non-operating segment. Corporate administration costs are not allocated to the respective segments and are included in Corporate & Other. Eliminations consist of intersegment interest income and interest expense derived in the Group's normal course of business from intercompany funding.

| | Derivatives Brokerage & Clearing | Prime Brokerage/ Capital Markets | Corporate & Other | Eliminations | Total |
|---|---|---|---|---|---|
| | | | (in thousands) | | |
| **Three Months Ended May 31, 2005 (unaudited)** | | | | | |
| Interest revenue | $ 76,383 | $ 1,002,355 | $ 3,771 | $ (143,038) | $ 939,471 |
| Total revenues | 336,566 | 1,123,811 | 5,506 | (153,847) | 1,312,036 |
| Interest expense | 50,464 | 973,328 | 43,076 | (143,038) | 923,830 |
| Depreciation and amortization | 3,096 | 3,782 | 2,784 | — | 9,662 |
| Income before provision for income taxes, income from equity investees, members' interest in earnings of subsidiary and minority interest | 35,539 | 50,080 | (41,841) | — | 43,778 |
| **As of May 31, 2005 (unaudited)** | | | | | |
| Total assets | 9,866,659 | 79,581,861 | 772,274 | (15,903,603) | 74,317,191 |
| **Three Months Ended May 31, 2004 (unaudited)** | | | | | |
| Interest revenue | $ 37,438 | $ 381,034 | $ 6,624 | $ (47,536) | $ 377,560 |
| Total revenues | 263,839 | 440,653 | 7,032 | (54,100) | 657,424 |
| Interest expense | 20,135 | 356,872 | 15,510 | (48,263) | 344,254 |
| Depreciation and amortization | 3,182 | 558 | 2,621 | — | 6,361 |
| Income before provision for income taxes, income from equity investees, members' interest in earnings of subsidiary, minority interest and discontinued operations | 40,865 | 31,568 | (14,060) | — | 58,373 |
| **As of February 28, 2005** | | | | | |
| Total assets | 9,303,522 | 50,629,868 | 716,668 | (11,884,709) | 48,765,349 |

F-63

*Geographic Information*

The Group conducts business in three countries that individually comprise greater than 10% of revenues and long-lived assets within the last three years. The following information provides a reasonable representation of each region's contribution to the consolidated amounts:

|  | Three Months Ended May 31, 2005 | | Three Months Ended May 31, 2004 | |
|---|---|---|---|---|
|  | (unaudited) (in thousands) | | | |
| Total revenues: |  |  |  |  |
| United States | $ | 1,056,306 | $ | 502,952 |
| Bermuda |  | 115,112 |  | 52,262 |
| United Kingdom |  | 79,386 |  | 66,361 |
| Other |  | 61,232 |  | 35,849 |
| Total | $ | 1,312,036 | $ | 657,424 |

|  | As of May 31, 2005 | | As of February 28, 2005 | |
|---|---|---|---|---|
|  | (unaudited) (in thousands) | | | |
| Long-lived assets: |  |  |  |  |
| United States | $ | 32,041 | $ | 32,417 |
| Bermuda |  | 1,302 |  | 1,318 |
| United Kingdom |  | 5,965 |  | 4,979 |
| Other |  | 8,957 |  | 5,157 |
| Total | $ | 48,265 | $ | 43,871 |

## NOTE J—SUBSEQUENT EVENTS

In April 2005, the Board of Directors of Refco Inc., a newly-formed Delaware corporation, approved the filing with the Securities and Exchange Commission of a registration statement on Form S-1 in connection with the proposed initial public offering (the "Offering") of its common stock. Immediately prior to consummation of the Offering, the Company's existing members will contribute all of their Class A and Class B units in the Company to Refco Inc. in exchange for shares of common stock of Refco Inc. As a result, Refco Inc. will own all of the outstanding membership interests in the Company. There can be no assurance that the Offering will be consummated.

Refco Inc. is a Delaware "C" corporation, and as such is subject to federal and state income taxes. Deferred tax assets and liabilities will be recognized for the tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax basis. Deferred tax assets and liabilities will be measured using enacted tax rates applied to taxable income in the years in which those temporary differences are expected to be recovered or settled. A deferred tax asset valuation allowance will be recorded if it is more likely than not that all or a portion of the recorded deferred tax assets will not be realized.

In June 2005, the Group entered into a definitive agreement to acquire the global brokerage operations of Cargill Investor Services for $208.0 million in cash and a future contingent cash payment of between $67.0 million and $192.0 million, based on the performance of the acquired operations.

F-64

**NOTE K—CONDENSED CONSOLIDATING FINANCIAL INFORMATION**

The following information sets forth the Group's condensed consolidating financial statements as of May 31, 2005 and February 28, 2005 and for each of the three months ended May 31, 2005 and 2004. New Refco Group refers to New Refco Group Ltd., LLC as parent of Refco Group Ltd., LLC, and Refco Group refers to Refco Group Ltd., LLC as issuer of the senior subordinated notes.

**Condensed consolidating balance sheet**

| | As of May 31, 2005 | | | | | |
|---|---|---|---|---|---|---|
| | New Refco Group | Refco Group | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | (unaudited) (in thousands) | | | | | |
| Cash and cash equivalents | $      — | $      — | $   37,714 | $   367,315 | $      — | $   405,029 |
| Cash and securities segregated under federal and other regulations | | | | | | |
| Cash and cash equivalents | — | — | — | 1,053,218 | — | 1,053,218 |
| Securities purchased under agreements to resell | — | — | — | 67,013 | — | 67,013 |
| Securities purchased under agreements to resell | — | — | — | 53,805,462 | (7,254,088) | 46,551,374 |
| Deposits with clearing organizations and others | — | — | 8,380 | 3,579,657 | (1,068,890) | 2,519,147 |
| Receivables from securities borrowed | — | — | — | 2,844,780 | (212,791) | 2,631,989 |
| Receivables from broker-dealers, clearing organizations and customers, net of reserves | — | 171,686 | 3,911,509 | 14,994,063 | (6,499,464) | 12,577,794 |
| Securities owned, at market value or fair value | — | — | 246 | 7,285,765 | (511,972) | 6,774,039 |
| Investment in and advances to subsidiaries | 187,927 | 2,555,130 | 954,244 | — | (3,697,301) | — |
| Goodwill, identifiable intangible assets and other assets | — | 93,368 | 487,407 | 1,404,952 | (248,139) | 1,737,588 |
| Total assets | $  187,927 | $ 2,820,184 | $ 5,399,500 | $ 85,402,225 | $ (19,492,645) | $ 74,317,191 |
| Liabilities | | | | | | |
| Short-term borrowings, including current portion of long-term borrowings | $      — | $    8,000 | $      — | $   136,913 | $      — | $   144,913 |
| Securities sold under agreements to repurchase | — | — | — | 50,653,338 | (7,320,097) | 43,333,241 |
| Payable from securities loaned | — | — | — | 2,534,496 | (76,349) | 2,458,147 |
| Payable to broker-dealers and clearing organizations | — | — | 4,806 | 8,517,177 | (77,463) | 8,444,520 |
| Payable to customers | — | 1,322,444 | 4,325,821 | 9,845,731 | (7,871,187) | 7,622,809 |
| Securities sold, not yet purchased, at market value or fair value | — | — | 255 | 10,590,124 | — | 10,590,379 |
| Accounts payable, accrued expenses and other liabilities | 2,500 | 65,813 | 92,167 | 211,744 | (94,075) | 278,149 |
| Long-term borrowings | — | 1,236,000 | — | — | — | 1,236,000 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Subordinated debt | — | — | — | 112,688 | (112,688) | — |
| Total liabilities | 2,500 | 2,632,257 | 4,423,049 | 82,602,211 | (15,551,859) | 74,108,158 |
| Membership interests issued by subsidiary and minority interest | — | — | 2,609 | 20,997 | — | 23,606 |
| Members' equity | 185,427 | 187,927 | 973,842 | 2,779,017 | (3,940,786) | 185,427 |
| Total liabilities and members' equity | $ 187,927 | $ 2,820,184 | $ 5,399,500 | $ 85,402,225 | $ (19,492,645) | $ 74,317,191 |

