UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
XL SPECIALTY INSURANCE COMPANY,    :
    :
          Plaintiff,    :
    :
          v.    :      No. 08-CV-3821(GEL)
    :
JOHN D. AGOGLIA, PHILLIP R. BENNETT,    :
LEO R. BREITMAN, EDWIN L. COX,    :
SUKHMEET DHILLON, THOMAS H.    :
DITTMER, NATHAN GANTCHER, STEPHEN    :
GRADY, TONE GRANT, THOMAS HACKL,    :
DAVID V. HARKINS, SCOTT L. JAECKEL,    :
DENNIS A. KLEJNA, THOMAS H. LEE,    :
ERIC G. LIPOFF, SANTO C. MAGGIO,    :
PETER MCCARTHY, JOSEPH MURPHY,    :
FRANK MUTTERER, RONALD L. O'KELLEY,    :
RICHARD N. OUTRIDGE, SCOTT A.    :
SCHOEN, WILLIAM M. SEXTON, GERALD    :
SHERER, PHILIP SILVERMAN, AND    :
ROBERT C. TROSTEN,    :
    :
          Defendants.    :
-------------------------------------------------------------x


## MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF
## PLAINTIFF, XL SPECIALTY INSURANCE CO., FOR SUMMARY JUDGMENT


*Of Counsel*:

  James A. Skarzynski
  James T. Sandnes (JS-8944)
  Jill M. Levy
  Ari R. Magedoff

BOUNDAS, SKARZYNSKI,
    WALSH & BLACK LLC
One Battery Park Plaza
New York, New York 10004
(212) 820-7700 (Telephone)
(212) 820-7740 (Facsimile)

*Attorneys for XL Specialty Insurance Company*

July 11, 2008

Table of Contents

Table of Contents ...................................................................................................... i

Table of Authorities ................................................................................................ iii

The Undisputed Facts ............................................................................................... 3

    A.    Refco and the XL Policy ................................................................................ 3

    B.    The Fraud and the Criminal Convictions ..................................................... 5

    C.    The Bankruptcy and the Underlying Matters ............................................... 8

    D.    This Action and XL's Need for Relief ........................................................... 9

Argument .................................................................................................................. 9

I.        STANDARD FOR THE A SUMMARY JUDGMENT MOTION ................. 9

II.      THE TERMS OF THE IRE PROVIDE THAT
           KNOWLEDGE BY ANY OFFICER VITIATES
           COVERAGE FOR ALL DIRECTORS AND OFFICERS ........................... 11

    A.    The Clear and Unambiguous Language of the
         IRE Provides that if "Any" Insured Knew
         of the Fact, Circumstance or Situation
         the Entire "Claim" is Uncovered ................................................................ 11

    B.    The Severability Provision of the
         XL Policy Does Not Apply to the IRE ....................................................... 13

III.     BENNETT'S CONVICTION ESTABLISHES
           THAT THE IRE HAS BEEN TRIGGERED ............................................. 15

    A.    Bennett's Conviction Establishes Knowledge of
         Facts Circumstances or Situations Related to
         The Massive Fraud and Wrongdoing at Refco .......................................... 16

    B.    Bennett's Conviction Establishes That
         He had Reason to Suppose that a Claim Might
         Arise from those Facts Circumstances or Situations ................................. 20

    C.    All of the Underlying Matters Arise from
         Facts, Circumstances or Situations Covered
         By Bennett's Conviction ............................................................................ 21

IV.    THERE IS NO DOUBT THAT THE IRE IS
       PART OF THE XL POLICY SO THERE IS
       NO NEED FOR DISCOVERY ...................................................................................... 22

Conclusion ........................................................................................................................... 25

Table of Authorities

**Cases**

*Algie v. RCA Global Communications, Inc.*, 891 F. Supp. 875 (S.D.N.Y. 1994),
  *aff'd,* 60 F.3d 956 (2d Cir. 1995) ........................................................................... 24

*Allstate Ins. Co. v. Mugavero*, 79 N.Y.2d 153 (1992) ...................................................... 12

*American Express Bank Ltd. v. Uniroyal, Inc.*, 562 N.Y.S.2d 613 (1st Dep't 1990)..................... 11

*American Home Prods. Corp. v. Liberty Mut. Ins. Co.*, 748 F.2d 760 (2d Cir. 1984). ................. 14

*American International Specialty Lines Ins. Co. v. Towers Fin. Corp.,* No. 94 Civ. 2727
  (WK)(AJP), 1997 WL 906427 (S.D.N.Y. Sept. 12, 1997)........................................................ 12

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................. 24

*Andy Warhol Foundation for the Visual Arts, Inc. v. Fed. Ins. Co.*, 189 F.3d 208
  (2d Cir. 1999)........................................................................................ 11

*Axis Reinsurance Company v. Bennett*, Nos. 07 Civ. 7924(GEL) and 08 Civ. 3242(GEL),
  2008 WL 2485388 (S.D.N.Y. June 19, 2008) ..........................................................*passim*

*Banca Commerciale Italiana, New York Branch v. Northern Trust Int'l Banking Corp.,*
  160 F.3d 90 (2d Cir. 1998) ........................................................................... 10

*Bd. of Mgrs. Of Yardarm Condominium II v. Fed. Ins. Co.*, 669 N.Y.S.2d 332 (2d Dep't 1998) .. 11

*Bourne v. Walt Disney Co.*, 68 F.3d 621 (2d Cir. 1995) ................................................ 11

*Brunetto v. Massachusetts Mut. Life Ins. Co.*, 200 F. Supp.2d 380 (S.D.N.Y. 2002) ................... 11

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......................................................... 9

*Collins v. Harrison-Bode*, 303 F.3d 429 (2d Cir. 2002) ................................................ 14

*Coregis Ins. Co. v. Lewis, Johs, Avallone, Aviles & Kaufman, LLP*, No. 01 Civ. 3844 (SJ),
  2006 WL 2135782 (E.D.N.Y. July 28, 2006)......................................................20, 21

*Davis v. State of New York,* 316 F.3d 93 (2d Cir. 2002)............................................9, 10

*Hugo Boss Fashions, Inc. v. Fed. Ins. Co.,* 252 F.3d 608 (2d Cir. 2001) ............................... 11

*Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133 (2d Cir. 2000) ..................................... 11

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ...................... 10

*McCauley Enters., Inc. v. New Hampshire Ins. Co., 716* F. Supp. 718  (D. Conn. 1989)............. 12

*Meloff v. New York Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995), *on subsequent appeal,*
  240 F.3d 138 (2d Cir. 2001) .......................................................................... 10

*Paddington Partners v. Bouchard*, 34 F.3d 1132 (2d Cir. 1994) ................................... 10

*PaineWebber Inc. v. Bybyk*, 81 F.3d 1193 (2d Cir. 1996)............................................ 11

