HELEN B. KIM (HK-8757)
KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
Telephone:    310-788-4525
Facsimile:    310-788-4471

    -and-

PHILIP A. NEMECEK (PN-3319)
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022-2585
Telephone:    212-940-8834
Facsimile:    212-940-8776

*Attorneys for Defendant and Counterclaim Plaintiff*
*Dennis A. Klejna*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x

XL SPECIALTY INSURANCE COMPANY,    :
                                   :
                Plaintiff,         :
                                   :
        v.                         :
                                   :
JOHN D. AGOGLIA, PHILLIP R. BENNETT,   :      No. 08 CIV 3821 (GEL)
LEO R. BREITMAN, EDWIN L. COX,         :
SUKHMEET DHILLON, THOMAS H.            :      *Electronically filed*
DITTMER, NATHAN GANTCHER,              :
STEPHEN GRADY, TONE GRANT,             :      **ANSWER AND**
THOMAS HACKL, DAVID V. HARKINS,        :      **COUNTERCLAIMS OF**
SCOTT L. JAECKEL, DENNIS A. KLEJNA,    :      **DEFENDANT DENNIS A.**
THOMAS H. LEE, ERIC G. LIPOFF, SANTO   :      **KLEJNA**
C. MAGGIO, PETER MCCARTHY, JOSEPH      :
MURPHY, FRANK MUTTERER, RONALD L.      :
O'KELLEY, RICHARD N. OUTRIDGE,         :
SCOTT A. SCHOEN, WILLIAM M. SEXTON,    :
GERALD SHERER, PHILIP SILVERMAN and    :
ROBERT C. TROSTEN,                     :
                                       :
                Defendants.            :
                                       :
---------------------------------------------------------- x

Defendant Dennis A. Klejna, by and through his attorneys, Katten Muchin Rosenman

LLP, states as follows for his Answer to the Complaint of plaintiff XL Specialty Insurance

Company ("XL"), dated April 22, 2008, in the above-captioned action (the "Complaint"):

1.     No response is required for paragraph 1 of the complaint.

2.     Denies each and every allegation contained in paragraph 2 of the Complaint,

except admits that XL issued a directors and officers management liability policy number

ELU089673-05 (the "XL Policy") to Refco Inc. ("Refco") for the period of August 11, 2005 to

August 11, 2006.

3.     Denies any involvement or culpability relating to the allegations of wrongdoing

contained in paragraph 3 of the Complaint; otherwise denies knowledge or information sufficient

to form a belief as to the truth of the allegations contained in paragraph 3 of the Complaint,

except admits, upon information and belief, that the XL Policy incepted on August 11, 2005,

which was the same date as the Refco initial public offering, and that Refco filed for Chapter 11

bankruptcy on October 17, 2005.

4.     Denies each and every allegation contained in paragraph 4 of the Complaint,

except admits that numerous lawsuits and investigations have been initiated against Refco and

certain individuals, and refers to the pleadings in these Underlying Matters for the allegations

contained therein.

5.     Denies knowledge or information sufficient to form a belief as to the truth of the

allegations contained in paragraph 5 of the Complaint, except admits, on information and belief,

that three Refco executives, Phillip R. Bennett ("Bennett"), Robert C. Trosten ("Trosten") and

Santo C. Maggio ("Maggio") have pled guilty to various criminal charges and that former

President of Refco Group Ltd. LLC, Tone Grant ("Grant") was found guilty by a jury on April 17, 2008.

6.      Denies each and every allegation contained in paragraph 6 of the Complaint, except admits that Mr. Klejna, among other defendants, has sought coverage under the XL Policy in connection with the Underlying Matters and that XL has denied coverage, and refers to the XL Policy for the contents thereof.

7.      Denies each and every allegation contained in paragraph 7 of the Complaint.

8.      With respect to the allegations contained in paragraph 8 of the Complaint, admits that XL purports to seek a declaration from this Court resolving the coverage dispute in their favor; and avers that XL is entitled to no relief.

9.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 9 of the Complaint, except admits that XL avers that the Court has jurisdiction over the parties and the subject matter of this action pursuant to 28 U.S.C. § 1332.

10.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 10 of the Complaint, except admits that XL avers that the Court has jurisdiction over this action pursuant to 28 U.S.C. § 1367.

11.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 11 of the Complaint, except admits that XL avers that the Court has *in personam* jurisdiction over Mr. Klejna pursuant to CPLR §§ 301 and 302 and admits that Mr. Klejna is a former officer of Refco and that he transacted business in New York or otherwise engaged in a sufficient course of conduct in the State to make the exercise of personal jurisdiction proper.

12.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 12 of the Complaint, except admits that XL avers that the Court has jurisdiction pursuant to CPLR § 302 and admits that the action *In re Refco, Inc. Securities Litigation*, No. 05-8626 (GEL) is pending before this Court and, admits, upon information and belief, that criminal proceedings against Bennett, Trosten, Maggio and Grant have been conducted in this judicial district.

13.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 13 of the Complaint, except admits that XL avers that venue is appropriate pursuant to 28 U.S.C. § 1391.

14.     Denies each and every allegation contained in paragraph 14 of the Complaint.

15.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 15 of the Complaint, except admits, upon information and belief, that XL is an insurance company.

16.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 16 of the Complaint.

17.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 17 of the Complaint, except admits, upon information and belief, that Bennett is the former Chairman, President and CEO of Refco, and that in October 2005, Bennett was asked by the Refco Board of Directors to take a leave of absence.

18.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 18 of the Complaint.

19.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 19 of the Complaint.

20.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 20 of the Complaint.

21.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 21 of the Complaint.

22.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 22 of the Complaint.

23.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 23 of the Complaint, except admits, upon information and belief, that defendant Stephen Grady served as Chief Operating Officer of Refco Global Futures LLC.

24.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 24 of the Complaint, except admits, upon information and belief, that Grant served as President of Refco Group Ltd., LLC.

25.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 25 of the Complaint.

26.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 26 of the Complaint, except admits, upon information and belief, that defendant David V. Harkins served as a director of Refco.

27.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 27 of the Complaint, except admits, upon information and belief, that defendant Scott L. Jaeckel served as a director of Refco.

-5-

28.     Denies each and every allegation contained in paragraph 28 of the Complaint, except admits that Mr. Klejna served as Executive Vice President and General Counsel of Refco and that Mr. Klejna is a resident of New York.

29.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 29 of the Complaint, except admits, upon information and belief, that defendant Thomas H. Lee served as a director of Refco.

30.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 30 of the Complaint.

31.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 31 of the Complaint, except admits, upon information and belief, that defendant Maggio served as President and CEO of Refco Securities, LLC and President of Refco Capital Markets, Ltd.

32.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 32 of the Complaint.

33.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 33 of the Complaint, except admits, upon information and belief, that defendant Joseph Murphy served as President of Refco during October and November of 2005.

34.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 34 of the Complaint.

35.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 35 of the Complaint, except admits, upon information and belief, that defendant Ronald L. O'Kelley served as a director of Refco.

36.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 36 of the Complaint.

37.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 37 of the Complaint, except admits, upon information and belief, that defendant Scott A. Schoen served as a director of Refco.

38.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 38 of the Complaint, except admits, upon information and belief that defendant William M. Sexton served as Executive Vice President and Chief Operating Officer of Refco.

39.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 39 of the Complaint, except admits, upon information and belief that defendant Gerald Sherer served as Executive Vice President and Chief Financial Officer of Refco.

40.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 40 of the Complaint.

41.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 41 of the Complaint, except admits, upon information and belief, that defendant Trosten served as Executive Vice President and Chief Financial Officer of Refco Group Ltd., LLC.

42.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 42 of the Complaint, except admits that the XL Policy is a directors and officers management liability policy with a policy period of August 11, 2005 to August 11, 2006 and a limit of $20 million, and refers to the XL Policy for the contents thereof.

43.     Denies each and every allegation contained in paragraph 43 of the Complaint, except admits that U.S. Specialty Insurance Company ("U.S. Specialty"), Lexington Insurance Company ("Lexington"), Axis Reinsurance Company ("Axis"), Allied World Assurance Company ("AWAC") and Arch Insurance Company ("Arch") have issued underlying insurance policies to Refco, and refers to those policies for the contents thereof.

44.     Admits that paragraph 44 of the Complaint purports to quote from the XL Policy, and refers to the XL Policy for the contents thereof.

45.     Admits that paragraph 45 of the Complaint purports to quote from Endorsement 12 to the XL Policy, and refers to the XL Policy and Endorsement 12 for the contents thereof.

46.     Admits that the XL Policy provides coverage to Insured Persons in excess of the Underlying Coverage and admits that paragraph 46 of the Complaint purports to quote from Endorsement 9 of the XL Policy, and refers to the XL Policy and Endorsement 9 for the contents thereof.

47.     Denies each and every allegation contained in paragraph 47 of the Complaint, and refers to the XL Policy and its endorsements for the contents thereof.

48.     Denies each and every allegation contained in paragraph 48 of the Complaint, except admits the allegations contained in the first sentence of paragraph 48 and the second and third sentences of footnote 6, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence of paragraph 48, and admits, upon information and belief, the allegations contained in the third and fourth sentences of paragraph 48 and the allegations contained in footnote 8.

49.     Admits, upon information and belief, that Refco conducted its initial public offering on August 11, 2005.

50.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 50 of the Complaint, and refers to the October 10, 2005 press release for the contents thereof.

51.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 51 of the Complaint, and refers to the October 11, 2005 press release for the contents thereof.

52.    Admits, upon information and belief, that Refco filed for bankruptcy in the Southern District of New York on or about October 17, 2005.

53.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 53 of the Complaint, and refers to the contents of the third superseding indictment filed on or about January 16, 2007 (the "S3 Indictment") for the contents thereof.

54.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 54 of the Complaint, except admits, upon information and belief, that Bennett and Trosten pled guilty to various federal charges brought against them on or around February 2008.

55.    Denies any involvement or culpability relating to the allegations of wrongdoing contained in paragraph 55 of the Complaint, and refers to the S3 Indictment for the contents thereof.

56.    Denies any involvement or culpability relating to the allegations of wrongdoing contained in paragraph 56 of the Complaint, and refers to the S3 Indictment for the contents thereof.

57.    Denies any involvement or culpability relating to the allegations of wrongdoing contained in paragraph 57 of the Complaint, and refers to the S3 Indictment for the contents thereof.

58.    Denies any involvement or culpability relating to the allegations of wrongdoing contained in paragraph 58 of the Complaint, and refers to the S3 Indictment for the contents thereof.

59.    Denies any involvement or culpability relating to the allegations of wrongdoing contained in paragraph 59 of the Complaint, and refers to the S3 Indictment for the contents thereof.

60.    Denies any involvement or culpability relating to the allegations of wrongdoing contained in paragraph 60 of the Complaint, and refers to the S3 Indictment for the contents thereof.

61.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 61 of the Complaint, and refers to the S3 Indictment for the contents thereof.

62.    Denies any involvement or culpability relating to the allegations of wrongdoing contained in paragraph 62 of the Compliant; otherwise denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 62 of the Complaint, except admits, upon information and belief, that Bennett pled guilty to various federal charges, and refers to the transcript of the February 15, 2008 hearing (the "Bennett Transcript") for the contents thereof.

63.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 63 of the Complaint, except admits, upon information and

belief, that Bennett pled guilty to various federal charges, and refers to the Bennett Transcript for the contents thereof.

64.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 64 of the Complaint, and refers to the S3 Indictment for the contents thereof.

65.    Denies any involvement or culpability relating to the allegations of wrongdoing contained in paragraph 65 of the Complaint; otherwise denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 65 of the Complaint, except admits, upon information and belief, that Trosten pled guilty to various federal charges, and refers to the transcript of the February 20, 2008 hearing (the "Trosten Transcript") for the contents thereof.

66.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 66 of the Complaint, except admits, upon information and belief, that Trosten pled guilty to various federal charges, and refers to the Trosten Transcript for the contents thereof.

67.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 67 of the Complaint, except admits, upon information and belief, that Maggio pled guilty to various federal charges, and refers to the criminal Information brought against Maggio (the "Maggio Information") for the contents thereof.

68.    Denies any involvement or culpability relating to the allegations of wrongdoing contained in paragraph 68 of the Complaint; otherwise denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 68 of the Complaint, and refers to the Maggio Information for the contents thereof.

69.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 69 of the Complaint, and refers to the Maggio Information for the contents thereof.

70.    Denies any involvement or culpability relating to the allegations of wrongdoing contained in paragraph 70 of the Complaint; otherwise denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 70 of the Complaint, except admits, upon information and belief, that Maggio pled guilty to various federal charges, and refers to the transcript of the December 19, 2007 hearing (the "Maggio Transcript") for the contents thereof.

71.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 71 of the Complaint, except admits, upon information and belief, that Maggio pled guilty to various federal charges, and refers to the Maggio Transcript for the contents thereof.

72.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 72 of the Complaint, except admits, upon information and belief, that Grant was convicted on or around April 17, 2008.

73.    Denies any involvement or culpability relating to the allegations of wrongdoing contained in paragraph 73 of the Complaint; otherwise denies knowledge or information sufficient to form a belief as to the truth of allegations contained in paragraph 73 of the Complaint.

74.    Admits, upon information and belief, that various lawsuits were filed against certain of the defendants in the above-captioned action beginning on or about October 12, 2005.

75.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 75 of the Complaint, and refers to the complaint filed in *United States v. Bennett*, No. 05-1720 (S.D.N.Y.) (the "Bennett Criminal Complaint") for the contents thereof.

76.    Denies any involvement or culpability relating to the allegations of wrongdoing contained in paragraph 76 of the Complaint; otherwise denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 76 of the Complaint, and refers to the Bennett Criminal Complaint, the S3 Indictment, and the Maggio Information for the contents thereof.

77.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 77 of the Complaint.

78.    Admits, upon information and belief, the allegations contained in paragraph 78 of the Complaint.

79.    Denies any involvement or culpability relating to the allegations of wrongdoing contained in paragraph 79 of the Complaint, except admits that Mr. Klejna is named as a defendant in the First Amended Consolidated Class Action Complaint ("FAC") and the Second Amended Consolidated Class Action Complaint ("SAC"), and refers to the FAC and SAC for the contents thereof.

80.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 80 of the Complaint, except admits, upon information and belief, notice was provided to XL on behalf of Mr. Klejna of certain matters arising out of Mr. Klejna's employment with Refco.

81.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 81 of the Complaint.

82.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 82 of the Complaint.

83.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 83 of the Complaint.

84.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 84 of the Complaint.

85.     Denies any involvement or culpability relating to the allegations of wrongdoing contained in paragraph 85 of the Complaint; otherwise denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 85 of the Complaint.

86.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 86 of the Complaint.

87.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 87 of the Complaint.

88.     Denies any involvement or culpability relating to the allegations of wrongdoing contained in paragraph 88 of the Complaint; otherwise denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 88 of the Complaint, and refers to the THL Funds Action Complaint for the contents thereof.

89.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 89 of the Complaint.

90.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 90 of the Complaint.

91.    Denies any involvement or culpability relating to the allegations of wrongdoing contained in paragraph 91 of the Complaint; otherwise denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 91 of the Complaint.

92.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 92 of the Complaint.

93.    Admits, upon information and belief, the allegations contained in paragraph 93 of the Complaint.

94.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 94 of the Complaint.

95.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 95 of the Complaint.

96.    Admits, upon information and belief, the allegations contained in paragraph 96 of the Complaint.

97.    Denies any involvement or culpability relating to the allegations of wrongdoing contained in paragraph 97 of the Complaint; otherwise denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 97 of the Complaint.

98.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 98 of the Complaint.

99.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in the Complaint.

100.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 100 of the Complaint.

101.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 101 of the Complaint.

102.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 102 of the Complaint.

103.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 103 of the Complaint.

104.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 104 of the Complaint.

105.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 105 of the Complaint.

106.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 106 of the Complaint.

107.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 107 of the Complaint.

108.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 108 of the Complaint.

109.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 109 of the Complaint.

110.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 110 of the Complaint.

111.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 111 of the Complaint.

112.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 112 of the Complaint.

113.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 113 of the Complaint.

114.   No response is required for paragraph 114 of the Complaint.

115.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 115 of the Complaint.

116.   Admits the allegations contained in paragraph 116 of the Complaint.

117.   Admits the allegations contained in paragraph 117 of the Complaint.

118.   Admits the allegations contained in paragraph 118 of the Complaint.

119.   Admits the allegations contained in paragraph 119 of the Complaint.

120.   No response is required for paragraph 120 of the Complaint.

**CLAIM FOR RELIEF**

121.   Repeats and realleges each response set forth in paragraphs 1 through 120 above.

122.   Denies each and every allegation contained in paragraph 122 of the Complaint.

123.   Denies each and every allegation contained in paragraph 123 of the Complaint.

124.   Denies each and every allegation contained in paragraph 124 of the Complaint.

125.   Denies each and every allegation contained in paragraph 125 of the Complaint.

126.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 126 of the Complaint.

127.    Denies each and every allegation contained in paragraph 127 of the Complaint.

128.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 128 of the Complaint.

129.    Denies each and every allegation contained in paragraph 129 of the Complaint.

130.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 130 of the Complaint.

131.    Denies each and every allegation contained in paragraph 131 of the Complaint.

132.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 132 of the Complaint.

