UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x
XL SPECIALTY INSURANCE COMPANY,

                Plaintiff,

v.

JOHN D. AGOGLIA, PHILLIP R. BENNETT, LEO R.
BREITMAN, EDWIN L. COX, SUKHMEET DHILLON,
THOMAS H. DITTMER, NATHAN GANTCHER,
STEPHEN GRADY, TONE GRANT, THOMAS HACKL,
DAVID V. HARKINS, SCOTT L. JAECKEL, DENNIS
A. KLEJNA, THOMAS H. LEE, ERIC G. LIPOFF,
SANTO C. MAGGIO, PETER MCCARTHY, JOSEPH
MURPHY, FRANK MUTTERER, RONALD L.
O'KELLEY, RICHARD N. OUTRIDGE, SCOTT A.
SCHOEN, WILLIAM M. SEXTON, GERALD SHERER,
PHILIP SILVERMAN and ROBERT C. TROSTEN,

                Defendants.
-------------------------------------------------------------------- x

No. 08 CIV 3821 (GEL)

*Electronically filed*

## INSUREDS' STATEMENT OF ADDITIONAL MATERIAL FACTS AND RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS SUBMITTED ON BEHALF OF XL SPECIALTY INSURANCE COMPANY PURSUANT TO LOCAL RULE 56.1

KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
Telephone:   (310) 788-4400
  -and-
575 Madison Avenue
New York, NY 10022-2585
Telephone:   (212) 940-8800

*Attorneys for Dennis A. Klejna*

PROSKAUER ROSE LLP
1585 Broadway
New York, New York 10036-8299
Telephone: (212) 969-3000

*Attorneys for Richard N. Outridge*

FRIEDMAN & WITTENSTEIN
A Professional Corporation
600 Lexington Avenue
New York, NY 10022
Telephone: (212) 750-8700

*Attorneys for William M. Sexton and Gerald M. Sherer*

HELLER EHRMAN LLP
Times Square Tower
7 Times Square
New York, NY 10036-6524
Telephone: (212) 832-8300

*Attorneys for Philip Silverman*

GAGE SPENCER & FLEMING, LLP
410 Park Avenue, 9th Floor
New York, New York 10022
Telephone: (212) 768-4900

*Attorneys for John D. Agoglia and Peter McCarthy*

WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0119
Telephone: (212) 310-8000

*Attorneys for Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley and Scott A. Schoen*

HARVEY FISHBEIN
61 Broadway, Suite 1601
New York, New York 10006
Telephone: (212) 233-9555

*Attorneys for Joseph Murphy*

Pursuant to Rule 56.1 of the Local Rules for the Southern District of New York, Defendants and Counterclaim Plaintiffs Dennis A. Klenja, William M. Sexton, Gerald Sherer, Joseph Murphy, Richard N. Outridge, Phillip Silverman, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley and Scott A. Schoen, John D. Agoglia, and Peter McCarthy ( collectively, "the Insureds") respectfully submit the following Statement of Additional Material Facts and Response to Statement of Undisputed Material Facts submitted on behalf of XL Specialty Insurance Company. Except as expressly indicated herein, the Insureds' response of "Not Controverted" to any alleged fact should be construed as a response only for the purpose of responding to this motion and should not be taken as an admission of fact in any litigation other than the above-captioned action. Evidentiary references are to the Declaration of Pamela Sylwestrzak submitted in opposition to XL's motion for summary judgment ("Sylwestrzak Decl.").

1. Prior to its Initial Public Offering ("IPO"), Refco Inc. ("Refco") (or a predecessor entity), was a closely held financial services/brokerage firm. It provided execution and clearing services for exchange-traded derivatives and provided prime brokerage services in the fixed income and foreign exchange markets. (IJX 18 at 1)

**Not Controverted for purposes of this motion.**

2. On August 11, 2005, Refco conducted its IPO, selling over 30.4 million shares to the public. (Sandnes Aff't Ex. 33 at 9)

**Not Controverted for purposes of this motion.**

3. The IPO, however, raised only $583 million in new capital, because nearly half of the shares were actually sold by existing shareholders, including Bennett. (*Id.* at 113)

