**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------ x
                                                                         :
XL SPECIALTY INSURANCE COMPANY,                                          :
                                                                         :
                    Plaintiff,                                           :
                                                                         :
        v.                                                               :        No. 08 CIV 3821 (GEL)
                                                                         :
JOHN D. AGOGLIA, PHILLIP R. BENNETT, LEO R.                              :        *Electronically filed*
BREITMAN, EDWIN L. COX, SUKHMEET DHILLON,                                :
THOMAS H. DITTMER, NATHAN GANTCHER,                                      :
STEPHEN GRADY, TONE GRANT, THOMAS HACKL,                                 :
DAVID V. HARKINS, SCOTT L. JAECKEL, DENNIS                               :
A. KLEJNA, THOMAS H. LEE, ERIC G. LIPOFF,                                :
SANTO C. MAGGIO, PETER MCCARTHY, JOSEPH                                  :
MURPHY, FRANK MUTTERER, RONALD L.                                        :
O'KELLEY, RICHARD N. OUTRIDGE, SCOTT A.                                  :
SCHOEN, WILLIAM M. SEXTON, GERALD SHERER,                                :
PHILIP SILVERMAN and ROBERT C. TROSTEN,                                  :
                                                                         :
                    Defendants.                                          :
------------------------------------------------------------------------ x

## INSUREDS' MEMORANDUM OF LAW IN OPPOSITION TO XL SPECIALTY INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
Telephone:        (310) 788-4400
    -and-
575 Madison Avenue
New York, NY 10022-2585
Telephone:        (212) 940-8800

*Attorneys for Dennis A. Klejna*

PROSKAUER ROSE LLP
1585 Broadway
New York, New York 10036-8299
Telephone: (212) 969-3000

*Attorneys for Richard N. Outridge*

FRIEDMAN & WITTENSTEIN
A Professional Corporation
600 Lexington Avenue
New York, NY 10022
Telephone: (212) 750-8700

*Attorneys for William M. Sexton and Gerald M. Sherer*

HELLER EHRMAN LLP
Times Square Tower
7 Times Square
New York, NY 10036-6524
Telephone: (212) 832-8300

*Attorneys for Philip Silverman*

GAGE SPENCER & FLEMING, LLP
410 Park Avenue, 9th Floor
New York, New York 10022
Telephone: (212) 768-4900

*Attorneys for John D. Agoglia and Peter McCarthy*

WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0119
Telephone: (212) 310-8000

*Attorneys for Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley and Scott A. Schoen*

HARVEY FISHBEIN
61 Broadway, Suite 1601
New York, New York 10006
Telephone: (212) 233-9555

*Attorneys for Joseph Murphy*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................... ii

PRELIMINARY STATEMENT ........................................................ 1

STATEMENT OF FACTS ............................................................. 3

    A.    Refco Background ............................................................ 3

    B.    The Underlying Actions ...................................................... 3

    C.    The Refco Inc. D&O Liability Insurance "Tower" ............................ 4

    D.    The August 10, 2005 XL Policy Binder and Subsequent XL Policy ............ 5

    E.    XL's Initial Denial of Claims ............................................... 6

    F.    Procedural History of this Action ........................................... 6

ARGUMENT ..................................................................... 7

I.    XL'S MOTION FOR SUMMARY JUDGMENT MUST BE DENIED BECAUSE XL'S
    BINDER DID NOT CONTAIN THE INVERTED REPRESENTATION
    ENDORSEMENT ("IRE") UPON WHICH XL RELIES ............................... 7

    A.    The The Binder Was the Operative Contract Between the Parties
        and Did Not Include the IRE ............................................... 7

    B.    XL Was Not Permitted to Alter the Terms of the Binder...................... 8

    C.    XL's Claim that it Added the IRE at the Request of Refco Improperly Relies
        Upon Extrinsic Evidence, and in any Event Raises Numerous Questions of
        Material Fact .............................................................. 10

II.    THE SEVERABILITY PROVISIONS OF THE POLICY PRECLUDE XL FROM
    DENYING COVERAGE TO INNOCENT INSUREDS ............................... 11

    A.    The Full Severability Provision in the XL Policy Cannot Be Read As Limited
        to the Statements Made in the Application as a Matter of Law.................. 11

    B.    XL Cannot Demonstrate that the IRE Clearly and Unmistakably Precludes Coverage
        for Innocent Insureds ..................................................... 14

    C.    At the Very Least, the Policy is Ambiguous and Presents Material Questions
        of Fact that Preclude the Entry of Summary Judgment in XL's Favor ......... 14

III.    XL HAS FAILED TO DEMONSTRATE THAT EVERY SINGLE CAUSE OF ACTION
    ASSERTED IN THE UNDERLYING LITIGATIONS "AROSE FROM" BENNETT'S
    FRAUD .................................................................... 19

CONCLUSION ................................................................... 22

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Anderson v. Liberty Lobby Inc.*,
    477 U.S. 242 (1986).............................................................................................7

*Axis Reinsurance Co. v. Bennett*,
    2008 WL 2485388 (S.D.N.Y. June 19, 2008) .....................................7, 11, 13, 18

*Capital Management Select Fund Ltd. v. Bennett, et al.*,
    No. 07 Civ. 8688 (GEL) (S.D.N.Y.)......................................................................4

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).............................................................................................7

*National Union Fire Ins. Co. of Pittsburgh, Pa. v. L.E. Myers Co. Group*,
    1997 WL 148231 (S.D.N.Y. Mar. 31, 1997).....................................................8-9

*New York v. Hendrickson Brothers, Inc.*,
    840 F.2d 1065 (2d Cir. 1988) .............................................................................19

*Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Ins. Co.*,
    472 F.3d 33 (2d Cir. 2006) ...........................................................14, 16, 17, 18, 19

*Scotto v. Almenas*,
    143 F.3d 105 (2d Cir. 1998) .................................................................................7

*Westport Ins. Corp v. Hanft & Knight, P.C.*,
    523 F.Supp.2d 444 (M.D. Pa. 2007)...................................................................19

*Wetherell v. Sentry Reinsurance, Inc.*,
    743 F. Supp. 1157 (E.D. Pa. 1990)......................................................................9

*Weyant v. Okst*,
    101 F.3d 845 (2d Cir. 1996) .................................................................................7

*World Trade Center Properties, LLC v. Hartford Fire Ins. Co.*,
    345 F.3d 154 (2d Cir. 2003) ...........................................................................8, 10

### STATE CASES

*City of New York v. Evanston Ins. Co.*,
    39 A.D.3d 153, 830 N.Y.S.2d 299 (2d Dep't 2007)............................................17

*County of Columbia v. Continental Ins. Co.*,
    83 N.Y.2d 618, 612 N.Y.S.2d 345 (1994)...........................................................15

*Gaetan v. Firemen's Ins. Co.,*
    264 A.D.2d 806, 695 N.Y.S.2d 608 (2d Dep't 1999)..............................................................14

*Newin Corp. v. Hartford Accident & Indemnity Co.,*
    62 N.Y.2d, 479 N.Y.S.2d 3.....................................................................................................18

*Seaboard Sur. Co. v. Gillette Co.,*
    64 N.Y.2d 304, 486 N.Y.S.2d 873 (1984)..............................................................................14

*Springer v. Allstate Life Ins. Co.,*
    94 N.Y.2d 645, 710 N.Y.S.2d 298 (2000)................................................................................8

*State of New York v. Home Indemnity Co.,*
    66 N.Y.2d 669, 495 N.Y.S.2d 969 (1985)..............................................................................18