F-65

**Condensed consolidating balance sheet**

|  | | February 28, 2005 | | | | |
|---|---|---|---|---|---|---|
|  | New Refco | Refco Group | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|  | | | (in thousands) | | | |
| Cash and cash equivalents | $     — | $     — | $  29,429 | $  493,192 | $     — | $  522,621 |
| Cash and securities segregated under federal and other regulations | | | | | | |
|     Cash and cash equivalents | — | — | — | 1,102,539 | — | 1,102,539 |
|     Securities purchased under agreements to resell | — | — | — | 58,650 | — | 58,650 |
| Securities purchased under agreements to resell | — | — | — | 34,548,479 | (4,312,608) | 30,235,871 |
| Deposits with clearing organizations and others | — | — | 6,348 | 3,409,003 | (975,698) | 2,439,653 |
| Receivables from securities borrowed | — | — | — | 3,128,304 | — | 3,128,304 |
| Receivables from broker-dealers, clearing organizations and customers, net of reserves | — | 125,796 | 3,298,520 | 6,508,245 | (5,854,262) | 4,078,299 |
| Securities owned, at market value or fair value | — | — | 341 | 5,990,649 | (396,193) | 5,594,797 |
| Investment in and advances to subsidiaries | 152,750 | 2,472,182 | 907,702 | — | (3,532,634) | — |
| Goodwill, identifiable intangible assets and other assets | — | 92,852 | 365,745 | 1,394,157 | (248,139) | 1,604,615 |
|     Total assets | $  152,750 | $  2,690,830 | $  4,608,085 | $  56,633,218 | $  (15,319,534) | $  48,765,349 |
| Liabilities | | | | | | |
|     Short-term borrowings, including current portion of long-term borrowings | | $  8,000 | $     — | $  24,628 | $     — | $  32,628 |
|     Securities sold under agreements to repurchase | | — | — | 33,001,115 | (4,375,212) | 28,625,903 |
|     Payable from securities loaned | — | — | — | 3,028,933 | — | 3,028,933 |
|     Payable to broker-dealers and clearing organizations | | — | 6,093 | 1,122,507 | (387,478) | 741,122 |
|     Payable to customers | | 1,237,776 | 3,601,764 | 8,603,429 | (6,595,411) | 6,847,558 |
|     Securities sold, not yet purchased, at market value or fair value | | — | 351 | 7,832,671 | — | 7,833,022 |
|     Accounts payable, accrued expenses and other liabilities | 2,500 | 54,304 | 71,693 | 195,976 | (71,891) | 252,582 |
|     Long-term borrowings | | 1,238,000 | — | — | — | 1,238,000 |
|     Subordinated debt | | — | — | 113,264 | (113,264) | — |
|     Total liabilities | 2,500 | 2,538,080 | 3,679,901 | 53,922,523 | (11,543,256) | 48,599,748 |
|     Membership interests issued by subsidiary and minority interest | — | — | — | 15,351 | — | 15,351 |
|     Members' equity | 150,250 | 152,750 | 928,184 | 2,695,344 | (3,776,278) | 150,250 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Total liabilities and members' equity | $ 152,750 | $ 2,690,830 | $ 4,608,085 | $ 56,633,218 | $ (15,319,534) | $ 48,765,349 |

F-66

**Condensed consolidating statement of income**

| | New Refco Group | Refco Group | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
|---|---|---|---|---|---|---|
| | | | | **Three Months Ended May 31, 2005** | | |
| | | | | (unaudited) | | |
| | | | | (in thousands) | | |
| **Revenues** | | | | | | |
| Commissions and brokerage | $ — | $ — | $ 1,112 | $ 252,109 | $ (9,008) | $ 244,213 |
| Interest | — | 1,962 | 49,582 | 1,030,965 | (143,038) | 939,471 |
| Principal transactions, net | — | — | 30,100 | 84,664 | — | 114,764 |
| Asset management and advisory fees | — | — | — | 5,559 | — | 5,559 |
| Other | — | 1,725 | 2,706 | 5,399 | (1,801) | 8,029 |
| Total revenues | — | 3,687 | 83,500 | 1,378,696 | (153,847) | 1,312,036 |
| **Expenses** | | | | | | |
| Commissions and order execution costs | — | — | 21,941 | 194,987 | (9,008) | 207,920 |
| Interest | — | 36,821 | 53,342 | 976,705 | (143,038) | 923,830 |
| Employee compensation and benefits | — | 2,516 | 5,557 | 66,172 | — | 74,245 |
| General, administrative and other | — | 1,699 | 1,660 | 60,705 | (1,801) | 62,263 |
| Total expenses | — | 41,036 | 82,500 | 1,298,569 | (153,847) | 1,268,258 |
| Equity in net income (loss) of subsidiaries | 42,587 | 80,541 | 43,373 | — | (166,501) | — |
| Income (loss) before provision for income taxes, income from equity investees, members' interest in earnings of subsidiary and minority interest | 42,587 | 43,192 | 44,373 | 80,127 | (166,501) | 43,778 |
| Provision for income taxes | — | 605 | — | 4,385 | — | 4,990 |
| Income (loss) before income from equity investees, members' interest in earnings of subsidiary and minority interest | 42,587 | 42,587 | 44,373 | 75,742 | (166,501) | 38,788 |
| Income from equity investees | — | — | 13,442 | 740 | — | 14,182 |
| Members' interest in earnings of subsidiary and minority interest | — | — | — | 10,383 | — | 10,383 |
| Net income | $ 42,587 | $ 42,587 | $ 57,815 | $ 66,099 | $ (166,501) | $ 42,587 |