*Sales v. State Farm Fire and Cas. Co.*, 849 F.2d 1383  (11th Cir. 1988)............................ 12

*Seiden Assoc. Inc. v. ANC Holdings, Inc.*, 959 F.2d 425 (2d Cir. 1992) ............................ 11

*Spezialetti v. Pacific Employers Ins. Co.,* 759 F.2d 1139 (3d Cir. 1985) ...................................... 12

*State Farm Fire & Cas. Co. v. Wolford*, 498 N.Y.S.2d 631 (4th Dep't 1986).............................. 12

**Rules**

Fed. R. Civ. P. 26(f) ................................................................................................. 24

Fed. R. Civ. P. 56(d) ...........................................................................................10, 25

Fed. R. Civ. P. 56(e)................................................................................................. 9

Fed. R. Civ. P. 56(f) ......................................................................................10, 23, 24

Fed. R. Evid. 803(22)............................................................................................... 16

Fed. R. Evid. 804(b)(3) ............................................................................................ 16

Fed. R. Evid. 807 .................................................................................................... 16

**Other Authorities**

10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,
   *Federal Prac. & Proc.* § 2737 (2008) .............................................................. 24-25

Plaintiff, XL Specialty Insurance Co. ("XL"), respectfully submits this memorandum of law in support of its motion pursuant to Fed. R. Civ. P. 56 for summary judgment on its complaint. This motion is supported by the accompanying declaration of Henry Toolan ("Toolan Dec.") and affidavit of James Sandnes ("Sandnes Aff't") and the three contemporaneously-filed volumes of the Insurers Joint Exhibits ("IJX").

## Preliminary Statement

The massive fraud that occurred at Refco Inc. ("Refco") is well known to this Court from its supervision of a number of Refco-related cases. Among the many who were victimized and deceived by this fraud, which permeated every aspect of Refco's operations, are the Directors and Officers ("D&O") insurers, including XL.

XL issued to Refco a $20 million policy (the "Policy," as more fully defined below), which is the top of a $70 million "tower" of insurance. Toolan Dec. Ex. A. *Less than 2 months* after Refco procured the XL Policy (and the rest of its $70 million program), the fraud at Refco was revealed. Thus, virtually all of the wrongdoing at Refco, which injured investors and insurers alike, had already occurred when the insurance was purchased.

Refco CEO, Phil Bennett ("Bennett"), has admitted he knew all about that wrongdoing (indeed, that he was one of its principal authors) when he signed the XL policy application and agreed to its terms, including a key provision known as the "Inverted Representation Endorsement" (the "IRE"). Bennett, as well as several of Refco's other most senior officers, have since pled guilty to, or have been convicted of, multiple counts of securities fraud and other crimes as a result of their intentional wrongdoing.

On July 3, 2008, Bennett was sentenced to 16 years in a federal penitentiary (including 5 years supervised release). The fact that the insurance companies were victims of the fraud was

so clear and palpable that the United States Attorney noted in his sentencing memorandum, when arguing for a virtual life sentence for Bennett, that Bennett "knowingly accepted millions of dollars from Refco's Directors and Officer's insurance" under "false pretenses" and the AUSA noted, at the sentencing hearing, that Bennett "basically stole [$10 million] from the [D&O] insurance companies, receiving money that he knew he was not entitled to receive." Government's Sentencing Memorandum at 32-33, *United States of America v. Bennett*, No. 05 Cr. 1192 (NRB) (S.D.N.Y. June 6, 2008) and IJX 34 at 21:20-23.

This Court is already familiar with some of the issues related to the D&O tower from its June 19, 2008 opinion in the case *Axis Reinsurance Company v. Bennett*, Nos. 07 Civ. 7924(GEL) and 08 Civ. 3242(GEL), 2008 WL 2485388 (S.D.N.Y. June 19, 2008)) (the "*Axis* Decision").  As discussed below, the defenses available to XL are equally compelling as those in the *Axis* Decision.  While XL has additional defenses to coverage, this motion is focused specifically on the plain and clear meaning and effect of the IRE, which XL believes is dispositive as to this case.  The IRE provides that, "***no coverage will be available***" under the XL Policy for any "***Claims*** arising from any fact, circumstance or situation" if "***any***" director or officer of Refco "***had knowledge***" of those facts circumstances or situations that had "***reason to suppose might afford grounds for any Claim***."

Bennett's judgment of conviction judicially establishes, beyond any cavil, that Refco directors and officers did have knowledge of "facts, circumstances or situations" which they had "reason to suppose" might afford grounds for a "Claim" under the XL Policy.  As such, the IRE provides that there is no coverage for any claim arising from those facts circumstances or situations. [1]

---

[1] Unless otherwise defined herein, all capitalized terms shall have the same meaning as in the XL Policy.

Former defendants Bennett, Edwin L. Cox, Santo C. Maggio, Stephen Grady (stipulation pending), and Robert C. Trosten (the "Conceding Defendants") have apparently recognized as much, and have entered into stipulations agreeing not to assert a right to coverage under the XL Policy. [2]

## The Undisputed Facts

A.     Refco and the XL Policy

Prior to its Initial Public Offering ("IPO"), Refco (or a predecessor entity), was a closely held financial services/brokerage firm.  It provided execution and clearing services for exchange-traded derivatives and provided prime brokerage services in the fixed income and foreign exchange markets.

On August 11, 2005, Refco conducted its IPO, selling over 30.4 million shares to the public.  The IPO, however, raised only $583 million in new capital, because nearly half of the proceeds from the 30.4 million shares sold in the IPO redounded to the personal benefit of existing shareholders, including Bennett, who sold Refco stock in the IPO valued at more than $100 million.  Sandnes Aff't Ex. 33 at 113.

As part of the IPO, Refco procured a large program of directors and officers coverage. The program was layered, with multiple insurance companies issuing policies in excess of the Primary Policy.  Visually represented, the main Refco tower of D&O insurance is as follows:

---

[2] Defendants John D. Agoglia, Leo R. Breitman, Thomas H. Dittmer, Nathan Gantcher, Tone Grant, David V. Harkins, Scott L. Jaeckel, Dennis A. Klejna, Thomas H. Lee, Peter McCarthy, Joseph Murphy, Frank Mutterer, Ronald L. O'Kelley, Richard N. Outridge, Scott A. Schoen, William M. Sexton, Gerald Sherer and Philip Silverman have all been served or waived service of process. Defendant Thomas Hackl, a Swiss citizen and resident, has refused to consent to service and has not yet been served with the complaint.  Counsel for XL has been in contact with counsel for defendants Sukhmeet Dhillon, and Eric G. Lipoff and provided him with a stipulation pursuant to which such counsel would accept service of process on their behalf.  However, their counsel has not yet returned the finalized stipulation to counsel for XL.