133.    Denies each and every allegation contained in paragraph 133 of the Complaint.

134.    Denies each and every allegation contained in paragraph 134 of the Complaint.

135.    Denies each and every allegation contained in paragraph 135 of the Complaint.

136.    Denies each and every allegation contained in paragraph 136 of the Complaint.

137.    Denies each and every allegation contained in paragraph 137 of the Complaint.

138.    Denies each and every allegation contained in paragraph 138 of the Complaint.

### FIRST DEFENSE

139.    XL fails to state a claim against Mr. Klejna upon which relief can be granted.

### SECOND DEFENSE

140.    Upon information and belief, XL's claims against Mr. Klejna are barred, in whole or in part, by the doctrine of laches.

### THIRD DEFENSE

141.    Upon information and belief, XL's claims against Mr. Klejna are barred, in whole or in part, by the doctrine of waiver.

### FOURTH DEFENSE

142.    Upon information and belief, XL's claims against Mr. Klejna are barred, in whole or in part, by the doctrine of estoppel.

### FIFTH DEFENSE

143.    Upon information and belief, XL's claims against Mr. Klejna are barred, in whole or in part, by the doctrine of unclean hands.

### SIXTH DEFENSE

144.    Upon information and belief, XL's claims against Mr. Klejna are barred as a result of XL's inequitable conduct in connection with its purported denial of coverage under the XL Policy.

### SEVENTH DEFENSE

145.    Upon information and belief, XL's claims against Mr. Klejna are barred because XL has acted in bad faith in unilaterally changing the terms of the XL Policy so as to provide purported grounds to deny coverage after receiving claims under the Policy.

### COUNTERCLAIMS

Dennis A. Klejna (the "Counterclaim Plaintiff"), by and through his attorneys, Katten Muchin Rosenman LLP, alleges as follows for his counterclaims against XL Specialty Insurance Company ("XL"):

## INTRODUCTION

1.    XL is the fifth excess insurer in the "tower" of Directors and Officers ("D&O") liability insurance obtained by Refco for the policy period beginning in August 2005. The Counterclaim Plaintiff, along with other former Refco officers and directors insured under the policies (collectively, the "Insureds"), have been named as defendants in various civil actions relating to the collapse of Refco.[1]  The Insureds have requested coverage for such actions, including defense costs, from the insurers in the D&O "tower."

2.    XL has denied coverage to the Insureds, and has commenced this action seeking a declaration that its excess D&O corporate liability insurance policy issued to Refco for claims made during the period from August 11, 2005 to August 11, 2006 (the "XL Policy") (attached as Exhibit A hereto) does not provide coverage to any of the Insureds in connection with the "Underlying Matters" described in the Complaint filed by XL on or about April 22, 2008 (the "Complaint," or "Compl.").

3.    None of the grounds alleged in the Complaint provides XL with a valid basis for refusing coverage to the Counterclaim Plaintiff.  Nonetheless, it is clear that XL does not intend to honor its contractual obligations to the Counterclaim Plaintiff when the XL Policy is triggered.

4.    An actual controversy exists between the Counterclaim Plaintiff and XL. The Counterclaim Plaintiff seeks a declaration from this Court that the XL Policy provides coverage for him in the Underlying Matters and the Underlying Actions (defined herein) in accordance with the requirements of the XL Policy.

---

[1]    Unless specifically noted otherwise, and consistent with the defined terms in the XL Complaint, the term "Refco" used throughout these Counterclaims refers to Refco Inc., the company formed pursuant to the August 2005 initial public offering, as well as Refco Group Ltd., LLC, the company through which Refco's business was conducted prior to the initial public offering.  The term "Refco" also includes subsidiaries of Refco Inc. and Refco Group Ltd., LLC.

## JURISDICTION AND VENUE

5.      These counterclaims are brought pursuant to Rule 13 of the Federal Rules of Civil Procedure.

6.      This Court has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the Counterclaim Plaintiff and XL, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these counterclaims occurred in this judicial district.

## PARTIES

8.      Counterclaim Plaintiff Klejna is a former officer of Refco who, at times relevant to this action, served as Executive Vice President and General Counsel of Refco.  Mr. Klejna is a resident of the State of New York.

9.      Upon information and belief, XL is an insurance company that is organized and exists pursuant to the laws of the State of Delaware and has its principal place of business in Connecticut.

## GENERAL ALLEGATIONS

**A.      The Underlying Actions**

10.     On October 10, 2005, Refco disclosed in a press release that it had been carrying an undisclosed receivable of $430 million from an entity controlled by defendant Phillip R. Bennett ("Bennett"), the Chief Executive Officer of Refco.  On October 11, 2005, Refco issued a second press release relating to the $430 million receivable.

11.    On October 17, 2005, Refco and many of its direct and indirect subsidiaries filed voluntary petitions for relief in this Court under Chapter 11 of the United States Bankruptcy Code.

12.    These events in October 2005 led to a series of civil lawsuits, government investigations and criminal proceedings against certain of the Insureds.  Upon information and belief, on or about January 16, 2007, a federal Grand Jury returned a third superseding indictment against three Refco executives – Bennett, Robert Trosten ("Trosten") and Tone Grant ("Grant") – containing charges of, inter alia, securities fraud.  Also, upon information and belief, a criminal information was filed against a fourth Refco executive, Santo Maggio ("Maggio"), containing similar charges.

13.    Upon information and belief, Maggio pled guilty to various federal charges in December 2007, and Bennett and Trosten pled guilty to various federal charges in February 2008.  Also, upon information and belief, Grant was found guilty of various federal charges in April 2008.

14.    The Counterclaim Plaintiff has not been charged with any crimes.  However, solely on account of his services to Refco, the Counterclaim Plaintiff (along with other Insureds) was named as a defendant in several civil lawsuits brought by private plaintiffs, including the following actions:

(i)     In re Refco, Inc. Sec. Litig., No. 05 Civ. 8626 (GEL) (S.D.N.Y.);

(ii)    In re Refco Capital Markets, Ltd. Brokerage Customer Sec. Litig., No. 06 Civ. 643 (GEL) (S.D.N.Y.);

(iii)   American Financial International Group-Asia, LLC, et al. v. Bennett, et al., No. 05 Civ. 8988 (GEL) (S.D.N.Y.); and

(iv)    Civil forfeiture proceeding against Mr. Klejna initiated by United States; complaint not yet filed.

These actions are collectively referred to herein as the "Underlying Actions."

15.    The Counterclaim Plaintiff properly gave notice of each of the Underlying

Actions to the insurers in the Refco "tower" of D&O liability insurance, including XL, and

requested coverage from such insurers under the policies described below.

**B.    The Refco "Tower" of D&O Insurance**

16.    As indicated above, Refco procured a "tower" of D&O liability insurance

coverage. Such coverage consists of a primary policy and five excess policies for the period

from August 11, 2005 to August 11, 2006 (the "policy period").

The U.S. Specialty Policy

17.    U.S. Specialty Insurance Company ("U.S. Specialty") issued the primary policy,

Directors, Officers and Corporate Liability Insurance Policy No. 24-MGU-05-A10821, to Refco

for the policy period with a $10 million limit of liability (the "U. S. Specialty Policy").

18.    The U.S. Specialty Policy provides directors and officers with coverage for "Loss

arising from Claims . . . against the Insured Persons for Wrongful Acts." (Id. at Insuring

Agreement (A)).

19.    U.S. Specialty recognized its coverage obligations to the Counterclaim Plaintiffs

as well as other Insureds. After obtaining approval from this Court to comply with the terms of

its policy and advance defense costs to Insureds, U.S. Specialty paid the defense costs of the

Insureds until the limits of the U.S. Specialty Policy were exhausted in early 2007.

The Lexington Policy

20.    Lexington Insurance Company ("Lexington") issued the first excess policy above

the U.S. Specialty Policy, Directors and Officers Liability and Corporation Reimbursement

Follow Form Excess Liability Policy No. 1620924, to Refco for the policy period with a $7.5 million limit of liability in excess of $10 million (the "Lexington Policy").

21.    The Lexington Policy "follows form" with the U.S. Specialty Policy.

22.    Lexington complied with its duties under the Lexington Policy and paid the defense costs of the Insureds in connection with the Underlying Actions until the limits of the Lexington Policy were exhausted in July 2007.

The Axis Policy

23.    Axis Reinsurance Company ("Axis") is the second excess insurer in the Refco "tower" of D&O liability insurance. Axis issued the second excess policy above the Lexington Policy, SecurExcess Policy No. RNN 506300, to Refco for the policy period with a $10 million limit of liability in excess of $17.5 million (the "Axis Policy").

24.    Like the Lexington Policy, the Axis Policy also "follows form" to the U.S. Specialty Policy.

25.    Axis was ordered by the United States Bankruptcy Court for the Southern District of New York to advance defense costs despite its denial of coverage, and the Axis Policy has now been exhausted by reason of advancement.

The AWAC Policy

26.    Allied World Assurance Company ("AWAC") is the third excess insurer in the Refco "tower" of D&O liability insurance. The AWAC policy, Excess Directors and Officers Insurance and Company Reimbursement Policy No. AW0418197, was issued to Refco for the policy period with a $12.5 million limit of liability in excess of $27.5 million (the "AWAC Policy").

27.    The AWAC Policy "follows form" to the U.S. Specialty Policy.

28.     In a proceeding commenced by various Insureds in the United States Bankruptcy Court for the Southern District of New York, AWAC was ordered, pending a final determination of coverage or until further order, to advance defense costs despite its denial of coverage. At present, the AWAC Policy is being depleted.

The Arch Policy

29.     Arch Insurance Company ("Arch") is the fourth excess insurer in the Refco "tower" of D&O liability insurance. The Arch policy, Excess Insurance Policy No. DOX0009322-00, was issued to Refco for the policy period with a $10 million limit of liability in excess of $40 million (the "Arch Policy").

30.     The Arch Policy "follows form" to the U.S. Specialty Policy.

31.     The Insureds have requested coverage for the Underlying Actions, including advancement of their defense costs, from Arch. Arch has denied coverage to the Insureds, and it has refused to advance any defense costs.

32.     The Insureds have, therefore, sought a declaration, inter alia, that both the AWAC and Arch Policies provide coverage for them for the Underlying Actions.

Coverage Provided by XL

33.     XL is the fifth excess insurer in the Refco "tower" of D&O liability insurance. The XL Policy, Class A-Side Management Liability Insurance Coverage Form No. ELU089673-05, was issued to Refco for the policy period with a $20 million limit, and coverage thereunder is triggered once Losses are not paid under any other policy. Unlike the excess policies referred to above, the XL Policy does not "follow form" to the U.S. Specialty Policy.

The XL Binder

34.     Upon information and belief, on or about August 10, 2005, XL provided Refco with a binder pursuant to which XL agreed to provide $20 million worth of coverage that would follow the payment of losses under the U.S Specialty, Lexington, Axis, AWAC and Arch Policies (the "XL Binder"). (A copy of the XL Binder is attached hereto as Exhibit B).

35.     The XL Binder lists twelve separate endorsements applicable to the XL Policy. The so-called "Inverted Representation Endorsement" (the "IRE") (discussed below) was not included among the twelve endorsements listed in the XL Binder; nor was the IRE referred to elsewhere in the XL Binder.

36.     Upon information and belief, Refco paid the premium quoted in the XL Binder (i.e., $370,300) and thereby obtained coverage from XL in accordance therewith.

The Belated Issuance of the XL Policy

37.     Although the XL Policy incepted on August 11, 2005, upon information and belief, it was not actually issued until December 2005.

38.     Upon information and belief, therefore, the actual issuance of the XL Policy occurred months after several of the Underlying Actions were commenced, and notice of such actions had been provided to the insurers in the "tower" of Refco D&O liability insurance, including XL.

39.     The XL Policy names as an "Insured Person" under the Policy "any past, present, or future director or officer . . . of the Company." (Ex. A at Section II Definitions (I)(1)). The XL Policy provides those directors and officers with coverage for "Loss resulting from a Claim first made against the Insured Persons during the Policy Period . . . for a Wrongful Act ." (Id. at Section I Insuring Agreement).

40.    "Loss" is defined broadly as "damages, judgments, settlements or other amounts . . . and Defense Expenses that the Insured Persons are obligated to pay." (See id. at Section II Definitions (K)).

41.    Each of the Underlying Actions is a "Claim" against the Counterclaim Plaintiff (and other Insureds) for "Wrongful Acts" covered by the Insuring Agreement of the XL Policy. (See id. at Section II Definitions (C) and (P)).

Severability Provisions Contained in the XL Policy

42.    The XL Policy contains a "severability" provision in a "Representation Clause" that states: "No knowledge or information possessed by any Insured Person will be imputed to any other Insured Person for the purposes of determining the availability of coverage with respect to Claims made against any other Insured Person." (Id. at Section IV Conditions (K)).

43.    The XL Policy also includes a second "severability" provision: "No conduct of any Insured Person will be imputed to any other Insured Person to determine the application of any of the above EXCLUSIONS." (Id. at Section III Exclusions) (together with the Representation Clause, the "Severability Provisions").

XL's Improper Attempt to Add the IRE to the XL Policy

44.    Upon information and belief, when XL issued the XL Policy in December 2005, it attempted to add the IRE to the policy, despite the fact that the IRE was not included or referred to in the XL Binder. (See id. at Endorsement No. 13; Ex. B).

45.    The IRE states in pertinent part that:

> [N]o coverage will be available under this Policy for Loss . . . from
> Claims arising from any fact, circumstance or situation of which,
> as of the effective date of this Policy, any Insured had knowledge
> and had reason to suppose might afford grounds for any Claim that
> would fall within the scope of the insurance afforded by this
> Policy.

(Id. at Endorsement No. 13).

## C.   Wrongful Attempts by XL to Avoid Coverage under the XL Policy

The January 24, 2006 XL Letter

46.     By letter dated January 24, 2006 (the "January 24, 2006 XL Letter"), XL purported to deny coverage to the Counterclaim Plaintiff and the other Insureds for the Lawsuits, identified in the letter as seventeen lawsuits filed in connection with the Refco fraud. (A copy of the January 24, 2006 XL Letter is attached as Exhibit C hereto).

The IRE as an Alleged Ground Upon Which to Deny Coverage

47.     In the January 24, 2006 XL Letter, XL asserted several alleged grounds for its denial of coverage, including but not limited to the purported IRE.

48.     The January 24, 2006 XL Letter states, "[g]iven that Mr. Bennett (if not others) had knowledge of the hidden receivable as of August 11, 2005, the [XL] Policy's Inverted Representation Endorsement bars coverage for each of the Lawsuits." (Id.).

The IRE Was Improperly Added to the Policy and Does Not Apply

49.     The IRE, however, did not appear in and was not part of the XL Binder – the operative agreement between the parties.

50.     Upon information and belief, XL unilaterally added the IRE to the XL Policy in an improper, bad faith attempt to avoid coverage for the noticed Underlying Actions and Underlying Matters.

51.     Thus, the IRE is not properly a part of the XL Policy, and, as such, it is not operative and cannot bar coverage to the Counterclaim Plaintiff.

The IRE Directly Conflicts with the Severability Provisions

52.     Even if the IRE was properly made a part of the XL Policy – which it was not – it directly conflicts with the Severability Provisions contained in the XL Policy, and it does not purport to replace or supersede the Severability Provisions.

53.     As set forth above, the Severability Provisions provide that "[n]o knowledge or information possessed by any Insured Person" and "[n]o conduct of any Insured Person" will be imputed to any other Insured for purposes of making a coverage determination   (Ex. A at Section IV Conditions (K) and Section III Exclusions).

54.     Thus, even if the IRE were operative – which it is not – pursuant to the Severability Provisions, XL cannot rely on the knowledge of one Insured (e.g., Bennett) to deny coverage to another Insured (e.g., the Counterclaim Plaintiff).

(ii)     The Prior Claim Argument

55.     The January 24, 2006 XL Letter also denied coverage for several of the Lawsuits on the ground that each was sufficiently related to a "Claim" first made prior to the inception date of the XL Policy (i.e., prior to August 11, 2005).  The January 24, 2006 Letter contended that several of the Lawsuits involved the same "Wrongful Acts" or "Interrelated Wrongful Acts" as the acts giving rise to a claim in an action filed by the Bankruptcy Trust of Gerard Sillam (the Sillam action), so that each could be treated as a single Claim made prior to the policy period. (Ex. C at pp. 8-10).

The March 6, 2006 Letter

56.     By a second letter dated March 6, 2006 (the "March 6, 2006 XL Letter"), XL purported to deny coverage to the Counterclaim Plaintiff and the other Insureds for the Newly

Noticed Matters, identified in the letter as seven additional matters filed in connection with the alleged Refco fraud. (A copy of the March 6, 2006 XL Letter is attached as Exhibit D hereto).

57.    The March 6, 2006 XL Letter purported to deny coverage for all of the Newly Noticed Matters for the same reasons that coverage for the "previously noticed matters," the Lawsuits, was barred. (Ex. D at pp. 6-7).

The XL Declaratory Judgment Action

58.    On or about April 22, 2008, XL commenced the instant action, seeking a declaration that the XL Policy does not provide insurance coverage for any of the Insureds in connection with the Underlying Matters.

59.    The Underlying Matters, as defined in the Complaint, include all of the Lawsuits and the Newly Noticed Matters identified in the January 24, 2006 and the March 6, 2006 XL Letters, the Underlying Actions defined herein, and "any other notice of claim or potential claim" and "any additional civil, criminal or regulatory actions" instituted or coming to the attention of XL after the filing of the Complaint "to the extent they arise out of the same or related transactions or occurrences raised in the Underlying Matters." (Compl. ¶¶ 74-120).