**Not Controverted, for purposes of this motion, that the IPO raised approximately $583 million.**

4.  Bennett sold Refco stock in the IPO valued at more than $100 million. (IJX 18 at 29)

**Not Controverted for purposes of this motion.**

5.  In connection with the IPO, Refco procured a large program of directors and officers coverage. (IJX 26-31)

**Not Controverted for purposes of this motion.**

6.  The program was a $70 million "tower" of insurance, comprised of multiple policy layers, each layer issued by a different insurance company. (Toolan Dec. ¶3; IJX 26-31)

**Not Controverted for purposes of this motion.**

7.  One of the policies issued as part of that "tower" was issued by XL, policy number ELU089673-05 (the "XL Policy"). (Toolan Dec. Ex. A)

**Controverted.** On August 10, 2005, XL issued a policy binder for the excess policy it had agreed to issue to Refco for the 2005-2006 Policy Period. (Sylwestrzak Decl. ¶ 4 & Ex. A.) The Policy Binder sets forth the material terms of the insurance agreement between Refco and XL. It refers to the form of policy to be issued by XL and to the Endorsements to be added to that policy form. Notably, the form to which the Policy Binder refers contains no Inverse Representation Endorsement ("IRE"), and the Policy Binder does not list the IRE among the Endorsements to be added. (*See id.*).

On or about December 27, 2005, more than 4-1/2 months after XL's Policy Binder had been issued and more than two months after claims against the Insureds were tendered to XL (*see* Compl. ¶¶ 75, 80, 83), XL issued its excess policy for the 2005-2006 Policy Period in the amount of $20 million. (Sylwestrzak Decl. ¶ 6 and Ex. B) The XL Policy, as issued, includes as an endorsement the IRE, which purports to exclude Claims

> arising from any fact, circumstance or situation of which, as of the effective date of this Policy, any Insured had knowledge and had reason to suppose might afford grounds for any Claim that would fall within the scope of the insurance afforded by this Policy.

(*Id.* at Endorsement No. 13). The XL Policy elsewhere makes clear that the knowledge of one insured cannot be used as a ground to deny coverage to another insured. (*Id.* at § IV, Conditions (K); *see also id.* at III, Exclusions). Accordingly, which document constitutes the operative contract, the Policy Binder or the ultimately issued XL Policy, which is inconsistent with the Policy Binder, is in controversy and is a subject of factual dispute. In addition, there has been virtually no discovery conducted to date and Insureds have reason to believe that discovery will yield additional admissible evidence relevant to this issue (see Kim Decl.).

8.   Exhibit A to the Toolan Dec. is a true and correct copy of the XL Policy. (*Id.* at ¶2 and Ex. A)

**Controverted. Although Exhibit A is a true and correct copy of the document ultimately issued by XL, the XL Policy is not consistent with the Policy Binder and accordingly the XL Policy was not the operative contract during the relevant time periods (see response to paragraph number 7).**

9.   The XL Policy covers claims first made during the period of August 11, 2005 to August 11, 2006. *Id.* Ex. A.

**Controverted. The Policy Binder covers claims first made during the period in question (see response to paragraph number 7).**

10.   The XL Policy sits atop the D&O tower, at $20 million excess of $50 million in underlying coverage. (*Id.* Ex. A; IJX 26-31)

**Controverted, although it is accurate if the Policy Binder is substituted for the XL Policy (see response to paragraph number 7).**

84314760

11.     The XL Policy provides coverage to directors and officers for non-indemnifiable claims in excess of any other insurance program, including the $50 million of underlying coverage. (Toolan Dec. Ex. A; IJX 26-31)

**Controverted, although it is accurate if the Policy Binder is substituted for the XL Policy (see response to paragraph number 7).**

12.     Subject to all of its terms and conditions, the XL Policy affords specified coverage to "Insured Persons" (defined by the Policy as "any past, present or future director or officer . . . of the Company") for "Loss resulting from a Claim first made against the Insured Persons during the Policy Period . . . for a Wrongful Act, except to the extent that such Loss is paid by any other Insurance Program or as indemnification from any source." (Toolan Dec. Ex. A, Section II (I)).

**Not Controverted, although the terms of the XL Policy speak for itself and is not the operative contract (see response to paragraph number 7).**

13.     Endorsement 13 to the XL Policy (the "IRE") provides as follows:

> In consideration of the premium charged, *no coverage will be available* under this Policy for Loss, including Defense Expenses, *from Claims arising from any fact, circumstance or situation of which*, as of the effective date of this Policy, *any Insured had knowledge* and had *reason to suppose might afford grounds for any Claim* that would fall within the scope of the insurance afforded by this Policy.