*Sun-Times Media Group, Inc. v. Royal Sunalliance Ins. Co. of Canada,*
    2007 WL 1811265 (Del. Super. June 20, 2007)......................................................................21

*Superior Ice Rink, Inc. v. Nescon Contracting Corp.,*
    2008 NY Slip Op 5679, 2008 WL 2447575 (2d Dep't June 17, 2008)...................................18

*Wright v. Evanston Ins. Co.,*
    14 A.D.2d 505, 788 N.Y.S.2d 416 (2d Dep't 2005)...............................................................17

## RULES

Fed. R. Civ. P. 56(b) ....................................................................................................................7

Fed. R. Civ. P. 56(c) ....................................................................................................................7

Fed. R. Civ. P. 56(f).................................................................................................................2, 7

Fed. R. Evid. 803(22) .................................................................................................................19

Defendants and Counterclaim Plaintiffs Dennis A. Klejna, William M. Sexton, Gerald Sherer, Joseph Murphy, Richard N. Outridge, Philip Silverman, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, John D. Agoglia, and Peter McCarthy  (collectively, the "Defendants" or "Insureds") respectfully submit this memorandum of law in opposition to the motion for summary judgment filed by Plaintiff XL Specialty Insurance Company ("XL").  By its motion, made prior to any discovery in this action, XL seeks a declaration that it has no obligation to provide the Defendants with coverage under the excess insurance policy it issued to Refco Inc. ("Refco").

## PRELIMINARY STATEMENT

XL is the excess insurer at the top of the tower of Directors and Officers ("D&O") liability insurance obtained by Refco for the policy period August 11, 2005 through August 11, 2006.  The Defendants were officers and directors of Refco during the policy period, and are "Insureds," as defined under the terms of XL's policy (the "Policy").  Since January 24, 2006, however, XL has denied any obligation to provide coverage under the Policy for claims made against the Insureds.

XL has never disputed that the claims made against the Insureds fall squarely within the definition of "Claims" that are covered by the Policy.  Nevertheless, XL contends that the Policy does not cover those claims, because it contains an "Inverted Representation Endorsement" (the "IRE").  Although the Policy Binder (the "Binder") XL issued on August 10, 2005 did not contain a reference to an IRE or any other similar term, XL subsequently attempted to insert the IRE when it issued the Policy on December 27, 2005, after claims at issue before this Court had been tendered to XL.  According to XL, the IRE excludes coverage for any matter as to which, on the effective date of the Policy, any insured had knowledge and had reason to suppose might give rise to a Claim that would fall within the scope of the insurance provided by the Policy. But, as we demonstrate below, XL has no right to rely on the IRE, and certainly has not established its right to any relief as a matter of law.

To begin, the Binder – the operative insurance contract at the time claims arose – does not contain or refer to any IRE.  *See* Point I.A. *infra*.  Further, there can be no dispute that XL

1

had a duty, as a matter of law, to issue a policy consistent with the terms of the Binder. *See* Point I. B. *infra.*

XL attempts to justify its departure from the terms of its Binder – and to avoid its manifest liability – by offering extrinsic evidence in support of its motion. But it is not entitled to do so since it does not and cannot cite anything about the Binder that is the least bit ambiguous. And even assuming that XL could demonstrate some ambiguity in the Binder so as to warrant the Court's consideration of extrinsic evidence, the affidavits and documentary evidence submitted in support of XL's motion raise, *inter alia*, an issue of material fact regarding whether the IRE is properly part of the policy. Indeed, XL's reliance on extrinsic evidence only serves to highlight that its summary judgment motion is premature. As more fully explained in the Declaration of Helen B. Kim pursuant to Rule 56(f) (the "Kim Decl."), discovery is necessary before the Insureds can fairly oppose XL's motion. Indeed, discovery has not even begun. At a minimum, the Insureds are entitled to obtain documents from XL relevant to its decision to include the IRE in the XL Policy and conduct depositions of the Marsh and XL representatives who negotiated the terms of coverage under the XL Policy, including that of Henry Toolan, the XL underwriter whose affidavit is submitted in support of XL's motion. *See* Point I.C. *infra.*

Moreover, even if XL were able to establish as a matter of law that it might treat the IRE as part of the Policy – which XL cannot do – the Policy itself contains severability provisions that would nevertheless prevent XL from denying coverage to insureds who had no knowledge of matters that might give rise to a claim. As explained in Point II *infra*, despite XL's heavy reliance on this Court's decision in the Axis Reinsurance Company litigation, the language at issue here is materially different from the language at issue in that case and, as such, this Court's earlier decision in *Axis* is not controlling here. Indeed, in contrast to the severability provision in the Axis policy, the full severability provision in the XL Policy, standing alone and when considered in context of its surrounding clauses, clearly evidences the parties' intent to assure that innocent insureds would be covered by the Policy in all circumstances. At the very least, there is ambiguity regarding the meaning of the IRE, when properly read in the context of the

2

severability provisions and the XL Policy as a whole, that cannot be resolved without document and deposition discovery designed to ascertain the parties' intent.

Finally, even if XL were able to use the IRE to deny coverage to "innocent" insureds, it has not demonstrated that the IRE has been triggered with respect to claims for which it seeks to avoid coverage in the case at bar. As explained in Point III *infra*, XL has not carried its burden of demonstrating that, as a matter of law, each and every claim asserted in the numerous Underlying Matters arises from facts or circumstances of which any insured's knowledge has appropriately been established.

In sum, XL's motion, at a minimum, raises numerous questions of fact as to whether the IRE is properly part of the Policy; if so, whether the Policy's severability provisions would nevertheless apply for the benefit of specific Insureds; and if so, whether the IRE has been triggered with regard to specific claims. As XL cannot come close to showing that summary judgment is appropriate prior to discovery, this Court should deny XL's motion and permit discovery to proceed in this action.

## STATEMENT OF FACTS

### A.    Refco Background

On or about August 11, 2005, Refco conducted its initial public offering ("IPO"). (XL Complaint ("Compl.") ¶ 49). Two months later, on October 10, 2005, Refco disclosed in a press release that it had been carrying an undisclosed $430 million receivable from an entity controlled by defendant Phillip R. Bennett, then Refco's Chief Executive Officer. (*Id.* at ¶ 50). On October 11, 2005, the company issued a second press release stating that its financial statements could not be relied upon. (*Id.* at ¶ 51). On or about October 17, 2005, Refco and many of its direct and indirect subsidiaries filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York. (*Id.* at ¶ 51).