F-67

**Condensed consolidating statement of income**

| | Three Months Ended May 31, 2004 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Refco Group | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (unaudited) (in thousands) | | |
| **Revenues** | | | | | |
| Commissions and brokerage | $ — | $ 1,893 | $ 219,732 | $ (5,830) | $ 215,795 |
| Interest | 5,919 | 22,932 | 396,245 | (47,536) | 377,560 |
| Principal transactions, net | — | 12,970 | 48,230 | — | 61,200 |
| Asset management and advisory fees | — | 1,702 | 189 | — | 1,891 |
| Other | 369 | 1,334 | 9 | (734) | 978 |
| Total revenues | 6,288 | 40,831 | 664,405 | (54,100) | 657,424 |
| **Expenses** | | | | | |
| Commissions and order execution costs | — | 4,978 | 142,831 | (5,103) | 142,706 |
| Interest | 12,273 | 28,924 | 351,320 | (48,263) | 344,254 |
| Employee compensation and benefits | 1,025 | 4,925 | 58,620 | — | 64,570 |
| General, administrative and other | 4,536 | 7,456 | 36,263 | (734) | 47,521 |
| Total expenses | 17,834 | 46,283 | 589,034 | (54,100) | 599,051 |
| Equity in net income (loss) of subsidiaries | 70,816 | 70,146 | — | (140,962) | — |
| Income (loss) before provision for income taxes, income from equity investees, members' interest in earnings of subsidiary, minority interest and discontinued operations | 59,270 | 64,694 | 75,371 | (140,962) | 58,373 |
| Provision for income taxes | — | — | 6,330 | — | 6,330 |
| Income (loss) before income from equity investees, members' interest in earnings of subsidiary, minority interest and discontinued operations | 59,270 | 64,694 | 69,041 | (140,962) | 52,043 |
| Income from equity investees | — | 6,209 | 388 | — | 6,597 |
| Members' interest in earnings of subsidiary and minority interest | — | — | 926 | — | 926 |
| Income (loss) from continuing operations | 59,270 | 70,903 | 68,503 | (140,962) | 57,714 |
| **Discontinued operations:** | | | | | |
| Income from discontinued operations | — | — | 3,437 | — | 3,437 |
| Applicable income tax expense | — | — | 1,881 | — | 1,881 |
| Net income | $ 59,270 | $ 70,903 | $ 70,059 | $ (140,962) | $ 59,270 |

F-68

**Condensed consolidating statement of cash flows**

| | Three Months Ended May 31, 2005 | | | | | |
|---|---|---|---|---|---|---|
| | New Refco Group | Refco Group | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (unaudited) | | | |
| | | | (in thousands) | | | |
| Net cash generated from (used in) operating activities | $ — | $ 2,000 | $ 8,285 | $ (106,648) | $ — | $ (96,363) |
| Cash flows from investing activities | | | | | | |
| Acquisition of businesses, net of cash acquired | — | — | — | (17,101) | — | (17,101) |
| Net cash used in investing activities | — | — | — | (17,101) | — | (17,101) |
| Cash flows from financing activities | | | | | | |
| Repayment of long-term borrowings | — | (2,000) | — | — | — | (2,000) |
| Withdrawals of interests by members of subsidiary | — | — | — | (2,128) | — | (2,128) |
| Net cash used in financing activities | — | (2,000) | — | (2,128) | — | (4,128) |
| Net increase (decrease) in cash and cash equivalents | — | — | 8,285 | (125,877) | — | (117,592) |
| Cash and cash equivalents, beginning of period | — | — | 29,429 | 493,192 | — | 522,621 |
| Cash and cash equivalents, end of period | $ — | $ — | $ 37,714 | $ 367,315 | $ — | $ 405,029 |

| | Three Months Ended May 31, 2004 | | | | |
|---|---|---|---|---|---|
| | Refco Group | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Consolidation Adjustments | Consolidation Totals |
| | | | (unaudited) | | |
| | | | (in thousands) | | |
| Net cash generated from (used in) operating activities | $ — | $ 14,715 | $ (279,907) | $ — | $ (265,192) |
| Cash flows from financing activities | | | | | |
| Withdrawals of interests by members of subsidiary | — | — | (4,876) | — | (4,876) |
| Net cash used in financing activities | — | — | (4,876) | — | (4,876) |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Net cash generated from discontinued operations | | — | | — | | 151,315 | | — | 151,315 |
| Net increase (decrease) in cash and cash equivalents | | — | | 14,715 | | (133,468) | | — | (118,753) |
| Cash and cash equivalents, beginning of period | | — | | 4,477 | | 311,736 | | — | 316,213 |
| Cash and cash equivalents, end of period | $ | — | $ | 19,192 | $ | 178,268 | $ | — | $ 197,460 |

F-69



QuickLinks

TABLE OF CONTENTS
Dealer Prospectus Delivery Obligation
PROSPECTUS SUMMARY
Our Company
Our Competitive Strengths
Our Business Strategy
Our Businesses
Recent Transactions
Our Executive Offices
The Offering
Summary Historical and Pro Forma Consolidated Financial Data
RISK FACTORS
Risks Relating to Our Company
Risks Related to Our Substantial Indebtedness
Risks Relating to Our Common Stock and this Offering
FORWARD-LOOKING STATEMENTS
USE OF PROCEEDS
DIVIDEND POLICY
CAPITALIZATION
DILUTION
UNAUDITED PRO FORMA CONSOLIDATED FINANCIAL STATEMENTS
Refco Inc. and Subsidiaries Unaudited Pro Forma Consolidated Balance Sheet as of May 31, 2005 (in thousands)
Notes to Unaudited Pro Forma Consolidated Balance Sheet
Refco Inc. and Subsidiaries Unaudited Pro Forma Condensed Consolidated Statements of Income Year ended February 28, 2005 (in thousands, except per share data)
Refco Inc. and Subsidiaries Unaudited Pro Forma Condensed Consolidated Statement of Income Three Months ended May 31, 2005 (in thousands, except per share data)
Notes to Unaudited Pro Forma Consolidated Statements of Income
SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA
MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS
INDUSTRY
Futures and Options Trading Volume on Global Derivatives Exchanges (Contract amounts in millions)
BUSINESS
Fiscal Year 2005 Prime Brokerage/Capital Markets Net Revenue Breakdown
MANAGEMENT
Summary Compensation Table
PRINCIPAL AND SELLING STOCKHOLDERS
CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS
DESCRIPTION OF CAPITAL STOCK
DESCRIPTION OF INDEBTEDNESS
SHARES ELIGIBLE FOR FUTURE SALE
MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES
UNDERWRITING
LEGAL MATTERS
EXPERTS
AVAILABLE INFORMATION
GLOSSARY
INDEX TO CONSOLIDATED FINANCIAL STATEMENTS
REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM
REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM
NEW REFCO GROUP LTD., LLC AND SUBSIDIARIES CONSOLIDATED BALANCE SHEETS
NEW REFCO GROUP LTD., LLC AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF INCOME
NEW REFCO GROUP LTD., LLC AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF CHANGES IN MEMBERS' EQUITY
NEW REFCO GROUP LTD., LLC AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF CASH FLOWS
NEW REFCO GROUP LTD., LLC AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
NEW REFCO GROUP LTD., LLC AND SUBSIDIARIES CONSOLIDATED BALANCE SHEETS

NEW REFCO GROUP LTD., LLC AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF INCOME
NEW REFCO GROUP LTD., LLC AND SUBSIDIARIES CONSOLIDATED STATEMENT OF CHANGES IN
MEMBERS' EQUITY
NEW REFCO GROUP LTD., LLC AND SUBSIDIARIES CONSOLIDATED STATEMENTS OF CASH FLOWS
NEW REFCO GROUP LTD., LLC AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
NEW REFCO GROUP LTD., LLC AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

EX-99.1 2 a05-17426_1ex99d1.htm EX-99.1

**Exhibit 99.1**

## Refco Announces Undisclosed Affiliate Transaction

NEW YORK, October 10, 2005 - Refco Inc. (NYSE: RFX) today announced that it had discovered through an internal review a receivable owed to the Company by an entity controlled by Phillip R. Bennett, Chief Executive Officer and Chairman of the Board of Directors, in the amount of approximately $430 million. Mr. Bennett today repaid the receivable in cash, including all accrued interest. Based on the results of the review to date, the Company believes that the receivable was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible. The Company believes that all customer funds on deposit are unaffected by these activities. Independent counsel and forensic auditors have been retained to assist the Audit Committee in an investigation of these matters.