| Layer/Attachment Point | Insurer |
|---|---|
| $ 20 Million Excess of $ 50 Million | XL Specialty Insurance Company |
| $10 Million Excess of $40 Million | Arch Insurance Company (the "Arch Policy") |
| $12.5 Million Excess of $27.5 Million | Allied World Assurance Company (the "AWAC Policy") |
| $10 Million Excess of $17.5 Million | Axis Reinsurance Company (the "Axis Policy") |
| $7.5 Million Excess of $10 Million | Lexington Insurance Company (the "Lexington Policy") |
| $10 Million Excess of retention (if applicable) | U.S. Specialty ("Primary Policy") |

The XL Policy sits atop of the D&O tower at the $20 million excess of $50 million position.[3]  Toolan Dec. Ex. A and IJX 26-31.  The XL Policy is known as a "Classic Side-A Policy," number ELU089673-05, and covers claims first made during the period of August 11, 2005 to August 11, 2006 (*i.e.*, the "Policy").  Toolan Dec. Ex. A.  The XL Policy provides coverage to directors and officers for non-indemnifiable claims in excess of any other insurance program, including the $50 million of Underlying Coverage.[4]

Subject to all of its terms and conditions, the XL Policy affords specified coverage to "Insured Persons" (defined by the Policy as "any past, present or future director or officer . . . of the Company") for "Loss resulting from a Claim first made against the Insured Persons during

---

[3] Collectively the Primary Policy, Lexington Policy, Axis Policy, the AWAC Policy and the Arch Policy are referred to herein as the "Underlying Coverage."  Copies of those policies are annexed at IJX 26 - 31.

[4] Illinois National Insurance Company ("Illinois National") also issued a separate policy to part of the Refco group of companies.  Although that policy had been canceled prior to the inception of the XL Policy, because of an extended discovery period endorsement, the Illinois National policy continued to provide coverage for portions of the Underlying Matters.  To the extent the Illinois National policy does provide such coverage, the XL policy is also excess to the Illinois National policy.  A copy of the Illinois National Policy is annexed to the Sandnes Aff't as Exhibit 32.

the Policy Period . . . for a Wrongful Act, except to the extent that such Loss is paid by any other

Insurance Program or as indemnification from any source." Toolan Dec. Ex. A, Section II (I).

The XL Policy states that coverage "shall be specifically excess over, and shall not contribute

with . . . all indemnification to which an Insured Person may be entitled from any source." *Id.*

at Endorsement No. 9.

Endorsement 13 to the XL Policy (the IRE mentioned above) excludes Claims arising

from matters which *any* of the Insured Persons knew might afford grounds for a Claim.  The IRE

provides as follows:

> In consideration of the premium charged, ***no coverage will be available***
> under this Policy for Loss, including Defense Expenses, ***from Claims***
> ***arising from any fact, circumstance or situation of which***, as of the
> effective date of this Policy, ***any Insured had knowledge*** and had ***reason***
> ***to suppose might afford grounds for any Claim*** that would fall within the
> scope of the insurance afforded by this Policy.

Toolan Dec. Ex. A, Endorsement No. 13 (*emphasis added*).

In the *Axis* Decision, as discussed in detail below, this Court held that a provision very

similar to the IRE clearly and unambiguously provides that if *any* director or officer knew of the

misconduct that occurred prior to the policy inception, there is no coverage for a claim arising

from that misconduct for *any* of the directors or officers.

B.    The Fraud and the Criminal Convictions

The XL Policy incepted on August 11, 2005, the same day Refco conducted its IPO.

However, entirely unbeknownst to XL at that time, it is now undeniably clear that many of

Refco's most senior directors and officers were engaged in a widespread and massive scheme to

conceal hundreds of millions of dollars of uncollectible receivables, including $430 million owed

to Refco by an off-balance sheet entity called Refco Group Holdings, Inc. ("RGHI").

Specifically, as established by the guilty pleas, RGHI was used to hide a series of substantial

customer trading losses, as well as losses from proprietary trading activities that it had repeatedly affirmatively assured its customers was not occurring.  IJX 20-22.

These combined customer losses and proprietary trading losses threatened the continued viability of Refco's business.  IJX 18 at ¶9.  So, in order to prevent these losses from coming to light, certain of its officers, including Bennett, moved those losses and expenses out of Refco and into RGHI, an entity that once owned Refco and that was owned by, among others, Bennett and Tone Grant ("Grant").  IJX 18 at ¶9 and IJX 21 at 17:12-14.  This resulted in an uncollectible receivable being due from RGHI to Refco, which, at times, exceeded $1 billion, and was fraudulently represented to be due from unrelated parties.  IJX 18 at ¶9.

One of the ways the massive RGHI receivable was hidden was to use customer and/or third-party money to revolve it, paying it down and then building it back up.  Therefore, at the end of each year, starting in year-end in February 1998, through year-end 2004, and quarterly from May 2004 through May 2005, Refco engaged in a complex series of multi-million dollar "round-trip loans" with customers/third-parties, including an entity called BAWAG.  IJX 18 at ¶¶46-47 and IJX 21 at 17:5-11.  Collectively, spanning a seven-year period, the defendants engaged in over $5.295 billion of these round-trip transactions.  IJX 18 at ¶¶22-23.

On October 10, 2005, *only 59 days after the August 11, 2005 inception of the XL Policy*, the fraud first came to light when Refco publicly admitted in a press release that the RGHI receivable "was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible."  Sandnes Aff't Ex. 34.  Seven days later, on October 17, 2005, Refco filed for protection under Chapter 11 of the Bankruptcy Code.

A Grand Jury of this Court indicted various officers and directors of Refco related to the fraudulent RGHI receivable. The indictment was superseded by a second and then a third superseding indictment (the "S3 Indictment"). The S3 Indictment charged Bennett, as well as Robert C. Trosten ("Trosten")(CEO of Refco Securities and Refco Capital Markets) and Grant (former President of Refco Group Ltd., LLC) with securities fraud, bank fraud, wire fraud and money laundering as well as conspiracy to commit securities fraud, bank fraud, wire fraud and money laundering. IJX 18. The S3 Indictment also charged Bennett with making false filings with the SEC and making false statements to Refco's auditors. *Id.*[5]

On February 15, 2008, Bennett, who falls within the definition of an "Insured Person" under the XL Policy, pled guilty to *all twenty counts against* him in the S3 Indictment. IJX 21. Five days later, on February 20, 2008, Trosten, who also is an Insured Person under the XL Policy, similarly pled guilty to charges of conspiracy, securities, wire and bank fraud and money laundering. Ex. IJX 22. Santo C. Maggio ("Maggio") pled guilty to a separate criminal Information charging the same basic fraud as alleged in the S3 Indictment. IJX 17 and IJX 20.