60.    XL contends that no coverage for any Loss is afforded to any Insured with respect to the Underlying Matters because at least one Insured Person (i.e., Bennett, Trosten, Maggio and/or Grant) had knowledge of a "fact, circumstance or situation" that gave rise to the charges or causes of action in the Underlying Matters. (Compl. ¶ 133).

## COUNT I

### (Declaratory Relief)

61.    Counterclaim Plaintiff repeats and realleges paragraphs 1 through 60 of these Counterclaims as if fully set forth herein.

62.     Pursuant to the terms of the XL Policy, XL is contractually obligated to provide coverage to Counterclaim Plaintiff for all Loss (as defined in the XL Policy) arising from the Underlying Actions once coverage is triggered.

63.     As of the present date, XL has denied its contractual obligations and has denied coverage under the XL Policy.

64.     Upon information and belief, Refco paid all premiums for the XL Policy and has performed all of the terms and conditions of the XL Policy on its part to be performed, unless otherwise excused.

65.     Counterclaim Plaintiff, as an Insured under the XL Policy, and therefore, a party to the insurance contract, has performed all the terms and conditions of the XL Policy on his part to be performed, unless otherwise excused.

66.     At all relevant times mentioned herein, the XL Binder and/or the XL Policy was, and is, in full force and effect.

67.     None of the grounds asserted by XL for the denial of coverage under the XL Policy provides a valid basis for denying coverage to the Counterclaim Plaintiff.

68.     The primary ground asserted by XL in the January 24, 2006 XL Letter and in the Complaint – specifically, the alleged "knowledge" of Insureds Bennett, Trosten, Maggio and/or Grant – rest on those individuals' alleged knowledge of the specific wrongdoing alleged in the Underlying Matters, which has not been established in any proceeding.

69.     Even if one or more of these three individuals are hereafter found to have knowledge of wrongdoing, as alleged by XL, such knowledge is not a valid basis for XL to deny coverage to Counterclaim Plaintiff.

70.     The Inverted Representation Endorsement relied upon by XL was not referred to
in the XL Binder, and is materially inconsistent therewith.  Upon information and belief, this
endorsement was unilaterally and improperly added by XL to the XL Policy in or about
December 2005 – months after several of the Underlying Matters had commenced and notice of
such proceedings had been provided to XL – in a bad faith attempt to avoid coverage for the
Underlying Matters.

71.     The IRE is not part of the insurance contract between XL and the Counterclaim
Plaintiff.

72.     Even if the IRE was properly made a part of the XL Policy, the IRE conflicts with
the Severability Provisions in the XL Policy.

73.     The Counterclaim Plaintiff had no knowledge, at any time prior to the inception
of the XL Policy, of any wrongdoing relating to Refco, or of any facts or circumstances that
might give rise to a Claim under the "tower" of D&O insurance obtained by Refco for the policy
period.

74.     Similarly, upon information and belief, the Underlying Actions are not related in
any way to the June 2005 complaint in the Sillam action, which was relied upon in the January
24, 2006 XL Letter but is not referred to in the Complaint.

75.     The Underlying Actions do not constitute Claims that were first brought prior to
the inception of the XL Policy.

76.     An actual controversy exists between XL and the Counterclaim Plaintiff as to
whether the Counterclaim Plaintiff is entitled to coverage for the Underlying Actions under the
XL Policy, and judicial resolution of the parties' rights and obligations is necessary.

77.     This Court should issue a judgment declaring that Counterclaim Plaintiff is entitled to coverage under the XL Policy for Loss arising out of the Underlying Actions.

## COUNT II

### (Injunctive Relief)

78.     Counterclaim Plaintiff repeats and realleges paragraphs 1 through 77 of these Counterclaims as if fully set forth herein.

79.     XL will become obligated to make payments to Counterclaim Plaintiff for Losses in the Underlying Actions in accordance with the XL Policy.

80.     Counterclaim Plaintiff is entitled to permanent injunctive relief requiring XL to make such payments in accordance with XL's contractual obligations.

## COUNT III

### (Breach of Contract)

81.     Counterclaim Plaintiff repeats and realleges paragraphs 1 through 80 of these Counterclaims as if fully set forth herein.

82.     Pursuant to the terms of the XL Policy, XL is contractually obligated to provide coverage to the Counterclaim Plaintiff for all Loss (as defined in the XL Policy) arising from the Underlying Actions once Losses are not paid by any other policy.

83.     As of the present date, XL has denied its contractual obligations and has denied coverage under the XL Policy.

84.     Upon information and belief, Refco paid all premiums for the XL Policy and has performed all of the terms and conditions of the XL Policy on its part to be performed, unless otherwise excused.

85.    Counterclaim Plaintiff, as an Insured under the XL Policy, has performed all the terms and conditions of the XL Policy on his part to be performed, unless otherwise excused.

86.    At all relevant times mentioned herein, the XL Policy was, and is, in full force and effect.

87.    None of the grounds asserted by XL for the denial of coverage under the XL Policy provides a valid basis for denying coverage to Counterclaim Plaintiff.

88.    By denying coverage to Counterclaim Plaintiff for the Underlying Actions, XL has breached the XL Policy.

89.    Counterclaim Plaintiff has suffered and continues to suffer damages as a direct and consequential result of XL's breach of its contractual duties and obligations under the XL Policy, including without limitation his attorneys' fees and the costs and disbursements he has incurred in the defense of this action.

90.    Counterclaim Plaintiff is entitled to recover his damages from XL under the terms of the XL Policy in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Counterclaim Plaintiff Dennis A. Klejna respectfully requests entry of judgment in his favor as follows:

1.    Dismissing the Complaint with prejudice;

2.    On Count I of the Counterclaims, declaring that Counterclaim Plaintiff is entitled to coverage under the XL Policy for Loss arising out of the Underlying Actions, including but not limited to Defense Costs;

3.    On Count II of the Counterclaims, requiring XL to make payments to Counterclaim Plaintiff for Loss in the Underlying Actions, in accordance with the XL Policy;

4.    On Count III of the Counterclaims, awarding Counterclaim Plaintiff damages against XL for its breach of the XL Policy;

5.    Awarding Counterclaim Plaintiff his attorneys' fees and costs and disbursements of this action; and

6.    Granting such other and further relief as the Court may deem proper.

## JURY DEMAND

Mr. Klejna hereby demands trial by jury on all issues in the Complaint or in the Counterclaims so triable.

Dated: New York, New York
      July 14, 2008

HELEN B. KIM
KATTEN MUCHIN ROSENMAN LLP

/s/ Helen B. Kim
Helen B. Kim (HK-8757)
2029 Century Park East, Suite 2600
Los Angeles, CA 90027
Telephone: (310) 788-4525
Facsimile: (310) 788-4471

PHILIP A. NEMECEK
KATTEN MUCHIN ROSENMAN LLP

/s/ Philip A. Nemecek
Philip A. Nemecek (PN-3319)
575 Madison Avenue
New York, NY 10022-2585
Telephone:    212-940-8834
Facsimile:    212-940-8776

*Attorneys for Defendant and Counterclaim
Plaintiff Dennis A. Klejna*

31436453v4

# EXHIBIT A

Policy Number:   ELU089673-05
Renewal of Number

☐ **Greenwich Insurance Company**
☒ **XL Specialty Insurance Company**
Members of the XL America Companies

**CLASSIC A-SIDE MANAGEMENT LIABILITY INSURANCE POLICY DECLARATIONS**

Executive Offices
70 Seaview Avenue
Stamford, CT 06902-6040
Telephone 877-953-2636

THIS IS A CLAIMS MADE POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY ONLY APPLIES TO CLAIMS FIRST MADE DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF DEFENSE EXPENSES. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY THE INSURER TO DEFEND ANY INSURED. PLEASE READ AND REVIEW THE POLICY CAREFULLY.

**Item 1. Name and Mailing Address of Insured Entity:**
Refco Inc.
550 W. Jackson Blvd., Suite 1300
Chicago, IL  60661

**Item 2. Policy Period:**  From:  August 11, 2005  To:  August 11, 2006
At 12:01AM Standard Time at your Mailing Address Shown Above

**Item 3. Limit of Liability:**
$20,000,000  Aggregate each Policy Period (including **Defense Expenses**)

**Item 4. Optional Extension Period and Premium:**
Length of Optional Extension Period:   One Year
Optional Extension Premium:        $740,600.00

**Item 5. Notices required to be given to the insurer must be addressed to:**
Executive Liability Underwriters
One Constitution Plaza, 16th Floor
Hartford, CT  06103
Toll Free Telephone: 877-953-2636

**Item 6. Premium:**

| | |
|---|---|
| Premium | $370,300.00 |
| Taxes, Surcharges or Fees: | $0.00 |
| Total Policy Premium: | $370,300.00 |

**Item 7. Policy Forms and Endorsements Attached at Issuance:**
CL 71 00 03 00   CL 72 02 05 00 , CL 83 08 09 02 , XL 83 07 01 00 , XL 80 24 03 03 , XL 80 39 04 05
CL 83 06 07 02 , CL 83 14 10 03 , CL 80 34 12 02 , CL 80 18 09 02 , XL 80 34 10 04 , XL 83 25 10 00
Manuscript 3027 12 05 , XL 80 04 04 00

Countersigned: _____    By: _____
                        Date                                    Authorized Representative

THESE **DECLARATIONS** AND THE POLICY, WITH THE ENDORSEMENTS, ATTACHMENTS, AND THE **APPLICATION** SHALL CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE INSURER AND THE INSURED RELATING TO THIS INSURANCE.

CL 70 00 11 01

CLASSIC A-SIDE MANAGEMENT LIABILITY POLICY

In Witness Whereof, the Insurer has caused this Policy to be executed by its authorized officers, but this Policy will not be valid unless countersigned on the Declarations page, if required by law, by a duly authorized representative of the Insurer.

*Nicholas M. Brown Jr.*
Nicholas M. Brown Jr.
President

*Theresa M. Morgan*
Theresa M. Morgan
Secretary

**XL Specialty Insurance Company**

*Nicholas M. Brown Jr.*
Nicholas M. Brown Jr.
President

*Theresa M. Morgan*
Theresa M. Morgan
Secretary

**Greenwich Insurance Company**

# POLICYHOLDER DISCLOSURE

## NOTICE OF TERRORISM INSURANCE COVERAGE

Coverage for acts of terrorism is already included in your current policy. You should know that, effective November 26, 2002, under your existing coverage, any losses caused by certified acts of terrorism would be partially reimbursed by the United States under a formula established by federal law. Under this formula, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The portion of your annual premium that is attributable to coverage for acts of terrorism is: $ waived.  Any premium waiver is only valid for the current Policy Period.

I ACKNOWLEDGE THAT I HAVE BEEN NOTIFIED THAT UNDER THE TERRORISM RISK INSURANCE ACT OF 2002, ANY LOSSES CAUSED BY CERTIFIED ACTS OF TERRORISM UNDER MY POLICY COVERAGE WILL BE PARTIALLY REIMBURSED BY THE UNITED STATES AND I HAVE BEEN NOTIFIED OF THE AMOUNT OF MY PREMIUM ATTRIBUTABLE TO SUCH COVERAGE.

Name of Insurer:  **XL Specialty Insurance Company**
Policy Number:      **ELU089673-05**

# IN WITNESS ENDORSEMENT

XL SPECIALTY INSURANCE COMPANY

ADMINISTRATIVE OFFICE:     SEAVIEW HOUSE
                           70 SEAVIEW AVENUE
                           STAMFORD, CT 06902-6040

STATUTORY HOME OFFICE:     1201 NORTH MARKET STREET
                           SUITE 501
                           WILMINGTON, DE 19801

It is hereby agreed and understood that the following In Witness Clause supercedes any and all other In Witness clauses in this policy.

All other provisions remain unchanged.

IN WITNESS WHEREOF, the Company has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

_____          _____
Richard S. Banas                          Kenneth P. Meagher
President                                 Secretary

IL MP 9104 0704 XLS

XL Specialty Insurance Company - Illinois Policyholder Notice

## IMPORTANT NOTICE TO ALL ILLINOIS POLICYHOLDERS

In the event you need to contact someone about this Policy for any reason, please contact us at:

**XL Specialty Insurance Company**
**c/o XL Insurance Underwriters**
**100 Constitution Plaza, 17th Floor**
**Hartford, Connecticut 06103**

If you have been unable to contact or obtain satisfaction from the Insurer, you may contact the Illinois Department of Insurance to obtain information or make a complaint at:

**Illinois Department of Insurance**
**Consumer Division of Public**
**Services Section**
**Springfield, Illinois 62767**

Endorsement No.: 1
Named Insured: Refco Inc.
Policy No: ELU089673-05

CL 72 02 05 00

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# ILLINOIS AMENDATORY ENDORSEMENT

DIRECTORS & OFFICERS PROFESSIONAL LIABILITY COVERAGE FORM

I.    Section IV., CONDITIONS, paragraph (I), CANCELLATION AND RENEWAL OF COVERAGE, is deleted and replaced by: Cancellation -- "The Insured" may cancel this policy by returning the policy to "The Company," or by giving "The Company" written notice and stating at what future date coverage is to stop.

"The Company" may cancel this policy by mailing written notice of cancellation to "The Insured" and any mortgagee or lienholder at the last mailing address known to "The Company."

"The Company" will mail the notice to "The Insured" and any mortgagee or lienholder at least ten (10) days before the effective date of the cancellation when cancellation is for nonpayment of premium. When cancellation is for any other reason, "The Company" will mail the notice of cancellation to "The Insured" and any mortgagee or lienholder at least 30 days prior to the effective date of the cancellation during the first 60 days of coverage or 60 days prior to the effective date of the cancellation if the coverage has been in effect for more than 60 days.

If this policy has been in effect 60 days or more, or if it is a renewal of a policy issued by "us" effective immediately, "we" may cancel this policy only if one or more of the following reasons apply:

    a.    nonpayment of premium;

    b.    the policy was obtained through a material misrepresentation;

    c.    any "insured" has violated any of the "terms" and conditions of the policy;

    d.    the risk originally accepted has measurably increased;

    e.    certification of the Director of the loss of reinsurance by the insurer which provided coverage to "us" for all or a substantial part of the underlying risk insured; or

    f.    a determination by the Director that the continuation of the policy could place "us" in violation of the insurance laws of this state.

"Our" notice will include the reason or reasons for cancellation. "We" will also mail a copy of the notice to "your" broker, if known, or to the agent of record. Proof of mailing is sufficient proof of notice.

"Your" return premium, if any, will be calculated according to "our" rules. It will be refunded to "you" with the cancellation notice or within a reasonable time. Payment or tender of the unearned premium is not a condition of cancellation.

Nonrenewal -- If "we" decide not to renew this policy, "we" will mail "our" notice of nonrenewal to "you" at least 60 days before the end of the policy period or anniversary date.

"Our" notice will include the reasons for nonrenewal. "We" will also mail a copy of the notice to "your" broker, if known, or to the agent of record and any mortgagee or lienholder at the last mailing address known to "us". Proof of mailing is sufficient proof of notice.

CL 72 02 05 00

CL 72 02 05 00

**Endorsement No.: 1**
**Named Insured: Refco Inc.**
**Policy No: ELU089673-05**

**Effective: August 11, 2005**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

Renewal -- If "we" decide to renew this policy with premium increases of 30% or higher, or impose changes in deductible or coverage that materially alter the policy, "we" will mail to "you" written notice of such increase or change in deductible or coverage at least 60 days prior to the renewal or anniversary date.

All other terms and conditions of the Policy remain the same.

CL 72 02 05 00

Endorsement No.: 2
Named Insured: Refco Inc.
Policy No: ELU089673-05

CL 83 08 09 02

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# PRIOR ACTS EXCLUSION

In consideration of the premium charged, no coverage will be available under this Policy for Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any act, error, omission, misstatement, misleading statement, neglect, breach of duty, or Wrongful Act, committed or allegedly committed prior to August 5, 2004.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

CL 83 08 09 02

Page 1 of 1

Endorsement No.: 3
Named Insured: Refco Inc.
Policy No: ELU089673-05

XL 83 07 01 00

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# SPECIFIED CLAIMS EXCLUSION

In consideration of the premium charged, no coverage will be available under this Policy for Loss, including Defense Expenses, in connection with any proceeding set forth below, or in connection with any Claim based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any such proceeding or any fact, circumstance or situation underlying or alleged therein:

    Edward McElwreath Case

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

XL 80 24 03 03

Endorsement No.: 4
Named Insured: Refco Inc.
Policy No: ELU089673-05

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# TERRORISM PREMIUM ENDORSEMENT

Please note: The portion of your annual premium set forth in Item 6. of the Declarations that is attributable to coverage for acts of terrorism is: $ waived.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

XL 80 24 03 03

Page 1 of 1

XL 80 39 04 05

Endorsement No.: 5
Named Insured: Refco Inc.
Policy No: ELU089673-05

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# CHANGE OF ADDRESS OF INSURER ENDORSEMENT

In consideration of the premium charged, as of the effective date of this Endorsement:

Notices required to be given to the Insurer must be addressed to:

**Notice to Claim Dept:**
XL Professional
One Hundred Constitution Plaza, 18th Floor
Hartford, CT 06103
Attn: Claim Dept.