(Toolan Dec. Exhibit A, Endorsement No. 13 (*emphasis added*)).

**Not Controverted, but the XL Policy is not the operative contract (see response to paragraph number 7).**

14.     The XL Policy includes the IRE. (Toolan Dec. Ex. A)

**Controverted. The IRE was not included in the Binder, which was the operative contract. XL was obligated to provide a policy consistent with the Binder. Thus, the IRE should not be considered part of the XL Policy.**

15. XL's obligations (if any) to provide insurance coverage under the its contract of insurance are subject to the terms of the IRE. (Toolan Dec. ¶ 25 and Ex. A)

**Controverted (see response to paragraph number 7).**

16. The IRE is clear and unambiguous. (Toolan Dec. Ex. A)

**Controverted. The IRE is inconsistent with other terms of the XL Policy in that it contains in its "CONDITIONS" section a paragraph entitled "Representation Clause." The second sentence of that clause states: "No knowledge or information possessed by any Insured Person will be imputed to any other Insured Person for the purpose of determining the availability of coverage with respect to Claims made against any other Insured Person." (Sylwestrzak Decl. Ex. B at § IV, Conditions (K)). The second sentence does not contain any reference to the application but rather simply states that the knowledge of one insured cannot be used to deny coverage to another insured. (*See id.*). Further, the IRE is ambiguous when read with the other terms of the XL Policy.**

17. Under the IRE, if any insured person knows of any fact, circumstance or situation which such person had reason to suppose might afford grounds for any Claim any Claim arising from that fact, circumstance or situation is not covered by the XL Policy. (*Id.* at Ex. A, Endorsement 13)

**Controverted (see response to paragraph 16).**

18. The IRE is an enforceable limitation on the coverage provided by the XL Policy. (*Id.* at Ex. A)

**Controverted (see response to paragraphs 7 and 16).**

19. As of August 11, 2005, the inception date of the XL Policy, Refco's most senior directors and officers were engaged in a widespread and massive scheme to conceal hundreds of

- 6 -

millions of dollars of uncollectible receivables, including $430 million owed to Refco by a related off-balance sheet entity called Refco Group Holdings, Inc. ("RGHI"). (IJX 17-25)

**Controverted, except it is not controverted for purposes of this motion that Bennett and certain of Refco's senior officers were engaged in a fraudulent scheme designed to hide Refco's true financial condition.**

20. The RGHI receivable was used to hide several significant customer losses, proprietary trading losses, bad debts and various operating expenses. (IJX 18 at ¶9 and IJX 21 at 17:12-14)

**Controverted. The Insureds refer to the indictment S3 05 Cr 1192 (NRB) (IJX 18 at ¶9) for its true and complete contents. The plea allocution by Bennett (IJX 21 at 17:12-14) only admits that the RGHI Receivable was composed of, amongst other things, historical customer losses, bad debts, and expenses that RGHI had incurred on behalf of Refco. The allocution does not specify that the RGHI Receivable included proprietary trading losses.**

21. This resulted in a receivable being due from RGHI to Refco, which, at times, exceeded $1 billion. (IJX 17, 18, 20, 21, 22)

**Not Controverted for purposes of this motion.**

22. The size and related party nature of the RGHI receivable was concealed from various auditors, investors, and lenders. (IJX 17, 18, 20, 21, 22)

**Not Controverted for purposes of this motion.**

23. At the end of each year, starting in year-end in February 1998, thru year-end 2004, and quarterly from May 2004 thru May 2005, Refco engaged in a complex series of multi-million dollar "round-trip" loans. (IJX 17, 18, 20, 21, 22)

**Not Controverted for purposes of this motion.**

24. The round-trip loans helped to conceal the massive RGHI receivable. (IJX 17, 18, 20, 21, 22)

**Not Controverted for purposes of this motion.**

25. As a result of the concealment of the RGHI receivable, Refco's financial statements were materially false and misleading. (IJX 17, 18, 20, 21, 22)

**Not Controverted for purposes of this motion.**

26. On October 10, 2005 the fraud first came to light when Refco publicly admitted in a press release that the RGHI receivable "was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible." (Sandnes Aff't Ex. 34)

**Not Controverted for purposes of this motion that on October 10, 2005, Refco issued a press release, and refer to that press release for its true and complete contents.**

27. Seven days later, on October 17, 2005, Refco filed for protection under Chapter 11 of the Bankruptcy Code. (Docket in *In re Refco*, 05-60006 (S.D.N.Y. Bankr.))