### B.    The Underlying Actions

The collapse of Refco in October 2005 and the bankruptcy filings that quickly followed led to the commencement of a series of civil actions, government investigations, and criminal

proceedings against certain of Refco's officers and directors (the "Underlying Actions"). A number of these Underlying Actions remain pending. Civil actions against Refco officers and directors were filed as early as October 2005 and include: *In re Refco, Inc. Securities Litigation*, 05 Civ. 8626 (S.D.N.Y.) (GEL) (the "Securities Litigation"); *In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation*, No. 06 Civ. 643 (GEL) (S.D.N.Y.); *V.R. Global Partners L.P. v. Bennett, et al.*, No. 07 Civ. 8686 (GEL) (S.D.N.Y.); *Capital Management Select Fund Ltd. v. Bennett, et al.*, No. 07 Civ. 8688 (GEL) (S.D.N.Y.); *Kirschner v. Thomas H. Lee Partners, L.P., et al.*, No. 07-7074 (GEL)(S.D.N.Y.); and *Kirschner v. Grant Thornton LLP, et al.*, No. 2007-1-008818 (Illinois Circuit Ct.) (removed to federal court). (Compl. ¶¶ 74, 78-120). Defendants Bennett, Robert Trosten and Tone Grant were also named as defendants in a criminal proceeding. *United States v. Phillip Bennett, Robert Trosten and Tone Grant*, S3 05 Cr. 1192 (NRB) (S.D.N.Y.) (the "Criminal Action"). (*Id.* at ¶¶ 53, 75).[1]

### C.    The Refco Inc. D&O Liability Insurance "Tower"

In anticipation of its initial public offering, Refco obtained D&O liability insurance for the benefit of its directors and officers for the policy period August 11, 2005 to August 11, 2006 (the "2005-2006 Policy Period"). Refco's D&O insurance was structured as a "tower," consisting of a primary policy and five excess policies providing for a total of $70 million of coverage. (Declaration of Pamela Sylwestrzak submitted in opposition to XL's summary judgment motion ("Sylwestrzak Decl.") ¶ 3).[2] XL required Refco to fill out XL's own form of application, which included a representation and warranty as to the absence of facts or

---

[1]  On February 15, 2008, Bennett pled guilty to the counts against him in the Criminal Action. On February 20, 2008, Robert Trosten, Refco's former Chief Financial Officer, also pled guilty to certain of the charges against him in the Criminal Action.

[2]  The tower of Refco Inc.'s D&O insurance for the policy period August 11, 2005 through August 11, 2006 was as follows:  (1) U.S. Specialty Insurance Company Directors, Officers and Corporation Liability Insurance Policy No. 24-MGU-05-A10821 ($10 million primary coverage); (2) Lexington Insurance Company Directors and Officers Liability and Corporation Reimbursement Follow Form Excess Liability Policy No. 1620924 ($7.5 million excess of $10 million); (3) Axis Reinsurance Co. SecurExcess Policy No. RNN 506300 ($10 million excess of $17.5 million); (4) Allied World Assurance Company Excess Directors and Officers Insurance and Company Reimbursement Policy No. AW0418197 ($12.5 million excess of $27.5 million); (5) Arch Insurance Company Excess Insurance Policy No. DOX0009322-00 ($10 million excess of $40 million); and (6) XL Insurance Company Class A-Side Management Liability Insurance Policy NO. ELU089673-05 ($20 million excess of $50 million). (Sylwestrzak Decl. ¶ 3.)

circumstances that might give rise to a claim. (*Id.* ¶ 8 & Ex. C). And while the other excess policies "followed form" as to the primary policy, the XL Policy did not. (Compl. ¶ 47).

### D.   The August 10, 2005 XL Policy Binder and Subsequent XL Policy

On August 10, 2005, XL issued a Policy Binder for the excess policy it had agreed to issue to Refco for the 2005-2006 Policy Period. (Sylwestrzak Decl. ¶ 4 & Ex. A.) The Binder sets forth the material terms of the insurance agreement between Refco and XL. It refers to the form of policy to be issued by XL and to the endorsements to be added to that policy form. Specifically, the Binder identifies twelve separate endorsements, all of which were followed by a unique identification number (except the "Controlling Shareholder Endorsement," which was listed but not followed by a number); these identification numbers correspond precisely with the endorsements that appear in the XL Policy. For example, the Binder refers to "Non-Rescindable Endorsement – XL 80 34 10 04." (*See id.* Ex. A). The XL Policy contains a corresponding endorsement – referred to in the XL Policy as "Rescission Endorsement" – bearing the same number (*i.e.*, XL 80 34 10 04). (*See id.* Ex. B). Significantly, the Binder does not list the IRE, or its identification number, among the Endorsements nor does it even reference generally that the IRE (or a provision of similar effect) will be added. (*See id.* Ex. A).

On or about December 27, 2005, more than 4-1/2 months after XL's Policy Binder had been issued and more than two months after claims against the Insureds were tendered to XL (*see* Compl. ¶¶ 75, 80, 83), XL issued its excess policy for the 2005-2006 Policy Period in the amount of $20 million. (Sylwestrzak Decl. ¶ 6 & Ex. B). The XL Policy, as issued, includes as an endorsement the IRE, which purports to exclude Claims

> arising from any fact, circumstance or situation of which, as of the effective date of this Policy, any Insured had knowledge and had reason to suppose might afford grounds for any Claim that would fall within the scope of the insurance afforded by this Policy.

(*Id.* at Endorsement No. 13). The XL Policy elsewhere makes clear that the knowledge of one insured cannot be used as a ground to deny coverage to another insured. (*Id.* at § IV, Conditions (K); *see also id.* at § III, Exclusions).

### E.    XL's Initial Denial of Claims

Four weeks after issuing its policy, in a letter dated January 24, 2006, XL denied coverage to the Insureds regarding the claims made against them in various lawsuits, including those later consolidated as *In re Refco Securities Litigation.* (*See* Sylwestrzak Decl. Ex. E).  In denying coverage, XL relied upon the IRE it had added to the Policy although the operative insurance contract, the Binder XL had earlier issued, contained no such provision.  It asserted that Mr. Bennett's knowledge, on the effective date of the Policy, of facts that might give rise to claims barred coverage not only for him, but also for all other Insureds.  (*Id.* at 8).[3]

### F.    Procedural History of this Action

On April 22, 2008, XL commenced this action by filing a complaint containing a single claim for declaratory relief that there is no coverage under the Policy for the Underlying Matters. XL's complaint relies entirely upon the IRE that it added to the Policy, when issued, although its Binder had contained no such provision.  On July 11, 2008, prior to the Insureds even responding to the complaint,[4] and without any discovery having occurred,[5] XL filed the instant motion for summary judgment.  While XL's complaint seeks to impute the presumed knowledge of Bennett, Santo Maggio, Trosten and Grant to the other Insureds in an attempt to deny coverage to them based on the IRE (Compl. ¶¶ 123-134.), XL's motion relies solely on the alleged knowledge of Bennett.

---

[3]  In its January 24, 2006 letter, XL also claimed that the securities class action litigations "involved the same "Wrongful Acts or Interrelated Acts" as the allegations asserted in a bankruptcy action, entitled, *Bankruptcy Trust of Gerard Sillam, et al. v. Refco Group LLC.* (*Id.* at 10).  In its Complaint and the instant motion for summary judgment, however, XL makes no reference to the *Sillam* action.  Thus, it appears that XL has abandoned its initial position that the Insureds' claims are related to the actions at issue in *Sillam.*

[4]  On or about July 14, 2008, the Insureds filed answers to XL's complaint, disputing XL's entitlement to relief, and asserted counterclaims seeking both a declaration that the Insureds are covered  with respect to the Underlying Matters, and an injunction requiring XL to pay for Losses incurred in the Underlying matters.

[5]  On July 29, 2008, the Insureds served their First Request for Production of Documents on XL.  (Kim Decl. Ex. A). But, to date, XL has not produced any requested documents or otherwise responded to that request.  Prior to that request, XL produced what it refers to as its "Underwriting File," but there has otherwise been no discovery in this action.

## ARGUMENT

When ruling on a motion for summary judgment, the court "is required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir. 1996). In addition, all ambiguities must be resolved in favor of the party opposing the motion. *See, e.g., Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir. 1998).

Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

Although a party may move for summary judgment "at any time," Fed. R. Civ. P. 56(b), this court has held that a motion for summary judgment filed prior to discovery should be granted only "in the clearest of cases." *Axis Reinsurance Co. v. Bennett,* 2008 WL 2485388, *7 (S.D.N.Y. June 19, 2008); *see Celotex Corp.,* 477 U.S. at 322 (summary judgment typically granted only after adequate time for discovery). Under Rule 56(f), summary judgment is inappropriate where the party opposing the motion establishes that it is not currently in a position to present facts essential to justify its opposition. *See Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 25 (1986); *Celotex Corp.,* 477 U.S. at 326 (summary judgment motion should be denied or continued when a reasonable opportunity to develop the record has not been provided). Here, because the Insureds lack first-hand knowledge as to the procurement of Refco's insurance, the absence of any opportunity for them to take discovery makes summary judgment particularly inappropriate.

## I.    XL'S MOTION FOR SUMMARY JUDGMENT MUST BE DENIED BECAUSE XL'S BINDER DID NOT CONTAIN THE INVERTED REPRESENTATION ENDORSEMENT ("IRE") UPON WHICH XL RELIES

### A.    The Binder Was the Operative Contract Between the Parties and Did Not Include the IRE

On August 10, 2005, XL issued its Binder to Refco, effective as of August 11, 2005. Between August 11, 2005 and December 27, 2005, when the XL Policy was ultimately issued,

that Binder – and not the ultimately issued Policy – was the operative insurance contract between the parties. *See, e.g., World Trade Center Properties, LLC v. Hartford Fire Ins. Co.*, 345 F.3d 154, 167 (2d Cir. 2003) (an insurance binder is "a fully enforceable 'present contract of insurance'" (citation omitted)); *Springer v. Allstate Life Ins. Co.,* 94 N.Y.2d 645, 649, 710 N.Y.S.2d 298, 300 (2000) ("an insurance binder is a temporary or interim policy until a formal policy is issued" (citations omitted)).

XL does not dispute that the Insureds are all insureds under the Binder's provisions. Nor does it dispute that claims at issue before this Court, including the actions consolidated as the Securities Litigation, arose, within the terms of the Binder, before the Policy was issued on December 27, 2005. Most significantly, XL does not dispute that the IRE on which it relies *was not included in the operative insurance contract – the Binder XL issued on August 10, 2005.* (Toolan Decl. ¶ 5).[6]   Accordingly, XL cannot obtain a declaration of no coverage based on the IRE.

### B.    XL Was Not Permitted to Alter the Terms of the Binder

On December 27, 2005 – more than four months after the Binder was issued and more than two months after the Refco officers and directors first sought coverage – XL issued its Policy, including the IRE as an additional endorsement. (*See* Sylwestrzak Decl. ¶ 6 & Ex. B). But it is well-established in this Circuit that an insurance policy's departure from what was agreed upon in the policy binder cannot be used to deny coverage with respect to claims that arose while the binder was effective. *See, e.g. World Trade Center Properties*, 345 F.3d at 167-68 (as of September 11, 2001, parties could not be bound to policies, because policies had not yet been issued).

Indeed, it is well-settled that a carrier, such as XL, has a legal duty to "draft a policy in accordance with the binder." *National Union Fire Ins. Co. of Pittsburgh, Pa. v. L.E. Myers Co. Group,* 1997 WL 148231, *3 (S.D.N.Y. Mar. 31, 1997). To the extent that an insurance policy

---

[6]   The Binder listed the policy form to be used, which indisputably does not contain an IRE. It also listed twelve separate endorsements to be added to that form, but the IRE was not among them. Thus the Binder did not include any reference to the IRE upon which XL relies, either expressly or by reference to any other document. (*See* Sylwestrzak Decl. Ex. A).

departs from the binder, "such a departure constitute[s] a breach of duty on the part of [the carrier]." *Id.*; *Wetherell v. Sentry Reinsurance, Inc.*, 743 F. Supp. 1157, 1170 (E.D. Pa. 1990) (an "insurer cannot avoid liability under the terms of the binder by issuing a policy at variance with the binder. An insurer cannot avoid liability simply by issuing a policy which does not cover the risk contemplated by the binder, especially after loss has occurred and liability attaches" (*quoting* Couch on Insurance 2d (Rev. ed.) § 14:37)).

But even assuming *arguendo* that the IRE modified the Binder, it grossly understates its impact to refer to it merely as a "departure" from the terms of the Binder. To read the IRE into the XL Policy is to effectuate a wholesale rescission of the binding contract of insurance entered into between XL and the Insureds when the Binder became effective on August 11, 2005. As referenced above, the Binder specifically listed a "Non-Rescindable Endorsement," which appears in the XL Policy as "Rescission Endorsement." (*See* Sylwestrzak Decl. Exs. A & B). The Rescission Endorsement states: "In consideration of the premium charged, the Insurer shall not be entitled under any circumstances to rescind this Policy, other than for non-payment of Premium." (*See id.* Ex. B, Endorsement No. 10). Yet the IRE, to the extent XL's position is accepted, does just what the Rescission Endorsement prohibits "under any circumstances" – it rescinds the coverage the Insureds are plainly entitled to under the terms of the Binder. Thus, contrary to XL's *de facto* position, discussed further below, that the IRE, though omitted in the Binder, should be construed as an additional term that simply modified the coverage provided by the Binder, in reality, XL's position is that the IRE should be construed so as to completely eviscerate the binding contract of insurance created by the Binder. This cannot be right, as a matter of insurance law and basic contract interpretation. XL cannot, as a matter of law, evade its liability to the Insureds under the Binder through the belated addition of a term that so fundamentally alters the terms of coverage so as to render it illusory.

Accordingly, XL cannot obtain a declaration of no coverage based on the IRE it inserted into the Policy since it had no legal right to include in its Policy an endorsement not referred to in, and at variance with, its Binder.

**C.    XL's Claim that it Added the IRE at the Request
of Refco Improperly Relies Upon Extrinsic Evidence, and
in any Event Raises Numerous Questions of Material Fact**

In an attempt to justify its reliance upon the IRE, XL submits the affidavit of Henry

Toolan and two e-mails suggesting that Marsh USA, Inc. ("Marsh"), Refco's insurance agent,

had expressed a willingness to have an IRE added to the Policy. (Toolan Decl. ¶ 7; XL Br. at

22). However, "extrinsic evidence may not be used to contradict clearly unambiguous language

contained in an insurance binder." *World Trade Center Properties*, 345 F.3d at 184. And XL

has not identified any ambiguity in the language of the Binder to justify such an attempt to rely

on extrinsic evidence.

But even if XL convinces the Court to look beyond the terms of the Binder, the question

of what additional terms can be "implied" is a question of fact that requires discovery concerning

the "parties pre-binder negotiations," including evidence of the policy forms "exchanged in the

process of negotiating the binder . . . ." *World Trade Center Properties*, 345 F.3d at 170.

Simply put, XL's argument raises questions of material fact that discovery and possibly a trial

will be needed to resolve. In the first instance, the emails submitted by XL, in themselves, raise

issues of fact that preclude summary judgment. For example, XL refers to an email that Kenny

Li of Marsh sent to all the excess insurance carriers on August 9, 2005, in which Mr. Li stated

that "should you need one to bind, please include an inverted warranty endorsement on your

revised quote." Contrary to XL's position, however, the precise meaning and import of this

email is far from clear. Given that XL did not in fact include the IRE in a revised quote or in its

Binder, it can hardly be taken as incontrovertible evidence that the IRE is properly part of the XL

policy. (*See* Sylwestrzak Decl. Ex. A). Absent discovery regarding, *inter alia*, what other

communications may have occurred, what the parties intended with respect to an "inverted

warranty," or why XL chose to issue a Binder the day after Mr. Li's e-mail with no inverted

warranty included, the Insureds' ability to fully oppose XL's motion is greatly prejudiced. As

detailed in the Kim Declaration submitted in opposition to XL's motion, discovery may reveal

either that the IRE was not intended to be part of the XL policy or not intended to carry the

meaning that XL now urges upon this Court. It also bears emphasis that the Insured's ability to

10

oppose summary judgment is greatly limited by the facts that not only were the Insureds

themselves not involved in the negotiation of the XL Policy, but also the entity that secured

coverage on their behalf – Refco – no longer exists and its representatives are not in the

Insureds' control.  Under these circumstances, summary judgment  is particularly inappropriate.