This receivable from the entity controlled by Mr. Bennett was reflected on the Company's prior period financials, as well as on the Company's May 31, 2005 balance sheet. The receivable was not shown as a related party transaction in any such financials. For that reason, and after consultation by the Audit Committee with the Company's independent accountants, the Company determined, on October 9, 2005, that its financial statements, as of, and for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance, Inc. should no longer be relied upon.

At the request of the Board of Directors Mr. Bennett has taken a leave of absence. William M. Sexton, who recently announced his impending resignation as Executive Vice President and Chief Operating Officer of Refco Inc. and Refco Group Ltd., LLC, will remain with the Company and has been appointed as Chief Executive Officer of Refco Inc. Mr. Sexton said, "I am staying at Refco because I believe in our employees, customers and franchise. I am excited about the opportunities ahead and am eager to work with our management team to help the Company achieve even greater success." Joseph J. Murphy, Chief Executive Officer of Refco Global Futures and President of Refco LLC, has been appointed President of Refco Inc.

and Refco Capital Markets, Ltd.  Mr. Murphy said, "We continue to see strong momentum across our businesses with record derivative contract and foreign exchange volume in the quarter."  Mr. Sexton and Mr. Murphy have been leaders of the senior management team at Refco for the past six years, and have been instrumental in the Company's growth and success.  Also at the request of the Board, Santo C. Maggio, President and Chief Executive Officer of Refco Securities, LLC and Refco Capital Markets, Ltd., has taken a leave of absence.  Peter McCarthy has been appointed President of Refco Securities, LLC.

In light of the Audit Committee's investigation, the Company, Refco Group Ltd., LLC and Refco Finance Inc. each will likely delay the filing of its Quarterly Report on Form 10-Q for the quarterly period ending August 31, 2005, due on October 17, 2005.  The Company cannot estimate at this time when the Fiscal 2006 second quarter Form 10-Q filings will be made or when the Audit Committee investigation will be concluded.

Business Highlights

For the quarter ended August 31, 2005, derivatives brokerage and clearing contract volumes increased by 61 million contracts, or 40.3%, to 212 million contracts for the second quarter compared to the same quarter a year ago, and by 5 million contracts, or 2.5%, compared to the quarter ended May 31, 2005.

Foreign exchange dollar volumes increased by $172 billion, or 56.4%, to $477.4 billion for the second quarter compared to the same quarter a year ago, and by $67.6 billion, or 16.5%, compared to the quarter ended May 31, 2005.

The average net customer securities financing portfolio, or average domestic net repo book, increased by 27.4% for the quarter ended August 31, 2005 to $47.0 billion from $36.9 billion for the quarter ended August 31, 2004.

As of August 31, 2005, cash and cash equivalents were $648.6 million (of which approximately $230 million was subsequently used to redeem a portion of the Company's subordinated debt), and regulated subsidiaries reported net capital of $665.8 million and excess

2

regulatory capital of $279.3 million. These figures do not reflect the $433 million received today from Mr. Bennett to settle his outstanding receivable.

**About Refco Inc.**

Refco Inc. (NYSE: RFX) is a diversified financial services organization with operations in 14 countries and an extensive global institutional and retail client base. Refco's worldwide subsidiaries are members of principal U.S. and international exchanges, and are among the most active members of futures exchanges in Chicago, New York, London and Singapore. In addition to its futures brokerage activities, Refco is a major broker of cash market products, including foreign exchange, foreign exchange options, government securities, domestic and international equities, emerging market debt, and OTC financial and commodity products. Refco is one of the largest global clearing firms for derivatives. For more information, visit www.refco.com.

**Cautionary Note Regarding Forward-Looking Statements**

This press release contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of the 1995. In this press release, all statements other than statements of historical fact are forward looking statements that involve risks and uncertainties and actual results could differ. These forward looking statements are based on assumptions that we have made in light of our experience and on our perceptions of historical events, current conditions, expected future developments and other factors we believe are appropriate under the circumstances. Although we believe that these forward looking statements have a reasonable basis, you should be aware that numerous factors, including the outcome of the Audit Committee's investigation; changes in domestic and international market conditions; competition; our ability to attract and retain customers; our relationships with introducing brokers; retention of our management team; our ability to manage our growth or integrate future acquisitions, our exposure to significant credit risks with respect to our customers, international operations and expansion, system failures, the performance of third-party suppliers, changes in regulations or exchange membership requirements, the effectiveness of compliance and risk

3

management methods, potential litigation or investigations, employee or introducing broker misconduct or errors, reputational harm, and changes in capital requirements, could cause actual results to differ materially from our expectations. Because of these factors, we caution that you should not place undue reliance on any of our forward looking statements. Further, any forward looking statement speaks only as of today. It is impossible for us to predict how new events or developments may affect us.  The Company disclaims any intention or obligation to update or revise any forward-looking statements, either to reflect new information or developments or for any other reason.

4

EXHIBIT 35

**BENNETT'S KNOWLEDGE CHART**
**KEY**

| Reference | Concern | Plea Knowledge |
|---|---|---|
| A | RGHI | Count 1 |
| B | Round-trip loans | Count 1 |
| C | Deception of investors, lenders and auditors | Count 2 (9% senior subordinated notes)<br>Count 3 (securities fraud)<br>Count 15 (HSBC Bank) |
| D | False financial statements | Counts 5-54<br>Counts 6-51<br>Counts 4-10k<br>Counts 7-13 (wire fraud) |
| E | Insureds benefited from the fraud | Counts 16-20 (money laundering) |