Defendant Tone Grant, on April 17, 2008, was convicted by a jury, in this Court, of conspiracy, securities fraud, wire fraud, bank fraud and money laundering arising out of the same wrongdoing to which Bennett, Trosten and Maggio pled guilty. IJX 24 at 3095-97.

As disclosed in the plea allocution transcripts, Bennett, Trosten and Maggio were aware of, and actively sanctioned and participated in this scheme to create the RGHI receivable and to enter into year-end and quarter-end round-trip transactions to conceal the RGHI receivable from auditors, investors and lenders. These guilty pleas definitively establish that Bennett (as well as

---

[5] The S3 Indictment further charged that Bennett, Trosten and others participated in a scheme to defraud participants in the 2004 leveraged buyout of Refco, which was led by private equity fund Thomas H. Lee Partners, by misleading the fund and purchasers of the $600 million in notes and $800 million in bank debt about the true financial health of Refco. IJX 18 at ¶¶36 - 44.

the others) had precisely the type of knowledge that vitiates coverage under the IRE for all Defendants. IJX 20, IJX 21 and JX 22. At the conclusion of the February 15, 2008 hearing, Judge Buchwald found that Bennett pled guilty voluntarily and knowingly. *Id.* at 20. On July 3, 2008, Bennett was sentenced to 16 years in prison (including 5 years supervised release). IJX 23 at 42:9-13 and IJX 25. Trosten, Maggio and Grant have not yet been sentenced on their convictions.

C.    The Bankruptcy and the Underlying Matters

As a result of the fraud and the misconduct, as noted, on October 17, 2005, Refco filed for Chapter 11 bankruptcy protection. The bankruptcy proceeding eventually produced a plan of liquidation for Refco.

In the wake of the collapse of Refco, numerous lawsuits and governmental and/or regulatory investigations and/or criminal actions were initiated against Refco and certain individuals, including the Defendants (the "Underlying Matters"). The Underlying Matters are described more fully in the Sandnes Aff't, at ¶8 and Ex. 35, and copies of all of the complaints in the Underlying Matters are submitted as IJX 1 to IJX 16.

The one thing the Underlying Matters all have in common is that, at their core, they all relate to the same fraud charged in the S3 Indictment to which Bennett and others have pled guilty. They all either allege that plaintiffs were injured by the failure to properly disclose the RGHI receivable, the transactions used to cover up the uncollectability of RGHI or the bankruptcy that resulted from the RGHI related fraud. These connections are detailed in Section III below and a chart, annexed to the Sandnes Aff't as Exhibit 35, that details how each of the Underlying Matters arise from a "fact, circumstance or situation" to which Bennett (and Maggio and Trosten) have pled guilty to knowingly and wrongfully committing.

D.    This Action and XL's Need for Relief

The Defendants are all arguably Insured Persons under the XL Policy and have sought

coverage under the Policy in connection with the Underlying Matters.  XL has denied coverage

for the Underlying Matters, as have several carriers participating on the underlying D&O tower.

Despite similar denials of coverage, the insurers on the D&O tower below XL have been

faced with motions for preliminary injunction by the Defendants and have been ordered to

advance the costs of defense incurred in connection with the Underlying Matters, fully

exhausting several layer of coverage already.[6]

The Defendants have asserted that the carriers must provide coverage until there is a final

determination of the Underlying Matters or a judicial declaration that there is no coverage

afforded.  Thus, unless and until such a final determination is reached, it is reasonable to assume

that the Defendants will seek a preliminary injunction requiring XL to advance, as soon as the

layer below XL is exhausted.  Therefore, XL has instituted this action seeking a declaration of no

coverage for the Underlying Matters under the XL Policy.

## Argument

## I.    STANDARD FOR THE A SUMMARY JUDGMENT MOTION

Summary judgment is appropriate where there is no genuine issue of material fact to be

resolved and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v.

Catrett*, 477 U.S. 317, 330 (1986).  Once the motion is properly made and supported, an

opposing party may not rely merely on allegations or denials in its own pleading but must, by

affidavits or otherwise, set out specific facts showing a genuine issue for trial.  Fed. R. Civ. P.

---

[6] Moreover, two of the Defendants have reached settlements in connection with one of the Underlying Matters, and
both of those settlements have received preliminary approval from this Court.  Collectively, the two settlements
require a $15.1 million contribution from the insurers.  None of the insurers has consented to fund either of the two
settlements.

56(e); *Davis v. State of New York,* 316 F.3d 93, 100 (2d Cir. 2002); *see also, Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Slue v. New York University Medical Center,* 409 F. Supp.2d 349, 357 (S.D.N.Y. 2006). A genuine issue for trial exists only if, based on the record as a whole, a reasonable jury could find in favor of the nonmoving party. *Banca Commerciale Italiana, New York Branch v. Northern Trust Int'l Banking Corp.*, 160 F.3d 90, 93 (2d Cir. 1998). Conclusory statements or mere allegations are not sufficient to defeat summary judgment. *Davis*, 316 F.3d at 100.

Nor can a party opposing summary judgment stave off summary judgment by an empty request for discovery. Rule 56(f) requires that the non-movants "show by affidavit that, for specified reasons, [the Defendants] cannot present facts essential to justify [their] opposition." Fed. R. Civ. P. 56(f). The Defendants are not entitled merely to say the motion should be denied to allow some amorphous discovery. Under the rule, the affidavit must explain: "(1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort… has [been] made to obtain them, and (4) why [those efforts have been] unsuccessful." *Axis* Decision at *7. *See also, Meloff v. New York Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995), *on subsequent appeal,* 240 F.3d 138 (2d Cir. 2001)); *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir. 1994).

In the event that the Court does conclude that discovery on a limited issue is necessary, Rule 56(d)(1) further provides that the Court can grant partial summary judgment, specifying which factual issues are still open for resolution and which are not.

## II.    THE TERMS OF THE IRE PROVIDE THAT
KNOWLEDGE BY ANY OFFICER VITIATES
COVERAGE FOR ALL DIRECTORS AND OFFICERS

### A.    The Clear and Unambiguous Language of the
IRE Provides that if "Any" Insured Knew
of the Fact, Circumstance or Situation,
the Entire "Claim" is Uncovered

"[A]n insurance policy, like any contract, must be construed to effectuate . . . the plain

meaning of the policy's terms." *Andy Warhol Foundation for the Visual Arts, Inc. v. Fed. Ins.

Co.*, 189 F.3d 208, 215 (2d Cir. 1999); *see also*, *Brunetto v. Massachusetts Mut. Life Ins. Co.*,

200 F. Supp.2d 380, 382 (S.D.N.Y. 2002).  And under New York law, when the terms of a

written contract are clear and unambiguous, those "'[w]ords and phrases are given their plain

meaning'" *Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 139 (2d Cir. 2000)(quoting

*PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996)) and "a court must enforce that

plain meaning, '[r]ather than rewrite an unambiguous agreement.'"  *Krumme*, 238 F.3d at

139(quoting *American Express Bank Ltd. v. Uniroyal, Inc.*, 562 N.Y.S.2d 613, 614 (1st Dep't

1990)).