**All other Notices:**
XL Professional
One Hundred Constitution Plaza, 17th Floor
Hartford, CT 06103
Attn: Underwriting

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

Endorsement No.: 6
Named Insured: Refco Inc.
Policy No: ELU089673-05

CL 83 06 07 02

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# AMEND INSURED V. INSURED EXCLUSION

In consideration of the premium charged, Section III Exclusions (A)(1) of the Policy is amended to read in its entirety as follows:

"(1)   by, on behalf of, or at the direction of the Company, Outside Entity or any Insured Person, except and to the extent such Claim:

(i)   is brought by a security holder of the Company or Outside Entity who, when such Claim is made and maintained is acting independently of, and without the solicitation, assistance, participation or intervention of the Company or any Outside Entity;

(ii)   is brought by the Bankruptcy Trustee or Examiner of the Company or Outside Entity, or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the Company or Outside Entity;

(iii)   is in the form of a crossclaim, third party claim or other claim for contribution or indemnity by an Insured Person which is part of or results directly from a Claim which is not otherwise excluded by the terms of this Policy; or

(iv)   is an Employment Practices Claim;"

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

Endorsement No.: 7
Named Insured: Refco Inc.
Policy No: ELU089673-05

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

CL 83 14 10 03

# PENDING AND/OR PRIOR LITIGATION EXCLUSION

In consideration of the premium charged, no coverage will be available under this Policy for Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or Wrongful Act, underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding or arbitration which was brought prior to August 11, 2005.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

CL 83 14 10 03

Page 1 of 1

Endorsement No.: 8
Named Insured: Refco Inc.
Policy No: ELU089673-05

CL 80 34 12 02

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# AMEND MERGERS AND ACQUISITIONS ENDORSEMENT

In consideration of the premium charged, Section IV Conditions (C)(1) of the Policy is amended to read in its entirety as follows:

"(1)    If during the Policy Period, the Company acquires any assets, acquires a Subsidiary, or acquires any entity by merger, consolidation or otherwise, or assumes any liability of another entity, coverage shall be provided for any Loss involving a Claim for a Wrongful Act occurring after the consummation of the transaction; provided however, if by reason of the transaction (or series of transactions) the entity, assets, Subsidiary or liabilities so acquired or so assumed, exceed thirty five percent (35%) of the total assets or liabilities of the Company, as represented in the Company's most recent audited consolidated financial statements, coverage under this Policy shall be provided for a period of ninety (90) days for any Loss involving a Claim for a Wrongful Act that occurred after the transaction has been consummated.  Coverage beyond the ninety (90) day period will be provided only if:

    (a)    the Insurer receives written notice containing full details of the transaction(s); and

    (b)    the Insurer at its sole discretion, agrees to provide such additional coverage upon such terms, conditions, limitations, and additional premium that it deems appropriate."

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

CL 80 18 09 02

Endorsement No.: 9
Named Insured: Refco Inc.
Policy No: ELU089673-05

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# AMEND CONDITIONS (B)(1) ENDORSMENT

In consideration of the premium charged, Section IV Conditions (B)(1) of the Policy is amended to read in its entirety as follows:

"(1)    The Insured Persons and the Company understand and agree that all coverage under this Policy shall be specifically excess over, and shall not contribute with:

   (i)    all indemnification to which an Insured Person may be entitled from any source, including but not limited to the Company or any Outside Entity; and

   (ii)    any Insurance Program maintained by the Company or any Outside Entity, whether such other insurance is stated to be primary, contributing, excess or otherwise.

   However, if Loss is not paid by such other insurance or as indemnification, this Policy will respond on behalf of the Insured Persons as if it were primary, subject to all of its terms, conditions and limitations and without prejudice to the insurer's excess position."

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

XL 80 34 10 04

Endorsement No.: 10
Named Insured: Refco Inc.
Policy No: ELU089673-05

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# RESCISSION ENDORSEMENT

In consideration of the premium charged, the Insurer shall not be entitled under any circumstances to rescind this Policy, other than for non-payment of premium.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

XL 80 34 10 04

Endorsement No.: 11
Named Insured: Refco Inc.
Policy No: ELU089673-05

XL 83 25 10 00

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# SPECIFIED ACTS EXCLUSION

In consideration of the premium charged, no coverage will be available under this Policy for Loss, including Defense Expenses, in connection with any fact, circumstance, situation, transaction, event or Wrongful Act set forth below or in connection with any Claim, based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

Wells Notice/ SEC Investigation

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

Endorsement No.: 12
Named Insured: Refco Inc.
Policy No: ELU089673-05

Manuscript 3027 12 05

Effective: August 11, 2005
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# CONTROLLING SHAREHOLDER ENDORSEMENT

In consideration of the premium charged:

(1)    The term "Insured Person," as defined in Section II. DEFINITIONS (I) of the Policy, is amended to include Philip Bennett in his capacity as a controlling shareholder of the Company, but only with respect to Securities Claims to the extent and during such time that such Securities Claims are also made and maintained against any other Insured Person or the Company.

(2)    With respect to Philip Bennett only, the definition of "Wrongful Act" in Section II. DEFINITIONS (P) of the Policy is amended to include the following:

    (a)    any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by Philip Bennett while acting in his capacity as controlling shareholder of the Company, or

    (b)    any matter claimed against Philip Bennett solely by reason of his status as controlling shareholder of the Company.

(3)    "Securities Claim" means a Claim which is brought by or on behalf of one or more of the securities holders of the Company in their capacities as such, or which arises from the purchase or sale of, or offer to purchase or sell, any securities issued by the Company, whether such purchase, sale or offer involves a transaction with the Company or occurs in the open market.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

**Endorsement No.: 13**
**Named Insured: Refco Inc.**
**Policy No: ELU089673-05**

XL 80 04 04 00

**Effective: August 11, 2005**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# INVERTED REPRESENTATION ENDORSEMENT

In consideration of the premium charged, no coverage will be available under this Policy for Loss, including Defense Expenses, from Claims arising from any fact, circumstance or situation of which, as of the effective date of this Policy, any Insured had knowledge and had reason to suppose might afford grounds for any Claim that would fall within the scope of the insurance afforded by this Policy.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Signature

_____
James Koval
Print Name

_____
Sr. Vice President
Title

EXECUTIVE LIABILITY UNDERWRITERS     ☐  Indian Harbor Insurance Company
                                              Member of     XL America Companies

> ## APPLICATION FOR CLASSIC A-SIDE MANAGEMENT
> ## LIABILITY INSURANCE POLICY

**NOTICE: THE POLICY FOR WHICH THIS APPLICATION IS MADE APPLIES, SUBJECT TO ITS TERMS, ONLY TO "CLAIMS" FIRST MADE DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED BY "DEFENSE EXPENSES," AND "DEFENSE EXPENSES" WILL BE APPLIED AGAINST THE RETENTION.  THE INSURER WILL HAVE NO DUTY UNDER THE POLICY TO DEFEND ANY "CLAIM."  THE ENTIRE APPLICATION SHOULD BE CAREFULLY READ BEFORE IT IS EXECUTED.**

1.  a) Name of Applicant: _Refco, Inc._
        (Whenever used in this Application, the term "Applicant" shall mean the Parent Company)

    b) Principal Address: _550 W. Jackson Blvd_
       City: _Chicago_                State: _Il_   Zip Code: _60661_

    c) Name and title of the officer of the Applicant designated as the representative to receive all notices from the Insurer on behalf of all person(s) and entity(s) proposed for this insurance:
       _____

2.  Has the Applicant or any Subsidiary in the past thirty-six (36) months completed or agreed to, or does it contemplate within the next (12) months, any of the following, whether or not such transaction was or will be completed?  If "Yes," please describe the significant provisions of the transaction(s) as an attachment to this Application.

    a) Any registration for a public placement of securities?                    ☒ Yes    ☐ No

    b) Reorganization or arrangement with creditors under federal or state law? _See above_   ☐ Yes    ☐ No

3.  Prior Activities:

    a) Has any person(s) or entity(s) proposed for this insurance been a party to any of the following?

       1) Any civil, criminal or administrative proceeding alleging or investigating a violation of any securities or regulation?
                                                                               ☐ Yes   ☒ No

       2) Any representative actions, class actions or derivative suits?        ☐ Yes   ☐ No

       If "Yes" to 1) or 2) above, a statement to the Application providing full details must be attached.

    b) No claims have been made against any persons or entity(s) proposed for this insurance in their capacity as a director or officer of the Applicant, except as follows (provide detail as to defense costs, settlements, judgments, or other amounts).  If answer is "none" so state:
       _McElwreath v. Refco Securities – Marsh will_
       _forward documents_

    c) No persons or entity(s) proposed for this insurance which they have reason to suppose might afford grounds for any claim such as would fall within the scope of the proposed insurance, except as follows.  If answer is "none" so state:
       _____
       _____

**Without prejudice to any other rights and remedies of the Insurer, any claim arising from any claims, facts, circumstances or situations disclosed or required to be disclosed in response to 3. b) and 3. c) is excluded from the proposed insurance.**

4.  As part of this Application, please submit the following documents with respect to the Applicant:

    a) Latest 10-Q report filed and any 8-K or 13D reports filed with the SEC within the last 12 months.

    b) Each prospectus, offering circular or private placement memorandum within the last 12 months.

    c) Last proxy statement, 10-K and annual report, including audited financial statements with all notes and schedules.

    d) Copies of all provisions of the Applicant's charter and bylaws relating to the indemnification of its directors and officers.

CL 95 00 03 00

Page 1 of 3

EXECUTIVE LIABILITY UND' 'WRITERS    ☐  Indian Harbc 'nsurance Company
Member of ... XL America Companies

FOR THE PURPOSE OF THIS APPLICATION, THE UNDERSIGNED AUTHORIZED AGENT OF THE PERSONS AND ENTITY(S) PROPOSED FOR THIS INSURANCE DECLARES THAT TO THE BEST OF THEIR KNOWLEDGE AND BELIEF, AFTER REASONABLE INQUIRY, THE STATEMENTS HEREIN ARE TRUE AND COMPLETE. THE INSURER IS AUTHORIZED TO MAKE ANY INQUIRY IN CONNECTION WITH THIS APPLICATION. SIGNING THIS APPLICATION DOES NOT BIND THE INSURER TO COMPLETE THE INSURANCE.

THE UNDERSIGNED DECLARES THAT THE PERSON(S) AND ENTITY(S) PROPOSED FOR THIS INSURANCE UNDERSTAND:

(A)     THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED, AND MAY BE COMPLETELY EXHAUSTED BY THE PAYMENT OF "DEFENSE EXPENSES," AND IN SUCH EVENT, THE INSURER WILL NOT BE RESPONSIBLE FOR ANY ONGOING DEFENSE EXPENSES OR FOR THE AMOUNT OF ANY JUDGEMENT OR SETTLEMENT TO THE EXTENT THAT ANY OF THE FOREGOING EXCEED ANY APPLICABLE LIMIT OF LIABILITY;

(B)     "DEFENSE EXPENSES" WILL BE APPLIED AGAINST THE RETENTION;

(C)     THIS POLICY APPLIES ONLY TO "CLAIMS" FIRST MADE OR DEEMED MADE DURING THE "POLICY PERIOD," OR, IF PURCHASED, ANY EXTENDED REPORTING PERIOD;

(D)     THE INSURER HAS NO DUTY UNDER THIS POLICY TO DEFEND ANY "CLAIM."

IF THE INFORMATION IN THIS APPLICATION MATERIALLY CHANGES BETWEEN THE DATE OF THIS APPLICATION AND THE POLICY EFFECTIVE DATE, THE APPLICANT WILL NOTIFY THE INSURER WHO MAY MODIFY OR WITHDRAW ANY QUOTATION.

THE INFORMATION CONTAINED AND SUBMITTED WITH THIS APPLICATION IS ON FILE WITH THE INSURER AND, ALONG WITH THE APPLICATION, IS CONSIDERED TO BE PHYSICALLY ATTACHED TO THE POLICY AND WILL BECOME PART OF THE POLICY IF ISSUED.

NOTICE TO COLORADO APPLICANTS:  IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY.   PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE, AND CIVIL DAMAGES.  ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICY HOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICY HOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES.

NOTICE TO FLORIDA APPLICANTS:  ANY PERSON WHO, KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY EMPLOYER OR EMPLOYEE, INSURANCE COMPANY, OR SELF-INSURED PROGRAM, FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE OR MISLEADING INFORMATION IS GUILTY OF A THIRD DEGREE FELONY.

NOTICE TO KENTUCKY APPLICANTS:  ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES ANY APPLICATION FOR INSURANCE CONTAINING ANY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME.

NOTICE TO MINNESOTA, OHIO AND ARKANSAS APPLICANTS:  ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD, WHICH IS A CRIME.

NOTICE TO NEW JERSEY APPLICANTS:  ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES.

CL 95 00 03 00

Page 2 of 3

**EXECUTIVE LIABILITY UND⌐ ⌐WRITERS**    ☐  **Indian Harbo⌐ ⌐nsurance Company**
Member of ⌐⌐⌐ XL America Companies

NOTICE TO NEW YORK APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION. NO COVERAGE EXISTS FOR CLAIMS FIRST MADE AFTER THE END OF THE POLICY PERIOD UNLESS, AND TO THE EXTENT, THE EXTENDED REPORTING PERIOD APPLIES. UPON TERMINATION OF COVERAGE FOR ANY REASON, A 60-DAY AUTOMATIC EXTENDED REPORTING PERIOD WILL APPLY. FOR AN ADDITIONAL PREMIUM CALCULATED AS INDICATED IN ITEM 5 OF THE DECLARATION, AN EXTENDED REPORTING PERIOD CAN BE PURCHASED FOR A PERIOD OF AT LEAST ONE YEAR. NO COVERAGE WILL EXIST AFTER THE EXPIRATION OF THE EXTENDED REPORTING PERIOD WHICH MAY RESULT IN A POTENTIAL COVERAGE GAP IF PRIOR ACTS COVERAGE IS NOT SUBSEQUENTLY PROVIDED BY ANOTHER CARRIER. DURING THE FIRST SEVERAL YEARS OF CLAIMS MADE RELATIONSHIPS, CLAIMS MADE RATES ARE COMPARATIVELY LOWER THAN OCCURRENCE RATES, AND THE INSURED CAN EXPECT SUNSTANTIAL ANNUAL PREMIUM INCREASES, INDEPENDENT OF OVERALL RATE INCREASES UNTIL THE CLAIMS MADE RELATIONSHIP REACHES MATURITY.

NOTICE TO OKLAHOMA APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY.

NOTICE TO PENNSYLVANIA APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.

APPLICANT:

_PRES, CHAIRMAN AND CEO._          _8/15/05._

BY (Signature of Chairman and/or President)          TITLE          DATE

It is agreed and understood that the Application will only be executed by the Chairman and/or President of the Applicant acting in their capacity(s) as the authorized agent of the individual(s) and entity(s) proposed for this insurance.

PRODUCER (Insurance Agent or Broker):          INSURANCE AGENCY OR BROKERAGE:

INSURANCE AGENCY OR BROKERAGE TAXPAYER ID          AGENT OR BROKER LICENSE NO.:
OR SOCIAL SECURITY NO.:

ADDRESS OF AGENT OR BROKER (include Street, City, and Zip Code):

E-MAIL ADDRESS OF AGENT OR BROKER:

SUBMITTED BY (Insurance Agency or Brokerage):

INSURANCE AGENCY OR BROKERAGE TAXPAYER ID          AGENT OR BROKER LICENSE NO.:
OR SOCIAL SECURITY NO.:

ADDRESS OF AGENT OR BROKER (include Street, City, and Zip Code):

CL 95 00 03 00          Page 3 of 3

# CLASSIC A-SIDE MANAGEMENT LIABILITY INSURANCE COVERAGE FORM

**THIS IS A CLAIMS MADE POLICY WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

In consideration of the payment of the premium, and in reliance on all statements made and information furnished to Executive Liability Underwriters, the Underwriting Manager for the Insurer identified on the Declarations Page (hereinafter, the "Insurer") including the Application and subject to all of the terms, conditions and limitations of all the provisions of this Policy, the Insurer, the Insured Persons and the Company agree as follows:

## I. INSURING AGREEMENT

The Insurer will pay on behalf of the **Insured Persons Loss** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** or, if applicable, the Optional Extension Period, for a **Wrongful Act**, except to the extent that such **Loss** is paid by any other **Insurance Program** or as indemnification from any source. If **Loss** is not paid by such other **Insurance Program** or as indemnification from any source, the Insurer will pay covered **Loss** on behalf of the **Insured Persons**, subject to all of the terms, conditions (including but not limited to Condition IV(B)) and limitations of the Policy.

## II. DEFINITIONS

(A)     "Application" means:

(1)     the **Application** attached to and forming part of this Policy; and

(2)     any materials submitted therewith, which shall be retained on file by the Insurer and shall be deemed to be physically attached to this Policy.

(B)     "Change in Control" means:

(1)     the merger or acquisition of the **Parent Company**, or of all or substantially all of its assets by another entity such that the **Parent Company** is not the surviving entity;

(2)     the acquisition by any person, entity, or affiliated group or persons or entities of the right to vote for, select, or appoint more than fifty percent (50%) of the directors of the **Parent Company**; or

(3)     the appointment of a Receiver, Conservator, Liquidator, Trustee, Rehabilitator, or any comparable authority, with respect to the **Parent Company**.