**Not Controverted for purposes of this motion.**

28. A Grand Jury of this Court indicted various officers and directors of Refco related to the fraudulent RGHI receivable. (Docket in *United States of America v. Bennett*, No. 05 Cr. 1192 (NRB)(S.D.N.Y.))

**Not Controverted for purposes of this motion that Bennett, Tone Grant and Robert Trosten were indicted by a Grand Jury of this Court, but refer to the docket and grand jury indictment referenced in paragraph 28 for their true and complete contents.**

29. The indictment was superseded by a second and then a third superseding indictment (the "S3 Indictment"). (IJX 18)

**Not Controverted for purposes of this motion.**

30. The S3 Indictment charged Bennett, as well as Robert C. Trosten ("Trosten")(CEO of Refco Securities and Refco Capital Markets) and Tone Grant (former President of Refco Group Ltd., LLC) with securities fraud, bank fraud, wire fraud and money laundering as well as conspiracy to commit securities fraud, bank fraud, wire fraud and money laundering. (IJX 18)

**Not Controverted for purposes of this motion but refer to the S3 Indictment for its true and complete contents.**

31. The S3 Indictment also charged Bennett with making false filings with the SEC and making false statements to Refco's auditors. (IJX 18)

**Not Controverted for purposes of this motion but refer to the S3 Indictment for its true and complete contents.**

32. Bennett falls within the definition of an "Insured Person" under the XL Policy. (Toolan Dec. Ex. A, Section II)

**Not Controverted for purposes of this motion.**

33. On February 15, 2008, Bennett pled guilty to *all twenty counts against* him in the S3 Indictment. (IJX 21)

**Not Controverted for purposes of this motion.**

34. In Bennett's plea allocution, he acknowledged that the RGHI receivable was used to hide customer losses, bad debts and expenses. (IJX 21 at 17:12-14)

**Not Controverted for purposes of this motion but refer to Bennett's plea allocution for its true and complete contents.**

35. Bennett admitted that the round-trip loan transactions were used to conceal the true nature of the RGHI receivable. (*Id.* at 17:15-17)

- 9 -

84314760

**Not Controverted for purposes of this motion but refer to Bennett's plea allocution for its true and complete contents.**

36. Bennett admitted that he, and others, wrongfully concealed the RGHI receivable from auditors, as well as various investors and lenders. (IJX 21)

**Not Controverted for purposes of this motion but refer to Bennett's plea allocution for its true and complete contents.**

37. Bennett admitted that he knew that Refco's financial statements were materially false and misleading, including the S1, S4 and 10-K specified in Counts 4, 5 and 6 of the S3 Indictment. (*Id.* at 18:18-22)

**Not Controverted for purposes of this motion but refer to Bennett's plea allocution for its true and complete contents.**

38. Bennett admitted that he executed a scheme to defraud the financial institutions. (*Id.* at 17:23-25)

**Not Controverted for purposes of this motion but refer to Bennett's plea allocution for its true and complete contents.**

39. Bennett admitted to money-laundering the proceeds of the leveraged buyout transaction with Thomas H. Lee Partners, knowing that the money had been unlawfully obtained. (IJX 21 at 18:3-7)

**Not Controverted for purposes of this motion but refer to Bennett's plea allocution for its true and complete contents.**

40. In his plea allocution, Bennett admitted that he knew that failing to disclose the RGHI receivable was wrong. (*Id.* at 18:14-25)

**Not Controverted for purposes of this motion.**

84314760

41. In his plea allocution, Bennett admitted that he knew that obtaining funds from Refco's investors and lenders based on misleading financial statements was wrong. (*Id.* at 18:14-25)

**Not Controverted for purposes of this motion.**

42. In his plea allocution, Bennett admitted that he knew that failing to disclose these facts in public filings in connection with Refco's sale and registration of Refco's notes and common stock was wrong. (*Id.* at 18:14-25)

**Not Controverted for purposes of this motion.**

43. On February 20, 2008, Trosten, who also is an Insured Person under the XL Policy, similarly pled guilty to charges of conspiracy, securities, wire and bank fraud and money laundering. (IJX 22)