## II.    THE SEVERABILITY PROVISIONS OF THE POLICY PRECLUDE <br> XL FROM DENYING COVERAGE TO INNOCENT INSUREDS

Even if XL could establish as a matter of law that the IRE was properly made a part of

the Policy – which it cannot – severability provisions in the Policy prevent XL from denying

coverage to innocent insureds, or at the very least raise questions of material fact as to the

intention of the contracting parties.

### A.    The Full Severability Provision in the XL Policy <br> Cannot Be Read As Limited to the Statements <br> Made in the Application as a Matter of Law

Relying on this Court's decision in *Axis*, XL contends that the two severability provisions

in the XL policy are limited to representations in the Application and, as such, do not prevent the

imputation of Bennett's knowledge to the innocent Insureds.  (*See* XL Br. at 13-15; *see also*

Sylwestrzak Decl. Ex. B, at § IV, Conditions (K), "Representation Clause," sentence 2 (the "Full

Severability Provision")); *see also id.* Ex. B at § III, Exclusions).[2]  In *Axis*, this Court rejected

the Insureds' position that the severability provision at issue – there, sentence 3 in Endorsement

No. 10 to the U.S. Specialty Policy to which the Axis Policy followed form (the "Axis

Severability Provision") – "operate[d] as a general non-imputation clause that bars Axis from

imputing Bennett's knowledge . . . to the other insureds . . . ." *Axis Reinsurance Co. v. Bennett*,

2008 WL 2485388, *10.  In denying the Insureds' motion, the Court stated that "even though the

[Axis Severability Provision] itself contains no restrictive language, when read in context with

the surrounding clauses, the provision 'admits of only one reasonable interpretation' – *i.e.*, that it

extends only to the statements Refco made in the Application." *Id.* (citation omitted).  As

explained below, however, this Court's reasoning in *Axis* is not applicable to the XL Policy

---

[2] The severability provision in Section III, Exclusions, states, in pertinent part: "No conduct of any **Insured Person** will be imputed to any other **Insured Person** to determine the application of any of the above EXCLUSIONS." *See* Sylwestrzak Decl. Ex. B, § III, Exclusions (emphasis in original).

because there are fundamental differences between the XL Full Severability Provision and the
Axis Severability Provision dealt with in this Court's *Axis* opinion.[8]

First and foremost, unlike the Axis Severability Provision, the Full Severability Provision
in the XL Policy clearly and unambiguously states that it is *not* limited to particulars and
statements contained in the application.  Indeed, as illustrated in the chart below, while both the
Axis Severability Provision and the Full Severability Provision, standing alone, are not restricted
to representations in the Application, the Full Severability Provision goes even further – it
specifically states that knowledge of one insured cannot be imputed to another insured "*for the
purposes of determining the availability of coverage with respect to Claims made against any
other Insured Person.*"  (Sylwestrzak Decl. Ex. B, at § IV, Conditions (K), "Representation
Clause" (emphasis added).

| XL | Axis |
|---|---|
| Each Insured Person represents that the statements contained in the Application are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and constitute a part of this Policy, are the basis of this Policy.  *No knowledge or information possessed by any Insured Person will be imputed to any other Insured Person **for the purposes of determining the availability of coverage with respect to Claims made against any other Insured Person.*** | The Insureds represent that the particulars and statements contained in the Application are true, accurate and complete and are deemed material to the acceptance of the risk assumed by the Insurer under this Policy.  This Policy is issued in reliance upon the truth of such representations.  *No knowledge or information possessed by any Insured will be imputed to any other Insured.  If any of the particulars or statements in **Application** is untrue, this Policy will be void with respect to any Insureds who knew of such untruth.* |

Thus, the Full Severability Provision in the XL Policy, standing alone, is broader than the Axis
Severability Provision and plainly is *not* restricted to representations in the application.

But even when considered in context of its surrounding clauses – as this Court did in *Axis*
– the Full Severability Provision cannot be read, as a matter of law, to be limited to particulars
and statements in the application.  In *Axis,* this Court emphasized that the severability provision

---

[8]  As set forth in our opposition to the motions by AWAC and Arch for summary judgment, the Insureds respectfully
disagree with the Court's conclusion in *Axis* as to the scope of the severability endorsement to the primary policy.
In any event, the basis for that conclusion is simply not applicable to the XL Policy, as set forth above.

in the primary policy was sandwiched between clauses that spoke specifically of "particulars and statements contained in the Application." *See Axis v. Bennett*, 2008 WL 2485388, *10.[2] As is evident by comparing the language in the severability provisions in the chart above, in contrast to the Axis Severability Provision, the Full Severability Provision in the XL Policy is not sandwiched between sentences that refer to statements and particulars contained in the application. Although the first sentence does concern statements and particulars contained in the application, the second (and final) sentence – the Full Severability Provision – clearly states that knowledge of one insured cannot be imputed to another insured for purposes of making a coverage determination. There is no subsequent sentence modifying the Full Severability Provision to restrict it to statements and particulars in the Application. Thus, in order to conclude that the Full Severability Provision is limited to the particulars and statements in the application *as a matter of law*, this Court would have to read additional language into the Full Severability Provision that simply is not there. Fairly read, the Fully Severability Provision plainly is *not* limited to particulars and statements contained in the application.

There is a further distinction between the XL and Axis policies that is relevant to this analysis. In *Axis*, the Court found relevant the fact that the Axis Severability provision actually appears in the underlying U.S. Specialty Policy to which Axis follows form. The Court noted that the terms of the Axis Policy, which includes the inverted warranty, overrode the terms of the U.S. Specialty Policy, which includes the severability provisions. The Court determined that inconsistencies between the two should be resolved in favor of the Axis provision. The Court noted that even if the Axis Severability Provision "extend[ed] beyond 'the particulars or statements contained in the Application' to function as a general non-imputation clause, the express terms of the Warranty Letter, assuming that the Letter [was] properly part of [the Axis Policy] would override" the Axis Severability Provision (which appeared in the underlying U.S. Specialty Policy, not the Axis Policy) because the Axis policy provided coverage in conformance with the underlying policies, *except* as specifically set forth in the Axis policy. *Id.* at * 10 n.13.

---

[2] As set forth in our opposition to the motions by AWAC and Arch for summary judgment, the Insureds respectfully disagree with the Court's conclusion in *Axis* as to the scope of the severability endorsement to the primary policy. In any event, the basis for that conclusion is simply not applicable to the XL Policy, as set forth above.

Here, not only do the Severability Provisions and IRE both appear in the XL Policy, but the IRE also specifically states that *all* other terms of the Policy (including the Severability Provisions) "shall remain unchanged." Thus, even assuming that the IRE is part of the XL Policy – which it is not -- it does not override the Full Severability Provision.