EXHIBIT 35

| Claim # | Nature / Basis | Insureds Named | Wrongful Transaction | Bennett's Knowledge |
|---------|----------------|----------------|----------------------|---------------------|
| | | | *In re Refco Securities Litigation* (S.D.N.Y.) Case No. 05-8626[1] | |
| 1 | §12(a) of the Securities Act | Bennett, Trosten, Jaeckel | Bond Offering Memoranda (¶119) and statements at Bond Show (¶¶158-164) were materially false due to concealment of RGHI receivable, related party transactions and the round-trip loans ("RTLs"). (¶¶96-97, 132-153, 198) | A, B, C, D |
| 3[2] | §11 of the Securities Act | Bennett, Murphy, Lee, Sexton, Silverman, Maggio, Klejna, Harkins, Jaeckel, Schoen, O'Kelley, Gantcher, Breitman | Bond Registration Statement contained material untrue statements (¶181) due to concealment of the RGHI receivable, related party transactions and the RTLs. (¶¶96-97, 198) | A, B, C, D |
| 5 | §11 of the Securities Act | Bennett, Sherer, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, Schoen | The IPO Registration Statement contained material untrue statements (¶¶204, 215) due to concealment of the RGHI receivable, related party transactions and the RTLs. (¶¶96-97, 198) | A, B, C, D |
| 9 | §10(b) and Rule 10b-5 of the Exchange Act | Bennett, Trosten, Murphy, Sherer, Maggio, Sexton, Klejna, Silverman, O'Kelley, Gantcher, Breitman, Lee, Harkins, Jaeckel, Schoen | The Bond Offering Memorandum, Bond Road Show, Bond Registration Statement, IPO Registration Statement, Form 10K and other SEC filings were materially false due to concealment of the RGHI receivable and the RTLs. (¶¶96-97, 119, 132-153, 158, 165, 198, 204-215) | A, B, C, D |

---

[1] Counts 7, 8, 10, 11 and 15 do not bring claims against any Refco directors or officers and therefore will not be addressed herein.

[2] Counts 2, 4 and 6 bring claims under §15 of the Securities Act against Refco directors and officers for control person liability with respect to the false statements in the Bond Offering Memoranda, the Bond Registration Statement and the IPO Registration Statement, respectively. Thus, those claims arise out of the same facts and circumstances in counts 1, 3 and 5.

A = RGHI                        B = Round-trip loans              C = Deception of investors, lenders and auditors
D = False financial statements  E = Insureds benefited from the fraud

EXHIBIT 35

| Claim # | Nature / Basis | Insureds Named | Wrongful Transaction | Bennett's Knowledge |
|---|---|---|---|---|
| 12, 13, 14, 16 | §20(a) of the Exchange Act | Lee, Harkins, Jaeckel, Schoen, Bennett, Murphy, Trosten, Sherer, Sexton, Silverman, Maggio, Klejna, O'Kelley, Gantcher, Breitman | Control person liability scheme to defraud in connection with Bond Offering and up to and including the IPO, based on fraudulent statements made due to concealment of RGHI receivable and RTLs.  (¶¶96-97, 132-153, 198) | A, B, C, D, E |
| | | | | |
| *BAWAG v. Refco, et al.* (Bankr. S.D.N.Y.) Case No.05-03161[3] | | | | |
| 2-5 | Fraud in the Inducement; Fraud; Civil Conspiracy; Unjust Enrichment | Bennett | Bennett is the only defendant named in this action.  Bennett has entered into a Stipulation agreeing not to assert coverage under the XL Policy. | A, B, C, D, E |
| | | | | |
| *Thomas H. Lee Equity Fund V, L.P., et al. v. Bennett, et al.* (S.D.N.Y.) Case No. 05-9608 | | | | |
| 1-3 and 5 | §10(b) and Rule 10b-5 of the Exchange Act; Fraud; Negligent Misrepresentation; Contribution and Indemnification | Bennett Maggio | Bennett and Maggio are the only defendants named in these causes of action.  Bennett and Maggio have entered into Stipulations agreeing not to assert coverage under the XL Policy. | A, B, C, D, E |
| 4 | Breach of Contract | Bennett Grant | Providing false financial statements, concealing the existence of the RGHI receivable and RTLs in connection with the LBO. (¶¶30, 34-36, 71, 73-76) | A, B, C, D |

---

[3]  Counts 1, 6 and 7 do not bring claims against any Refco directors or officers.

A = RGHI                          B = Round-trip loans                     C = Deception of investors, lenders and auditors
D = False financial statements    E = Insureds benefited from the fraud

EXHIBIT 35

| Claim # | Nature / Basis | Insureds Named | Wrongful Transaction | Bennett's Knowledge |
|---|---|---|---|---|
| | | | | |
| *Unovalores Ltd.. v.Bennett.* (Sup. Ct. N.J.) Case No. L1564-05 | | | | |
| 1-5 | Fraud; New Jersey Rico statute 2C:41; New Jersey Rico statute 2C:41; Breach of Fiduciary Duty; Tortious Interference | Bennett | Bennett is the only defendant named in this action. Bennett has entered into a Stipulation agreeing not to assert coverage under the XL Policy. | A, B, C, D, E |
| | | | | |
| *Fine v. Bennett, et al.* (S.D.N.Y.) Case No. 05-8701 (Dismissed 3/13/2006 for failure to prosecute)[4] | | | | |
| 1 | Breach of Fiduciary Duty | Bennett, Sexton, Sherer, Murphy, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, Schoen | Statements in prospectus, filed in connection with the IPO, were false and misleading due to concealment of the RGHI receivables and RTLs. (¶¶8, 12) | A, B, C, D |
| 2 | Abuse of Control | Bennett, Sexton, Sherer, Murphy, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, Schoen | Engaging in wrongful conduct by concealment of the RGHI receivable and issuing a false and misleading prospectus in connection with the IPO. (¶¶8, 12, 46, 47, 57) | A, B, C, D |
| 3 | Gross Mismanagement | Bennett, Sexton, Sherer, Murphy, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, Schoen | Engaging in wrongful conduct by concealment of RGHI receivable and issuing false and misleading prospectus in connection with the IPO (¶¶8, 12, 46, 47, 57) | A, B, C, D |
| 4 | Waste of Corporate Assets | Bennett, Sexton, Sherer, Murphy, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, Schoen | Wrongful acts, including RGHI and false financials, allowed for inflated bonuses at the expense of the company and shareholders. | A, B, C, D |

---

[4] Count 6 does not bring a claim against any Refco directors or officers.

A = RGHI                     B = Round-trip loans                    C = Deception of investors, lenders and auditors
D = False financial statements   E = Insureds benefited from the fraud

EXHIBIT 35

| Claim # | Nature / Basis | Insureds Named | Wrongful Transaction | Bennett's Knowledge |
|---|---|---|---|---|
| 5 | Unjust Enrichment | Bennett, Sexton, Sherer, Murphy, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, Schoen | Gaining of illegal personal profit due to the fraudulent RGHI scheme and inflated value at the IPO. (¶¶18, 43, 47-48, 90) | A, B, C, D |
| | | | | |
|  | *Mehta v. Bennett, et al.* (S.D.N.Y.) Case No. 05-8748 (Dismissed 3/13/2006 for failure to prosecute)[5] | | | |
| 1 | Breach of Fiduciary Duty | Bennett, Sexton, Sherer, Murphy, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, Schoen | False financial statements, including failure to disclose the RGHI receivable. (¶¶43, 47, 53-58, 74-76) | A, B, C, D |
| 2 | Abuse of Control | Bennett, Sexton, Sherer, Murphy, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, Schoen | Issuing false financial statements, including failure to disclose the RGHI receivable and the RTLs. (¶¶43, 47, 53-58, 74-76) | A, B, C, D |
| 3 | Gross Mismanagement | Bennett, Sexton, Sherer, Murphy, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, Schoen | Issuing false financial statements, including failure to disclose the RGHI receivable and the RTLs. (¶¶43, 47, 53-58, 74-76) | A, B, C, D |
| 4 | Waste of Corporate Assets | Bennett, Sexton, Sherer, Murphy, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, Schoen | Engaging in RGHI scheme and receiving inflated bonuses at the expense of company and shareholders. (¶¶18, 43, 47-48, 53-58, 74-76, 18, 90) | A, B, C, D |
| 5 | Unjust Enrichment | Bennett, Sexton, Sherer, Murphy, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley, Schoen | Gaining of illegal personal profit due to fraudulent RGHI scheme and inflated value at the IPO. (¶¶46-48, 68, 94) | A, B, C, D |