This Court in the *Axis* Decision, said exactly that: "If the language of the contract is

'unambiguous and conveys a definite meaning,' then the interpretation of the contract is a

question of law for the court."  *Axis* Decision at *10 (quoting *Bourne v. Walt Disney Co.*, 68 F.3d

621, 629 (2d Cir. 1995)).  The Second Circuit has explained that "the question of whether an

insurance policy is ambiguous is a matter of law to be determined by the court,"  *Seiden Assoc.

Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992), and has made clear that "under

New York law, ambiguity does not exist 'simply because the parties urge different

interpretations,'"  *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.,* 252 F.3d 608, 616-617 (2d Cir.

2001)(quoting *Bd. of Mgrs. Of Yardarm Condominium II v. Fed. Ins. Co.*, 669 N.Y.S.2d 332, 332

(2d Dep't 1998)).

   Here, under the clear and unambiguous terms of the XL Policy, if any Insured Person had

knowledge, as of the inception of the XL Policy, of any facts circumstances or situations that

might give rise to a Claim under the XL Policy, no coverage is afforded for that Claim.  There is

simply no other way to read the IRE provision that states:  "***no coverage*** will be available . . . for

Loss, . . . from Claims ***arising from*** any ***fact, circumstance or situation*** of which, as of the

effective date of this Policy, ***any Insured had knowledge*** and ***had reason to suppose might***

***afford grounds for any Claim*** . . . ."  Toolan Dec. Ex. A, Endorsement No. 13 (*emphasis added*).

   The law is clear in New York that when, as here, the language of a policy provision refers

to "any" it means "any."  As this Court explained in the *Axis* Decision:

> [I]t is well established that "[t]he language 'any insured' has been consistently
> interpreted as expressing a contractual intent to create joint obligations and to
> prohibit recovery by an innocent co-insured." *McCauley Enters., Inc. v. New
> Hampshire Ins. Co.,* 716 F. Supp. 718, 721 (D. Conn. 1989) (collecting cases).
> "Indeed, unlike the phrase 'the insured,' the phrase 'any insured' unambiguously
> expresses a contractual intent to create joint obligations and to prohibit recovery
> by an innocent co-insured." *Sales v. State Farm Fire and Cas. Co.*, 849 F.2d
> 1383, 1385 (11th Cir. 1988); *see State Farm Fire & Cas. Co. v. Wolford*, 498
> N.Y.S.2d 631, 632 (4th Dep't 1986) (applying "any insured" exclusion to bar
> coverage for innocent insured); *see also Allstate Ins. Co. v. Mugavero*, 79 N.Y.2d
> 153, 164 (1992) (contrasting exclusionary clauses barring coverage for "*an*
> insured" versus "*the* insured".

*Axis* Decision at *15; *see also*, *American International Specialty Lines Ins. Co. v. Towers Fin.*

*Corp.,* No. 94 Civ. 2727 (WK)(AJP), 1997 WL 906427 (S.D.N.Y. Sept. 12, 1997)(coverage

properly denied to all innocent insureds unaware of the misrepresentations); *Spezialetti v. Pacific*

*Employers Ins. Co.,* 759 F.2d 1139, 1141-42 (3d Cir. 1985)(dishonest acts of one insured

precluded coverage for innocent insureds under "any insured" exclusion**).**

This Court went on to conclude in the *Axis* Decision that the Axis Policy "Knowledge Exclusion specifically excludes coverage for any 'Claims' of which '*any Insured* had knowledge.' . . . Accordingly, if the Knowledge Exclusion is part of the 2005-2006 Axis Policy, Axis may properly impute Bennett's knowledge of the fraud at Refco to all insureds and use the Knowledge Exclusion to deny coverage to them." *Axis* Decision at *15 (emphasis in original). The same conclusion should be reached here because, in all material respects, the language of the Axis Policy and the XL Policy are the same:

| Axis Policy Knowledge Exclusion | XL Policy IRE |
| --- | --- |
| In consideration of the premium charged, it is agreed that this Policy does not respond to **Claims** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, or event, which as of the inception date of the **Policy Period**, any **Insured** had knowledge and had reason to suppose might give rise to a **Claim** that would fall within the scope of the insurance afforded by this Policy. (IJX 28 at Endorsement No. 6.) | In consideration of the premium charged, no coverage will be available under this Policy for Loss, including Defense Expenses, from Claims arising from any fact, circumstance or situation of which, as of the effective date of this Policy, any Insured had knowledge and had reason to suppose might afford grounds for any Claim that would fall within the scope of the insurance afforded by this Policy. (Toolan Dec. Ex. A at Endorsement No. 13) |

B.    The Severability Provision of the
      XL Policy Does Not Apply to the IRE

This Court, in the *Axis* Decision, also held that the so-called severability provisions of the Axis policy did not apply to the exclusion.

Again, the same thing holds true for the XL Policy, because, the severability provisions of the two policies are materially identical. As with the Axis Policy, the XL Policy contains two severability provisions. The first is in the "representations" provisions:

13

| Axis Policy Language from Primary Policy Representation Provision | XL Policy Representations Provision |
|---|---|
| The **Insureds** represent that the particulars and statements contained in the **Application** are true, accurate and complete and are deemed material to the acceptance of the risk assumed by the Insurer under this Policy.  This Policy is issued in reliance upon the truth of such representations.  No knowledge or information possessed by any **Insured** will be imputed to any other **Insured**.  If any of the particulars or statements in the **Application** is untrue, this Policy will be void with respect to any Insured who knew of such untruth.  (IJX 26 at Endorsement No. 10) | Each **Insured Person** represents that the statements and particulars contained in the **Application** are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and constitute a part of this Policy, are the basis of this Policy.  No knowledge or information possessed by any **Insured Person** will be imputed to any other **Insured Person** for the purposes of determining the availability of coverage with respect to **Claims** made against any other **Insured Person**.  (Toolan Dec. Ex. A at Section IV (K)) |

With respect to that Axis Policy provisions, this Court held that:

> [W]hen the severability provision is read, "not as if isolated from the context, but in the light of the [Endorsement] as a whole," *Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002), it is clear that the scope of the provision is limited to the statements Refco made in the Application it submitted to U.S. Specialty.  Indeed, the opening clauses of [the representation provision] specifically limit the scope of the representations made by the insureds, and the insurer's reliance upon those representations, to the "particulars and statements contained in the Application."

*Axis* Decision at *10.  The exact same is true as to the XL Policy.