(C)     "Claim" means:

(1)     a written demand for monetary or non-monetary relief;

(2)     any civil or criminal judicial proceeding in a court of law or equity, or arbitration; or

(3)     a formal civil, criminal, or administrative regulatory proceeding or formal investigation against an **Insured Person**.

(D)     "Company" means the **Parent Company** and any **Subsidiary** created or acquired on or before the Inception Date set forth in ITEM 2 of the Declarations or during the **Policy Period**, subject to CONDITIONS IV(C).

(E)  "**Defense Expenses**" means reasonable legal fees and expenses incurred in the defense of any **Claim**. **Defense Expenses** will not include the **Company's** overhead expenses or any salaries, wages, fees, or benefits of its directors, officers, or employees.

(F)  "**Employment Practices Claim**" means a **Claim** alleging an **Employment Practices Wrongful Act**.

(G)  "**Employment Practices Wrongful Act**" means any actual or alleged:

   (1)  wrongful termination of employment whether actual or constructive;

   (2)  employment discrimination of any kind;

   (3)  sexual or other harassment in the workplace; or

   (4)  wrongful deprivation of career opportunity, employment related misrepresentations, retaliatory treatment against an employee of the **Company**, failure to promote, demotion, wrongful discipline or evaluation, or refusal to hire.

(H)  "**Insurance Program**" means

   (1)  any existing Management Liability insurance, Directors' and Officers' Liability insurance, or similar insurance, and

   (2)  any other existing insurance under which coverage may be owed.

(I)  "**Insured Person**" means:

   (1)  any past, present, or future director or officer, or member of the Board of Managers, of the **Company** and those persons serving in a functionally equivalent role for the **Parent Company** or any **Subsidiary** operating or incorporated outside the United States;

   (2)  any individual identified in (I)(1) above who, at the specific written request of the **Company**, is serving as a director, officer, trustee, regent, or governor of any **Outside Entity**; or

   (3)  the lawful spouse of any person set forth in the above provisions of this definitions, but only to the extent the spouse is a party to any **Claim** solely in their capacity as a spouse of such persons and only for the purposes of any **Claim** seeking damages recoverable from marital community property, property jointly held by any such person and spouse, or property transferred from any such person to the spouse.

In the event of the death, incapacity or bankruptcy of an individual identified in (I)(1), (2), and (3) above, any **Claim** against the estate, heirs, legal representatives or assigns of such individual for a **Wrongful Act** of such individual will be deemed to be a **Claim** against such individual.

(J)  "**Interrelated Wrongful Acts**" means any **Wrongful Act** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related, or series of related, facts circumstances, situations, transactions, or events.

(K)  "**Loss**" means damages, judgments, settlements or other amounts (including punitive or exemplary damages, where insurable by law) and **Defense Expenses** that the **Insured Persons** are obligated to pay. **Loss** will not include:

   (1)  the multiplied portion of any damage award;

   (2)  fines, penalties or taxes imposed by law; or

   (3)  matters which are uninsurable under the law pursuant to which this Policy is construed.

Note: With respect to judgments in which punitive damages are awarded, the coverage provided by this Policy shall apply to the broadest extent permitted by law. If, based on the written opinion of counsel for an **Insured Person**, punitive damages are insurable under applicable law, the Insurer will not dispute the written opinion of counsel for the **Insured Person**.

(L)    "**Parent Company**" means the entity named in Item 1 of the Declarations.

(M)    "**Policy Period**" means the period form the Inception Date to the Expiration Date set forth in ITEM 2 of the Declarations or to any earlier cancellation date.

(N)    "**Outside Entity**" means any corporation or organization other than the **Company** of which any **Insured Person** serves as a director, officer, trustee, regent, or governor, but only if such service is at the specific written direction of the **Company**.

(O)    "**Subsidiary**" means any entity during any time in which the **Parent Company** owns, directly or through one of more **Subsidiary(ies)**, more than fifty percent (50%) of the outstanding securities representing the right to vote for the election of such entity's directors.

(P)    "**Wrongful Act**" means:

    (1)    any actual or alleged act, error, or omission, misstatement, misleading statement, neglect, or breach of duty by any **Insured Person** while acting in his or her capacity as an:

        (i)    **Insured Person** of the **Company** or a person serving in a functionally equivalent role for the **Parent Company** or any **Subsidiary**;

        (ii)    **Insured Person** of the **Company** who at the specific written request of the **Company** is serving as a director, officer, trustee, regent or governor or an **Outside Entity**; and

    (2)    any Employment Practices Wrongful Act.

## III.    EXCLUSIONS

(A)    Except for **Defense Expenses**, the Insurer shall not pay **Loss** in connection with any **Claim**:

    (1)    by, on behalf of, or at the direction of the **Company** or **Outside Entity**, except and to the extent such **Claim**:

        (i)    is brought by a security holder of the **Company** or **Outside Entity** who, when such **Claim** is made and maintained, is acting independently of, and without the solicitation, assistance, participation or intervention of the **Company** or any **Outside Entity**.

        (ii)    is brought by the Bankruptcy Trustee or Examiner of the **Company** or **Outside Entity**, or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the **Company** or **Outside Entity**;

    (2)    brought about or contributed to in fact by any:

        (i)    intentionally dishonest, fraudulent, or criminal act or omission or any willful violation of any statute, rule, or law; or

        (ii)    profit or remuneration gained by any **Insured Person** to which such **Insured Person** is not legally entitled;

as determined by a final adjudication in the underlying action or in a separate action or proceeding;

(B)    The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured Person**:

    (1)    for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, defamation, slander, libel, disease or death of any person, or damage or destruction of any tangible property including **Loss** of use thereof. EXCLUSION (B) shall not apply to any **Claim**:

        (i)    brought by a security holder of the **Company** or **Outside Entity** for any actual or alleged violation of the Securities Act of 1933, the Securities Act of 1934, or any state securities statute; or

        (ii)    a derivative action brought by or on behalf of, or in the name or right of, the **Company**, and brought and maintained independently of, and without solicitation, assistance, participation or invention of the **Company**, **Insured Person**, or **Outside Entity**.

    (2)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance or situation, transaction, event or **Wrongful Act** which, before the Inception Date of this Policy, was the subject of any notice given under any other Management Liability Insurance, Directors' and Officers' Insurance, or any other similar insurance.

Note:    EXCLUSION (B)(1) will not apply to any allegation of libel, slander, defamation, mental anguish or emotional distress if and only to the extent that such allegations are made as part of an **Employment Practices Claim** for an **Employment Practices Wrongful Act**.

No conduct of any **Insured Person** will be imputed to any other **Insured Person** to determine the application of any of the above EXCLUSIONS.

## IV.    CONDITIONS

### (A)    Limit of Liability

The amount set forth in ITEM 3 of the Declarations shall be the maximum aggregate Limit of Liability of the Insurer under this Policy. Payment of **Loss**, including **Defense Expenses**, by the Insurer shall reduce the Limit of Liability.

### (B)    Indemnification and Other Insurance

    (1)    The **Insured Persons** and the **Company** understand and agree that all coverage under this Policy shall be specifically excess over, and shall not contribute with:

        (i)    all indemnification to which an **Insured Person** may be entitled from any source, including but not limited to the **Company** or any **Outside Entity**; and

        (ii)    any **Insurance Program** maintained by the **Company** or any **Outside Entity**, whether such other insurance is stated to be primary, contributing, excess, or otherwise.

    (2)    This Policy shall not be subject to the terms or conditions of any other insurance. The Insurer does not waive compromise or release any of its rights to recover **Loss** paid under this Policy from the issuers of any other insurance under which coverage may be owed, or from any person or entity from which an **Insured Person** is entitled to indemnification.

### (C)    Mergers and Acquisitions

    (1)    If during the **Policy Period**, the **Company** acquires any assets, acquires a **Subsidiary**, or acquires any entity by merger, consolidation or otherwise, or assumes any liability of another entity, coverage

CLASSIC A-SIDE
CL 71 00 03 00

shall be provided for any **Loss** involving a **Claim** for a **Wrongful Act** occurring after the consummation of the transaction.

(2)  With respect to the acquisition, assumption, merger, consolidation or other of any entity, asset, **Subsidiary** or liability as described in (C)(1) above, there will be no coverage available under this Policy for any **Claim** made against the acquired, assumed, merged, or consolidated entity, asset, **Subsidiary**, liability, or **Insured Person** for a **Wrongful Act** committed at any time during which such entity, asset, liability, or **Subsidiary** is not insured under this Policy.

(3)  If during the **Policy Period** any entity ceases to be a **Subsidiary**, the coverage provided under this Policy shall continue to apply to the **Insured Persons** who because of their service with such **Subsidiary** were covered under this Policy but only with respect to a **Claim** for a **Wrongful Act** that occurred or allegedly occurred prior to the time such **Subsidiary** ceased to be a **Subsidiary** of the **Company**.

(4)  If, during the **Policy Period**, there is a **Change In Control**, the coverage provided under this Policy shall continue to apply but only with respect to a **Claim** for a **Wrongful Act** committed or allegedly committed prior to the time of the **Change In Control**; and

   (i)  coverage will cease with respect to any **Claim** for a **Wrongful Act** committed subsequent to the **Change In Control**; and

   (ii)  the entire premium for the Policy will be deemed to be fully earned immediately upon the consummation of a **Change In Control**.

(D)  **Notice**

(1)  As a condition precedent to any right to payment under this policy with respect to any **Claim**, the **Insured Persons** or the **Company** shall give written notice to the Insurer of any **Claim** as soon as practicable after it is first made.

(2)  If, during the **Policy Period**, the **Insured Persons** or the **Company** first becomes aware of a specific **Wrongful Act** and if, during the **Policy Period**, the **Insured Persons** or the **Company**:

   (i)  provide the Insurer with written notice of the specific **Wrongful Act**, the consequences which have resulted or may result therefrom (including but not limited to actual or potential damages), the identities of the potential claimants, and the circumstances by which the **Insured Persons** first became aware of such **Wrongful Act**; and

   (ii)  request coverage under this Policy for any subsequently resulting **Claim** for such **Wrongful Act**;

then any **Claim** subsequently made arising out of such **Wrongful Act** will be treated as if it had been first made during the **Policy Period**.

All notices under CONDITIONS (D) (1) and (2) must be sent by certified mail or the equivalent to the address set forth in ITEM 5 of the Declarations; Attention: Claim Department.

(E)  **Defense and Settlement of Claims**

(1)  It shall be the duty of the **Insured Persons** and not the duty of the Insurer to defend **Claims**. No **Insured Person** may incur any **Defense Expenses** or admit liability for, make any settlement offer with respect to, or settle any **Claim** without the Insurer's consent, such consent not to be unreasonably withheld.

(2)  Upon written request, the Insurer will pay on a current basis any **Defense Expenses** before the disposition of the **Claim** for which this Policy provides coverage. As a condition of the advancement of

**Defense Expenses**, the Insurer may require a written undertaking, in a form satisfactory to the Insurer, which will guarantee the repayment of any **Loss** including **Defense Expenses** paid to or on behalf of the **Insured Persons** if it is finally determined that the **Loss** incurred is not covered under this Policy.

(3)    Except for such **Defense Expenses**, the Insurer shall pay **Loss** only upon the final disposition of any **Claim**.

(F)    **Assistance, Cooperation and Subrogation**

(1)    The **Insured Persons** and the **Company** agree to provide the Insurer with all information, assistance and cooperation that the Insurer may reasonably request, and further agree that they will do nothing which in any way increases the Insurer's exposure under this Policy or in any way prejudices the Insurer's potential or actual rights of recovery.

(2)    In the event of any payment under this Policy, the Insurer shall be subrogated to all of the potential or actual rights of recovery of the **Insured Persons**. The **Insured Persons** and the **Company** shall execute all papers required and will do everything necessary to secure such rights including but not limited to the execution of such documents as are necessary to enable the Insurer to effectively bring suit in their name, and will provide all other assistance and cooperation which the Insurer may reasonably require.

(G)    **Interrelated Claims**

All **Claims** arising from the same **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have be made at the earliest time at which the earliest such **Claim** is made or deemed to have been made pursuant to CONDITION (D)(1) and (2) above, if applicable.

(H)    **Exhaustion**

If the Insurer's Limit of Liability as set forth in ITEM 3 of the Declarations is exhausted by the payment of **Loss**, the premium as set forth in ITEM 6 of the Declarations will be fully earned, all obligations of the Insurer under this Policy will be completely fulfilled and exhausted, and the Insurer will have no further obligations of any kind whatsoever under this Policy.

(I)    **Cancellation and Renewal of Coverage**

(1)    Except for the nonpayment of premium, as set forth in (I)(2) below, the **Parent Company** has the exclusive right to cancel this Policy. Cancellation may be effected by mailing to the Insurer written notice when such cancellation shall be effective, provided the date of cancellation is not later than the Expiration Date set forth in ITEM 2 of the Declarations. In such event, the Insurer shall retain the customary short rate portion of the earned premium. Return or tender of the unearned premium is not a condition of cancellation.

(2)    The Insurer may only cancel this Policy for nonpayment of premium. The Insurer will provide not less than twenty (20) days written notice stating the reason for cancellation and when the Policy will be canceled. Notice of cancellation will be sent to the **Parent Company** and the agent of record for the **Insured Person**, if applicable.

(3)    The Insurer is under no obligation to renew this Policy upon its expiration. Once the Insurer chooses to non-renew this Policy, the Insurer will deliver or mail to the **Parent Company** written notice stating such at least sixty (60) days before the Expiration Date set forth in ITEM 2 of the Declarations.

(J)    **Optional Extension Period**

(1)    If either the **Parent Company** or the Insurer does not renew this Policy, the **Parent Company** shall have the right, upon payment of an additional premium set forth in ITEM 4 of the Declarations, to an

extension of the coverage provided by this Policy with respect only to any **Claim** first made during the period of time set forth in ITEM 4 of the Declarations after the Policy Expiration Date, but only with respect to a **Wrongful Act** occurring prior to the Policy Expiration Date.

(2)    As a condition precedent to the right to purchase the Optional Extension Period the total premium for this Policy must have been paid in full. The right of the **Parent Company** to purchase the Optional Extension Period will be immediately terminated if the Insurer does not receive written notice by the **Parent Company** advising it wishes to purchase the Optional Extension Period together with full payment of the premium for the Optional Extension Period within thirty (30) days after the Policy Expiration Date.

(3)    If the **Parent Company** elects to purchase the Optional Extension Period as set forth in (J)(1) and (2) above, the entire premium for the Optional Extension Period will be deemed to be fully earned at the Inception Date for the Optional Extension Period.

(4)    The purchase of the Optional Extension Period will not in any way increase the Limit of Liability set forth in ITEM 3 of the Declarations, and the Limit of Liability with respect to **Claims** made during the Optional Extension Period shall be part of and not in addition to the Limit of Liability for all **Claims** made during the **Policy Period**.

**(K)    Representation Clause**

Each **Insured Person** represents that the statements and particulars contained in the **Application** are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and constitute a part of this Policy, are the basis of this Policy. No knowledge or information possessed by any **Insured Person** will be imputed to any other **Insured Person** for the purposes of determining the availability of coverage with respect to **Claims** made against any other **Insured Person**.

**(L)    Action Against the Insurer, Assignment, and Changes to Policy**

(1)    No action may be taken against the Insurer unless, as a condition precedent thereto:

    (i)    there has been full compliance with all of the terms and conditions of this Policy; and

    (ii)    the amount of the obligation of the **Insured Person** has been finally determined either by judgment against the **Insured Person** after actual trial, or by written agreement of the **Insured Person**, the claimant and the Insurer.

(2)    Nothing contained herein shall give any person or entity any right to join the Insurer as a party to any **Claim** against the **Insured Person** to determine their liability, nor may the **Insured Person** implead the Insurer in any **Claim**.

(3)    Assignment of interest under this Policy shall not bind the Insurer unless its consent is endorsed hereon.

(4)    Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Insurer will not cause a waiver or change in any part of this Policy or prevent the Insurer from asserting any right under the terms, conditions and limitations of this Policy. The terms, conditions and limitations of this Policy may only be waived or changed by written endorsement signed by the Insurer.

**(M)    Authorization and Notices**

It is understood and agreed that the **Parent Company** will act on behalf of the **Company** and the **Insured Persons** with respect:

CLASSIC A-SIDE
CL 71 00 03 00

(1)    the payment of the premiums,

(2)    the receiving of any return premiums that may become due under this Policy,

(3)    the giving of all notices to the Insurer as provided herein, and

(2)    the receiving of all notices from the Insurer.

(N)    **Entire Agreement**

The **Insured Persons** agree that the Declarations, Policy, including the endorsements, attachments and the **Application** shall constitute the entire agreement between the Insurer or any of its agents and the **Insured Persons** relation to the insurance.