**Not Controverted for purposes of this motion.**

44. Santo C. Maggio ("Maggio") plead guilty to a separate criminal Information charging the same basic fraud as alleged in the S-3 Indictment. (IJX 20)

**Not Controverted for purposes of this motion but refer to Maggio's guilty plea and the criminal information referenced in paragraph 44 for their true and complete contents.**

45. Defendant Tone Grant, on April 17, 2008, was convicted by a jury of conspiracy, securities fraud, wire fraud, bank fraud and money laundering arising out of the same wrongdoing to which Bennett, Trosten and Maggio pled guilty. (IJX 24)

**Not Controverted that on April 17, 2008, Tone Grant was convicted by a jury of conspiracy, securities fraud, wire fraud, bank fraud and money laundering, and refer to Grant's jury conviction for its true and complete contents.**

84314760

46. Bennett was aware of, and actively sanctioned and participated in the scheme to create the RGHI receivable and to enter into year-end and quarter-end round trip transactions to conceal the RGHI receivable from auditors, investors and lenders. (IJX 18 and 21)

**Not Controverted for purposes of this motion.**

47. Bennett knew that Refco's financial statements were materially false and misleading. (*Id.*)

**Not Controverted for purposes of this motion.**

48. Trosten was aware of, and actively sanctioned and participated in the scheme to create the RGHI receivable and to enter into year-end and quarter-end round trip transactions to conceal the RGHI receivable from auditors, investors and lenders. (IJX 18 and 22)

**Not Controverted for purposes of this motion.**

49. Trosten knew that Refco's financial statements were materially false and misleading. (IJX 22 at 17)

**Not Controverted for purposes of this motion.**

50. Maggio was aware of, and actively sanctioned and participated in the scheme to create the RGHI receivable and to enter into year-end and quarter-end round trip transactions to conceal the RGHI receivable from auditors, investors and lenders. (IJX 17 and 20)

**Not Controverted for purposes of this motion.**

51. Maggio knew that Refco's financial statements were materially false and misleading. (IJX 20 at 18:4-6)

**Not Controverted for purposes of this motion.**

52. Grant was aware of, and actively sanctioned and participated in the scheme to create the RGHI receivable and to enter into year-end and quarter-end round trip transactions to conceal the RGHI receivable from auditors, investors and lenders. (IJX 19 and 24)

84314760

**Controverted. Although Grant was found guilty on all five counts of indictment $S_4$ 05 Cr 1192 (NRB) (IJX 19), the jury verdict rendered (IJX 24) does not disclose which of the numerous alleged specific facts or overt acts listed in the indictment were found by the jury to support the verdicts.**

53.     Grant knew that Refco's financial statements were materially false and misleading. (*Id.*)

**Controverted. Although Grant was found guilty on all five counts of indictment $S_4$ 05 Cr 1192 (NRB) (IJX 19), the jury verdict rendered (IJX 24) does not disclose which of the numerous alleged specific facts or overt acts listed in the indictment were found by the jury to support the verdicts.**

54.     On July 3, 2008, Bennett was sentenced to 16 years in prison (including 5 years supervised release). (IJX 23)

**Not Controverted for purposes of this motion.**

55.     In the wake of the collapse of Refco, numerous lawsuits and governmental and/or regulatory investigations and/or criminal actions were initiated against Refco and certain individuals, including the Defendants (the "Underlying Matters") including the following:

| |
|---|
| *In re Refco, Inc. Securities Litigation*, No. 05 Civ. 8626 (GEL) (S.D.N.Y.) - Second Amended Consolidated Class Action Complaint (dated December 3, 2007) |
| *American Financial International Group et al. v. Bennett et al.*, No. 05 Civ. 8988 (GEL) (S.D.N.Y.) - Third Amended Class Action Complaint (dated January 8, 2008) |
| *BAWAG v. Refco, et al.*, Case No.05-03161 (Bankr. S.D.N.Y.) - Complaint (dated 11/16/2005) |
| *Capital Management Select Fund Ltd. v. Bennett et al.*, No. 07 Civ. 8688 (GEL) (S.D.N.Y.) - Complaint (dated October 9, 2007) |
| *Fine v. Bennett*, et al., No. 05 Civ. 8701 (GEL) (S.D.N.Y.) - Complaint (dated October 13, 2005) |