In sum, unlike in *Axis*, this Court cannot conclude that the XL Full Severability Provision is limited to the particulars and statements in the application *as a matter of law*. This finding, standing alone, creates an ambiguity in the XL Policy that cannot be resolved without discovery as to the parties intent which precludes summary judgment. As explained further below, the most logical interpretation of the XL Policy (assuming *arguendo* that the IRE is part of the policy) is that the Full Severability Provision and the IRE, when read together, exclude coverage *only* for the Insured who had knowledge of facts or circumstances that might give rise to a claim at the XL policy's inception, but at the very least, the IRE and Full Severability Provision, when read together and in context of the XL Policy, create an ambiguity in the XL Policy that is not ripe for summary judgment.

## B.    XL Cannot Demonstrate that the IRE Clearly and Unmistakably Precludes Coverage for Innocent Insureds

In order to obtain summary judgment based on the IRE , XL must satisfy several threshold requirements. As stated by the Second Circuit in *Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Ins. Co.,* 472 F.3d 33, 42 (2d Cir. 2006):

> [T]o 'negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the in the particular case and that its interpretation of the exclusion is the only construction that [could] fairly be placed thereon.'[10]

---

[10] *See also Gaetan v. Firemen's Ins. Co.,* 264 A.D.2d 806, 808, 695 N.Y.S.2d 608, 610 (2d Dep't 1999):

> Generally, *when an insurer wishes to exclude certain coverage from its policy obligations, it must do so in clear and unmistakable language.* Such exclusions or exceptions from policy coverage must be specific and clear in order to be enforceable, and they are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction. Thus, *the insurance company bears the burden of establishing that the exclusions apply in a particular case and that they are subject to no other reasonable interpretation.*

(emphasis added) (internal citations omitted); *Seaboard Sur. Co. v. Gillette Co.,* 64 N.Y.2d 304, 311, 486 N.Y.S.2d 873, 876 (1984) ("[B]efore an insurance company is permitted to avoid policy coverage, it must satisfy the burden ... of establishing that the exclusions or exemptions apply in the particular case, and that they are subject to no other reasonable interpretation").

Thus, in order to negate the effect of the Severability Provisions, XL must establish that: (1) the IRE clearly and unmistakably excluded coverage for innocent insureds; (2) its interpretation of the IRE is the only reasonable interpretation of the provision; and (3) the IRE applies. As explained below, XL cannot meet any of these three requirements.

First, there is absolutely no indication that the parties intended to supersede or replace the Severability Provisions, let alone "clear and unmistakable" language to that effect. Indeed, the IRE specifically states that: "[a]ll other terms, conditions and limitations of this Policy *shall remain unchanged.*" (Sylwestrzak Decl. Ex. B, Endorsement No. 13) (emphasis added). Had XL intended to negate the coverage provided to innocent insureds by virtue of the Severability Provisions, it should have clearly stated that intention. Having included in its Policy a sentence specifically stating that the knowledge of one insured will *not* be imputed to any other insured "for the purpose of determining the availability of coverage," it was incumbent upon XL to make unmistakably clear that an endorsement would allow it to do just that; the IRE does not meet that standard.[11]

Second, XL has failed to establish that the IRE is not subject to any other reasonable interpretation. Rather than accepting XL's interpretation, which would render the Severability Provisions virtually meaningless, the Severability Provisions and the IRE can easily and logically be read together so as to exclude coverage to any insured who had knowledge of any fact, circumstance, or situation that might afford grounds for a claim, while maintaining coverage for insureds who had no such knowledge.[12] *See County of Columbia v. Continental Ins. Co.,* 83 N.Y.2d 618, 628, 612 N.Y.S.2d 345, 349 (1994) (stating that "an insurance contract should not be read so that some provisions are rendered meaningless").

Further, accepting XL's interpretation of the IRE would lead to the anomalous result that the Insureds would be entitled to coverage if Bennett had simply completed XL's application and

---

[11] Even the name of the IRE suggests that it is subject to the terms of the Full Severability Provision, which is entitled "Representation Clause." An "inverted" representation is, after all, a "representation."

[12] Because Refco was not providing the warranty in the Application as to there being no facts that might give rise to a claim, without the IRE there would have been nothing in the Policy allowing XL to deny coverage to an insured based on that insured's knowledge as of the inception of the Policy of the facts that form the basis for a claim asserted against him.

lied, rather than crossing out question 3(c) as he did.  (*See* Sylwestrzak Decl. Ex. C).

Specifically, question 3(c) of the XL application stated:

> No person or entity(s) proposed for this insurance is cognizant of any fact, circumstance or situation which they have reason to suppose might afford grounds for any claim such as would fall within the scope of the proposed insurance, except as follows.  If answer is "none," so state:

(Sylwestrzak Decl. Ex. C).  The application provided blank lines for purposes of answering the question, and beneath those lines stated that "any claim arising from any claims, facts, circumstances, or situations disclosed or required to be disclosed in response to [Question 3(c)] is excluded from the proposed insurance."  (*Id.*).  If Bennett had falsely written "none" in the space provided, there is little question that, pursuant to the Full Severability Provision, the innocent insureds would be entitled to coverage.  Rather than respond to the question, however, Bennett crossed the question out.  (*Id.*).

As evidenced by the emails XL relies upon, in order to address Bennett's failure to answer this question, Marsh invited XL, if necessary, to substitute an inverted warranty for the warranty that would have been part of the XL policy had Bennett responded to question 3(c).  Marsh clearly did not authorize XL to substitute a broader warranty.  On the contrary, an additional email, not cited by XL, dated August 9, 2005 by Kenny Li of Marsh to Hank Toolan of XL and sent at essentially the same time as the Marsh email cited by XL, demonstrates that Marsh only invited XL to substitute an *equivalent* warranty to the warranty that would have resulted had Bennett answered Question 3(c).  In the email, Mr. Li asks: "[c]an you add an inverted warranty endorsement so that the client does not have to fill out the warranty portion of the application?  kl."  (*Id.* Ex. D).

It simply defies common sense – and the reasonable business expectations of the parties – to hold that by authorizing XL to substitute and equivalent warranty, Marsh consented to the Insureds being placed in a far worse position than if the alleged substitution did not take place.  Instead, the most reasonable interpretation of this warranty-swap scenario is that Marsh agreed that XL could insert an equivalent warranty that would place the Insureds in the exact same position they would have been had the application been properly completed.  *Parks Real Estate Purchasing Group*, 472 F.3d at 42 ("An insurance contract should be read in light of common

16

speech and the reasonable expectations of a businessperson"). At the very least, the emails between Marsh and XL (and the contrary affidavits offered by the parties on summary judgment) create genuine issues of material fact and highlight the need for discovery.

Moreover, XL's interpretation would render the Policy wholly illusory and amount to a rescission of coverage as prohibited by the XL Policy's Rescission Endorsement.[13] Since the XL Policy is at the very top of a D&O "tower" of insurance, the only reasonably foreseeable scenario that could trigger coverage requests under the top tiers of the tower would involve massive fraud-like scenarios like at issue in Refco; in such situations, it is a virtual certainty that, by the very nature of massive corporate frauds, at least one director or officer would have had some relevant knowledge before the policy was issued. Thus, to accept XL's interpretation of the Policy is to permit XL to have received a large premium with virtually no risk that it would ever be required to provide coverage to any insured. Such a result is untenable, and contrary to public policy. *City of New York v. Evanston Ins. Co.,* 39 A.D.3d 153, 156, 830 N.Y.S.2d 299, 302 (2d Dep't 2007) ("[The insurer's] interpretation would indiscriminately exclude coverage in every case in which any person or entity other than the named insured is in any degree at fault for the accident, irrespective of whether the putative additional insured bears any responsibility at all. *Such extremely narrow coverage would be, at best, of minimal value to the reasonable businessperson*"); *Wright v. Evanston Ins. Co.,* 14 A.D.2d 505, 506, 788 N.Y.S.2d 416, 417 (2d Dep't 2005) (rejecting interpretation of policy advanced by insurer as it would render policy illusory, in contravention of public policy of state); *Parks Real Estate Purchasing Group,* 472 F.3d at 45, 48 (finding the term "contamination" ambiguous where, under insurer's construction of the term, the exclusion could "be applied in a limitless variety of situations" and the "all-risk policy would insure against virtually nothing").