---

[5] Count 6 does not bring a claim against any Refco directors or officers.

| | | |
|---|---|---|
| A = RGHI | B = Round-trip loans | C = Deception of investors, lenders and auditors |
| D = False financial statements | E = Insureds benefited from the fraud | |

EXHIBIT 35

| Claim # | Nature / Basis | Insureds Named | Wrongful Transaction | Bennett's Knowledge |
|---|---|---|---|---|
| | | | | |
| *American Financial International Group – Asia, LLC, et al. v. Bennett, et al.* (S.D.N.Y.) Case No. 05-8988 | | | | |
| 1 | Fraud and Misrepresentation | Bennett, Sherer, Sexton, Maggio, Trosten, Mutterer | Misrepresented true financial condition of Refco, (¶¶ 75-76), wrongful conversion of customer assets and use of customer funds in the RTLs (¶¶87-92) – all in connection with RGHI scheme. (¶¶77-82) | A, B, C, D |
| | | | | |
| *In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation* (S.D.N.Y.) Case No. 06-643 | | | | |
| 1 | §10(b) and Rule 10b-5 of the Exchange Act | Bennett, Maggio, Grant, Trosten, Outridge, Lee, Harkins, Jaeckel, Schoen | Fraudulent conversion of customer assets and fraudulent misrepresentation of Refco's financials (¶¶71, 106-109) in furtherance of the RGHI scheme, including use of the RTLs. (¶¶72-74) | A, B, C, D |
| 2 | §10(b) and Rule 10b-16 of the Exchange Act | Bennett, Maggio, Grant, Trosten, Outridge | Failure to disclose the conversion of customer securities for use by Refco entities (¶71, ¶¶106-109) in furtherance of the RGHI scheme, including the RTLs. (¶¶71-74) | A, B, C, D |
| 3 | §20A of the Exchange Act | Bennett, Maggio, Grant, Trosten, Outridge, Lee, Harkins, Jaeckel, Schoen | Control Person Liability. | A, B, C, D |
| | | | | |
| *Capital Management Select Fund Ltd., et al. v. Bennett, et al.* (S.D.N.Y) Case No. 07-8688 | | | | |
| 1 | §10(b) and Rule 10b-5 of the Exchange Act | Bennett, Sexton, Maggio, Murphy, Silverman, Trosten, Outridge, Grant, Lee, Harkins, Jaeckel, Schoen | Fraudulent conversion of customer funds and fraudulent misrepresentation of Refco's financials (¶¶61, 105-107) in furtherance of the RGHI scheme, including the RTLs. (¶¶62-63) | A, B, C, D |
| 2 | §10b and Rule 10b-16 of the Exchange Act | Bennett, Sexton, Maggio, Murphy, Silverman, Trosten, Outridge, Grant | Fraudulent use of customer funds in the RTLs (¶¶61, 105-107) in furtherance of the RGHI scheme. (¶¶62-63). | A, B, C, D |

A = RGHI                          B = Round-trip loans                        6          C = Deception of investors, lenders and auditors
D = False financial statements    E = Insureds benefited from the fraud

EXHIBIT 35

| Claim # | Nature / Basis | Insureds Named | Wrongful Transaction | Bennett's Knowledge |
|---|---|---|---|---|
| 3 | §20A of the Exchange Act | Bennett, Sexton, Maggio, Murphy, Silverman, Trosten, Outridge, Grant, Lee, Harkins, Jaeckel, Schoen | Control Person Liability. | A, B, C, D, E |
| | | | | |
| *VR Global Partners, L.P., et al. v. Bennett, et al.* (S.D.N.Y) Case No. 07-8686 | | | | |
| 1 | §10(b) and Rule 10b-5 of the Exchange Act | Bennett, Sexton, Maggio, Murphy, Silverman, Trosten, Outridge, Grant, Lee, Harkins, Jaeckel, Schoen | Fraudulent conversion of customer assets (¶80) in furtherance of the RGHI scheme, including the RTLs and dissemination of fraudulent financial statements. (¶¶30-35) | A, B, C, D |
| 2 | §10b and Rule 10b-16 of the Exchange Act | Bennett, Sexton, Maggio, Murphy, Silverman, Trosten, Outridge, Grant | Fraudulent conversion of customer assets for use in the RTLs in furtherance of the RGHI scheme. Dissemination of fraudulent financial statements. (¶¶30-35) | A, B, C, D |
| 3 | §20A of the Exchange Act | Bennett, Sexton, Maggio, Murphy, Silverman, Trosten, Outridge, Grant, Lee, Harkins, Jaeckel, Schoen | Control Person Liability. | A, B, C, D |

A = RGHI                               B = Round-trip loans                    C = Deception of investors, lenders and auditors
D = False financial statements         E = Insureds benefited from the fraud

EXHIBIT 35

| Claim # | Nature / Basis | Insureds Named | Wrongful Transaction | Bennett's Knowledge |
|---|---|---|---|---|
| | | | | |
| | *Kirschner v. Agoglia, et al.* (Bankr. S.D.N.Y.) Case No. 07-03060[6] | | | |
| 1-2 | Recovery of fraudulent transfers pursuant to 11 U.S.C. 544(b), 550(a)(1) and NY DCL § 270 et seq. | Bennett, Grady, Maggio, Murphy, Mutterer, Sexton, Trosten, McCarthy, Agoglia | Using RGHI and the RTLs to falsely inflate Refco's financials (¶¶59-81), defendants reaped financial benefit by making fraudulent transfers during the period of 2002-2004 (¶¶87-113), including transfers made in connection with the LBO and IPO. (¶¶114-116,123-126, 135-138, 145-150, 164-168) | A, B, C, D |
| 3 | Recovery of the LBO Redemption, Dittmer LBO, Grant LBO, Dhillon LBO and Lipoff LBO fraudulent transfers pursuant to 11 U.S.C. §§ 544(b), 550(a)(1), 550(a)(2) and NY DCL § 270 et seq. | Bennett, Grady, Maggio, Murphy, Mutterer, Sexton, Trosten, Dittmer, Grant, Dhillon, Lipoff | Using RGHI and the RTLs to falsely inflate Refco's financials (¶¶ 59-81), defendants reaped financial benefit by making fraudulent transfers during the period of 2002-2004 (¶¶87-113), including transfers made in connection with the LBO and IPO. (¶¶114-116,123-126, 135-138, 145-150, 164-168) | A, B, C, D, E |
| 4 | Recovery of the 2005 LBO Redemption Transfers pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B)(ii)(IV), 550(a)(1) and NY DCL § 270 et seq. | Maggio, Mutterer, Sexton | Using RGHI and the RTLs to falsely inflate Refco's financials (¶¶59-81), defendants reaped financial benefit by making fraudulent transfers during the period of 2002-2004 (¶¶87-113), including transfers made in connection with the LBO and IPO. (¶¶114-116,123-126, 135-138, 145-150, 164-168) | A, B, C, D, E |

---

[6] Count 8 does not bring a claim against any Refco director and officer.