Moreover, this Court went on to say in its *Axis* Decision:

> [E]ven though the severability provision itself contains no restrictive language, when read in context with the surrounding clauses, the provision "admits of only one reasonable interpretation" – *i.e.*, that it extends only to the statements Refco made in the Application.  *American Home Prods. Corp. v. Liberty Mut. Ins. Co.*, 748 F.2d 760, 765 (2d Cir. 1984).

*Axis* Decision at *10 (footnote omitted).  Again, the exact same is true as to the XL Policy.

The second severability provision, in both the Axis and XL Policies, relates to the

policies' exclusions:

| Axis Policy Language from Primary Policy Exclusions Provision | XL Policy Exclusions Provision |
|---|---|
| For purposes of determining the application of the above EXCLUSIONS, no **Wrongful Act** of any **Insured Person** will be imputed to any other **Insured Person** who did not have actual knowledge of, or directly participate in the commission of, such **Wrongful Act** . . . . (IJX 26 at EXCLUSIONS, p. 5) | No conduct of any **Insured Person** will be imputed to any other **Insured Person** to determine the application of any of the above EXCLUSIONS. (Toolan Dec. Ex. A at Section III, p. 4) |

With respect to that second severability provision of the Axis Policy, this Court in *Axis* held:

> [T]he express terms of the second severability provision, located at the end of the "Exclusions" section in the 2005-2006 Primary Policy, limit its application to "the above EXCLUSIONS."  . . . The Knowledge Exclusion, which was added by Axis to its own 2005-2006 Policy, is not one of "the above EXCLUSIONS" contained in the 2005-2006 Primary Policy.  Accordingly, that severability provision also does not preclude Axis from relying on Bennett's knowledge of the Refco fraud to bar coverage for all insureds pursuant to the Knowledge Exclusion.

*Axis* Decision at *14 (footnote omitted).  Once again, the exact same is true as to the XL Policy.

In *Axis*, this Court ultimately concluded that "neither [of] the severability provisions . . . precludes Axis from imputing Bennett's knowledge of the fraud. . .  to all insureds and denying coverage to them." *Id*. at *15.  Given the near identity of the terms of the severability provisions of the XL and Axis Policies, the same conclusion should be reached with respect to the XL Policy.

## III.    BENNETT'S CONVICTION ESTABLISHES THAT THE IRE HAS BEEN TRIGGERED

When the language of the IRE is broken down, it is clear that the IRE has three elements:

- First, "*any*" Insured Person must know of a fact, circumstance or situation as of the effective date of this Policy;

- Second, the Insured Person must have "reason to suppose" the fact, circumstance or situation "might afford grounds" for a Claim under the policy; and

- Finally, the Claim must "arise from" that fact, circumstance or situation.

As discussed in the following sections, each of those elements is met here.

A.    Bennett's Conviction Establishes Knowledge of
       Facts Circumstances or Situations Related to
       The Massive Fraud and Wrongdoing at Refco

As evidenced by three guilty pleas and one jury conviction, it is apparent that as of

August 11, 2005, the XL Policy inception date, several of the Insured Persons, including

Bennett, Maggio and Trosten, unquestionably possessed knowledge of facts, situations and/or

circumstances related to:

1.    The RGHI receivable (including its formation and its related-party nature);

2.    The use of round-trip loans to conceal the nature and un-collectability of the
       RGHI receivables;

3.    The deception of investors, lenders and auditors;

4.    The fact that Refco financial statements were materially inaccurate; and

5.    The fact that Insureds directly benefited from the fraud.

While all of the convictions are probative, for evidentiary reasons XL focuses on the

guilty plea by Bennett.  His recent sentencing results in a "final judgment of conviction" and is

admissible under Fed. R. Evid. 803(22).[7]  That judgment of conviction judicially establishes,

beyond any reasonable doubt, his knowledge of such facts, situations and circumstances of the

fraudulent activities at Refco.  In fact, Bennett admitted to the charges in the S3 Indictment

*without exception*:

> THE COURT:  Mr. Bennett, did you commit the crimes for which you've
> been charged with in the indictment?
>
> THE DEFENDANT:  I did, your Honor.

---

[7] In the preliminary injunction motions on the issue of advancement, some of the Defendants asserted that the guilty pleas were not admissible as a result of the rule against hearsay.  However, those motions were heard before the final judgment of conviction was entered against Bennett.  Moreover, even if Fed. R. Evid. 803(22) were not applicable, the Bennett plea is also admissible under other exceptions to the rule against hearsay, including Fed. R. Evid. 804(b)(3)  and Fed. R. Evid. 807.

       1.      <u>The RGHI receivable</u>:  Count 1 of the S3 Indictment provides a description of the way in which the RGHI receivable, which eventually totaled more than $1 billion in uncollectible debt, was manipulated to conceal Refco's losses.

> The debt by RGHI to Refco, carried on Refco's books as a receivable from RGHI, was over time comprised of, among other things, the following principal components: (a) liabilities incurred by Refco when brokerage customers to whom it had extended credit defaulted on their obligations, which were later transferred to RGHI; (b) Refco's proprietary trading losses; (c) various operating expenses incurred by Refco and paid in the first instance by Refco but later transferred to RGHI as an increase in RGHI's debt to Refco; and (d) transactions designed to pad Refco's revenues in which the benefits accrued to Refco and the associated costs were incurred by RGHI.

IJX 18 at ¶9.

       Bennett pled guilty to that count and, in his plea allocution, expressly confirmed the fraudulent purpose of RGHI, stating that, "[t]he [RGHI] receivable was composed of, amongst other things, historical customer losses, bad debts, and expenses that [RGHI] had incurred on behalf of Refco."  IJX 21 at 17:12-14.

       2.      <u>The round-trip transactions</u>:  Bennett knew of, and actively participated in organizing numerous, multimillion dollar year-end and quarterly round-trip transactions in order to conceal the RGHI receivable and the true financial condition of Refco.  The S3 Indictment explains that from year-end in February 1998, through year-end in February 2004, and again in May 2004, Refco engaged in these round-trip loan transactions with third-parties and with an entity called BAWAG for the specific purpose of concealing the RGHI receivable.  Moreover, as explained in the S3 Indictment, Bennett continued to manipulate Refco's finances between the August 2004 leveraged buyout and the August 2005 IPO.  IJX 18 at ¶46.  As listed in the S3 Indictment, these fraudulent year-end and quarterly round-trip transactions were massive in nature, totaling over $5.295 billion.  *Id.* at ¶¶22-23.

Again, during his allocution, Bennett expressly conceded the allegation when he

explained the nature and deceptive purpose of the round-trip transactions:

> I agreed with other Refco executives to enter into a series of transactions at the
> end of Refco's financial reporting periods to make it appear as if a receivable due
> to Refco from Refco [Group] Holdings, Inc. [RGHI], a related party, was instead
> due from an independent third-party customer.
>
> *    *    *
>
> I, along with other Refco executives, have caused Refco to enter into these
> transactions in order to conceal the size and nature of the [RGHI] receivable.