CL 71 00 03 00

# EXHIBIT B

**XL** INSURANCE

XL Professional
100 Constitution Plaza
17th Floor
Hartford, CT 06103
Phone    860-246-1863
Fax        860-246-1899

## CLASSIC A-SIDE MANAGEMENT LIABILITY BINDER

| Date: | August 10, 2005 | |
|---|---|---|
| Name: | James Schneider | |
| Company: | Marsh | |
| Fax: | 212.345.9418 | |
| From: | Hank Toolan     Direct: 860.948.1846 | hank.toolan@xlgroup.com |

### INSURED INFORMATION

| Name: | Refco Group Ltd LLC |
|---|---|
| Address: | 200 Liberty St Fl 23 |
| | New York, NY  10281-1003 |
| Policy Number: | **ELU089673-05** |
| Carrier: | XL Specialty Insurance Company |

| POLICY FORM | | POLICY PERIOD |
|---|---|---|
| CL 71 00 03 00 | Classic A-Side Management Liability | August 11, 2005 to August 11, 2006 |
| **LIMIT of LIABILITY** | | **OPTIONAL EXTENSION PERIOD** |
| $20,000,000 | Aggregate each Policy Period (including defense expenses) | One year at 200% of the annual premium |
| **INSURANCE PROGRAM** | | |
| $50,000,000 HCC, Lexington, Axis, AWAC, Arch | | |

PREMIUM:  $370,300.00

The portion of your annual premium that is attributable to coverage for acts of terrorism is: $ waived.

Commission: 12.50%

Premium Due Date:  September 10, 2005

### ENDORSEMENTS:

- Terrorism Insurance Disclosure
- Terrorism Premium Endorsement -XL 80 24 03 03
- Amend Insured vs. Insured Exclusion- CL 83 06 07 02
- Prior and Pending Litigation Exclusion-August 11, 2005- CL 83 14 10 03
- Amend Mergers and Acquisitions Endorsements: 35%-CL 80 34 12 02
- Amend Conditions (B)(1) Endorsement- CL 80 18 09 02
- Non-Rescindable Endorsement- XL 80 34 10 04
- Prior Acts Exclusion-CL 83 08 09 02
- Specific Claims Exclusion- McElworth- XL 83 07 01 00
- Specific Events Exclusion-Wells Notice/ SEC Investigation- XL 83 25 10 00
- Controlling Shareholder Coverage- Phillip Bennett
- Change of Address of Insurer Endorsement- XL 80 39 04 05

THE BINDER IS SUBJECT TO RECEIPT, REVIEW, AND ACCEPTANCE OF THE FOLLOWING ITEMS.
THE ITEMS LISTED BELOW MUST BE RECEIVED WITHIN 10 DAYS.

- Classic A-Side Application
- Final Prospectus

IF THE TOTAL PREMIUM IS NOT PAID BY THE PREMIUM DUE DATE SET FORTH ABOVE, THE INSURER WILL CANCEL THE COVERAGE FOR NON-PAYMENT OF PREMIUM. THE EFFECT OF SUCH CANCELLATION WILL BE THAT THE OFFERED COVERAGE SHALL NOT INCEPT, AS IF SUCH OFFER OF COVERAGE HAD NEVER BEEN MADE.

Confidential
M-CHI 000515



**XL Professional**
100 Constitution Plaza
17th Floor
Hartford, CT 06103
Phone    860-246-1863
Fax       860-246-1899

# INVOICE SUMMARY

**Refco Group Ltd LLC**
**ELU089673-05**

| PREMIUM AMOUNT | COMMISSION % | COMMISSION AMOUNT | * TAXES/ SURCHARGES | NET PREMIUM DUE | PREMIUM DUE DATE |
|---|---|---|---|---|---|
| $370,300.00 | 12.50% | $46,287.50 | $0.00 | $324,012.50 | September 10, 2005 |

* Taxes/Surcharges if applicable.

Formal Invoice will be sent via the U.S. Mail to:

James Schneider
Marsh
1166 Avenue of the Americas
New York, NY  10036

IF THE TOTAL PREMIUM IS NOT PAID BY THE PREMIUM DUE DATE SET FORTH ABOVE, THE INSURER WILL CANCEL THE COVERAGE FOR NON-PAYMENT OF PREMIUM. THE EFFECT OF SUCH CANCELLATION WILL BE THAT THE OFFERED COVERAGE SHALL NOT INCEPT, AS IF SUCH OFFER OF COVERAGE HAD NEVER BEEN MADE.

Confidential
M-CHI 000516

# EXHIBIT C

**BSWB**
Attorneys at Law

Chicago
New York
London

**Boundas, Skarzynski, Walsh & Black, LLC**

One Battery Park Plaza   22nd Floor   New York, New York 10004
P: 212 821 7750   F: 212 820 7740/7788   W: www.bswb.com

James A. Skarzynski, Esq.
Direct Dial 212 820 7720
Direct Fax 212 820 7775
jskarzynski@bswb.com

Cecilia W. Kaiser, Esq.
Direct Dial 212 820 7710
ckaiser@bswb.com

January 24, 2006

**VIA E-MAIL & FIRST CLASS MAIL**
Ms. Andrea Lieberman
Marsh USA
500 West Monroe Street
Chicago, Illinois 60661

Re:   Insured:      Refco, Inc.
      Issuing Co.:  XL Specialty Insurance Company
      Policy No.:   ELU089673-05
      Our File No.: 13304

Dear Andrea:

As you know, we have been retained by XL Specialty Insurance Company ("XL") to represent its interests in connection with Classic A-Side Management Liability Insurance Policy No. ELU089673-05 (the "Policy") issued to Refco, Inc. ("Refco") for the claims-made policy period of August 11, 2005 to August 11, 2006. We are directing this letter to you as the authorized insurance representative for all of the Insureds.[1] To the extent that you are not acting as the authorized representative for any of the Insureds, we ask that you please advise us and forward a copy of this letter to the appropriate party(ies).

On XL's behalf, this letter will acknowledge receipt of letters dated October 13, 2005, October 18, 2005, October 21, 2005, October 25, 2005, October 27, 2005, November 21, 2005 and November 30, 2005 from Marsh enclosing the complaints filed in the following matters (collectively, the "Lawsuits"):

(1)   *Glaubach v. Refco, Inc., et al.*, Case No. 05CV8692 (S.D.N.Y.);
(2)   *Frontpoint Financial Servs., Inc. v. Refco, Inc., et al.*, Case No.05CV8663 (S.D.N.Y.);
(3)   *Lieber v. Refco, Inc., et al.*, Case No. 05CV8667 (S.D.N.Y.);
(4)   *United States of America v. Bennett*, Case No. 05MAG1720 (S.D.N.Y.);
(5)   *Sandra Weiss v. Refco, Inc., et al.*, Case No. 05CV8691 (S.D.N.Y.);
(6)   *Mehta v. Bennett, et al.*, Case No. 05CV8748 (S.D.N.Y.);

---

[1] By "Insureds" we mean Refco and **Insured Persons**.

**BSWB**

Ms. Andrea Lieberman
January 24, 2006
Page 2

(7)  *Wakefield v. Refco, Inc., et al.*, Case No. 05CV8742 (S.D.N.Y.);
(8)  *Baker v. Bennett, et al.*, Case No. 05CV8923 (S.D.N.Y.);
(9)  *Becker v. Refco, Inc., et al.*, Case No. 05CV8929 (S.D.N.Y.);
(10) *Nathanson v. Bennett, et al.*, Case No. 05CV8926 (S.D.N.Y.);
(11) *American Financial Int'l Group – Asia, LLC v. Refco, Inc., et al.*, Case No. 05CV8988 (S.D.N.Y.);
(12) *Mettupatti v. Bennett, et al.*, Case No. 05CV9048 (S.D.N.Y.);
(13) *Todd Weiss v. Bennett, et al.*, Case No. 05CV9126 (S.D.N.Y.);
(14) *Weit v. Bennett, et al.*, Case No. 05CV9611 (S.D.N.Y.);
(15) *Bankruptcy Trust of Gerard Sillam, et al. v. Refco Group LLC, et al.*, Case No. 05/603931 (N.Y. Sup.);
(16) *City of Pontiac General Employees' Retirement Sys. v. Bennett, et al.*, Case No. 05CV9941 (S.D.N.Y.); and
(17) *BAWAG P.S.K. Bank Für Arbeit und Wirtschaft und Österreichische Postsparkasse Aktiengesellschaft v. Refco, Inc., et al. (In re Refco Inc., et al.)*, Case No. 05-60006 (Bankr. S.D.N.Y.).

## I.  The Litigation

### A.  The Securities Class Action Lawsuits

*Glaubach, Frontpoint, Lieber, Sandra Weiss, Wakefield, Baker, Becker, Nathanson, Todd Weiss, American Financial, Mettupatti, Weit* and *City of Pontiac* are purported shareholder class action lawsuits filed in the United States District Court for the Southern District of New York beginning in October 2005. With the exception of *American Financial*, each of these Lawsuits alleges violations of the federal securities laws.

*Glaubach, Becker, Nathanson* and *Mettupatti* are purportedly brought on behalf of a class of all purchasers of Refco securities, whereas *Frontpoint, Lieber, Sandra Weiss, Wakefield, Baker, Todd Weiss, Weit* and *City of Pontiac* are purportedly brought on behalf of a class of all purchasers of Refco common stock (collectively the "Securities Class Actions"). The purported class in *City of Pontiac* also specifically includes those who purchased bonds pursuant to Refco's August 5, 2004 bond offering. *American Financial* is purportedly brought on behalf of a class of persons who traded currencies through or had currency trading accounts with Refco F/X Associates, LLC ("Refco FX"), which is alleged to be the currency trading arm of Refco. With the exception of the class period alleged in *City of Pontiac*, the alleged class periods all commence on August 11, 2005 but vary in their ending dates from October 7, 2005 to October 18, 2005. The alleged class period in *City of Pontiac* runs from August 5, 2004 to October 18, 2005.

Both Refco and Refco Group Holdings, Inc. ("RGHI") are named in several of these complaints. The following individuals, who are identified as Refco directors and/or officers are also named in some or all of the Securities Class Actions: Philip Bennett, Gerald Sherer, Leo Breitman, Nathan Gantcher, David Harkins, Scott Jaeckel, Thomas Lee, Ronald O'Kelley and Scott Schoen. Other defendants

**BSWB**

named in the Securities Class Actions include Credit Suisse First Boston LLC, Goldman Sachs & Co., Banc of America Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith, Inc., Deutsche Bank Securities, Inc., J.P. Morgan Securities, Inc., Grant Thornton, LLP, Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., William Blair & Co., LLC, Harris Nesbitt Corp., CMG Institutional Trading, LLC, Samuel A. Ramirez & Co., Inc., Muriel Siebert & Co., Inc., The Williams Capital Group, L.P., Utendahl Capital Partners, L.P. and Liberty Corner Capital.

The complaints in the Securities Class Actions generally allege that on August 11, 2005, Refco sold 26.5 million shares at $22 per share in its initial public offering ("IPO") for proceeds of $583 million. The complaints further allege that, in connection with the IPO, Refco filed a Form S-1 Registration Statement and Prospectus in August 2005, which were materially false and misleading. The *City of Pontiac* complaint additionally alleges that Refco's offering statement issued in connection with the August 2004 bond offering was false and misleading. As set forth in the complaints, just nine weeks after the IPO, on October 10, 2005, Refco revealed that Mr. Bennett, Refco's CEO, Chairman and controlling shareholder, owed Refco $430 million and was being placed on a leave of absence. Refco also acknowledged at that time that, based on the undisclosed related party transaction, its prior financial statements for the fiscal years ending 2002 through 2005 and the quarter ended May 31, 2005 should not be relied upon. As a result, the price of Refco's common stock fell $12.96 per share, or 45.3%, to close at $15.60 per share on October 10, 2005. The complaints allege that, following Refco's further announcement on October 11, 2005 that the $230 million receivable consisted in major part of uncollectible historical obligations owed by unrelated third parties dating back to 1998, Refco's common stock fell further, to close at $13.85 per share on October 11, 2005, after a five-hour halt on trading Refco shares on the New York Stock Exchange ("NYSE") was lifted. The next day, the *Wall Street Journal* reported that Mr. Bennett had paid Liberty Corner Capital to help him hide hundreds of millions of dollars of debt to Refco and that the Securities Exchange Commission ("SEC") had launched an investigation. The same day, the United States Attorney for the Southern District of New York announced that Mr. Bennett had been arrested and charged in a criminal complaint with having defrauded investors in the IPO, and shares of Refco fell an additional $3.00 dollars per share, to close at $10.85 per share. On October 13, 2005, Refco announced that it had hired advisors and was imposing a 15-day moratorium on customer withdrawals at Refco Capital Markets, Ltd. Following this announcement, at which time Refco's stock was trading at $7.90 per share, the NYSE again imposed a trading halt. On October 17, 2005, Refco announced that it was filing for bankruptcy, after negotiating a deal to sell its primary business to a group led by J.C. Flowers & Co., LLC, and on October 18, 2005, the NYSE lifted the trading ban on Refco stock, which closed at $0.65 per share.

The Securities Class Actions complaints allege violations by the defendants of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, and violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5. The complaints seek class certification, unspecified damages and attorneys' fees and costs.

The complaint in *American Financial* alleges that, in connection with the above, on or about October 17, 2005, Refco FX advised plaintiffs and other purported class members that they could not deposit and/or withdraw funds from their currency trading accounts at Refco FX and that Refco FX did

**BSWB**

not know when customers would be able to resume deposits to and withdrawals from their accounts. The complaint in *American Financial* alleges fraud, misrepresentation, negligence, negligent misrepresentation, unjust enrichment, restitution, quantum meruit, breach of contract, breach of warranty and unfair competition against Mr. Bennett, Refco and Refco FX. As relief, the complaint in *American Financial* seeks class certification, unspecified rescissory and compensatory damages, equitable and/or injunctive relief, including the imposition of a constructive trust on defendants' assets and restriction of defendants' trading activities, and attorneys' fees and costs.

### B. The Shareholder Derivative Action

*Mehta* is a shareholder derivative action also filed in the United States District Court for the Southern District of New York in October 2005. As defendants, the *Mehta* complaint names the following individuals, who are identified as directors and officers of Refco: Philip Bennett, William Sexton, Gerald Sherer, Joseph Murray, Leo Breitman, Nathan Gantcher, David Harkins, Scott Jaeckel, Thomas Lee, Ronald O'Kelley and Scott Schoen. Also named as defendants in the *Mehta* complaint are Credit Suisse First Boston LLC, Goldman Sachs & Co., Banc of America Securities, LLC, Deutsche Bank Securities, Inc., J.P. Morgan, Merrill Lynch & Co., Sandler O'Neill & Partners, L.P., and HSBC (the "IPO Defendants") and Thomas H. Lee Partners, L.P.

In connection with the same allegations contained in the Securities Class Actions, the *Mehta* complaint alleges the following counts against the individual defendants and Thomas H. Lee Partners: (1) breach of fiduciary duty; (2) abuse of control; (3) gross mismanagement; (4) waste of corporate assets; and (5) unjust enrichment. The *Mehta* complaint further alleges aiding and abetting against the IPO Defendants. In addition, the complaint alleges demand futility. As relief, the *Mehta* complaint seeks unspecified damages, equitable and/or injunctive relief, the imposition of a constructive trust on defendants' assets and restriction of defendants' trading activities, restitution, disgorgement, improved corporate governance and internal procedures and attorneys' fees and costs.

### C. The Criminal Complaint

*United States of America v. Phillip Bennett* is a criminal complaint filed on October 12, 2005 in the United States District Court for the Southern District of New York, alleging one count of securities fraud, in violation of 15 U.S.C. §78j(b) (the "Criminal Complaint"). Specifically, the Criminal Complaint alleges that Mr. Bennett caused Refco to file a false and fraudulent S-1 Registration Statement with the SEC in August 2005, which failed to disclose hundreds of millions of dollars of transactions with and debts owed to Refco by RGHI, a company Mr. Bennett controlled. Moreover, the Criminal Complaint alleges that Mr. Bennett caused Refco to engage in a series of transactions designed to disguise the related-party nature of a $300 million-plus debt owed to Refco by RGHI by temporarily paying off the debt and transferring it from RGHI to another entity unrelated to Mr. Bennett and that this temporary re-positioning of debt was carried out so that the debt would not appear to be owed by RGHI over Refco's February 28, 2005 year-end. Additionally, the Criminal Complaint alleges that on October 10, 2005, Refco issued a press release announcing that it had discovered a $430 million debt owed by an entity controlled by Mr. Bennett, and that he had repaid the entire sum the same day, but that following

**BSWB**

this announcement, the market price of Refco stock fell from its October 7, 2005 closing price of $28.56 per share to its October 11, 2005 closing price of $13.85 per share, resulting in a market capitalization loss of over $1 billion. The Criminal Complaint charges Mr. Bennett with one count of securities fraud under 15 U.S.C. §78j(b).

### D. The *Sillam* Action

*Bankruptcy Trust of Gerard Sillam, et al. v. Refco Group LLC, et al.*, is an action based on business tort allegedly committed by the numerous defendant companies and their directors and/or officers on a worldwide basis, which seeks restitution for unjust enrichment allegedly conferred to the Refco Group of companies. The plaintiff is a French businessman, who alleges that he had filed a related complaint on September 8, 2004, also in the New York Supreme Court, against Refco Group and Mr. Bennett but "lost his capacity to sue for pecuniary losses," further to a September 28, 2004 order by a French tribunal and therefore brings the present action through his bankruptcy trust.[2] Based on the allegations in the *Sillam* complaint, the earlier complaint appeared to concern certain introductions and business contacts allegedly made by Mr. Sillam on behalf of the Refco companies for which Mr. Sillam asserts in this complaint that he was not paid.