| |
|---|
| *In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation*, No. 06 Civ. 643 (GEL) (S.D.N.Y.) - Second Amended Consolidated Class Action Complaint (dated December 21, 2007) |
| *Kirschner v. Agoglia, et al.*, No. 05-60006, Adv. Pro. No. 07-3060 (Bankr. S.D.N.Y.) - Complaint (dated October 15, 2007) |
| *Kirschner v. Bennett, et al.*, No. 07 Civ. 8165 (GEL) (S.D.N.Y.) - Complaint (dated August 27, 2007) |
| *Kirschner v. Grant Thornton LLP et al.*, No. 07 Civ. 11604 (GEL) (S.D.N.Y.) - Complaint (dated August 21, 2007) |
| *Kirschner v. Hackl, et al.*, No. 07 Civ. 9238 (GEL) (S.D.N.Y.) - Complaint (dated October 15, 2007) |
| *Kirschner v. Thomas H. Lee Partners, LP. et al.*, No. 07 Civ. 7074 (GEL) (S.D.N.Y.) - Complaint (dated November 20, 2007) |
| *Krys, et al. v. Sugrue, et al.*, No. 08-3065 (GEL) (S.D.N.Y.) & No. 08-3086 (GEL) (S.D.N.Y.) - Complaint (dated March 5, 2008) |
| *Mehta v. Bennett*, No. 05 Civ. 8748 (GEL) (S.D.N.Y.) - Complaint (dated October 14, 2005) |
| *Thomas H. Lee Equity Fund V, L.P. v. Bennett, et al.*, No. 05-9608 (GEL) (S.D.N.Y.) - Complaint (dated November 14, 2005) |
| *Unovalores Ltd. v. Bennett*, No. L1564-05 (Sup. Ct. N.J.) - Complaint (dated November 1, 2005) |
| *V.R. Global Partners, L.P. v. Bennett et al.*, No. 07 Cir. 8686 (GEL) (S.D.N.Y.) - Complaint (dated October 9, 2007) |

(IJX 1-16)

The Underlying Matters all relate to the same fraud charged in the S3 Indictment to which Bennett and others have pled guilty. (IJX 1-16, 18; Sandnes Aff't Ex. 35)

**Controverted. That complaints in the Underlying Matters refer to facts charged in the S3 Indictment and allege some relationship between those facts and the allegations supporting the claims asserted does not support the legal conclusion that such claims "arise from" the "same fraud charged in the S3 Indictment."**

56.     All of the Underlying Matters allege either that plaintiffs in those cases were injured by the failure to properly disclose the RGHI receivable, by the transactions used to cover up the uncollectability of RGHI and/or by the bankruptcy resulting from the RGHI fraud. (*Id.*)

84314760

**Controverted. See response to paragraph 55.**

57. Each of the Underlying Matters arise from a "fact, circumstance or situation" to which Bennett has pled guilty to knowingly and wrongfully committing. (*Id.*)

**Controverted. See response to paragraph 55.**

58. Bennett's guilty plea definitively establishes that Bennett had knowledge of the facts, circumstances or situations from which the Underlying matters arose. (IJX 1-16, 18, 21; Sandnes Aff't Ex. 35)

**Controverted. See response to paragraph 55.**

59. Bennett had reason to suppose that the facts circumstances or situations of which he had knowledge, as of the inception date of the XL Policy, might afford grounds for a claim under the XL Policy. (*Id.*)

**Not controverted for purposes of this motion.**

60. There is no coverage afforded for any of the Defendants under the XL Policy for claims arising from the Underlying Matters. (Toolan Dec. Ex. A; Sandnes Aff't Ex. 35)

**Controverted (see response to paragraphs 7, 16 and 55).**


**Pursuant to Local Rule 56.1(b), the Insureds respectfully submit the following Statement of Additional Material Facts.**

1. The policy binder issued by XL on August 10, 2005 for the excess policy it agreed to issue to Refco for the 2005-2006 policy period was the only policy binder issued by XL to Refco for the 2005-2006 policy period. (*See* Sylwestrzak Decl. Ex. A).

2. The policy binder did not contain an Inverse Representation Endorsement ("IRE"). (*Id.*).

84314760

3. At no time subsequent to the issuance of its policy binder on August 10, 2005 and prior to the issuance of its policy in December 2005, did XL ever request modification of its policy binder, dated August 10, 2005. (Sylwestrzak Decl. ¶ 6).