Third, as explained in Point I *supra*, at the very least there is a genuine issue of material fact regarding whether the IRE was part of the XL Policy.

---

[13] *See* Sylwestrzak Decl. Ex. B, Endorsement No. 13 ("In consideration of the premium charged, the Insurer shall not be entitled under any circumstance to rescind this Policy, other than for non-payment of premium. All other terms, conditions and limitations of this Policy remain unchanged.").

17

Accordingly, XL has failed to demonstrate that the IRE excludes coverage to the Insureds and its motion should be denied.

### C.    At the Very Least, the Policy is Ambiguous and Presents Material Questions of Fact that Preclude the Entry of Summary Judgment in XL's Favor

Even if XL's interpretation of the Policy were reasonable – which it clearly is not – such an interpretation would simply render the Policy ambiguous. As the court in *Parks Real Estate Purchasing Group* stated:

> An ambiguity exists where the terms of an insurance contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

472 F.3d at 42. Here, to the extent the IRE is considered part of the XL Policy, it simply cannot be reconciled with the severability provisions and other terms of the contract of insurance between XL and the Insureds. Thus, to the extent the IRE is considered part of the policy, discovery is necessary to ascertain, *inter alia*, the parties' intent with respect to the effect of the Severability Provisions and the IRE, as well as the circumstances surrounding Mr. Li's August 9, 2005, e-mails to Mr. Toolan . As emphasized above, discovery in this matter has not yet even commenced. Therefore, consideration of the IRE (and the extrinsic evidence submitted by XL in support of its motion), presents genuine issues of material fact that cannot be resolved without discovery and, thus, preclude summary judgment. *See Axis v. Bennett*, 2008 WL 2485388, *7.[14]

---

[14]   *See also Newin Corp. v. Hartford Accident &Indemnity Co.*, 62 N.Y.2d, 916, 919, 479 N.Y.S.2d 3, 5 (holding that where a clause in the policy was ambiguous, a material question of fact was presented and summary judgment should have been denied); *State of New York v. Home Indemnity Co.*, 66 N.Y.2d 669, 671, 495 N.Y.S.2d 969, 971 (1985) ("If, however, the language in the insurance contract is ambiguous and susceptible of two reasonable interpretations, the parties may submit extrinsic evidence as an aid in construction, and the resolution of the ambiguity is for the trier of fact."); *Parks Real Estate Purchasing Group*, 472 F.3d at 48 (concluding that material questions of fact pertaining to the meaning of an ambiguous term in the policy remained for resolution by the trier of fact); *Superior Ice Rink, Inc. v. Nescon Contracting Corp.*, 2008 NY Slip Op 5679, *3, 2008 WL 2447575 (2d Dep't June 17, 2008) (where "parties' intent depends on the credibility of . . . extrinsic evidence, or a choice among reasonable inferences to be drawn therefrom," then a determination regarding intent is to be made by a jury).

## III.    XL HAS FAILED TO DEMONSTRATE THAT EVERY SINGLE CAUSE OF ACTION ASSERTED IN THE UNDERLYING LITIGATIONS "AROSE FROM" BENNETT'S FRAUD

Over twenty separate suits have been filed against the Insureds and other parties that relate to the demise of Refco. These suits, most of which are pending before this Court, involve such diverse claims as securities fraud, misuse of customer property, breach of fiduciary duties, fraudulent transfers, and preferences. Even assuming that the IRE should be considered part of the XL Policy, XL has failed to demonstrate that the IRE bars coverage for each and every claim asserted in each of the Underlying Matters as a matter of law. In order for the IRE to be triggered, XL must demonstrate, *inter alia*, that the claims asserted against the Insureds in each suit that it seeks an order relieving it of its coverage obligation to the Insureds "arise from" facts or circumstances known by an Insured (*i.e.*, Bennett) prior to the XL Policy's inception. XL bears the burden of demonstrating the "arising from" relationship between each of the claims asserted in the Underlying Matters and Bennett's knowledge.[15]  *See* XL Br. at 12 (citing New York cases interpreting "arising out of").

XL has not met its burden. XL contends – as do Arch and AWAC in their respective motions for summary judgment – that each of the claims in the Underlying Matters arises from facts admitted by Bennett in connection with his criminal conviction. (XL Br. at 21). But rather than rigorously demonstrating causal links between the facts admitted by Bennett in his February 15, 2008 plea allocution ("Bennett's guilty plea") and the claims in each Underlying Matter – as it must do in order to be entitled to summary judgment – XL relies on the conclusory statement that "[m]ost of the Underlying Matters arise directly from the RGHI receivable scheme."[16]  (XL Br. at 21). According to XL, the RGHI receivable scheme to which Bennett

---

[15] *See Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) ("'[T]o 'negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case and that its interpretation of the exclusion is the only construction that [could] be fairly placed thereupon'") (citation omitted); *Westport Ins. Corp v. Hanft & Knight, P.C.*, 523 F.Supp.2d 444, 452 (M.D. Pa. 2007) ("Where an insurer relies upon on a policy exclusion as the basis for its denial of coverage and refusal to defend, the insurer has asserted an affirmative defense and, accordingly, bears the burden of proving such a defense") (citation omitted).

[16] Under Federal Rule of Evidence 803(22), only facts "essential to sustain the judgment" against Bennett are admissible against the Defendants. *See* Fed. R. Evid. 803(22) (2008) ("Evidence of a final judgment, entered after a trial or upon a plea of guilty . . . adjudging a person guilty of a crime punishable by death or imprisonment in excess of one year, *to prove any fact essential to sustain the judgment* . . .") (emphasis added); *see also New York v. Hendrickson Brothers, Inc.*, 840 F.2d 1065, 1081 (2d Cir. 1988) ("A prior judgment of conviction may be used as

pled guilty consisted of: (1) "the RGHI receivable"; (2) "round-trip transactions";
(3) "concealing the RGHI transactions from Refco's investors, lenders, and auditors";
(4) Refco's false financial statements"; and (5) "[t]he transmission of leveraged buyout Proceeds
to insureds." (XL Br. at 17-18). XL's blunderbuss attempt to connect each and every disparate
claim in the numerous Underlying Matters in one fell swoop does not come close to satisfying its
burden of demonstrating that each claim, on a case-by-case, defendant-by-defendant basis "arises
from" the RGHI receivable scheme *as a matter of law.*

By way of example, an examination of the claims asserted in four Underlying Matters
related to the alleged misuse of customer funds at Refco Capital Markets ("RCM") aptly
demonstrates why XL's "everything arises from the RGHI receivable scheme" argument is
plainly insufficient as a matter of law. *See In re Refco Capital Markets, Ltd. Brokerage
Customer Securities Litigation*, 06-643 (S.D.N.Y.) (GEL); *VR Global Partners L.P., et al. v.
Bennett, et al.*, 07-8686 (S.D.N.Y.) (GEL); *Capital Mgmt Select Fund Ltd v. Bennett, et al.*, 07-
8688 (S.D.N.Y.) (GEL); and *Krys v. Sugrue*, 08-3065 and 08-3086 (S.D.N.Y.) (GEL)
(collectively, the "RCM Actions"). (IJX 4, 6, 12 and 16). The claims asserted in the RCM
actions, fairly read, "arise from" a separate fraud from the RGHI receivable fraud – Refco's
alleged improper use of securities on deposit at RCM to finance daily operations, trading losses,
and significant acquisitions (the "RCM fraud").[17] Although the complaints in the RCM actions
do allege that the RCM fraud and RGHI receivable fraud are somehow related, those allegations,
standing alone, cannot satisfy XL's burden to demonstrate one "arises from" the other as a matter
of law.[18] Having failed to demonstrate an "arising from" relationship on a claim-by-claim,
defendant-by-defendant basis, XL's motion simply cannot be granted.