A = RGHI                           B = Round-trip loans              C = Deception of investors, lenders and auditors
D = False financial statements     E = Insureds benefited from the fraud

EXHIBIT 35

| Claim # | Nature / Basis | Insureds Named | Wrongful Transaction | Bennett's Knowledge |
|---|---|---|---|---|
| 5 | Recovery of the Greenshoe Dividend pursuant 11 U.S.C. §§ 544(b), 548(a)(1)(B)(ii)(IV), 550(a)(1) and NY DCL § 270 et seq. | Bennett, Maggio, Murphy, Sexton, Grady, McCarthy | Using RGHI and the RTLs to falsely inflate Refco's financials (¶¶59-81), defendants reaped financial benefit by making fraudulent transfers during the period of 2002-2004 (¶¶87-113), including transfers made in connection with the LBO and IPO. (¶¶114-116,123-126, 135-138, 145-150, 164-168) | A, B, C, D, E |
| 6 | Recovery of the Greenshoe Dividend and 2005 LBO Redemption preferential transfers pursuant to 11 U.S.C. §§ 547(B), 501(a)(1) | Bennett, Maggio, Murphy, Sexton, Grady, McCarthy | Within 90 days of bankruptcy petition, defendants reaped financial benefit by making fraudulent transfers. (¶¶197-199, 204-205, 274, 262-263, 276) | A, B, C, D |
| 7 | Recovery of the Dittmer Challenged Transfers pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B)(ii)(IV), 550(a)(1), 550(a)(2) and NY DCL § 270 et seq. | Dittmer | With full knowledge of the RGHI fraudulent scheme, and the RTLs, (¶80) Dittmer sold his 51% interest in Refco in exchange for $5 million and future payments (¶¶88, 91), and received $25 million in connection with the IPO. (¶¶303-304) | A, B, C, D, E |
| 9 | Recovery of the Cox LBO Transfer and Cox Post-LBO Transfer pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B)(ii)(IV), 550(a)(1), 550(a)(2) and NY DCL § 270 et seq. | Cox | Cox, through RGHI, received fraudulent payments (¶¶127, 131, 213-214) in connection with RGHI and the RTLs. | A, B, C, D, E |

A = RGHI                    B = Round-trip loans                    C = Deception of investors, lenders and auditors
D = False financial statements     E = Insureds benefited from the fraud

EXHIBIT 35

| Claim # | Nature / Basis | Insureds Named | Wrongful Transaction | Bennett's Knowledge |
|---------|----------------|----------------|----------------------|---------------------|
| 10 | Unjust Enrichment | Agoglia, Bennett, Cox, Dhillon, Dittmer, Grady, Grant, Lipoff, Maggio, McCarthy, Murphy, Mutterer, Sexton, Trosten | Defendants were enriched upon receipt of the fraudulent transfers. (¶329) | A, B, C, D, E |
| 11 | Equitable Subordination | Agoglia, Bennett, Cox, Dhillon, Dittmer, Grady, Grant, Lipoff, Maggio, McCarthy, Murphy, Mutterer, Sexton, Trosten | Defendants caused Refco to disseminate false and misleading statements, including information surrounding the RGHI receivable and the RTLs. (¶¶59-81) | A, B, C, D |
| | | | | |
| *Kirschner v. Hackl, et al.* (S.D.N.Y.) Case No. 07-9238[7] | | | | |
| 2 | Transfer pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B)(ii)(IV), 550(a)(1), 550(a)(2) and NY DCL § 270 et seq. | Hackl | Hackl benefited from several fraudulent transfers (¶¶5, 48) while have full knowledge of the RGHI scheme (¶¶32-33) and assisted Bennett and others to carry out the RTL scheme. (¶¶39, 41, 43-47) | A, B, C, D, E |
| 4 | Fraudulent transfer pursuant to 11 U.S.C. 548(a)(1)(A), 550(a)(1), 550(a)(2) | Hackl | Hackl benefited from several fraudulent transfers (¶¶5, 48) while have full knowledge of the RGHI scheme (¶¶32-33) and assisted Bennett and others to carry out the RTL scheme. (¶¶39, 41, 43-47) | A, B, C, D, E |
| 6 | Fraudulent transfer pursuant to 11 U.S.C. 544(b), 550(a)(1), 550(a)(2) and NY DCL § 270 et seq. | Hackl | Hackl benefited from several fraudulent transfers (¶¶5, 48) while have full knowledge of the RGHI scheme (¶¶32-33) and assisted Bennett and others to carry out the RTL scheme. (¶¶39, 41, 43-47) | A, B, C, D, E |

---

[7] Counts 1, 3, 5, 7, 9 and 10 do not bring claims against any Refco director or officer.

| | | |
|---|---|---|
| A = RGHI | B = Round-trip loans | C = Deception of investors, lenders and auditors |
| D = False financial statements | E = Insureds benefited from the fraud | |

EXHIBIT 35

| Claim # | Nature / Basis | Insureds Named | Wrongful Transaction | Bennett's Knowledge |
|---|---|---|---|---|
| 8 | Fraudulent transfer pursuant to 11 U.S.C. 544(b), 550(a)(1), 550(a)(2) and NY DCL § 270 et seq. | Hackl | Hackl benefited from several fraudulent transfers (¶¶5, 48) while have full knowledge of the RGHI scheme (¶¶32-33) and assisted Bennett and others to carry out the RTL scheme. (¶¶39, 41, 43-47) | A, B, C, D, E |
| 11 | Breach of Fiduciary Duty | Hackl | Hackl breached his fiduciary duties as Refco executive vice president from 2002 to 2004 (¶167) by knowingly and actively participating in the RTLs in 2003 and 2004 in order to conceal the RGHI receivable. (¶168). | A, B, C, D, E |
| 12 | Aiding and Abetting | Hackl | Hackl willingly and knowingly provided substantial assistance to the fraudulent RTL scheme by helping BAWAG and Refco effectuate the RTLs in order to conceal the RGHI receivable. (¶173) | A, B, C, D, E |
| 13 | Civil Conspiracy | Hackl | Hackl conspired with others, including Bennett, to engage in the fraudulent RTL scheme in order to conceal the RHGI receivable and misrepresent Refco's financial position. (¶179) | A, B, C, D, E |
| 14 | Unjust Enrichment | Hackl | Gaining of illegal personal enrichment in connection with fraudulent transfers as part of RGHI scheme. (¶191) | A, B, C, D, E |
| 15 | Equitable Subordination | Hackl | Inequitable, unconscionable and wrongful conduct, including Refco disseminating false and misleading statements. (¶196) | A, B, C, D, E |