IJX 21 at 17:6-11, 17:15-17.

>       3.       Concealing the RGHI transactions from Refco's investors, lenders and auditors:

Bennett also acknowledged that he, and others, wrongfully concealed the RGHI receivable from

auditors, as well as various investors and lenders.  Such fraud was charged in Counts 2, 3 and 15

of the S3 Indictment.  IJX 18 at ¶¶71, 73, 83.  During his plea allocution, Bennett clearly

admitted that he was aware that the RGHI receivable was improperly concealed from creditors,

investors and lenders:

> We concealed the receivable from, amongst others, Refco's auditors, Thomas H.
> Lee Partners, various lenders who, in 2004, participated in Refco's senior secured
> credit facility and the issuance of 9 percent senior subordinated notes [Count 2],
> and also investors in Refco's common stock [Count 3].
>
> Among the lenders to whom I knowingly caused the [RGHI] receivable to be
> misrepresented was HSBC Bank, referenced in Count Fifteen of the indictment.
>
> The [RGHI] receivable and related party transaction used to conceal it were
> material information that Refco investors and lenders would have wanted to have
> known prior to investing in or lending money to Refco.
>
> …I knew that failing to disclose the receivable was wrong; I knew that obtaining
> funds from Refco's investors and lenders based on misleading financial
> statements was also wrong.

IJX 21 at 17:17-25, 18:8-11, 18:14-7.

4.    <u>Refco's false financial statements</u>:  Bennett was fully aware of the fact that Refco's financial statements, which were filed with the SEC and provided to investors, auditors and others, were materially false and misleading.  Bennett admitted as much when he pled guilty to Counts 1 and 4-13 of the S3 Indictment.  *Id*.  In acknowledging his wrongful acts in connection with the filing of false financial statements, at his plea allocution, Bennett stated:

> I also caused Refco to file documents with the SEC, namely S1, [Count 6] S4 [Count 5], and 10-K [Count 4] that did not disclose the full extent of the [RGHI] receivable or the transactions used to conceal it; and, thus, were false and misleading with respect to material facts.  I knew that failing to disclose these facts in public filings and in connection with Refco's sale and registration of Refco's notes and common stock was wrong, and I deeply regret having done so.
>
> I and other Refco executives also used the interstate wires to accomplish these acts within this district, as referenced in Counts Seven through Thirteen.

*Id*.

5.    <u>The transmission of leveraged buyout Proceeds to insureds</u>:  Bennett also pled guilty to all five money-laundering counts in the S3 Indictment, Counts 16-20.  *Id*. at 18.  In his plea allocution, Bennett stated:

> Furthermore, I caused funds obtained from the transaction with Thomas H. Lee Partners, referenced in paragraph 34 of the indictment, to be wired to various parties receiving proceeds from the transaction, as referenced in Counts Sixteen through Twenty, knowing that this money had been unlawfully obtained.

*Id*.

Thus, the first element of the IRE has certainly been met.  Bennett has admitted to knowing of the facts, circumstances and situations surrounding each of the items listed above.[8]

---

[8] Of course, the wrongdoing was far broader than just Bennett.  The guilty pleas by Trosten and Maggio judicially establish, beyond a reasonable doubt, their knowledge of such facts, circumstances and situations.  Maggio, for example in his plea allocution, stated "[a]s a result of my conduct and that of my coconspirators false financial statements were issueds to obtain debt financing from the public  .  .  .  I deeply regret my conduct and the harm that it has caused."  IJX 20 at 18:4 - 6, 18:15 - 16.  Similarly, when Trosten pled guilty, he explained, "while I was employed at Refco, I agreed with other Refco executives to hide the true nature of Refco's finances on Refco's

B.     Bennett's Conviction Establishes That
       He had Reason to Suppose that a Claim Might
       Arise from those Facts Circumstances or Situations

Bennett's judgment of conviction also establishes the second element required for

application of the IRE, *i.e.*, that Bennett had "reason to suppose" a fact, circumstance or

situation, of which he admittedly had knowledge, "might afford grounds" for a Claim under the

XL Policy.

Indeed, Bennett specifically admits knowing what he was doing was wrong.  As noted

above, in his plea allocution, Bennett stated, "I knew that failing to disclose the receivable was

wrong; I knew that obtaining funds from Refco's investors and lenders based on misleading

financial statements was also wrong . . .  I knew that failing to disclose these facts in public

filings and in connection with Refco's sale and registration of Refco's notes and common stock

was wrong, and I deeply regret having done so."  IJX 21 at 18:14 - 17, 18:22 - 25.

This "reason to suppose" element of the IRE is an objective standard – *i.e.*, would a

reasonable person understand that, given the facts circumstances or situations, there may be

grounds for a Claim to be made under the Policy.  *Coregis Ins. Co. v. Lewis, Johs, Avallone,*

*Aviles & Kaufman, LLP*, No. 01 Civ. 3844 (SJ), 2006 WL 2135782, at *11-12 (E.D.N.Y. July

28, 2006).  There is no doubt a reasonable person who had devised and executed a scheme to

create hundreds of millions in phony receivables to cover losses, and then used client funds to

revolve the receivable to hide its true nature, would have reason to know that a Claim might

occur.  No properly instructed reasonable jury could conclude otherwise.

---

financial statements.  I knew that Refco's financial statements did not accurately reflect Refco's financial condition.
. . I knew that obtaining funds from Refco investors and lenders based on misleading financial information was
wrong . . .  I wish to apologize to my family and those that I harmed by my conduct, which I deeply and sincerely
regret, your Honor."  IJX 22 at 17:18-22, 19:9-10, 19:14-16.

The conviction of Grant similarly judicially establishes, beyond a reasonable doubt, Grant's knowledge of such
facts, circumstances and situations.

But where, as here, a person affirmatively states that he subjectively knew of the illegality of conduct, there is no need even to consider the reasonable person standard. *Id*. at *10. And there is no doubt that Bennett (and the others who pled guilty) knew that he was engaging in wrongful and illegal conduct. IJX 21.

C.     All of the Underlying Matters Arise from
       Facts, Circumstances or Situations Covered
       By Bennett's Conviction

The Underlying Matters all consist of charges or causes of action arising from a "fact, circumstance or situation" of which the Insured Persons "had knowledge" and "had reason to suppose might afford grounds" for a Claim under the XL Policy. In turn, the Claims made under the XL Policy, with respect to the Underlying Matters, are all subject to the restriction in coverage dictated by the IRE.