As defendants, the complaint in *Sillam* names Refco Group, Refco Overseas Ltd. ("Refco Overseas") and RGHI (collectively, the "Refco Entities"), and the following individuals identified as directors and/or officers of Refco: Phillip Bennett, Thomas Lee, Scott Schoen, David Harkins, Gerald Sherer, Leo Breitman, Scott Jaeckel, Nathan Gantcher and Ronald O'Kelley. The complaint also names the following individuals identified as directors of Refco Overseas: Mark Slade, Julian Courtney, Richard Reinert, and David Campbell. Defendant Halim Saad is identified as a former Refco Overseas officer, and defendant Dennis Klejna is identified as the general counsel of Refco LLC. Also named as defendants are Grant Thornton, LLP; Liberty Corner Capital; Thomas H. Lee Partners, L.P. and Thomas H. Lee Partners Fund V; the NYSE; and the following financial institutions that are identified as having underwritten Refco's IPO: Credit Suisse First Boston LLC, Goldman Sachs & Co., Banc of America Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith, Inc., Deutsche Bank Securities, Inc., J.P. Morgan Securities, Inc., Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., William Blair & Co., LLC, Harris Nesbitt Corp., CMG Institutional Trading, LLC, Samuel A. Ramirez & Co., Inc.,

---

[2] Mr. Sillam also alleges that numerous other, related actions have been pending for some time, to wit, "joint and several cases against [Refco Overseas Ltd.] and Refco Securities S.A. have been in progress since April 25, 2003 before the Commercial Court ('Tribunal de Commerce') in Paris at the request of Gerard Sillam" and "two criminal lawsuits, in the form of two writs have been issued against X at the High Court in Paris ('Tribunal de Grande Instance'), one by the Finance Section, for obtaining judgments by false pretenses and various related offenses which may have been committed before the courts in France during hearings before the 'Juge de l'Execution' (the judge handling the execution of judgments) of the High Court in Paris in April 2002 and before the 'Premier President' (chief presiding judge) of the Court of Appeals in Paris in November 2003." *Sillam*, ¶¶ 63-64. Mr. Sillam further alleges that the he has filed "a criminal complaint with civil action regarding the essence of this case, namely possible breach of trust and fraud aggravated by receiving stolen goods," *id.* at ¶ 66, and refers to numerous other demands he has made, *see, e.g., id.* at ¶¶45, 47, 51, 60, 61, 70.

**BSWB**

Muriel Siebert & Co., Inc., The Williams Capital Group, L.P., Utendahl Capital Partners, L.P (the "Underwriter Defendants").[3]

     In a nutshell, the complaint in *Sillam* alleges that Mr. Sillam is owed money for helping the Refco Entities set up and develop their new securities business in Europe beginning in 1997. The *Sillam* complaint alleges that, relying on a letter dated September 1, 1997 from Halim Saad, director of Refco Overseas's institutional commercial trade office (the "September Contract Letter"), Mr. Sillam introduced Imad Lahoud to Refco Overseas and organized a meeting in the office of Mr. Lahoud's company, Investment Management Services ("IMS"). The Sillam complaint alleges that the September Contract Letter set out commissions and rebates payable to Mr. Sillam for acting as an introducing agent regarding Mr. Lahoud. The complaint further alleges that, as a result of this introduction, significant business relationships developed between Mr. Lahoud and Refco SA, the French affiliate of the Refco Group and that Refco Group, Refco Overseas and Refco SA benefited from the goodwill contribution of HL Gestion, which took over IMS's business. Additionally, the complaint alleges that on June 29, 1999, HL Holding (another company controlled by Mr. Lahoud) entered into a Memorandum of Understanding with Refco Global Holdings and Refco SA for the joint formation of Refco HL Securities to engage in the business of clearing French stocks and developing a clearing business for financial futures by Refco SA and HL Securities, an affiliate of HL Holding. The complaint alleges that Refco HL Securities took over the business and goodwill of IMS and HL Gestion. The complaint further alleges that, as soon as he learned of the negotiations for this business combination, Mr. Sillam contacted Mr. Saad and asserted his entitlement to commissions under the September Contract Letter. The complaint alleges that Mr. Saad pronounced the September Contract Letter null and void.

     The complaint further alleges that Mr. Sillam accordingly undertook legal action to recover amounts allegedly owed to him under the September Contract Letter, including causing a writ to be served on Mr. Lahoud on October 16, 2000 and a summons to be forwarded to Mr. Bennett on November 15, 2000. Following the execution of a Merger Treaty among various Refco companies on November 28, 2000, the complaint alleges that Refco Group and Mr. Sillam met in December 2000. Mr. Sillam allegedly believed the meetings to be settlement discussions; it is alleged that they were, instead, intended to uncover Mr. Sillam's evidence in ongoing criminal proceedings involving Refco Group. The merger was completed in December 2000 or January 2001 and resulted in the formation of Refco Securities SA and the liquidation of SNC Refco Securities. The complaint states that Mr. Sillam sued Refco Overseas and Refco Securities SA in France in April 2003 and instituted various criminal complaints involving Refco Group, the Merger Treaty and the September Contract Letter, as well as a criminal complaint against Refco Overseas filed by Mr. Sillam in June 2005, alleging that the Refco Entities, Mr. Bennett, Mr. Lee, Mr. Schoen and Thomas H. Lee Partners, L.P. and Thomas H. Lee Partners Fund V, as well as Refco's auditors, Grant Thornton, issued false and fraudulent statements in disclosures filed with the French authorities prior to Refco's IPO. Additionally, the complaint alleges that the Underwriter Defendants and Grant Thornton failed to exercise due diligence in underwriting Refco's IPO.

---

[3] The NYSE and Liberty Corner Capital are alleged to be defendants in this action but are not included in the case caption. *See Sillam,* ¶¶ 90 & 92.

**BSWB**

The *Sillam* complaint asserts the following specific counts: (1) fraud against Refco Group, Mr. Bennett and Mr. Saad; (2) fraudulent misrepresentation against Refco Group and Mr. Bennett; (3) tortious interference with contract against Refco Group and Mr. Bennett; and (4) unjust enrichment against all defendants, other than Mr. Saad. As relief, the *Sillam* complaint seeks compensatory damages of $150 million, plus interest; punitive damages; restitution for unjust enrichment in the sum of $800 million, plus interest; and attorneys' fees and costs.

### E. The *BAWAG* Action

*BAWAG P.S.K. Bank Für Arbeit und Wirtschaft und Österreichische Postsparkasse Aktiengesellschaft v. Refco, Inc., et al. (In re Refco Inc., et al.) ("BAWAG")* is an adversary proceeding filed on November 16, 2005 by an Austrian Bank, BAWAG, in Refco's Chapter 11 bankruptcy proceeding. Named as defendants in *BAWAG* are Refco, Refco Group and 25 other Refco entities that are also debtors in the Refco bankruptcy, RGHI, Mr. Bennett, the Phillip R. Bennett Three Year Annuity Trust (the "Bennett Trust"), John Does 1-10 and XYZ Corporations 1-10.

The *BAWAG* complaint alleges that, after Refco completed its IPO on August 10, 2005, a Refco employee and/or Grant Thornton questioned whether a Refco receivable in the amount of $430 million had been properly accounted for as a third-party receivable when it appeared to be a related-party receivable from RGHI, which was privately held by Mr. Bennett. The *BAWAG* complaint further alleges that, by late September or early October 2005, Refco knew not only that the receivable was, in fact, a related-party receivable but also that it was likely impaired and not collectible. The complaint alleges that Refco and its related entities nevertheless undertook to support and assist Mr. Bennett in his effort to obtain a $420 million loan from *BAWAG*, which was to be used to repay the receivable. The complaint alleges that, on October 6, 2005, Mr. Bennett requested that BAWAG make the loan to RGHI and the Bennett Trust, and as inducement to make the loan, Mr. Bennett offered to pledge as collateral Refco stock then valued at over $1.2 billion that he, RGHI and the Bennett Trust owned. The complaint alleges that, following Mr. Bennett's urging, BAWAG wired €350 million into a Refco Capital Markets account at approximately 6 a.m. on October 10, 2005, secured by the pledged shares. The complaint further alleges that, less than two hours later, Refco issued a press release disclosing the $430 million receivable owed to Refco by a company controlled by Mr. Bennett and the repayment of the receivable in cash, that Refco's financial statements could no longer be relied upon and that Mr. Bennett would be placed on leave. The complaint alleges that at no time did the defendants disclose to BAWAG the facts relating to the receivable, the unreliability of Refco's financial statements, Mr. Bennett's imminent leave of absence, or the impending public disclosure of these facts. The complaint alleges that the defendants wrongfully and intentionally concealed the facts disclosed in the October 10 press release from BAWAG and had BAWAG been aware of any of the key facts set forth in that press release, it would not have made the loan. The complaint alleges that, as soon as BAWAG learned of press release, it immediately tried to stop the wire transfer but could not. On October 21, BAWAG delivered a notice of default under the loan asserting that misrepresentations and omissions had been made by the borrowers and demanding an immediate return of the funds. The complaint alleges that the shares pledged as collateral, which had been worth $1.2 billion, now trade for less than $1.00 per share.

**BSWB**

Ms. Andrea Lieberman
January 24, 2006
Page 8

Based on the above, the complaint asserts seven causes of action: (1) imposition of a constructive trust against Refco, Refco Capital Markets and any John Doe and XYZ Corporation defendants in possession of the loan proceeds; (2) fraud in the inducement against Mr. Bennett, RGHI and the Bennett Trust; (3) fraud against Refco, Mr. Bennett and Refco Capital Markets; (4) civil conspiracy against Refco, Mr. Bennett, RGHI and the Bennett Trust; (5) unjust enrichment against Refco, Mr. Bennett, RGHI, the Bennett Trust, Refco Capital Markets, Refco Group and any John Doe and XYZ Corporation defendants in possession of the loan proceeds; and (7) conversion against Refco, Refco Capital Markets and any John Doe and XYZ Corporation defendants in possession of the loan proceeds. As relief, BAWAG seeks the imposition of a constructive trust on the loan proceeds, rescission, judgment of not less than €350 million, interest, punitive and exemplary damages, attorneys' fees and costs.

**II. Coverage Discussion**

The Policy provides a $20 million maximum aggregate limit of liability, inclusive of **Defense Expenses**. XL has reviewed the Lawsuits for potential coverage under the Policy based on the information the Insureds have made available to it. Based on that information, XL is denying coverage for the Lawsuits, as explained below.

First, coverage for each of the Lawsuits is excluded by the Policy's Inverted Representation Endorsement, which provides:

> In consideration of the premium charged, no coverage will be available under this Policy for Loss, including Defense Expenses, from Claims arising from any fact, circumstance or situation of which, as of the effective date of this Policy, any Insured had knowledge and had reason to suppose might afford grounds for any Claim that would fall within the scope of the insurance afforded by this Policy.

> All other terms, conditions and limitations of this Policy shall remain unchanged.

*See* The Policy, End. No. 13. Based on allegations in the Securities Class Actions, the *Mehta* complaint, the Criminal Complaint, the *Sillam* complaint, the *BAWAG* complaint, and as admitted by Refco in its press releases, Mr. Bennett had knowledge as far back as 1998 of uncollectible historical obligations owed by third parties unrelated to Refco that make up the $430 million receivable, revelation of which is the subject of each of the Lawsuits. The effective date of the Policy is August 11, 2005. Given that Mr. Bennett (if not others) had knowledge of the hidden receivable as of August 11, 2005, the Policy's Inverted Representation Endorsement bars coverage for each of the Lawsuits.

Second, coverage under the Policy is only available for "a **Claim** first made against the **Insured Persons** during the **Policy Period** ... for a **Wrongful Act**, except to the extent that such **Loss** is paid by any other **Insurance Program** or as indemnification from any source." *See* The Policy, I. Because it is not a **Claim** first made during the **Policy Period**, there is no coverage for the *Sillam* complaint under the Policy. The **Policy Period** of the Policy is August 11, 2005 to August 11, 2006. The *Sillam* complaint

**BSWB**

Ms. Andrea Lieberman
January 24, 2006
Page 9

makes clear that, before the Policy incepted on August 11, 2005, Mr. Sillam made several demands for monetary and non-monetary relief and filed lawsuits, both in the United States and in France, based on the same or related, or series of related, facts, circumstances, situations, transactions or events as those alleged in the *Sillam* complaint. *See Sillam* Complaint, ¶8 (referring to "a related complaint" filed in September 2004 in New York state court, alleging the same injuries alleged in the *Sillam* complaint); ¶45 (referring to a writ served in France in October 2000); ¶47 (referring to an "answering letter" dated November 6, 2000 demonstrating Mr. Bennett's knowledge of Mr. Sillam's claims); ¶48 (referring to a letter communicating summons and answer to Refco Group and Mr. Bennett); ¶51 (referring to a certified letter dated December 18, 2000 giving "formal notice" to SNC Refco Securities of Mr. Sillam's rights under the September Contract Letter); ¶60 (referring to Refco Overseas's January 10, 2001 letter rejecting Mr. Sillam's rights to commissions); ¶61 (referring to January 2001 $50,000 offer of settlement to Mr. Sillam); ¶63 (referring to litigation against Refco Overseas and Refco Securities SA in progress since April 2003 in France); ¶64 (referring to two criminal lawsuits filed in France in 2002 and 2003); ¶66 & Exh. L (referring to a "criminal complaint with civil action regarding the essence of [this] case" filed in France on March 4, 2004); and ¶70 (referring to a criminal complaint filed on June 30, 2005 in France alleging that Refco Overseas and Refco Securities filed false and misleading financial statements in relation to Refco's August 2005 IPO).

Third, even assuming the *Sillam* complaint was a **Claim** first made during the **Policy Period** – which it is not – coverage for the *Sillam* complaint would be excluded under the Policy's Pending and/or Prior Litigation Exclusion, which provides as follows:

> In consideration of the premium charged, no coverage will be available under this Policy for Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or Wrongful Act, underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding or arbitration which was brought prior to August 11, 2005.

> All other terms, conditions and limitations of this Policy shall remain unchanged.

*See* The Policy, End. No. 7. As detailed above, the *Sillam* complaint arises out of and is based upon the same facts, circumstances, situations, transactions, events or **Wrongful Acts** alleged in litigation filed prior to August 11, 2005. Therefore, coverage for the *Sillam* complaint would be excluded under the Policy's Pending and/or Prior Litigation Exclusion.

Fourth, to the extent that the *Sillam* complaint is based upon or arises out of conduct by any Insured prior to August 5, 2004, coverage for the *Sillam* complaint would be excluded under the Policy's Prior Acts Exclusion, which provides as follows:

> In consideration of the premium charged, no coverage will be available under this Policy for Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any act, error, omission, misstatement,

**BSWB**

Ms. Andrea Lieberman
January 24, 2006
Page 10

misleading statement, neglect, breach of duty, or Wrongful Act, committed or allegedly committed prior to August 5, 2004.

*See* The Policy, End. No. 2. As set forth above, the *Sillam* complaint arises out of alleged conduct by several Insured Persons occurring prior to August 4, 2005, including Refco Overseas's and Mr. Saad's refusal to honor the September Contract Letter beginning in 1999. Therefore, coverage for the *Sillam* complaint would be additionally excluded under the Policy's Prior Acts Exclusion.

Fifth, to the extent that the *Sillam* complaint is based on, arises out of, directly or indirectly results from, is in consequence of, or in any way involves any fact, circumstance or situation, transaction, event or **Wrongful Act** that was the subject of any notice given under any other insurance policy before the inception date of the Policy, Exclusion (B)(2) of the Policy would exclude coverage for the *Sillam* complaint. *See* The Policy, V.(B)(2).

Sixth, to the extent that they constitute a **Claim**, the Securities Class Actions, the *Mehta* complaint, the Criminal Complaint, the *Sillam* complaint, and the *BAWAG* complaint are deemed to be one **Claim** as they appear to involve the same **Wrongful Acts** or **Interrelated Wrongful Acts** relating to alleged misrepresentations concerning Refco's IPO. *See* The Policy, IV.(G). The Policy defines **Interrelated Wrongful Acts** as "any **Wrongful Act** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related, or series of related, facts, circumstances, situations, transactions or events." *See* The Policy, II.(J). Based on allegations in the *Sillam* complaint that Mr. Sillam filed an action in France in June 2005 against one or more of the Insureds alleging that Refco's public filings in connection with its August 2005 IPO were false and misleading, XL reserves its right to deny coverage for each of the Lawsuits as **Claims** first made prior to the inception of the Policy and/or pursuant to the Policy's exclusions for Pending and/or Prior Litigation and **Claims** noticed under prior insurance policies.

Based on the foregoing, XL is denying coverage for the Lawsuits. Without prejudice to its denial of coverage, XL specifically reserves the right to raise any other terms and conditions of the Policy as defenses to coverage.

Please feel free to contact us with any questions.

Very truly yours,

James A. Skarzynski
Cecilia W. Kaiser

cc:    R. Damian Brew, Esq. (via email)

N:\13308\Correspondence\Coverage\Lieberman 1.doc

# EXHIBIT D

**BSWB**

Attorneys at Law

**Chicago**
**New York**
**London**

Boundas, Skarzynski, Walsh & Black, LLC

One Battery Park Plaza   22nd Floor   New York, New York 10004
P: 212 821 7750   F: 212 820 7740/7788   W: www.bswb.com

James A. Skarzynski, Esq.
Direct Dial 212 820 7720
Direct Fax 212 820 7775
jskarzynski@bswb.com

Cecilia W. Kaiser, Esq.
Direct Dial 212 820 7710
ckaiser@bswb.com

March 6, 2006

**VIA E-MAIL & FIRST CLASS MAIL**
Ms. Andrea Lieberman
Marsh USA
500 West Monroe Street
Chicago, Illinois 60661

Re:    Insured:     Refco, Inc.
        Issuing Co.:  XL Specialty Insurance Company
        Policy No.:   ELU089673-05
        XL Ref. No.: ELU003490
        <u>Our File No.: 13304</u>

Dear Andrea:

As you know, we have been retained by XL Specialty Insurance Company ("XL") to represent its interests in connection with Classic A-Side Management Liability Insurance Policy No. ELU089673-05 (the "Policy") issued to Refco, Inc. ("Refco") for the claims-made policy period of August 11, 2005 to August 11, 2006. We are directing this letter to you as the authorized insurance representative for all of the Insureds.[1] To the extent that you are not acting as the authorized representative for any of the Insureds, we ask that you please advise us and forward a copy of this letter to the appropriate party(ies).