4. On December 27, 2005 XL issued its excess policy for the 2005-2006 policy period which added the IRE to the terms contained in the policy binder. (*Compare* Sylwestrzak Decl. Ex. A with Sylwestrzak Decl. Ex. B, Endorsement No. 13).

5. The policy binder issued on August 10, 2005 and the XL policy issued on December 27, 2005 each contain in it's "CONDITIONS" section a paragraph entitled "Representation Clause." The second sentence of that clause states: "No knowledge or information possessed by any **Insured Person** will be imputed to any other **Insured Person** for the purpose of determining the availability of coverage with respect to **Claims** made against any other **Insured Person**." (*See* Sylwestrzak Decl. Ex. B, § IV, Condition (K) (bold in original)).

6. The "non-imputation" provision in Condition (K) of the XL Policy was not intended to be limited to matters in the application. (Sylwestrzak Decl. ¶ 7).

7. XL clearly and unambiguously indicated in its Policy that the IRE would not be subject to the severability provision in Condition (K) of the XL Policy. (*See* Sylwestrzak Decl. Ex. B, Endorsement No. 13).

8. A reasonable reading of the IRE, in conjunction with the severability provision in Condition (K), is that it excludes coverage for an insured who had knowledge of any facts or circumstances likely to afford grounds for a claim, while maintaining coverage for insureds who had no such knowledge.

7. The IRE is inconsistent with the Representation Clause contained in the policy binder issued on August 10, 2005 and with the XL policy issued on December 27, 2005. (*Compare* Sylwestrzak Decl. Ex. A with Sylwestrzak Decl. Ex. B, Endorsement No. 13).

84314760

Dated: New York, New York
August 8, 2008

/s/ Helen B. Kim
HELEN B. KIM (HK-8757)
KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90027
Telephone: (310) 788-4525
Facsimile: (310) 788-4471
   -and-
PHILIP A. NEMECEK (PN-3319)
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022-2585
Telephone:   (212) 940-8834
Facsimile:   (212) 940-8776
*Attorneys for Defendant and Counterclaim Plaintiff Dennis A. Klejna*

/s/ Harvey Fishbein
HARVEY FISHBEIN (HF-1219)
61 Broadway, Suite 1601
New York, New York 10006
Telephone: (212) 233-9555
Facsimile: (212) 267-3024

*Attorneys for Defendant and Counterclaim Plaintiff Joseph Murphy*

/s/ Michael F. Walsh
GREG A. DANILOW (GD-1621)
MICHAEL F. WALSH (MW-8000)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
*Attorneys for Defendants and Counterclaim Plaintiffs Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, and Scott A. Schoen*

/s/ Richard Cashman
RICHARD CASHMAN (RC-4769)
HELLER EHRMAN LLP
Times Square Tower
7 Times Square
New York, NY 10036-6524
Telephone: (212) 832-8300
Facsimile: (212) 763-7600
*Attorneys for Defendant and Counterclaim Plaintiff Philip Silverman*

/s/ Claire P. Gutekunst
CLAIRE P. GUTEKUNST (CG-0117)
JESSICA MASTROGIOVANNI
PROSKAUER ROSE LLP
1585 Broadway
New York, New York 10036-8299
Telephone: (212) 969-3000
Facsimile: (212) 969-2900

*Attorneys for Defendant and Counterclaim Plaintiff Richard N. Outridge*

/s/ Ivan Kline
STUART I. FRIEDMAN (SF-9186)
IVAN KLINE (IK-9591)
FRIEDMAN & WITTENSTEIN
A Professional Corporation
600 Lexington Avenue
New York, NY 10022
Telephone: (212) 750-8700
Facsimile: (212) 223-8391
*Attorneys for Defendants and Counterclaim Plaintiffs William M. Sexton and Gerald M. Sherer*

/s/ William Fleming
WILLIAM FLEMING (WF-0411)
GAGE SPENCER & FLEMING, LLP
410 Park Avenue, 9th Floor
New York, New York 10022
Telephone: (212) 768-4900
Facsimile: (212) 768-3629

*Attorneys for Defendants and Counterclaim Plaintiffs John D. Agoglia and Peter McCarthy*

84314760