---

prima facie evidence in a subsequent civil suit only with respect to matters of fact or law 'necessarily decided by the
conviction and the verdict on which it was based'") (quoting *Emich Motors Corp. v. General Motors Corp.*, 340
U.S. 558, 569 (1951)). Here, all facts "essential to sustain the judgment" were admitted by Bennett during his guilty
plea. Therefore, any facts relied upon by XL outside Bennett's guilty plea should be deemed inadmissible hearsay.

[17] In fact, the plaintiffs in *In re Refco Capital Markets* explicitly refer to the RCM fraud as "another fraudulent
scheme." *See In re Refco Capital Markets* Compl. at ¶ 72 ("In addition, Bennett, Maggio, and others, were
perpetrating *another fraudulent scheme* (the 'RGHI Scheme') . . .") (emphasis added).

[18] *See, e.g., VR Global Partners* Compl. at ¶ 2 ("This action arises out of two related fraudulent schemes"); *id.* ¶ 30
("In addition to the RCM Securities Scheme to convert customer securities to finance Refco's operations, Bennett,
Grant, Maggio and Trosten . . . perpetrated *another related scheme* to improve falsely the appearance of Refco's

Moreover, none of the facts underlying the RCM fraud are even referenced in Bennett's guilty plea. XL's attempt to expand the scope of Bennett's guilty plea to encompass facts outside those expressly admitted during his plea allocution fails on the facts and as a matter of law. *See Sun-Times Media Group, Inc. v. Royal Sunalliance Ins. Co. of Canada*, 2007 WL 1811265, *11 (Del. Super. June 20, 2007) (holding that an insurer's "attempt to expand the scope of [a former officer's] guilty plea" to exclude coverage for an insured company was not proper because the underlying action included transactions that were not part of the guilty plea). Therefore, XL cannot carry its burden of demonstrating the necessary causal relationship between Bennett's guilty plea and the claims in the RCM actions and, as such, its motion must be denied as to these claims.

As another example, avoidance claims (*i.e.*, fraudulent and/or preferential transfers) (the "avoidance claims") are asserted against certain officers in *Kirschner v. Agoglia, et al.*, Adv. Pro. No. 07-3060 (RDD) ("Kirschner v. Agoglia")(IJX 7) based upon various payments made to them pursuant to allegedly "clandestine" or "secret" arrangements entered into well prior to Refco's August 2004 LBO. (Compl. ¶¶ 7-8, 93-102, 171-77, 217-30, 243-71). During his plea allocution, Bennett said absolutely nothing that addressed the agreements with these officers or the transfers to them, or that addressed the bases for the claims against them (*e.g.*, in the case of the constructive fraud claims, Refco's solvency or the consideration provided by recipients of transfers, and in the case of the actual fraud claims, the alleged intention to defraud creditors through the agreements and transfers in issue).

In sum, XL has absolutely failed to demonstrate that each claim for which it seeks to avoid its coverage obligations to the Insureds "arises from" the facts stated in Bennett's guilty plea. In the absence of a clear and unequivocal demonstration of the "arising from" requirement

---

financial condition (the 'RGHI Scheme')"); *id.* ¶ 200 ("Further, many Refco affiliates lacked the ability to repay the Intercompany Loans to RCM as a result of the RGHI Scheme"); *In re Refco Capital Markets* Compl. at ¶¶ 72-73 (the "RGHI Scheme" was operated "at times using the proceeds from converted customer securities in furtherance of the scheme"; "[a]s part of the RTL's, RCM would make loans, sometimes in cash, to third parties" which "were funded by the proceeds of the conversion of RCM's customers' securities"); Sphinx Compl. ¶ 8 ("Bennett diverted customer assets held at RCM, including [Sphinx Managed Futures Fund SPC's] cash to fund a series of "round-trip loan" transactions . . .").

as to each claim, XL is not entitled to judgment as a matter of law.  As such, its motion must be denied.

## CONCLUSION

For the foregoing reasons, XL Specialty Insurance Company's motion for summary judgment should be denied in its entirety.

Dated: New York, New York
      August 8, 2008


  /s/ Helen B. Kim
HELEN B. KIM (HK-8757)
KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90027
Telephone: (310) 788-4525
Facsimile: (310) 788-4471
      -and-
PHILIP A. NEMECEK (PN-3319)
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY  10022-2585
Telephone:    (212) 940-8834
Facsimile:    (212) 940-8776
*Attorneys for Defendant and Counterclaim Plaintiff*
*Dennis A. Klejna*


  /s/ Michael F. Walsh
GREG A. DANILOW (GD-1621)
MICHAEL F. WALSH  (MW-8000)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY  10153-0119
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
*Attorneys for Defendants and Counterclaim Plaintiffs*
*Leo R. Breitman, Nathan Gantcher, David V.*
*Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L.*
*O'Kelley, and Scott A. Schoen*


  /s/ Claire P. Gutekunst
CLAIRE P. GUTEKUNST (CG-0117)
JESSICA MASTROGIOVANNI
PROSKAUER ROSE LLP
1585 Broadway
New York, New York 10036-8299
Telephone: (212) 969-3000
Facsimile:  (212) 969-2900

*Attorneys for Defendant and Counterclaim Plaintiff*
*Richard N. Outridge*


/s/ Harvey Fishbein
HARVEY FISHBEIN (HF-1219)
61 Broadway, Suite 1601
New York, New York 10006
Telephone: (212) 233-9555
Facsimile: (212) 267-3024

*Attorneys for Defendant and Counterclaim Plaintiff*
*Joseph Murphy*


/s/ Richard Cashman
RICHARD CASHMAN (RC-4769)
HELLER EHRMAN LLP
Times Square Tower
7 Times Square
New York, NY 10036-6524
Telephone:  (212) 832-8300
Facsimile:  (212) 763-7600
*Attorneys for Defendant and Counterclaim Plaintiff Philip*
*Silverman*


/s/ Ivan Kline
STUART I. FRIEDMAN (SF-9186)
IVAN KLINE (IK-9591)
FRIEDMAN & WITTENSTEIN
A Professional Corporation
600 Lexington Avenue
New York, NY  10022
Telephone:  (212) 750-8700
Facsimile:  (212) 223-8391
*Attorneys for Defendants and Counterclaim Plaintiffs*
*William M. Sexton and Gerald M. Sherer*

/s/ William Fleming
WILLIAM FLEMING (WF-0411)
GAGE SPENCER & FLEMING, LLP
410 Park Avenue, 9th Floor
New York, New York 10022
Telephone: (212) 768-4900
Facsimile: (212) 768-3629

*Attorneys for Defendants and Counterclaim Plaintiffs*
*John D. Agoglia and Peter McCarthy*