A = RGHI                              B = Round-trip loans                   C = Deception of investors, lenders and auditors
D = False financial statements        E = Insureds benefited from the fraud

EXHIBIT 35

| Claim # | Nature / Basis | Insureds Named | Wrongful Transaction | Bennett's Knowledge |
|---|---|---|---|---|
| | | | | |
| *Krys, et al. v. Sugrue, et al.* (S.D.N.Y.) Case No. 08-3065 / 08-3086[8] | | | | |
| 11 | Conspiracy | Bennett Hackl | Conspiracy to divert Sphinx Funds cash (¶162) to fund Refco's operations as part of the overall Refco fraudulent scheme (¶193) in which Refco's trading losses, operating losses, operating expenses and true financial condition were concealed through a series of RTLs involving RGHI. (¶¶195-198) | A, B, C, D |
| 14[9] | Fraud | Bennett, Trosten, Maggio, Grant, Hackl | Concealing Refco's true financial condition and hiding Refco's trading losses, operating losses, operating expenses through a series of RTLs involving RGHI (¶¶162, 193-199).  Plaintiffs relied on the false public statements made in connection with the LBO and IPO. (¶201-204) | A, B, C, D |
| 15 | Breach of Fiduciary Duty | Bennett, Trosten, Maggio, Grant, Hackl, Klejna | Diversion of assets to fund Refco's business, the RTLs, misleading investors with false financials and the fraudulent scheme. | A, B, C, D |
| 16 | Conversion | Bennett, Trosten, Maggio, Grant, Hackl | Wrongful conversion of funds as part of the overall Refco fraudulent scheme including RGHI. (¶¶197-198) | A, B, C, D |

---

[8] Counts 1-10 do not bring claims against any Refco directors and officers
[9] Counts 12-13 do not bring claims against any Refco directors and officers.

| A = RGHI | B = Round-trip loans | C = Deception of investors, lenders and auditors |
| D = False financial statements | E = Insureds benefited from the fraud | |

EXHIBIT 35

| Claim # | Nature / Basis | Insureds Named | Wrongful Transaction | Bennett's Knowledge |
|---|---|---|---|---|
| 17 | Aiding and Abetting Breach of Fiduciary Duty | Bennett, Trosten Maggio, Grant, Hackl, Klejna | Concealment of the true nature of Refco's financial condition and diverting customer funds as part of the overall Refco fraudulent scheme (¶193) in which Refco's trading losses, operating losses, and operating expenses were concealed (¶¶195-196) through a series of RTLs (¶198) involving RGHI. (¶197) | A, B, C, D |
| 24[10] | Conspiracy by means of the RGHI receivable | Bennett, Trosten, Hackl, Grant, Maggio | Conspiracy to conceal hundreds of millions of trading losses from Refco's financial statements by transferring losses and expenses to RGHI and concealing the RGHI receivable through the RTLs. (¶¶162, 164, 195-198, 387-388, 390) | A, B, C, D |
| 27[11] | Interference with Contract and Prospective Contract | Bennett, Trosten Maggio, Grant, Hackl, Klejna, Lee Harkins, Jaeckel Schoen | Intentional interference with contract by allowing Sphinx money to be used for RTLs and concealing the true financial condition of Refco. (¶¶162-171) | A, B, C, D |
| | | | | |
| | *Kirschner v. Thomas H. Lee Partners, L.P., et al.* (S.D.N.Y.) Case No. 07-7074[12] | | | |
| 5 | Breach of Fiduciary Duty for Compensatory Damages | Harkins, Jaeckel Lee, Schoen | Failure to conduct proper due diligence and to report RGHI receivable.  Improperly proceeding with the IPO. (¶¶52-61, 74-77, 171). | A, B, C, D |
| 6 | Breach of Fiduciary Duty for Restitution | Harkins, Jaeckel Lee, Schoen | Self dealing and failure to engage in due diligence prior to the IPO, which would have revealed RGHI and the RTLs. (¶¶52-61, 74-77) | A, B, C, D |
| 7 | Unjust Enrichment | Harkins, Jaeckel, Lee, Schoen | Gaining of wrongful personal profit in connection with the IPO. (¶246) | A, B, C, D |

[10] Counts 19-23 do not bring claims against any Refco directors and officers.
[11] Counts 25 and 26 do not bring claims against any Refco directors and officers.
[12] Counts 1-4 do not bring claims against any Refco defendants.

A = RGHI                              B = Round-trip loans                    C = Deception of investors, lenders and auditors
D = False financial statements        E = Insureds benefited from the fraud

EXHIBIT 35

| Claim # | Nature / Basis | Insureds Named | Wrongful Transaction | Bennett's Knowledge |
|---|---|---|---|---|
| 8 | Violation of the Delaware General Corporation Law §§ 170 - 174 | Harkins, Jaeckel, Lee, Schoen | Wrongful approval and payment of at least $120.2 million in IPO dividends including the Greenshoe Dividend and payments to cover tax obligations owed by owners of Refco. (¶¶242, 304) | A, B, C, D |
| 9 | Forfeiture of Compensation | Harkins, Jaeckel, Lee, Schoen | Due to breaches in fiduciary duties for failure to report the RGHI receivable and proceeding with the IPO, defendants are required to disgorge all compensation received in connection with the IPO. (¶246) | A, B, C, D |
| | | | | |
| | *Kirschner v. Bennett, et al.* (S.D.N.Y) Case No. 07-8165 | | | |
| 1-3 | Fraud; Breach of Fiduciary Duty / Aiding and Abetting; Conversion | Bennett, Trosten Maggio | Bennett, Trosten and Maggio are the only defendants named in this action. Bennett, Trosten and Maggio have entered into Stipulations agreeing not to assert coverage under the XL Policy. | A, B, C, D, E |
| | | | | |
| | *Kirschner v. Grant Thornton LLP, et al.* (S.D.N.Y.) Case No. 07-11604[13] | | | |
| 1-2, 16, 18 and 38 | Breach of Fiduciary Duty by RCM; Fraud by RCM; Breach of Fiduciary Duty by RGL; Fraud by RGL; Breach of Fiduciary Duty by Refco Inc. | Bennett, Trosten, Maggio | Bennett, Trosten and Maggio are the only defendants named in these causes of action. Bennett, Trosten and Maggio have entered into Stipulations agreeing not to assert coverage under the XL Policy. | A, B, C, D |
| 17 | Breach of Fiduciary Duty by RGL | Bennett, Grant | Breach of fiduciary duty regarding the 2004 LBO while concealing the RGHI receivable and the RTLs in order to effectuate a lucrative cash out. (¶¶59-60, 74) | A, B, C, D |

---

[13] Counts 3-15, 19-37 and 39-44 do not bring claims against any Refco directors and officers.

| | | |
|---|---|---|
| A = RGHI | B = Round-trip loans | C = Deception of investors, lenders and auditors |
| D = False financial statements | E = Insureds benefited from the fraud | |