Most of the Underlying Matters arise directly from the RGHI receivable. In particular, the *In re Refco Securities Litigation* matter being heard by this Court is plainly based on the facts about which Bennett has admitted he had knowledge. Rather than encumbering this brief with a detailed analysis of the factual predicate of each of those Underlying Matters, XL has summarized the relationship of each of the Underlying Matters to the facts outlined in section III(A), *supra*, in a detailed chart annexed to the Sandnes Aff't as Exhibit 35. That chart demonstrates that each of the Underlying Matters has, at its core, the RGHI receivable or one of the other matters outlined above. The chart provides specific cross-references to the portions of the complaints in the Underlying Matters which reference the applicable allegations.

Thus, for example, some of the Underlying Matters have allegations regarding false financial statements. The falsity clearly derives from the improper financial reporting of the RGHI receivable. It is clear that Bennett admitted knowledge of improper financial statements. The chart indicates which cases fall under this category.

Similarly, as detailed in the chart, several cases involve the sale of 9% senior subordinated notes, all of which stem from the fraudulent concealment of the RGHI receivable. However, even if the RGHI receivable was not specifically referenced in these complaints, Bennett pled guilty to Count 2 of the S3 Indictment, for fraud in connection with the sale of the 9% notes.

The same is true as to the other assertions of wrongdoing. At bottom, all of the Underlying Matters "arise from" the "facts, circumstances and situations" which Bennett unquestionably had knowledge. Thus, under the plain language of the IRE, no coverage is afforded by the XL Policy for the Underlying Matters.

## IV.    THERE IS NO DOUBT THAT THE IRE IS PART OF THE XL POLICY SO THERE IS NO NEED FOR DISCOVERY

At the Rule 16 conference in this case, the Defendants suggested that discovery may be necessary with respect to the circumstances surrounding the inclusion of the IRE in the XL Policy. Therefore, at the conference, XL agreed to produce its underwriting file, with respect to the Policy, and the portions of its claim file which concern the IRE. Indeed, prior to the Defendants filing of a response to this motion, XL will already have produced to the Defendants those materials.

Those documents unequivocally illustrate that the IRE was part of the XL Policy and that Marsh USA Inc. ("Marsh"), Refco's agent, had the IRE in its possession prior to binding the Policy. Indeed, the documents clearly show that the IRE was issued at the express request of Refco. For example, attached to the Toolan Declaration is an August 9, 2005 email exchange between Kenny Li of Marsh and Mr. Toolan, the XL underwriter responsible for managing the binding of the Policy. In emails, titled "Re: Refco-warranty," Marsh requested that XL "please include an inverted warranty endorsement . . . ." Toolan Dec. Ex. B. Two minutes later, Mr.

Toolan responded to Mr. Li's email indicating "[t]his confirms that we will use the inverted warranty." *Id.* The exchange between Marsh and XL is patently clear – Marsh requested inclusion of the IRE, and XL confirmed that the XL Policy would, in fact, include the IRE.

Not only was it the intent of Marsh and XL to include the IRE, there is also no question that Marsh was in possession of the IRE prior to binding, as evidenced by an email sent later that same afternoon of August 9, 2005 from Mr. Li to Mr. Toolan titled "Re: Refco – requests." In that email, Mr. Li is apparently attempting to collect all relevant Policy materials, and states, "I need a copy of your form and all endorsements." Several minutes later, Mr. Toolan responds, attaching an electronic copy of the IRE, with the notation below, "[o]ne more." Toolan Dec. Ex. C.

Toolan also testifies in his declaration, "on personal knowledge, that there was a clear, explicit and unequivocal agreement, prior to the Policy being bound, that the IRE was part of the Policy." Toolan Dec. ¶5.

Despite this clear documentary record, and Toolan's direct testimony, XL anticipates that some Defendants may file a Fed. R. Civ. P. 56(f) affidavit asking for additional discovery. As discussed above, Rule 56(f) requires the Defendants to provide specific detail as to the needed discovery before the Court should entertain such a request.

Here, XL has not yet seen the Rule 56(f) affidavit, but XL understands that Defendants' discovery request apparently stems from one single document contained in the Marsh file, a binder which Defendants assert does not refer to the IRE and therefore, they say, creates an issue of fact as to the intent of the parties to include the IRE in the XL Policy. Obviously, XL will address the specifics of what is said in such an affidavit, when and if it is filed, but XL believes

no affidavit can establish the need for such discovery, because there is no legitimate issue of material fact to be decided.

Even assuming, *arguendo*, that the last XL Policy binder did not mention the IRE, the documentary record is clear that the IRE is part of the XL Policy. Given the explicit communications (quoted above) agreeing that the IRE is part of the Policy, there is no legitimate basis for discovery because no properly instructed reasonable jury could find that the IRE was not part of the XL Policy. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) (there "is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party").

XL believes that, if Defendants do seek further discovery, the true purpose behind that request will simply be to delay resolution of this matter while, at the same time, seeking an order for XL to advance defense expenses. Such an outcome would unfairly and profoundly prejudice XL. Therefore, even if the Court were to find, based on a Rule 56(f) affidavit, that some additional discovery might be needed, such discovery should be limited to the issue related to the inclusion of the IRE and should be completed promptly. Rule 56(f)(3) provides that the Court can order specific proceedings as are necessary to resolve open factual issues and Fed. R. Civ. P. 26(f)(2) authorizes sequencing of discovery.

Moreover, the Court, pursuant to Fed. R. Civ. P. 56(d), can grant partial summary judgment on the application of the IRE, finding that Bennett's admitted knowledge of the wrongdoing at Refco brings all of the Underlying Matters within the ambit of the IRE. 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Prac. & Proc.* § 2737 (2008)*;* Fed. R. Civ. P. 56(d) advisory committee's note (1946)*,; see also, Algie v. RCA Global Communications, Inc.*, 891 F. Supp. 875, 883 (S.D.N.Y. 1994), *aff'd,* 60 F.3d 956 (2d Cir. 1995).

24

Fed. R. Civ. P. 56(d) empowers the Court to "specify those facts that really cannot be controverted." *Wright, supra,* at 1.  Thus, pursuant to Fed. R. Civ. P. 56(d), the Court can rule that the three elements of the IRE have been established in this case, even if it finds that there is some need for limited discovery regarding the Policy procurement process.

## Conclusion

For the reasons stated above, XL's motion for summary judgment should be granted.


Dated: New York, New York
      July 11, 2008

                                 Respectfully submitted,

                                 BOUNDAS, SKARZYNSKI, WALSH
                                  & BLACK, LLC

*Of Counsel*:
                                 By:___/s James Sandnes_____

  James A. Skarzynski                     James Sandnes (JS-8944)
  James Sandnes                          A Member of the Firm
  Jill M. Levy                            One Battery Park Plaza – 32nd Floor
  Ari R. Magedoff                  New York, New York 10004
                                   Telephone: (212) 820-7700