On XL's behalf, this letter will acknowledge receipt of letters from Marsh dated February 8, 2006, February 10, 2006 and February 21, 2006 concerning the following matters (collectively, the "Newly Noticed Matters"):

(1)    SEC Order Directing Private Investigation And Designating Officers To Take Testimony dated October 12, 2005 (the "SEC Investigation");

(2)    *Thomas H. Lee Equity Fund V, L.P., et al. v. Bennett, et al.,* Case No. 05CV9608 (S.D.N.Y.) (the "*Lee* Action");

(3)    Subpoena issued by the Commodity Futures Trading Commission ("CFTC Subpoena");

(4)    *Unovalores, Ltd. v. Bennett,* Case No. L1564-05 (N.J. Sup.) (the "*Unovalores* Action");

(5)    *United States v. Bennett.,* Case No. 05CR___ (S.D.N.Y.) (the "Grand Jury Indictment");

---

[1] By "Insureds" we mean Refco and Insured Persons.

**BSWB**

Ms. Andrea Lieberman<br>
March 6, 2006<br>
Page 2

    (6)    *Gensheimer v. Bennett, et al.*, Case No. 05CV10318 (S.D.N.Y.); and

    (7)    *Teachers' Retirement System of the State of Illinois, et al. v. Lee, et al.*, Case No. 05CV10403 (S.D.N.Y.).

As set forth below, XL is denying coverage for the Newly Noticed Matters.

## I.  The Newly Noticed Matters

### A.  The Securities Class Action Lawsuits

*Gensheimer* and *Teachers' Retirement* are purported shareholder class actions filed in the United States District Court for the Southern District of New York. *Gensheimer* was filed on December 8, 2005, and *Teachers' Retirement* was filed on December 12, 2005. Both of these lawsuits allege violations of the federal securities laws.

*Gensheimer* and *Teachers' Retirement* are purportedly brought on behalf of all persons or entities that purchased or otherwise acquired the publicly traded securities of Refco from August 5, 2004 to October 18, 2005.[2] The plaintiff in *Gensheimer* is an individual, whereas the plaintiffs and proposed class representatives in *Teachers' Retirement* are institutional investors.[3] Named as defendants in these actions are Refco Group Holdings, Inc. ("RGHI") and the following individuals, who are identified as Refco directors and/or officers:  Philip Bennett, Gerald Sherer, Leo Breitman, Nathan Gantcher, David Harkins, Scott Jaeckel, Thomas Lee, Ronald O'Kelley, Scott Schoen, William Sexton, Santo Maggio, Dennis Klejna, and Perry Rotkowitz. Other defendants named in these complaints include Credit Suisse First Boston LLC, Goldman Sachs & Co., Banc of America Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith, Inc., Deutsche Bank Securities, Inc., J.P. Morgan Securities, Inc.; Mayer, Brown, Rowe & Maw LLP ("Mayer Brown") and Mayer Brown partner Joseph Collins; Grant Thornton, LLP and Grant Thornton partner Mark Ramler; Sandler O'Neill & Partners, L.P.; HSBC Securities (USA) Inc.; William Blair & Co., LLC; Harris Nesbitt Corp.; CMG Institutional Trading, LLC; Samuel A. Ramirez & Co., Inc.; Muriel Siebert & Co., Inc.; The Williams Capital Group, L.P.; Utendahl Capital Partners, L.P.; and Liberty Corner Capital; Liberty Corner Capital Strategies, Liberty Corner Advisors (the "Liberty Entities") and the Liberty Entities' CEO and majority shareholder, Terry Pigott.

*Gensheimer* and *Teachers' Retirement* generally allege that, using falsified financial statements and without disclosing material adverse information, the defendants recapitalized Refco via a $600

---

[2] *Gensheimer* describes its class as all purchasers of Refco common stock pursuant or traceable to Refco's August 11, 2005 IPO and all who purchased or acquired "original issuance" Refco bonds pursuant to Refco's August 5, 2004 bond offering and who subsequently purchased or acquired registered Refco bonds pursuant to Refco's April 13, 2005 prospectus and exchange offer, whereas *Teachers' Retirement* describes its class as all who purchased Refco's 9% bonds in its August 5, 2004 bond offering from the Original Purchaser/Reseller Banks and all who purchased or otherwise acquired common stock issued pursuant to the August 11, 2005 IPO during the period of August 11, 2005 to October 18, 2005.

[3] We note that one of the class representatives proposed for *Teachers' Retirement* is City of Pontiac General Employees' Retirement System, the named plaintiff and proposed class representative in the *City of Pontiac* action.

**BSWB**

million public bond offering to institutional investors in August 2004 and in August 2005, again using Refco's falsified financial statements and without disclosing material information, undertook an Initial Public Offering ("IPO") for proceeds of hundreds of millions of dollars. The complaints further allege that, in October 2005, members of the Refco management who had not been "in" on the ongoing falsification of its financial statements discovered suspicious quarter-end transactions between the Liberty Entities, Refco and Mr. Bennett, leading to the disclosure on October 10, 2005 that Mr. Bennett owed Refco $430 million and was being placed on a leave of absence. The complaints allege that Refco also acknowledged at that time that, based on the undisclosed related party transaction, its prior financial statements for the fiscal years ending 2002 through 2005 and the quarter ended May 31, 2005 should not be relied upon. The complaints further allege that, as a result of defendants' conduct, plaintiffs and the other members of the purported class suffered damages in connection with their purchases and sales of Refco's bonds purchased in August 2004 and stock issued pursuant to the August 2005 IPO, as the price of Refco's publicly traded stock and bonds declined when the truth concerning the previously undisclosed false statements and financial falsifications became public in October 2005.

*Gensheimer* and *Teachers' Retirement* assert the following specific claims for relief: (1) violations of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"); (2) violations of Sections 12(a)(2) and 15 of the Securities Act; and (3) violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 (the "Exchange Act"). As relief, the complaints seek class certification, unspecified damages, rescissory damages to the extent class members still hold Refco shares or bonds, and costs and expenses and all other appropriate relief.

### B. The *Lee* and *Unovalores* Actions

The *Lee* Action was filed on November 14, 2005 in the United States District Court for the Southern District of New York. Plaintiffs in the *Lee* action are private equity funds: Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V., L.P. and Thomas H. Lee Equity (Cayman) Fund V, L.P. (collectively, the "Funds"). Named as defendants in the *Lee* Action are Phillip Bennett; Tone Grant, who is identified as the president of Refco Group prior to Mr. Bennett; Santo Maggio, who is identified as the president and CEO of Refco Securities, LLC, and Refco Capital; and RGHI. The complaint in the *Lee* Action alleges that the Funds lost hundreds of millions of dollars in connection with the defendants' fraud in inducing the Funds to acquire a large equity stake in Refco Group Ltd., LLC, in August 2004 (the "2004 Purchase"). The complaint alleges that the Funds undertook a ten-month long due diligence, spending over $10 million in fees to outside advisors in the process, in connection with the potential investment in Refco. The complaint further alleges that the Funds relied on Refco's financials and Mr. Bennett's representations in deciding to make the investment but that, unbeknownst to them, beginning sometime prior to 2004, the defendants had embarked on a secretive and willful scheme to misrepresent Refco's true financial picture by falsifying its books and records, including the financial statements provided to the Funds in the course of their due diligence for the 2004 Purchase. The complaint alleges that the parties entered into an Equity Purchase Agreement, which governed the 2004 Purchase, pursuant to which RGHI agreed to indemnify the Funds for all damages resulting from a breach of the covenants contained in the agreement, and that Messrs. Bennett and Grant personally guaranteed 50% of RGHI's indemnification obligation. The complaint also alleges that the

**BSWB**

Ms. Andrea Lieberman
March 6, 2006
Page 4

defendants' fraud was revealed in October 2005, at which time Refco issued the press release announcing Mr. Bennett's manipulation of Refco's financial statements and following which Refco's stock price dropped precipitously and the company filed for Chapter 11 bankruptcy protection.

In addition to asserting claims for fraud, negligent misrepresentation, breach of contract, contribution and indemnification, the *Lee* Action also asserts claims for violation of Section 10(b) and Rule 10b-5 of the Exchange Act. As relief, the *Lee* Action seeks compensatory damages in excess of $245 million, plus interest; exemplary damages; indemnification under the Equity Purchase Agreement and for damages caused by the breach of that agreement; a declaration that Messrs. Bennett, Maggio and RGHI are jointly and severally liable to the Funds; fees and expenses; and any other just and proper relief.

The *Unovalores* Action was originally filed in the Superior Court of New Jersey for Somerset County on November 3, 2005.[4] The plaintiff in *Unovalores* Action is a corporation (Unovalores), and the only named defendant in that action is Phillip Bennett. Unovalores alleges that it opened an account at Refco Capital Markets, Ltd. ("Refco Capital") on or about July 18, 2005, and entered into a repurchase transaction with Refco Capital on or about August 31, 2005 (the "Repurchase Transaction"). The complaint in the *Unovalores* Action alleges that, had Unovalores known that Refco Capital was not financially strong and stable, it would not have entered into the Repurchase Transaction, and that, unbeknownst to Unovalores, Mr. Bennett was engaged in a "massive fraud on, among others, ... Refco Capital's account holders," which included improperly diverting proceeds from Refco Capital's repurchase transactions. Unovalores alleges that the $430 million receivable from an entity controlled by Mr. Bennett was part of his scheme to artificially enhance Refco's and Refco Capital's financial statements, including the Registration Statement and Prospectus for Refco's IPO. Unovalores alleges that, as a result of Mr. Bennett's fraud, Refco announced on or about October 13, 2005 that Refco Capital had been rendered illiquid and was unable to honor its contractual obligations to its account holders or to return assets to them and that Unovalores has lost all, or substantially all, of its assets in its Refco Capital account.

The *Unovalores* action asserts the following counts: (1) fraud; (2) New Jersey RICO, N.J.S.A. 2C:41-1(c); (3) conspiracy under New Jersey RICO, N.J.S.A. 2C:41-1(d); (4) breach of fiduciary duty; (5) tortious interference with contract and (6) writ of attachment. As relief, the complaint seeks compensatory and punitive damages, consequential damages, issuance of a writ of attachment to seize Mr. Bennett's personal and real property located in Somerset County, New Jersey, a preliminary and permanent order of attachment against all of Mr. Bennett's assets; fees, interest and costs of suit; and all other just and equitable relief.

---

[4] We understand that the *Unovalores* Action was subsequently removed to the United States District Court for the District of New Jersey and that a motion to remand was filed and a cross-motion for transfer of venue to the United States District Court for the Southern District of New York has also been filed.



### C. The Grand Jury Indictment

The Grand Jury Indictment relates to the previously noticed criminal proceeding, *United States of America v. Phillip Bennett*, a criminal complaint filed on October 12, 2005 in the United States District Court, Southern District of New York. The eight-count Grand Jury Indictment charges Mr. Bennett with Conspiracy to Commit Securities Fraud, Wire Fraud, and To Make False Filings with the SEC; Securities Fraud; False Filing with the SEC – Exchange Act; two counts of False Filing with the SEC – Securities Act; and three counts of Wire Fraud. The Grand Jury Indictment alleges that, from the late 1990's, Mr. Bennett and other sought to hide Refco's losses through its own and its customers' trading in securities and commodities. The Grand Jury Indictment alleges that, when customers to whom Refco had extended credit sustained market losses and were unable to make payments on the credit Refco had extended, Refco liquidated certain of those positions and assumed the resulting losses. And rather than write off those losses, the Grand Jury Indictment alleges that Mr. Bennett caused those and other losses to be transferred to RGHI, a company he controlled. The Grand Jury Indictment further alleges that this resulted in Refco's books reflecting a large receivable from RGHI. The Grand Jury Indictment further alleges that, in order to hide the losses, Mr. Bennett directed a series of transfers, which concealed the losses and also caused Refco to make false and fraudulent filings with the SEC. The Grand Jury Indictment alleges that, in reliance on Refco's public filings and accompanying audited financial statements, the public purchased approximately $583 million of Refco's common stock in the Refco IPO on August 10, 2005. The Grand Jury Indictment alleges that, upon discovering the $430 million receivable on its books from RGH in early October 2005, Refco demanded repayment of the debt from Mr. Bennett, and issued a press release announcing its discovery, which caused the market price of Refco stock to plummet, resulting in a loss of over $1 billion in market capitalization, followed by Refco's and 23 of its subsidiaries' filing for bankruptcy on October 17, 2005.

The Grand Jury Indictment seeks forfeiture of all property traceable to the alleged fraud offenses, in an amount of at least $700 million, for the proceeds obtained as a result of the offenses, or substitute property.

### D. The Government Investigations

Refco has also provided notice to XL of two government investigations: (1) the SEC Investigation and (2) the CFTC Subpoena.

In the SEC Investigation, a formal Order Directing Private Investigation And Designating Officers to Take Testimony dated October 12, 20005, entitled *In the Matter of Refco, Inc.*, HO-10337, was issued (the "SEC Investigative Order"). Although Refco has not been able to provide a copy of the SEC Investigative Order, pursuant to the SEC's express condition that Mr. Bennett's defense counsel use the document solely in connection with their representation of him, Refco has described the investigation as one inquiring whether "Refco, certain of its present and former officers, directors or employees (and others) have committed substantially the same Wrongful Acts set out against Mr. Bennett in the Complaint and the various civil suits filed against him."

**BSWB**

Ms. Andrea Lieberman
March 6, 2006
Page 6

The CFTC Subpoena was also issued pursuant to a formal investigative order, this one dated October 13, 2005 and amended November 15, 2005 (the "CFTC Investigative Order"). Refco has not been able to provide a copy of the CFTC Investigative Order because the CFTC has refused to provide it to Refco. Refco's defense counsel has reviewed the CFTC Investigative Order, however, and reports that it is entitled In Re: Refco LLC, Refco FX, Refco Capital Markets, Refco Group, Liberty Corner Asset Management, Liberty Corner Capital Strategies and Phillip R. Bennett and states that it is to:

> Determine whether, in connection with the transfer of funds by and between various Refco entities and/or various hedge funds, or the reporting of or representations made about such transfers(,) Refco Inc., Refco LLC, Refco FX, Refco Capital Markets, Refco Group, Liberty Corner Asset Management, Liberty Corner Capital Strategies, Mr. Bennett or any other persons or entities, have engaged, are engaging or are about to engage in acts and practices in violation of Sections 9(a)(3) or 9(a)(4) or Commission Regulations 1.14 and 1.15.

**II. Coverage Discussion**

As you know, the Policy provides a $20 million maximum aggregate limit of liability, inclusive of **Defense Expenses**. XL has reviewed the Newly Noticed Matters for potential coverage under the Policy based on the information the Insureds have made available to it. Based on that information, XL is denying coverage for each of the Newly Noticed Matters, as explained below.

Preliminarily, based on the information provided to XL, the SEC Investigation does not appear to constitute a **Claim** as defined by the Policy. The Policy defines **"Claim"** to mean:

    (1)    a written demand for monetary or non-monetary relief;
    (2)    any civil or criminal judicial proceeding in a court of law or equity, or arbitration; or
    (3)    a formal civil, criminal, or administrative regulatory proceeding or formal investigation against an **Insured Person**.

*See* The Policy, II.(B). The information provided to XL indicates only that a formal investigative order has issued against Refco, which is not an **Insured Person** under the Policy. Accordingly, based on the information presently available to XL, the SEC Investigation does not implicate coverage under the Policy.

Even assuming arguendo that the SEC Investigation did constitute a **Claim** under the Policy – which it does not – coverage for the SEC Investigation and for each of the other Newly Noticed Matters is not available under the Policy. To the extent that the Newly Noticed Matters each constitute a **Claim** under the Policy, they would be deemed to be one and the same **Claim** as the previously noticed matters, which were acknowledged in our January 24, 2006 letter, because they appear to involve the same **Wrongful Acts** or **Interrelated Wrongful Acts**. *See* The Policy, IV.(G). The Policy defines

**BSWB**

Ms. Andrea Lieberman
March 6, 2006
Page 7

**Interrelated Wrongful Acts** as "any **Wrongful Act** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related, or series of related, facts, circumstances, situations, transactions or events." *See* The Policy, II.(J). Accordingly, coverage for the Newly Noticed Matters is barred for the same reasons that coverage for the previously noticed matters is barred, as set forth in our January 24, 2006 letter, which we incorporate herein by reference.

Without prejudice to its denial of coverage, XL specifically reserves the right to raise any other terms and conditions of the Policy as defenses to coverage.

Please feel free to contact us with any questions.

Very truly yours,

James A. Skarzynski
Cecilia W. Kaiser